# Exhibit A

December 14, 2015

**VIA ECF**

The Honorable Rodney Gilstrap
Sam B. Hall, Jr. Federal Building and
United States Courthouse
100 East Houston Street
Marshall, Texas 75670

Re:    ***Personalized Media Communications, LLC v. Apple Inc.***
       **Case No. 2:15-cv-01366-JRG-RSP**

Dear Judge Gilstrap:

Plaintiff Personalized Media Communications, LLC and Defendant Apple Inc. submit this joint
letter pursuant to the Court's Standing Order Regarding Motions Under 35 U.S.C. § 101.

## I.    PMC: Claim Construction Is Necessary To Inform the Court's § 101 Analysis

PMC accuses Apple of infringing thirty-one claims from four PMC patents (U.S. Patents Nos.
8,191,091, 8,559,635, 7,752,649, and 8,752,088).  Apple has moved to dismiss PMC's complaint
arguing that PMC's claims are drawn to unpatentable subject matter.  Apple contends on that
basis that PMC's patents are invalid under  35 U.S.C. § 101.  PMC respectfully submits that
there are twenty-seven terms within the thirty-one asserted claims that require construction prior
to resolution of Apple's motion to dismiss.

Apple contends that the asserted claims of PMC's '091 and '635 Patents "are directed to the
abstract idea of converting information from one format to another (*i.e.*, decrypting
information)."  D.I. 34 at 16-17.  Apple's definition of "decrypting" is unreasonably broad.  The
claimed inventions are directed to methods that are far more specific than merely "converting
information from one format to another."  The inventions are directed to management of
"decryption keys" and their distribution in a digital network to control access to, and
"decryption" of, "encrypted" digital content delivered over the network.  '091 Pat., 1:25-28.
Based on the dispute between the parties concerning the definition of "decrypting," construction
is needed of '091 and '635 Patent claim terms including "encrypted digital information
transmission," "decrypting," "decryption key," "to decrypt in a specific fashion on the basis of
said code," and "control signal," among others.[1]

The layered signal decryption technology claimed the '091 and '635 Patents – which allows

---

[1] Other terms that require construction for the '635 and '091 Patents are:  instruct-to-enable
signal, programming, processor instructions, tuning said receiver station to a channel, remote
source, enabling information, encryption, remote transmitter station, unaccompanied by any non-
digital information transmission and downloadable code.  Other terms that require construction
for the '649 Patent claims are:  stored function invoking data, digital television signals, control
processor and digital video signals.

encrypted content to be transmitted along with encrypted digital control signals and requires decryption of the digital control signals first in order to unlock the encrypted content – was initially conceived to inhibit piracy of digital TV content delivered in cable, satellite and other networked systems. '091 Pat., 2:45-48. At that time, the secure delivery of programming content along with related control signals to control or enable specific signal processing operations at remote receiver stations was a technological challenge particular to a distributed computing environment in networked systems.

The solutions developed to address key management and digital content delivery are technical, concrete, and rooted in the same emergent technology as the problem that inspired them and required new hardware implementations. They "include techniques whereby the pattern of the composition, timing and location of embedded signals may vary in such fashions that only receiving apparatuses that are preinformed regarding the patterns that obtain at any given time will be able to process the signals correctly." '091 Pat., 7:40-49. For example, in one embodiment, a signal processor 26 detects digital signals found in a television, radio and/or other transmission from remote content providers, decrypts encrypted digital signals, assembles detected digital signals into message units, and sends those messages to other devices, or stores them for later transmission to remote sites. The signal processor is capable of detecting digital signals that are varying in their location, timing and/or composition in the received digital transmission. '635 Pat., 15:13-18:29. In embodiments described in the specification, a program is delivered as a digital television signal that includes digital "control signals" and digital "instruct-to-enable" signals such as "decryption keys" placed in the encrypted digital content transmission. '635 Pat., 143:55-161:21, FIG. 4.

The claims of the '649 Patent cover technological solutions that are considerably more specific than merely "the abstract idea of deciding which television program to display." D.I. 34 at 2. They are directed to *how* to distribute digital television programming and control information so as to control the processing of the content at receiver stations. Terms that require construction to understand the scope of the claims include "message stream," "control information," "register memory," and "cadence information."

The '649 Patent claims describe the transmission of "digital television signals" along with "message streams" or other "control information" that control the processing and output of digital television content to users. "In the present invention, particular signal processing apparatus ('signal processor') detect signals and, in accordance with instructions in the signals and preprogramming in the signal processor, decrypt and/or record and/or control station apparatus by means of the signals…" '649 Pat., 8:35-39. "The scanners/switches, working in parallel or series or combinations, transfer the transmission to receiver/decoder/detectors that identify signals encoded in programming transmissions and convert the encoded signals to digital information; decryptors that may convert the received information, in part or in whole, to other digital information according to preset methods or patterns; and one or more processor/monitors and/or buffer comparators that organize and transfer the information stream." *Id*., 8:47-5l; 144:31-160:54 (describes *how* a "message stream" controls received states in a network). Like the claims of the '635 and '091 Patents, this patent is directed to a problem rooted in emergent technology in the area of digital video distribution in networked systems.

Claim 14 of the '088 Patent is not merely directed to the abstract idea of "monitoring how

information is used." D.I. 34 at 2. Rather, it is directed to how to process and route signals within a receiver station in a network, including monitoring how those signals are routed and used. '088 Pat., 2:32-39. Terms that require construction to determine the scope of claim 14 include "multimedia receiving apparatus," "input ports," "output ports," and "multimedia signals." The problem of monitoring signal usage is a particularly acute one in computer networks with distributed processing and receiver stations that may be located across the country. The specification discloses in detail how "multimedia receiving apparatuses" may be controlled in their routing of signals from a specific input port to specific output ports. *See, e.g.*, '088 Pat., FIG. 3A (switch 39A), FIG. 7 (switch 259; 16:55-63 (providing detailed description).

Thus, the claims of the patents-in-suit describe particular methods and apparatus that represent specific solutions to vexing technological problems. What the additional features include must be determined during claim construction. Further, the claims of the '635 and '088 Patents derive priority to November 1981, while the claims of the '649 and '091 Patents claim priority to September 1987. These dates are critical to both claim construction and the Section 101 analysis because the questions of the state of the art, the technological environment in which the claimed inventions operate, and the conventionality of the claimed technology must be viewed within the proper context. Here, without an opportunity to fully examine how a person of ordinary skill in the art would interpret the claims at the relevant points in time, and given the parties' disagreements, it would be improper to simply adopt Defendant's characterization of the claims. *See Advanced Marketing Sys., LLC v. CVS Pharmacy*, Slip op., Case No. 6:15-cv-134 (E.D. Tex. Nov. 18, 2015). PMC requests that the Court defer decision on Defendant's motion until the completion of claim construction pursuant to E.D. Tex. LPR 1-2.

## II.   Apple's Position

Apple respectfully submits that, contrary to PMC's position, this Court need not engage in claim construction, let alone construction of 27 terms, to rule on the § 101 issues. The long history of litigation surrounding the family of PMC patents confirms that the § 101 issues are independent, and can be decided without resolution, of any claim construction questions. Moreover, as an independent basis of dismissal, Apple's motion seeks to dismiss the '635 and '091 patent counts brought by PMC based on collateral estoppel, *i.e.*, issue preclusion. Dkt. 34 at 1-16. No aspect of collateral estoppel depends on claim construction, and thus Apple respectfully submits that the Court fully consider its motion to dismiss without delay.

Other than its list of 27 terms, PMC has refused to provide any explanation to Apple as to why construction of these terms is necessary to evaluate § 101 issues. Apple has thus been forced to prepare its "response" without knowing the basis for PMC's position, and Apple has difficulty conceiving what that basis might be. Indeed, PMC's prior cases and conduct are inconsistent with its present position regarding the need for extensive claim construction. When PMC was previously faced with the same claim construction question earlier this year in Delaware – where seven related PMC patents were at issue, as opposed to four related PMC patents here – PMC identified just eight terms that allegedly required construction for the § 101 analysis. *See* Dkt. 34-4 at 2-3 (Ex. 2 to Apple's motion to dismiss) (*PMC v. Amazon*, No. 1:13-cv-1608-RGA, Dkt. 120 (D. Del. Mar. 20, 2015)). The Delaware court considered PMC's position and determined the claims asserted against Amazon were patent-ineligible under § 101 (including invalidating virtually identical claims to those asserted against Apple) without finding

it necessary to construe *any* terms. Likewise, in this case, as further explained below, construing the terms identified by PMC would have no conceivable impact on the § 101 analysis.

Tellingly, several terms identified by PMC have previously been construed by this court, and the analysis and constructions show that claim construction of these terms has no bearing on the § 101 issues. For example, this court previously construed "decrypt" as "decoding data using a key," which does not present a § 101 issue. *PMC v. Motorola et al.*, No. 2:08-cv-70, Dkt. 271 at 49-54 (E.D. Tex. Sept. 30, 2011). Even PMC's proposed construction in Delaware of "decrypting" for § 101 purposes, which asserted that decryption uses "mathematical operations" on data, is a prime example of an abstract concept that the Supreme Court and Federal Circuit have explained is not patent eligible in *Alice* and *Digitech*. Dkt. 34-4 at 2 (*PMC v. Amazon*, No. 1:13-cv-1608-RGA, Dkt. 120). PMC's own patent specification further confirms that decryption – under any construction – cannot provide an inventive concept under § 101, as PMC characterized decryptors as "standard," "conventional," and "well known in the art." '635 patent, 16:40-45 ("Decryptor, 10, is a standard digital information decryptor, well known in the art"), 148:11-16 ("Decryptors, 107, 224 and 231, are conventional decryptors, well known in the art"). PMC's list of 27 terms includes several other encryption/decryption-related terms (*e.g.*, "decryption key," "encrypted/encryption," "encrypted digital information transmission," and "to decrypt in a specific fashion on the basis of said code"), all of which similarly would have no impact on the § 101 analysis.

Likewise, this court previously construed the term "programming," and separately determined that "control signal" (both on PMC's list) requires no construction. *PMC v. Zynga*, No. 2:12-cv-68-JRG-RSP, Dkt. 150 at 23, 26 (E.D. Tex. Aug. 28, 2013). Nothing about the constructions of these terms (or lack thereof) would impact the § 101 analysis. Indeed, this court has construed various terms closely related to terms on PMC's list (*e.g.*, "processor," "instruct signals," "remote data source," "remote video source," "remote station"), and in each instance the construction has no perceivable impact on the § 101 analysis. *Id*. at 14-29.

Several terms on PMC's list relate to data items, such as various types of (i) "signals" (*e.g.*, "instruct-to-enable signal," "control signal," "digital television signals," "digital video signals," "multimedia signals"), (ii) "information" (*e.g.*, "enabling information," "control information," "cadence information"), and (iii) other data (*e.g.*, "programming," "processing instructions," "downloadable code," "message stream," "stored function invoking data"). PMC further lists several generic components (*e.g.*, "remote source," "remote transmitter station," "multimedia receiving apparatus," "control processor," "register memory," "input ports," "output port"). Regardless of the precise construction of these terms, to the extent they need to be construed at all, PMC has not shown how any of these constructions change the § 101 calculus.

Further undermining PMC's position, several terms on PMC's list are terms that were recited in PMC's asserted claims in Delaware, yet when previously invited to identify terms that require construction for the § 101 analysis, PMC excluded these terms. For example, PMC did not previously identify the following terms now on its list: "processor instructions" (recited in asserted claim 9 of the '587 patent in Delaware), "enabling information" (recited in asserted claim 22 of the '304 patent in Delaware), "remote source" (recited in asserted claim 22 of the '304 patent and asserted claim 13 of the '243 patent in Delaware), and "encrypted/encryption" (recited in asserted claims 1, 22, and 23 of the '304 patent and asserted claims 18 and 49 of the

'749 patent in Delaware).  *See PMC v. Amazon*, No. 1:13-cv-1608-RGA, Dkt. 92.  Similarly, slight variations of several terms now on PMC's list were recited in the asserted claims in Delaware, but not previously raised by PMC as requiring construction, including "code" (recited in asserted claims 2 and 18 of the '749 patent), "transmitter station" (recited in nine asserted claims in Delaware), "memory" (recited in 12 asserted claims in Delaware), and "processor" (recited in 10 asserted claims in Delaware).  *Id.*

PMC's attempt to use claim construction as a means for delaying ruling on the § 101 issues in Apple's motion to dismiss should be rejected.  The circumstances of this case show that claim construction would not impact the § 101 analysis, and thus it is appropriate for the court to make a determination of patent eligibility at the pleading stage without delay.  *See, e.g., eDekka LLC v. 3Balls.com, Inc.*, No. 2:15-cv-541-JRG, Dkt. 100 at 4 (E.D. Tex. Sept. 21, 2015) ("In certain circumstances, claim construction is not a pre-requisite to a § 101 determination."); *Clear With Computers, LLC v. Altec Indus., Inc.*, No. 6:14-cv-79-JRG, Dkt. 59 at 6 (E.D. Tex. Mar. 3, 2015) (noting the Court previously construed claims from patents in the same family numerous times).  Apple's independent collateral estoppel ground for dismissal further supports that claim construction is unnecessary at this stage.