```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                         MARSHALL DIVISION

 4   PERSONALIZED MEDIA              )(

 5   COMMUNICATIONS, LLC             )(    CIVIL DOCKET NO.

 6                                   )(    2:15-CV-1366-JRG-RSP

 7   VS.                            )(    MARSHALL, TEXAS

 8                                   )(

 9   APPLE, INC.                     )(    JUNE 28, 2016

10                                   )(    9:05 A.M.

11                    CLAIM CONSTRUCTION HEARING

12             BEFORE THE HONORABLE JUDGE ROY S. PAYNE

13                 UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:  (See Attorney Attendance Sheet docketed in
                          minutes of this hearing.)
17

18   FOR THE DEFENDANT:  (See Attorney Attendance Sheet docketed in
                          minutes of this hearing.)
19

20   COURT REPORTER:     Shelly Holmes, CSR-TCRR
                         Official Reporter
21                       United States District Court
                         Eastern District of Texas
22                       Marshall Division
                         100 E. Houston Street
23                       Marshall, Texas  75670
                         (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

1                              I N D E X

2

3    June 28, 2016

4                                                        Page

5        Appearances                              1

6        Hearing                                  3

7        Court Reporter's Certificate           121

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    LAW CLERK:  All rise.

2                    THE COURT:  Good morning.  Please be seated.

3              For the record, we're here for the claim construction

4    hearing in Personalized Media Communications versus Apple,

5    et al., which is consolidated under Case No. 2:15-1366.

6                    Would counsel state their appearances for the record?

7                    MR. CAPSHAW:  Your Honor, Calvin Capshaw for PMC, and

8    I'll identify the people who will be speaking to the Court

9    today.  Mr. Doug Kline from Goodwin Proctor.

10                   MR. KLINE:  Good morning.

11                   THE COURT:  Good morning.

12                   MR. CAPSHAW:  Ms. Jennifer Albert --

13                   MS. ALBERT:  Good morning, Your Honor.

14                   MR. CAPSHAW:  -- Goodwin Proctor.

15                   THE COURT:  Good morning.

16                   MR. CAPSHAW:  Ms. Lana Shiferman, Goodwin Proctor.

17                   MS. SHIFERMAN:  Good morning, Your Honor.

18                   THE COURT:  Morning.

19                   MR. CAPSHAW:  Joe Grinstein from Susman Godfrey.

20                   MR. GRINSTEIN:  Morning.

21                   THE COURT:  Good morning.

22                   MR. CAPSHAW:  Ming Xi from Susman Godfrey.

23                   MS. XI:  Good morning.

24                   MR. CAPSHAW:  I think that's all, Your Honor.

25                   THE COURT:  Thank you, Mr. Capshaw.

1           MR. GARDNER:  Good morning, Your Honor.  Allen Gardner

2    here for Apple.  Sir, with me today is Mr. Marc Sernel --

3           MR. SERNEL:  Good morning, Your Honor.

4           THE COURT:  Good morning.

5           MR. GARDNER:  Joel Merkin.

6           MR. MERKIN:  Morning.

7           MR. GARDNER:  And Archit Shah.

8           MR. SHAH:  Good morning, Your Honor.

9           MR. GARDNER:  And, sir, we are ready to proceed.

10          THE COURT:  All right.  Thank you, Mr. Gardner.

11          MR. EVERINGHAM:  Good morning, Your Honor.  Chad

12   Everingham here on behalf of Vizio, TPV, and Hon Hai.  I'm here

13   with Kevin McBride, who will be addressing the Court on the

14   claim construction issues.

15          MR. MCBRIDE:  Good morning.

16          MR. EVERINGHAM:  We also have Romeao Jennings and

17   Steve Zager here also from Akin Gump.  And our client

18   representative, Mr. Avi Schwartz is here, as, well, from Vizio.

19          THE COURT:  All right.

20          MR. EVERINGHAM:  We're ready.

21          THE COURT:  Thank you, Mr. Everingham.

22          All right.  Let me also just state for the record that

23   earlier this morning, we distributed to counsel a set of

24   preliminary constructions of most of the terms.

25          The purpose of issuing those is not to dissuade the

```
 1   parties from taking whatever positions they feel are
 2   appropriate during this hearing but rather to let counsel know
 3   where the Court is after the initial review of the briefs and
 4   the record and to allow you to focus your time and attention
 5   where you believe the Court may have most gone astray.
 6        I do reserve the right to and not uncommonly do amend
 7   these constructions based upon the arguments at the hearing.
 8   So I hope that you'll take them in that spirit.
 9        As I'm sure you know, I would like to hear the
10   arguments on a term-by-term basis, but I'm quite willing to
11   have you take them in whatever order counsel think is most
12   efficient and group them, if you think that would be helpful.
13        So having said that, I'll turn it over to counsel for
14   Plaintiff.
15        MR. KLINE:  Thank you, Your Honor.
16        Consistent with the -- the helpful guidance you just
17   offered, we're going to start and go right to the first term
18   from the proposed order, which the Court characterized as the
19   decrypting or decryption terms, the decryption key term, and
20   the encrypted term.
21        And we're going to go first, Your Honor, and then I
22   think that we largely are going to go term-by-term, but from
23   time to time, I think counsel for Apple is likely to -- to lead
24   off the presentation, but in this case, PMC is going to lead
25   off the presentation.
```

1          THE COURT:  All right, Mr. Kline.

2          MR. KLINE:  So if we could turn directly, please, to

3    Slide 3.

4          So, Your Honor, as we said, we have decrypting,

5    decryption, we have encrypted, decryption key, and then

6    encrypted digital information transmission, although we don't

7    plan to spend any time arguing about encrypted digital

8    information transmission, and we will rest on our briefs on

9    that term.

10         I think that Apple is taking the same position there.

11         So focusing on the first three terms here.

12         Breaking them down, Your Honor, the first term,

13   "encrypted."  As you know, PMC's proposed construction was a

14   method that uses a digital key in conjunction with an

15   associated algorithm to decipher -- that is, render

16   intelligible or usable -- digital data.

17         Apple had proposed deciphering, rendering intelligible

18   or usable, data using a key.  The dispute between the parties,

19   Your Honor, has been whether decryption is an entirely digital

20   process conducted on entirely digital data.

21         As Your Honor is well aware, this is a large portfolio

22   of patents that all claim priority to two original

23   applications, one filed in 1981, the second filed in 1987 as a

24   continuation-in-part application.  The four patents in this

25   law -- lawsuit all claim priority to one or both of those

1  applications.

2       And this issue, whether encryption is a digital

3  process, has been presented to a number of tribunals over the

4  years that have seen other patents in this -- in this family.

5       And as Your Honor, I'm sure, is well aware from the

6  briefing, each side has prior decisions that it can point to to

7  say that other Courts have agreed with us.  PMC pointed out

8  places where the Board of Patent Appeals and Interferences and

9  other tribunals have agreed that encryption is an entirely

10  digital process, and Apple has pointed to decisions where

11  courts have not agreed that encryption is an entirely digital

12  processed.

13       So rather than count noses, Your Honor, of prior

14  decisions, it probably makes sense to look at some of the

15  primary source material and make a decision about what's

16  appropriate, independent of what prior Courts have done.

17       Decryption key, Your Honor, is digital data used by a

18  device or method in conjunction with an associated algorithm to

19  decipher encrypted digital information.  Again, the dispute is

20  clear.  Apple's proposal is simply that it's a key used for

21  deciphering, that is, rendering intelligible or use -- or

22  useable data.

23       I would point out, Your Honor, that nowhere does

24  either patent specification talk about decrypting analog data.

25  Every time the '81 specification or the '87 specification talks

1    about deciphering, if you will, digital data, it always talks

2    about that in the context of decrypting.

3         There is an example in the patent specification where

4    the -- the processes are compared and contrasted.  Each side

5    has its view on what that paragraph in the specification means.

6         If we look at every other place in the specification,

7    though, Your Honor, it's quite clear that the inventors

8    consistently described decryption as a process that operates on

9    digital data.  For example, in the '490 patent, Column 4 at

10   Lines 65 to 67, decryptors are described that may convert the

11   received information in part or in whole to other digital

12   information, according to preset methods or patents -- or

13   patterns.

14        At the '091 patent, Column 73, Lines 31 to 37, there

15   is an example described, Example No. 2, that explains before

16   the message is embedded at the program originating studio and

17   transmitted, the execution segment of the command and all of

18   the meter-monitor segment, except for the length-token, are

19   encrypted using standard encryption techniques well known in

20   the art that encrypt binary information.

21        Again, Your Honor, at the '91 (sic) patent, Column

22   148, around Lines 51 to 57, there's a reference to an Example 4

23   before the Wall Street message.  Embedded at the Wall Street

24   Week program originating studio and transmitted, all

25   information of the execution segment, the meter-monitor

```
1   segment, and the program instruction set in the information

2   segment are encrypted, standard -- right, thank you -- standard

3   encryption techniques that encrypt binary information.  Every

4   single time the patent specifications talk about encryption,

5   they refer to binary information.

6          We have Example 7, Your Honor, from the '091 patent.

7   The digital video information is doubly encrypted.

8          And here's an important part of the specification,

9   Your Honor -- it doesn't get much attention in the Defendants'

10  brief at all -- where the inventors clearly distinguished

11  digital encryption or decryption from analog scrambling and

12  descrambling.  At the beginning of this section from the '091

13  patent, Your Honor, Columns 143, around Lines 20 to 30, various

14  scrambling means are well known in the art for scrambling,

15  usually the video portion of analog television transmissions,

16  in such a fashion that only subscriber stations with

17  appropriate descrambling means have capacity to tune suitably

18  to the television transmissions and display the transmitted

19  television image information.

20         So the first sentence here, Your Honor, talks about

21  scrambling and descrambling analog signals.

22         In contrast, the inventors went on to describe that

23  encryption/decryption means and methods are well known in the

24  art that can regulate the reception and use of, for example,

25  digital video and audio television transmissions, digital audio
```

 1    radio and phonograph transmissions, digital broadcast print

 2    transmission, and digital data communications.

 3              THE COURT:  Now, Mr. Kline, those are clearly just

 4    exemplary discussions.

 5              MR. KLINE:  That's right, Your Honor.

 6              THE COURT:  You -- you've made reference to but not

 7    really discussed the passage that appears to go the other way

 8    from -- from Column 159 that was talked about in the briefs,

 9    and maybe that's what you're --

10              MR. KLINE:  I've got that up now, Your Honor.

11              THE COURT:  -- moving to now.

12              MR. KLINE:  Right.

13              THE COURT:  All right.

14              MR. KLINE:  Now, here is an example.  There are

15    several examples described.  The first, there's an example

16    where the decryption cipher key information may be computed in

17    other more complex fashions.

18              There's a second example from the middle of the

19    paragraph.  It says:  And, for example, the transmitted program

20    may be processed through fewer than three steps of decryption.

21    And then I think the language Your Honor is referring to, yet

22    another variation of the invention it describes, and, for

23    example, the Wall Street Week transmission may be of

24    conventional analog television.  And the decryptors, 107, 224,

25    and 231, may be conventional descramblers well known in the art

1    that descramble analog television transmissions.

2          The inventors explained that in the case of an analog

3    television transmission, you can use descramblers.  They never

4    say you can use decryptors for analog television, and they

5    never say you can use descrambling for digital television.

6    They say when you have analog television, you can use a

7    descrambler.

8          THE COURT:  But doesn't that passage clearly indicate

9    that the decryptors can include analog descramblers?

10          MR. KLINE:  It doesn't say, Your Honor, that the

11    decryptors can include analog descramblers --

12          THE COURT:  It says that they may be them.

13          MR. KLINE:  When it is analog television that you're

14    dealing with.  It never says that you can use a decryptor on

15    digital television.  It says if you're using analog television,

16    you can use a descrambler.

17          And this issue got a lot of attention during

18    prosecution, Your Honor, that I think is relevant.

19          THE COURT:  All right.

20          MR. KLINE:  As I mentioned, there are tribunals that

21    have heard this before.  The Board of Patent Appeals and

22    Interferences in -- in a matter of the '825 patent, which is an

23    ancestor of the patents-in-suit, Your Honor, in the same family

24    was presented with that issue.

25          The issue was whether the terms "encryption" and

 1    "decryption" are broad enough to read on scrambling and

 2    descrambling.  And the Board of Patent Appeals and

 3    Interferences concluded that we conclude that encryption and

 4    decryption are not broad enough to read on scrambling and

 5    descrambling.

 6         And how do they reach that conclusion, Your Honor?

 7    For a variety of reasons, including that there was a disclaimer

 8    during prosecution.

 9         If we look at the '825 patent re-examination appeal

10    brief, Your Honor, and I have to actually -- I have to

11    apologize, Your Honor.  I have to hand up copies of this.  I

12    don't have an exhibit cite from the briefs, but I have multiple

13    copies.

14         THE COURT:  All right.

15         MR. KLINE:  Both for opposing counsel and for the

16    Court.  I have to apologize, Your Honor.  I have copies of the

17    binders for the Court.

18         THE COURT:  All right.

19         MR. KLINE:  So, Your Honor, turning to Slide 14 --

20    and, again, this comes from the appeal brief filed by PMC

21    during re-examination of the '825 patent, which is a parent to

22    the patents in the lawsuit.

23         The question was whether a reference the --

24    Aminetzah -- Aminetzah reference -- whether the Aminetzah

25    reference anticipated or rendered obvious certain claims that

1    were then pending, and PMC explained to the Patent Office in

2    that appeal brief that decrypting of encrypted signals recited

3    in Claim 15 of that patent relates to digital signals.  The

4    Aminetzah reference discussing scrambling/unscrambling system

5    does not disclose or suggest the additional step recited at

6    Claim 15.

7            Scrambling and encryption are different terms in the

8    art.  In particular, encryption relates to digital signals.  In

9    fact, the claim constructions in the Harmon report and the

10   Peterson report both reflect the ordinary understanding in the

11   art that decryption pertains to digital signals, which is

12   different from descrambling which pertains to analog signals.

13   This is from an appeal brief filed in this family of patents,

14   Your Honor, nearly 10 years ago now by PMC.

15           Similarly, Your Honor, a related patent in the family,

16   the '277 patent -- and, again, I'm going to have to hand copies

17   of this.

18           THE COURT:  And while you're doing that, tell me, does

19   this patent that we're discussing now claim priority to the

20   1981 or 1987?

21           MR. KLINE:  Yes, to '81, Your Honor.  The patent --

22   the terms in suit -- the patents-in-suit that include these

23   terms claim priority to the '81 application.

24           THE COURT:  And that's the '635 and '088?

25           MR. KLINE:  I believe so.  '091, Your Honor.

1          THE COURT:  You're saying the '091 claims priority to

2    the -- to 1981?

3          MR. KLINE:  Yes, Your Honor.

4          THE COURT:  Okay.  And what about the '649, the same

5    thing?

6          MR. KLINE:  It doesn't include this term -- and '649

7    is '87 priority.

8          THE COURT:  All right.

9          MR. KLINE:  At Slide 15, Your Honor, again, one of the

10   parents to the patents-in-suit, the '277 patent, was submitted

11   to re-examination, again, back November of 2008.  In its reply

12   brief, PMC explained to the Patent Office about the exact same

13   specification that one of ordinary skill in the art would

14   understand that a decryptor -- that it decrypts signals as

15   interpreted in light of the specification does not include

16   analog scrambling and descrambling.

17          Here, the inventor expressly distinguished his use of

18   the terminology encryption/decryption from the

19   scrambling/descrambling shown in the reference that was at

20   issue at the time, Your Honor.

21          PMC explained that, in essence, the inventor expressly

22   advised the reader that by the terms "encryption" and

23   "decryption," he meant something beyond the conventional

24   scrambling/descrambling relied upon by the examiner.  This was

25   a statement that PMC made to the Patent Office in connection

1    with re-examination of a parent application to the

2    patents-in-suit eight years ago, Your Honor.

3            So it was examples like this upon which the Board of

4    Patent Appeals and Interferences found that PMC had disclaimed

5    any right to claim that encryption might cover scrambling or

6    descrambling.

7            And I think finally, Your Honor, we have the

8    patent-in-suit -- one of the patents-in-suit itself.  I have to

9    hand this up, as well, the '635 patent prosecution history, one

10   of the patents-in-suit, Your Honor, from an amendment and

11   request for consideration that PMC filed April 2nd, 2013.  PMC

12   explained to the Patent Office that applicants note that

13   encryption is not disclosed anywhere in the specification of

14   the reference that was at issue.

15           The reference, Davidson, describes scrambling video

16   signals and converting analog audio signals to coded digital

17   audio signals but does not teach or suggest encryption.

18           Next quote, Your Honor, they went on to say that

19   applicants have consistently asserted in their previous

20   responses at the Board of Patent Appeals and Interferences that

21   the encryption and decryption require a digital signal.  PMC

22   explained that the board considered the very same specification

23   in finding that encryption and decryption are limited to

24   digital applications.  The board also held that encryption and

25   decryption are not broad enough to read on scrambling and

1    descrambling.

2         So, Your Honor, what we have is two patent

3    specifications that always talk about encryption with respect

4    to digital information.  They never talk about descrambling

5    digital information.

6         There is one example in the specification that it says

7    when the Wall Street Week program is broadcast in analog

8    television, then descramblers can be used, but it does not --

9    and it makes the point, you can't use encryptors for that.  You

10   use descramblers for that.

11        If there was any reasonable way to interpret the

12   specifications themselves either way, that was resolved by the

13   further prosecution history, Your Honor.  We've seen statements

14   made in 2007 by PMC to the Patent Office in connection with

15   re-examination.  We've seen statements made in 2008 that PMC

16   made to the Patent Office in 2008.  We've seen a statement that

17   PMC made during prosecution of one of the patents-in-suit three

18   years ago, Your Honor, April 2nd of 2013, where PMC expressly

19   stated to the Patent Office that encryption and decryption are

20   not broad enough to read on scrambling and unscrambling.

21        If these patents on their face on the day they were

22   filed could have been construed to cover scrambling and

23   descrambling when they used the terms "encryption" and

24   "decryption" -- and we submit that they should not have been

25   construed that way -- but to any extent they could have been

1   construed that way on the day they were filed, that coverage

2   was disavowed, Your Honor, by the statements that we've

3   identified through the presentation and that tribunals such as

4   the Board of Patent Appeals and Interference relied upon in

5   finding that disavowal.

6          So the Court, with all due respect, Your Honor, should

7   reconsider the proposed construction, take a look at PMC's

8   proposed construction, and decryption or decrypting or

9   decryption and decryption keys, Your Honor, those are digital

10  activities that take place on digital data.

11         I'm happy to answer any questions Your Honor may have,

12  but I'm sure my friend for Apple has his own perspective.

13         THE COURT:  No.  The information you provided on the

14  prosecution history was helpful.  And I'll consider it in

15  connection with your arguments, Mr. Kline.

16         MR. KLINE:  Very good.  Thank you, Your Honor.

17         MR. SERNEL:  Your Honor, may I approach with the

18  slides?

19         THE COURT:  Yes.

20         MR. SERNEL:  May I proceed?

21         THE COURT:  Yes, go ahead, Mr. Sernel.

22         MR. SERNEL:  Good morning, Your Honor.  Marcus Sernel

23  on behalf of Apple.

24         And dealing with the decrypting and decryption and

25  encrypted terms first, I'll get to decryption key in a minute

1    separately.

2          As Mr. Kline indicated, the dispute here is about

3    whether this fully digital concept should be read into the

4    claims through the requirement for digital keys and digital

5    data.

6          We are comfortable with your proposed construction for

7    decrypting and decryption.

8          I might suggest on decryption key an alternative

9    approach.

10         And then for encrypted, I think the concept of a

11   digital key leaked into there, and so I'd -- I'd like to

12   discuss that.

13         Your Honor hit on the -- the key point in the

14   specification that we think makes crystal clear that

15   descriptors may be conventional descramblers, making clear that

16   this is not a fully digital process.  It is not limited to only

17   digital encryption/decryption techniques, that these scrambling

18   analog television transmissions is included within this.  I

19   don't know how they could be clearer here in -- in making that

20   point in the specification.

21         In the intrinsic evidence, there's a lot of patents

22   cited on the face of the -- the asserted patents.  These are

23   three examples.  There are more examples where these came from,

24   but that's intrinsic evidence as part of the record.  And you

25   can see here in patents from the time frame we're talking

1    about, these patents using the terms "encrypted," "scrambling,"

2    "unscrambling," "analog" interchangeably.  And so clearly at

3    the time in -- in the '80s that we're talking about, these

4    terms -- it -- it wasn't a clear concept as Mr. Kline suggests

5    that encrypted/decrypted is strictly digital.  Clearly, those

6    terms were used by people of skill in the art at the time to

7    refer to analog processes.

8            It's very interesting.  We've got a -- a notebook

9    entry from the inventor, Mr. Harvey, where contemporaneous

10   essentially with the filing of the 1981 application, he wrote

11   in his notebook and made very, very clear what he intended when

12   he used the term "decryptor" and -- and the terms "decryption"

13   and "encryption" in his patent.  And emphasized that by

14   decryption, he meant anything that serves as a means or methods

15   to decode, decrypt, decipher, or otherwise render an obscured

16   signal into a meaningful one.

17           So here we not only have the statement in the

18   specification, we have contemporaneous inventor notebook where

19   he's confirming that he was intending a broad application of

20   encryption/decryption, not thinking about it in the narrow way

21   that PMC would have you construe it to be a fully digital

22   process.

23           And then we cited in our briefs some dictionary

24   definitions where encryption and -- and scrambling, for

25   example, with the -- with the decryption and then that refers

1  to the deciphering definition, again, uses these terms

2  interchangeably.

3           As Mr. Kline indicated, there's been some Court

4  decisions previously on this exact issue.  I would suggest that

5  all of the recent Court decisions, and this is one -- PMC

6  versus Motorola from the Eastern District of Texas a few years

7  ago that addressed these exact same issues, looking at

8  essentially the exact same evidence, these disclaimers, some

9  other things.  And you can see here that in that case, the

10  Court rejected the attempt to read the encrypt/decrypt terms

11  to be limited to -- to digital data, again, citing some of

12  the evidence -- same evidence that Your Honor has in front of

13  you.

14           I would suggest that -- and Mr. Kline said that there

15  were these other Courts that went the other way.  I'll get to

16  that in a minute, but I think, one, those are Courts that dealt

17  with this issue many years ago.  Two, in some of those

18  instances, it was an agreed term, and so it wasn't even a

19  debate -- a dispute in those cases.  It was agreed in at least

20  one of those cases that it would be a -- a digital process.

21  When it's been fought out recently, this has been the answer

22  every time.

23           And, again, the PTAB, there's been some recent IPR

24  decisions that have come down in -- in very similar related

25  patents stemming from the same specification, and the PTAB has

1    come down and construed decryptor to reject this concept that

2    it's fully digital and finding that it includes the

3    descrambling analog concept.

4         As you can see here, the BPAI decisions have also --

5    that -- that went PMC's way have recently been rejected by the

6    PTAB, the most recent PTAB decisions.  And, again, these --

7    these arguments about disclaimer and statements made

8    disclaiming coverage of anything that's not digital, that's

9    been dealt with in some of these recent PTAB decisions, and

10   they have found no clear disclaimer in the -- in the various

11   prosecution history.

12        So although a lot of this evidence that I was handed

13   here today, I don't think, is was part of the -- the record, at

14   least it wasn't until just now, I think conceptually that issue

15   has been dealt with by previous Courts and the -- and the PTAB,

16   and it's been rejected that -- that there's any clear and

17   unmistakable disclaimer of claim coverage in the file

18   histories.

19        THE COURT:  Mr. Sernel, do you know whether or not

20   those decisions considered all of the prosecution history that

21   Mr. Kline just went through?

22        MR. SERNEL:  I don't know.  I tend to think that at

23   least the last one that he handed up looked recent enough

24   that I -- I don't know that it was a part of those records.  I

25   believe that at least some of what he handed me was considered,

```
 1   and at least, like I said, conceptually, I think the same sort
 2   of things were considered, but I -- I can't say for certain.
 3               THE COURT:  All right.
 4               MR. SERNEL:  So that's -- that's our argument on -- on
 5   decryption and encryption.  I think it's improper to read in
 6   this digital requirement.
 7               I would note that, again, we are comfortable with your
 8   decrypting and decryption preliminary construction.
 9               In terms of encrypted, I see that it -- it has
10   reference to a digital key.  There are clearly ways to do this
11   with -- with things that are other than digital keys.  And I
12   think the broad statements in the specification and the broad
13   statements in the contemporaneous invention notebook of
14   Mr. Harvey and the usage of the term in the various patents in
15   the intrinsic record emphasize that we shouldn't be reading in
16   digital into this construction at all either on the key side or
17   on the data side, and so I -- I -- with one slight modification
18   of encrypted, I think you've got it right.  I think digital
19   should come out of -- of that proposed construction, as well.
20               In terms of decryption key, very quickly.  On this
21   one, again, you did not read in a requirement for digital here,
22   so I think you've got that right in your preliminary.
23               Our suggestion, however, is that we don't think you
24   need to construe the term "key."  And what your preliminary
25   does is essentially adopt this concept of data used by a device
```

1  in conjunction with an associated algorithm.

2       Generally speaking, I agree that that's what a key is.

3  However, the -- the vague nature of sort of data used with an

4  algorithm, I think, has the potential for leading to confusion

5  when we apply these claims and that construction down the road.

6  It is very clear what a key is, and I've got some statements

7  here from their own expert where we asked them the question:

8  Well, is -- is this a term that one of the -- of skill in the

9  art would know about?

10      Yes.

11      And -- and a person of skill in the art would

12  understand it without any further explanation?

13      Yes.

14      I don't think we need to construe the term "key."  I

15  think by construing it, we will merely inject confusion and

16  potential mischief where we're applying data and algorithms to

17  things that really aren't keys.

18      I think -- I would suggest Your Honor follow what

19  happened in PMC versus Motorola where encrypt and decrypt were

20  construed with the term just "key" in them, and think that's

21  the better way to do it.

22      There is references to keys throughout our documents,

23  their documents.  I think people know what that is.  I think

24  it's just going to make it more difficult for the jury to

25  figure out what's going on if we add 15 words as a construction

1   of key rather than just adopting a construction that's got the

2   word "key" in it.

3           THE COURT:  So tell me, though, what you're worried

4   about with respect to the construction of key?

5           MR. SERNEL:  Like I said, it's hard to -- to explain

6   exactly.  I think it's generally right that it is data used by

7   a device or method in conjunction with an associated algorithm.

8   I believe that those terms are vague, and so we could be

9   getting into a situation where it's any kind of data and then

10  any kind of algorithm, and then suddenly we're talking about

11  something that's not really a key anymore, when, you know, I

12  think it's a well understood term in the art that there are

13  keys.  Again, our documents refer to keys all over the place.

14  And if they're pointing to those things as keys, we're good.

15          I just worry that introducing whatever that is, a

16  dozen words is just going to make this difficult case even more

17  difficult for a jury to try to get their arms around and apply

18  claim constructions and claims to prior art and accused

19  devices.

20          And that's all I have on that.

21          Encrypted digital information transmission, we are

22  okay with Your Honor's construction on that and -- and plan to

23  stand on the briefs on that.

24          THE COURT:  All right.

25          MR. KLINE:  Your Honor, if I could just answer a

1    question that -- that you had?

2            THE COURT:  Certainly, you can respond.

3            MR. KLINE:  If we could have -- if we could switch the

4    presentation.  Thank you.

5            Your Honor asked whether the -- any of the prior

6    Courts or -- or the PTAB or the BPAI that had resolved --

7    answered this question considered the prosecution evidence that

8    I handed up, and Mr. Sernel referred to the Motorola decision.

9    I think that Motorola decision was from September of 2011.

10           Slide 16, Your Honor, is the amendment and response

11   filed by PMC in the '635 patent prosecution.  The '635 patent

12   is a patent-in-suit.  This response was filed April 2nd, 2013,

13   so after that Motorola decision.  Certainly, by definition, it

14   could not have been considered by the Motorola Court, and it

15   was in that patent prosecution of one of the patents-in-suit

16   that in order to overcome cited art, PMC argued to the Patent

17   Office that encryption and decryption require a digital signal.

18           I have no doubt, Your Honor, that if under different

19   circumstances we were trying -- PMC was trying to assert

20   against an Apple process that was not digital, including claims

21   to encryption and decryption, that Apple would be arguing that

22   we disclaimed scope and that we are bound by the representation

23   that PMC made to the Patent Office in 2013 when it told the

24   Patent Office, in an effort to try to overcome cited art, that

25   encryption and decryption require a digital signal.

 1              That's all I had, Your Honor.

 2              THE COURT:  Have these disclaimer arguments been

 3     rejected by the Patent Office in any proceedings?

 4              MR. KLINE:  I don't believe that this specifically --

 5     well, I'm being told maybe they have.  I'm sorry, I don't want

 6     to miss -- I don't know the answer to that question, Your

 7     Honor.

 8              THE COURT:  Well, if they have, why should I reach a

 9     different result?

10              MR. KLINE:  Well, because, Your Honor, there has not

11     been any decision that is binding on this Court about what this

12     claims mean -- what this term means.  The Federal Circuit has

13     never weighed in on this.

14              There is pending before the Federal Circuit right now

15     in, I think, a case involving Amazon as a Defendant an appeal

16     where this issue may get resolved, but none of the decisions

17     are binding on this Court.

18              And as is clear from both sides' presentations, Your

19     Honor, this decision -- this -- the Courts and the board has

20     considered this, and different Courts and different boards have

21     come out different ways.  So I think it's incumbent upon us to

22     look at the primary source of material and make a decision that

23     is proper in view of the case law, in view of the facts as they

24     exist today.

25              And the facts as they exist today, the patent

1    prosecution history of one of the patents-in-suit includes this

2    disclaimer, and that is an express disavowal of encryption

3    covering anything other than a digital signal.

4            THE COURT:  All right.

5            MR. KLINE:  Thank you, Your Honor.

6            THE COURT:  All right.

7            MR. SERNEL:  Your Honor, the next term we'd like to

8    argue is the -- the term to decrypt in a specific -- specific

9    fashion on the basis of said code.

10            This one is linked with the term determining a fashion

11   in which said receiver station locates a first decryption key.

12   We are okay with how Your Honor construed the second term, the

13   determining a fashion term, but I'd like to -- to speak briefly

14   to the first term, which is to decrypt in a specific fashion on

15   the basis of said code.

16            I think, Your Honor, on this one, your proposed

17   preliminary construction is on the right path, but doesn't

18   quite have it right, and that's why I'd like to -- to discuss

19   it.

20            The preliminary construction you have for the -- the

21   to decrypt in a specific fashion term is controlling how the

22   decryption occurs based on the received code.  I generally

23   agree that that's what's going on, but I don't think your

24   preliminary proposed construction would quite fit into the

25   claims as it's been presented.  If you plugged in your

1  construction for this term, I'm not sure it would quite make

2  sense in the context of the claim, and so I just wanted to talk

3  through that.

4       You can see here what -- this slide is actually based

5  on PMC's proposed construction, and I think it -- it makes the

6  point that I'd like to make also with -- with your preliminary

7  construction, which is when you attempt to inject PMC's

8  proposed construction, which, again, is controlling the

9  decrypting process through the selection of a decryptor, a

10  decryption key and/or a decryption algorithm, based on the

11  received code, I think if you look at the -- the intrinsic

12  evidence and look at the context of the claim, there's three

13  things there suggested by PMC, I believe the first two of which

14  aren't really consistent with the claim language itself.

15       What's really going on here is you're selecting a

16  decryption algorithm or a method based on the received code,

17  essentially how you're decrypting, selecting a decryptor.  And

18  you can see here we plugged in their language to see if it --

19  it makes sense.  Controlling a decryptor that decrypts

20  encrypted digital data, you can see the controlling of the

21  decrypting process, I think, sort of repeats that.  That's part

22  of the problem I have with your preliminary.

23       But let's just look at the first option there of -- of

24  their proposed construction.  Controlling a decryptor that

25  decrypts encrypted digital data through the selection of a

1   decryptor.  I don't think that makes sense.  And to the extent

2   that your preliminary construction could be read to include

3   that, I don't think it would make sense.

4        We already have a decryptor.  We're controlling a

5   decryptor that decrypts, and then selecting a decryptor is not

6   decrypting any specific fashion on the basis of said code.  We

7   already have the decryptor.  It encrypts encrypted digital

8   data, and so selection of a decryptor or selection of a

9   decryption key is not doing what's called for in the claim,

10  which is to decrypt in a specific fashion on the basis of said

11  code.

12       I understand that Your Honor's preliminary where

13  you're saying controlling how the decryption occurs, I read

14  that to be consistent with what our proposal is, which is if

15  you go back, to decrypt with a method specified by said code

16  and some form of that to decrypt in a way specified by said

17  code if -- if you want to try to get the concept that's in your

18  preliminary in the right form so then when it's plugged into

19  the claim language, it fits in -- in the context and makes

20  sense, I'd suggest that there may be alterations of the way we

21  phrased it that would be -- we'd be comfortable with, and I

22  think it would be consistent with your proposed preliminary.

23       I don't think your proposed construction, as phrased

24  currently, one, fits contextually into the claim, and, two, I

25  think it continues to leave open this possibility that we're

1    going to have things like selection of a decryptor or selection

2    of a decryption key being a specific fashion of controlling a

3    decryptor to decrypt which I don't think makes any sense.

4           So, again, I'm -- I'm okay with the determining a

5    fashion preliminary construction.  I've got that -- I've made

6    my points on the to decrypt in a specific fashion.  I believe

7    it should be modified to both fit the contextual language and

8    be more consistent with how Apple has proposed it, which is

9    what we're talking about here is the method by which the

10   decryption is happening.  There's different ways you could

11   phrase that consistent with your preliminary, but that's, I

12   think, the concept that should be -- should be recognized.

13          THE COURT:  My concern with your choice of method is

14   that it may imply a certain complexity to it that the -- the

15   disputed term doesn't itself carry.

16          MR. SERNEL:  And that -- and that's a fair point, Your

17   Honor.  I don't -- I think that is what's talked about in the

18   intrinsic evidence.  I think that is the right answer.

19          As I indicated, I think we would be comfortable with

20   something like if -- if you don't like the word "method," to

21   decrypt in a particular way specified by said code.  That, I

22   think, would capture the concept sufficiently and would be a

23   different way of phrasing it that I think would be consistent

24   with the intrinsic evidence.

25          THE COURT:  All right.  Thank you, Mr. Sernel.

1          MS. ALBERT:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MS. ALBERT:  Could we go to Slide 116, please?  116.

4          To decrypt in a specific fashion on the basis of said

5    code means controlling the decrypting process on the basis of

6    the received code, and the manners through which the decryption

7    process may be controlled by the received code include through

8    the selection of a decryptor, a decryption key or a decryption

9    algorithm based on the received code.

10          And Mr. Sernel mentioned that he didn't think that the

11   claim would make sense using Your Honor's proposed

12   construction, but the claim terms -- as we know, a method does

13   not necessarily require that the claim terms be performed in

14   the order in which they're recited.

15          So the controlling step could very well come before --

16   or the -- yeah, controlling step could very well come before

17   the -- the step that Mr. Sernel mentioned.

18          And, additionally, Your Honor, there are examples in

19   the specification where there are two decryptors that could be

20   used in the decryption process.  So perhaps there's a step of

21   controlling a decryptor, and then there's another step of

22   selecting the decryptor.

23          And we'll see in the specification, the specification

24   makes clear that the received code could be used to control the

25   selection of a decryptor, the selection of a decryption key, or

1    the selection of a decryption algorithm.

2            As shown on Slide 117 -- or 118, pardon me, the 1981

3    specification at Column 14, Lines 10 through 27 describes an

4    example where the received code may select the decryptor 107

5    from among the other decryptors to perform decryption.

6            THE COURT:  Well, what -- what problem would you have

7    with the alternatives that Mr. Sernel just mentioned about way

8    instead of method?

9            (Off the record discussion among counsel.)

10           MS. ALBERT:  I think that the word "way" could

11   encompass that the decryption process may be controlled based

12   on the selection of a decryptor or the selection of a

13   decryption key or the selection of an algorithm.  I think "way"

14   could encompass all three of those scenarios, and those are all

15   three of the scenarios in which the received code may control

16   the decryption process that are described in the specification.

17           We're -- we're -- you know, we are generally in

18   agreement with Your Honor's proposed construction because

19   it's -- it's more consistent with the language of the claim.

20           On Slide 119, we see that the received code may inform

21   the decryptor how to decrypt.  So, you know, this example

22   describe -- this is an example where the received code is used

23   to tell the decryptor which method to use if the decryptor is

24   capable of multiple means of decryption.

25           So, Your Honor, we're -- it would be incorrect to

1    limit the claim term to decrypt in a specific fashion on the

2    basis of said code to only a situation where the received code

3    specifies the method of decryption, as Apple originally

4    proposed.  As we see, the specification describes that the

5    received code may also provide a decryption key.  It may

6    indicate which decrypt -- decryptor to use to perform

7    decryption, or it may specify which means to use if the

8    decryptor is capable of multiple decryption means.

9            Thank you, Your Honor.

10           THE COURT:  Thank you, Ms. Albert.

11           MR. SERNEL:  Your Honor, just 10 seconds of rebuttal

12   to that, and then I'll turn the floor over to Mr. Merkin for

13   the next term.

14           The only thing I would disagree on Ms. -- Ms. Albert's

15   presentation is that my proposed change to -- to Apple's

16   construction adding the way, instead of the specified method, I

17   would completely disagree that that would cover selecting a

18   decryptor to do the decryption process.  I think that doesn't

19   make any sense in the context of the claim.  Same thing with

20   selecting a decryption key.

21           So I -- I disagree with her understanding of that, and

22   that, I think, circles back to why I believe that our proposed

23   language is the best language to make clear what's going on

24   here, which is the method.  We'd be comfortable with the way,

25   but as I said, I would -- I think we interpret that differently

1    than -- than Ms. Albert would.

2            With that, I'd like to turn it over to Mr. Merkin to

3    deal with the next term, which is the remote source and remote

4    transmitter station terms.

5            THE COURT:  All right.

6            MR. MERKIN:  Your Honor, Joel Merkin on behalf of

7    Apple.

8            For the two remote terms -- on Slide 25, we've

9    identified a pair of issues.  I want to just make a few brief

10   comments focusing on the second issue identified, does remote

11   require a different geographical location or does remote simply

12   mean separate.

13           I want to turn to the intrinsic support.

14           We can turn to Slide 29.

15           What we're looking at on Slide 29 is from the

16   background of the invention section of the '091 patent, and it

17   cites to a prior art reference, which I'll call the '480 prior

18   art reference, which refers to a remote keyboard.  That's

19   highlighted.  It refers to it again in the passage a little

20   lower.

21           What I've shown on the bottom of Slide 29 is that '480

22   prior art patent, and in Figure 1, the remote keyboard that's

23   being referred to in the specification is the remote control

24   keyboard CT.  And what that is, is a remote control similar to

25   the remote control that I'm holding in my hand, and it is

1  remote from the receiver device in the sense that it is

2  separate from the receiver device.  You generally would not

3  consider the remote control or remote keyboard to necessarily

4  be at a different geographical location from the receiver.  And

5  so based on this usage of remote in the '091 specification,

6  it's clear that remote, when used in various terms encompasses

7  both things that are at a different geographical location and

8  things that are simply separate.

9          If we can turn to Slide 28.

10         I've highlighted -- in a very recent PTAB decision,

11 the PTAB has considered the term "remote" in the context of

12 similar terms from the same specification, and, again, rejected

13 that remote means the same as geographical separate location.

14 They said they do not mean the same thing?  Nothing limits

15 the -- the term "remote" to any specified distance, and the

16 term "remote," as used, includes wireless devices -- it's at

17 the bottom of Slide 28 -- wireless devices that artisans of

18 ordinary skill term a remote control device, and that's relying

19 on the same evidence I just pointed to, the remote keyboard

20 passages from Slide 29.

21         Lastly, if we can turn to Slide 27, you'll see this

22 Court's prior construction for similar remote terms from the

23 Zynga case -- this is in 2013--  where remote data source was

24 construed to be a separate data source.  Remote video source

25 was separate video source.  Remote station construed to be a

1    separate station.

2         It's Apple's position that the separate construction

3    of remote equating remote with separate is more appropriate

4    than equating remote with a separate or different geographical

5    location.

6         MS. ALBERT:  Let's turn to Slide 77, please.

7         Your Honor, we agree that the term "remote source"

8    means a source of information or data that's at a location

9    different from the receiver station.

10         And we also agree that the term "remote transmitter

11   station" means a station that is at a location different from a

12   receiver station that transmits programming or other

13   information.

14         Now, there is no instance in the patent specifications

15   where the word "remote," as used in connection with the

16   patented inventions, means anything other than geographically

17   distant.  Indeed, the -- the references that my opposing

18   counsel pointed to are discussed in the background of the

19   invention section where the inventors are discussing the

20   deficiencies in the prior art.

21         Indeed, throughout the disclosure with reference to

22   the patented inventions, the disclosure contrasts local inputs,

23   such as the local input 225 shown in Figure 4 of the patent,

24   with remote sources of transmissions originating, for example,

25   from remote transmitter stations.

1          So it's clear in the context of the description in the

2     specification that remote in the context of the patented

3     inventions means a different location, not local to the

4     receiver station.

5          And let's -- I'm on Slide 78 now.

6          So, for example, as shown in the 1981 specification

7     at -- at Column 1, Lines 49 through 53, the term "remote" is

8     used to describe a remote geographic location.

9          As shown in Slide 79, there's another example from the

10    1981 specification at Column 8, Lines 46 through 55, where

11    remote is used to mean, again, a geographically distant

12    location.

13         And turning to Slide 80, here's an example from the

14    1987 specification at Column 159, Line 62, to Column 160, Line

15    4, where the disclosure contrasts a local station with a remote

16    station apparatus.  And it's clear that the remote station

17    apparatus is not in the same geographic location as the local

18    station apparatus because it is being interrogated by

19    telephone.

20         So a construction which would define the term "remote

21    source" simply to mean a separate source, and the term "remote

22    transmitter station" to mean separately -- a separate

23    transmitter station would be inconsistent with the

24    specifications and would encompass sources local to the

25    receiver station, and those local sources were never described

1    by the inventors in connection with the patented inventions as

2    being remote.

3            So we submit that Your Honor's proposed constructions

4    are the correct ones.

5            Thank you.

6            THE COURT:   Thank you, Ms. Albert.

7            MR. SERNEL:   Your Honor, Marcus Sernel again for

8    Apple.

9            The next term in the order is the detecting set of

10   terms, and I will acknowledge, Your Honor, that your

11   preliminary reaction to this one was similar to my preliminary

12   reaction, that why do we need to construe detecting.  As I dug

13   further into the evidence, I think I've concluded absolutely

14   that Apple's proposed construction is what's going on here.

15   Demodulating and identifying is what we're talking about when

16   we're detecting signals in these claims.  And I'd like to go

17   through the evidence that led me to that conclusion, and I

18   think should lead you to change your preliminary to that

19   construction.

20           This shows up in a variety of places in the claims.

21   It's always in the context of detecting some kind of embedded

22   signal or information within an information transmission, and

23   so here's the various places in which it shows up.

24           Here's just a few examples of the context of the

25   claims in which this -- these "detecting" terms appear.  Again,

1    it's detecting certain kinds of information or a signal within

2    an embedded -- embedded within a transmission.

3          What is going on with this concept of detecting?  We

4    had a tech tutorial that we had submitted to Your Honor a

5    month or so ago.  And what's always going on in every example

6    in the patent and what was going on in the 1980s when you were

7    talking about detecting was taking some kind of broadcast,

8    cable cast, some kind of signal and essentially de --

9    disaggregating the various signals that are baked into that

10   transmitted signal and then identifying -- so you're

11   demodulating the signal.  You're taking the waveform, taking

12   the -- the digital or -- or analog video or audio signals, and

13   then also disaggregating the control signal.  You're

14   demodulating that, essentially extracting out the information,

15   and then what you're doing is identifying the control signal.

16   That's what's going on in every one of these situations in the

17   claims.  When you're detecting a signal embedded within a

18   transmission, you have to demodulate it, and then you have --

19   then you're identifying the signal.

20         And so in the -- in the briefing, PMC in their opening

21   brief pointed to the digital detectors that are in, for

22   example, Figure 2A of the patent as the place in which the

23   detection is happening.  Where is this detecting step

24   happening?  PMC was very clear in arguing in their opening

25   brief that's happening in the digital detector.

1          And their argument then was, well, look, there's a --

2    a box in front of the digital detectors that's an amplitude

3    demodulator, and so clearly the concept of demodulating isn't

4    included within the concept of detecting because, look, there's

5    a separate box for demodulating.  So that was their argument in

6    their opening brief.

7          As you saw in our briefing, Your Honor, the issue of

8    what happens in these digital detectors was previously disputed

9    in prior cases.  And, in fact, went up to an appeal of an ITC

10   determination in the -- the 1998 time frame.  And you can see

11   here that PMC very, very clearly argued that what the digital

12   detector did and what it referred to was demodulation circuitry

13   for extracting digital information from a carrier signal.  They

14   were very, very clear in arguing -- and this was actually in

15   response to an indefiniteness conclusion by the ITC.  And so

16   they were -- they were arguing, no, there isn't a well

17   understood meaning, a person of skill in the art could

18   understand what this is, and the digital detector, they said,

19   was referring to demodulation circuitry.

20         And, again, later statements down below where they're

21   referring to their evidence, including PMC's expert saying very

22   clearly that a digital detector would include a demodulator.

23         And essentially what happens here, Your Honor, is when

24   you have one of these signals, you need to put it through

25   multiple steps of demodulation.  You first need to take it off

1  the -- what is transmitted, basically a carrier signal, to get

2  the TV baseband signal, and then you still need to demodulate

3  it further in order to -- to get this control information and

4  the various signals or information that is talked about in the

5  claims.

6        What's going on in these digital -- digital detectors

7  very clearly includes a further step of demodulating.

8        Now, what happened then is -- is confusing to some

9  extent, but essentially what happened is the Federal Circuit

10 agreed with PMC in response to this argument that a detector

11 had a well known -- a digital detector had a well known mean --

12 meaning to a person of skill in the art.

13       THE COURT:  They didn't accept the meaning that PMC

14 was putting forward.

15       MR. SERNEL:  You are correct on that.  And -- and as

16 you saw in what the -- the Federal Circuit said in a footnote,

17 they said, well, we're going to adopt this construction of

18 digital detector that had a meaning set forth in the

19 specification which said detecting information -- digital

20 information essentially.

21       And so from my standpoint, that essentially begs the

22 question of, okay, what does detecting mean?  There's -- that

23 was defining digital detector, found a definition that included

24 detecting, and I would say, well, what does that detecting?

25 It's -- and there's two steps to detecting.  It's demodulating

1    and identifying.

2         I would suggest that where they fought off this

3    estoppel or fought off this indefiniteness argument with an

4    argument as to a meaning that -- that Your Honor could find

5    that estoppel applies.  I certainly think it's -- it's

6    persuasive evidence as to what is going on when we're talking

7    about detecting in these digital detectors.

8         THE COURT:  Well, what is it that you're concerned

9    will be considered detecting if we don't limit it to

10   demodulation?

11        MR. SERNEL:  Well, there are -- there are situations

12   where you're just -- you just have a signal, and -- and you --

13   you use a signal where you're not necessarily disaggregating it

14   or extracting it from a waveform or some carrier signal.

15        And so that's what's going on here in every situation

16   in the patent.  You're -- you're having to extract it off of a

17   carrier signal, and if you're not doing that, we don't think

18   you're practicing the -- this invention or these claims.

19        THE COURT:  Can you point to anything in the

20   specification where the patentee has disavowed any other means

21   of detecting beyond demodulation?

22        MR. SERNEL:  Well, again, I would suggest that if

23   you're not demodulating, you're not detecting.  I don't know of

24   any clear and unmistakable disclaimer.  I'm arguing that

25   detecting, in the context of 1980s patent -- and we'll look at

1    dictionary definitions here in a minute.  Detecting means

2    demodulating and identifying.  That is its plain meaning.

3                THE COURT:  All right.

4                MR. SERNEL:  And you can see here, again, it's --

5    this -- this amplitude demodulator in -- in the various

6    embodiments is doing this first step of demodulation.

7                There's also a second step.  And -- and, again, the

8    green box as we've indicated here in the slide color in the

9    digital detector, again, that's where PMC argues the detecting

10   step is happening.  And that is where, as we saw in their clear

11   statements in the briefing in the prior case, is where

12   demodulation is happening.  As well, there's demodulating and

13   identifying these digital signals in that green box that is

14   separate and apart from the yellow boxes, which are the

15   additional demodulators which is just taking it off the carrier

16   signal to begin with.

17               And you can see here, the -- the argument that we saw

18   in reply was, well, there are embodiments in the specification

19   that say you don't -- you don't need boxes 31 and 32.  You

20   don't need a filter.  You don't need box 32, a demodulator.

21   Essentially those functions are -- are built into the -- to the

22   TV receiver.  And I think they're still done, but they're built

23   into another box in the system.

24               And so they said, look, this -- this is clear.  You

25   don't need box 32 doing the amplitude demodulating, but that

```
 1   doesn't answer the point of what's going on in -- in the green
 2   boxes.  They are still detecting information, and the way
 3   they're doing that is by demodulating the signal further and
 4   identifying the signals -- the embedded information in them.
 5          And so I don't think this answers the point about
 6   what's happening in the digital detector which PMC has
 7   previously argued is demodulating a signal.
 8          Here's a dictionary -- a couple of dictionary
 9   definitions from the time.  And, again, we're in the '80s.
10   We're in a technical field.  And you can see here a dictionary
11   of computers, the -- detection is the procedure found in a
12   demodulator.  Detection, see demodulation.  That's what this is
13   in this context.  Detection is demodulation.
14          I get it that lawyers and I had the same reaction to
15   start.  When I look at the term "detecting," I'm not a person
16   of skill in the art in the '80s in this industry.  I think,
17   okay, well, you know, detecting is -- is something that's going
18   to be broader than demodulating and identifying.  When you look
19   at it from the perspective of a person of skill in the art in
20   the '80s, those are the definitions that control, and -- and
21   those include demodulation.
22          You can see even in PMC's dictionary that they cited,
23   and I think this is -- this was also potentially cited by the
24   Federal Circuit, that a definition there also says demodulator,
25   straight up.  And in this context, that is the right definition
```

1    to apply here.

2            THE COURT:  I mean, but the Federal Circuit itself did

3    not limit it to demodulation, right?

4            MR. SERNEL:  Again, they -- they interpreted digital

5    detector, and they kind of gave a circular definition, which

6    was detecting a digital signal.  We are now looking at the term

7    "detecting" itself.  And the term "detecting" itself, I

8    suggest, it's very clear both in PMC's statements, the -- the

9    dictionary definitions, how it's used, it's always demodulating

10   a signal from a carrier and then identifying the embedded

11   information or the control signal.

12           And you can see here we asked inventor Harvey in his

13   deposition this question, and he agreed that the term

14   "detect" -- one -- one function of -- of detecting with the

15   incoming signals would be to demodulate the analog signal, the

16   waveform, and then identify the signals.  He didn't -- didn't

17   disagree with that.

18           So, again, I -- I believe I -- I understand why you

19   came out where you did on your preliminary construction.  We

20   believe when you dig further into the evidence, what's going

21   on with detecting in this context is demodulating and

22   identifying the various signals in the claims in which that

23   term is used.

24           THE COURT:  All right.  Thank you, Mr. Sernel.

25           MR. KLINE:  Thank you, Your Honor.  We certainly agree

 1   with the Court that the term "detecting" needs no further

 2   construction.  We agree with Apple's counsel's initial

 3   instinct on this matter that the term requires no further

 4   construction.

 5        For all the discussion about the Federal Circuit, the

 6   Federal Circuit was not asked to construe detect or detecting.

 7   It was asked to construe detector.  The term before the Court

 8   here is detecting.  And the Federal Circuit, even with respect

 9   to the term detector, did not construe it in a manner that

10   Apple suggests this Court ought to construe detecting.

11        What we're left with, Your Honor, is an argument from

12   Apple that detecting requires demodulation because they say so.

13   The patent doesn't say that.  Apple just comes here and says we

14   say that's how it works.

15        If you look at Figure 2A of the -- of the '091 patent,

16   plainly, the -- the demodulator's -- amplitude demodulator 32

17   is separate from the digital detector 38.  It is separate from

18   the digital detector 34.  And, in fact, before you get to the

19   digital detector 37, which is to follow Path B in Figure 2A,

20   the signal has to pass through two demodulators, amplitude

21   demodulator 32 and audio demodulator 35.

22        And, Your Honor, this is a depiction of the decoder

23   30, which is shown in Figure 2.  And that becomes important to

24   some later slide.  So the patent plainly explains that the

25   digital detector is different from the demodulator.

```
 1              At Columns 18, Lines 56 to 61 of the '091 patent, with

 2    reference to this figure, it explains that line receiver 33 --

 3    if I come back, Your Honor, you can see line receiver 33 in

 4    about the middle of the figure.  The patent describes that line

 5    receiver 33 receives the information only of that portion or

 6    portions of the overall video transmission and passes that

 7    information to a digital detector 34 which acts to detect the

 8    digital signal.  It doesn't say to demodulate the signal.  It

 9    says simply to detect the signal.

10              Later, demodulation, again, is described as separate

11    from detection.  The television signal -- this is Column 18 of

12    the '091 patent.  The television signal then passes to a

13    standard amplitude demodulator 32, which uses standard

14    demodulator techniques well known in the art, to define the

15    television baseband signal.  And that's what demodulation does,

16    Your Honor.  It brings the signal down to a baseband.

17              The patent goes on to describe this baseband signal is

18    then transferred through separate paths through three separate

19    detector devices where the detector does need to determine the

20    presence of an embedded signal.

21              The apparatus of these separate paths are designed to

22    act on the particular frequency ranges in which the embedded

23    signal information may be found.

24              Column 19, Lines 3 through 10, the patent describes

25    that the digital detector 37 detects signal information.  Later
```

1    in the same section, shown on the slide, it describes that a

2    digital detector 38 detects signal information.

3         Now, it's interesting that Apple points to the

4    specific portions of the specification where it describes that

5    the decoders may omit demodulators.  This is the '091 patent,

6    Your Honor, Column 47 around Line 6 -- beginning around Line 61

7    on Slide 27.

8         Receiving the embedded binary information at decoder

9    203, which does not include a filter 31 or a demodulator 32,

10   but then later describes the digital detector 34 automatically

11   detects the binary information.  So we have a description in

12   the patent specification of detection occurring without

13   demodulation.

14        And, again, another example, Your Honor, Column 162 of

15   the '091 patent, any given decoder -- at Slide 28.  Any given

16   decoder may have more or less apparatus than that shown in

17   Figures 2A -- that should be 2B, Your Honor, or 2C, and later,

18   as emphasized on the slide, said decoders do not require

19   filters 31 and demodulators 32.

20        At one point in Apple's brief, Your Honor, they argue

21   that PMC's own expert acknowledges that detecting had a

22   particular technical meaning to a person of ordinary skill in

23   the art at the time of the invention.  This is at Page 11 of

24   Apple's brief.  And they cite Exhibit 9, the Weaver transcript,

25   Page 115, around Lines 8 through 12.

```
1              And what they're citing there, Your Honor, is only

2    when Mr. Weaver was asked:  Now, detecting has a particular

3    technical meaning to one of skill in the art in the 1980s,

4    doesn't it?

5              And he answered:  Yes.

6              Apple chose not to ask the Court to read further where

7    the very next question he was asked was:  And it means

8    demodulating, doesn't it?

9              And he answered:  No.

10             He was asked:  What does it mean?

11             And he answered:  Determining whether something

12   exists.

13             So, Your Honor, it seems clear to us that the Court's

14   proposal that the term needs no further construction and that

15   detecting simply means determining whether something exists

16   which is ordinary skill.  Let's not forget, Your Honor, the

17   task is to make this job as straightforward for the jury as it

18   can be.  And construing detecting to require demodulating and

19   identifying both would be incorrect as a matter of law, and it

20   certainly wouldn't help this jury understand any more clearly

21   what detecting means.

22             Thank you, Your Honor.

23             THE COURT:  Thank you, Mr. Kline.

24             MR. SERNEL:  If we could go to -- to programming.

25             I think I had addressed Mr. Kline's points in my
```

1   presentation.

2          THE COURT:  All right.

3          MR. SERNEL:  The reference to demodulators, that's not

4   talking about the demodulating that's happening in the digital

5   detector.  So I'll stand on my prior argument on that.

6          In terms of programming, Your Honor, we are -- this

7   one is -- is a little bit complicated.  Programming appears

8   across multiple patents.  And we are comfortable with Your

9   Honor's preliminary construction insofar as it relates to

10  patents claiming priority to the 1987 patent application.

11         I would like to address the construction insofar as

12  you -- you would suggest applying it to patents claiming

13  priority to the 1981 specification.

14         And I'll note that Your Honor may have seen the filing

15  yesterday that indicates that previously, PMC had been arguing

16  that the '091 patent was -- had a priority date of 1987.

17  Yesterday, we received a document from them indicating they're

18  now going to change their claim of priority to 1981.  I'm still

19  wrestling with exactly how we'll deal with that and whether

20  it's proper to -- to change to a different argument now.

21         I think there are actually clearer statements in

22  the -- the prosecution history of that patent saying that

23  they've disclaimed any claim to priority to 1981, but for

24  purposes of today's presentation, I don't think you're going to

25  sort out disputes as to what the priority dates for these

1    various patents are, and we certainly don't agree to them.  We

2    will just argue in terms of something that's based on 1981,

3    something that's based on 1987, and what's the proper

4    conclusion for both.

5         And you can see here that previously in -- in the

6    Amazon IPR decisions, the patent owner had not disputed that

7    the '81 specification defined programming differently than the

8    1987 specification.  And so the issue for the 1981

9    specification and -- and patents claiming priority to the 1981

10   specification is whether the programming definition in the --

11   and, actually, this is a typo -- '87 specification should apply

12   where the priority date is a claim to '81.

13        So let's look at the 1981 specification, and here's

14   the abstract.  And you can see here there's a pretty

15   straightforward statement that programming here -- and this is

16   in the abstract.  This is -- the abstract is a summary of

17   the -- the invention set forth in the patent specification.

18        Programming here means everything transmitted over

19   television or radio intended for communication of entertainment

20   or to instruct or to inform.

21        There was some argument in the briefing by PMC that,

22   well, because it appears in the abstract, it doesn't get as

23   much weight as if it appeared somewhere else.  The Federal

24   Circuit has addressed that issue in prior cases in saying they

25   frequently look to the abstract to determine the scope of the

1    invention, and you should certainly look to the abstract in

2    this definition here to determine what the proper definition

3    for this term is for the -- the patents claiming priority to

4    1981.

5            I think it's just a black letter law that you can't

6    write into a continuation-in-part application information.  And

7    what they did was they included a definition in their 1987

8    patent application, and then put that information into a time

9    machine and put it back into a patent claiming priority to the

10   1981 priority filing.

11           If we're going to go to trial on patents claiming

12   priority to 1981 and there's a 1981 priority date that applies,

13   the 1987 specification is as -- is as if it doesn't even exist.

14   And so to take that definition and to transport it in time back

15   to a patent claiming priority to 1981 I think is completely

16   wrong and can't happen.

17           I think you have to look to the 1981 abstract and the

18   1981 specification to define what this term means in that

19   context.  And, again, we're in the 1980s.  Things may be

20   evolving over time.

21           And where they acted as their own lexicographer, I

22   agree, they can define this term.  They did it in '87.  That's

23   going to control for '87.  They also did it in 1981, and that

24   should control for 1981 equally.

25           THE COURT:  Aren't there disclosures in the 1981

1    specification that are broader than this language that you're

2    citing to in the abstract?

3            MR. SERNEL:  So two answers to that.  One, I would say

4    even if there are, when -- when a patentee acts as his own

5    lexicographer and defines a term, that controls.  You don't

6    look to other things in the specification to say, well, we're

7    going to adjust it.  When you define a term, that controls.

8    The Federal Circuit says that.

9            And then I think also when you look at the -- the

10   various places where they suggest that programming might be

11   something else, I think it's always done in the context of

12   television or radio programming.  And when you look at -- at

13   the context and -- and when they refer to computer programming

14   or computers or -- or different transmission systems, it always

15   circles back when you look at the context to -- to television

16   programming and radio programming.

17           And so I would suggest even if you look beyond and --

18   and find that there's not an express definition, I think as an

19   express definition, it's clear as a bell that -- that it is an

20   express definition, it controls.  Even if you look beyond that

21   and want to look at the totality, I think what's talked about

22   in that '81 specification is focused on TV and -- and radio

23   programming, and that's a proper definition to control.

24           THE COURT:  Doesn't it talk about books?

25           MR. SERNEL:  I don't know that that talks about that

1    in the context of programming per se.

2            THE COURT:  Well, let me see, I made a note about

3    Column 21 through 22 of the '490.

4            MR. SERNEL:  And, again, I would have to look at this,

5    Your Honor.  I don't have a slide on it.  I apologize.  It

6    would look -- it would appear to me that it's talking about it

7    in the terms of videos and -- and potentially TV, and then

8    combining that with this book store concept.  Again, I think

9    the definition in the abstract controls.  You don't even need

10   to wrestle with the more difficult question of what is the

11   totality of the specification telling you.  But I think reading

12   that definition as a definition is consistent with the

13   specification.  It focuses principally on TV and radio

14   programming.

15           THE COURT:  Okay.

16           MR. KLINE:  Just a couple of quick points, Your Honor.

17   We largely rest on our briefs on this point.

18           If -- if you could go to Slide 41, please.  Thank you.

19           So this is -- this is the abstract from the 1981

20   specification.  The language that counsel is relying upon is a

21   parenthetical within the abstract.  The parenthetical refers to

22   the preceding sentence as -- as likely as anything else.  The

23   first sentence of the abstract is:  Apparatus and methods for

24   automatically controlling programming transmissions and

25   presentations on television and radio equipment and monitoring

1    the programming transmitted and presented.  Parenthetical,

2    programming here means everything transmitted over television

3    or radio intended for communication of entertainment or to

4    instruct or to -- or inform.

5         So the abstract is explaining that with respect to

6    apparatus and methods for automatically controlling programming

7    transmissions and presentations on television and radio

8    equipment, programming there means everything transmitted over

9    television or radio intended to communicate, to entertain, to

10   instruct, or to inform.

11        If we go on, Your Honor, you said aren't there other

12   examples in the patent specification than television and radio

13   programming?  And there are, there are a few.

14        At Slide 42, there's one.  Column 490 -- sorry,

15   Column 16 of the '490 patent.  For example, TV set 131 may

16   receive programming from many sources, including cable

17   converter box 133, video cassette recorder 135, and videodisc

18   player 137.

19        And to the section of the specification that Your

20   Honor referred to just a moment ago at Slide 43, absolutely,

21   one of the examples for carrying out the patented invention

22   that inventors Harvey and Cuddihy thought of was rather than

23   book stores stocking books, they might stock video desks --

24   discs with the books on them, and a customer could come into

25   the book store and ask to buy a title, hypothetically, How to

1    Grow Grass.  And it could be delivered to the customer in the

2    book store by instructing a laser videodisc system 232 to

3    transmit its encrypted copy of How to Grow Grass to printer or

4    other means 221.

5          So Your Honor, in our view, has the claim -- the

6    proposed claim construction is correct.  It's not limited even

7    for patents relying on the 1981 spec solely to things that can

8    be transmitted over television and radio.  That would let out

9    many examples in the specification.

10          THE COURT:  What do you say, Mr. Kline, to the

11    argument that under Federal Circuit precedent, if it's a

12    defined term, that should be the end of the analysis?

13          MR. KLINE:  Well, of course, the MPEP at the time said

14    not to rely on the abstract for construing the claims.  We do

15    have that Federal Circuit case.  And what I would say, Your

16    Honor, is if we have an example where arguably the patent might

17    be interpreted in ways that conflict or ways that don't

18    conflict, then the better course is to interpret the patent in

19    a way that is consistent.  And the way to interpret this

20    abstract in a manner that is consistent with the specification

21    is that the parenthetical refers only to the preceding

22    sentence, not to the invention in all the ways it may be

23    carried out as further described in the specification.

24          The abstract starts with apparatus and methods for

25    controlling programming transmissions and presentations on

```
 1  television and radio equipment.  The parenthetical says
 2  programming here means everything transmitted over television
 3  or radio intended to communicate, entertain, or to instruct or
 4  to inform.  The inventors wanted to make clear that with
 5  respect to programming transmissions and presentations on
 6  television and radio equipment, it was everything.  But they
 7  went on to describe in their specification other embodiments of
 8  the invention, such as video laser disc players, printing
 9  books, things of that nature, which is consistent with the
10  Court's construction.
11          THE COURT:  All right.
12          MR. KLINE:  Thank you, Your Honor.
13          And then I think I'm up for tuning.  Is that -- do we
14  agree on that, Marc?
15          THE COURT:  Why don't -- before we proceed with
16  tuning, we'll take the morning recess.
17          MR. KLINE:  Very good.  Thank you, Your Honor.
18          THE COURT:  Thank you.
19          LAW CLERK:  All rise.
20          (Recess.)
21          LAW CLERK:  All rise.
22          THE COURT:  Thank you.  Please be seated.
23          All right.  I think, Mr. Kline, I interrupted you when
24  you were moving on to the "tuning" term, I believe.
25          MR. KLINE:  Thank you, Your Honor.  We largely are
```

 1   going to rest on our briefs on tuning, though there is just one

 2   point I would like to draw the Court's attention to.

 3          We're at Slide 44 of our presentation.

 4          The Court's proposed construction for tuning is

 5   selecting a frequency for said receiver station to receive

 6   programming.  I'd like to just draw the Court's attention to --

 7   in the '091 patent, Column 215, around Lines 56 to 65.

 8          There is a reference to the apparatus where it may

 9   tune to the transmission of a selected digital data channel.

10   And there's no limitation that that data channel must be a

11   certain frequency.  It's just described as tuning to a selected

12   digital data channel.

13          We had submitted with our -- our brief at Exhibit O a

14   contemporaneous definition of channel, a -- just simply a path

15   along which signals can be sent, for example, a data channel or

16   an output channel.  So we just would like to draw the Court's

17   attention to that and suggest that tuning a receiver to a

18   station -- tuning the receiver station to a channel is broader

19   than simply selecting a frequency.

20          THE COURT:  All right.  And what was that passage that

21   you just referred to on the previous slide?

22          MR. KLINE:  That's at the '091 patent, Your Honor,

23   Column 215, around Lines 56 to 65.  And there's an express

24   reference that the apparatus may tune to the transmission of a

25   selected digital data channel.

1           THE COURT:  All right.

2           MR. KLINE:  Thank you.

3           THE COURT:  Thank you.

4           MR. SERNEL:  Your Honor, Marc Sernel on behalf of

5    Apple.

6           We think your -- your preliminary construction on this

7    one is right on.  It adopted Apple's proposed construction.

8    Tuning to a channel is selecting a frequency for said receiver

9    station to receive programming.

10          I'm going to quickly go through my slides, and then --

11   and then answer Mr. Kline's citation to the specification.

12          There are many places in the specification where when

13   they talk about tuning to something, you're tuning to a

14   selected frequency.  Time and time again tuners tune to given

15   frequencies in the specification.

16          Dictionary definitions are aligned.  Tuning is the

17   adjustment relating to frequency to adjust for residence at a

18   desired frequency.

19          Again, channels are associated with frequencies, as

20   well.  And so the reference to the digital channel that

21   Mr. Kline pointed to when the specification is talking about

22   that, the channels are transmitted at assigned television

23   frequencies, and that's how it's done when you transmit

24   multiple channels.

25          And you can see, we have inventor testimony agreeing

1    with that construction, as well.  More dictionary definitions.

2           And then I want to quickly get to Mr. Kline's passage.

3    The -- the passage here on the left is what Mr. Kline just

4    pointed Your Honor to in terms of a reference to digital --

5    digital data Channels A and B.  If you actually look at a later

6    discussion of the same embodiment in the specification, it's

7    referring to the receipt of a transmission of a particular

8    television frequency transmission.

9           That's the way -- even if you're talking in the terms

10   of digital data channels, they are going to be communicated

11   either over the air or through a cable.  When you have

12   channels, you're need -- you need to put them on separate

13   frequencies.  And when you tune to them, you're tuning to a

14   selected frequency.

15          So we believe your proposed preliminary construction

16   is correct, and Mr. Kline's citation is not inconsistent with

17   that.  It's entirely consistent with it, if you look at the

18   entire context of that embodiment.

19          THE COURT:  All right.

20          MR. KLINE:  Just briefly, Your Honor.  And that

21   section of the specification referred to by Apple is an example

22   where we're still receiving programming.  And maybe the

23   programming is coming in on a frequency, but we've seen other

24   examples where -- and I -- I should say, it's television

25   programming in that instance where it may be coming in on a

 1    frequency.  But we've seen examples where a book may be

 2    downloaded, and there's certainly no requirement that the book

 3    would come in on a digital channel that was coming in at a

 4    frequency.  It could just be tuned, as described earlier in the

 5    spec.

 6          I think this comes up a little more when we talk about

 7    television receiver.  And we had just agreed during the break,

 8    if it's okay with the Court, maybe we could go from tuning to

 9    television receiver.

10          THE COURT:  All right.

11          MR. SERNEL:  So on this one, Your Honor, television

12    receiver, it's in the preamble.  There's no dispute that the

13    preamble is limiting.

14          Your Honor said that no construction is necessary.

15          We believe that the term should be given the

16    construction a receiver that can be tuned to a television

17    frequency.  We believe that is the plain meaning and -- and

18    that you should adopt that specific construction.

19          We've looked at prior PMC statements in prior cases.

20    This is another one where PMC made arguments that a television

21    receiver should be interpreted to refer to the tuner portion of

22    a regular television set.  That's what a television receiver

23    is.

24          You can see here another statement finding that the

25    ALJ construes the phrase "television receiver" as directed to a

1    tuner that outputs conventional audio and composite video

2    transmission.  That's what it does.  It's -- it's tuning, and

3    then tuning to a selected frequency.

4         Again, this is just a -- a reference to the -- what's

5    happening in the specification.  And, again, same -- same

6    evidence that I just pointed you to.  Television receivers,

7    what do they do?  They tune to given frequencies.

8         And so it ties in this concept of tuning.  We just

9    talked about the tuning to a channel construction.  We believe

10   television receiver should get a similar construction.  That's

11   what television receivers do, they tune to selected

12   frequencies.  There's more evidence where this came from, but

13   I'm not going to go through all of these citations.  We cited

14   them all in our brief.  But time and again that's what it's

15   talking about here, a television receiver tuning to

16   frequencies.

17        Again, Inventor Harvey, when asked the question:  And

18   a television receiver would be a receiver that can be tuned to

19   a particular television channel or frequency; is that correct?

20        And he answers:  If you are saying that it can receive

21   a television signal and is tuneable, I think that's correct.

22        And then further clarifying:  When you say tuneable,

23   that would be tuneable to a frequency, a television frequency,

24   correct?

25        He says:  Yes.

1              And, again, this is the same issue with respect to

2    the -- the evidence we just talked about.  We don't think the

3    references to digital data channels is inconsistent with having

4    a television receiver tuned to a frequency.  That is the way

5    even digital information is communicated over the air or

6    through a cable.  You need to do it at -- at different

7    frequencies, and so a television receiver is -- is tuning to a

8    selected frequency.

9              So we believe television receiver does require a

10   construction.  We believe saying that no construction is

11   necessary will leave open potential arguments that are

12   improper.  We believe it should be construed to require

13   selection of a selected frequency.

14             MS. BONN:  Good morning, Your Honor.  Amanda Bonn with

15   Susman Godfrey, and I'll being addressing television receiver.

16             If we could take a look at Slide 102, please.

17             So, Your Honor --

18             Thank you.

19             So, Your Honor, we -- we agree with the Court that no

20   construction is necessary.  Our position is the plain and

21   ordinary meaning of television receiver applies.  And I think

22   that there's -- there's sort of two disputes that come up,

23   and -- but the one that Apple has tuned into today is the issue

24   of whether a television receiver has to tune to a specific

25   frequency.  And there are a few problems with that

1    construction.

2          So one issue is that the claim itself -- for example,

3    Claim 39 -- doesn't have any tuning or frequency limitation.

4    So it's reading in or importing an additional limitation into

5    the claim language that's not there.  And we see that that's a

6    problem because in the specification, there are different

7    embodiments where a TV receiver and a TV tuner are two separate

8    components, two different things.  And we can see that here in

9    the '091 patent at Figure 3 and Figure 6A.  We can see that in

10   the '091 patent, Column 12, where it's describing what the

11   tuner does.  And, again, in Column 1 -- 166 where it's talking

12   about what the television receiver or TV receiver does.

13         So, essentially, what they are trying to do is say

14   that the TV receiver, for example, in Claim 39, is limited to a

15   tuner embodiment.

16         And we can see that that's a problem when we look at

17   some of the other asserted claims in the related case.  So in

18   the Vizio case, for example, and we'll see this in Phase II

19   Markman -- in the 6,649 patent at Claim 9, we see that there's

20   a claim where the television receiver and the tuner are two

21   different components.

22         And so this is the problem where they're trying to

23   conflate tuner and receiver so that in every single claim the

24   receiver has to be a tuner.

25         And one of the issues that came up in the "tuning"

1  term is this spec cite to digital data channels.  And we can

2  see that Apple sort of came back and said, well, Your Honor, if

3  you look a little bit later in the next column over, you can

4  see that that same embodiment is still receiving a television

5  frequency transmission.  And I think that's taking it a little

6  bit out of context.

7            Fran, if you can pull up Column 214.

8            So this is the '091 patent, and if we look one column

9  ahead to Column 214 of the two spec cites, the digital data

10  channels and then Apple's rejoinder on television frequencies.

11            If we can tune into 214 around Line 50, where it says

12  Figure 7C?

13            So we can see that the preface to the embodiments that

14  are being addressed says:  Figure 7C illustrates methods for

15  monitoring multiple programming channels, selecting programming

16  and information of interest, and receiving said selected

17  programming and information.

18            So the next two columns are addressing embodiments

19  under this broader umbrella of receiving programming channels.

20  And one of those examples in the next column over talks about

21  digital data channels.  That's the portion that Mr. Kline

22  referred to.  And then there's a further discussion that talks

23  about television frequency channels.

24            But essentially, they're trying to narrow down a TV

25  receiver even narrower than a receiver that receives television

```
 1   programming, which is essentially the alternate construction

 2   that PMC proposed, and they're trying to say it's not that

 3   broad, it's narrower, it has to receive television frequencies.

 4        So that's the problem that the specification is

 5   broader, it includes different embodiments, and they're

 6   essentially trying to limit TV receiver to a single embodiment,

 7   read out these digital data channel embodiments, and it's --

 8   it's contradicted by this Column 214.

 9        I'd also like to look at Column 229 at around Line 60.

10        And we can see here that there are discussions about

11   receiving data from a telephone or a remote data service

12   computer by means of a network.  So, again, this is talking

13   about receiving information not limited to just television

14   frequencies, but from a tel -- a telephone or remote data

15   service computer.

16        And if we look at Figure 7C, we can again see that

17   there's an example or an embodiment of information that's

18   coming from a telephone or remote data service computer.

19        So I think that's the key dispute when it comes to

20   television receiver.  And we agree with Your Honor that there's

21   no construction that's necessary.  It's the plain and ordinary

22   meaning.  But if the Court were to say we need to construe it,

23   it should be PMC's alternate proposed construction that it's an

24   electronic device that receives television -- excuse me, that

25   receives television programming.  It's not that has to tune to
```

1   a television frequency.

2          And just, you know, one final comment I wanted to

3   make.  There's been some discussion from Apple about a prior

4   ITC proceeding and a suggestion that the position that PMC is

5   taking here is inconsistent with the position it took there.

6          And, Fran, if you could actually turn to Slide 114,

7   please.

8          I think the key here is that the claim at issue in the

9   ITC proceeding was from a different patent, and it was a very

10  different claim.  And we can see it on the left-hand side here.

11  The claim that was at issue in the ITC proceeding was Claim 44

12  of the '277 patent, and the preamble there recited a television

13  receiver system comprising.  And then a television receiver was

14  essentially part of that television receiver system.  And in

15  that case, there was a dispute about whether the television

16  receiver that was a component of the television receiver system

17  referred to, quote, the tuner portion of the television

18  receiver system or the display portion.

19         And so it's really taking the argument there out

20  context because that particular claim was drafted in a way that

21  the television receiver was a component of the receiver system.

22  And that's different from the way the claims are drafted in

23  this case.

24         In this case, in Claim 39, for example, we're talking

25  about a television receiver that does a number of things.  And,

1    for example, we can see in the last limitation of Claim 39,

2    there's a displaying component, right?  So the claims at issue

3    here are drafted differently than the claim that was at issue

4    in the ITC proceeding.  The dispute in that case was a -- a

5    completely different dispute.

6            And so, Your Honor, we would just urge the Court that

7    we think that the Court's decision that no construction is

8    necessary is the correct one, but if a construction ultimately

9    results, it needs to be broad enough to fall under that

10   umbrella of an electronic device that receives television

11   programming.  It should not be importing limitations that that

12   programming has to be received through a television frequency.

13           Thank you.

14           THE COURT:  All right.  Thank you, Ms. Godfrey (sic).

15           MS. ALBERT:  Your Honor, we would like to briefly

16   address the terms "downloadable code" and "locating code."

17           And turn to Slide 144, please.

18           So the issue presented by these two terms is whether

19   the received code and the code that's located can include data

20   and instructions or is limited to instructions only.

21           And respectfully, Your Honor, the patent

22   specifications include embodiments where the code that's

23   located or downloaded can include both data and instructions.

24   For example, as -- as shown on Slide 145, Apple, in its brief,

25   relied upon an example of compiled machine language code as --

1    as confirming their position that the downloaded code or the

2    received code can be comprised of instructions only.

3         But, actually, the specification describes this

4    compiled machine language code as consisting of both computer

5    program instructions and data, as we see at Column 184, Lines

6    23 through 30 and 39 through 40 of the '091 patent.

7         So respectfully, Your Honor, a construction that would

8    limit the terms "downloadable code" and "locating code" to

9    instructions only would exclude some of the preferred

10   embodiments where the downloadable code consists of both

11   instructions and data.

12        Thank you, Your Honor.

13        THE COURT:  All right.

14        MR. SERNEL:  Marc Sernel on behalf of Apple again.

15        We think you've got this one right, Your Honor, in

16   your preliminary construction of "downloadable code" and

17   "locating code."  Downloadable code is one or more instructions

18   received in a transmission from a remote source.

19        This begs the question of what code are we talking

20   about when we're looking at the context of these claims.  And I

21   think Your Honor is all over this, based on the preliminaries,

22   but I just wanted to go through it quickly to make sure we know

23   what we're talking about here.

24        In terms of code, obviously, code can be -- when

25   you're referring to code, it can be machine language code or

1    source code, assembly language code, that type of code.  There

2    are other kinds of codes, and those are things also referred to

3    in the patents as unique digital codes or unique identifier

4    codes, something like an ATM code or a pass code.  These are

5    the same word used in two different ways, and we need to look

6    to the context of the claims to see how they are used.

7            And I think Your Honor focused in on this in -- in

8    adopting the preliminary construction, but as used in the

9    claims asserted in this case, it is clear that the code that

10   we're talking about is the type of source code, assembly

11   language code, essentially instructions, one or more

12   instructions, given the way the term is used in the claims

13   themselves.

14           You can see in Claim 18, it talks about locating code.

15   It doesn't say locating a code.  It doesn't say locating one or

16   more codes.  It says locating code.  And my linguistic experts

17   on my team have taught me about things such as non-count nouns

18   and countable nouns.  And when you're talking about source code

19   and machine code, that's what they refer to in linguistics as a

20   non-count noun.

21           An example of that would be sort of homework.  You

22   don't say a homework.  You don't say homeworks, two homeworks.

23   It's something that just always has the singular form.  You

24   don't put a or numbers in front of it.

25           Different from a code or codes when you're talking

1    about a pass code or pin code type of thing.  An example of a

2    countable noun that's similar to that would be an assignment.

3    You can refer to an assignment, assignments, two assignments.

4    And so when you look at the context of the claim language, and

5    that's where you start when you're doing claim construction, I

6    think Your Honor was right on in finding that what we're

7    talking about here is instructions.  We're not talking about

8    data.

9         And essentially, what their construction attempts to

10   do is allow for the possibility where you're just going to have

11   data, you're not going to have instructions.  Your

12   interpretation, I think, is -- is absolutely correct.  It's one

13   or more instructions.  Doesn't mean it can't have data.  It

14   doesn't exclude it.  But what we're talking about here is the

15   type of source code, machine code, a -- this non-count noun

16   version of code.  We think your proposed preliminary

17   construction is absolutely correct, and you should stick with

18   it.

19             THE COURT:  All right.

20             MR. KLINE:  If we could turn to Slide 70, please.

21             Your Honor, this is -- we were all interested to see

22   an empty box in the preliminary ruling, which we take this to

23   mean this is a green field for the -- for the hearing.

24             So we're at 12 in your list, Your Honor, wherein the

25   use of said identified signal comprises information of the

1  passing of said identified signal on said step of -- of

2  passing.

3          Apple has contended that the claim is -- that term is

4  indefinite, and we certainly disagree with that.  We largely

5  rest on our briefs, Your Honor, but with a blank square, I'm

6  eager to answer questions you may have.

7          I will point the Court to one section of the

8  specification that we think is helpful here.  So this is Claim

9  14 of the '088 patent.  And I'll say, Your Honor, you can see

10 the way we had arranged this on Slide 70 of our presentation,

11 because these two wherein clauses, as well as communicating

12 information on a use of said identified signal, they -- they

13 interact with one another in Claim 14 of the '888 (sic) patent.

14         And it's at the end of the claim where we talk

15 about -- toward the end, we're passing the signal from said

16 processor to the output port.  And then where our bolding

17 begins:  Wherein a way the signal is passed from said output

18 port is based on said step of identifying.

19         The next term is communicating information on a use of

20 said identified signal.  And then the phrase we're discussing

21 right now:  Wherein the use of said identified signal comprises

22 information of the passing of said identified signal based on

23 said step of passing.

24         I would direct the Court's attention -- and it's Slide

25 74 of our presentation -- do I have that right?

1             The '490 patent, Column 17, Lines 10 through 24,

2      there's an embodiment described -- part way down the paragraph,

3      in a predetermined fashion, signal processor 130 identifies and

4      marks the source of signals as coming from a device 139.  And

5      that can be, Your Honor, making a decision based on said step

6      of passing.

7             Monitoring signal usage rather than programming usage

8      and viewership.  So that's an example, Your Honor, where the

9      patent specification gives an explanation of what might be

10     meant by the term "wherein the use of said identified signal

11     comprises information of the passing of said identified signal

12     based on said step of passing."  So, for example, the signal

13     may have come from a specific device.

14            I hope that's helpful, Your Honor.

15            THE COURT:  Mr. Kline --

16            MR. KLINE:  Yes.

17            THE COURT:  -- is your position that we should

18     construe the -- the phrase "the use," which follows directly

19     wherein in that clause, as meaning information on the use?

20            MR. KLINE:  My position has been, Your Honor, that the

21     claim needs no further...

22            Let me go back, if I can remind myself.  We think it's

23     plain and ordinary meaning.

24            THE COURT:  And you think the plain and ordinary

25     meaning is that it means information on the use?

```
 1            MR. KLINE:  I believe so, Your Honor, although I think
 2    I have to reserve the right to be second guessed on that.
 3            I think that's fine, Your Honor.
 4            THE COURT:  Well, if we don't add that language of
 5    "information on," then how do you make literal sense of the --
 6    of the phrase?
 7            MR. KLINE:  So, Your Honor, wherein the use of said
 8    identified signal comprises information of the passing of said
 9    identified signal based on said step of passing.  So, I'm
10    sorry, Your Honor, where are you proposing to --
11            THE COURT:  Well, my understanding was that at the
12    beginning of the wherein clause that you just read, where it
13    says, "wherein the use," you want us to construe that as
14    wherein information on the use?
15            MR. KLINE:  Well, the claim itself says:  Wherein the
16    use of said identified signal comprises information of the
17    passing of said signal.  Where did it come from?  When was it
18    passed?  Things of that nature, Your Honor.
19            THE COURT:  Well, which would be information on the
20    use?
21            MR. KLINE:  Right.
22            THE COURT:  So if we don't read in "information on,"
23    how do we make sense of the clause?
24            MR. KLINE:  Well, I think because the clause itself
25    reads it in, Your Honor, wherein the use of said identified
```

```
 1   signal comprises information of the passing of said identified
 2   signal.
 3             THE COURT:   How does the use comprise information?
 4             MR. KLINE:   What time was it used?  Where was it sent?
 5   Things of that nature.
 6             THE COURT:   That's information on the use.
 7             MR. KLINE:   That's right.
 8             THE COURT:   Not about the use.
 9             MR. KLINE:   Right.
10             THE COURT:   That's what I'm struggling with is how to
11   give literal effect to this because I'm not comfortable with
12   rewriting it.
13        MR. KLINE:   And, I think, Your Honor, that if I
14   understand correctly your thought process, the notion that the
15   use includes information is already written within the claim.
16             THE COURT:   Well, I just have trouble with how the use
17   can include information.
18        MR. KLINE:   I'm sorry, Your Honor, I find myself just
19   reading the claim over and over again.
20             Communicating the claim term -- and perhaps it's
21   helpful to -- to look at the entire element rather than just
22   the wherein clause.
23             So what I'm doing, Your Honor, is I'm looking at 71,
24   but haven't given you the courtesy of putting it up for you.
25             THE COURT:   I have the --
```

1            MR. KLINE:  Okay.

2            THE COURT:  -- claim in front of me.

3            MR. KLINE:  Thank you.

4            So the last phrase, communicating information on a use

5    of said identified signal wherein the use of said identified

6    signal comprises information of the passing of said identified

7    signal.  Where did the signal come from?  What device did it

8    come from?  What time was the signal passed?

9            In some embodiments, Your Honor, you may be familiar,

10   if you -- if you rent a movie from iTunes, you get a period of

11   30 days or so within which you are free to play the movie, or

12   it -- it expires.  And once you begin to play the movie, you

13   have to play it as many times as you'd like within, I think, 24

14   hours.  So tracking the time that the signal is noting that --

15   that it was downloaded and it is live for 30 days.  When did we

16   begin to play the movie?  24 hours later, it expires, even if

17   it's sooner than 30 days.  So the time that signals were passed

18   can be important.  Where signals came from, where they were

19   passed to.

20           THE COURT:  All of which would be information on a

21   use --

22           MR. KLINE:  Yes.

23           THE COURT:  -- which the opening clause identifies.

24   Are you contending that it was not a drafting error?

25           MR. KLINE:  Yes, Your Honor.  We don't contend that

1    this is a drafting error.

2              THE COURT:  All right.  All right.

3              MR. KLINE:  Thank you, Your Honor.

4              THE COURT:  Thank you, Mr. Kline.

5              MR. SERNEL:  Your Honor, Marc Sernel on behalf of

6    Apple.

7              I think the blank box that you had in your preliminary

8    constructions reflects that there is no sensible way to

9    construe this phrase.  We believe it's indefinite, and in the

10   briefs, PMC suggested that it should be redrafted to make it

11   sensible and -- redrafted in one of the many ways it could be

12   redrafted to make it sensible.  We think the Federal Circuit

13   law prohibits you from doing that, and we believe that the

14   proper finding here is that it's indefinite.

15             Here's the claim language.  And, again, in the briefs,

16   what PMC argued was essentially that the use of said identified

17   signal is short for and essentially they suggested you should

18   read in language -- and actually two sets of language, both

19   information on, and then also this concept of collected in the

20   claims.  And so I've -- I've redrafted the claim here in the

21   way that they would suggest you redraft it, by adding in

22   language "wherein information on the use," and then adding in

23   this concept of collected.  That's what they're asking you to

24   do, redraft these claims to make them sensible.

25             As written, they are nonsensical.  And there's just an

1    absolute mismatch, as Your Honor's questions indicate, between

2    the wherein the use and then what it's comprising.  There are

3    ways to fix it, and, you know, one way that they suggest in

4    their brief, that's one way you could fix it.  You could do

5    other things to, you know, avoid the mismatch and -- and kind

6    of have these things tie together, where instead of adding

7    information, you make the comprising use a use step.

8         And so this is not something that's subject to

9    reasonable certainty.  It requires you to redraft it.  There's

10   multiple ways you could fix it, but that's not your job to fix

11   claims.  Your job is to construe claims.

12        And the Federal Circuit's very clear on these points.

13   Again, Courts may not redraft claims.  That's what they're

14   asking you to do to try to sustain the validity of this, and we

15   don't think there is a proper construction of what is written

16   in a nonsensical way.  There are ways to fix it, but that's not

17   proper claim construction.  We believe the proper finding here

18   is indefiniteness.

19        THE COURT:  Is there another reading of the clause

20   that you think is reasonable the way it's written other than to

21   understand it as referring to information on the use?

22        MR. SERNEL:  Like I said, Your Honor, we sat there and

23   scratched our heads looking at this for a long time, as well.

24   We had a blank piece of paper as to what reasonably this could

25   mean.  We came to the conclusion, there's just a mismatch.

1        And, again, there are ways to fix it, and -- and what

2  they've suggested here is one way to fix it, putting in that

3  information on would then make it sensible.

4        I think there are other ways.  I could add a few

5  words, change things around, and fix it to -- to avoid the

6  mismatch and have the wherein part of that clause connect up

7  with the language that follows the comprising.  And so where

8  you've got these multiple ways, you might be able to

9  rehabilitate --

10        THE COURT:  Well, give me a for instance.

11        MR. SERNEL:  For example -- yeah, again, the wherein

12  the use of, you could then have comprises use of passing of an

13  identified signal, or, again, it's just kind of connecting use

14  to use.  That'd be a way to -- to fix this.

15        And so there's other ways.  I could add three words

16  and -- and come up with different meanings that I think would

17  be sensible.  But here as written, there's clearly a mismatch.

18  Mr. Kline acknowledges it's not a -- a drafting error.  This is

19  apparently what they intended, but we believe it's absolutely

20  nonsensical as written, as Your Honor indicated in your

21  questions, and you should find it indefinite.

22        THE COURT:  All right.  Thank you, Mr. Sernel.

23        MR. SERNEL:  Your Honor, we had -- we had talked

24  about -- there are two claims in which we argue indefiniteness,

25  and so the parties have agreed to -- to move on to that one out

1    of order.  That's the term "stored function invoking data."

2         On this one, we -- Apple disagrees with your

3    preliminary construction.  You did figure out a way to -- to

4    construe this one as stored data that invokes a function.  We

5    believe this one is subject to multiple different possible

6    meanings.

7         The proper construction of this is not reasonably

8    clear, and so we believe that the proper finding on this one is

9    indefinite, as -- as well.

10        And so just to set the stage, this is how the term

11   appears in Claim 62 of the '649 patent.  It talks about

12   comparing stored function invoking data.  There is no other

13   reference to this term, "stored function" -- "stored function

14   invoking data" anywhere in the specification, and so there's no

15   explanation anywhere as to what this means.  All we have is

16   this usage in Claim 62.

17        There was an effort in PMC's brief to point to

18   somewhat like terms.  They pointed to terms, such as "control

19   invoking instructions," "controlled-function invoking

20   information."  But those aren't stored function invoking data,

21   and don't address what we think is one of the unclear ambiguous

22   issues, which is what is exactly stored.

23        I'll note that when you look at controlled-function

24   invoking information in their brief and in the -- the quotation

25   from the specification, that is actually -- there's a dash

1   between controlled and function which helps explain what's

2   modifying what.  We don't have that in the term in Claim 62.

3        So we think this term is not precise enough to meet

4   the Supreme Court's standard in Nautilus for indefiniteness.

5   And we believe there's at least three potential interpretations

6   on -- on the table here when you've got these multiple

7   adjectives and -- and nouns.  What's modifying what, I think,

8   is -- is uncertain, and there's -- the three interpretations

9   are listed here.  Data for invoking a stored function.  Do we

10  have stored data for invoking a function or stored data for

11  invoking a stored function?  What is stored modifying?  We

12  think that's not clear from the claim language, and we have

13  no -- nothing in the specification to help us out.

14       In the -- in their brief, PMC started with -- and

15  their proposed construction was data stored in memory, and then

16  requiring the functions also be stored.  And so it was going

17  with the third interpretation, which is actually different from

18  Your Honor's preliminary which just requires the data be

19  stored, not the function be stored.

20       In the reply brief, they then evolved to this second

21  interpretation, which is the data stored.  The function is not

22  stored.  You can see we asked both -- there's two inventors on

23  this patent.  We asked them both this question, and we got two

24  different answers.

25       We had Mr. Harvey saying that stored is modifying

1   data, not function.  That's consistent with what you've done.

2   Inventor Cuddihy, when reviewing the language, couldn't --

3   couldn't figure it out, and -- and couldn't provide us an

4   answer.

5           And so, again, I think the -- the standard under

6   Nautilus, it's a lot more rigorous than what we used to operate

7   in pre-2014.  A patent must be precise enough to afford clear

8   notice of what is claimed, thereby apprising the public of what

9   is still open to them.

10          And we think that here where we don't know whether it

11  requires stored data, stored function, or both, that is not

12  giving us the clear notice that's required by the Supreme Court

13  and Federal Circuit case law.  And we think this term is

14  indefinite.

15          THE COURT:  All right.

16          MR. GRINSTEIN:  You have Slide 61, please.

17          Your Honor, Joe Grinstein for PMC.

18          Just so the record is clear, the -- Ms. Bonn and

19  Ms. Xi and myself were on the PMC/Vizio case.  This is a common

20  term between Vizio and Apple, so I'm here responding to Apple's

21  argument, which is also Vizio's argument, but that's why I'm --

22  I'm standing here right now.

23          THE COURT:  All right.  Mr. Grinstein, thank you.

24          MR. GRINSTEIN:  Obviously, the dispute on this

25  particular term is whether or not the term "stored function

 1   invoking data" is indefinite.

 2           What the Defendants here have done is manufactured a

 3   dispute essentially complaining that there's a lack of hyphens

 4   in the claim term.  They throw their hands up in the air and

 5   say we can't figure it out, this claim term, because is it

 6   stored function, hyphen, invoking data?  Is it stored, hyphen,

 7   function invoking data?  Is it stored, hyphen, data for

 8   invoking a stored, hyphen, function?  Essentially because

 9   there's no hyphens in -- in the claim language, their position

10   is it's indefinite.

11           I think counsel just made a hyphenation argument by

12   looking at the specification, and I think that the

13   specification is actually pretty illuminating in its use of

14   hyphens.

15           So, for example, the specification of the '091 patent

16   at Column 12 first uses the term "control invoking

17   instructions," and that makes it clear that we're talking about

18   instructions that invoke control.  There's no use of hyphens

19   there.  I don't think anyone suggests what that specification

20   passage is talking about is somehow uncertain or unclear,

21   despite the lack of hyphens.

22           The specification goes in a different particular

23   section of the '091 patent.  Here we're at Column 143, and here

24   the specification does use a hyphen and says

25   "controlled-function invoking information."  So now we know if

1   we want to modify the word "function," we can do so with a

2   hyphen.  And that's what the patentee choose -- chose to do

3   right here, is modify the word "function" with the word

4   "controlled," and to make it clear that that word "function"

5   was being modified, a hyphen was inserted in front of

6   "controlled."

7          The patent specification goes on in Column 49, again,

8   of the '091 patent.  Here we've got the phrase "preprogrammed

9   controlled-function-invoking information."  Now, the patent

10  wants the word "preprogrammed" not to modify

11  controlled-function-invoking, but instead, to modify

12  information.  And so in that situation, the patentee knows not

13  to use a hyphen and to use -- have the word "preprogrammed"

14  stand out by itself.

15         And that brings us to the claim language, which I

16  think also resolves this -- this particular dispute.  The claim

17  language here is stored function invoking data.  The patentee

18  chose not to put a hyphen between stored and function because

19  the patentee didn't want the word "function" to be modified by

20  the term "stored."

21         And importantly, when we look at this claim, the

22  Court's construction, which is a variation of our construction,

23  is the only construction that actually makes any sense in the

24  context of the claim because in this particular clause, we are

25  comparing stored function invoking data to the contents of said

1   at least one registered memory.

2          Well, where did that data come from?  That is the

3   first time in this particular claim that stored function

4   invoking data is mentioned.  It's not mentioned previously in

5   the claim.  Where is this stored function invoking data coming

6   from?  What is this data?  Well, it's function invoking data

7   that has been pre-stored that is in the register memory -- or

8   that is pre-stored, and that's where we're getting this

9   function invoking data.

10         If we are to construe this clause in one of the ways

11  in which the Defendants say it can be construed, which is not

12  to say how they want it construed, but they're just saying

13  here's one of many alternate constructions, they would say, ah,

14  one of many alternate constructions is that we're talking now

15  about stored-function invoking data.

16         But where did this stored-function invoking data --

17  with a hyphen in between stored and function -- where did that

18  come from?  We don't know.  It makes its first appearance in

19  this comparing clause.  We don't know where it's located.  We

20  don't know where it came from.

21         Per the Defendants' construction, this particular data

22  is coming up out of the blue and has no grounding in the rest

23  of the apparatus.  That, I submit, is not a plausible reading

24  of the claim.  And it's not enough to create an indefiniteness

25  by clear and convincing evidence just to come up with some

1    implausible reading of the claim and say, well, here's another

2    way to read it, and since there's more than one way to read it,

3    therefore, there's no reasonable certainty, and the claim is

4    indefinite.

5         That's not enough to get over the clear and convincing

6    bar, and I think that's what the Defendants have offered.  They

7    certainly haven't offered any actual evidence.  They've not

8    offered the evidence of any claim -- of any inventor.  We have

9    the testimony of the inventor, Mr. Harvey, who confirms the

10   same reading that PMC is proposing today.  They don't have the

11   invent -- evidence from any expert.  We've got evidence from

12   Mr. Weaver who's declaring that the -- the claim term is

13   amenable to construction.

14        So at end of the day, there's evidence on the PMC

15   side.  There's attorney argument on the Defendants' side.  I

16   don't believe that attorney argument rises to the level of

17   clear and convincing evidence sufficient to invalidate the

18   claim.

19        THE COURT:  All right.  Thank you, Mr. Grinstein.

20        MS. ALBERT:  Your Honor, we're next going to address

21   the claim terms "processor" and "control processor."

22        And could I have Slide 99, please?

23        So both PMC and Vizio agree that the term "processor"

24   means a device that performs operations according to

25   instructions.  And so the issues presented by the terms

1    "processor" and "control processor" are really whether these

2    devices operate on data or -- or have to operate on data in

3    accordance with instructions.

4          And a construction that a processor is -- is a device

5    that operates on data would be overly broad and could -- could

6    encompass devices that while they may operate on data, would

7    never be considered to be processors.

8          For example, a memory operates on data, but it

9    wouldn't be considered by a person of skill in the art to be a

10   processor.  A keyboard operates on data, but it would never be

11   considered by a person of skill in the art to be a processor or

12   a control processor.

13         And turning to Slide 100, the specifications make

14   clear that processors operate on data by executing

15   instructions.  And, for example, on Slide 100, we see an

16   excerpt from the '091 patent at Column 118, Lines 10 through

17   13, which indicates that executing said decrypt process and

18   meter-current-00-header-message instructions cause control

19   processor, 39J, then to transfer to decryptor the spam

20   information of the second message in the following fashion.

21         And if we look at the next slide, 101, we see that

22   the -- the 1987 specification at Column 8, Lines 34 through 39,

23   also indicates that in accordance with the present invention,

24   the signal processor detects signals, and in accordance with

25   instructions in the signals and preprogramming in the signal

1    processor, decrypts and/or records and/or control station

2    apparatus by means of the signal and/or discards the signals.

3              So these excerpts from the specification make clear

4    that in the context of the present invention, the processors

5    operate on data according to instructions.  And we believe that

6    a construction that would disregard the requirement for

7    operating on data in accordance with instructions would sweep

8    in devices that persons of skill in the art would never

9    consider to be processors or control processors.

10             THE COURT:  Ms. Albert, in the Zynga matter, didn't

11   PMC tell the Court that this term was not limited to

12   instructions?

13             MS. ALBERT:  It did, Your Honor.  I believe that was a

14   different patent with different claim terms, but it's clear

15   that in the -- in the context of these claim terms, the

16   processors are required to operate on data in accordance with

17   instructions.

18             THE COURT:  How different was that patent?

19             MS. ALBERT:  I can't remember the patent number that

20   was in that case.

21             THE COURT:  Was it from this specification?

22             MS. ALBERT:  It is from this specification, yes, Your

23   Honor.

24             THE COURT:  And isn't that where the -- where you're

25   saying I should look to determine the meaning of processor?

1          MS. ALBERT:  Yes, Your Honor.  But as we've shown, the

2    specification describes the processor as operating on data in

3    accordance with instructions.

4          THE COURT:  And aren't there also examples in the

5    specification that are not described to be executing

6    instructions?

7          MS. ALBERT:  I don't believe there are instructions in

8    the specification where a processor would process data that --

9    that wouldn't be responsive to some sort of instruction.

10          THE COURT:  All right.  Let me take a look.  Now,

11    it -- Column 19, Line 14 to 16, talking about the decoder

12    described in Figure 2B?  I think that's one that was cited to

13    us before as involving processing but not a requirement of

14    executing instructions.

15          MS. ALBERT:  Your Honor, could you -- what was your

16    citation, Your Honor?

17          THE COURT:  19, 14.

18          MS. ALBERT:  19, 14.

19          THE COURT:  19.

20          MS. ALBERT:  And, Your Honor, in that Figure 2B,

21    the -- the radio decoder does include controller 44, which is a

22    processor that operates in accordance with instructions.

23          THE COURT:  But that -- the figure is not talking

24    about that.  It's talking about the decoder that detects and

25    processes signal information.

1           MS. ALBERT:  Well, if you see the -- the line,

2    there -- there is a possibility in that figure of the

3    controller communicating with the radio decoder 44.  There's an

4    arrow drawn from controller 44 back to radio decoder 42.  So it

5    does receive instructions from the controller.

6           THE COURT:  And what is your explanation for why you

7    would represent to the Court in the Zynga matter that it's not

8    limited to -- that this specification does not limit

9    processor to executing instructions and now you're saying it

10   does?

11          MS. ALBERT:  I would need to look in the context of

12   the claims that were at issue in the Zynga case and compare it

13   to the claims at issue in our case, but with respect to the

14   claims that are at issue in our case, it's PMC's position that

15   those claims require that the processor operate on data in

16   accordance with instructions.

17          THE COURT:  Tell me what it is about those claims that

18   differentiates that processor from other processors addressed

19   in the specification.

20          MS. ALBERT:  There are requirements for controlling

21   the decryption, for example.  With respect to Claim 14 of the

22   '088 patent, for example, that claim requires a processor that

23   is programmed to perform a number of different functions,

24   including identifying a signal, passing a signal, communicating

25   information on use.

```
 1              THE COURT:  So your representation is that all of the

 2    claims asserted here that contain processor are different from

 3    the claims that were at issue in the Zynga matter in that

 4    regard?

 5              MS. ALBERT:  I don't know if I can make the

 6    representation about all of the claims without looking at the

 7    claims that were at issue, but I would represent that the

 8    claims at issue in this matter do require that the processor

 9    operate in accordance with instructions.

10              THE COURT:  All right.

11              MS. ALBERT:  Thank you, Your Honor.

12              THE COURT:  Thank you, Ms. Albert.

13              MR. MERKIN:  Your Honor, Joel Merkin on behalf of

14    Apple.

15              Just a few quick responsive points on the construction

16    for processor.

17              Slide 105 is where Apple identifies just a few of

18    the examples in the specification.  I think you alluded to one

19    of them, Column 19, where there are plenty of examples in the

20    spec that do describe processors that are not limited to

21    being -- operating according to instructions, the signal

22    decoder.  Even counsel for PMC said it's possible maybe for

23    instructions, but it doesn't require instructions to be

24    operated according to.

25              The cite under that, you'll see the EOFS, the end of
```

1    file signal valve, processes things like buffers and

2    comparators are described in PMC's specification as processing.

3    I can go on and on.

4         So there's plenty of items in PMC's specification that

5    clearly do not operate according to instructions.

6         I also want to direct your attention to Slide 103.

7    Actually, it wasn't just the Zynga case that PMC previously

8    took the position that processor doesn't need to be performed

9    on operations according to data and instructions.  You can see

10   in Slide 103, this is actually the Amazon case.  It's not

11   before this Court.  It was before the Delaware court.  PMC's

12   own proposal was just very similar to this Court's prior

13   construction -- any device capable of performing operations on

14   data.  That, again, applied to two different PMC patents, the

15   '304 patent and the '749 patent.

16        The '304 patent and '70 -- '749, identical spec.  The

17   '304 patent is even so close to the claims at issue in the

18   Apple litigation that Apple has a pending motion to dismiss

19   based on collateral estoppel issues related to the '304 patent.

20   So there's no real argument.  I guess PMC previously took the

21   position it doesn't need to be -- operate on data according to

22   instructions.

23        Also, I want to just quickly draw your attention to

24   Slide 102.  The PTAB very recently considered this, too.  This

25   is March 2006, and also agreed processor is just a device that

1    operates on data.  So everyone has -- everyone who's considered

2    a dispute has consistently found processor in PMC's

3    specification is not limited to operating according to

4    instructions.

5         Your Honor, I'd like to turn to -- turn to the next

6    term on the list, the "instruct-to-enable signal" term.

7         THE COURT:  All right.

8         MR. MERKIN:  On Slide 110, you'll see the dispute here

9    is whether the word "instruct" should be read out of the term

10   "instruct-to-enable signal."

11        Instruct-to-enable signal, it's a term that is not

12   used in PMC's specification.  Apple simply proposed a plain

13   meaning construction, intended to clarify this rather unusual

14   term.  We weren't try to be tricky here.  This is

15   instruct-to-enable signal, and Apple's proposed construction,

16   which we continue to contend should be the adopted

17   construction, is simply a signal that provides an enabling

18   construction.  We tried to highlight here on Slide 11 (sic),

19   just for consistency between the actual language of the term

20   and Apple's proposed construction.

21        Now, PMC complains -- I'm on Slide 112 -- that Apple's

22   construction for the word "instruct-to-enable signal" includes

23   the word "instruction," and instead, proposes a construction

24   itself that amounts to simply a -- a signal that has enabling

25   information.

1          Now, that's similar to what the Court included in its

2    proposed and preliminary construction.  The Court's preliminary

3    construction, a signal that enables the implementation of the

4    enumerated operation.  So the word "instruct" that's included

5    in Apple's proposed construction, that comes straight from the

6    term.  It's an instruct-to-enable signal.

7          In fact, if you look on Slide 112, we've shown Claim

8    26 of the '091 patent.  This claim distinguishes an

9    instruct-to-enable signal from simply enabling information.

10   You can see the claim recites detecting the presence of an

11   instruct-to-enable signal.  That's what is at -- is at issue

12   here.

13         Separately, there's an issue of receiving enabling

14   information.  I submit that the claim -- Court's preliminary

15   construction, which does not include the word "instruction,"

16   seems to be reading out the notion that the

17   instruct-to-enable signal is a signal that does provide an

18   instruction.

19         Slide 113, you'll see this is the portions that -- of

20   the specification that PMC has cited to.  And if you read this

21   closely, in all these instances it refers to instructions.

22   Typically, they're enable WSW, which stands for Wall Street

23   Week instructions.  So really, all parts of the specification

24   that PMC is pointing to that could support instruct-to-enable

25   signal, again, the term isn't -- itself isn't used in the

1    specification, all refers to it using instructions.

2         Lastly, Slide 114, you see, again, this was just over

3    a year ago in the Amazon case pending in the District of

4    Delaware for a -- a different term in a different patent, but

5    that used the word "instruct signal," which is part of a

6    process of instruct-to-enable signal.  This included instruct

7    signal.  PMC proposed to the Court that instruct signal means a

8    signal including an instruction or series of instructions, dot,

9    dot, dot.

10        So it seems like instructions need to be included

11   within the construction for an instruct-to-enable signal.

12   Simply calling it a signal that enables something and doesn't

13   specify that the instruct-to-enable signal is a signal that

14   provides an enabling instruction would read out the term

15   "instruct" from the term.

16        THE COURT:  Do you dispute that there are instruct-to

17   terms in the specification that don't include or require

18   instructions?

19        MR. MERKIN:  So, Your Honor, I believe there are other

20   instruct signals not present in these claims.  For instance, I

21   recall instruct to decrypt signals which likewise would in --

22   be a -- you know, just regurgitating kind of a plain meaning, a

23   signal that provides an instruction to decrypt.  Here we're

24   talking about an instruct-to-enable signal.  And, again, it

25   would just be a signal that provides an enabling instruction.

1          So I don't believe there's instruct signals in the

2   specification that actually wouldn't be instructions.  A signal

3   that instructs essentially is an instruction.

4          THE COURT:  All right.  Thank you, Mr. Merkin.

5          MS. ALBERT:  Turn to Slide 124, please.

6          Your Honor, we agree with the Court's proposed

7   construction that an instruct-to-enable signal is a signal that

8   enables the implementation of an enumerated operation.

9          And if you do refer to the specification, you'll see

10  that the instruct-to-enable signal is not limited to

11  instructions.  It's a signal that's broadly comprised of

12  information that enables the execution of instructions.

13         For example, turning to Slide 125, we see here an

14  example from the 1987 specification in the '091 patent at

15  Column 156, Lines 4 through 9, that describe the enabling

16  message as being comprised of SPAM information.  So that's

17  information.  It doesn't require that it be instructions.  And

18  that SPAM information enables the detector to detect digital

19  information of the message and the controller to process the

20  information.

21         And turning to Slide 126, we see at Column 148, Lines

22  56 through 62, a description of an instruct-to-enable signal

23  called:  Please-fully-enable-WSW-on-CC13-at-particular-8:30

24  information.  Again, the -- the patent specification uses the

25  term "information" to describe this instruct-to-enable signal

1    that then causes the controller 20 to select particular

2    WSW-on-CC13-at-particular-8:30 information in the received

3    information and record the selected information at memory and

4    then execute particular

5    receive-authorizing-info-at-appointed-time instructions.

6           So, Your Honor, PMC agrees with the Court's proposed

7    construction and believes that the instruct-to-enable signal

8    should not be limited to a construction that would require that

9    it be instructions.

10          Thank you.

11          THE COURT:  All right.

12          MS. XI:  Your Honor, Meng Xi on behalf of PMC.

13          On message stream, which is No. 18 on the tentative

14   order, we noticed that the Court rejected all the parties'

15   proposed constructions, and instead construed message stream to

16   include signal processing information.

17          We just want to make clear on the record today that

18   the tentative construction of signal processing information

19   does not exclude digital video and audio signals.

20          For example, let me direct the Court's attention to

21   Claim 51 of the '2,649 patent.

22          Could we go to Slide 93?

23          MS. XI:  This claim discloses that digital television

24   signals are included in said message stream, and I will note

25   that this is consistent with the Court's tentative construction

1    for Claim Term No. 22, digital television signals, which

2    include both digital video -- video signals and digital audio

3    signals.

4         Now, Vizio also makes a big deal in its opposition

5    brief at Docket No. 160 that PMC's expert, Dr. Weaver, could

6    not point to a place in the spec that describes television

7    signals are messages.  But as the Court is aware, extrinsic

8    evidence may not contradict intrinsic evidence, and the

9    intrinsic evidence here is clear that digital television

10   signals can include or can be included in a message stream.

11        Anticipating Defendants' arguments, Your Honor, I'd

12   like to shift gears to talk about PMC and Apple's dispute that

13   message stream is a series of data packages that -- that comes

14   down to just one word for the dispute, whether these data

15   packages could be analog or if they are fully digital.

16        Can we go to Slide 81 for that?  We're on Slide 81.

17        Figure 2I from the spec shows one configuration of a

18   message stream.  It's got padding bits, commands,

19   information -- information segments, and the file signals and

20   others.  But the use of bits, which is highlighted on that

21   slide, is a telltale sign that the message -- message stream is

22   digital, as opposed to analog.

23        This is because there are major differences between

24   digital and analog signals.  A digital signal, which is in red

25   here, has a discrete value at each time sampling point.  And an

1    analog signal is a continuous smooth signal that contains

2    time-varying quantities.

3          It's undisputed -- well, these are undisputed.  On

4    this graph here that you see voltages plotted on the vertical Y

5    access and time runs along the horizontal X axis, each of the

6    vertical lines represent a time sampling point.  The blue

7    analog signals are smooth and continuous because there are an

8    infinite number of possible values for the signals at each time

9    sampling point.  And the red digital signals with their finite

10   set of possible values will look angular and rigid as the

11   signals try approximate values at each time sampling point.

12         Now, with that in mind, the terminology used for

13   digital signals is very important here.  As any computer

14   programmer can tell you, a digital signal has binary states on

15   or off, high or low, 1 or 0.  There is no in between.

16         Digital signals are thus represented by bits, which is

17   a con -- contraction of the word "binary" and "digits"

18   themselves.  When someone says bits, someone is talking about

19   something digital, as opposed to analog.

20         Further, in computer programming terminology, a bit is

21   typically a single element of code, 0 or 1.  A byte is 8 bits.

22   It could be, you know, four 0s followed by four 1s or eight 1s,

23   or it could be eight 0s.  And, finally, a word is a unit of

24   manipulation made up of bits.

25         So going back to Slide 82, the use of -- the usage of

```
 1   bits here is very telltale, that we're talking about digital

 2   signals.

 3          Also, if you look at Figure 2J, we've got more

 4   description and more uses of the word "byte" and "word," which

 5   are significant here for the reasons stated.  And same thing

 6   elsewhere in the specification.  We've got first bit of one

 7   header to the last bit in the bolded passage.  And, again, this

 8   shows that message streams are digital, not analog.  If we were

 9   talking analog, we wouldn't be using bits.

10          So Apple should not be allowed to assert that message

11   streams can be analog, and that's why we would urge that you

12   keep the construction that specifies that such message streams

13   are digital by using the word "bits."

14          THE COURT:  I mean, this -- this construction is a

15   definition from your specification.

16          MS. XI:  Yes.  And the specification actually uses

17   SPAM, signal processing apparatuses and methods --

18          THE COURT:  Uh-huh.

19          MS. XI:  -- in place of signal processing.  And, I

20   mean, the -- yes, that is -- that is from -- that's straight

21   from the spec.

22          THE COURT:  You want it to say SPAM?

23          MS. XI:  We said SPAM in the spec, but we wanted to

24   make sure that the Court is not excluding digital video signals

25   and digital audio signals in its tentative construction.
```

1          THE COURT:  The -- how is that the issue that's

2    presented?

3          MS. XI:  I was just anticipating what Apple was going

4    to come up here and argue over the audio -- analog versus

5    digital issue.  But I could -- I could sit down and wait to

6    respond until Apple makes that.

7          THE COURT:  All right.  That'd be fine, Ms. Xi.  Thank

8    you.

9          MS. XI:  Great.

10         MR. MCBRIDE:  Good morning, Your Honor.  Kevin McBride

11   on behalf of the Vizio Defendants.

12         Your Honor, with respect to message stream, we believe

13   that the Court's preliminary construction is acceptable, and we

14   have no objection to it.

15         I think the main issue that I'd like to respond to is

16   PMC's counsel's submission that the construction somehow allows

17   for the inclusion of digital video, digital audio, or digital

18   television signals within the message stream.  And counsel

19   relies on Claim 51 of the '2,649 patent.

20         But Claim 51 is not part of the intrinsic record, Your

21   Honor.  As Your Honor noted, we have a very clear glossary

22   definition, taken right from the specification, ratified in the

23   prosecution history, and that is the intrinsic record which

24   should be persuasive here.

25              A later written claim has to accept claim

1    constructions as they're laid out and defined in the intrinsic

2    record.  We can't be rewriting the specification or the

3    glossary to save a claim.  I think counsel for Apple referred

4    earlier to the general principles that we shouldn't be

5    fashioning claim construction with an eye towards saving an

6    otherwise invalid claim.

7          And I will acknowledge that Claim 51 appears to lack

8    support in the specification and -- and lack written

9    description.

10         I did ask PMC's expert in his deposition, Dr. Weaver,

11   if it's true that the Harvey specification does not disclose

12   any examples in which television signals are embedded in the

13   message stream.

14         And he agreed with me:  I believe that's correct.

15         So -- and we cited that in our brief, Your Honor.  So

16   it seems wholly inappropriate to try and redo the glossary to

17   save a later written claim which itself lacks written

18   description.

19         I have no further comments.

20         THE COURT:  All right.  Thank you, Mr. McBride.

21         MS. XI:  May I respond?

22         THE COURT:  Yes, you may.

23         MR. SHAH:  Your Honor, Archit Shah on behalf of Apple.

24   I just wanted to address one issue which I think might clarify

25   the presentation.

1              THE COURT:  All right.

2              MR. SHAH:  Counsel for PMC has referred to Figure 2I

3    and Figure 2J in discussing the structure of the message

4    stream.  The -- to the extent Your Honor has adopted the

5    glossary as a -- a construction, I just point out that neither

6    counsel for PMC, nor Vizio, has argued that the -- Figure 2I is

7    limiting or the definition is an exemplary embodiment.

8              And the construction from the glossary that Your Honor

9    has adopted refers to bits at the beginning and end of a

10   message.  There's no particular aspect of that construction

11   that addresses the rest of the content of that message.  And so

12   I'm just responding to counsel for PMC's position that the

13   message stream would be all digital.

14             With that, we have no further comments on message

15   stream.

16             THE COURT:  All right.

17             MS. XI:  Your Honor, it's black letter law that claims

18   are part of the spec, and the claim language is intrinsic

19   evidence here, which is part of the patent.  The claim has been

20   asserted in this case, 51, against the Defendants, and it has

21   been charted, as well.

22             We're not trying to undo the glossary, and the reason

23   that Claim 51 is coming up at all is because Vizio wants to

24   limit message stream to control information only.  And control

25   information excludes digital video signals and audio signals.

1          And I like to turn to Slide 92.

2          Vizio's proposed construction tries to replace

3    messages with control information, and that's just not right.

4    Claims 39 and 54 of the '2,649 patent each discloses control

5    information as being a part of a message stream.  To select

6    control information in said at least a first portion of said

7    message stream and to select control information in said

8    message stream.

9          So it would be completely nonsensical to select

10   control information in control information.

11         The Court should not adopt a proposed construction

12   that's nonsensical.

13         Also, being part of a message stream means that

14   control information does not have to be the entire message

15   stream or even the message.  These terms are simply not

16   synonymous.

17         Vizio's proposed construction is overly simplistic for

18   a message to include only control information all of the time.

19         We would like the Court not to replace message with

20   control information.

21         THE COURT:  Thank you, Ms. Xi.

22         MR. SHAH:  Thank you, Your Honor.  Mr. Shah for Apple.

23         Next term on the list is register memory.

24         And, Mr. Kim, if you could turn to Slide 121.  Yeah.

25         Your Honor's proposed construction and the parties

1    agree that register memory temporarily stores information for

2    later use in operations.  The question is whether register

3    memory can be any temporary storage or is limited to temporary

4    storage in a processor consistent with the specification and

5    the way the term is used in -- in the patent in the claims.

6          Register memory refers to storage in a processor and

7    not other types of memory described in the -- PMC's

8    specification.

9          THE COURT:  And what do you rely upon to limit it to

10   processor?

11         MR. SHAH:  Let me jump to Slide 125, which I think

12   will provide explanation for -- provide the context for the

13   specification.

14         The specification -- specification discusses random

15   access memory, buffers, read only memory, and these are in --

16   highlighted here in Figure 3A.

17         If we can go to the next slide.

18         What the specification further does is specifically

19   distinguish RAM-type memory, random access memory, from -- from

20   register memory.  And you can see here that -- sorry, if we can

21   go to the next slide.

22         So looking at '091 patent at Column 33 there, register

23   memory is distinguished from RAM capacity.  And the particular

24   embodiment that's being discussed here describes having three

25   different memory locations.  These locations could be in

1    register memory, or they could be in RAM -- in a RAM-type

2    memory.  And that is consistent with Figure 3A.

3           If we could go back to --

4           THE COURT:  How does that distinction turn on whether

5    register memory is in a processor or not?

6           MR. SHAH:  That distinction clarifies that register

7    memory is not synonymous with RAM memory and that RAM memory is

8    distinct from register memory.  The --

9           If we could turn back to Slide 125.

10          What we see here is the other types of memory

11   described in PMC's specification are illustrated separate from

12   the processors.  What's not illustrated here is the register

13   memory, precisely because it's contained in the processors

14   depicted here.

15          So if I look at, for example, the green highlighting

16   RAM under 39B, there's a processor for error correction.  It

17   has RAM memory.  It has ROM recommend.  It's connected to

18   buffer memory.  Register memory need not be depicted because --

19   precisely because it is within the processor.  And the same

20   would be true for the control processor 39J that is depicted on

21   the right side of Figure 3A.

22          That's also consistent with the way the term is used

23   elsewhere in the specification if we looked at Slide 122.

24          The microprocessor is specifically designed to have

25   register memories, the -- the register memories of the control

1   processor and the register of the CPU and other designated

2   processors.

3          THE COURT:  Can you point to anything that limits

4   register memory to a processor?

5          MR. SHAH:  I think all of these depict the

6   understanding of those of skill in the art that register memory

7   is the -- distinguished from the types of memory that are

8   separate from processors.  This is the type of memory that's

9   associated with the processor.  It's consistent with the

10  specification cites here, as well as well as what's -- what's

11  in the file history where it discusses -- this is on Slide 123,

12  It's cited in our brief -- the control based on processor

13  register memory, and the context for this -- this particular

14  amendment in the '649 file history is to overcome a double

15  patenting rejection, and they're discussing how the '649 patent

16  relates to the -- the processors that are involved in -- in

17  processing the -- the signals in PMC's invention.

18          And, finally, I think we have -- you know, we've also

19  cited to the -- the testimony of the Inventor Harvey, and this

20  is on Slide 124.  And he generally agreed, at the time of the

21  inventions, going back to the 1980s, the processor is -- is

22  within the -- the register memory is in the processor itself.

23          THE COURT:  Usually and generally, is that the best

24  you got?

25          MR. SHAH:  I mean, this is the extrinsic evidence.  I

1   think consistent with the Figure 3A, the way the terms are

2   used.  The -- the issue with the broader definition that

3   Your -- Your Honor has proposed is precisely that it

4   encompasses other types of memory, such as RAM memory, which

5   are separate from the processor and specifically distinguished

6   in the specification.

7          And this is why -- again, turning to Slide 127 -- you

8   know, the -- the text of the specification distinguishes

9   register memory from RAM memory.  But Your Honor's proposed

10  construction would encompass RAM memory within -- within the --

11  the separately described register memory.

12         THE COURT:  All right.

13         MR. GRINSTEIN:  Your Honor, let me just simply

14  respond.

15         If I could actually have Defendants' Slide 125, I'd

16  appreciate that.  Thank you very much.

17         It seemed like Defendants' entire argument comes down

18  to the idea that in the -- say, the control processor -- oops,

19  can't quite use the laser pointer on the TV.  But it -- the RAM

20  memory and the ROM memory are depicted as being outside the

21  control processor, and so, therefore, we need a construction of

22  register memory as memory being inside a processor so as to

23  distinguish RAM and ROM memory.

24         But actually this Figure 3A from the patent depicts

25  RAM and ROM memory as being inside the processor.  39J right

1    there is referred to in the patent specification.  If you look

2    at Column 118, Lines 10 through 13, 39J is referred to as the

3    control processor.  So that entire big square, all three

4    subcomponents within that big square, are the processor, and

5    RAM and ROM are being depicted here as being within the

6    processor.

7         So even if Defendants got their construction of

8    inserting in the processor as being a limitation on register

9    memory, that wouldn't exclude RAM and ROM memory anyway because

10   the patent specification, this figure itself, depicts RAM and

11   ROM as being within the processor, all of which just goes to

12   show that their particular limitation, the additional

13   limitation they want to insert in a processor is not

14   appropriate here.

15        THE COURT:  Do you contend that register memory should

16   encompass RAM?

17        MR. GRINSTEIN:  I think it can encompass RAM.  I don't

18   think it -- it necessarily excludes it.  I think there's a

19   possibility that it could encompass it.  And at the end of the

20   day, it's a functional-type of situation.  It's not a

21   specific structure, but it's a function.  What does the

22   register memory do?  And Your Honor's construction has defined

23   register memory in terms of its function, not in terms of

24   specific type of memory, but in terms of its function, it's a

25   particular type of memory that temporarily stores instructions

 1  for later use.

 2          THE COURT:  All right.

 3          MR. GRINSTEIN:  Thank you, Your Honor.

 4          THE COURT:  Thank you, Mr. Grinstein.

 5          Anything further on that?

 6          MR. SHAH:  Your Honor, I'd just note that counsel for

 7  PMC appears to argue that it wouldn't make a difference if

 8  in -- the processor's added to the construction with respect to

 9  random access memory, and to the extent they're happy to

10  concede that in -- in the processor should be part of the

11  construction of register memory, we'd be happy to agree with

12  that.

13          THE COURT:  I don't construe his argument that way.

14          MR. GRINSTEIN:  It wasn't, Your Honor.

15          THE COURT:  Okay.  Any further argument?  No?

16          MR. MERKIN:  Your Honor, Joel Merkin on behalf of

17  Apple.  I'd like to address two terms together that Apple has

18  the same issues with respect to the terms.  The terms are

19  "digital television signals" and "digital video signals."

20          Apple's dispute with the preliminary constructions for

21  both of those terms are whether digital signals are limited to

22  entirely digital signals, or do they encompass signals with

23  some digital information?

24          The claims at issue state television signals are

25  digital.  They do not state that -- that television signals are

1   entirely digital.

2           If you look at Slide 131 and compare that with other

3   claims that are at issue in this litigation -- these are,

4   again, PMC patents, same specification, related patent, the

5   '635 patent, there are claims that describe digital information

6   transmission.  And then in that case, because digital

7   information transmission may include some digital information,

8   the claim expressly states it's unaccompanied by any

9   non-digital information transmission.

10          Now, we don't have that in these claims.  When they

11  recite digital television signals, PMC knew how to and could

12  have said unaccompanied by any non-digital television signals.

13  It's simply not present in the claims.

14          The part of the specification that PMC relies on for

15  its digital video and digital television constructions is

16  Example 7 where it simply states:  So-called, quote, unquote,

17  digital video and, quote, unquote, digital audio well known

18  in the art.  But entirely digital television and entirely

19  digital video were certainly not well known in the art in the

20  1980s.

21          Looking at Slide 133, PMC's inventor, Inventor

22  Cuddihy, explained in 1987, any -- any video that was entirely

23  digital in its format was of an experimental nature.

24          Similarly, PMC's expert, Dr. Weaver, in the 1980s:

25  Digital -- digital television would have been experimental?

1        Unequivocal response:  Yes.

2        With the spec being quite unclear as to exactly the

3   scope of digital television signals and digital video signals,

4   it's important here for this term, look at the file history to

5   see what was actually argued by PMC, see how the examiner

6   responded to those arguments, and see what PMC continued to

7   say.

8        Here on Slide 135, you'll see PMC initially argued

9   that digital television included digital video and digital

10  audio.  The date of when PMC argued that was January 27th,

11  1997.  They were attempting to overcome prior art, and PMC was

12  making the statement to try to get around prior art in the

13  final history.

14       In response to that statement, the examiner -- this is

15  on the bottom part of Slide of 135 -- said -- he maintains that

16  the descriptions found in applicant's original disclosure

17  pertaining to the transmission of digitally formatted

18  television signals were at best confusing.

19       Certainly didn't seem clear to the examiner that

20  PMC's -- what they're saying is a clear statement, that's all

21  digital was actually digital.

22       Following this later in prosecution, there's a very

23  clear and unequivocal statement by PMC.  This is now dated

24  October 2, 1998, a quote shown on Slide 136.  Reading the

25  context of this, it says:  Television programming transmission

1    is disclosed to be comprised of a digital -- excuse me, a video

2    portion, an audio portion, and an -- embedded encoded digital

3    signals.

4         It goes on to say -- this is PMC's statement during

5    prosecution:  The audio portion, video portion, and signal

6    portion of the television programming transmission may be

7    entirely or partially encoded in digital information thereby

8    comprising digital television.

9         PMC expressly stated it can be entirely or partially

10   encoded in digital format thereby comprising digital

11   television.

12        We see a similar statement on the next slide.  This is

13   from the same file history amendment that PMC was making in

14   October 1998, later than the previous statements we're looking

15   at, where the television programming transmission is disclosed

16   as containing embedded encoded digital signals that generate

17   television programming.

18        The '81 case discloses that television programming

19   transmission, including digital signals, and thus being

20   digital television.  This is completely consistent with

21   Apple's proposed construction that digital television

22   signals are not necessarily entirely digital signals, but are

23   digital -- excuse me, television signals that include digital

24   information.

25        MR. KLINE:  Thank you, Your Honor.  I think I can go

1    through this rather quickly.

2           I think we're at Slide 52.

3           We largely rest on the briefs with respect to the --

4    with this issue, Your Honor.  We just have a couple of comments

5    about the remarks that counsel for Apple made.

6           What's important -- pardon me -- at the outset to

7    focus on, in our view, is that the term that we are construing

8    is digital television signal and digital video signal, not

9    information transmission, not broadly digital television, or

10   digital television transmission, but rather the claim terms are

11   digital television signals and digital video signals.

12          With respect to Claim 39, for example, of the '649

13   patent, the term "digital television signal" shows up in the

14   context of the clause receiving an information transmission,

15   including digital television signals and a message stream.

16          The patent describes -- for example, the '091 patent

17   describes, for example, Column 48, Lines 13 through 16, that a

18   television signal that consists of so-called digital video and

19   digital audio were well known in the art.

20          I'll come to it later, and we certainly dispute --

21   there was plenty of references cited on the face of the patent,

22   Your Honor, that are entitled digital television.  So people of

23   ordinary skill in the art at the time these applications were

24   filed were familiar with the concepts of digital video and

25   digital audio.

1          During prosecution of the '649 case -- and we'll talk

2    about this somewhat in some more detail -- there's an Office

3    Action -- the original -- as originally filed, applicant's

4    disclosure lacks any specific description.

5          There's a recognition, though, that digital television

6    signals and digital video signals are, in fact, digital.  As to

7    how the transmission circuitry of applicant's used to carry out

8    said recited methods was specifically modified and/or

9    configured for the purpose of handling digital television

10   signals.

11         There was an issue, Your Honor, whether the '81

12   specification disclosed -- sufficiently disclosed digital

13   television signals.

14         In response, and I think counsel for Apple referred to

15   some of this material.  In response, PMC submitted a paper

16   explaining -- these are PMC's words -- that the '81 case does,

17   in fact, disclose the television programming transmission,

18   including digital signals and thus being digital television.

19         But, again, Your Honor, we're not construing here

20   digital television.  We're construing digital television

21   signals.

22         So television programming transmission, including

23   digital signals.  At the TV signal decoder, the selected

24   frequency of the programming transmission is then transmitted

25   through Paths A, B, and C.  We've seen this Figure 2A, Your

1    Honor, from the '091 patent before.  This is the decoder

2    depicted in Figure 2.  It's shown here in more detail in

3    Figure 2A, and it shows that the signal is split into three

4    paths.

5            This portion of the specification describes that the

6    programming transmission is then transmitted through Paths A,

7    B, and C to three separate digital detector devices, 34, 37,

8    and 38.  We've talked quite a bit about those over the course

9    of the day.

10           Turning to the next slide, this is -- this is the

11   document that Apple refers to.  It's Exhibit 26 of their brief,

12   and it comes from the '649 patent prosecution history.  It

13   notes that digital detector 34 -- again, this is PMC explaining

14   the '81 specification -- digital detector 34 decodes encoded

15   signal information in the line portion or portions of the

16   analog video portion of the television programming

17   transmission.  Digital detector 37 determines whether a

18   particular encoded signal is present in the audio portion, and

19   then digital detector 38 receives a separately defined and

20   clearly digital transmission.

21           So digital detector 38 receives a separately defined

22   and clearly digital transmission of.  That phrase "separately

23   defined" comes up several times on the next slide, Your Honor,

24   which is a continuation of this portion of the document that

25   PMC cited -- submitted to the Patent Office where they

1 explained since the television programming transmission is

2 disclosed to be comprised of a video portion, an audio portion,

3 and embedded encoded digital signals -- again, there's the word

4 "signal," Your Honor -- the separately defined transmission is

5 at least some of the television programming transmission that

6 contains the encoded digital signal.

7    What we have, Your Honor, is Path C in Figure 2A,

8 which is described as a clearly digital transmission and that

9 it is separately defined.  When we go on to Slide 57, we say

10 that the embedded code -- encoded digital signals, the

11 separately defined transmission is at least some of the

12 television programming transmission that contains the encoded

13 digital signals.

14    Now, counsel for Apple went on to focus on the next

15 sentence.  Thus, it is disclosed that the audio portion, video

16 portion, and signal portion of the television programming

17 transmission -- that's the television programming transmission,

18 may be entirely or partially encoded in digital format

19 separately defined from the analog format.  The digital signals

20 themselves, Your Honor, are separately defined from the analog

21 format, and they are entirely digital.

22    So the claim construction proposed is correct that

23 television program in which the video and audio -- digital

24 television signals are programming in which the video and audio

25 are transmitted as digital video signals and digital audio

1    signals.  It's the signals that we're defining, Your Honor, not

2    the transmission overall.

3              Thank you.

4              THE COURT:  All right.  Thank you, Mr. Kline.

5              MR. MCBRIDE:  And, Your Honor, Kevin McBride for the

6    Vizio Defendants.

7              If I might, just a couple quick comments.  First of

8    all, both counsel for Apple and counsel for PMC have alluded to

9    enablement issues.  We think enablement is an issue for another

10   day and doesn't really affect the claim construction issues

11   that we're faced here.

12             With respect to the Court's preliminary construction,

13   we have no objection to it.  The only -- we have no objection

14   to it.  The only additional response I might make to Apple's

15   presentation beyond what counsel for PMC has stated is that in

16   connection with the specification -- if I could have the ELMO

17   on?  Zoom in on that.  Thank you.

18             At -- I think counsel for PMC referred to the

19   Example 7 in the specification, the Wall Street Week example,

20   transmitted in digital form.  And that's a long -- there's a

21   long discussion in that example, but at one part, in Column

22   154, starting at Line 57 through Line 64, it talks about how

23   the digital transmission is ceased and the receiving station

24   commences receiving television information as conventional

25   analog television and to prepare to receive particular embedded

1    SPAM information at the decoder 30.

2         If we were to adopt Apple's construction here and

3    allow for digital television to encompass analog with some

4    digital information embedded in it, then this would probably

5    say ceasing to receive digital television and commencing to

6    receive digital television.  It would become nonsense.

7         So the specification in this example clearly draws a

8    distinction between digital television as being completely

9    digital in terms of audio and video and conventional analog

10   television which could have some digital information embedded

11   in it.

12        Thank you, Your Honor.

13        THE COURT:  All right.  Thank you, Mr. McBride.

14        MR. MCBRIDE:  Your Honor, in the progression of

15   issues, we skipped over the term "multimedia."  We had -- we

16   Vizio had offered a construction on that.  I note in the

17   Court's preliminary construction, you referred only to the '088

18   patent, and so I guess my question is, were you intending that

19   we -- we Vizio save our arguments on multimedia for Phase II,

20   or would you like to hear us on this?

21        THE COURT:  I -- I am construing the term "multimedia

22   signals," not multimedia.

23        MR. MCBRIDE:  We had multimedia presentation in --

24        THE COURT:  So, yes, my intent would be that we'll

25   revisit other "multimedia" terms when we get to Phase II.

1          MR. MCBRIDE:  All right.  Thank you, Your Honor.

2          THE COURT:  All right.

3          MR. KLINE:  I get the pleasure of saying I think we're

4  done, Your Honor, unless you have more that you'd like to talk

5  about.

6          THE COURT:  I think that's good.

7          Mr. Everingham, you as well?

8          MR. EVERINGHAM:  Your Honor, I believe that

9  completes the claim construction issues that were calendared

10  for today.  There is a pending procedural motion in the Vizio

11  matter that deals with a number of asserted claims.

12          We had suggested in our papers that because everyone

13  was going to be here, it might be an opportune time to address

14  it now, but given the hour, I would certainly -- I'm not --

15  I'm not advocating that it be heard today, but if we could

16  perhaps set a telephone conference to address those issues in

17  the near future, it might help the parties streamline those

18  issues.

19          THE COURT:  All right.  I'll take a look at that and

20  see if we should proceed in that fashion.

21          MR. EVERINGHAM:  Understood.  Thank you, Your Honor.

22          THE COURT:  Thank you.  And we are adjourned.

23          LAW CLERK:  All rise.

24          (Hearing concluded.)

25

1                        CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                    7/29/16
      SHELLY HOLMES, CSR-TCRR              Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25