IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, LLC, § § § *Plaintiff*, § § v. § § APPLE, INC., § § *Defendant*. § | Case No. 2:15-cv-01366-JRG-RSP |

**MEMORANDUM ORDER**

Before the Court is the Motion to Exclude Certain Opinions of PMC's Damages Expert Michael Dansky filed by Defendant Apple, Inc. Dkt. No. 273. Apple moves to strike portions of the testimony of Mr. Michael Dansky, Plaintiff Personalized Media Communications, LLC's ("PMC") damages expert. *See* Dkt. No. 273 at 5[1].

### I.    BACKGROUND

On October 10, 2016, PMC's damages expert, Mr. Dansky, served his damages report estimating Apple's alleged infringement of the asserted patents. Mr. Dansky calculated a running royalty close to $240 million, he based his report on Apple's allegedly infringing FairPlay, FPS, and HLS functionalities. *See* Dkt. No. 273 at 5.

Mr. Dansky did a series of calculations to estimate the sum Apple would pay to PMC in a hypothetical licensing agreement. Mr. Dansky first calculated the profits from iTunes downloads per infringing unit ("Standard Profit Per Unit"). *See id.* at 8. He then computes the quotient of the FairPlay staff headcount number to the iTunes staff headcount number. The staff quotient is then multiplied by the Standard Profit Per Unit ("FairPlay-related Profit per Unit"). *See id.* Mr. Dansky

---

[1] Citations are to page numbers assigned through the ECF system.

then concludes that the reasonable royalty rate attributable to the patents-in-suit is 100%. *Id*. In other words, the FairPlay-related Profit per Unit is the value attributable to the patents-in-suit. Mr. Dansky states that the parties would have agreed to split this profit 50/50, to thus reach the final reasonable royalty rate of $0.007 per download. *See id*.

On November 21, 2016, Apple filed this Motion[2].

## II.   LEGAL STANDARDS

### A.  *Daubert* Standard

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Federal Rule of Evidence 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether

---

[2] PMC filed its response in opposition to Apple's Motion on December 8, 2016. Dkt. No. 294. Apple filed their reply in support for their Motion on December 15, 2016. Dkt. No. 314. PMC filed its sur-reply on December 22, 2016. Dkt. No. 328.

an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

### B. Damages

A patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." 35

3

U.S.C. § 284. "A 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868–69 (Fed. Cir. 2010) (citation omitted). A comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in *Georgia–Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

"A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018), *cert. denied,* 139 S. Ct. 1265 (2019). The patentee bears the burden of proving damages. *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citations omitted). Thus, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . ." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Accordingly, royalties must be apportioned between the infringing and non-infringing features of the product. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *Lucent*, 580 F.3d at 1336–37. If the patentee fails to tie the theory to the facts of the case, the testimony is excluded. *Uniloc USA*, 632 F.3d at 1315.

"[A]pportionment can be addressed in a variety of ways, including 'by careful selection of the royalty base to reflect the value added by the patented feature [or] … by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (brackets and ellipsis in original) (quoting *Ericsson*, 773 F.3d at 1226). Therefore, there is "nothing inherently wrong with using the market value of the entire product [as a royalty

base], especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature." *Id.* (quoting *Lucent*, at 1339).

### III.  ANALYSIS

Apple moves to strike certain opinions of Mr. Dansky's damages report: (1) Mr. Dansky's opinion about the reasonable royalty structure; (2) Mr. Dansky's calculation of Apple's profits attributable to the patents-in-suit; and (3) Mr. Dansky's opinion about whether Apple and PMC would discuss entering into a portfolio license agreement.

#### A.  Mr. Danksy's Royalty Structure

Apple argues that Mr. Dansky's testimony should be excluded because his "opinion that the parties would have agreed to a running royalty is not the product of a reliable principle or method, and it does not reliably apply a principle or method to the facts." Dkt. No. 273 at 8–9. Apple argues Mr. Dansky's review of "numerous" Apple and PMC licenses, third party license research, and professional experience, is not sufficient for Mr. Dansky to conclude that Apple and PMC would have agreed to a running royalty structure. *See id.* at 9–10. They further argue "Mr. Dansky's opinion relying on the four third-party licenses does not reliably apply his method to the facts of this case." *Id.* at 10 (emphasis omitted). Apple submits the third-party licenses relied upon are unreliable and incomparable since the context of the agreements is unknown and one of the licenses has been partially redacted. *See* Dkt. No. 314 at 5. Apple claims it has been prejudiced because of PMC's untimely production of the four third-party licenses. *See id.*

PMC counters that "Apple's argument is a classic example of a party disagreeing with an expert's 'conclusions, not his methodology.'" Dkt. No. 294 at 9 (*quoting TQP Dev., LLC v. 1-800-*

*Flowers.com, Inc.*, No. 2:11-cv-248-JRG-RSP, 2013 U.S. Dist. LEXIS 195929 at *9 (E.D. Tex. Nov. 12, 2013)). PMC asserts Mr. Dansky carefully reviewed the produced Apple licenses, examined 20 years of PMC licenses, searched publicly available license agreements, and exercised his professional judgment—which is based on many years of professional experience. *See* Dkt. No. 294 at 10–11. PMC explains Apple has not been prejudiced since its expert witness "knew of, and had access to, the specific licenses" Mr. Dansky relied on. Dkt. No. 328 at 6.

Though Apple states that Mr. Dansky's methods and conclusions are incorrect because they are based only on his experience and third-party licenses, this assertion is plainly incorrect. *See* Dkt. No. 273 at 9. Mr. Dansky reviewed Apple licenses, reviewed PMC licenses, deliberated with other experts, accessed publicly available information, and relied on his professional experience to support his conclusions—Mr. Dansky used a reasonable methodology. *See* Dkt. Nos. 294-3 at 28, 31, 38, 41. He used a reasonable approach, which has been sufficiently disclosed in his report, to determine how Apple and PMC would structure a hypothetical royalty agreement. Apple may disagree with Mr. Dansky's conclusions, but the role of the Court is to assess Mr. Dansky's methods, not assess his conclusion. *See Micro Chem., Inc.*, 317 F.3d at 1391-92. His testimony on the royalty structure of an Apple-PMC license is sufficiently reliable to be presented for the jury's consideration.

The third-party licenses were not pulled from thin air, as Apple suggests. Mr. Dansky explains:

> [a]s part of my research and analysis of potentially relevant and "customary" licensing and/or profit apportionment practices, my team and I searched a database for publicly available license agreements and circumstances that might be considered comparable to the license that would result from this hypothetical negotiation. We performed a keyword search of the available license agreements from related technology industries, using search terms based on the names of the parties and accused products and services in this matter, and also a number of relevant terms such as "download", "stream", and "encryption". Our search

6

> retrieved over 500 license and other agreements, which we subsequently screened for relevance. . . . Our screening resulted in a set of four license agreements with sufficient potential utility to warrant further review.

Dkt. No. 294-3 at 39–40 (footnote omitted). Mr. Dansky's method of screening and locating third-party licenses is acceptable. *Id*. Apple argues that the "[f]our third-party licenses, none of which involve Apple or PMC, do not provide an independent validation of Mr. Dansky's conclusion." Dkt. No. 273 at 9. The third-party "licenses may not be perfectly analogous to the patents-in-suit—something that is almost inherent to any comparable license approach—[that] generally goes to the weight of the evidence, not its admissibility." *PerdiemCo, LLC v. Industrack LLC*, No. 2:15-cv-727-JRG-RSP, 2016 U.S. Dist. LEXIS 155754, *12 (E.D. Tex. Nov. 9, 2016). Mr. Dansky sufficiently discussed the merits and considerations of the third-party licenses; the Court sees no reason to exclude Mr. Dansky's testimony on this subject.

Apple has not been prejudiced by PMC's allegedly untimely production of the third-party licenses. PMC rebuts Apple's assertion and argues they did produce the licenses. *See* Dkt. No. 294-1 ¶ 3. Even if Apple's assertion is taken as true, the Court will not exclude Mr. Dansky's testimony. Apple did not raise this issue until filing the Motion despite multiple opportunities to bring this to PMC's attention. *See id*. ¶¶ 5–7. Apple has not shown that PMC refused to produce these documents, and PMC remedied this issue as soon as it was raised. Dkt. No. 294 at 12.

### B. Mr. Dansky's Apportionment Calculations

Apple asserts Mr. Dansky's calculations are incorrect because (1) he mistakenly included "in-app" purchases, (2) used an unreliable method to estimate the FairPlay-related Profit per Unit, and (3) he mistakenly attributed 100% of FairPlay's value to the patents-in-suit.

7

### 1. In-App Purchases

Apple argues Mr. Dansky incorrectly incorporated in-app purchase revenue, which is the revenue associated with an unaccused functionality, in his damages calculations. Dkt. No. 273 at 12. "Mr. Dansky [] calculated a 'Standard Profit per Unit' by subtracting 'Royalties' from the 'Billings' for iTunes and Apple Music and dividing that 'Standard Profit' figure by the 'Total Units.'"[3] Dkt. No. 273 at 12. Apple alleges that

> [i]n Exhibit 8 to Mr. Dansky's report, which is the support for [his calculations], he expressly states in his notes that item [d] Billings and item [e] Royalties "[i]ncludes in-app purchases." In other words, the "Billings" and "Royalties" figures that Mr. Dansky uses to calculate "Standard Profit" (the numerator of his calculation) include in-app purchases, while the "Total Units" figure (the denominator of his calculation) excludes in-app purchases.

Dkt. No. 273 at 12 (citations omitted). Apple also alleges Mr. Dansky did not adequately discuss his reasoning for including in-app purchases.

Again, PMC submits Apple's "disagreement is over a specific judgement call made" by Mr. Dansky. Dkt. No. 294 at 13–14. PMC believes Mr. Dansky provided enough evidence and explanation for the inclusion of in-app purchases in his calculations. *See* Dkt. No. 294 at 14. PMC explains that "Mr. Dansky testified that including in-app revenue in calculating the profit average was fair because in-app purchases are clearly related and attributable to the infringing functionality that allowed customers to download apps." *Id* (citing Dkt. No. 294-9 at 5). PMC also cites to Mr. Dansky's explanation that "'both free and paid apps often include the ability for a user to make 'in-app' purchases, generating significant additional revenue for Apple from its share of the purchase price.'" Dkt. No. 294 at 14 (*quoting* Dkt. No. 294-3 at 5).

---

[3] To calculate Total Units, Mr. Dansky adds together both paid and unpaid units of content. "Mr. Dansky explicitly excluded in-app purchases from the 'Total Units'" ("Total Units"). Dkt. No. 273 at 11–12.

Indeed, Mr. Dansky provided enough evidence to support his decision to include in-app purchase revenue. The parties agree that Mr. Dansky properly excluded in-app purchases from the Total Units royalty base, since those were not accused. *See* Dkt. No. 294 at 14. The parties also agree that the Standard Profit numerator includes in-app purchases and the Total Units denominator excludes in-app units. *See id*. The parties' dispute is centered on whether Mr. Dansky can incorporate, and has properly supported his inclusion of, in-app revenue in his damages estimate. *Id*. He can, so long as he provides a reasonable explanation. The role of the Court is satisfied that Mr. Dansky sufficiently explained his inclusion of the in-app revenue so that it will assist the fact finder during trial. Mr. Dansky explains that

> both free and paid apps often include the ability for a user to make "in-app" purchases, generating significant additional revenue for Apple from its share of the purchase price. For example, users of the game app "Madden NFL Football" can purchase "Madden Cash" for use while playing the game. Many apps have both a free and paid version, and users of the initial free version frequently later upgrade to the paid version.

Dkt. No. 328-2 at 2 (footnote omitted). Thus, Mr. Dansky has adequately explained the basis for including "in-app" revenues in his calculations while properly excluding the units of "in-app" purchases. Apple may disagree with Mr. Dansky's reasoning and may believe his reasoning is weak—but vigorous cross-examination is the traditional means of attacking shaky but admissible evidence, not exclusion. *See Daubert*, 509 U.S. at 596.

### 2. Headcount Apportionment Method

Apple contends "Mr. Dansky's method of using headcount to apportion the value of the claimed methods is not a 'settled principle[] of apportionment'" and is inadmissible. *See* Dkt. No. 273 at 14 (alteration in original). In order to determine the apportionment of the Fairplay functionality, Mr. Dansky used

9

> "the headcount associated with the team supporting FairPlay as compared to Apple's overall headcount for iTunes" as a "reasonable proxy" for the economic contribution of FairPlay to the iTunes business. Using a ratio of the FairPlay team headcount to the iTunes team OCOGS headcount, Mr. Dansky calculated that FairPlay represented 5.6% of the iTunes business.

Dkt. No. 273 at 14 (*quoting* Dkt. No. 273-2 at 21–22). Apple argues that Mr. Dansky failed to explain the connection between the headcount ratio and the economic value of the patents-in-suit and could not otherwise provide evidence to support his headcount ratio method. *See id*. Apple further argues Mr. Dansky's 17.5 FairPlay headcount figure is unreliable because it is derived from a "'ballpark' estimate from a single employee who 'didn't know the details' . . . when he was asked." Dkt. No. 314 at 7 (*quoting* Dkt. No. 273-8 at 5).

PMC counters that using the headcount ratio as a value approximation of the patents is a common cost accounting principal taught in accounting textbooks. *See* Dkt. No. 294 at 15 (citing Dkt. No. 294-10 at 5; Dkt. No. 294-11 at 5). PMC explains that Mr. Dansky's headcount ratio was a well understood industry method and he was not required to explain the economic theory underpinning the headcount ratio. *See* Dkt. No. 328 at 7. PMC defends Mr. Dansky's use of the "17.5" figure and states this figure goes to the weight of Mr. Dansky's testimony not its admissibility. *See* Dkt. No. 294 at 16.

Mr. Dansky's headcount ratio method of apportioning the value of FairPlay is admissible. Apple's concern that Mr. Dansky did not properly explain why his method is a reasonable proxy of FairPlay's contribution to iTunes is unfounded. Mr. Dansky has explained his rationale for using headcount as a reasonable proxy:

> FairPlay is an enabling technology for Apple's iTunes business, mandated by the content providers as a requirement for Apple to provide the digital entertainment so highly desired by the purchasers of Apple's devices in a manner acceptable to the content owners. Apple has incurred both development and ongoing costs in the creation and maintenance of FairPlay. It is reasonable to assume Apple would not have borne these costs unless it had no choice.

10

Dkt. No. 273-2 at 21. Furthermore, PMC has shown that the headcount method is a well-known accounting method. *See* Dkt. No. 294 at 15; *see e.g.* Dkt. No. 294-10. Since Mr. Dansky has used a known accounting method and sufficiently tied this method to the facts of the case, he met the minimum relevance and reliability threshold.

Mr, Dansky's "17.5" headcount number is acceptable. Though Apple alleges this figure is unreliable, it is Apple's own witness who offers these numbers. Dkt. No. 273-8 at 5. Mr. Dansky took available evidence and made a reasonable calculation based on that evidence. *See* Dkt. No. 273-2 at 21. Apple also disagrees with the overall iTunes headcount number selected by Mr. Dansky. *See* Dkt. No. 273 at 15–16. Apple argues Mr. Dansky incorrectly selected the entire business unit as the overall iTunes headcount number, Apple believes a different number would be more appropriate. *See id*. The correctness of the overall iTunes headcount number is a factual consideration that should be left to the triers of fact, thus, Mr. Dansky's calculation is admissible.

### 3. Value of Patents-in-Suit

Apple argues Mr. Dansky mistakenly apportioned the entire value of the FairPlay functionality to the accused patents. Dkt. No. 273 at 16. Apple claims Mr. Dansky did not properly invoke the entire market exception under *LaserDynamics* because Mr. Dansky admitted there are additional non-infringing FairPlay functionalities—which Mr. Dansky otherwise dismissed. Dkt. No. 273 at 16 (citing *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012)).

PMC argues that Apple's challenge is unfounded and is merely a disagreement over technical facts. *See* Dkt. No. 294 at 17. PMC contends that Apple's invocation of *LaserDynamics* is also incorrect. *Id*. PMC argues *LaserDynamics* limits the royalty base of the damages calculation but not the royalty rate. *See id* at 17–18 (*citing LaserDynamics*, 694 F.3d at 67). In any case, PMC

contends that even if the entire market rule were to apply to the royalty rate, Mr. Dansky "relied on the opinion[] of Dr. Weaver in concluding that the patented technology was essential to the value of FairPlay as a whole. Dkt. No. 328 at 8 (citing Dkt. No. 328-2 at 23).

Mr. Dansky's judgment of the value derived from the patents-in-suit to FairPlay is admissible. Apportionment may occur in the royalty base, royalty rate, or anywhere in between as long as "the ultimate reasonable royalty award [is] based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). There is little question that Mr. Dansky attempted to apportion the royalty base of the iTunes revenues. *See* Dkt. No. 273 at 11–12; *see also* Dkt. No. 294 at 7–8. Mr. Dansky's attempt to apportion the royalty base is sufficient to meet the minimum apportionment necessary. Apple may believe that further apportionment may be proper or that certain assumptions may be incorrect, but these are questions for a jury to decide. The Court will not exclude Mr. Dansky's apportionment calculations.

Apple argues PMC "must show that the patented method drove demand for the patented functionality." Dkt. No. 273 at 17 (citing *LaserDynamics*, 694 F.3d at 68). This is incorrect. The entire market rule, as discussed in *LaserDynamics*, restricts the royalty base not the royalty rate. *See id* at 67. As discussed above, Mr. Dansky has apportioned the royalty base. Apple may contend that Mr. Dansky's royalty rate calculation is improper since he attributed 100% of the FairPlay value to the patents-in-suit, but that is permissible since Mr. Dansky has attempted to apportion the royalty base; thus, honoring his requirement to apportion. Furthermore, Mr. Dansky provides support for his belief that 100% of the FairPlay value is attributable to the patents-in-suit, such as his reliance on Dr. Weaver's technical opinion. Dkt. No. 273-3 at 13. For these reasons, Mr. Dansky's royalty rate calculations are admissible.

### C. Portfolio License

Apple argues that Mr. Dansky made a fundamental error when he suggested that the parties would have entered into a portfolio license, rather than just a license to the patents-in-suit. Dkt. No. 273 at 18. Apple claims Mr. Dansky did not even attempt to argue that a portfolio license would have the same monetary value as a license limited to only the patents-in-suit. Dkt. No. 273 at 19.

PMC points out that Mr. Dansky did claim that a portfolio license would have the same monetary value as a license to only the patents-in-suit. *See* Dkt. No. 294 at 19. PMC argues Mr. Dansky was "clear that his estimated royalty rate did not 'add any incremental value' for the notion of a portfolio license." Dkt. No. 294 at 19 (*quoting* Dkt. No. 294-9 at 9).

Mr. Dansky has proffered testimony that in a hypothetical negotiation Apple and PMC would have discussed licensing PMC's whole patent portfolio. Dkt. No. 273-2 at 4. Mr. Dansky, however, states "I don't think [the reasonable royalty amount] would change—whether it was the patents in question or the portfolio, I don't think the dollars would really change at all." Dkt. No. 294 at 19 (*quoting* Dkt. No. 294-9 at 8). Since Mr. Dansky has admitted that though a portfolio license might be negotiated it would not change his damages estimate, the Court finds that such testimony is not helpful to the jury and will likely inject unnecessary confusion.

It is therefore **ORDERED** that PMC shall seek leave from the Court, and show sufficient relevance to outweigh that confusion, before offering Mr. Dansky's testimony regarding whether a portfolio license would have been negotiated during the hypothetical Apple-PMC negotiation.

## IV.     CONCLUSION

It is therefore **ORDERED** that PMC shall seek leave from the Court before offering Mr. Dansky's testimony regarding whether a portfolio license would have been negotiated during the hypothetical Apple-PMC negotiation. In all other respects, the Motion is **DENIED**.

**SIGNED this 19th day of February, 2021.**

```
_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE
```