**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, LLC, | § § § | |
| *Plaintiff*, | § § | Case No. 2:15-cv-01366-JRG-RSP |
| v. | § § | |
| APPLE, INC., | § § | |
| *Defendant*. | § § | |

**MEMORANDUM ORDER**

Before the Court is the Motion to Strike Testimony of Vincent A. Thomas filed by Plaintiff Personalized Media Communications, LLC ("PMC"). Dkt. No. 275. PMC moves to strike the testimony of Mr. Vincent A. Thomas, Apple, Inc.'s damages expert. *See* Dkt. No. 275 at 5[1]. The Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**I.     BACKGROUND**

On October 10, 2016, PMC's damages expert, Mr. Michael J. Dansky ("Mr. Dansky"), served his damages report detailing Apple's alleged infringement of the asserted patents. *See* Dkt, No. 275 at 5. Mr. Dansky calculated a running royalty of $240 million, basing his estimate on Apple's allegedly infringing FairPlay, FPS, and HLS functionalities. *Id*. On October 31, 2016, Apple served Mr. Thomas' damages report to rebut Mr. Dansky's damages calculations. *Id*. at 6. Mr. Thomas' report disclosed alternative estimates, calculations, and analysis for Apple's alleged infringement. *See id*. Mr. Thomas estimates that PMC would be entitled to a lump-sum payment

---

[1] Citations are to page numbers assigned through ECF system.

of $1 million per allegedly infringing patent. *Id*. On November 21, 2016, PMC filed this Motion[2]. Dkt. No. 275.

## II.   LEGAL STANDARDS

### A. *Daubert* Standard

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Federal Rule of Evidence 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

---

[2] Apple filed its response in opposition to PMC's Motion on December 8, 2016. Dkt. No. 292. PMC filed their reply in support for their Motion on December 12, 2016. Dkt. No. 308. Apple filed its sur-reply on December 22, 2016. Dkt. No. 330.

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). Accordingly, "a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015).

As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

**B.  Damages**

The Federal Circuit has stated that "estimating a 'reasonable royalty' is not an exact science. As such, the record may support a range of 'reasonable' royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty."

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014). However, "the patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . [unless] the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Garretson v. Clark*, 111 U.S. 120, 121, 4 S. Ct. 291, 28 L. Ed. 371, 1884 Dec. Comm'r Pat. 206 (1884). Accordingly, proof of damages must be carefully tied to "the claimed invention's footprint in the market place." *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014); *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product."); *CSIRO v. Cisco Sys.*, 809 F.3d 1295 (Fed. Cir. 2015) ("[D]amages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more").

### III.  ANALYSIS

#### A.  Mr. Thomas' Lump Sum Royalty Estimate

PMC states that Mr. Thomas' testimony is based on unreliable, unsupported, and/or opaque methodologies. *See* Dkt. No. 275 at 5. PMC argues Mr. Thomas' estimate of a lump sum royalty is unsupported, contains flawed analysis of both PMC and Apple license agreements, and is a black box assessment. *Id*.

##### 1.  Mr. Thomas' Basis or Methodology for Determining Non-Infringing Alternatives

PMC believes Mr. Thomas' report is premised on inaccurate and incorrect assumptions of both Dr. Stephen Wicker ("Dr. Wicker")—Apple's non-infringement expert—and Mr. Thomas.

4

PMC asserts Mr. Thomas is not permitted to rely entirely on a "discussion with Dr. Wicker" for the availability and costs associated with potential design-arounds. *See* Dkt. No. 275 at 6 (citing Dkt. No. 275-3 ¶¶ 99–101, n. 242–45, n. 247–49). PMC argues that Mr. Thomas' calculation, which is based solely on Dr. Wicker's expert opinion and experience, that it would take "'six Apple engineers six months to design, develop, test, and implement' a design-around" is unreliable. Dkt. No. 275 at 12. PMC further argues that Mr. Thomas' figure of $400,000 associated with "other costs and unforeseen issues" is insufficiently explained. *Id*. PMC contends it is "unable to either agree or disagree with Mr. Thomas' [cost] choices because he has not disclosed the choices he made about included and excluded costs." Dkt. No. 306 at 6 (citing Dkt. No. 275-3 ¶ 101).

Apple counters that "Thomas's reliance on Apple's technical expert, Dr. Stephen Wicker, for information about non-infringing alternatives is entirely appropriate . . . [because] Thomas is not required to have experience with DRM technology to independently determine whether a design-around proposed by Dr. Wicker would be acceptable." Dkt. No. 292 at 5–6. Apple argues Mr. Thomas "took conservative estimates of the time and personnel it would take to develop a non-infringing alternative based upon Dr. Wicker's testimony, and conservative estimates of the salaries of those personnel and potential other costs and unforeseen issues." *Id*. at 6.

The Court will not exclude Mr. Thomas' testimony regarding his analysis and cost estimate of non-infringing alternatives. Underpinning Mr. Thomas' report is a conversation with Dr. Wicker concerning the implementation methods, and resources required, to develop a non-infringing alternative. *See* Dkt. No. 275-3 at ¶¶ 99–101. Although PMC argues Mr. Thomas' heavy reliance on Dr. Wicker's expertise is impermissible, using a technical expert in the industry to help form a damages opinion is permitted, even such heavy reliance. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Experts routinely rely upon other experts hired by the party they

5

represent for expertise outside of their field.") (citing *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 609–613 (7th Cir. 2002) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert."). Therefore, Mr. Thomas' reliance on Dr. Wicker's expert opinion of non-infringing alternatives is permissible. Though Mr. Thomas' report may heavily cite to a discussion, which may not be easy to "fact check," that is not a reason to exclude Mr. Thomas' testimony. PMC can, and did, depose Mr. Thomas to probe the content and substance of the conversation with Dr. Wicker. *See* Dkt. No. 273-4 at 6. PMC raises questions regarding the reliability and assumptions in Dr. Wicker's analysis, these are best handled in the motion related to Dr. Wicker's testimony not Mr. Thomas'. *See* Dkt. No. 262.

Mr. Thomas provided a reasonable accounting of the non-infringing alternative costs. The $400,000 figure used by Mr. Thomas is an assertedly conservative estimate, based on his conversation with Dr. Wicker, of any potential or unforeseen costs associated with developing a non-infringing alternative(s). *See* Dkt. No. 275-3 ¶101. Based on his conversation with Dr. Wicker and professional experience, Mr. Thomas estimated $400,000 for any potential or unforeseen costs. *Id*. At some point an expert must be allowed to rely on and use his or her judgment, so long as their opinion is supported by facts and data. The Court is not willing to say that Mr. Thomas' approach was unreasonable or that his opinion is completely unsupported by facts and data. PMC's disagreement with Mr. Thomas' conclusions are best handled through cross-examination.

2. Mr. Thomas' Reliance on the Zynga and ARRIS Agreements

PMC states that the Zynga and ARRIS agreements identified by Mr. Thomas are not comparable to the hypothetical PMC-Apple negotiation. *See* Dkt. No. 275 at 9. PMC believes "the circumstances under which the Zynga license was negotiated . . . renders the license not comparable" and that "Thomas fail[ed] to address this distinction." Dkt. No. 275 at 13–14. PMC

argues that since "[t]he Zynga license was negotiated after a finding of non-infringement by a jury and the institution of *inter partes* review proceedings against all of the asserted claims" it is not comparable to a hypothetical negotiation with Apple, despite certain PMC employees arguing otherwise. *Id*. PMC also argues that Mr. Thomas' analysis of the ARRIS agreement is fatally flawed because "there are fundamental features distinguishing the ARRIS license agreement that Thomas never attempts to address." *Id*. at 14. PMC explains that Mr. Thomas ignored "that ARRIS already had rights to the PMC patents at the time of the [ARRIS] negotiation . . . [and that] ARRIS had received a license to the PMC patents following its acquisition of General Instruments from Motorola Mobility . . . [the] license that Thomas relies on [were] meant to be an add on license to ensure that all ARRIS products were covered" under PMC's portfolio. *Id*. PMC claims Mr. Thomas did not adjust his analysis due the circumstances of either the Zynga or ARRIS license. *See id*.

Apple claims PMC induced Apple into believing the Zynga license was analogous. *See* Dkt. No. 292 at 8. Apple cites Mr. Gerald Holtzman's ("Holtzman") testimony "that the Zynga license 'was ***not*** the result of settlement of litigation'" as well as pre-suit emails suggesting that Zynga and Apple were analogous companies as evidence of PMC's inducing statements. Dkt. No. 292 at 8 (citing Dkt. No. 292-3 at 5–6). Furthermore, Apple submits that "Thomas did note differences between the Arris license and the theoretical license that PMC and Apple would reach as a result of the hypothetical negotiation. Dkt. No. 292 at 8 (citing Dkt. No. 292-2 ¶ 112) (emphasis removed).

Mr. Thomas' discussion of the Zynga and ARRIS licenses as indicative of the value of the patents-in-suit will not be stricken. The Zynga agreement is titled "Settlement and Patent License Agreement." Dkt. No. 275-8 at 2. The Court is not convinced by Holtzman's characterization that

the Zynga agreement was not due to settlement. Holtzman's characterization is plainly incorrect given the title and preamble. *Id* ("WHEREAS, PMC and Zynga now desired to settle all disputes between them related to Litigation, the IPRs, and the patents-in-suit and all related patents and patent applications and enter into this Agreement providing for a full, final, complete and global resolution of all past, present, and future such claims"). However, its status as a litigation license is not dispositive of its admissibility or its comparability. *PerdiemCo, LLC v. Industrack LLC*, No. 2:15-cv-726-JRG-RSP, 2016 U.S. Dist. LEXIS 155754, *13 (E.D. Tex. Nov. 9, 2016) (citations omitted). "[T]he Court must apply scrutiny in determining the admissibility of such licenses. Accordingly, 'the Court assesses litigation licenses on a case-by-case basis in determining their admissibility.'" *PerdiemCo,*, 2016 U.S. Dist. LEXIS 155754 at *13 (citations omitted). Litigation licenses can involve licenses to patents of comparable technology. *S3g Tech. v. Unikey Techs.*, No. 6:16-cv-400-RWS-KNM, 2018 U.S. Dist. LEXIS 239516, *7 (E.D. Tex. May 8, 2018).

It is reasonable for Mr.Thomas to use the Zynga license as a benchmark of value as long as he accounted for technological and economic differences. "So long as the jury is provided evidence of these similarities and differences so that they may consider the relevance of the challenged settlement agreements for themselves, the agreements may properly be admitted into evidence." *PerdiemCo*, 2016 U.S. Dist. LEXIS 155754 at *14 (*quoting Finjan, Inc. v. Blue Coat Sys.*, Inc., No. 13-cv-03999-BLF, 2015 U.S. Dist. LEXIS 88760, 2015 WL 4129193, at *5 (N.D. Cal. July 8, 2015)). The Court is satisfied that Mr. Thomas considered these differences in his analysis. His analysis relied on testimony and evidence regarding the comparability of Zynga and Apple to conclude that the licenses are similar. *See* Dkt. No. 275-3 ¶ 63, ¶ 113. Pre-suit emails between Apple and PMC discuss the parallels between Apple's business model and Zynga's business model. *See id*. ¶ 113. Mr. Thomas discussed PMC correspondence with Apple, where

PMC described Zynga as a company involved in "advanced web based and mobile technologies"—a similar industry to Apple's. *Id*. Mr. Thomas' opinion on the Zynga license meets the threshold of admissibility.

For similar reasons, Mr. Thomas may rely on the ARRIS licensing agreement in his testimony. PMC's contention about the differences between the ARRIS license, and the hypothetical negotiation may be well founded. Mr. Thomas, however, does address these differences in his report. *See* Dkt. No. 275-3 ¶¶ 111–12 ("The PMC agreement with Arris does contain additional consideration such as assignment of patents from PMC to Arris that would have required their own value separate from the value the licensee placed on the patents-in-suit"). Differences between the ARRIS license and the hypothetical negotiation are also discussed at different points in the report. *See* Dkt. No. 275-3 ¶¶ 111–12, ¶¶ 195–99. The court is satisfied that Mr. Thomas adequately provided evidence of the similarities and differences that would inform a jury. Thus, Mr. Thomas' testimony comparing the ARRIS agreement is admissible.

To the extent PMC argues that Mr. Thomas should have considered additional differences in either the Zynga or ARRIS licenses such as company size, technology differences, economical differences, etc. these criticisms go to the weight of Mr. Thomas' opinion, not its admissibility.

### 3. Analysis of Apple's Licensing History

PMC contends that Mr. Thomas' report is flawed because "his analysis is based solely on the 25 license agreements produced in this litigation . . . [and neither] Thomas nor Apple's Principal Counsel . . . [were] aware of how the 25 license agreements were selected." Dkt. No. 275 at 15–16 (citing Dkt. No. 275-4 at 8, 275-6 at 4). PMC states Mr. Thomas' opinion is unreliable because he was unaware of Apple's license selection criteria. *See* Dkt. No. 275 at 16. PMC submits Mr. Thomas did not adjust his analysis "to account for any differences between the Apple licenses

and the hypothetical negotiation at issue. For example, . . . the accused products in the various licenses, the size of the parties involved, or the likely validity of the patents at issue." Dkt. No. 275 at 17.

Apple explains that PMC ignored "the extensive discussions between the parties about this issue during fact discovery" and waived this issue. *See* Dkt. No. 292 at 11. Apple states it communicated to PMC that the produced licenses were "technologically comparable [] to the accused functionalities of the patents-in-suit" and PMC failed to inquire further. Dkt. No. 292-7 at 4.

PMC and Apple exchanged several letters discussing the criteria used to select the licenses, ultimately culminating in a meet-and-confer about this topic. *See* Dkt. Nos. 292-6, 292-7, 292-8, 292-9. It appears that PMC was adequately satisfied with Apple's explanation of the selection criteria since no motion to compel on this issue was filed and PMC has not offered evidence to the contrary. If PMC wished to investigate further, it should have continued its inquiry into Apple or asked the Court for relief.  There is no requirement that a damages expert discover all possible comparable licenses. He merely has to properly analyze those he relies upon.

Mr. Thomas reviewed Apple's licenses for indicators of value and adjusted accordingly. Dkt. No. 275-3 ¶ 121. Mr. Thomas lists three licenses that PMC and Apple would have considered during their hypothetical negotiation. *Id*. Mr. Thomas confirmed these three patents are similar technologically to the patents-in-suit and discusses why they are relevant to the hypothetical negotiation. *Id*. at ¶¶ 121–25. Mr. Thomas has sufficiently examined the relevant Apple licenses and noted relevant differences, and although no adjustments appear to have been made that is not a basis for exclusion. *Id*.

#### 4. Basis or Methodology for Lump Sum Estimate

PMC argues Mr. Thomas' methodology to arrive at his $1 million total lump sum damages estimate is so opaque and indiscernible that PMC is "prevented from fully cross-examining Mr. Thomas on the actual bases and assumptions underlying his opinion." Dkt. No. 275 at 18. They believe, "[t]he opacity of Thomas' methodology leaves him free to testify at trial concerning his analysis of a host of factors as potential bases for his lump sum estimate." *Id*. In particular, PMC contends Mr. Thomas "does not disclose, for example, whether [he] simply adopted the cost of designing and implementing a non-infringing alternative as the primary determinant of reasonable damages for each patent, and if so, why." *Id*. at 17–18.

Apple challenges PMC's assertions, Apple states "Thomas discuss[es] how the parties would have considered each factor . . . he considered the result of a hypothetical negotiation between the parties at *Georgia-Pacific* factor 15, all of his earlier considerations were synthesized to reach his conclusion." Dkt. No. 292 at 15 (citing Dkt. No. 292-2 ¶¶ 186–99). Apple points to the most relevant factors Mr. Thomas considered in his report, specifically his heavy reliance on factors 1 to 3. *See* Dkt. No. 292 at 16.

Mr. Thomas's testimony about his methodology and analysis of his lump sum estimate is sufficiently reliable and meets the threshold specificity to help the trier of fact. Mr. Thomas' *Georgia-Pacific* analysis has the specificity required to aid the jury in resolving factual disputes. Mr. Thomas reviews a few factors to support his lump sum estimate. His analysis includes review of both Apple and PMC licensing history, review of relevant licenses, discussion of non-infringing alternatives, and how each consideration shaped his calculations and analysis. Mr. Thomas discusses the *Georgia-Pacific* factors and the upward, neutral, or downward impact the facts of the case have on those factors. Mr. Thomas makes several considerations each of which appear to

point him towards his $1 million figure such as his analysis of non-infringing alternatives and review of the PMC licenses. Both considerations point to the estimated $1 million figure. His opinion is not so opaque as to be immune from rigorous cross-examination.

### B. Mr. Thomas' Discussion of Mr. Dansky's Calculation

PMC argues that Mr. Thomas' damages calculation is improper because his calculation of the value added by the patents-in-suit to the FairPlay functionality is flawed. *See* Dkt. No. 275 at 18. PMC points to Mr. Thomas' calculation when he "divided the profitability of FairPlay by 53 (50 Apple DRM patents plus the three patents-in-suit)." *Id*. They state Mr. Thomas' calculation "necessarily assumes that each of Apple's patents has in fact contributed separate and non-cumulative benefit[s] to FairPlay." *Id*. at 18–19. PMC further states "[t]he Thomas Report contains no analysis of whether each (or even any) of Apple's DRM patents were in fact used by Apple in its FairPlay technology at the time the patents-in-suit were issued, the priority date of the Apple patents, or whether the Apple patents are valid." Dkt. No. 275 at 19.

Apple counters that Mr. Thomas was merely correcting and rebutting Mr. Dansky's erroneous damages calculation. *See* Dkt. No. 292 at 17. They argue "Thomas alternative calculation merely points out that PMC has not sufficiently tied its damages theory to the facts of this case." Dkt. No. 292 at 19.

PMC's arguments are well taken. Mr. Thomas made an unreliable calculation of the value attributable to the patents-in-suit that was carried into his later calculations. Mr. Thomas disagreed with Mr. Dansky's assessment that the FairPlay functionality derives 100% of its value from the patents-in-suit. Mr. Thomas rebuts Mr. Dansky's calculation by re-calculating the percentage of value added by the patents-in-suit by "*[a]ssuming* equal value of the Apple DRM patents and the patents-in-suit . . . divid[ing] the three patents-in-suit by 53 (50 Apple DRM patents plus the three

12

patents-in-suit.)" Dkt. No. 275-3 ¶ 235 (emphasis added). Mr. Thomas' calculation is reminiscent of a royalty stacking calculation. However, Mr. Thomas' calculation diverges from royalty stacking significantly. Mr. Thomas is not sure if any of the fifty patents were being practiced by Apple at the time of the infringement. Furthermore, there is been no evidence cited in the report (nor has Apple referred to any in the briefing) that any of the fifty patents were being practiced by Apple at the time of infringement. *See* Dkt. No. 275-4 at 13. Simply owning a patent does not mean that it is being practiced in a particular product. It cannot be assumed any one patent is being practiced without a more thorough investigation/analysis—much less fifty patents. Mr. Thomas' calculation is fatally flawed solely on that ground.

However, assuming *arguendo* that each patent of the fifty Apple DRM patents were practiced in the FairPlay functionality at the time of infringement, Mr. Thomas cannot assume that each patent has equal value. The exercise of performing an apportionment analysis is to separate the specific value of the patents-in-suit using reliable known methods. *VirnetX, Inc.*, 767 F.3d at 1327. It would be unscientific to make a conclusory assumption that each patent has equal value. Indeed, not all patents are created equal. An expert may conclude—by using evidentiary support— that the patents-in-suit holds the same value as Apple's other DRM patents, but Mr. Thomas cannot simply make this assumption. The expert must tie his or her analysis to the facts of the case. *Id.* at 1331–34. Mr. Thomas' assumptions cannot be made without any support. Merely stating a conclusory assumption not predicated on evidence is inadmissible. Thus, Mr. Thomas' method of determining the value attributable to the patents-in-suit is unreliable.

Mr. Thomas and his report cannot rely on his calculations of the value added by the patents-in-suit to the FairPlay functionality. Accordingly, the Court **STRIKES** ¶ 235 of the report and any testimony relying upon the calculation discussed in it.

## IV. CONCLUSION

After due consideration, the Motion is **GRANTED-IN-PART**. The Court **STRIKES** Mr. Thomas' calculations of the value added by the patents-in-suit to the FairPlay functionality referenced in ¶ 235. In all other respects, the Motion is **DENIED**.

**SIGNED this 19th day of February, 2021.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE