07:44:33

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                        MARSHALL DIVISION

 4   PERSONALIZED MEDIA              )(

 5   COMMUNICATIONS, LLC,            )(

 6        PLAINTIFF,                 )(    CIVIL ACTION NO.

 7                                   )(    2:15-CV-1366-JRG-RSP

 8   VS.                            )(    MARSHALL, TEXAS

 9                                   )(

10   APPLE INC.,                     )(    MARCH 15, 2021

11        DEFENDANT.                 )(    9:22 A.M.
```

12            <u>TRANSCRIPT OF VOIR DIRE OF THE JURY PANEL</u>

13            <u>BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP</u>

14                <u>UNITED STATES CHIEF DISTRICT JUDGE</u>

15

```
16   FOR THE PLAINTIFF:      Mr. Douglas J. Kline
                             Mr. J. Anthony Downs
17                           Mr. Kevin P. Martin
                             Mr. Robert Frederickson, III
18                           GOODWIN PROCTER, LLP
                             100 Northern Avenue
19                           Boston, MA 02210

20   COURT REPORTER:        Ms. Shelly Holmes, CSR, TCRR
                             Official Court Reporter
21                           United States District Court
                             Eastern District of Texas
22                           Marshall Division
                             100 E. Houston
23                           Marshall, Texas  75670
                             (903) 923-7464
24
     (Proceedings recorded by mechanical stenography, transcript
25   produced on a CAT system.)
```

```
 1  FOR THE PLAINTIFF:      Ms. Alexandra D. Valenti
                            Ms. Autumn E. Soucy
 2                          GOODWIN PROCTER, LLP
                            The New York Times Building
 3                          620 Eighth Avenue
                            New York, NY 10018-1405
 4
                            Mr. S. Calvin Capshaw, III
 5                          Ms. Elizabeth DeRieux
                            CAPSHAW DERIEUX, LLP
 6                          114 E. Commerce Avenue
                            Gladewater, TX 75647
 7
    FOR THE DEFENDANT:      Mr. Gregory S. Arovas
 8                          Mr. Robert A. Appleby
                            Mr. Alan Rabinowitz
 9                          Mr. Jonathan D. Brit
                            KIRKLAND & ELLIS, LLP
10                          601 Lexington Avenue
                            New York, NY 10022
11
                            Mr. Marcus E. Sernel
12                          Ms. Meredith Zinanni
                            Mr. Jake Rambeau
13                          KIRKLAND & ELLIS, LLP
                            300 North LaSalle Street
14                          Suite 2400
                            Chicago, IL 60654
15
                            Mr. Ellisen S. Turner
16                          KIRKLAND & ELLIS, LLP
                            2049 Century Park East
17                          Suite 3700
                            Los Angeles, CA 90067
18
                            Mr. Sean M. McEldowney
19                          KIRKLAND & ELLIS, LLP
                            655 15th Street NW
20                          Suite 1200
                            Washington, DC 20005
21
                            Ms. Melissa R. Smith
22                          GILLAM & SMITH, LLP
                            303 South Washington Avenue
23                          Marshall, TX 75670

24

25
```

|   |   |   |
|---|---|---|
|  | 1 | P R O C E E D I N G S |
|  | 2 | (Venire panel in.) |
| 07:44:33 | 3 | COURT SECURITY OFFICER:  All rise. |
| 07:44:34 | 4 | THE COURT:  Thank you.  Be seated, please. |
| 09:22:24 | 5 | Good morning, ladies and gentlemen.  Thank you for |
| 09:22:33 | 6 | being here. |
| 09:22:35 | 7 | My name is Rodney Gilstrap, and I am the Chief |
| 09:22:40 | 8 | United States District Judge for the United States District |
| 09:22:41 | 9 | Court for the Eastern District of Texas. |
| 09:22:42 | 10 | I have lived here in Marshall, Texas, since 1981. |
| 09:22:49 | 11 | I practiced law in this community and in this general East |
| 09:22:53 | 12 | Texas area for 30 years.  And after practicing law for 30 |
| 09:22:56 | 13 | years, I was nominated and confirmed as a United States |
| 09:23:01 | 14 | District Judge in 2011. |
| 09:23:02 | 15 | So I've had this job since then.  I will make a |
| 09:23:07 | 16 | small confession to all of you.  I wasn't born in Texas.  I |
| 09:23:11 | 17 | was born in Florida.  But I got here as quickly as I could. |
| 09:23:16 | 18 | I came to Texas at the ripe old age of 18 and enrolled as a |
| 09:23:22 | 19 | student at Baylor University.  I finished my college work |
| 09:23:26 | 20 | there and stayed and went to law school at Baylor |
| 09:23:29 | 21 | University School of Law. |
| 09:23:30 | 22 | I am married.  I have two grown children.  And my |
| 09:23:33 | 23 | wife owns and operates a retail floral business here in |
| 09:23:36 | 24 | Marshall. |
| 09:23:36 | 25 | Now, I tell you all these things about myself |

09:23:39  1  because in a few minutes, I'm going to ask each of you to

09:23:43  2  give the same kind of information to me about yourselves.

09:23:46  3  And I think you're entitled to know as much about me as I'm

09:23:49  4  going to shortly find out about each of you all.

09:23:52  5         We are about to engage in the selection of a jury

09:23:56  6  in a civil case involving allegations of patent

09:23:59  7  infringement.

09:24:00  8         However, before we go any further, I'd like to

09:24:06  9  briefly mention some of the public health and safety

09:24:09  10  precautions that we're going to be taking during this

09:24:12  11  trial.

09:24:13  12         Each of you should have got a letter signed by me

09:24:15  13  when you were summonsed setting forth a great number of the

09:24:19  14  public health precautions that we're going to be

09:24:22  15  implementing throughout this trial.  There will be some

09:24:24  16  additional safeguards that I'll discuss with you as we go

09:24:27  17  through the trial process.

09:24:28  18         However, the eight of you that are selected to

09:24:33  19  serve as the jury in this case, and we will select eight of

09:24:36  20  you to serve as the jury, I'll be implementing these

09:24:41  21  precautions with regard to our eight-member jury.

09:24:44  22         Throughout the trial, the jury will have their

09:24:47  23  temperature taken each morning when they enter the

09:24:50  24  courthouse with a handheld thermometer.  Once the jury is

09:24:56  25  seated in the jury box, I'm going to ask those eight

09:24:59  1  persons to replace these cloth or material masks that

09:25:03  2  you're wearing with either a see-through mask or a face

09:25:11  3  shield.  And if you'd like to, you can wear both.

09:25:15  4        But it's an important part of the trial process

09:25:17  5  for the lawyers and the Court to be able to see the faces

09:25:21  6  of the jury, to read their expressions, to have an idea of

09:25:26  7  whether what I'm saying to you or the lawyers are arguing

09:25:29  8  in front of you is getting through or not getting through.

09:25:34  9  It's necessary for the trial to be what it should be for

09:25:37 10  the jury's faces to be seen.

09:25:39 11        So, those of you that are selected to serve as our

09:25:43 12  eight-person jury, once you're seated in the box, I'm going

09:25:46 13  to ask you to take off a mask that can't be seen through

09:25:50 14  and covers up about three-fourths of your face, and put on

09:25:54 15  a plastic replacement, either a face shield or a plastic

09:25:57 16  mask, or if you'd like to, both.

09:25:59 17        But as I say, it's critical for the process to

09:26:01 18  work as it should for the lawyers and the jury to be able

09:26:06 19  to see each other's faces.

09:26:07 20        The lawyers are going to remain with their masks

09:26:11 21  at counsel table, but whenever they speak to the jury,

09:26:13 22  whenever they examine a witness, they will go to the

09:26:16 23  podium, and at the podium, they will remove their mask, and

09:26:19 24  when they're finished, they'll put their mask back on when

09:26:23 25  they go back to counsel table.  So you'll see their faces,

09:26:26   1   they'll see your faces, and the witnesses will unmask at

09:26:30   2   the witness stand, so when that part of the process goes

09:26:32   3   on, everybody will see everybody.

09:26:33   4          Also, we're going to seat our eight-person jury in

09:26:38   5   our jury box so that there'll be four people on the first

09:26:43   6   row spread out with an empty chair between you, and the

09:26:45   7   second four people will be on the back row spread out with

09:26:48   8   an empty chair between you.  No two people on the jury will

09:26:52   9   be seated directly side-by-side.

09:26:54   10          Also, during the course of the trial, the Court

09:26:56   11   has ordered that the clerk's office provide lunches for the

09:27:00   12   jury in the jury room.  So you are not going to leave the

09:27:04   13   courthouse and go out to the community -- into the

09:27:07   14   community and mix and mingle with the general public and

09:27:09   15   then come back to the courthouse.

09:27:11   16          Your lunches will be brought to you when we break

09:27:13   17   for lunch, and you'll have those in the jury room, so each

09:27:18   18   day when you arrive, you'll be in this building until the

09:27:21   19   end of the day when I send you home until the next day.

09:27:24   20   You won't be coming and going from the building.

09:27:27   21          Again, that's a -- one of the safety precautions

09:27:29   22   that we're going to implement.

09:27:31   23          Also, each night when the jury leaves, a special

09:27:37   24   cleaning will take place in the jury room, the jury box,

09:27:41   25   and the restrooms.  There are two separate sets of

09:27:44  1  restrooms that are adjacent to the jury room.  All three of

09:27:48  2  those areas will be deeply cleaned or specially cleaned

09:27:51  3  each evening in addition to the general cleaning that goes

09:27:55  4  on in the courtroom.

09:27:56  5       Also, you probably can't see them, but there are

09:27:58  6  two new air filtration systems we've added to the

09:28:02  7  courtroom.  They're right in front of the bar on each far

09:28:04  8  end of the room, and they'll be filtering the air with

09:28:09  9  commercial filtration throughout the process of the trial.

09:28:12  10      So we've done, in short, ladies and gentlemen,

09:28:15  11 everything we can think of to minimize any public health

09:28:18  12 risk and to make this trial as safe as we can make it.  And

09:28:22  13 I wanted to make sure you were aware of that.  If there are

09:28:25  14 other precautions you need to be made aware of, I will

09:28:28  15 mention those to you as we go forward.

09:28:30  16      The key and the purpose of all of this is not only

09:28:33  17 do we have a fair and impartial trial, but we have a fair,

09:28:36  18 impartial, and a safe trial.

09:28:38  19      Now, if you'll indulge me a minute, I'd like to

09:28:43  20 briefly review with you how we came to have our American

09:28:47  21 civil jury trial system.

09:28:48  22      If you go back in ancient history and if you begin

09:28:52  23 with the Pentateuch, the first five books of the Old

09:28:56  24 Testament, you'll find that the ancient Hebrew nation

09:28:59  25 empaneled juries for the purpose of establishing property

09:29:03  1  ownership and property value.  The ancient Greeks began

09:29:06  2  using a jury system about 1500 BC.

09:29:10  3       The Romans, as they did with many things, copied

09:29:14  4  the jury system from the Greeks.  And it was the Romans who

09:29:18  5  brought the jury system to what is now Great Britain or

09:29:22  6  England in the 4th Century AD when they crossed the English

09:29:26  7  Channel and conquered that island.

09:29:28  8       So, the jury system came to Great Britain in the

09:29:32  9  4th Century AD.  By the 12th Century AD, there had been 800

09:29:37  10  years of an active and robust jury system in England.  But

09:29:41  11  in the 12th century, a tyrannical king came to the throne

09:29:46  12  of Great Britain named King John, and King John became

09:29:53  13  embroiled in various disputes with his nobles that led that

09:29:58  14  country to the verge of a civil war.

09:30:01  15       One of those disputes was King John's efforts to

09:30:03  16  do away with the right to trial by jury.  That series of

09:30:06  17  disputes did not ripen into a civil war.  A resolution of

09:30:09  18  all the disputes between King John and his nobles was

09:30:12  19  reached at a place in England called Runnymede where the

09:30:15  20  king and his nobles executed a document that you probably

09:30:19  21  have all heard of before.  That document is called the

09:30:22  22  Magna Carta.

09:30:23  23       In fact, ladies and gentlemen, you might be

09:30:27  24  interested to know that 28 of our 50 United States have

09:30:30  25  adopted in their own state constitutions the exact language

09:30:35  1   from the Magna Carta that guarantees the right to trial by

09:30:39  2   jury.

09:30:40  3           So you can see that our founding fathers as

09:30:46  4   British colonists when they came to this country were well

09:30:51  5   learned in and familiar with the jury trial system, and

09:30:53  6   that followed them to North America when Great Britain

09:30:57  7   colonized what's now our country.

09:31:00  8           And the jury trial system flourished in colonial

09:31:06  9   America under the rule of Great Britain for over a hundred

09:31:10  10  years until another tyrannical king came to the throne of

09:31:16  11  Great Britain.  This time his name was King George, III and

09:31:20  12  King George, III as you remember from American history

09:31:22  13  became embroiled with his American colonists on a great

09:31:26  14  number of issues.  One of the issues amongst all of the

09:31:28  15  others was King George, III's attempt to do away with the

09:31:33  16  right to trial by jury in colonial America.

09:31:35  17          In fact, when Thomas Jefferson sat down to write

09:31:38  18  the Declaration of Independence setting forth the various

09:31:42  19  reasons and disputes and issues that necessitates -- or

09:31:47  20  necessitated our country separating from Great Britain and

09:31:51  21  forming our own independent nation, the effort to curtail

09:31:56  22  the right to trial by jury was specifically spelled out by

09:31:59  23  Thomas Jefferson in the Declaration of Independence.

09:32:02  24          If you get the Declaration of Independence and you

09:32:04  25  read it, you will find one of the complaints against the

09:32:08  1  British Crown necessitating our separation and independence

09:32:12  2  was the effort to curtail the right to trial by jury.

09:32:15  3          So you can see, ladies and gentlemen, that the

09:32:18  4  right to trial by jury was an important part of our

09:32:21  5  founding as an independent country.

09:32:23  6          And, in fact, when we gained our independence and

09:32:28  7  after several years we adopted the governing document that

09:32:32  8  is the Supreme law of the land in this country, the

09:32:36  9  Constitution of the United States, the right to trial by

09:32:41  10  jury was incorporated into the Constitution as a part of

09:32:45  11  the first 10 amendments known as the Bill of Rights.

09:32:48  12          And the Seventh Amendment to the United States

09:32:50  13  Constitution which was ratified in 1791 specifically

09:32:55  14  guarantees the right to trial by jury to resolve civil

09:32:58  15  disputes between American citizens.

09:32:59  16          So since 1791, for well over 200 years, every

09:33:07  17  American has had the right, the constitutionally guaranteed

09:33:10  18  right to resolve their civil disputes through a trial by

09:33:14  19  jury.

09:33:14  20          I will let you know that I personally view the

09:33:22  21  right to trial by jury as one of the most important rights

09:33:25  22  we have as Americans, and I hope those of you that

09:33:28  23  participate in this trial will come to see it for the

09:33:33  24  invaluable institution that it is, as you participate in

09:33:37  25  the process as we go forward.

09:33:38  1          Now, during the course of this trial, the lawyers

09:33:45  2  are going to ask you various questions as a part of their

09:33:51  3  efforts, along with the Court, to help secure a fair and an

09:33:53  4  impartial jury to hear the issues in this case.

09:33:56  5          I want you to understand when the lawyers ask you

09:33:59  6  questions, they're not trying to pry into your personal

09:34:04  7  affairs.  They're not attempting to be nosy.  They are

09:34:07  8  attempting to ask pertinent questions to secure -- or help

09:34:11  9  secure a fair and an impartial jury.

09:34:13  10          The important thing for each of you on the

09:34:17  11  panel -- the venire panel to remember is when these

09:34:22  12  questions will be asked there are no wrong answers.  As

09:34:24  13  long as your responses to the questions asked are full,

09:34:28  14  complete, and truthful, then there are no wrong answers to

09:34:31  15  any of the questions that you'll be asked today.

09:34:33  16          Also, ladies and gentlemen, I don't expect there

09:34:39  17  to be any improper questions asked of the panel.  These are

09:34:43  18  experienced trial lawyers on both sides of this case.  They

09:34:46  19  understand the Federal Rules of Civil Procedure, they

09:34:49  20  understand the local rules of this Court, they understand

09:34:52  21  the Court's rulings on specific matters in this case.

09:34:56  22          If a question should be asked that I view as

09:34:59  23  improper, I will certainly stop them.  But I don't

09:35:02  24  anticipate that happening.  These are very experienced

09:35:04  25  trial counsel.

09:35:05  1          Also, ladies and gentlemen, I don't know if this
09:35:09  2  will happen today.  It rarely does, but it's within the
09:35:13  3  realm of possibility, as they say, so I'm going to mention
09:35:16  4  it to you.  If you're asked a question that you view in
09:35:20  5  your own personal mind and in your own circumstances is so
09:35:24  6  private and so personal that you're not comfortable
09:35:28  7  answering that question in front of everybody in the room,
09:35:31  8  you always have the right to simply say, I'd like to talk
09:35:35  9  about that with Judge Gilstrap.

09:35:36  10         And if you answer in that way, I will provide an
09:35:41  11  opportunity where you can answer that question outside of
09:35:44  12  the presence of everybody else on the panel.

09:35:46  13         I don't expect that to happen.  It rarely comes
09:35:49  14  up, but if it should come up, you have the ability to give
09:35:53  15  that answer and I'll respond accordingly.

09:35:57  16         Now, this case is going to begin the trial as soon
09:36:03  17  as we select the jury today.  So we will actually start the
09:36:06  18  case later today after the jury is selected.  And I'm --
09:36:10  19  it's my expectation that the case will go throughout the
09:36:13  20  rest of this week, and it will either end on Friday of this
09:36:18  21  week, or it's possible it could carry over until Monday of
09:36:21  22  next week.

09:36:21  23         So today is the 15th, as Shakespeare would say,
09:36:27  24  beware of the ides of March, but I expect the case to
09:36:32  25  finish either on the 19th, which is Friday of this week, or

09:36:35   1   maybe -- hopefully not, but maybe on Monday, the 22nd,

09:36:39   2   which would be Monday of next week.  That's an estimate,

09:36:42   3   ladies and gentlemen.

09:36:42   4         Trials are not precise scientific events.  But

09:36:47   5   that's my best estimate.  And I need to know at this time

09:36:51   6   if there are any of you who are on the panel that if you

09:36:56   7   were selected, you would have a serious impediment to being

09:37:00   8   able to be present throughout the trial, whether it ends on

09:37:05   9   this Friday or whether it ends on Monday of next week.

09:37:09   10        And by that, I mean if you have a surgical

09:37:12   11  procedure scheduled for yourself or a member of your

09:37:15   12  immediate family who is dependent upon you, then that's

09:37:20   13  something I need to know about.  If you have

09:37:25   14  business-related travel that is prepaid and non-refundable

09:37:28   15  and you're going to jeopardize your job if you don't go,

09:37:32   16  that also qualifies.

09:37:35   17        But if there's something of a very serious nature

09:37:38   18  that would be an impediment to you being present throughout

09:37:42   19  the trial, then that's something I need to know about.

09:37:45   20        If there's anybody that believes you have a

09:37:48   21  situation like that, I need you to raise your hands,

09:37:51   22  please.

09:37:51   23        All right.  I don't see any hands in the

09:37:57   24  courtroom.  Thank you very much.

09:37:58   25        Now, I'm going to call for announcements at this

09:38:05   1   time in the case of Personalized Media Communications, LLC,

09:38:10   2   versus Apple Inc.  This is Civil Case No. 2:15-CV-1366.

09:38:17   3            Ladies and gentlemen, not all of the respective

09:38:20   4   trial teams are here in the courtroom based on social

09:38:24   5   distancing concerns.  They will be here after the jury is

09:38:28   6   selected and seated and we begin the trial, and I'm going

09:38:31   7   to allow counsel to introduce everybody on their trial

09:38:34   8   teams once the entirety of their respective trial teams are

09:38:38   9   present.

09:38:38   10            But at this time, I'm going to call for

09:38:41   11   announcements on the record from the parties.  What says

09:38:43   12   the Plaintiff?

09:38:44   13            MS. DERIEUX:  Elizabeth DeRieux on behalf of

09:38:46   14   Plaintiff, Personalized Media Communications, and we are

09:38:50   15   ready to proceed, Your Honor.

09:38:51   16            THE COURT:  Thank you.

09:38:51   17            What says the Defendant?

09:38:53   18            MS. SMITH:  Good morning, Your Honor.  Melissa

09:38:55   19   Smith on behalf of Apple, the Defendant.  I'm joined by

09:38:58   20   Mr. Greg Arovas, and we're ready to proceed, Your Honor.

09:39:00   21            THE COURT:  Thank you.

09:39:01   22            As I told you, ladies and gentlemen, this is a

09:39:07   23   case arising under the patent laws of the United States.

09:39:11   24   And what the Plaintiff, Personalized Media Communications,

09:39:14   25   which you're going to hear referred to throughout the trial

09:39:17  1   either as simply the Plaintiff, or probably for short

09:39:21  2   you'll hear the Personalized Media Communications referred

09:39:24  3   to as PMC.

09:39:26  4           What the Plaintiff, PMC, is claiming is that a

09:39:30  5   patent which it owns was infringed by the Defendant, Apple

09:39:34  6   Inc.  And you'll hear the Defendant referred to either

09:39:37  7   simply as the Defendant or Apple throughout the trial.  And

09:39:44  8   the Plaintiff is seeking money damages because of that

09:39:47  9   alleged infringement.

09:39:50  10          Now, the Defendant, Apple, denies that it

09:39:52  11  infringes the Plaintiff's patent, and Apple contends that

09:39:55  12  that patent is invalid.

09:39:56  13          Now, what I've just told you is a very shorthand

09:40:01  14  version of describing the case in layman's terms.

09:40:05  15          I know you've all seen the video prepared by the

09:40:08  16  Federal Judicial Center which was played to you by the

09:40:11  17  clerk's office this morning.  And having seen that, you

09:40:14  18  already know more about patent cases than most citizens do

09:40:17  19  when they arrive for jury duty.

09:40:19  20          As I mentioned, the lawyers on both sides are

09:40:22  21  about to question the panel as an effort to obtain

09:40:26  22  information to help them properly discharge their duty to

09:40:29  23  help the Court secure a fair and an impartial jury.

09:40:32  24          Again, they are not trying to pry into your

09:40:35  25  affairs unduly.  They're simply trying to gain relevant

09:40:39  1  information for that important purpose.  And as I

09:40:42  2  mentioned, the answers to their questions, as long as your

09:40:45  3  responses are full, complete, and truthful, there will be

09:40:48  4  no wrong answers.

09:40:49  5          One thing I do want to mention to you, ladies and

09:40:55  6  gentlemen, because it's possible the lawyers will ask you

09:40:58  7  about your ability to apply this, if you're selected on the

09:41:02  8  jury, is what's called the burden of proof.

09:41:04  9          In a patent case like this, the jury may be called

09:41:08  10  upon to apply two different burdens of proof.  The jury may

09:41:14  11  apply the burden of proof known as the preponderance of the

09:41:19  12  evidence, I'll say that again, the preponderance of the

09:41:25  13  evidence, as well as a second burden of proof known as

09:41:27  14  clear and convincing evidence, clear and convincing

09:41:32  15  evidence.

09:41:32  16          Now, when responding to lawyers' questions about

09:41:37  17  your ability to apply the burden of proof, I need to

09:41:39  18  instruct you that when any party has the burden of proof on

09:41:42  19  any claim or defense by a preponderance of the evidence, it

09:41:46  20  means that the jury must be persuaded by the credible or

09:41:50  21  believable evidence that that claim or defense is more

09:41:54  22  probably true than not true.  Let me say that again for

09:42:00  23  emphasis, more probably true than not true.

09:42:04  24          This is sometimes talked about as being the

09:42:07  25  greater weight and degree of credible testimony.

09:42:08  1          Let me give you an example that I hope will be

09:42:12  2  helpful.  If you'll look in front of me and in front of our

09:42:16  3  court reporter, you should be able to see in the courtroom

09:42:19  4  a statue of the Lady of Justice.  She's blindfolded.  She

09:42:23  5  holds lowered at her right side the sword of justice.

09:42:26  6          She holds raised in her left hand the Scales of

09:42:31  7  Justice.  The Scales of Justice are balanced and equal,

09:42:35  8  exactly the same.  And that's where these two parties

09:42:38  9  should start out in this case, in exactly the same balanced

09:42:43 10  and equal position.

09:42:43 11          But when you think about the burden of proof,

09:42:45 12  think about over the course of the trial, the Plaintiff

09:42:47 13  will put on their case, and that evidence will go on one

09:42:50 14  side of the scales, and the Defendant will put on their

09:42:52 15  case, and their evidence will go on the other side of the

09:42:56 16  scales.

09:42:56 17          And then when all the evidence is in, all the

09:42:59 18  evidence for both parties has been placed on one side or

09:43:02 19  the other of those scales, you, the jury, will be asked

09:43:05 20  certain questions, and if the party who has the burden of

09:43:09 21  proof on that question by a preponderance of the evidence

09:43:13 22  has the scales tip in their favor, even if they tip ever so

09:43:18 23  slightly, then they have met the burden of proof of a

09:43:21 24  preponderance of the evidence, more probably true than not

09:43:29 25  true, the greater weight and degree of credible testimony.

09:43:32  1        On the other hand, the second burden of proof that
09:43:36  2   the jury will be called upon to apply is known as clear and
09:43:40  3   convincing evidence.  Clear and convincing evidence, ladies
09:43:47  4   and gentlemen, means that the jury must have an abiding
09:43:52  5   conviction that the truth of the party's factual
09:43:55  6   contentions are highly probable.  I'll say that again for
09:43:59  7   emphasis, an abiding conviction that the truth of the
09:44:03  8   party's factual contentions are highly probable.
09:44:08  9        This clear and convincing evidence standard is a
09:44:11  10  higher burden of proof than the preponderance of the
09:44:14  11  evidence standard.
09:44:16  12       If you think about the same example with the
09:44:18  13  statue of Lady Justice that I gave you and the evidence for
09:44:23  14  both parties is placed on their respective sides of those
09:44:27  15  scales and the scales start off equal and balanced, at the
09:44:31  16  end of the trial, if a party has the burden of proof on an
09:44:36  17  issue by clear and convincing evidence, to meet that burden
09:44:39  18  of proof those scales must tip in their favor.
09:44:42  19       And they must tip more than ever so slightly, they
09:44:46  20  must definitely tip in that party's favor.  And if they do,
09:44:50  21  then that party meets the burden of proof known as clear
09:44:52  22  and convincing evidence.
09:44:52  23       Now, it's important for you to understand that
09:44:56  24  neither of these burdens of proof should be confused with a
09:45:01  25  third and separate and unrelated burden of proof that I'm

09:45:05  1  sure you've all heard about on television and in the media

09:45:08  2  called beyond a reasonable doubt.

09:45:10  3       Beyond a reasonable doubt is the burden of proof

09:45:13  4  applied in a criminal case.  It has absolutely no

09:45:18  5  application whatsoever in a civil case like this.  You

09:45:25  6  should not confuse clear and convincing evidence with

09:45:28  7  beyond a reasonable doubt.  It is not as high a standard as

09:45:31  8  beyond a reasonable doubt.  But it is a higher standard

09:45:35  9  than the preponderance of the evidence.

09:45:37  10      Now, I give you these instructions, as I say, in

09:45:41  11  case either or both sides in their questioning of you ask

09:45:44  12  about your ability to apply those two burdens of proof in

09:45:48  13  this case if you're selected to serve as a jury -- a juror.

09:45:52  14      Now, before the lawyers address the panel, I'm

09:45:57  15  going to ask each of you one at a time to now tell me as

09:46:00  16  much about you as I told you about me when I came out here

09:46:03  17  this morning.  You should see on the screens in front of

09:46:06  18  you, and you may have laminated copies, I'm not sure, but

09:46:10  19  you should have access to nine specific questions that I'm

09:46:18  20  going to ask each of you to answer.  And we're going to do

09:46:21  21  this in the following fashion:

09:46:22  22      Both of these Court Security Officers will be in

09:46:25  23  the gallery with two separate handheld microphones.  When

09:46:31  24  it's your turn to answer those questions, if you will

09:46:34  25  stand, if you will either lower or remove your masks so I

09:46:37  1   can see the entirety of your face, and the lawyers can,

09:46:39  2   too, and if you will then take a handheld microphone given

09:46:43  3   to you by one of the Court Security Officers, then holding

09:46:46  4   that microphone close enough to where we can hear

09:46:49  5   everybody -- everybody can hear in this big room, then

09:46:51  6   answer those nine questions.

09:46:53  7         And when you've finished answering those nine

09:46:56  8   questions, hand the handheld microphone back to the Court

09:47:00  9   Security Officer, raise your mask, and have a seat.  That's

09:47:03  10  how we're going to do it.

09:47:04  11        And the reason we're using two handheld

09:47:07  12  microphones is after Panel Member No. 1 answers those nine

09:47:14  13  questions, then that microphone will be cleaned and

09:47:18  14  disinfected, and the second microphone will be used with

09:47:22  15  the second person, and we'll follow that process

09:47:24  16  throughout.  So none of you are going to get a microphone

09:47:27  17  that hasn't been wiped down and disinfected and cleaned

09:47:31  18  just before you get it.  I wanted you to be aware of that,

09:47:34  19  as well.

09:47:35  20        And we'll do that throughout all the members of

09:47:37  21  the panel, and we'll begin with Panel No. 1, and if I can

09:47:46  22  ask the Court Security Officers to take their place, and

09:47:50  23  we'll go through and let each member of the panel answer

09:47:52  24  these nine questions.

09:48:01  25        All right.  We'll begin with Panel Member No. 1,

09:48:05 1  Mr. Jones.

09:48:06 2       JUROR JONES:  James Jones.  I live in McLeod,

09:48:10 3  Texas.  I have two kids.  I work for Nix Trucking.  Been

09:48:14 4  there for two years.  I haul chips.  High school diploma.

09:48:21 5  My wife's name is Jennifer Jones.  She works for HealthCARE

09:48:24 6  Express.  She works the front desk.  She's been there for

09:48:29 7  right at two years.  And I have no prior jury services.

09:48:32 8       THE COURT:  All right.  Thank you, Mr. Jones.

09:48:34 9       We'll go next to Panel Member No. 2, Ms. Haley.

09:48:40 10       JUROR HALEY:  My name is Debra Haley.  I have four

09:48:52 11  grown children and numerous grandchildren.  I don't work

09:48:58 12  anymore other than at home.  I have -- I did work as a

09:49:05 13  sitting service.  I managed a sitting service.  I did that

09:49:09 14  for about 10 years before I got remarried and retired.

09:49:12 15       THE COURT:  And when you say "sitting service,"

09:49:14 16  you mean go into people's homes?

09:49:16 17       JUROR HALEY:  For the elderly.  It's for the

09:49:17 18  elderly.

09:49:17 19       THE COURT:  And sitting for the elderly.  Thank

09:49:19 20  you.

09:49:19 21       JUROR HALEY:  I didn't do that -- I did do that

09:49:22 22  part a little bit, but mainly I just -- I managed the

09:49:25 23  office.  I did the paperwork and scheduling.

09:49:27 24       THE COURT:  Okay.  Thank you.  Please continue.

09:49:31 25       JUROR HALEY:  My educational background, a high

```
09:49:34   1   school diploma.  And my spouse's name is Revis Haley.  And
09:49:38   2   he doesn't work.  He's retired Army/Air Force.  And he's
09:49:43   3   been retired for a few years.  And I -- the only thing I've
09:49:50   4   ever done was the grand jury.  I did that a couple years
09:49:53   5   ago.
09:49:53   6               THE COURT:  All right, ma'am.  Thank you very
09:49:54   7   much.
09:49:56   8               Next is Panel No. 3 -- Panel Member No. 3,
09:50:01   9   Ms. Goodman.
09:50:02  10               JUROR GOODMAN:  My name is Beth Goodman.  I live
09:50:09  11   in Daingerfield, Texas.  I have one child.  I am employed
09:50:15  12   by the Daingerfield Housing Authority as a clerk.  I've
09:50:20  13   worked there approximately four years.  I had one year of
09:50:24  14   college.  My spouse's name is Jim.  He is employed at the
09:50:30  15   Morris County Sheriff's Department as a jailer.  He's
09:50:36  16   worked there approximately four months.  And I've had one
09:50:42  17   prior jury service in a civil case.
09:50:43  18               THE COURT:  And where was that prior jury service,
09:50:46  19   ma'am?
09:50:47  20               JUROR GOODMAN:  In Morris County.
09:50:49  21               THE COURT:  In state court?  There's not a federal
09:50:51  22   court in Morris County.
09:50:53  23               JUROR GOODMAN:  No, no, it was -- it must have
09:50:55  24   been state court.
09:50:55  25               THE COURT:  What kind of case was it, do you
```

09:50:57   1   remember?

09:50:57   2          JUROR GOODMAN:  It had to do with a high school

09:50:59   3   student, theft.

09:51:00   4          THE COURT:  All right.  Thank you very much,

09:51:02   5   ma'am.

09:51:02   6          All right.  Next is Panel Member No. 4, Mr. Cox.

09:51:09   7          JUROR COX:  My name is James Cox.

09:51:15   8          THE COURT:  Hold the microphone a little closer,

09:51:17   9   Mr. Cox.

09:51:17   10         JUROR COX:  My name is James Cox.

09:51:20   11         THE COURT:  Check that and see if it's working.

09:51:22   12   I'm not hearing Mr. Cox.

09:51:28   13         JUROR COX:  Hello.

09:51:29   14         THE COURT:  Now you're good.  Go ahead.

09:51:30   15         JUROR COX:  My name is James Cox.  I have two

09:51:33   16   children.  Place of employment, I work for American

09:51:36   17   Electric Power as an instrumentation technician working

09:51:41   18   with computers, instruments, whatever.  Been there 16

09:51:44   19   years.  Educational background, high school degree --

09:51:46   20   education, Associate's degree in electronics.  Spouse's

09:51:51   21   name is Sheila Cox.  She works for the Daingerfield School

09:51:55   22   District as a coach and teacher.  She's been there about

09:52:01   23   15, 16 years.  Jury service, no, sir.

09:52:05   24         THE COURT:  All right.  Thank you, Mr. Cox.

09:52:07   25         Next is Panel Member No. 5, Mr. Parker.

09:52:15  1          JUROR JAMES PARKER:  Hello.  All right.  My name

09:52:18  2  is James Parker.  I live here in Marshall, Texas.  I have

09:52:22  3  three children.  I work for Christus Good Shepherd out of

09:52:26  4  Longview.  And I've been there for 14 years.  My

09:52:31  5  educational is for biomedical equipment technician.

09:52:35  6  Spouse's name is Sabrina Parker, and she just started work

09:52:39  7  for Blue Cross Blue Shield for about a week and a half.  No

09:52:44  8  prior service.

09:52:44  9          THE COURT:  And what do you do for Christus Good

09:52:48  10  Shepherd?

09:52:49  11          JUROR JAMES PARKER:  I'm the biomedical

09:52:50  12  technician.

09:52:51  13          THE COURT:  All right, sir.

09:52:52  14          JUROR JAMES PARKER:  Work on the patient

09:52:53  15  equipment.

09:52:53  16          THE COURT:  Thank you, sir.

09:52:54  17          And next is Panel Member No. 6, Mr. Overstreet.

09:53:01  18          JUROR OVERSTREET:  My name is Arthur Overstreet.

09:53:05  19          THE COURT:  Could you take that -- could you pull

09:53:06  20  that mask down, Mr. Overstreet?

09:53:09  21          JUROR OVERSTREET:  Yes, sir.

09:53:10  22          THE COURT:  Thank you.

09:53:11  23          JUROR OVERSTREET:  My name is Arthur Overstreet.

09:53:14  24  And I lived in Camp County all my life.  I have three

09:53:20  25  children.  Workplace is Hiland Dairy in Tyler, Texas.

```
09:53:24   1              THE COURT:  What do you do for them, sir?

09:53:26   2              JUROR OVERSTREET:  Shipping and receiving.

09:53:30   3              THE COURT:  Okay.

09:53:32   4              JUROR OVERSTREET:  And high school diploma.

09:53:35   5   Pittsburg High School diploma and divorced.

09:53:40   6              THE COURT:  All right.  What about prior jury

09:53:41   7   duty?

09:53:42   8              JUROR OVERSTREET:  Yes, sir.  It's been months ago

09:53:45   9   here in Tyler -- here in Marshall.

09:53:45  10              THE COURT:  In this court?

09:53:47  11              JUROR OVERSTREET:  Yes, sir.

09:53:47  12              THE COURT:  And you say it's been months ago?

09:53:49  13              JUROR OVERSTREET:  No. It's been probably years.

09:53:51  14              THE COURT:  Okay.  What kind of -- do you remember

09:53:54  15   what kind of case it was?

09:53:55  16              JUROR OVERSTREET:  It was a patent.

09:53:57  17              THE COURT:  All right.  And you served on the

09:53:59  18   jury.  Did you serve as a foreperson or a member of the

09:54:04  19   jury?

09:54:05  20              JUROR OVERSTREET:  Member of the jury but they

09:54:06  21   settled out of court.

09:54:06  22              THE COURT:  Okay.  You didn't return a verdict?

09:54:08  23              JUROR OVERSTREET:  No.

09:54:08  24              THE COURT:  Okay.  Thank you very much.

09:54:08  25              JUROR OVERSTREET:  Thank you.
```

09:54:13  1            THE COURT:  That's very helpful.

09:54:14  2            Next is Panel Member No. 7, Ms. Parker.  We've got

09:54:18  3  at least two Parkers in our group.

09:54:21  4            JUROR KALEY PARKER:  My name is Kaley Parker.  I

09:54:26  5  live in Queen City, Texas.  I do have two children that we

09:54:29  6  adopted.  I currently work for the Queen City ISD.  I'm a

09:54:35  7  special education teacher assistant.  I have a high school

09:54:40  8  diploma with a year of college.  My husband is David

09:54:44  9  Parker.  He works for Chevron.  He is -- works in the

09:54:47 10  oilfield obviously, logistics coordinator, and also takes

09:54:51 11  over the COVID testing for all offshore rigs, and he's been

09:54:55 12  there for 11 years.  And I have no prior jury services.

09:54:59 13            THE COURT:  Thank you, Ms. Parker.

09:55:01 14            Next is No. 8, Panel Member No. 8, Mr. Moore.

09:55:08 15            JUROR BRIAN MOORE:  Yes.  I'm Brian Moore from

09:55:09 16  Atlanta, Texas.  I have three children, two stepchildren.

09:55:13 17  I work for Baker Hughes Petrolite, Upstream Chemicals.  I

09:55:18 18  am a driver there.  Been there for eight years.  I have a

09:55:21 19  high school diploma.  My spouse's name is Rita Moore.  She

09:55:27 20  is disabled.  And I have no prior jury services.

09:55:30 21            THE COURT:  All right, sir.  Thank you, Mr. Moore.

09:55:32 22            Next is Panel Member No. 9, Mr. Quarles.

09:55:38 23            JUROR QUARLES:  My name is Jerry Quarles.  I live

09:55:42 24  in Hallsville, Texas.  Been there 37 years.  Have two grown

09:55:46 25  sons.  Work for AP SWEPCO for 37 years, Pirkey Power Plant

09:55:52  1   in plant operations in various positions.  Educational is

09:55:57  2   high school diploma.  My spouse's name is Brenda.  She was

09:56:01  3   a librarian aid for 20 years in Hallsville High School,

09:56:08  4   school districts.  And no prior service.

09:56:12  5            THE COURT:  All right, sir, thank you,

09:56:16  6   Mr. Quarles.

09:56:16  7            Next is Panel Member No. 10, Ms. Smith.

09:56:22  8            JUROR SMITH:  Hello, my name is Angelique Smith.

09:56:27  9   I live in Diana, Texas.  I have two children, one grown

09:56:31  10  that has moved out and one still in high school.  I

09:56:32  11  currently work for myself as a metal scrapper and flipper

09:56:35  12  and part-time construction.  I've been doing that for about

09:56:39  13  the last four years after being injured at Walmart after 13

09:56:44  14  years there.  My educational background is high school

09:56:46  15  diploma.  I've been divorced for eight years, something

09:56:50  16  like that.  And I served on a jury in Gilmer, Texas a

09:56:55  17  number of years ago, which was a domestic violence alleging

09:57:00  18  attempted murder and ended in a mistrial.

09:57:02  19           THE COURT:  Thank you very much.

09:57:03  20           Next is Panel Member No. 11, Mr. Thomas.

09:57:09  21           JUROR THOMAS:  Good morning, Your Honor.

09:57:20  22           THE COURT:  Good morning.

09:57:21  23           JUROR THOMAS:  My name is James Thomas.  I live in

09:57:24  24  Marshall, Texas.  I've got two grown children.  I'm

09:57:27  25  currently the building superintendent for Harrison County.

09:57:30  1  I've been there for four years.  I've got a high school

09:57:33  2  diploma, and I'm not married, and I've served on a civil

09:57:37  3  case in a state's district court.

09:57:39  4          THE COURT:  How long ago?

09:57:41  5          JUROR THOMAS:  It's been over roughly a year ago.

09:57:43  6          THE COURT:  All right.  Do you remember what kind

09:57:44  7  of case it was?

09:57:45  8          JUROR THOMAS:  I believe it was a suit over -- I

09:57:51  9  don't remember exactly.  It was some suit, Judge, been a

09:57:54  10  while.

09:57:54  11          THE COURT:  All right.  Thank you.

09:57:55  12          All right.  Next is Panel Member No. 12,

09:57:59  13  Ms. Turner.

09:58:00  14          JUROR TURNER:  Good morning.  Jeanette Turner.

09:58:05  15  Live in Marshall, Texas.  Two children.  I'm retired from

09:58:09  16  the University of Texas Health Science Center at Tyler as a

09:58:16  17  human resources and benefits manager.  I worked there 24

09:58:19  18  years, eight months.  College diploma.  Divorced.  I've

09:58:25  19  served on one civil jury at the 71st District Court here in

09:58:30  20  Marshall, Texas.

09:58:31  21          THE COURT:  How long ago has that been,

09:58:33  22  Ms. Turner?

09:58:34  23          JUROR TURNER:  That has been about 10 years.

09:58:36  24          THE COURT:  Do you remember what the case was

09:58:37  25  about?

09:58:38   1              JUROR TURNER:  It was about an accident.

09:58:40   2              THE COURT:  Okay.  Thank you very much, ma'am.

09:58:43   3              JUROR TURNER:  Yes, sir.

09:58:44   4              THE COURT:  Next is Panel Member No. 13, Mr. Rand.

09:58:47   5              JUROR RAND:  Hi, my name is Flemon Rand.  I've got

09:58:51   6    one grown daughter.  I work for JBS/Pilgrim's Pride and

09:58:57   7    before that I worked for U.S. Steel for 32 years.

09:59:01   8    Education, high school and some technical hours for

09:59:08   9    wastewater management, water management.  Spouse is Juanita

09:59:14   10   Rand.  Retired.  Last jury service was a criminal murder

09:59:19   11   case.  And he pleaded -- he wound up pleading guilty to the

09:59:25   12   charge before we had a chance to make our decision in the

09:59:28   13   jury.

09:59:28   14             THE COURT:  Where was that, Mr. Rand?

09:59:31   15             JUROR RAND:  Upshur County.

09:59:35   16             THE COURT:  And what did your wife do before she

09:59:38   17   retired?

09:59:39   18             JUROR RAND:  She was a state resource officer

09:59:41   19   for -- applying for Medicaid/Medicare.

09:59:44   20             THE COURT:  Thank you, sir.

09:59:46   21             JUROR RAND:  Yes, sir.

09:59:47   22             THE COURT:  All right.  Next is Panel Member

09:59:48   23   No. 14, Ms. Washington.

09:59:50   24             JUROR WASHINGTON:  My name is Janie Washington.  I

09:59:56   25   live here in Marshall, Texas.  I have three adult children.

```
09:59:59   1   I work for Marshall Pottery, Deroma, and I've been there
10:00:07   2   for 23 years.  And I have a high school diploma, and I also
10:00:16   3   have a beauty salon.  I'm not married.  And I did two --
10:00:27   4   served jury twice.
10:00:28   5           THE COURT:  And where was that, ma'am, here in
10:00:30   6   Marshall?
10:00:32   7           JUROR WASHINGTON:  Here in Marshall.
10:00:33   8           THE COURT:  Okay.  And what kind of case was that
10:00:34   9   -- cases was that?
10:00:35  10           JUROR WASHINGTON:  One was theft and the other was
10:00:39  11   drug trafficking.
10:00:40  12           THE COURT:  And what do you do for Deroma?
10:00:44  13           JUROR WASHINGTON:  Warehouse and shipping manager.
10:00:46  14           THE COURT:  Okay.  And you said you had a beauty
10:00:48  15   parlor or something like that.  Does that mean you actually
10:00:51  16   operate one in addition to your other job?
10:00:54  17           JUROR WASHINGTON:  Yes, sir, to supplement my
10:00:56  18   income.
10:00:57  19           THE COURT:  Okay.  That's what I thought.  Thank
10:00:58  20   you, ma'am.
10:01:00  21           JUROR WASHINGTON:  Yes.
10:01:00  22           THE COURT:  Next is No. 15, Ms. Moore.
10:01:04  23           JUROR CAROLYN LOUISE MOORE:  I'm Carolyn Moore.  I
10:01:06  24   live in Union Grove.  I have two grown children.  And I
10:01:09  25   work at Seymour's part-time.  And worked for Dillard's
```

10:01:15  1  cosmetics for 30 years.  I have a high school background

10:01:18  2  plus training in the cosmetology.  Not married.  And I have

10:01:22  3  never served on a jury.

10:01:23  4        THE COURT:  Thank you, Ms. Moore.

10:01:25  5        Next is Panel Member No. 16, Ms. Gibbons.

10:01:29  6        JUROR GIBBONS:  My name is Rachel Gibbons.  I live

10:01:35  7  in Jefferson, Texas, and I've lived there for almost 10

10:01:38  8  years.  I have four children, one is graduated last year

10:01:42  9  and the other three are still in school.  And then I do not

10:01:49 10  work.  I've been a stay-at-home mom.  And done that for 19

10:01:55 11  years.

10:01:56 12        THE COURT:  You work plenty hard.  You just don't

10:01:58 13  work outside the home.

10:02:03 14        JUROR GIBBONS:  I was a high school drop-out.  I

10:02:05 15  was on the wrong path then.  And, yeah, I've straightened

10:02:09 16  up, though.  My spouse's name is Milam Gibbons, and he

10:02:14 17  works at ProFrac as a driver/trainer, he teaches people how

10:02:17 18  to drive 18-wheelers, and he's worked there for

10:02:21 19  approximately three years.  And I have never served on jury

10:02:26 20  duty.

10:02:26 21        THE COURT:  Good.  Thank you, ma'am.

10:02:28 22        All right.  Next is No. 17, Ms. Dotson.

10:02:33 23        JUROR DOTSON:  Good morning.  My name is Melissa

10:02:37 24  Dotson.  I have two adult children.  I live in Marshall.

10:02:43 25  Work for MHC Kenworth.  I've been with them a little over

10:02:50   1   four years.  I'm a lead counter -- so I sell the parts.

10:02:54   2   I'm married to Chris Dotson, who works for Longview Police

10:02:57   3   Department.  He's been with them currently 15 years.

10:03:00   4   Before that he was with another department for 15 years.

10:03:06   5   No prior jury service.

10:03:09   6           THE COURT:  All right.  And I assume MHC Kenworth

10:03:14   7   is a trucking company?

10:03:15   8           JUROR DOTSON:  Yes, sir.  It's a service and

10:03:17   9   part's department.  It's a dealership.

10:03:19  10           THE COURT:  All right.  Thank you, ma'am.

10:03:21  11           JUROR DOTSON:  You're welcome.

10:03:22  12           THE COURT:  All right.  Next is No. 18, Mr. Groce.

10:03:28  13           JUROR GROCE:  Good morning.  My name is Vernon

10:03:33  14   Groce.  And I live in Atlanta, Texas.  I have three

10:03:36  15   children, two boys and a girl.  And I'm the pastor of Holly

10:03:41  16   Street Church of God.

10:03:43  17           I've been there for nine years.  I've been

10:03:47  18   pastoring about 32 years.  I have a high school education

10:03:49  19   and a chaplains license and ministerial expert training.

10:03:49  20   And my wife's name is Tabitha Groce and she works for the

10:03:57  21   Atlanta school district as a teacher's aid, and she's been

10:04:00  22   there about two years, I believe, and I've never been

10:04:03  23   selected for a jury.

10:04:04  24           THE COURT:  All right.  Sir, thank you very much.

10:04:10  25           Next is No. 19, Ms. Pierce.

| | | |
|---|---|---|
| 10:04:16 | 1 | JUROR PIERCE:  Hi, my name is Traquaysha Pierce |
| 10:04:21 | 2 | and I live in Marshall, Texas.  I have no kids and I'm |
| 10:04:25 | 3 | currently unemployed.  I have a high school diploma.  And I |
| 10:04:32 | 4 | have never been to jury service. |
| 10:04:33 | 5 | THE COURT:  All right.  Ma'am, thank you. |
| 10:04:35 | 6 | Next is No. 20, Mr. Ladish or Ladish. |
| 10:04:40 | 7 | JUROR LADISH:  Good morning, my name is Ken |
| 10:04:42 | 8 | Ladish. |
| 10:04:43 | 9 | THE COURT:  Ladish. |
| 10:04:44 | 10 | JUROR LADISH:  And I'm from Gilmer, Texas.  I've |
| 10:04:46 | 11 | got three grown children.  Currently I'm retired.  I used |
| 10:04:50 | 12 | to work for JW Power as an inventory coordinator too where |
| 10:04:57 | 13 | I balanced inventory and closed out work orders and made |
| 10:05:00 | 14 | sure the projected dollar amount matched the ending dollar |
| 10:05:07 | 15 | amount.  I was there for a little over 25 years doing that. |
| 10:05:12 | 16 | I dropped out as a junior in college.  And I'm divorced. |
| 10:05:15 | 17 | And I've had no previous jury service. |
| 10:05:18 | 18 | THE COURT:  All right.  Thank you, sir. |
| 10:05:20 | 19 | Next is Panel Member No. 21, Ms. Blevins. |
| 10:05:32 | 20 | JUROR BLEVINS:  I am Dawn Blevins.  I live in |
| 10:05:35 | 21 | Marshall, Texas.  I have three Children.  I work at Scott |
| 10:05:39 | 22 | Industries.  What we do there is we process, manufacture |
| 10:05:46 | 23 | the components of specialized cylinders for hydraulics, |
| 10:05:51 | 24 | pneumatics, oilfield use.  And I receive the purchased |
| 10:05:56 | 25 | material test reports throughout the entire company. |

| | | |
|---|---|---|
| 10:05:59 | 1 | There's 13 plants in the United States and one up |
| 10:06:01 | 2 | in Canada.  And I do all the invoicing for, processing, and |
| 10:06:04 | 3 | sales at my plant location.  I've been there 15 years.  I |
| 10:06:08 | 4 | have a high school diploma and some college.  I am widowed. |
| 10:06:16 | 5 | My husband did floor installation for the nine years that |
| 10:06:19 | 6 | we were married and did that before then, and I've never |
| 10:06:22 | 7 | served on a jury. |
| 10:06:23 | 8 | THE COURT:  Thank you, Ms. Blevins. |
| 10:06:24 | 9 | Next is Panel Member No. 22. |
| 10:06:29 | 10 | JUROR FRUIA:  My name is Robin Fruia.  I live in |
| 10:06:35 | 11 | Gilmer, Texas.  I have four children.  My place of |
| 10:06:40 | 12 | employment is Longview Community Ministries.  We provide |
| 10:06:47 | 13 | emergency food and financial assistance for families in |
| 10:06:51 | 14 | crisis in Longview.  I've worked there for 10 years.  I |
| 10:06:54 | 15 | have a Bachelor's degree.  My husband is Tracy Fruia, he |
| 10:06:59 | 16 | works at CHRISTUS Good Shepherd in Longview. |
| 10:07:04 | 17 | He's a perfusionist and he's been there for 32 |
| 10:07:05 | 18 | years.  And I served on a criminal case in Gregg County |
| 10:07:08 | 19 | many years ago, but it was settled, so I wasn't there for |
| 10:07:15 | 20 | too long. |
| 10:07:15 | 21 | THE COURT:  And that was your only prior jury |
| 10:07:17 | 22 | duty. |
| 10:07:19 | 23 | JUROR FRUIA:  Yes, sir. |
| 10:07:20 | 24 | THE COURT:  Thank you very much, ma'am. |
| 10:07:22 | 25 | Next is Panel Member No. 23, Ms. Davis. |

10:07:25  1          JUROR DAVIS:  My name is Jennifer Davis.  And I
10:07:27  2   live in Pittsburg, Texas.  I have one child.  I am
10:07:31  3   self-employed.  I have two small businesses.  I do online
10:07:35  4   sales and marketing.  I'm an independent Paparazzi
10:07:40  5   consultant.  My other job is I do construction clean-up and
10:07:45  6   residential clean-up.
10:07:46  7          I have worked at the first job as an independent
10:07:49  8   consultant for about seven months.  And my cleaning job,
10:07:55  9   I've had about eight years.  I have some college.  I have
10:07:59  10  some business certificates.  I have a certificate in
10:08:04  11  long-term care facilities as an activity director and a
10:08:09  12  dietary manager.  My husband's name is Bryan Davis.  He
10:08:13  13  works at Mid America Pet Food in Mt. Pleasant.  And he does
10:08:20  14  shipping, and he's worked there two or three years.  And I
10:08:25  15  haven't had no prior jury services.
10:08:27  16         THE COURT:  Okay.  Thank you, Ms. Davis.
10:08:29  17         Next is Panel Member No. 24, Ms. Nolan.
10:08:34  18         JUROR NOLAN:  Yes.  Hello.  My name is Mary Alise
10:08:37  19  Nolan.  I have three grown children.  I worked for Gilmer
10:08:41  20  ISD 29 years.  I'm an instructional coach there.  And I
10:08:44  21  coach teachers from 8th through 12th in English.  I --
10:08:47  22  educational background, I have a master's and an
10:08:51  23  administrative certification beyond that.  My spouse's name
10:08:53  24  is Scott Nolan.  His place of employment, he owns Nolan
10:08:59  25  Properties, which is a real estate brokerage.

| | | |
|---|---|---|
| 10:09:02 | 1 | And he also is a painting contractor by trade.  He |
| 10:09:04 | 2 | has worked -- had that -- been a realtor for the past five |
| 10:09:08 | 3 | years and owned his own company for 35.  And I have had no |
| 10:09:12 | 4 | prior jury services. |
| 10:09:12 | 5 | THE COURT:  Thank you, ma'am. |
| 10:09:13 | 6 | Next is Panel Member No. 25, Ms. Miles. |
| 10:09:18 | 7 | JUROR MILES:  Good morning.  My name is Melissa |
| 10:09:21 | 8 | Miles.  I live in Marion County Texas on Monterey Lake.  I |
| 10:09:29 | 9 | have three adult children.  I work at the VA in Shreveport |
| 10:09:32 | 10 | as a registered nurse.  Worked there for 16 years.  I have |
| 10:09:36 | 11 | an Associate degree in nursing.  My husband's name is |
| 10:09:41 | 12 | Kevin.  He works at KLX Energy Services, he's a machinist. |
| 10:09:47 | 13 | He's been there for seven years.  And I have had no jury |
| 10:09:51 | 14 | service. |
| 10:09:51 | 15 | THE COURT:  All right.  Thank you, Ms. Miles. |
| 10:09:52 | 16 | Next is Panel Member No. 26, Ms. Alexander. |
| 10:09:56 | 17 | JUROR ALEXANDER:  I live in Hallsville, Texas.  I |
| 10:10:00 | 18 | have one child.  I'm a special education teacher at |
| 10:10:03 | 19 | Hallsville ISD.  I've worked for many years but I've worked |
| 10:10:07 | 20 | for Hallsville before.  I have a Bachelor's degree.  My |
| 10:10:10 | 21 | spouses's name is Daren Alexander, and he works for |
| 10:10:13 | 22 | Everything Marketing in Shreveport, and a web developer. |
| 10:10:18 | 23 | He's worked there for the last 10 years.  And I've never |
| 10:10:21 | 24 | been on a jury. |
| 10:10:23 | 25 | THE COURT:  All right.  Thank you, Ms. Alexander. |

| | | |
|---|---|---|
| 10:10:25 | 1 | Next is Panel Member No. 27, Ms. Bertussi. |
| 10:10:31 | 2 | JUROR BERTUSSI:  Hello.  My name is Rachelle |
| 10:10:34 | 3 | Bertussi.  I live in Hughes Springs, Texas.  I have no |
| 10:10:37 | 4 | children.  I work at Goldwater Bank processing and |
| 10:10:40 | 5 | coordinating mortgage loan applications.  Also, I work in a |
| 10:10:47 | 6 | salon on the weekends.  I have a certification in cosmetic |
| 10:10:51 | 7 | tattooing and am a licensed tattoo artist in Texas.  I have |
| 10:10:57 | 8 | a high school diploma and two years of college.  I am not |
| 10:11:03 | 9 | married.  And no prior jury service. |
| 10:11:04 | 10 | THE COURT:  Thank you, ma'am. |
| 10:11:05 | 11 | All right.  Next is Panel Member No. 28, |
| 10:11:09 | 12 | Ms. Black. |
| 10:11:09 | 13 | JUROR BLACK:  My name is Jodi Black.  I live in |
| 10:11:17 | 14 | Diana, Texas.  I have a son, a step-daughter, and I am |
| 10:11:20 | 15 | currently raising my two nieces.  I am a home health |
| 10:11:24 | 16 | pediatric nurse.  I've been with this company for 10 years. |
| 10:11:30 | 17 | THE COURT:  What company is that? |
| 10:11:32 | 18 | JUROR BLACK:  Berson Pediatrics home health.  I |
| 10:11:39 | 19 | am married to Drew Black, he works -- he's a plant manager |
| 10:11:43 | 20 | for Cactus Flow Products in Longview, but he also is a |
| 10:11:47 | 21 | crappie guide on the side, and he also runs 903 Outdoors. |
| 10:11:54 | 22 | It's a social media small business.  No prior jury |
| 10:12:02 | 23 | services. |
| 10:12:03 | 24 | THE COURT:  What about your educational |
| 10:12:04 | 25 | background, ma'am. |

```
10:12:05   1              JUROR BLACK:  Oh.  High school diploma and I am a
10:12:08   2   LVN nurse from Panola college.
10:12:12   3              THE COURT:  Thank you, ma'am.
10:12:13   4              All right.  Next is Panel Member No. 29,
10:12:16   5   Mr. McGriff.
10:12:18   6              JUROR MCGRIFF:  My name is Richard McGriff.  I
10:12:20   7   have two daughters.  I live in Marion County.  I work for
10:12:26   8   Prysmian Group in Scottsville.  Been there for 16 years.
10:12:27   9              THE COURT:  What was the name of that business,
10:12:30  10   sir?
10:12:30  11              JUROR MCGRIFF:  Prysmian, known as General Cable,
10:12:33  12   I guess, around here.
10:12:34  13              THE COURT:  I see.
10:12:36  14              JUROR MCGRIFF:  We got bought out a couple years
10:12:39  15   back.
10:12:39  16              THE COURT:  Right.  The word starts with a P.  I
10:12:41  17   see it on the sign when I drive down Highway 80.  I never
10:12:44  18   know how to pronounce it.
10:12:46  19              JUROR BLACK:  Yes, sir.
10:12:46  20              THE COURT:  Okay.
10:12:47  21              MR. MCGRIFF:  High school background.  My wife's
10:12:48  22   name is Ashley McGriff.  She works at Magnolia Place in
10:12:54  23   Jefferson.  She's been there for about a year as a nurse.
10:12:58  24   I served on one jury in Marion County.  I guess it would be
10:13:05  25   a criminal case.
```

| 10:13:06 | 1 | THE COURT:  How long ago? |
| 10:13:09 | 2 | JUROR MCGRIFF:  I want to say it was at least five |
| 10:13:11 | 3 | or six years ago. |
| 10:13:12 | 4 | THE COURT:  All right, sir.  Thank you very much. |
| 10:13:14 | 5 | JUROR MCGRIFF:  Thank you. |
| 10:13:15 | 6 | THE COURT:  Next is Panel Member No. 30, |
| 10:13:18 | 7 | Ms. Strong. |
| 10:13:20 | 8 | JUROR STRONG:  Hello, can you hear me? |
| 10:13:22 | 9 | THE COURT:  Yes, ma'am. |
| 10:13:25 | 10 | JUROR STRONG:  My name is Sally Strong.  I live in |
| 10:13:28 | 11 | Harleton.  I have one grown son.  I worked -- I'm retired |
| 10:13:31 | 12 | now but I worked for East Texas Council of Governments for |
| 10:13:36 | 13 | 16 years.  Worked in the work force system improvement |
| 10:13:37 | 14 | department.  I was lead monitor for subsidized child care |
| 10:13:42 | 15 | services in east -- 14 counties of East Texas.  And I have |
| 10:13:45 | 16 | a Bachelor's degree.  My husband's name is Jeffrey.  He's |
| 10:13:51 | 17 | self-employed as a wireless Internet installer.  And he's |
| 10:13:56 | 18 | been doing that for about 17 years.  And I've never served |
| 10:14:02 | 19 | in a jury. |
| 10:14:02 | 20 | THE COURT:  Thank you, Ms. Strong. |
| 10:14:03 | 21 | All right.  Next is Panel Member No. 31, |
| 10:14:08 | 22 | Ms. Langley. |
| 10:14:09 | 23 | JUROR LANGLEY:  My name is Paulette Langley.  I |
| 10:14:13 | 24 | live in Marshall, Texas.  I have two grown children.  Two |
| 10:14:17 | 25 | boys.  My -- I'm retired, but I worked for Baker Hughes |

10:14:25  1   Drilling Fluids for 22 years before.  And now I'm a

10:14:29  2   caregiver for my mother who has Alzheimer's, late stages.

10:14:39  3   We're going for the record how she can have it the longest.

10:14:43  4          And I worked at Baker Hughes for 22 years.  And I

10:14:46  5   had one year of college. My husband's name is Leslie

10:14:50  6   Langley.  He works for Witco or Pergan chemical, and he

10:14:54  7   works in the transportation department.  And he's worked

10:14:57  8   there 23 years, and I've worked -- I've done civil and

10:15:00  9   criminal.  I've served on a jury for civil and criminal

10:15:04  10  here in Marshall.

10:15:04  11         THE COURT:  Okay.  All right.  Ms. Langley, are

10:15:07  12  there other people that could provide care for your mother

10:15:09  13  if you were selected to serve?

10:15:12  14         JUROR LANGLEY:  Well, my husband took the day off

10:15:14  15  today, but I do have somebody I can --

10:15:18  16         THE COURT:  All right.

10:15:19  17         JUROR LANGLEY:  -- rely on.

10:15:21  18         THE COURT:  Thank you, ma'am.

10:15:22  19         Next is Panel Member No. 32, Mr. Adams.

10:15:25  20         JUROR ADAMS:  Good morning.  My name is Gary

10:15:30  21  Adams.  I live in Camp County.  I have one daughter.  I

10:15:34  22  retired after a 35-year career with BP Corporation.  My

10:15:39  23  background, I have a Bachelor of Science in mechanical

10:15:42  24  engineering and did graduate work in petroleum engineering.

10:15:45  25  My spouse's name is Janet.  She is retired also, also

10:15:49  1   worked as a florist.  And no prior jury service.

10:15:53  2          THE COURT:  All right.  Thank you, Mr. Adams.

10:15:56  3          Next is Panel Member No. 33, Ms. Carter.

10:16:00  4          JUROR CARTER:  Hello.  Sorry.  My name is Nancy

10:16:05  5   Carter.  I live in Gilmer, Texas.  I have three grown

10:16:08  6   children.  I teach economics at Tyler Junior College right

10:16:13  7   now.  I've been there for five years.  Prior to that, I

10:16:18  8   taught at other colleges and universities.

10:16:21  9          I have Bachelor's and Master's both in economics.

10:16:26  10  I have doctoral work in industrial engineering and in --

10:16:32  11  they called it educational computing, basically trying to

10:16:35  12  get better at teaching online.  So I have that.

10:16:38  13          My husband's name is Glen Carter.  He is retired.

10:16:43  14  He was a construction design engineer for the New Mexico

10:16:48  15  state highway department.  And, yeah, I -- he worked there

10:16:54  16  for 27 years.  And prior jury service, I served on a -- it

10:17:04  17  was criminal -- I think it was somewhere between insurance

10:17:08  18  fraud and theft.  That was the debate was which one it was

10:17:13  19  in New Mexico.  And then I was selected for a jury here in

10:17:19  20  Gilmer, but they settled when we broke to -- for everybody

10:17:25  21  to get ready, we came back to be seated, and it was

10:17:28  22  settled.  So I really don't know what it was about.

10:17:30  23          THE COURT:  All right.  Thank you, Ms. Carter.

10:17:32  24          All right.  Next is Panel Member No. 34,

10:17:36  25  Mr. Endsley.

10:17:37  1          JUROR ENDSLEY:  Good morning.  My name is Darrell
10:17:42  2   Endsley.  And I live in Queen City, Texas.  And I have four
10:17:46  3   adult children.  I'm retired.  And I retired from the
10:17:52  4   Federal Bureau of Prisons after 30 years, and I lived in
10:17:55  5   Queen City all my life.  And I have a high school degree
10:18:00  6   and some college.
10:18:01  7          My wife's name is Shannon.  And she's retired as a
10:18:05  8   school teacher from Queen City Independent School District.
10:18:11  9   And she lived there probably about 25 years.  And I was on
10:18:14 10   a grand jury about 20 years ago for Cass County.
10:18:18 11          THE COURT:  All right.  And your wife worked for
10:18:21 12   Queen City ISD.
10:18:23 13          JUROR ENDSLEY:  Yes.
10:18:26 14          THE COURT:  Did you say 25 years?
10:18:26 15          JUROR ENDSLEY:  About 28 almost 30 years.
10:18:29 16          THE COURT:  Okay.  Thank you, sir.
10:18:30 17          All right.  Next is Panel Member No. 35, Ms. Bush.
10:18:34 18          JUROR BUSH:  Hello.  My name is Christine Bush and
10:18:41 19   I live in Harleton, Texas.  I have three grown children and
10:18:45 20   three grown stepchildren.  I work at Summer Meadows nursing
10:18:47 21   home and rehab in Longview, Texas.  And I'm an MDS
10:18:48 22   coordinator.  I've worked there for 16 years.  I have a
10:18:52 23   high school diploma and one year of junior college.  My
10:18:55 24   husband's name is Allen Bush.  He works for Lindenmeyr
10:19:02 25   Munroe.  It's formerly Olmsted-Kirk, and he's worked there

10:19:05  1   for 16 years.  And I've only served on a grand jury.

10:19:09  2            THE COURT:  What does your husband do, ma'am?

10:19:11  3            JUROR BUSH:  He is a -- he was a toilet paper

10:19:16  4   person during the coronavirus salesman.

10:19:19  5            THE COURT:  Okay.

10:19:19  6            JUROR BUSH:  So A salesman.

10:19:20  7            THE COURT:  All right.  Next is Panel Member No.

10:19:23  8   36.

10:19:24  9            JUROR HUKILL:  Good morning, my name is Henry

10:19:27  10  Hukill.  I live in Harleton.  I have two kids, three step

10:19:31  11  kids.  I am currently employed with West Fraser, formerly

10:19:37  12  known as Norbord in Jefferson, Texas.  I'm in the finishing

10:19:41  13  department there.  I've been there for four years.  Prior

10:19:43  14  to that, I have 22 years retired Army.  I have a degree in

10:19:47  15  business.  My wife's name is Tracy.  She's a housewife.

10:19:50  16  Been a housewife for 10 years.  And I have never served on

10:19:55  17  any jury duty.

10:19:56  18            THE COURT:  All right, sir.  Thank you very much.

10:19:58  19            Next is Panel Member No. 37, Ms. Clawson.

10:20:02  20            JUROR CLAWSON:  My name is Catherine Clawson.  I'm

10:20:04  21  from Jefferson, Texas.  I have no kids.  I am a pumper for

10:20:10  22  Hart and McFarland Oil Producers.  I've been there for

10:20:12  23  about three years.  I'm currently in college.  I'm not

10:20:14  24  married.  And I have never served on a jury.

10:20:16  25            THE COURT:  Thank you, ma'am.

| | | |
|---|---|---|
| 10:20:17 | 1 | Next is No. 38, Ms. Ferguson. |
| 10:20:22 | 2 | JUROR FERGUSON:  Hi, my name is Autumn Ferguson. |
| 10:20:29 | 3 | I live in Longview, Texas.  I don't have any children.  I |
| 10:20:35 | 4 | manage a video game and electronics store in Longview |
| 10:20:38 | 5 | called Game X Change.  I have worked there for six years. |
| 10:20:45 | 6 | I've been the manager for five.  I graduated high |
| 10:20:49 | 7 | school in 2014.  I'm not married, but I do have a live-in |
| 10:20:54 | 8 | spouse.  His name is Cody.  And he works at the same |
| 10:20:57 | 9 | business I do.  He's been there for 15 years.  And I've |
| 10:21:02 | 10 | never been on a jury. |
| 10:21:03 | 11 | THE COURT:  Thank you very much. |
| 10:21:05 | 12 | Next is No. 38, Mr. Driggers. |
| 10:21:10 | 13 | JUROR DRIGGERS:  Good morning.  My name is Casey |
| 10:21:13 | 14 | Driggers.  Live in Gilmer, Texas.  My children are |
| 10:21:17 | 15 | four-legged.  No human children.  I work for Broson |
| 10:21:21 | 16 | Incorporated out of Gilmer, Texas.  We own Custom |
| 10:21:21 | 17 | Commodities Transport and Elliot Truck Line. |
| 10:21:27 | 18 | I'm the executive vice president of safety and |
| 10:21:29 | 19 | personnel for that company.  I've worked there about five |
| 10:21:33 | 20 | years.  Have a high school diploma.  About two years of |
| 10:21:39 | 21 | college.  No degrees or certificates.  I do hold a Texas |
| 10:21:47 | 22 | Commission of Law Enforcement certificate license for the |
| 10:21:52 | 23 | past 12 years.  Currently reserve with the Gilmer Police |
| 10:21:55 | 24 | Department. |
| 10:21:55 | 25 | My spouse's name is Ashley Driggers.  She works |

10:21:58   1   for ETEX Telephone Cooperative out of Gilmer.  She does a

10:22:03   2   little bit of everything there.  She's worked there about

10:22:06   3   12 years.  I am -- I cannot serve on a jury because nobody

10:22:14   4   will pick me because of my law enforcement.  But I have

10:22:17   5   testified and been an expert witness.

10:22:21   6            THE COURT:  You have served as a juror?

10:22:23   7            JUROR DRIGGERS:  No, sir.

10:22:24   8            THE COURT:  Okay.  Thank you, Mr. Driggers.

10:22:26   9            Next is No. 40, Mr. Berryhill.

10:22:31  10            JUROR BERRYHILL:  Morning.

10:22:31  11            THE COURT:  Morning.

10:22:32  12            JUROR BERRYHILL:  I'm Waymonn Berryhill.  I've

10:22:36  13   lived in Longview for 30 years.  Let's see, I have three

10:22:41  14   grown children.  I'm retired.  I worked last at Albertson's

10:22:50  15   as a scan coordinator.  What that is, is just determining

10:22:54  16   that the shelf price matches the computer.  I have a high

10:23:03  17   school diploma and about two years of college.  I'm a

10:23:08  18   widower.  Prior jury duty, I served on a criminal -- charge

10:23:20  19   here in Longview.

10:23:21  20            THE COURT:  All right, sir.

10:23:22  21            JUROR BERRYHILL:  Sorry, here in Marshall.

10:23:23  22            THE COURT:  How long ago has that been, sir?

10:23:26  23            JUROR BERRYHILL:  About 10 years ago.

10:23:28  24            THE COURT:  Thank you very much.

10:23:28  25            All right.  Ladies and gentlemen, thank you very

10:23:32  1  much for that information.

10:23:33  2        Now, I need to say a couple more things to you

10:23:37  3  before I turn the questioning over to the lawyers.

10:23:39  4        The jurors that are actually to serve as our

10:23:44  5  eight-person jury in this case will serve in the role as

10:23:47  6  the judges of the facts.  And the jury will make the sole

10:23:51  7  determination what the facts are in this case.

10:23:56  8        Now, my job as the judge is to rule on questions

10:24:01  9  of law, procedure, and evidence that might arise, to

10:24:03  10 maintain the decorum of the court, and to oversee an

10:24:07  11 efficient progression of the trial.

10:24:09  12       Also I want to say a couple things to you about

10:24:11  13 our judicial system that hopefully will put things in a

10:24:14  14 proper perspective for you.

10:24:15  15       In any jury trial, besides the parties themselves,

10:24:21  16 there are always three participants, the jury, the judge,

10:24:24  17 and the lawyers.

10:24:26  18       With regard to the lawyers, I think it's important

10:24:28  19 for each of you to understand that our judicial system is

10:24:32  20 an adversary system, which simply means that during the

10:24:36  21 course of the trial, each of the parties, through their

10:24:40  22 counsel, will attempt to present their respective cases to

10:24:44  23 the jury in the very best light possible.

10:24:46  24       Now, it's no surprise to any of you that lawyers

10:24:50  25 are sometimes criticized in the public and in the media,

10:24:55  1  but it's been the Court's perception that at least some of

10:24:58  2  that criticism comes from a basic misunderstanding of our

10:25:04  3  adversary system of justice in which the lawyers act as

10:25:08  4  advocates for the competing parties.

10:25:10  5        And as an advocate, a lawyer is ethically and

10:25:14  6  legally obligated to zealously assert his or her client's

10:25:19  7  position under the rules of our adversary system, and by

10:25:23  8  presenting the best case possible on behalf of their

10:25:26  9  respective clients, the lawyers hopefully will enable the

10:25:30  10 jury to better weigh the relevant evidence, to determine

10:25:33  11 the truth, and to arrive at a just verdict based on that

10:25:38  12 evidence.

10:25:38  13        This adversary system of justice has served our

10:25:42  14 nation well for well over 200 years, and America's lawyers

10:25:46  15 have been, are now, and will continue in the future to be

10:25:49  16 an indispensable part of this process.

10:25:52  17        So as we go forward with this trial, even though

10:25:57  18 it's possible over the course of the trial from time to

10:26:01  19 time I might frown at the lawyers, I'm simply trying to

10:26:05  20 make sure that their advocacy doesn't get outside the

10:26:11  21 boundaries of our adversary system and our rules of

10:26:13  22 procedure.

10:26:14  23        But those of you selected to serve on the jury

10:26:16  24 should keep in mind that the lawyers are just doing their

10:26:19  25 jobs, and I think it's important for all of to you

10:26:20  1   understand that as we go forward.

10:26:22  2        Also, ladies and gentlemen, for those of you

10:26:26  3   selected to serve on this jury, over the course of the

10:26:28  4   trial, I am going to do my very best to make sure that the

10:26:33  5   jury has no idea about what I think about the witnesses or

10:26:38  6   the evidence in this case, because determining the facts in

10:26:43  7   this case from the witnesses and the evidence is the jury's

10:26:47  8   job, it is not my job.

10:26:50  9        And the jury should not take any expressions or

10:26:54  10  comments that say see or hear or think they see or hear as

10:26:58  11  coming from me as something to consider in making the

10:27:00  12  ultimate decision about what the facts are in this case.

10:27:03  13  And I think it's important for you to keep that in mind, as

10:27:06  14  well.

10:27:06  15       All right.  At this time, Plaintiff's counsel may

10:27:11  16  address the panel.

10:27:12  17       Ms. DeRieux, would you like a warning on your

10:27:17  18  time?

10:27:18  19       MS. DERIEUX:  Yes, Your Honor.  Five minutes,

10:27:28  20  please.

10:27:28  21       THE COURT:  All right.  You may proceed from the

10:27:31  22  podium when you're ready.

10:27:32  23       MS. DERIEUX:  Good morning.  I'm going to start

10:27:40  24  with the information that Judge Gilstrap started with and

10:27:42  25  that you've already shared with us, so we sort of start on

10:27:47  1   a fair and even playing field here.

10:27:48  2          My name is Elizabeth DeRieux.  I live in

10:27:51  3   Gladewater, Texas.  I have four adult children and nine

10:27:55  4   grandbabies.  I work as an attorney.  And my firm is

10:28:04  5   Capshaw DeRieux and our offices are in Gladewater.  I've

10:28:08  6   been a lawyer 36 years, and we started our specific firm

10:28:12  7   about eight years ago.

10:28:13  8          I have an English degree from Lamar University.  I

10:28:16  9   started my career as an English teacher in high school and

10:28:21  10  then later went to law school and have a law degree from

10:28:27  11  the University of Houston.  I'm married to Pete Adams.

10:28:32  12  He's also an attorney although he's retired from his

10:28:33  13  practice.

10:28:33  14         And he runs a book store in Gladewater, known as

10:28:36  15  Gladewater Books.  So the curmudgeon that sits behind the

10:28:41  16  counter at Gladewater Books is my husband.  I have never

10:28:45  17  been selected to serve on a jury.

10:28:49  18         So I want to start with just a few remarks to give

10:28:57  19  you a very high-level understanding of the case that we're

10:28:59  20  going to be discussing in an effort to help you respond to

10:29:02  21  the questions so that we can all evaluate whether or not

10:29:06  22  you're the right person for this jury.  The case concerns

10:29:12  23  one United States patent, and we'll be referring to it as

10:29:16  24  the '091 patent, and it's owned by PMC, the Plaintiff.

10:29:19  25         And the patent lays out detailed methods for how

10:29:24  1   to encrypt and decrypt signals to protect digital content

10:29:31  2   such as apps or music or movies, for example.

10:29:33  3        The Defendant, as you've heard, is Apple.  And

10:29:36  4   Apple's FairPlay, and you'll hear this word a lot as we go

10:29:41  5   through the trial, FairPlay functionality is accused of

10:29:44  6   infringing the '091 patent.  That is -- our contention is

10:29:50  7   that Apple is using the patented technology without

10:29:54  8   permission.

10:29:55  9        THE COURT:  Ms. DeRieux, let me interrupt a

10:29:57  10  minute.

10:29:58  11       If I could ask the two gentlemen that serve as

10:30:04  12  CSOs to stand at the back of the room.  That way your

10:30:08  13  physiques won't block anybody on the panel from seeing the

10:30:13  14  person at the podium.

10:30:13  15       Thank you.

10:30:13  16       Go ahead, Ms. DeRieux.

10:30:14  17       MS. DERIEUX:  Apple uses FairPlay each time the

10:30:16  18  content is downloaded by an Apple device, and that

10:30:21  19  includes, for example, downloads of books or music or TV

10:30:25  20  shows or apps or movies through iTunes or app stores.  The

10:30:31  21  patented technology allows Apple to protect against piracy

10:30:33  22  of the copyrighted content that it distributes.  And

10:30:36  23  without those protections, Apple's ability to distribute

10:30:39  24  their content online would be severely limited.

10:30:42  25       Apple, as you've heard, denies that it is

10:30:45 1  trespassing on our property, and it also claims that the

10:30:50 2  '091 patent is really not worth that much money.

10:30:51 3          So I'm going to try to spend the next 25 or 30

10:30:55 4  minutes with you listening to you.  So I want you to feel

10:31:01 5  free to talk to me.  This is our one opportunity to hear

10:31:04 6  from our jurors.  And the rest of the time, if you're

10:31:07 7  selected for the jury, you're going to have to listen to

10:31:10 8  the lawyers and the witnesses.

10:31:11 9          If you have any personal beliefs, if you have

10:31:15 10 likes or dislikes or life experiences that might start you

10:31:18 11 leaning toward one side or the other, this is our

10:31:21 12 opportunity to learn about that.  Leaning toward one side

10:31:26 13 or the other, you often hear the word "bias" or

10:31:29 14 "prejudice," and outside this courtroom context, bias and

10:31:34 15 prejudice might feel like bad words.

10:31:36 16         So I don't want to point to you and say are you

10:31:39 17 biassed or prejudiced.  Because in this context, that's not

10:31:43 18 really what we're talking about.  We're talking about a

10:31:45 19 very universal experience that we all have.  We all bring

10:31:48 20 our experiences to the courtroom.  We bring our own

10:31:50 21 personal beliefs to the courtroom.

10:31:52 22         And that's not something to be ashamed of.  That's

10:31:54 23 something to be proud of and to talk about here so that we

10:31:58 24 can find out if you are the right person for this case.

10:32:01 25         Let me start out by asking, have -- did all of you

10:32:07   1   see the video this morning?  I'm just testing to see if

10:32:11   2   you're listening to me.

10:32:12   3          Have any of you seen any other videos about the

10:32:16   4   patent system or about the Patent Office other than the one

10:32:21   5   that you heard about -- that you've listened to this

10:32:24   6   morning before we started?  Anybody else seen any other

10:32:28   7   patent videos?  Thank you.

10:32:30   8          Have any of you ever read or seen or heard

10:32:36   9   anything else about the patent system before you got here

10:32:40  10   this morning that left you with strong opinions, one way or

10:32:45  11   the other, about the patent system?  The patent system in

10:32:50  12   America is terrible, it's wonderful?  Anyone else?

10:32:52  13          Okay.  You heard in that video this morning that a

10:33:02  14   patent -- excuse me -- that a patent is a piece of

10:33:05  15   property.  And when the Patent Office issues that patent,

10:33:10  16   I'm going to refer to it as an analogy.  It's like the

10:33:14  17   deed.  But we can't call the sheriff.  There are no patent

10:33:19  18   police.  We can't call them and say, somebody's trespassing

10:33:22  19   on our property.

10:33:22  20          So the one thing we can do is to come into a

10:33:25  21   District Court with a lawsuit, such as this one, and

10:33:29  22   enforce that patent.

10:33:31  23          Do we have any landowners on our panel today?

10:33:35  24          Let me see your hands again.

10:33:41  25          All right.  I'm going to try to call your names as

10:33:47  1  well as your numbers, and if I mess up your name, please

10:33:50  2  correct me.  I'll try not to mess it up twice.

10:33:53  3       Ms. Smith is No. 10.  She's going to -- he's going

10:33:57  4  to bring you a microphone, and I'm going to ask you some

10:34:00  5  questions.

10:34:02  6       THE COURT:  And would you stand up, please.

10:34:05  7       MS. DERIEUX:  Now, I believe you said that you own

10:34:07  8  some land.

10:34:09  9       JUROR SMITH:  Yes, ma'am.

10:34:10  10       MS. DERIEUX:  If an oil company drilled a well on

10:34:12  11  your property without your permission, what would you do?

10:34:16  12       JUROR SMITH:  Wonder how they got past the dogs

10:34:19  13  first.  I'm sure I would find out why they thought they

10:34:23  14  could drill there.

10:34:26  15       MS. DERIEUX:  And if they thought they could drill

10:34:28  16  there, would that be okay, if they said, Oh, we've got this

10:34:32  17  really good excuse, and we think it's okay.

10:34:35  18       JUROR SMITH:  No.

10:34:36  19       MS. DERIEUX:  Would you end it there?

10:34:38  20       JUROR SMITH:  Oh, I would definitely not end it

10:34:40  21  there.

10:34:41  22       MS. DERIEUX:  What would you do next?

10:34:43  23       JUROR SMITH:  I imagine I would want to seek

10:34:45  24  monetary comfort compensation or get their rig removed.

10:34:50  25       MS. DERIEUX:  Would you do that through a judicial

10:34:52  1  process such as this, or do you have another idea about how

10:34:54  2  you might address that?

10:34:55  3        JUROR SMITH:  I don't think people would be too

10:34:57  4  scared of me, so I would take it to a court process.

10:35:01  5        MS. DERIEUX:  Okay.  Thank you.

10:35:03  6        JUROR SMITH:  Thank you.

10:35:04  7        MS. DERIEUX:  I'm going to ask Mr. Parker, I

10:35:06  8  believe you're No. 5.  We have different Parkers on our

10:35:10  9  panel this morning.

10:35:11  10       Now I'm going to refer in some cases to statements

10:35:15  11 that were made on the questionnaires that you submitted.

10:35:19  12 And if I -- you know what, we looked at those really

10:35:23  13 quickly, and if I asked you a question and said, Do you

10:35:26  14 remember when you said that on the questionnaire and you

10:35:28  15 didn't say that on your questionnaire, remind me of that

10:35:32  16 because I've got that wrong.

10:35:34  17       So I'm going to start with Mr. Parker and say I

10:35:37  18 believe you made a remark on your questionnaire that it's

10:35:40  19 your personal belief that things should be handled outside

10:35:44  20 of court.

10:35:44  21       JUROR JAMES PARKER:  Yes.  I work in a field where

10:35:45  22 we have to work closely with each other and nothing -- all

10:35:49  23 things can be worked out, you know, one-on-one, if given

10:35:52  24 the right time and place.

10:35:53  25       MS. DERIEUX:  And is that related to your

10:35:55   1   profession?

10:35:56   2        JUROR JAMES PARKER:  Profession and way of life.

10:35:59   3        MS. DERIEUX:  All right.  Given that that is your

10:36:02   4   belief, do you believe that that would start you in this

10:36:05   5   case either for or against either of the parties in -- in

10:36:10   6   court if you were to be seated as part of the jury?

10:36:14   7        JUROR JAMES PARKER:  Why, yes.  I mean, that's

10:36:17   8   just a belief I've always lived by for 41 years.  There's

10:36:21   9   no way of changing it.  I say it every day, your whole job

10:36:25   10  revolves around conflict.  Things are going to break.

10:36:29   11  People don't understand it.  That's just part of life.

10:36:32   12       MS. DERIEUX:  If you were seated on this jury,

10:36:35   13  could you give my client a fair hearing and follow the

10:36:40   14  instructions from the Court?

10:36:43   15       JUROR JAMES PARKER:  I would try.  But I couldn't

10:36:45   16  promise you that.

10:36:46   17       MS. DERIEUX:  All right.  I understand.  Thank

10:36:47   18  you.  That's a -- I want to just hold Mr. Parker up as a

10:36:51   19  perfect example of a juror giving us information to help us

10:36:54   20  make the right decision here.

10:36:56   21       Is there anybody here that feels that patent

10:37:02   22  rights should be treated differently than property, like

10:37:08   23  land?  In other words, I made this analogy, it's like a

10:37:11   24  deed,  what if it was on your property, and you're saying,

10:37:15   25  oh, well, I get that if it's on my real estate, but patents

10:37:20   1   are somehow different.  Anybody hold that view?

10:37:23   2         Let me ask it the other way.  Does it make sense

10:37:26   3   in your head and consistent with your personal beliefs that

10:37:30   4   an owner of patent rights would treat those rights in a way

10:37:35   5   that is similar to the way you would treat your own

10:37:38   6   personal real estate rights?  Is that consistent with your

10:37:41   7   beliefs?

10:37:41   8         All right.  I'm going to talk to you just a minute

10:37:50   9   about PMC.  This is probably not a company that you've

10:37:54  10   heard of.  But the Plaintiff is a company founder -- excuse

10:37:58  11   me, founded by the inventor of the '091 patent.  And it was

10:38:03  12   developed to license technology in its patents.  PMC does

10:38:06  13   not manufacture devices, and it does not produce or provide

10:38:13  14   music or video content.

10:38:14  15         Is there anybody that believes that a company that

10:38:17  16   owns patents but that does not actually manufacture devices

10:38:22  17   or provide or produce videos or music, is that company

10:38:28  18   entitled to less protection than a company that actually

10:38:31  19   sells products or content?

10:38:41  20         I'm going to ask Mr. Jones, Juror No. 1.

10:38:51  21         JUROR JONES:  To be frank, I really don't

10:38:53  22   understand the question because --

10:38:56  23         MS. DERIEUX:  Let me try it again.  No, that's

10:38:57  24   fair.  Let me try it again.

10:38:59  25         You will hear that Apple produces products and

| | | |
|---|---|---|
| 10:39:04 | 1 | sells products.  My client, PMC, does not sell products nor |
| 10:39:09 | 2 | does it produce video content or music. |
| 10:39:13 | 3 | JUROR JONES:  Uh-huh. |
| 10:39:14 | 4 | MS. DERIEUX:  And my question is, is one company |
| 10:39:16 | 5 | that doesn't sell products at a disadvantage, from your |
| 10:39:20 | 6 | point of view, because it doesn't actually sell the |
| 10:39:22 | 7 | products? |
| 10:39:23 | 8 | JUROR JONES:  Yeah, I agree.  I mean, yeah, I'd |
| 10:39:28 | 9 | say they're at a disadvantage. |
| 10:39:30 | 10 | MS. DERIEUX:  And why is that? |
| 10:39:32 | 11 | JUROR JONES:  Because they don't sell nothing. |
| 10:39:35 | 12 | They just own a patent.  That's all they're holding is a |
| 10:39:37 | 13 | piece of paper. |
| 10:39:38 | 14 | MS. DERIEUX:  All right.  Thank you. |
| 10:39:39 | 15 | JUROR JONES:  You're welcome. |
| 10:39:40 | 16 | MS. DERIEUX:  Do I have anybody on the panel that |
| 10:39:43 | 17 | wants to disagree with Mr. Jones and take the other |
| 10:39:45 | 18 | position, that you think that a company that owns a patent |
| 10:39:50 | 19 | has a right to enforce it, whether they sell the products |
| 10:39:53 | 20 | or not? |
| 10:39:57 | 21 | I'm want to ask Mr. Moore, No. 8. |
| 10:40:06 | 22 | JUROR BRIAN MOORE:  It's their property.  They |
| 10:40:11 | 23 | deserve to protect it, whether they make anything or they |
| 10:40:14 | 24 | make anything, they have a patent on it. |
| 10:40:16 | 25 | MS. DERIEUX:  All right. |

10:40:17  1           JUROR BRIAN MOORE:  That's my belief.

10:40:19  2           MS. DERIEUX:  Yes, sir.  Thank you.

10:40:20  3           Let me ask Ms. Alexander.  I believe you're

10:40:35  4  No. 26.  On your questionnaire, if I don't have this

10:40:38  5  confused, you made a note that you were once accused of

10:40:43  6  using someone else's idea?

10:40:47  7           JUROR ALEXANDER:  (Shakes head negatively.)

10:40:48  8           MS. DERIEUX:  That wasn't you?  Sorry.

10:40:50  9           Has anybody else on the panel ever had a personal

10:40:58 10  experience where they -- either someone used an idea that

10:41:00 11  they came up with, without permission, or that you were

10:41:05 12  accused of using someone else's idea?  Is there anybody on

10:41:08 13  the panel that's had a personal experience?

10:41:13 14           That's No. 28.  You are Ms. Black.  Did you say

10:41:25 15  that on your questionnaire and I got it confused?

10:41:28 16           JUROR BLACK:  Pretty much.

10:41:29 17           MS. DERIEUX:  Okay.  I'm sorry for the confusion.

10:41:31 18  Thank you for helping.

10:41:33 19           JUROR BLACK:  Me and my husband run a small

10:41:37 20  business online, it's 903 Outdoors, I don't know if any of

10:41:41 21  you guys heard of it.  But we were accused from a Oklahoma

10:41:45 22  similar small business that we were copyrighting their logo

10:41:48 23  and their idea.  They didn't have any kind of proof.  I

10:41:55 24  mean, we were contacted from an attorney.  But we just

10:41:57 25  chose to settle it with them.

10:42:03  1        You know, not go public with it, not go to court
10:42:06  2   with it.  We settled between the two parties.  We changed
10:42:08  3   our logo.  They agreed to let us stay within the 903 area.
10:42:14  4   They stayed in Oklahoma.  And we worked it out like that.
10:42:18  5        MS. DERIEUX:  Is there anything that you carry
10:42:23  6   from that experience that you think would cause you to
10:42:26  7   lean, either for or against, PMC if you were seated as a
10:42:35  8   juror in this case?
10:42:36  9        JUROR BLACK:  Yes and no.  We -- you know, at the
10:42:42 10   time, this has been -- I mean, we -- my husband started
10:42:45 11   running this company probably 12 years ago.  And at the
10:42:49 12   time that this happened, we didn't really have a lot
10:42:54 13   invested in it.  They had only been a business probably a
10:42:59 14   year before us.
10:43:04 15        We really didn't think that our logo looked
10:43:07 16   anything like theirs.  We didn't think -- I mean, we didn't
10:43:10 17   even know who they were.  How could we have copied you
10:43:13 18   guys.  Where did y'all come from?  You know.  And so I
10:43:16 19   think that we chose to settle -- we just chose to work it
10:43:21 20   out and settle, and, you know, not make a big stink about
10:43:25 21   it.
10:43:26 22        I feel like money -- you know, at that time, I
10:43:29 23   told my husband, let's just work it out and not -- and
10:43:33 24   let's get it out of the way before we start making more
10:43:35 25   money, we have more merchandise, and we have more invested,

10:43:40  1  you know, rather than get later down the road and we've got

10:43:43  2  more things involved, if that makes any sense. I dont know.

10:43:47  3        MS. DERIEUX:  It does.  Thank you very much.

10:43:52  4  That's very helpful.

10:43:52  5        Does anybody on the panel own stock in Apple?  I

10:44:00  6  need to see your hands, and keep them up because we need to

10:44:03  7  identify anybody.

10:44:05  8        You are No. --

10:44:08  9        JUROR ADAMS:  32.

10:44:11  10        MS. DERIEUX:  -- 32.

10:44:12  11        Anybody else on the panel own stock?  You own

10:44:17  12  stock in Apple?  Ms. Black.

10:44:20  13        Anyone else?

10:44:25  14        Is it Mr. Rand?

10:44:29  15        JUROR QUARLES:  Quarles, No. 9.

10:44:32  16        MS. DERIEUX:  Gotcha.

10:44:34  17        And I saw another hand.  Anyone else on the panel

10:44:43  18  own stock?

10:44:55  19        JUROR ADAMS:  Can I clarify the inquiry?

10:44:55  20        MS. DERIEUX:  Yes, sir.

10:44:57  21        JUROR ADAMS:  Yes, I don't own individual Apple

10:45:00  22  stock.  I own it through mutual funds, through aggregate

10:45:06  23  funds, so I just wanted to make that distinction.

10:45:10  24        MS. DERIEUX:  Thank you.

10:45:12  25        And if anybody else has that circumstance, let's

| | | |
|---|---|---|
| 10:45:12 | 1 | raise your hand as well. |
| 10:45:12 | 2 | Yes, ma'am, you're Ms. Langley? |
| 10:45:12 | 3 | JUROR LANGLEY:  Yes. |
| 10:45:13 | 4 | MS. DERIEUX:  And you also own Apple stock? |
| 10:45:14 | 5 | JUROR LANGLEY:  We're in mutual funds. |
| 10:45:19 | 6 | MS. DERIEUX:  Gotcha.  Anyone else? |
| 10:45:19 | 7 | Okay.  I see another hand. |
| 10:45:19 | 8 | Yes, ma'am? |
| 10:45:28 | 9 | JUROR MILES:  25, Melissa Miles. |
| 10:45:28 | 10 | MS. DERIEUX:  I'm sorry.  Stand up SO -- |
| 10:45:30 | 11 | JUROR MILES:  25. |
| 10:45:30 | 12 | THE COURT:  We're going to have to take these one |
| 10:45:33 | 13 | at a time and make sure we identify everybody individually. |
| 10:45:37 | 14 | JUROR MILES:  Hi.  25, Melissa Miles.  We also own |
| 10:45:41 | 15 | some mutual funds with Apple. |
| 10:45:43 | 16 | MS. DERIEUX:  Okay.  Thank you. |
| 10:45:44 | 17 | Anybody I missed that I didn't get your name and |
| 10:45:49 | 18 | number?  Okay. |
| 10:45:50 | 19 | During the trial, the jury's going to hear from a |
| 10:45:57 | 20 | royalty and financial expert who's going to explain the |
| 10:46:00 | 21 | financial benefits that Apple received using PMC's patents. |
| 10:46:05 | 22 | Is there anybody on the panel that feels that no |
| 10:46:09 | 23 | matter what the evidence shows and even if you found |
| 10:46:14 | 24 | infringement, there's just no way you could ever see |
| 10:46:16 | 25 | yourself writing down substantial or a large amount of |

10:46:21  1  damages regardless of what the evidence of damages is?

10:46:28  2  Anybody have a strong reaction to that one way or the

10:46:31  3  other?

10:46:36  4        All right.  Is there anybody on the panel that

10:46:40  5  owns an Apple product?

10:46:47  6        Let me ask it the other way.

10:46:51  7        Is there anybody on the panel who does not own an

10:46:54  8  Apple product?

10:47:00  9        Is there anybody on the panel who has never owned

10:47:02  10  an Apple product?

10:47:04  11        Okay.  I'm going to take just a minute.  I'm going

10:47:07  12  to ask you to keep your hands up until I say your number.

10:47:12  13        Number 2 and 9 and 17.  I can't see everybody.  I

10:47:27  14  believe Ms. -- No. 12 and 13 and 20.  You are 16.

10:47:43  15        JUROR GIBBONS:  I did own one, but then I sold it

10:47:46  16  because --

10:47:47  17        THE COURT:  All right.  Folks, folks, we're going

10:47:48  18  to have to get a microphone, we're going to have to stand

10:47:51  19  up, and we're going to have to use that so I can hear you

10:47:53  20  and the court reporter can hear you.  I know there are a

10:47:56  21  lot of hands up, but please don't speak unless you're

10:48:00  22  specifically called on, and then do it the way that I've

10:48:02  23  discussed it with you.

10:48:04  24        Go ahead, Ms. DeRieux.

10:48:06  25        MS. DERIEUX:  I'm going to ask the officer to hand

10:48:08  1  Ms. Gibbons the microphone so she can say for the record

10:48:13  2  what she just said on -- in response to my question.

10:48:20  3        JUROR GIBBONS:  I did purchase an Apple --

10:48:23  4  actually my husband won it at a Christmas party for work.

10:48:28  5  And it was a tablet, a big tablet thing.  I tried it out

10:48:32  6  for a little while, and I didn't like it, so I ended up

10:48:35  7  giving it to my dad.

10:48:36  8        MS. DERIEUX:  Thank you.

10:48:37  9        No. 23, Ms. Davis?

10:48:44  10        THE COURT:  Please hand her a microphone.

10:48:46  11        JUROR DAVIS:  I've never had or owned any Apple

10:48:49  12  product.

10:48:49  13        MS. DERIEUX:  All right.  Did I get everybody that

10:48:59  14  raised their hand?  Did I miss any hands?

10:49:03  15        No. 14.

10:49:05  16        Anyone else?

10:49:06  17        I'm going to ask -- I believe -- I hope I'm

10:49:11  18  pronouncing this correctly.  No. -- Juror No. 27,

10:49:16  19  Ms. Bertussi?

10:49:23  20        JUROR BERTUSSI:  Bertussi.

10:49:24  21        MS. DERIEUX:  Bertussi.  I need to practice that.

10:49:26  22        I believe on your questionnaire, you mentioned

10:49:29  23  that you had had some training in specialized technology,

10:49:33  24  but I wanted to just ask you to give us a little more

10:49:36  25  information about the training and knowledge that you have

10:49:38  1  in technology.

10:49:44  2         JUROR BERTUSSI:  Mostly just with computers, you

10:49:47  3  know, processing applications in Excel and, you know,

10:49:49  4  things like that.  Not really too technical.

10:49:53  5         MS. DERIEUX:  So what were --

10:49:55  6         JUROR BERTUSSI:  As far as certifications in IT or

10:49:58  7  anything.

10:49:58  8         MS. DERIEUX:  I see.  So you were trained in -- in

10:50:00  9  the end of the process where you -- where the user would

10:50:02  10  learn to use those programs as opposed to troubleshooting

10:50:06  11  on the TI side; is that correct?

10:50:09  12         JUROR BERTUSSI:  Correct.

10:50:09  13         MS. DERIEUX:  Okay.  Is there anything about that

10:50:12  14  training that would keep you from focusing on the evidence

10:50:15  15  and following the evidence and the law as the judge gave

10:50:18  16  it?

10:50:20  17         JUROR BERTUSSI:  I don't think so.

10:50:23  18         MS. DERIEUX:  Okay.  Is there anything about an

10:50:32  19  experience that you've had with an Apple product that

10:50:36  20  would -- is there anyone here who believes that they would

10:50:39  21  start out with an opinion or you would start out leaning

10:50:45  22  either for or against one of the parties because of your

10:50:50  23  personal experience with Apple consumer products?

10:50:54  24         Ms. Gibbons?  Is this a different answer than your

10:50:59  25  experience that you were talking about a minute ago?  I'm

10:51:02  1  going to ask you to take the mic.

10:51:06  2          JUROR GIBBONS:  Not -- I've tried like with my

10:51:08  3  kids or my husband has one.  I've messed with them a little

10:51:12  4  bit, but it's just -- I think -- I don't like the way they

10:51:16  5  operate, and I think they're overrated.

10:51:20  6          MS. DERIEUX:  Thank you.  I'm sorry, if she could

10:51:23  7  have the microphone back.  Let me just ask one more

10:51:25  8  question.

10:51:26  9          Is there anything about those experiences and

10:51:29  10  opinions that you bring to the courtroom today that would

10:51:33  11  start you out one way or the other?

10:51:38  12          JUROR GIBBONS:  No.

10:51:39  13          MS. DERIEUX:  Do you believe that you could follow

10:51:40  14  the evidence and the instructions from the Court and be a

10:51:43  15  fair juror if you were selected?

10:51:45  16          JUROR GIBBONS:  Yes, ma'am.

10:51:46  17          MS. DERIEUX:  Okay.  Thank you.

10:51:46  18          How many of you do not have any apps that you

10:51:51  19  personally downloaded from an app store on a personal

10:52:00  20  mobile device.  Maybe I'm asking this a little backwards.

10:52:03  21          Have you ever downloaded an app onto your personal

10:52:12  22  mobile device?  Raise your hand.

10:52:16  23          Okay.  Is there anybody who didn't raise their

10:52:19  24  hand who has never downloaded an app?

10:52:32  25          I'm going to ask Ms. Goodman, No. 3.

10:52:44   1          THE COURT:  You have five minutes remaining,

10:52:47   2    counsel.

10:52:47   3          MS. DERIEUX:  Thank you.

10:52:47   4          How many apps have you personally downloaded if

10:52:51   5    you remember, just approximately?

10:52:55   6          JUROR GOODMAN:  No more than 10.

10:52:57   7          MS. DERIEUX:  All right.  And how often would you

10:52:58   8    say that you do that?

10:53:02   9          JUROR GOODMAN:  Oh, goodness, as the need arises,

10:53:06   10   not -- not too frequently.

10:53:09   11         MS. DERIEUX:  Okay.  Is there anything about your

10:53:11   12   experience in downloading personal apps that you believe

10:53:14   13   you would bring into the courtroom and would affect your

10:53:18   14   service as a juror in this case?

10:53:20   15         JUROR GOODMAN:  No, ma'am.

10:53:20   16         MS. DERIEUX:  All right.  Thank you.

10:53:28   17         JUROR GOODMAN:  Uh-huh.

10:53:29   18         MS. DERIEUX:  Has anyone on the panel ever stood

10:53:32   19   in line to buy the latest technology, the latest iPhone,

10:53:36   20   the latest computer, and you know when it's going to be

10:53:40   21   released?

10:53:42   22         Yes, ma'am, thank you.

10:53:44   23         And, Mr. Parker?

10:53:52   24         JUROR JAMES PARKER:  Yes.

10:53:56   25         MS. DERIEUX:  Can you tell me a little bit about

10:53:58   1   that experience?

10:53:58   2          THE COURT:  Let's take a microphone to Panel

10:53:58   3   Member No. 5, please.

10:54:00   4          JUROR JAMES PARKER:  It's just like waiting for

10:54:01   5   any other video game.  You wait, as soon as you comes out,

10:54:06   6   you make your purchase and hope for the best.

10:54:09   7          MS. DERIEUX:  And what was the technology that you

10:54:10   8   had gotten in line ahead of time for?

10:54:13   9          JUROR JAMES PARKER:  The latest one would be the

10:54:14  10   iPhone 12.  I waited for it on the wait list, and when it

10:54:20  11   came out, it was shipped to me.

10:54:21  12          MS. DERIEUX:  Great.  Thank you.

10:54:22  13          Ms. Haley?  I believe you said that you had a

10:54:35  14   sitting service, but that you also at some point served as

10:54:39  15   a paralegal in a law firm; is that correct?

10:54:42  16          JUROR HALEY:  I didn't have any training, per se,

10:54:44  17   other than in the office.  But, yes, I did for

10:54:48  18   approximately -- a total of four years.  I worked for the

10:54:51  19   attorney for five.

10:54:53  20          MS. DERIEUX:  And what kind of law did you

10:54:55  21   participate in as a paralegal?

10:54:57  22          JUROR HALEY:  He did family, family law mainly.

10:55:01  23          MS. DERIEUX:  Okay.

10:55:01  24          JUROR HALEY:  Some accidents.  I did the -- some

10:55:05  25   of the processing serving.  I did all kinds of stuff.

10:55:08   1          MS. DERIEUX:  Anything about that experience that
10:55:09   2   would impact your ability to be fair in this case?
10:55:12   3          JUROR HALEY:  No.
10:55:12   4          MS. DERIEUX:  All right.  Thank you.
10:55:13   5          Can I ask y'all to look around and see if there's
10:55:17   6   anybody that you know on the panel?
10:55:24   7          Keep your hands up for me.
10:55:25   8          And this is what I'm -- I'm going to ask you each
10:55:28   9   if you were selected with your friends, your colleague,
10:55:32  10   your boss, your cousin, whoever else you know on the panel,
10:55:39  11   is there anybody that feels they couldn't make an
10:55:41  12   independent decision and not be influenced by their friend,
10:55:46  13   colleague, neighbor, boss, whoever is on the panel?  Is
10:55:49  14   there anybody that has -- that would be concerned about
10:55:52  15   that?  You don't have to tell me a lot of detail.  I just
10:55:55  16   need a hand.
10:55:56  17          Ms. Gibbons.  I need to know who that person is.
10:56:03  18          JUROR GIBBONS:  Debra Haley is my mother, and my
10:56:07  19   mom is a very awesome woman, so I believe that her opinion
10:56:12  20   of something would kind of hinder mine.
10:56:14  21          MS. DERIEUX:  You are a great daughter.  Thank
10:56:17  22   you.
10:56:17  23          Anybody else that knows someone else on the panel
10:56:22  24   that thinks it might have an impact on your ability to be
10:56:26  25   independent?

10:56:27   1          All right.  Let me have your hands again just one

10:56:32   2   more time on the people that know someone.

10:56:36   3          No. 17.  Tell me who you know and how you're

10:56:39   4   related.

10:56:40   5          JUROR DOTSON:  I know Ms. Langley through my

10:56:44   6   family, through my parents.

10:56:45   7          MS. DERIEUX:  And if you were both selected for

10:56:47   8   the jury, do you think you could have an independent, even

10:56:50   9   if it -- even if it conflicted with her view, could you

10:56:53   10  form your own independent judgment.

10:56:55   11         JUROR DOTSON:  Yes, I could.

10:56:56   12         MS. DERIEUX:  Thank you.

10:56:59   13         I'm just going to gather my thoughts here and see

10:57:19   14  if there's anybody else I need to talk to.

10:57:21   15         Mr. Overstreet?

10:57:28   16         JUROR OVERSTREET:  Yes, ma'am.

10:57:30   17         MS. DERIEUX:  Yes, he's going to bring you a

10:57:32   18  microphone.  Tell me, again, how long ago it was that you

10:57:41   19  served on the jury.

10:57:42   20         JUROR OVERSTREET:  Almost like close to a year.

10:57:45   21         MS. DERIEUX:  Do you think anything that you

10:57:47   22  learned or remembered from that experience would impact

10:57:49   23  your ability to serve fairly and independently on this

10:57:52   24  jury?

10:57:53   25         JUROR OVERSTREET:  No, like I say, I -- they

```
10:57:55   1   settled out of court before --
10:57:57   2           MS. DERIEUX:  How much of the evidence did you
10:57:58   3   hear?  Did you actually --
10:58:00   4           JUROR OVERSTREET:  I heard all of it.  But, you
10:58:02   5   know, like I said, they settled out of court before.
10:58:07   6           MS. DERIEUX:  Okay.
10:58:07   7           THE COURT:  Ms. DeRieux, your time has expired.
10:58:12   8           MS. DERIEUX:  Thank you.
10:58:13   9           THE COURT:  Thank you, sir.
10:58:14  10           All right.  Defendants may now address the panel.
10:58:19  11           Ms. Smith, would you like a warning on your time?
10:58:22  12           MS. SMITH:  Please, Your Honor.  Five minutes.
10:58:24  13           THE COURT:  All right.  You may proceed when
10:58:28  14   you're ready.
10:58:29  15           MS. SMITH:  May it please the Court.
10:58:37  16           Good morning, everybody.  In the way of
10:58:44  17   reintroduction, again, my name is Melissa Smith, and I'm
10:58:46  18   joined by Mr. Greg Arovas, and we represent Apple.
10:58:48  19           Now, the first thing and the most important thing
10:58:54  20   I'm going to do this morning is to thank you all.  2020 was
10:59:00  21   by anyone's measure a very, very challenging year.  2021,
10:59:03  22   for those of us living in East Texas, we have, you know,
10:59:07  23   boiling water and bursting pipes and tons of snow and it
10:59:12  24   hasn't been any easier.
10:59:14  25           I've spent time poring over your questionnaires.
```

| 10:59:17 | 1 | We've got teachers, we've got first responders, we've got |
| 10:59:21 | 2 | medical professionals, and as I look at you guys, we've got |
| 10:59:23 | 3 | a whole group of people that have a million places you |
| 10:59:24 | 4 | probably are needed and quite frankly that you'd rather be. |
| 10:59:28 | 5 | So on behalf of Apple, we appreciate you showing |
| 10:59:31 | 6 | up today.  It's an important case for us.  And we |
| 10:59:34 | 7 | appreciate you making jury service a priority.  Thank you. |
| 10:59:38 | 8 | Ms. DeRieux went through the questions with you, |
| 10:59:45 | 9 | and Judge Gilstrap did as well, and so that's where I will |
| 10:59:48 | 10 | start. |
| 10:59:48 | 11 | I went to the University of Texas undergrad and |
| 10:59:51 | 12 | graduated from UT in 1994.  Like Judge Gilstrap, I went to |
| 10:59:55 | 13 | Baylor Law School.  I got out of there in '97.  In '97 I |
| 11:00:00 | 14 | moved to Jefferson, Texas, just down the road out in the |
| 11:00:03 | 15 | country.  I started practicing in Marshall.  I've been |
| 11:00:06 | 16 | practicing here in Marshall for 24 years. |
| 11:00:08 | 17 | A man named Gil Gillam hired me, gave me my first |
| 11:00:13 | 18 | job.  After about eight or nine years, he made me his |
| 11:00:17 | 19 | partner, and we have been together every day in my 24 years |
| 11:00:20 | 20 | of practice. |
| 11:00:20 | 21 | We have a law firm that some of you probably drove |
| 11:00:22 | 22 | by today when you were driving to the courthouse.  It's an |
| 11:00:23 | 23 | old yellow house that sits right behind this building. |
| 11:00:26 | 24 | It's called Gillam and Smith. |
| 11:00:28 | 25 | Personally, I am married.  My husband's name is |

| | | |
|---|---|---|
| 11:00:31 | 1 | Stephen.  He is retired law enforcement, although he is |
| 11:00:36 | 2 | having a hard time giving it up, so he's a reserve officer |
| 11:00:39 | 3 | in Marion County right now.  We have a seven-year-old girl, |
| 11:00:43 | 4 | I used to call her baby girl, but not a baby anymore, and a |
| 11:00:47 | 5 | nine-year-old little boy.  So when I'm not doing this, I |
| 11:00:50 | 6 | try to spend every single minute with those folks. |
| 11:00:52 | 7 | Now, Judge Gilstrap gives us just precious little |
| 11:00:57 | 8 | time, just a few minutes to give you an overview of this |
| 11:01:00 | 9 | case.  And what I'll tell you about this case is that Apple |
| 11:01:03 | 10 | takes these charges very, very seriously. |
| 11:01:06 | 11 | And the one thing you need to take away from this |
| 11:01:09 | 12 | visit with me is that it is Apple's position that they do |
| 11:01:15 | 13 | not, have never used the '091 patent in this case or any of |
| 11:01:23 | 14 | the ideas in the '091 patent. |
| 11:01:25 | 15 | Now, for those of you that are lucky enough to get |
| 11:01:29 | 16 | chosen and to hear this case all week, you're going to |
| 11:01:33 | 17 | hear -- you can -- and many of you -- some of you are |
| 11:01:34 | 18 | really young, but many of you, like me, can remember, the |
| 11:01:39 | 19 | Internet -- as I call it, the Internet explosion, when the |
| 11:01:43 | 20 | Internet became a part of all of our lives.  And that |
| 11:01:45 | 21 | created problems, because with the Internet, immediately we |
| 11:01:48 | 22 | saw piracy, we saw hackers, and Apple had a problem. |
| 11:01:53 | 23 | Apple needed to secure the things that they needed |
| 11:01:55 | 24 | online, the books, the music, the apps that Ms. DeRieux |
| 11:01:59 | 25 | mentioned.  They needed some security measure from those |

11:02:03  1   hackers and the pirates.  And the answer to that problem

11:02:05  2   was called FairPlay.  And Ms. DeRieux mentioned FairPlay.

11:02:08  3   And you're going to hear a lot about that in this case.

11:02:10  4          Now, what you also hear is Personalized Media had

11:02:17  5   its own problems.  And those problems are problems they had

11:02:21  6   back in the '80s.  Different problems, different solution,

11:02:25  7   and very, very different technology from what Apple uses in

11:02:32  8   FairPlay.

11:02:32  9          Now, we asked you all if you knew anybody in the

11:02:36  10  room, but what we failed to ask you thus far is if you know

11:02:40  11  any of the lawyers in the room.

11:02:41  12         Before getting here today, did anyone have a

11:02:45  13  relationship or any knowledge of the Capshaw DeRieux firm,

11:02:49  14  Ms. DeRieux or her partner, Mr. Capshaw, by raising hands.

11:02:54  15  Anyone know that firm?

11:02:55  16         All right.  Ms. DeRieux is joined today or for

11:03:00  17  those of you that get to serve on the case by a firm called

11:03:04  18  Goodwin Procter, and they have offices in DC and Boston.

11:03:08  19  Is anyone familiar with the Goodwin Procter firm?

11:03:14  20         No hands.

11:03:15  21         All right.  Ms. Goodman, may I speak with you?

11:03:20  22  No. 3.  While we're talking about lawyers, you probably

11:03:25  23  knew this was coming, didn't you?

11:03:27  24         JUROR GOODMAN:  Ask it and we'll see.

11:03:30  25         MS. SMITH:  Okay.  You have some experience

| | | |
|---|---|---|
| 11:03:32 | 1 | working for a private firm; is that correct? |
| 11:03:35 | 2 | JUROR GOODMAN:  I did. |
| 11:03:35 | 3 | MS. SMITH:  Okay.  And how long did you do that? |
| 11:03:38 | 4 | JUROR GOODMAN: 23 years. |
| 11:03:39 | 5 | MS. SMITH:  All right.  And that was the Nix law |
| 11:03:42 | 6 | firm; is that correct? |
| 11:03:42 | 7 | JUROR GOODMAN:  Yes, ma'am. |
| 11:03:43 | 8 | MS. SMITH:  All right.  Now, the Nix law firm, |
| 11:03:45 | 9 | I've seen a lot of their billboards and their media and |
| 11:03:48 | 10 | stuff, and they don't often say, we're here to represent |
| 11:03:51 | 11 | the wrongly accused, do they? |
| 11:03:53 | 12 | JUROR GOODMAN:  No. |
| 11:03:54 | 13 | MS. SMITH:  They're Plaintiff's lawyers. |
| 11:03:55 | 14 | JUROR GOODMAN:  Yes. |
| 11:03:55 | 15 | MS. SMITH:  And so they sit over at the table just |
| 11:03:58 | 16 | like Ms. DeRieux's crew; is that correct? |
| 11:04:00 | 17 | JUROR GOODMAN:  That's correct. |
| 11:04:02 | 18 | MS. SMITH:  All right.  Well, heart to heart, do I |
| 11:04:04 | 19 | have anything to worry about, because I'm over here |
| 11:04:06 | 20 | representing a Defendant, with putting you on this jury |
| 11:04:09 | 21 | when you spent 23 years working on the Plaintiff's side at |
| 11:04:12 | 22 | Nix? |
| 11:04:14 | 23 | JUROR GOODMAN:  No. |
| 11:04:14 | 24 | MS. SMITH:  I appreciate your honesty. |
| 11:04:18 | 25 | JUROR GOODMAN:  You're welcome. |

11:04:19   1              MS. SMITH:  Now, I don't think -- we heard --
11:04:20   2    Ms. DeRieux told you that Personalized Media doesn't make
11:04:24   3    any products, and so I don't think you've heard of them
11:04:27   4    before.  But has anybody ever, before getting in the
11:04:30   5    courthouse today, heard of Personalized Media by a showing
11:04:34   6    of hands?
11:04:42   7              Okay.  I'm going to pivot off of one of
11:04:46   8    Ms. DeRieux's questions a little bit.  She talked about if
11:04:50   9    you've ever been in a business dispute or land dispute or
11:04:53   10   something like that.  Is there anyone in this room that's
11:04:56   11   never been wrongly accused of something?  Not legally, just
11:05:02   12   in life.  Raise your hands.  You've never been wrongly
11:05:06   13   accused.  Never been.
11:05:07   14             JUROR ENDSLEY:  No.
11:05:08   15             MS. SMITH:  You're a lucky man.  Okay, I'm going to
11:05:10   16   talk to those of you that are -- I mean, this can be as
11:05:11   17   easy as -- you know, my kids are seven and nine and they
11:05:14   18   still haven't learned to replace the toilet paper when they
11:05:18   19   use the bathroom.  So it can be, you know, an everyday
11:05:21   20   thing.  But I'll -- I want to pick on someone we haven't
11:05:25   21   heard a lot from.
11:05:26   22             How about Ms. Parker.
11:05:29   23             Now, I don't want to know any details.  I don't
11:05:34   24   want to know any details.  But how did that make you feel
11:05:41   25   when you were wrongly accused?

11:05:44  1            JUROR KALEY PARKER:  Oh, very upset.

11:05:46  2            MS. SMITH:  Okay.  And you stuck up for yourself;

11:05:47  3  did you not?

11:05:48  4            JUROR KALEY PARKER:  Yes.

11:05:49  5            MS. SMITH:  Okay.  And if you were wrongly accused

11:05:50  6  of taking something, and I think Ms. DeRieux used the words

11:05:54  7  "substantial money involved," would you defend yourself?

11:05:56  8            JUROR KALEY PARKER:  Definitely.  Yeah.

11:05:57  9            MS. SMITH:  Would you hesitate to go to court to

11:06:00  10  defend yourself?

11:06:01  11            JUROR KALEY PARKER:  No.

11:06:01  12            MS. SMITH:  Okay.  Now, it's a little bit

11:06:03  13  different because Samsung is a company.  Do you think

11:06:07  14  Samsung -- or Apple, excuse me, is a company -- that's a

11:06:09  15  slip -- Apple is a company.  Do you -- is there any doubt

11:06:12  16  in your mind that Apple has every ability to show up in

11:06:15  17  court and defend itself, or any other company?

11:06:18  18            JUROR KALEY PARKER:  No.

11:06:19  19            MS. SMITH:  Thank you, ma'am.

11:06:20  20            Now, Ms. Black, Ms. DeRieux spoke to you about the

11:06:34  21  dispute you had with your husband's 903 Outdoor business;

11:06:42  22  is that correct?

11:06:42  23            JUROR BLACK:  Yes, ma'am.

11:06:43  24            MS. SMITH:  Okay.  And you guys made a choice that

11:06:44  25  you weren't going to go to court; is that correct?

11:06:47  1            JUROR BLACK:  Correct.

11:06:48  2            MS. SMITH:  Is there anything about that choice

11:06:51  3  that would cause you to take issue with Apple in this case

11:06:52  4  because they have chosen to come to court and defend

11:06:55  5  themselves?  I can take it, ma'am.  I want you to speak --

11:07:06  6  speak your truth.

11:07:07  7            Because I'm trying to figure out who would be the

11:07:09  8  best fit for this panel.  So if you think -- if you're

11:07:12  9  going to fault Apple here for coming to court and defending

11:07:16  10 itself, I'd like -- I'd rather know now than come Friday.

11:07:20  11           JUROR BLACK:  Yeah.  Yes, ma'am.

11:07:24  12           MS. SMITH:  Okay.  I appreciate your honesty.

11:07:26  13           Now, is there any --

11:07:30  14           And you can sit down.

11:07:31  15           JUROR BLACK:  Okay.

11:07:31  16           MS. SMITH:  Is there anyone else out there, and

11:07:34  17 all of you, all but one, except for lucky No. 34 out there,

11:07:38  18 have been accused of something that they haven't done

11:07:40  19 before?  And is there anyone sitting out there that joins

11:07:44  20 Juror No. 28, Ms. Black, and says, you know what, there --

11:07:51  21 this shouldn't be a place where we hear these disputes.  Is

11:07:54  22 there anyone that feels like that?  Anyone that thinks

11:07:57  23 these things should just settle out of court?

11:08:01  24           Juror No. 5, Mr. Parker.  We heard a little bit

11:08:05  25 from you about this.  I think that you -- I read the same

11:08:10  1  quote, I think.  In your juror questionnaire, you said

11:08:13  2  everything can be handled outside of court.

11:08:15  3          So where does that put you with Apple in this

11:08:17  4  case?

11:08:18  5          JUROR JAMES PARKER:  In the same guidelines.

11:08:19  6          MS. SMITH:  Okay.  You understand Apple doesn't

11:08:21  7  want to be in this court, and we're not here by choice?

11:08:26  8          JUROR JAMES PARKER:  I understand that.

11:08:28  9          MS. SMITH:  And do you fault Apple for having to

11:08:31  10  come to court and defend itself?

11:08:33  11          JUROR JAMES PARKER:  I will fault them for not

11:08:35  12  trying to find a reasonable solution with the -- I guess

11:08:39  13  you'd call them the Plaintiff.

11:08:41  14          MS. SMITH:  Okay.  Thank you.  Thank you.  Thank

11:08:44  15  you, sir.

11:08:44  16          All right.  Let's see.  Ms. Haley, Juror No. 2.

11:08:58  17  You've raised four kids.  We met one of them, right?

11:09:02  18          JUROR HALEY:  Yeah.

11:09:04  19          MS. SMITH:  All right.  Carving out Ms. Gibbons

11:09:07  20  from this, because I'm sure she never got any squabbles

11:09:11  21  with her brothers and sisters, right?

11:09:13  22          JUROR HALEY:  There was plenty.

11:09:14  23          MS. SMITH:  Okay.  Let's work with that.

11:09:17  24          So when you were bringing up Ms. Gibbons and her

11:09:21  25  brothers and sisters, they obviously had fights, did they

11:09:24  1  not?

11:09:24  2          JUROR HALEY:  Oh, yes.

11:09:25  3          MS. SMITH:  Okay.  And did you find that it's

11:09:27  4  almost instinctive that when they -- when a fight breaks

11:09:31  5  out, they have this urge to be the first one to tell you

11:09:34  6  their side of the story?

11:09:35  7          JUROR HALEY:  (Nods head affirmatively.)

11:09:37  8          MS. SMITH:  Would you?

11:09:38  9          JUROR HALEY:  Yes.

11:09:39 10          MS. SMITH:  So they get in a fight and they race

11:09:41 11  to you to tell their side of the story first, right?

11:09:44 12          JUROR HALEY:  Yes.

11:09:44 13          MS. SMITH:  As a good momma, did you just take

11:09:47 14  that first story and not listen to any of the rest?

11:09:51 15          JUROR HALEY:  No.

11:09:51 16          MS. SMITH:  Why not?

11:09:52 17          JUROR HALEY:  Because I never knew which one was

11:09:54 18  telling me the truth.  It was -- and that was always hard

11:09:58 19  to figure out.

11:09:59 20          MS. SMITH:  Okay.  And as you might guess, this

11:10:06 21  trial is going to run just like that.  The Plaintiff always

11:10:07 22  gets to speak first.

11:10:08 23          JUROR HALEY:  Yes.

11:10:09 24          MS. SMITH:  And they're going to -- they're good

11:10:10 25  lawyers, they're going to say a lot of smart things, but

11:10:13  1  will you wait until Apple speaks to make up your mind?

11:10:16  2           JUROR HALEY:  Yes.

11:10:16  3           MS. SMITH:  Thank you, ma'am.  I appreciate it.

11:10:18  4           What do you have to say about that, Mr. Jones?

11:10:21  5  Can you agree to wait until you hear the whole side of the

11:10:24  6  story before you make up your mind?

11:10:26  7           JUROR JONES:  Yes, I do.

11:10:29  8           MS. SMITH:  Okay.  I appreciate that, sir.

11:10:32  9           Everyone else on the first row, I'm going to call

11:10:36 10  it Mr. Jones's row, by raising hands, can you all wait --

11:10:41 11  commit to wait until you've heard all the evidence in the

11:10:43 12  case to make up your mind?  Raise your hands.

11:10:47 13           Alright.  Ms. Goodman.

11:10:49 14           Mr. Overstreet, do you have an opinion about that?

11:10:53 15  Let's hear from you, Mr. Overstreet.  We haven't heard from

11:10:55 16  you much today.

11:10:56 17           JUROR OVERSTREET:  I don't use apps.  I just use

11:11:04 18  my phones for emergency --

11:11:07 19           THE COURT:  Just a minute.  I can't hear you,

11:11:09 20  Mr. Overstreet.  I don't know if that mic is not working,

11:11:11 21  your mask is not down.

11:11:13 22           JUROR OVERSTREET:  Hello, hello.  It's not

11:11:16 23  working.

11:11:17 24           THE COURT:  Hand it back to the Court Security

11:11:18 25  Officer.  Sometimes they get pushed off by mistake when

11:11:21  1  they're passed around.

11:11:25  2          Let's get the other microphone.

11:11:33  3          JUROR OVERSTREET:  I don't -- I don't --

11:11:35  4          MS. SMITH:  Yes --

11:11:36  5          JUROR OVERSTREET:  Oh, hello.

11:11:38  6          MS. SMITH:  Yes, sir.

11:11:46  7          JUROR OVERSTREET:  Okay.

11:11:47  8          MS. SMITH:  Thank you.

11:11:48  9          JUROR OVERSTREET:  No, I -- I don't -- I don't

11:11:50  10  know nothing about -- you know, really about Apple or any

11:11:52  11  other -- you know, what's on -- you know, really --

11:11:56  12          MS. SMITH:  Okay.

11:11:58  13          JUROR OVERSTREET:  -- about Apple because I don't

11:11:59  14  have Apple on my phone.

11:12:01  15          MS. SMITH:  All right.  Well, you sat through

11:12:03  16  another patent trial, did you not?

11:12:05  17          JUROR OVERSTREET:  Yes.

11:12:05  18          MS. SMITH:  And what was the subject matter of

11:12:08  19  that trial?

11:12:08  20          JUROR OVERSTREET:  That subject was about UPS --

11:12:14  21          MS. SMITH:  Okay.

11:12:14  22          JUROR OVERSTREET:  -- Yeah -- not UPS but -- let

11:12:18  23  me think what it was -- something to do -- I believe it was

11:12:25  24  something to do with --

11:12:26  25          MS. SMITH:  Well, it was -- let me help you.  It

| | | |
|---|---|---|
| 11:12:29 | 1 | was a patent case, and before you walked into that case, |
| 11:12:31 | 2 | did you know much about patents? |
| 11:12:33 | 3 | JUROR OVERSTREET:  No. |
| 11:12:34 | 4 | MS. SMITH:  But I bet -- you said you sat through |
| 11:12:37 | 5 | a good deal of that trial, right? |
| 11:12:39 | 6 | JUROR OVERSTREET:  Yes. |
| 11:12:39 | 7 | MS. SMITH:  Up to the bitter end? |
| 11:12:42 | 8 | JUROR OVERSTREET:  Just like this right here. |
| 11:12:45 | 9 | MS. SMITH:  Right.  And you learned a whole lot |
| 11:12:47 | 10 | about patents in that case -- |
| 11:12:48 | 11 | JUROR OVERSTREET:  Yeah. |
| 11:12:48 | 12 | MS. SMITH:  -- did you not? |
| 11:12:48 | 13 | JUROR OVERSTREET:  Yeah. |
| 11:12:49 | 14 | MS. SMITH:  And so I promise you here that you'll |
| 11:12:51 | 15 | learn a whole lot about apps but my question was a little |
| 11:12:53 | 16 | bit different.  It was, just like in that other jury |
| 11:12:54 | 17 | service you had, can you wait until you hear from the |
| 11:12:55 | 18 | Plaintiff and the Defendant before you make up your mind? |
| 11:12:58 | 19 | JUROR OVERSTREET:  Yeah. |
| 11:12:58 | 20 | MS. SMITH:  Okay.  I appreciate that, |
| 11:13:01 | 21 | Mr. Overstreet. |
| 11:13:01 | 22 | All right.  I want to talk a little bit about |
| 11:13:05 | 23 | Apple products. |
| 11:13:07 | 24 | So we're lucky to have many, many of you as |
| 11:13:11 | 25 | customers, but I want to see by a showing of hands again |

11:13:16  1  who the Apple customers are.  Who owns Apple products right

11:13:19  2  now?

11:13:19  3        All right.  Now keep your hands up if you are not

11:13:25  4  satisfied in some way with your Apple products.

11:13:29  5        Juror No. 18, Mr. Groce.  Tell me about that.

11:13:35  6        JUROR GROCE:  I used to own an Apple phone.  I

11:13:41  7  didn't like it.  I'm not very good with technology.  My

11:13:45  8  daughter owns an Apple phone.  And she don't like it.  I

11:13:50  9  have an Apple iPad, and I don't like it.

11:13:55  10        MS. SMITH:  Okay.  Well, that's obviously tough

11:13:58  11  stuff for me to hear as I stand here in front of you

11:14:02  12  representing Apple.

11:14:03  13        JUROR GROCE:  Again, I'm not very good in

11:14:06  14  technology.  If it's not simple, then I lose patience with

11:14:09  15  it.

11:14:10  16        MS. SMITH:  Okay.  Well, Mr. Groce, and my

11:14:12  17  question is going to be this, knowing that you've had a

11:14:14  18  negative experience with a series, not one, but many Apple

11:14:18  19  products, and I -- on behalf of Apple, I apologize for

11:14:22  20  that, but in this trial, do you think you might be a better

11:14:26  21  fit for a different trial, and I'll have you know, this

11:14:29  22  won't be the last jury summons you ever get, but you might

11:14:33  23  be a better fit for a different trial that didn't involve

11:14:37  24  Apple given your negative opinions of Apple products.

11:14:39  25        JUROR GROCE:  I don't know.  I'd have to know the

11:14:41  1  trial.

11:14:42  2          MS. SMITH:  Okay.  Okay.  Fair enough.  Thank you,

11:14:43  3  sir.  Appreciate it.

11:14:44  4          All right.  Ms. Gibbons, you didn't raise your

11:14:51  5  hand, but you had a discussion with Ms. DeRieux about your

11:14:54  6  Apple tablet.  You said that you felt that Apple was a

11:15:00  7  little bit overrated.  I think I -- I tried to listen

11:15:03  8  closely.  I think I wrote that down right.

11:15:07  9          JUROR GIBBONS:  Yes, ma'am.

11:15:08  10          MS. SMITH:  Okay.  Tell me about your feelings.

11:15:10  11          JUROR GIBBONS:  I just think they're complicated

11:15:12  12  to me.  You got to have a certain iTunes account to even

11:15:16  13  get on there and do anything.  And they're just not like

11:15:19  14  the Androids that I like.  And my husband has an Apple as

11:15:22  15  of right now that he -- I got him for Christmas, and he is

11:15:26  16  currently looking into another Android because he's not

11:15:29  17  satisfied either.

11:15:29  18          MS. SMITH:  Knowing all of that, same question as

11:15:33  19  I had for Mr. Groce, do you think you might be a better

11:15:35  20  fit, knowing that you've had these negative experiences

11:15:38  21  with Apple, do you think you might be a better fit for a

11:15:41  22  different kind of case?

11:15:41  23          JUROR GIBBONS:  I would like to think that I

11:15:43  24  wouldn't -- just because of the dislikes that I have with

11:15:47  25  their product doesn't mean that -- they're still people so,

11:15:50   1   I mean --

11:15:50   2          MS. SMITH:  And I guarantee you, I'm not going to

11:15:52   3   ask you to use an Apple product if you're chosen for this

11:15:56   4   case.  Do we have that deal?

11:15:59   5          JUROR GIBBONS:  Deal.

11:16:00   6          MS. SMITH:  Okay.  Thank you, ma'am.  I appreciate

11:16:01   7   it.

11:16:01   8          All right.  You've heard -- there's going to be a

11:16:03   9   lot of patents in this case.  You're going to hear about, I

11:16:06  10   think, probably six Apple patents, and you're going to hear

11:16:08  11   about one on the PMC side, as well.

11:16:09  12          I think I saw on some of the questionnaires that

11:16:12  13   you guys -- some of you had some inventors in the family.

11:16:15  14          Let's see, Juror No. 33, Ms. Carter.  There we go.

11:16:21  15   Haven't heard from you today.  Ms. Carter, I noticed on

11:16:26  16   your questionnaire that you'd said that patents last too

11:16:29  17   long, and that you had an uncle that had a patent.  Tell me

11:16:33  18   about that.

11:16:33  19          JUROR DAVIS:  I have two uncles.  One invented

11:16:37  20   a -- it was something to do with covering coal, loads of

11:16:42  21   coal as they -- I don't know -- I don't know all the

11:16:44  22   details.

11:16:44  23          The other one invented some kind of a basketball

11:16:48  24   goal, portable, movable, whatever, one, various sizes, with

11:16:54  25   his son.  And they both got them patented and did whatever.

| | | |
|---|---|---|
| 11:16:58 | 1 | And my -- my objection to the length is that 20 |
| 11:17:02 | 2 | years made great sense long ago.  But in -- you know, and, |
| 11:17:09 | 3 | again, I'm an economist. |
| 11:17:10 | 4 | MS. SMITH:  Okay. |
| 11:17:11 | 5 | JUROR CARTER:  This is my thing, so that's |
| 11:17:13 | 6 | where -- you know, lots of these things.  It just -- in |
| 11:17:16 | 7 | this day and age, 20 years is an awful long time in the |
| 11:17:21 | 8 | life of a company or a product or anything else to own that |
| 11:17:27 | 9 | intellectual property. |
| 11:17:29 | 10 | MS. SMITH:  So you'd probably agree if we have a |
| 11:17:31 | 11 | patent -- let's say we have a patent from the '80s, like a |
| 11:17:34 | 12 | 1987 patent, you probably would have a hard time thinking |
| 11:17:38 | 13 | that that patent applied to a 2021 product? |
| 11:17:43 | 14 | JUROR CARTER:  At 20 years, isn't it already |
| 11:17:47 | 15 | expired?  Isn't that irrelevant?  I mean, right, I guess. |
| 11:17:52 | 16 | MS. SMITH:  I don't want to get -- delve into |
| 11:17:54 | 17 | patent law. |
| 11:17:55 | 18 | JUROR DAVIS:  Okay. |
| 11:17:55 | 19 | MS. SMITH:  But that wouldn't make sense to you, |
| 11:17:59 | 20 | would it? |
| 11:17:59 | 21 | JUROR DAVIS:  No. |
| 11:17:59 | 22 | THE COURT:  And to the extent we can all talk one |
| 11:18:02 | 23 | at a time, it would be helpful. |
| 11:18:04 | 24 | MS. SMITH:  All right.  I apologize, Your Honor. |
| 11:18:06 | 25 | THE COURT:  Let's continue. |

| | | |
|---|---|---|
| 11:18:07 | 1 | JUROR CARTER:  I'm sorry. |
| 11:18:07 | 2 | MS. SMITH:  Thank you, ma'am. |
| 11:18:08 | 3 | Juror No. 22, Ms. Fruia, did I say that right? |
| 11:18:12 | 4 | JUROR FRUIA:  Fruia. |
| 11:18:13 | 5 | MS. SMITH:  Fruia.  Third time is a charm, |
| 11:18:16 | 6 | Ms. Fruia. |
| 11:18:17 | 7 | JUROR FRUIA:  That's fine. |
| 11:18:18 | 8 | MS. SMITH:  Okay. Do you have an inventor in the |
| 11:18:19 | 9 | family? |
| 11:18:21 | 10 | JUROR FRUIA:  My had father had a patent on a |
| 11:18:26 | 11 | fishing product.  It was called the Keeper.  It was a |
| 11:18:30 | 12 | measurement tool that fishermen could mount to a boat, and |
| 11:18:35 | 13 | they could measure a fish to see if they needed to throw it |
| 11:18:38 | 14 | back or not. |
| 11:18:39 | 15 | MS. SMITH:  And ultimately did he make a product |
| 11:18:40 | 16 | with that. |
| 11:18:41 | 17 | JUROR FRUIA:  Yes, yes, ma'am. |
| 11:18:42 | 18 | MS. SMITH:  All right.  So and he never -- was he |
| 11:18:51 | 19 | ever involved in litigation? |
| 11:18:53 | 20 | JUROR FRUIA:  Not to my knowledge. |
| 11:18:54 | 21 | MS. SMITH:  Okay. |
| 11:18:54 | 22 | JUROR FRUIA:  This was in the '70s when it was |
| 11:18:56 | 23 | invented. |
| 11:18:56 | 24 | MS. SMITH:  Okay.  Thank you, ma'am. |
| 11:18:59 | 25 | JUROR FRUIA:  Uh-huh. |

11:18:59  1            MS. SMITH:  Juror No. 13, Mr. Rand?  I believe

11:19:08  2  your brother is an inventor; is that correct?

11:19:11  3            JUROR RAND:  Yes.  Yes.

11:19:12  4            MS. SMITH:  What's your brother do?

11:19:14  5            JUROR RAND:  He's a computer programmer and a

11:19:18  6  language programmer.  He does both.

11:19:22  7            MS. SMITH:  All right.  Okay, tell me a little bit

11:19:24  8  about his invention.

11:19:25  9            JUROR RAND:  It was for a new language, back in

11:19:29 10  the '80s.  He invented a new language where computers could

11:19:34 11  talk to each other.

11:19:35 12            MS. SMITH:  Okay.  All right.  And did -- this was

11:19:38 13  a software program?

11:19:40 14            JUROR RAND:  Yes.

11:19:41 15            MS. SMITH:  And was he eventually able to sell

11:19:42 16  that program to people or put it in some type of product?

11:19:47 17            JUROR RAND:  He got a patent on it.  I don't think

11:19:49 18  it's ever been sold or used.

11:19:51 19            MS. SMITH:  Okay.  And did he ever sue anybody

11:19:54 20  with it?

11:19:55 21            JUROR RAND:  No.  No, no.

11:19:57 22            MS. SMITH:  Okay.  Thank you, sir.

11:19:58 23            JUROR RAND:  Yes, ma'am.

11:19:59 24            MS. SMITH:  Now, the next set of questions, when

11:20:01 25  my partner was teaching me how to do voir dire, he said the

11:20:07  1   best way to get to know a big group of people in a room

11:20:11  2   like this is to have them tell you how they see themselves.

11:20:14  3          So the first question I have for you, we've got

11:20:18  4   some people who make quick decisions.  They can just make

11:20:21  5   decisions like this.  Good, bad or otherwise, they're

11:20:23  6   always quick.  Other people who take some time and want to

11:20:25  7   take every little detail.  By raise of hands, and I'm just

11:20:29  8   going to call out numbers, who are my quick decisionmakers

11:20:33  9   in my group?

11:20:36  10         All right.  I've got Ms. Fruia, and on the back

11:20:39  11  row, Ms. Ferguson, Mr. Driggers, Mr. Berryhill.  Did I get

11:20:43  12  that right?

11:20:45  13         All right.  Showing of hands, who are my folks

11:20:48  14  that take time, give everything thoughtful consideration?

11:20:52  15  Is that everyone else?  I just want to make sure I get a

11:20:54  16  hand from everybody.  All right.  Thank you all.

11:20:56  17         A little bit different question.  Some people

11:21:03  18  seek out leadership positions.  Some people are always the

11:21:08  19  persons that others want to be leaders.  So there are

11:21:10  20  leaders and then there are folks that are fine just being

11:21:12  21  part of the group.  Who are my -- who would say, I'm a

11:21:17  22  leader?  All right.  We've got a lot of leaders in there.

11:21:20  23         Okay.  1, sorry, 7, 8, 9, 10, 11, 13, 18, 23, and

11:21:32  24  Ms. Fruia.  And then I've got some on the back row.  Thank

11:21:36  25  you.  Thank you, guys.

11:21:39   1           Who would put themselves in a category of having

11:21:43   2   kind of special technical knowledge by raising hands?

11:21:46   3   Mr. Cox; is that right?  Mr. Cox.

11:21:51   4           And who else do I have?  On the first three rows,

11:21:53   5   Mr. Cox, Ms. Rand, anybody else?

11:21:57   6           Okay.  Mr. Cox, can you tell me why you say that?

11:22:00   7   They're coming with the mic.

11:22:02   8           JUROR COX:  Just working with electronics and

11:22:07   9   instrumentation, computers.

11:22:09   10          MS. SMITH:  All right.  Self-taught?

11:22:12   11          JUROR COX:  No, college education.

11:22:14   12          MS. SMITH:  Okay.  What was your major.

11:22:17   13          JUROR COX:  Electronics.

11:22:18   14          MS. SMITH:  Okay.  And when you -- remind you what

11:22:20   15   you do -- what you did for work or do for work.

11:22:24   16          JUROR COX:  Instrumentation.

11:22:25   17          MS. SMITH:  Okay.  And where do you do that?

11:22:27   18          JUROR COX:  American Electric Power.

11:22:30   19          MS. SMITH:  And does that flow over into friends

11:22:31   20   and family, when someone needs something fixed, you're the

11:22:32   21   guy that's going to do it.

11:22:34   22          JUROR COX:  If I can't get out of it, yes.

11:22:36   23          MS. SMITH:  Okay.  Okay.  Are you the guy that

11:22:38   24   typically -- I've never read an owner's manual in my life.

11:22:38   25   Are you the guy that will read -- read the manual and

11:22:41  1  figure out how to -- how to fix things?

11:22:45  2          JUROR COX:  If all else fails, read the

11:22:48  3  directions.

11:22:48  4          MS. SMITH:  Okay.  Thank you, sir.  I appreciate

11:22:49  5  that.

11:22:50  6          Mr. Rand, I -- thank you.

11:22:52  7          No. 13.  I know where your brother puts himself in

11:22:58  8  that category.  Tell me about your experience.

11:23:00  9          JUROR RAND:  Well, I do -- I work steam boiling

11:23:06  10 engineering, fabrication.  And this involves electronics --

11:23:16  11 fire, pressure, you just got to do a maze of things.

11:23:20  12 You've got to know -- and you got to -- if something -- if

11:23:22  13 safety feature go down, you got to react quickly.

11:23:25  14         And then the question that was I asked earlier,

11:23:28  15 then sometimes you have to let it -- you have to just sit

11:23:30  16 back and monitor things instead of making a quick decision

11:23:33  17 because it could be a wrong decision, because it's a

11:23:37  18 dangerous job.

11:23:38  19         MS. SMITH:  Right.

11:23:39  20         JUROR RAND:  But you've got to know electronics.

11:23:41  21 Again, pressures, safety features, why this does this,

11:23:46  22 that, and...

11:23:47  23         MS. SMITH:  Okay.

11:23:48  24         THE COURT:  Five minutes remaining.

11:23:50  25         MS. SMITH:  Thank you, Mr. Rand.

11:23:52  1              JUROR RAND:  Yes, ma'am.

11:23:53  2              MS. SMITH:  Has anyone ever gotten a call from a

11:23:57  3    telemarketer?  Has anybody not gotten a call?  I need to

11:24:03  4    talk to you about how not to get those.

11:24:05  5              Let's see, Ms. Smith, let's talk to you.

11:24:07  6              When a telemarketer calls, a salesman of some

11:24:12  7    sorts and you don't want what they're selling and you don't

11:24:15  8    need what they're selling, do you have -- do you hesitate

11:24:17  9    to tell them "no, thank you."

11:24:19  10             JUROR SMITH:  No.

11:24:20  11             MS. SMITH:  Okay.  I expect you'd agree that

11:24:22  12   companies have the same ability, when a salesman comes

11:24:25  13   knocking at the door, to say "no, thank you" if they don't

11:24:28  14   want it and they don't need it?  Would you agree with that?

11:24:31  15             JUROR SMITH:  That is correct.

11:24:31  16             MS. SMITH:  Thank you, Ms. Smith.

11:24:32  17             Does everyone agree with Ms. Smith that companies

11:24:36  18   have the same rights as individuals to say we don't want it

11:24:38  19   and we don't need it?

11:24:40  20             All right.  Thank y'all.

11:24:45  21             Ms. DeRieux said that they're going to ask you --

11:24:46  22   she was a little bit shy about the amount.  I didn't hear

11:24:47  23   an amount.  But she said they were going to ask for a

11:24:51  24   substantial or large amount of money.

11:24:53  25             And my question is this -- and I'll say, you know,

11:24:57  1  she's a good lawyer.  They're going to be good lawyers on

11:25:00  2  the other side.  They're going to put up a good case.  But

11:25:03  3  if the Plaintiff does not -- spends five days in this

11:25:08  4  courthouse and does not meet their burden -- and Judge

11:25:11  5  Gilstrap will tell you more about the burden -- but if the

11:25:14  6  Plaintiff doesn't meet their burden, can everyone commit to

11:25:19  7  giving them zero, by a showing of hands?

11:25:22  8       No one is out there saying, you know, they showed

11:25:24  9  up, they tried.  They gave it their best shot.  They should

11:25:29  10 deserve something.  Kind of an award for second place.  Is

11:25:32  11 there anyone that's thinking that way?

11:25:32  12       Ms. Goodman.

11:25:36  13       Bad question.  You're not thinking, well, gosh,

11:25:39  14 they showed up.  They're good lawyers.  They put on a case,

11:25:43  15 they tried.  They should deserve something.

11:25:43  16       Thank you.  Thanks.

11:25:43  17       All right.  I didn't share -- some of you may have

11:25:49  18 noted that I didn't share my own personal jury service with

11:25:52  19 you, and so I'll share it now.  I have been on a jury.  And

11:25:56  20 this ties into my last question.  I was on a jury when two

11:26:00  21 lawyers, that I still question today, thought I would be a

11:26:03  22 good fit for the jury.  It was a criminal case about a harm

11:26:07  23 to a very, very young child.

11:26:10  24       It was over in Marion County in State Court, and I

11:26:14  25 was about -- I felt like I was 10 months pregnant -- but I

| | | |
|---|---|---|
| 11:26:18 | 1 | was eight and a half months pregnant, and obviously |
| 11:26:22 | 2 | pregnant, and these lawyers thought that I would be a good |
| 11:26:25 | 3 | juror for some reason to sit on a case about someone |
| 11:26:27 | 4 | hurting a small baby. |
| 11:26:29 | 5 | So my question is this, they should have known |
| 11:26:31 | 6 | better.  But is there anything -- any question I haven't |
| 11:26:37 | 7 | asked -- you've heard a little bit about the case from each |
| 11:26:41 | 8 | side.  Is there anything that you want to tell me, anything |
| 11:26:44 | 9 | that I should know about you not being a good fit for this |
| 11:26:48 | 10 | panel or anything that Ms. DeRieux has said that causes you |
| 11:26:51 | 11 | to kind of start leaning toward the Plaintiff before you're |
| 11:26:54 | 12 | even selected for the case?  I don't always know the right |
| 11:26:58 | 13 | questions. |
| 11:26:59 | 14 | Ms. Nolan.  I know your brother.  I go back about |
| 11:27:04 | 15 | two decades with Brent, so. |
| 11:27:07 | 16 | JUROR NOLAN:  I just want to make that clear. |
| 11:27:08 | 17 | MS. SMITH:  And I appreciate that.  I should have |
| 11:27:10 | 18 | talked to you earlier. |
| 11:27:11 | 19 | And on that -- on that note, same question for |
| 11:27:14 | 20 | Ms. Goodman.  I mean, you've -- he does Plaintiff's work. |
| 11:27:18 | 21 | He's -- I've never seen a Goudarzi and Young billboard that |
| 11:27:25 | 22 | says we represent the wrongfully accused, right?  So you'd |
| 11:27:29 | 23 | probably start out leaning a little towards the Plaintiff's |
| 11:27:30 | 24 | side? |
| 11:27:31 | 25 | JUROR NOLAN:  I'm very fair and impartial. |

11:27:33   1          MS. SMITH:  Well I appreciate that.  Thank you,

11:27:34   2   ma'am.

11:27:34   3          No further questions.  And thank you all again for

11:27:37   4   your time this morning.

11:27:39   5          Thank you, Your Honor.

11:27:41   6          THE COURT:  Thank you, counsel.

11:27:43   7          Ladies and gentlemen, part of this process is

11:27:47   8   going to be requiring that there will be times I need to

11:27:52   9   talk to the lawyers outside of your presence.

11:27:54  10          Ordinarily, before we had a pandemic, I would

11:27:59  11   simply call them up here to the bench where you couldn't

11:28:02  12   hear them and we would talk quietly to each other at the

11:28:05  13   bench.  We can't do that in today's environment.

11:28:08  14          So I'm going to have to meet with the lawyers and

11:28:10  15   the court reporter in the jury room for a few minutes.  And

11:28:12  16   then after I meet with them, it's possible that some of you

11:28:16  17   may be brought in to let me talk with you there one at a

11:28:21  18   time, and you'll be brought in and taken back to your

11:28:24  19   position by our Court Security Officers.

11:28:25  20          While I'm out of the courtroom, you should keep

11:28:27  21   your mask on.  You should stay in your seats.  You can, if

11:28:31  22   you would like to, have a quiet discreet conversation with

11:28:35  23   your neighbor to either side of you if you want to.  You

11:28:37  24   don't have to.

11:28:39  25          If you have a conversation with somebody in the

11:28:44   1   courtroom today, don't talk about anything that's happened

11:28:46   2   with regard to the case.  Talk about the weather, talk

11:28:50   3   about your grandchildren, talk about a sports team,

11:28:54   4   anything you'd like to discuss, but don't talk about

11:28:57   5   anything involving the case.  Because let me tell you, you

11:29:00   6   have heard absolutely no evidence in this case whatsoever.

11:29:04   7   So don't talk about anything related to the case while I'm

11:29:07   8   out of the courtroom.

11:29:08   9        The Court Security Officers are going to be

11:29:10  10   checking with you while I'm out of the courtroom to see if

11:29:13  11   anyone needs a restroom break, and they'll be taking you in

11:29:16  12   very small groups to maintain social distancing.  If you

11:29:20  13   do, if you have an issue with that while I'm out of the

11:29:24  14   courtroom, just get the attention of one of the Court

11:29:27  15   Security Officers, and they'll work with you on that.

11:29:28  16        So if you will give me a little bit of time, I'll

11:29:31  17   be back in the courtroom as soon as I can.

11:29:35  18        At this time, I'll meet counsel and the court

11:29:37  19   reporter in the jury room.

11:29:48  20        (Conference outside of the presence of the jury.)

11:31:04  21        THE COURT:  Ms. DeRieux, does Plaintiff have any

11:31:36  22   challenges for cause?

11:31:38  23        MS. DERIEUX:  Yes, sir.  We challenge Juror No. 1,

11:31:40  24   Mr. Jones, based on -- and these are my notes --

11:31:46  25        THE COURT:  Just give me the names right now.

| | | |
|---|---|---|
| 11:31:49 | 1 | MS. DERIEUX:  Okay.  And No. 5, Mr. Parker. |
| 11:31:52 | 2 | THE COURT:  Anybody else? |
| 11:31:53 | 3 | MS. DERIEUX:  No, sir. |
| 11:31:54 | 4 | THE COURT:  All right. |
| 11:31:54 | 5 | Ms. Smith, do Defendants challenge anybody for |
| 11:31:57 | 6 | cause. |
| 11:31:57 | 7 | MS. SMITH:  Yes, Your Honor.  2, 5, 16, and 18. |
| 11:31:59 | 8 | THE COURT:  All right.  Do we have anybody on here |
| 11:32:17 | 9 | that based on the question about ownership of individual |
| 11:32:21 | 10 | shares of Apple stock, that anybody believes should be |
| 11:32:26 | 11 | disqualified as a matter of law? |
| 11:32:30 | 12 | MS. SMITH:  I believe they were all held in mutual |
| 11:32:33 | 13 | funds.  We -- we're not challenging. |
| 11:32:34 | 14 | THE COURT:  Clearly mutual funds that might own |
| 11:32:37 | 15 | shares of Apple are not an issue.  I just wanted to verify. |
| 11:32:41 | 16 | I don't want to get into this trial and then somebody says, |
| 11:32:44 | 17 | oops, this juror owns Apple stock and they should be |
| 11:32:47 | 18 | disqualified.  Okay. |
| 11:32:49 | 19 | MS. DERIEUX:  Based on my notes, we didn't have |
| 11:32:51 | 20 | any challenges on the stock question. |
| 11:33:01 | 21 | THE COURT:  Mr. Quarles, No. 9, didn't say he own |
| 11:33:05 | 22 | Apple stock.  He's retired from Pirkey Power Plant. |
| 11:33:06 | 23 | MS. DERIEUX:  He did.  My understanding was it was |
| 11:33:09 | 24 | a mutual found. |
| 11:33:10 | 25 | MS. SMITH:  That's my understanding as well. |

11:33:13   1          MS. DERIEUX:  He came back -- he was the one that

11:33:13   2   after the others started talking about mutual funds, he

11:33:17   3   came back and raised his hand and said something like, me

11:33:19   4   too, was my understanding of his statement.

11:33:21   5          THE COURT:  Okay.  I just would rather be careful

11:33:26   6   now than have a problem later.

11:33:28   7          MS. DERIEUX:  I agree, Your Honor.  I was trying

11:33:30   8   to keep those hands up and catch everybody.

11:33:33   9          THE COURT:  All right.  We obviously don't have

11:33:35   10  anybody that raised their hand with a scheduling issue that

11:33:37   11  we need to address.

11:33:38   12         Let me ask this, you both challenged Mr. Parker,

11:33:55   13  Venire Member No. 5, for cause.  Do you want to agree that

11:34:03   14  he should be excused, or do you want me to bring him back

11:34:06   15  here and question him about his ability to be fair?

11:34:09   16         MS. DERIEUX:  I'm satisfied that we just agree.

11:34:11   17         MS. SMITH:  I'd like to agree.

11:34:12   18         THE COURT:  Okay.  Then by agreement of the

11:34:14   19  parties, Mr. Parker, No. 5, is excused.

11:34:18   20         MS. SMITH:  Your Honor, I have a question about 2

11:34:20   21  and 16.  This is -- I've never had a mother/daughter duo

11:34:25   22  on -- it's not really a challenge as to each person

11:34:28   23  individually.  It's the fact that the daughter said she

11:34:31   24  couldn't -- she couldn't do anything contrary to what her

11:34:35   25  mom did.  So I don't know exactly how to conduct that

11:34:38  1  challenge.  It's more of a group --

11:34:40  2          THE COURT:  I've never had it happen before --

11:34:42  3          MS. SMITH:  -- challenge.

11:34:44  4          THE COURT:  -- but it may very well be the case

11:34:49  5  the mother can do whatever she wants to do and not be

11:34:52  6  influenced by the daughter, but the daughter doesn't feel

11:34:55  7  she can do what she needs to do without being influenced by

11:34:58  8  the mother.

11:34:58  9          I'm happy to talk to them both but I think we're

11:34:59 10  just going to -- I'm just going to have to put the question

11:35:00 11  to them and have them say whether that would be an

11:35:03 12  impediment to them being fair or impartial to both sides or

11:35:11 13  whether it wouldn't.

11:35:11 14          MS. SMITH:  Okay.  My focus was more on the

11:35:15 15  daughter, I think.

11:35:15 16          THE COURT:  I've had cousins before and I've had

11:35:15 17  uncles and nephews before.  I've never had a parent and a

11:35:16 18  child before.   But I think in any of those cases of some

11:35:18 19  familial relationship, you just have to ask each member

11:35:22 20  about their ability to be fair and impartial if the other

11:35:27 21  family member were to end up on the jury.

11:35:29 22          Is that the only basis you're challenging No. 2

11:35:36 23  on?

11:35:36 24          MS. SMITH:  Yes, Your Honor.

11:35:37 25          THE COURT:  Okay.  And I would assume you might

| | | |
|---|---|---|
| 11:35:39 | 1 | have another basis to challenge No. 16? |
| 11:35:42 | 2 | MS. SMITH:  Yes, Your Honor. |
| 11:35:42 | 3 | THE COURT:  Okay.  Are there any other questions |
| 11:35:44 | 4 | from counsel to the Court before I start bringing these |
| 11:35:48 | 5 | folks in and visiting with them? |
| 11:35:52 | 6 | MS. DERIEUX:  Nothing from Plaintiff.  Thank you. |
| 11:35:55 | 7 | MS. SMITH:  No, Your Honor. |
| 11:35:56 | 8 | THE COURT:  Okay.  All right.  Let's ask the Court |
| 11:35:58 | 9 | Security Officer to bring in Panel Member No. 1, Mr. Jones. |
| 11:36:16 | 10 | (Juror brought into jury room.) |
| 11:36:57 | 11 | THE COURT:  Come in, Mr. Jones. |
| 11:36:59 | 12 | JUROR JONES:  Yes, sir. |
| 11:37:00 | 13 | THE COURT:  If you wouldn't mind, have a seat |
| 11:37:02 | 14 | right there, sir. |
| 11:37:02 | 15 | JUROR JONES:  Yes, sir. |
| 11:37:02 | 16 | THE COURT:  Thank you. |
| 11:37:04 | 17 | Mr. Jones, I have in my notes that when asked |
| 11:37:08 | 18 | about the position of a party that owned a patent but |
| 11:37:11 | 19 | didn't manufacture a product, you said that a |
| 11:37:15 | 20 | non-manufacturing patent owner would be at a disadvantage |
| 11:37:18 | 21 | in your mind.  I think you said, if I wrote this down |
| 11:37:23 | 22 | properly, they just owned a piece of paper. |
| 11:37:25 | 23 | Now, I also heard you say that you'd listen to the |
| 11:37:28 | 24 | evidence from both sides of the case before you made up |
| 11:37:30 | 25 | your mind on any issues.  But I guess my question to you |

11:37:35  1  is, clearly, the Plaintiff here owns a patent or they

11:37:39  2  wouldn't have the right to bring this lawsuit.  But they --

11:37:42  3  by their own admission don't make a product.

11:37:45  4       JUROR JONES:  Right.

11:37:46  5       THE COURT:  Are you going to be able to treat the

11:37:48  6  Plaintiff just as fairly as you treat the Defendant, and

11:37:51  7  will they both start out in an equal position so that you

11:37:54  8  won't treat either of them differently until you start

11:37:59  9  hearing the evidence, and as you said clearly and

11:38:02 10  rightfully so, and you won't make any final decisions until

11:38:06 11  you hear all the evidence.

11:38:07 12       Or is there something about the fact that the

11:38:10 13  Plaintiff not making a product would cause you not to be

11:38:12 14  able to treat the Plaintiff and the Defendant just alike

11:38:16 15  and starting out even.

11:38:18 16       JUROR JONES:  No, sir, there's not.  It just, it

11:38:20 17  kind of fell with the question she had about the

11:38:23 18  landowners, where, you know, if someone come in and drilled

11:38:25 19  on your land, would you be upset?  Well, if you don't own

11:38:28 20  the mineral rights but you own the land, you can't say

11:38:32 21  nothing --

11:38:33 22       THE COURT:  Well, sometimes lawyers don't ask

11:38:35 23  great questions.  I was guilty of that many, many times.

11:38:38 24       JUROR JONES:  That was where I was.

11:38:40 25       THE COURT:  Okay.  So you could treat the

11:38:41   1   Plaintiff, PMC, and the Defendant, Apple, just the same

11:38:45   2   even though there's no question in anybody's mind that

11:38:48   3   Apple makes products, PMC doesn't make products?

11:38:51   4        JUROR JONES:  Yes.

11:38:53   5        THE COURT:  You could listen to the evidence and

11:38:55   6   make your decision based solely on the evidence from both

11:38:59   7   sides.

11:38:59   8        JUROR JONES:  Yes, sir.

11:39:00   9        THE COURT:  Okay.  Mr. Jones.

11:39:01   10        Any questions for Mr. Jones from Ms. DeRieux?

11:39:05   11        MS. DERIEUX:  Nothing further.  Thank you.

11:39:06   12        THE COURT:  Okay. I'm going to let you return to

11:39:10   13   your seat out there, Mr. Jones.  Just don't discuss

11:39:12   14   anything we've talked about in here.

11:39:14   15        JUROR JONES:  Yes, sir.

11:39:14   16        THE COURT:  Thank you very much.

11:39:16   17        JUROR JONES:  Thank you.

11:39:16   18        (Juror excused to return to the courtroom.)

11:39:16   19        THE COURT:  Let's bring in No. 2, Ms. Haley.

11:39:21   20        Mr. Jones is not excused.

11:39:45   21        (Juror brought into jury room.)

11:39:45   22        THE COURT:  Good morning, Ms. Haley.

11:39:50   23        JUROR HALEY:  Good morning.

11:39:51   24        THE COURT:  Would you come in and have a seat

11:39:52   25   right there?  Thank you.

11:39:53   1          Ms. Haley, I've been on the bench 10 years in

11:39:58   2   December.  I've never had a mother and a daughter on the

11:40:01   3   same jury panel.  And I heard your daughter, Ms. Gibbons,

11:40:09   4   talk about how much she respects you, as she should, and

11:40:12   5   how it would be hard for her to go a different direction if

11:40:15   6   you and she were on the same jury and you felt one way and

11:40:19   7   she might otherwise not feel that way but she'd be

11:40:23   8   influenced by the position you took.

11:40:24   9          I guess I need to get -- hear from you on the

11:40:26  10   reverse of that.  If you and she were on the jury, would

11:40:29  11   whatever position she took influence you or would you be

11:40:33  12   able to --

11:40:35  13          JUROR HALEY:  I have my own --

11:40:36  14          THE COURT:  -- make your own independent decision?

11:40:38  15          JUROR HALEY:  I have a mind of my own.

11:40:38  16          THE COURT:  I'm not suggesting --

11:40:40  17          JUROR HALEY:  I love my daughter, and she's really

11:40:44  18   intuitive on people, you know.  She reads them probably

11:40:47  19   better than I do.  But I still -- I have a mind of my own.

11:40:52  20          THE COURT:  And there's no guarantee that you and

11:40:54  21   she will both end up on this jury.

11:40:56  22          JUROR HALEY:  Yeah, I know.

11:40:57  23          THE COURT:  But if you did, you could handle

11:41:01  24   yourself just like the other seven people were seven

11:41:05  25   strangers and her being your daughter wouldn't change how

| | | |
|---|---|---|
| 11:41:08 | 1 | you would react to her or be influenced by her; is that |
| 11:41:10 | 2 | right? |
| 11:41:10 | 3 | JUROR HALEY:  No, I couldn't be influenced to |
| 11:41:13 | 4 | change what I think. |
| 11:41:13 | 5 | THE COURT:  Okay. Ms. Smith, do you have any |
| 11:41:15 | 6 | questions for Ms. Haley? |
| 11:41:16 | 7 | MS. SMITH:  No, Your Honor. |
| 11:41:17 | 8 | THE COURT:  Okay.  Ms. Haley, I'm going to let you |
| 11:41:21 | 9 | return to the jury -- to the courtroom.  Just don't discuss |
| 11:41:23 | 10 | anything we talked about in here. |
| 11:41:25 | 11 | JUROR HALEY:  Okay. |
| 11:41:25 | 12 | THE COURT:  Thank you very much. |
| 11:41:28 | 13 | (Juror excused to return to the courtroom.) |
| 11:41:29 | 14 | THE COURT:  All right.  Ms. Haley is not excused. |
| 11:41:32 | 15 | We've excused Mr. Parker, No. 5, by agreement. |
| 11:41:38 | 16 | That brings us to the other half of the equation, |
| 11:41:42 | 17 | No. 16, Ms. Gibbons. |
| 11:41:44 | 18 | Could we get Ms. Gibbons in, please? |
| 11:42:01 | 19 | (Juror brought into jury room.) |
| 11:42:01 | 20 | THE COURT:  Come in, Ms. Gibbons.  Do you mind |
| 11:43:46 | 21 | having a seat right there, please?  Thank you. |
| 11:43:50 | 22 | JUROR GIBBONS:  Do I need to take my mask down? |
| 11:43:53 | 23 | THE COURT:  Whatever you'd prefer -- |
| 11:43:55 | 24 | JUROR GIBBONS:  Okay. |
| 11:43:56 | 25 | THE COURT:  -- just so I can hear you. |

| | | |
|---|---|---|
| 11:43:57 | 1 | I heard your answers to the questions about if you |
| 11:44:01 | 2 | and your mother both ended up on the jury, and the way I |
| 11:44:07 | 3 | understood your answers were that if you both were on the |
| 11:44:09 | 4 | jury, whatever her position would be would influence you, |
| 11:44:15 | 5 | and it'd be hard for you to make the same kind of |
| 11:44:17 | 6 | independent decision as you would if she was not on the |
| 11:44:20 | 7 | jury. |
| 11:44:20 | 8 | Is that -- is that close, or if it's not, correct |
| 11:44:23 | 9 | it for me? |
| 11:44:24 | 10 | JUROR GIBBONS:  It is -- it close.  Okay.  A lot |
| 11:44:26 | 11 | of what my mom thinks is the same thing that I think. |
| 11:44:30 | 12 | So -- but I don't know if -- because if I firmly believe |
| 11:44:35 | 13 | that -- that she's wrong, then I'm going to stick with my |
| 11:44:38 | 14 | opinion. |
| 11:44:39 | 15 | THE COURT:  Okay. |
| 11:44:41 | 16 | JUROR GIBBONS:  Because I know she's smart, and I |
| 11:44:42 | 17 | love my other mother to death, but if I just firmly believe |
| 11:44:48 | 18 | that she's not right about it, then I don't think I could |
| 11:44:50 | 19 | go side with her. |
| 11:44:52 | 20 | THE COURT:  And if both of y'all end up on this |
| 11:44:54 | 21 | jury, it's my hope that the other six people are going to |
| 11:44:59 | 22 | be smart and nice people, too, that have good thoughts, as |
| 11:45:01 | 23 | well. |
| 11:45:01 | 24 | JUROR GIBBONS:  Yes, sir. |
| 11:45:02 | 25 | THE COURT:  But you're telling me if you feel like |

11:45:05   1   she's wrong, you're not going to --

11:45:06   2          JUROR GIBBONS:  I would not side with her.

11:45:08   3          THE COURT:  -- cave in for lack of a better

11:45:08   4   expression?

11:45:08   5          JUROR GIBBONS:  No, sir.

11:45:10   6          THE COURT:  Okay.  And let me ask you this, I also

11:45:13   7   have in my notes that you just don't like Apple products.

11:45:16   8          JUROR GIBBONS:  I don't.

11:45:17   9          THE COURT:  And that's very honest.

11:45:18  10          JUROR GIBBONS:  But I would not -- I wouldn't hold

11:45:20  11   it against them because there -- just because I don't like

11:45:22  12   their products.  A lot of people do.  Just because I don't

11:45:23  13   like it doesn't mean it's not --

11:45:23  14          THE COURT:  And you understand -- you understand

11:45:25  15   that the products in this case that are going to be -- the

11:45:27  16   products and the processes that are going to be accused of

11:45:33  17   infringing are going to be Apple products and processes.

11:45:35  18          JUROR GIBBONS:  Yes, sir.

11:45:36  19          THE COURT:  So knowing that you really don't like

11:45:38  20   their products, do you think you could treat them just the

11:45:41  21   same as if it were Samsung or some other company out there

11:45:48  22   besides Apple?

11:45:49  23          JUROR GIBBONS:  I will always have my opinion

11:45:52  24   about the product, but I would like to think that I would

11:45:54  25   not hold it -- I don't -- is it going -- I mean, okay, is

| | | |
|---|---|---|
| 11:46:00 | 1 | it going to be about the products, or is this just about |
| 11:46:04 | 2 | patents of -- because if they say, okay, well, do you like |
| 11:46:08 | 3 | the -- what's your opinion of a galaxy -- whatever the new |
| 11:46:15 | 4 | Galaxy is, and the Apple, whatever the new Apple phone is, |
| 11:46:18 | 5 | I would probably side with the Galaxy because I just don't |
| 11:46:22 | 6 | like -- |
| 11:46:23 | 7 | THE COURT:  And I don't think you're going to be |
| 11:46:24 | 8 | asked to do that. |
| 11:46:25 | 9 | I think what you're going to be asked to do is |
| 11:46:27 | 10 | look at the accused Apple products and then look at this |
| 11:46:31 | 11 | patent that's owned by PMC -- |
| 11:46:34 | 12 | JUROR GIBBONS:  Yes, sir. |
| 11:46:34 | 13 | THE COURT:  -- and say -- and answer the question, |
| 11:46:39 | 14 | does what these products do meet all of the requirements |
| 11:46:42 | 15 | and line up perfectly and fit with what the claims in the |
| 11:46:48 | 16 | PMC patent -- the PMC patent say that PMC owns and has the |
| 11:46:53 | 17 | right to control.  And they're either going to line up, or |
| 11:46:56 | 18 | they're not going to line up. |
| 11:46:57 | 19 | JUROR GIBBONS:  Yes, sir. |
| 11:46:58 | 20 | THE COURT:  So you're going to be looking at the |
| 11:47:00 | 21 | language in the patent, comparing it to the products that |
| 11:47:03 | 22 | Apple owns, but you're not going to be looking at Samsung |
| 11:47:07 | 23 | phones or HTC phones or ZTE phones or Ericsson phones or |
| 11:47:16 | 24 | anybody -- anybody else's phones. |
| 11:47:18 | 25 | JUROR GIBBONS:  I would like to -- yeah, I think I |

11:47:20  1  can -- I could give them a fair trial.

11:47:24  2          THE COURT:  Okay.

11:47:24  3          JUROR GIBBONS:  But I will be honest, I do have

11:47:27  4  very bad dyslexia, so, like, I don't understand stuff.  If

11:47:32  5  I read it, I would have to, like, read it over several

11:47:35  6  times before I understood it.  And most of the time, I

11:47:39  7  don't even understand it then.  I have to have it read to

11:47:42  8  me in order for me to understand.

11:47:44  9          THE COURT:  Okay.  Well, if you're on this jury,

11:47:49  10  you're going to be given a notebook, and in that notebook,

11:47:52  11  you're going to have a complete copy of this patent, and

11:47:55  12  you're going to have a pad that you can make notes on

11:47:58  13  throughout the trial as you listen to the evidence.  You're

11:48:01  14  also going to have some other material in there.

11:48:03  15          And then when the trial -- when the evidence is

11:48:07  16  all in and I send the jury back here to deliberate, you're

11:48:12  17  going to have a written verdict with questions in it that

11:48:15  18  everybody will be able to read those questions, and then

11:48:17  19  the group is going to have to answer those questions.

11:48:20  20          You're also going to be given instructions by me

11:48:24  21  on how you do your job and the rules that you apply.  And

11:48:29  22  those instructions are going to be given by me to the jury

11:48:32  23  orally in the courtroom, and then an exact written copy of

11:48:37  24  those instructions are going to be sent back to the jury

11:48:40  25  room so that everybody on the jury has their own copy of

11:48:43  1  those instructions and can look at them as much as they

11:48:45  2  need to.

11:48:46  3          Now, from where you sit now, if all that were to

11:48:50  4  happen, do you think you can be a part of a jury and make

11:48:53  5  an informed decision if you sat through this trial on the

11:48:56  6  jury, or do you think there's something that you know about

11:49:00  7  yourself that would keep you from being able to do that?

11:49:03  8          JUROR GIBBONS:  If I can understand everything,

11:49:06  9  reading it, yeah, I think I would be able to give them a

11:49:10  10  fair trial.

11:49:11  11         THE COURT:  Okay.  Ms. Smith, do you have any

11:49:16  12  questions for Ms. Gibbons?

11:49:18  13         MS. SMITH:  Ms. Gibbons, you've not heard of PMC

11:49:24  14  before you came into the courtroom?

11:49:25  15         JUROR GIBBONS:  No.

11:49:26  16         MS. SMITH:  So they're start out with a blank

11:49:29  17  slate, right?

11:49:32  18         JUROR GIBBONS:  (Nods head affirmatively.)

11:49:34  19         THE COURT:  And on the Apple side, you said

11:49:34  20  something when you were listening with Judge Gilstrap, you

11:49:36  21  said you'd always hold that view, those negative views of

11:49:39  22  their products, right?

11:49:40  23         JUROR GIBBONS:  Just that I don't like the way

11:49:42  24  they operate.

11:49:45  25         MS. SMITH:  Okay, and this case, I'll tell you, is

11:49:46  1  about the products, iPads, iPods, iPhones, all five days.

11:49:51  2  And we're going to say that Apple's innovative and that

11:49:55  3  Apple does things better than others, and I sense that when

11:49:58  4  I'm saying these things in court, you might have a

11:50:02  5  different opinion and you're -- you do, don't you?

11:50:06  6       JUROR GIBBONS:  (Nods head affirmatively.)

11:50:07  7       THE COURT:  And there's nothing I can do -- I

11:50:09  8  mean, you've had -- you've had not experience with one

11:50:11  9  Apple product but you've had a bad experience with multiple

11:50:15 10  products.

11:50:15 11       JUROR GIBBONS:  My kids -- my son likes it.  My

11:50:18 12  daughter wants one, but --

11:50:20 13       MS. SMITH:  But you won't get her one, will you?

11:50:23 14       JUROR GIBBONS:  Oh well, they have to buy their

11:50:24 15  own.  If they -- we provide them with a phone, but if you

11:50:26 16  want a better phone, then you provide your own.

11:50:29 17       MS. SMITH:  That's fair.  That's fair.  But what

11:50:30 18  my point being, you know, like you said, that you start out

11:50:33 19  with those views of the products, and no one can tell you

11:50:36 20  to forget about those views.  So Apple, you know, starts

11:50:39 21  out in a little different place than PMC, who starts at the

11:50:43 22  start line, because you've never heard of them before; is

11:50:46 23  that right?

11:50:46 24       JUROR GIBBONS:  I would -- I just don't like the

11:50:48 25  way they operate in how you -- it's not the actual, I

11:50:52  1  guess, product -- well, it is the product because that's

11:50:54  2  the -- how the product operates, but...

11:50:58  3          MS. SMITH:  Yeah, okay, thank you, ma'am.  I

11:51:00  4  appreciate that.

11:51:01  5          THE COURT:  Ms. DeRieux, do you have any questions

11:51:02  6  for Ms. Gibbons?

11:51:03  7          MS. DERIEUX:  If the judge gave you instructions

11:51:07  8  to limit your decision to what you heard in the courtroom,

11:51:12  9  would you be able to follow those instructions and not

11:51:18  10  bring in personal past thoughts or experiences, but limit

11:51:24  11  your focus during this trial to what you actually hear from

11:51:28  12  the witnesses and from the Court in terms of the decision

11:51:32  13  that you come to when you finally go to the jury room.

11:51:36  14          JUROR GIBBONS:  Yes, ma'am, I think I can.

11:51:38  15          MS. DERIEUX:  Thank you.  That's all, Your Honor.

11:51:40  16          THE COURT:  All right.  Ms. Gibbons, I'm going to

11:51:41  17  let you return to your place out in the courtroom.  Just

11:51:45  18  don't discuss anything we talked about in here.

11:51:47  19          JUROR GIBBONS:  Yes, sir.

11:51:48  20          THE COURT:  Thank you very much.

11:51:49  21          JUROR GIBBONS:  Thank you.

11:51:52  22          (Juror excused to return to the courtroom.)

11:51:52  23          THE COURT:  All right.  Let's get Mr. Groce,

11:52:05  24  No. 18, and bring him in, please.

11:52:08  25          I'm going to excuse Ms. Gibbons.

11:52:13  1          MS. SMITH:  Thank you, Your Honor.

11:52:13  2          THE COURT:  Well, it's not for anybody's thanks.

11:52:17  3   It's for two reasons.  I have some concerns given the

11:52:22  4   strength of her convictions that are negative to Apple that

11:52:26  5   she really could leave those experiences outside.  And

11:52:32  6   she's indicated some real concern about being able to

11:52:36  7   follow the evidence given her dyslexia, and this is going

11:52:40  8   to be by any standard a complicated trial.  And we have

11:52:45  9   plenty of people on the panel to get a jury from.

11:52:48  10          So she is -- she is in a position where I think

11:52:51  11   the safe thing to do is to excuse her, and she is excused.

11:53:00  12          (Juror brought into jury room.)

11:53:01  13          THE COURT:  Mr. Groce would you have a seat,

11:53:07  14   please, sir.

11:53:07  15          JUROR GROCE:  Yes, sir.

11:53:08  16          THE COURT:  Mr. Groce, my notes from what's

11:53:10  17   happened so far today, I have written down that you don't

11:53:12  18   like Apple products.  I think somebody tried to get you to

11:53:15  19   say you shouldn't be on this jury, and you never did say, I

11:53:19  20   shouldn't be on this jury.

11:53:20  21          But you did say clearly, you have some level of

11:53:24  22   dislike for Apple products.  And this trial is going to be

11:53:27  23   about certain Apple products.

11:53:30  24          JUROR GROCE:  Right.

11:53:30  25          THE COURT:  And the question I have for you, sir,

11:53:33  1   is whatever those experiences were --

11:53:35  2        JUROR GROCE:  Uh-huh.

11:53:35  3        THE COURT:  -- in the past before today, can you

11:53:40  4   completely set those aside and leave them outside the

11:53:44  5   courtroom and make any decisions you're going to make,

11:53:47  6   they're going to be very important decisions --

11:53:49  7        JUROR GROCE:  Uh-huh.

11:53:50  8        THE COURT:  -- without being influenced by those

11:53:52  9   at all and just decide whatever you're asked to decide

11:53:56  10  solely and only on what you hear and what you're shown in

11:54:00  11  the courtroom?

11:54:00  12       Or are you human enough, like some of us, to say,

11:54:04  13  I would try real hard, but I can't promise you I'd able to

11:54:08  14  not be influenced in some way?  I don't know how strong

11:54:11  15  those experiences have been with you.

11:54:14  16       JUROR GROCE:  Right.

11:54:14  17       THE COURT:  There are some that are not terribly

11:54:17  18  strong experiences, a lot easier to leave outside, and some

11:54:20  19  that are very strong experiences that are very hard to

11:54:23  20  leave outside.  So I just have to ask you in all candor to

11:54:27  21  explain to me where you fall on that.

11:54:29  22       JUROR GROCE:  Right.  Well, my experience is,

11:54:31  23  again, I have a very -- I'm not very good in technology,

11:54:35  24  and I don't have a lot of patience with it.  I've not had

11:54:42  25  good experience with Apple.  I like Android a lot better.

11:54:44  1   But that's beside the point.  It just seems simpler to

11:54:52  2   operate and use and all of that. You know, I'm human so I

11:54:54  3   just have to make the best decision that I could, you know.

11:54:56  4        THE COURT:  Well, do you think, in all honesty,

11:54:59  5   that if you were in that position and making a decision and

11:55:03  6   that decision involved Apple products, could you be as

11:55:11  7   neutral about that and not influenced by your prior

11:55:13  8   experiences as if this was trying to choose between a Ford

11:55:16  9   and a Chevy or something, you know, in a different area

11:55:20  10  altogether where you didn't have -- maybe you like Fords

11:55:23  11  better than Chevys, I don't know.

11:55:26  12        But in an area where you didn't have any prior bad

11:55:28  13  experiences or pre-existing feelings about the products.

11:55:32  14  If it was two products you'd not really ever seen or heard

11:55:36  15  before, could you treat Apple in this case like that?  Or

11:55:39  16  are those experiences such that you just can't tell me you

11:55:44  17  could be sure that they wouldn't impact your decision?

11:55:47  18  That's really the bottom line.

11:55:48  19        JUROR GROCE:  Yeah.  Well, like I say, I would

11:55:51  20  try.  But, I mean, I just -- I really couldn't be sure, I

11:55:54  21  guess.

11:55:54  22        THE COURT:  Okay.  Well, all I can ask for is your

11:55:58  23  most candid and honest answer.

11:56:00  24        JUROR GROCE:  Right.

11:56:00  25        THE COURT:  And I appreciate that.

11:56:01  1              JUROR GROCE:  Yes, sir.

11:56:02  2              THE COURT:  Ms. Smith, do you have any questions

11:56:03  3  for Mr. Groce?

11:56:05  4              MS. SMITH:  No, Your Honor.

11:56:06  5              THE COURT:  Ms. DeRieux?

11:56:08  6              MS. DERIEUX:  Nothing.  Thank you.

11:56:09  7              THE COURT:  All right.  Sir.  All right.  If

11:56:13  8  you'll go back and take your seat in the courtroom.  Just

11:56:17  9  don't discuss what we've talked about in here.

11:56:22  10             JUROR GROCE:  Yes, sir.

11:56:23  11             THE COURT:  Thank you very much.

11:56:24  12             (Juror excused to return to the courtroom.)

11:56:25  13             THE COURT:  I'm going to excuse Mr. Groce.

11:56:28  14             MS. SMITH:  Thank you, Your Honor.

11:56:28  15             THE COURT:  I appreciate his candor in saying he

11:56:35  16  would try.  But he could never tell me with any certainty

11:56:38  17  that he could be sure his negative prior experiences

11:56:41  18  wouldn't influence his service.

11:56:42  19             All right.  I have struck by agreement No. 5,

11:56:47  20  Mr. Parker.  And I've struck No. 16 and 18.  We're going to

11:56:53  21  seat eight jurors.  Each side is going to get four strikes.

11:56:57  22  That means 16 plus three -- is it 21 we strike through?

11:57:04  23             MS. DERIEUX:  I said 19.

11:57:06  24             MS. SMITH:  I thought 19.

11:57:08  25             THE COURT:  19.  I'm not sure that's right.  Let's

11:57:25   1   talk about it and make sure so we all leave here of one

11:57:29   2   mind.

11:57:29   3           Okay.  No. 5 is out.  No. 16 and No. 18 are out.

11:57:38   4   So that's three strikes on the first two pages.  That

11:57:44   5   leaves us 15 active people.  Then we need 19, 20, and 21 to

11:57:50   6   get back to -- no.  No, we don't need three more.  We just

11:57:57   7   need one more to get to 16.  So it is 19.  Okay.

11:58:03   8           All right.  Then strike through No. 19.

11:58:09   9           How much time do you all need to strike your list?

11:58:14   10           MS. SMITH:  May we have 15 minutes?

11:58:17   11           THE COURT:  I'll give you --

11:58:18   12           MS. DERIEUX:  May --

11:58:18   13           THE COURT:  Yes, ma'am.

11:58:19   14           MS. DERIEUX:  May we make just -- we need to go

11:58:20   15   off topic for just a minute.

11:58:22   16           MR. KLINE:  There is no challenge to the validity

11:58:25   17   of the patent in this case, Your Honor.

11:58:27   18           THE COURT:  Okay.

11:58:27   19           MR. KLINE:  So there's no issue upon which there's

11:58:30   20   a clear and convincing burden of proof.

11:58:32   21           THE COURT:  Okay.

11:58:33   22           MR. KLINE:  So if it's the appropriate time, if we

11:58:35   23   could just maybe let the jury that gets sat know that.  I

11:58:40   24   don't know, maybe we don't think that it will linger but --

11:58:42   25           THE COURT:  That's what happens when the

| 11:58:44 | 1 | magistrate judge does the pre-trial. |

11:58:44  1  magistrate judge does the pre-trial.

11:58:47  2         MR. KLINE:  I certainly wasn't going to stand up,

11:58:50  3  Your Honor.  I thought we could straighten it out.

11:58:53  4         THE COURT:  I'll address that.

11:58:54  5         MR. KLINE:  Thank you very much.

11:58:56  6         THE COURT:  Okay.

11:58:56  7         MS. SMITH:  Your Honor, may one team use this room

11:58:59  8  and another team use the attorney conference room?

11:59:02  9         THE COURT:  Attorney client's room, that's fine.

11:59:03  10        And if you'll see Ms. Brunson when you have your

11:59:06  11  list, and turn them in to her, we'll get our eight jurors

11:59:08  12  identified.

11:59:08  13        MS. SMITH:  Thank you.

11:59:09  14        THE COURT:  I'll give you about 15 minutes.

11:59:12  15        MS. DERIEUX:  Thank you, Your Honor.

11:59:12  16        MS. SMITH:  Thank you.

11:59:12  17        THE COURT:  Let's do this, let's go back in the

11:59:14  18  courtroom, and I'll explain to the panel what's going on,

11:59:18  19  and then you can break.

11:59:18  20        (Recess.)

11:59:18  21  (Proceedings in the courtroom, venire panel.

11:59:28  22  Present.)

11:59:28  23        THE COURT:  Thank you for your patience, ladies

12:01:12  24  and gentlemen.

12:01:12  25        I'm going to afford the lawyers on both sides of

12:01:19  1   the case approximately 15 minutes to generate some

12:01:23  2   information and turn it into the courtroom deputy that

12:01:26  3   we'll need as a part of selecting the jury.

12:01:29  4           While they're out of the courtroom, I'm going to

12:01:31  5   step off of the bench.  You all should stay where you're

12:01:34  6   seated.  Again, the Court Security Officers will check with

12:01:37  7   you about restroom breaks while I'm out of the courtroom.

12:01:40  8           It's just a minute or two after 12:00 noon.  I

12:01:46  9   always get nervous about people not being able to go to

12:01:50 10   lunch at 12:00.  I know some people have physical

12:01:54 11   conditions that they need to have something in their

12:01:57 12   system.

12:01:58 13           So while I'm out of the courtroom for the next 15

12:02:00 14   or 20 minutes, the clerk's office will be in here with

12:02:04 15   bottled water.  And I think there are peanut butter

12:02:07 16   crackers, there's something to munch on, and those will

12:02:11 17   be -- those will be available if you want those.  If you

12:02:12 18   do, just signal that you do, and they'll bring them to you.

12:02:16 19           Not many of you out there know me very well, but I

12:02:18 20   can promise you, the fact that I would let somebody bring

12:02:22 21   crackers and water into my courtroom tells you that this is

12:02:24 22   taking longer than I would like it to take.  But it's just

12:02:27 23   part of what we have to do to be as safe as we can in this

12:02:31 24   current environment.

12:02:31 25           So while I'm off the bench, the clerk's office

12:02:36  1  will be in here with those items, and if you like some, let

12:02:40  2  them know.  If you need a trip to the restroom, let one of

12:02:42  3  the Court Security Officers or the Court's personnel know

12:02:45  4  and they'll try to work with you.

12:02:47  5          Again, if you want to talk to somebody next to

12:02:49  6  you, that's perfectly fine.  Just don't discuss anything

12:02:52  7  that's been talked about during the trial.

12:02:54  8          And also, while I have you here, I want to make

12:02:58  9  one correction, and this is my fault.

12:03:00  10          I said in some of my earlier instructions to you

12:03:05  11  that the Defendants say the patent in this case is invalid.

12:03:10  12  That's not the case.  They're not making that claim.

12:03:13  13          And if the Defendant were claiming the patent was

12:03:17  14  invalid, then the evidence of that would have to be judged

12:03:23  15  by that clear and convincing evidence standard instead of

12:03:30  16  the preponderance of the evidence standard.

12:03:31  17          So because the Defendant is not asserting the

12:03:33  18  invalidity of the Plaintiff's patent, then there's not

12:03:37  19  going to be any application of the clear and convincing

12:03:39  20  evidence standard.

12:03:40  21          And, quite honestly, I missed that, and I should

12:03:45  22  have been more careful about those instructions.  So the

12:03:47  23  only burden of proof the jury selected in this case is

12:03:50  24  going to apply is the preponderance of the evidence

12:03:52  25  standard.

| | | |
|---|---|---|
| 12:03:53 | 1 | So I want to get that on the record as soon as I |
| 12:03:56 | 2 | realized my mistake and make sure you are all clear on |
| 12:04:00 | 3 | that. |
| 12:04:01 | 4 | So with that, ladies and gentlemen, I'm going to |
| 12:04:02 | 5 | afford the lawyers a chance to strike their list and get me |
| 12:04:06 | 6 | that information as we've discussed outside the jury's |
| 12:04:09 | 7 | presence for the next 15 minutes or so, and in the |
| 12:04:13 | 8 | meantime, the Court will stand in recess. |
| 12:04:15 | 9 | COURT SECURITY OFFICER:  All rise. |
| 12:04:20 | 10 | (Venire panel out.) |
| 12:33:06 | 11 | (Recess.) |
| 12:33:07 | 12 | COURT SECURITY OFFICER:  All rise. |
| 12:33:08 | 13 | THE COURT:  Be seated, please. |
| 12:33:09 | 14 | All right.  Ladies and gentlemen, if you will |
| 12:33:26 | 15 | listen carefully as your name is called and come forward |
| 12:33:29 | 16 | and take your seat -- or your position, rather, in the jury |
| 12:33:34 | 17 | box.  I'm going to ask all eight members of the jury to be |
| 12:33:37 | 18 | remain standing until all eight of you are in the jury box. |
| 12:33:43 | 19 | And I'm going to ask the first person called, if they would |
| 12:33:45 | 20 | go down the front row of the jury box and stand in front of |
| 12:33:50 | 21 | the last chair. |
| 12:33:50 | 22 | And then the second person will go down the |
| 12:33:52 | 23 | jury -- the front row of the jury box and stand in front of |
| 12:33:57 | 24 | the third chair from the end, leave an empty seat between. |
| 12:34:02 | 25 | And we'll put the first four jurors on the front row in |

12:34:02  1  that fashion.

12:34:05  2          And then, Juror No. 5, when your name is called,

12:34:07  3  if you'll go to the back row, go all the way to the end and

12:34:11  4  stand in front of the last chair, and then the next juror,

12:34:15  5  No. 6, will leave an empty chair between you and stand in

12:34:19  6  front of the third chair from the end and so forth and so

12:34:22  7  on.

12:34:22  8          That will position everybody on the jury such that

12:34:25  9  no two people are seated directly next to each other and

12:34:30  10  leave an empty chair between all eight of you.  And if you

12:34:33  11  would maintain that position in the jury box throughout the

12:34:37  12  trial during breaks and recesses when you come in, if

12:34:42  13  you'll go in that same order and be in that same position,

12:34:44  14  the Court will appreciate it.

12:34:46  15          So with that, Ms. Brunson, if you'll call the

12:34:51  16  members, the names of the eight members of our jury,

12:34:53  17  please.

12:34:53  18          COURTROOM DEPUTY:  James Cox, Arthur Overstreet,

12:35:00  19  Jerry Quarles, Angelique Smith, Jeanette Turner, Flemon

12:35:16  20  Rand, Mr. Rand, yes, sir.  Janie Washington and Carolyn

12:35:49  21  Moore.

12:35:52  22          THE COURT:  Thank you, ladies and gentlemen.  If

12:35:53  23  there's something in your seat, please pick it up.  But

12:35:56  24  otherwise, please have a seat.

12:36:01  25          Those of you on the panel that were not selected

12:36:04  1   to serve on this jury, I'm about to excuse you, but I want
12:36:06  2   to excuse you with a few final words before you leave us.
12:36:10  3            First of all, I want to thank you on behalf of the
12:36:15  4   Court, both the parties, all the lawyers.  Every one of us
12:36:18  5   on this side of the bar realizes that our system of justice
12:36:23  6   would not work and would come to a screeching halt unless
12:36:28  7   ordinary citizens like yourselves responded as you have and
12:36:32  8   when you're summonsed to appear for jury service that you
12:36:36  9   come, you present yourself.
12:36:37  10           I am very much aware that every one of you out
12:36:40  11  there who were not selected had other places to be this
12:36:44  12  morning, you had other things to do that were important in
12:36:47  13  your lives, and you set those things aside, and you
12:36:50  14  sacrificed in a very real way to be here and present
12:36:54  15  yourself for jury duty.
12:36:55  16           And I want you to know that all of us appreciate
12:36:58  17  that.  We understand that you are an integral and
12:37:03  18  indispensable part of the process.  And if you were not
12:37:07  19  where you are, if you had not appeared and presented
12:37:10  20  yourself and made the sacrifices necessary to do that, the
12:37:13  21  Court would not be able to go forward with this trial --
12:37:16  22  this important trial between these parties and reach an
12:37:19  23  ultimate resolution.
12:37:21  24           I hope that the next time you're served with a
12:37:26  25  summons, and I don't know when that will be, and I hope the

12:37:30  1   next time you are summonsed to come back to this court

12:37:34  2   since you all live in the Marshall Division of the Eastern

12:37:36  3   District of Texas that you'll come with the same positive

12:37:38  4   attitude and productive and cooperative spirit that I've

12:37:41  5   seen from all of you this morning.

12:37:43  6          Ladies and gentlemen, thank you so much.  You have

12:37:45  7   rendered very real and important public service.  And on

12:37:49  8   behalf of all of us, we thank you genuinely and sincerely.

12:37:53  9          As you leave the courtroom, if you will see the

12:37:55  10  clerk's office as you exit to the right, going out the

12:38:00  11  double doors in the back of the courtroom.  They're going

12:38:03  12  to want to retrieve these very expensive plastic numbers

12:38:07  13  you've been wearing on your clothing.  So don't take those

12:38:10  14  home as a souvenir.

12:38:12  15         Also if you need something in writing to verify

12:38:15  16  for an employer why you didn't show up for work today, they

12:38:19  17  will provide you with any and all documentation that you

12:38:22  18  need.  If you have any questions about your participation

12:38:25  19  as members of this venire panel, please see Ms. Clendening

12:38:25  20  and her staff in the clerk's office, and I promise you,

12:38:28  21  they will bend over backwards to help you and accommodate

12:38:31  22  you.

12:38:32  23         Again, ladies and gentlemen, those of you not

12:38:34  24  chosen for service on this jury, you leave with the thanks

12:38:39  25  and sincere appreciation of the Court and everyone involved

12:38:42  1  in this trial.  Those of you not selected are excused at

12:38:43  2  this time.

12:38:46  3          COURT SECURITY OFFICER:  All rise.

12:39:45  4          (Venire panel out.)

12:39:45  5          THE COURT:  All right.  I'll ask everybody except

12:39:47  6  the jury and the courtroom deputy to have a seat.  And I'll

12:39:50  7  ask our courtroom deputy to administer the oath to the

12:39:54  8  members of the jury at this time.

12:39:55  9          (Jurors sworn.)

12:40:11  10         THE COURT:  Thank you, ladies and gentlemen.

12:40:12  11  Please have a seat.

12:40:12  12         We're going to recess for lunch in just a minute,

12:40:15  13  but before we do, I have some instructions I need to go

12:40:19  14  over with you.

12:40:20  15         First of all, while you're on lunch break today,

12:40:25  16  please make sure that you communicate to Ms. Clendening's

12:40:29  17  office a good working cell phone number for you.  It is

12:40:33  18  possible something could arise over the course of the trial

12:40:35  19  where we would need to get in touch with you while you were

12:40:38  20  at home or before you arrived, and I want to make sure she

12:40:41  21  has a good working cell phone number for you.  So just as a

12:40:44  22  precaution, if you'll make sure that's communicated to the

12:40:47  23  clerk's office while you're on a lunch break.

12:40:49  24         Also, you have either in your chairs or next to

12:40:54  25  your chairs packets with the clear mask and the clear face

```
12:40:59   1  shields in them.  If you'll take those with you to the jury
12:41:01   2  room, and over the lunch hour figure out which of those --
12:41:04   3  or if not both, you'd like to use to replace these blocking
12:41:10   4  solid material masks that keep us all from seeing a
12:41:13   5  majority of your faces.
12:41:15   6       I will tell you this from personal experience,
12:41:17   7  there's a film over the plastic part, so unless you want
12:41:21   8  everything to look wrinkled, if you look through the film,
12:41:24   9  be sure to take the film off.  Because I forgot to do it
12:41:28  10  the first time I put one of those on, it was not a clear
12:41:31  11  view.
12:41:32  12       If you'll take the film off, once you get into
12:41:36  13  those packets, and you can do that over the lunch hour,
12:41:36  14  you'll see very clearly through either or both of those.
12:41:36  15  Of course, with the mask you won't be looking through them,
12:41:40  16  but you will with the face shield.
12:41:42  17       Also, ladies and gentlemen, and this is -- all my
12:41:46  18  instructions are important, but none of them are more
12:41:49  19  important than this one.  Do not discuss this case with
12:41:51  20  anyone.  And when I say "do not discuss it," I mean, don't
12:41:56  21  communicate about this case with anyone.  This goes back to
12:42:00  22  one of the fundamental premises of the jury trial system,
12:42:03  23  and that is, when all the evidence has been presented in
12:42:06  24  this case, you, the jury, are going to be asked to answer
12:42:09  25  certain questions that are going to be given to you in
```

12:42:13  1   what's called the verdict form.

12:42:14  2            And when you answer those questions, it must be

12:42:18  3   the case that the sole and only information you have to

12:42:22  4   draw upon in answering those questions is the information

12:42:26  5   that's come to you as a part of this trial in this

12:42:31  6   courtroom through the sworn testimony of the witnesses,

12:42:34  7   subject to cross-examination, and through the exhibits that

12:42:37  8   the Court has admitted into evidence.  Those must be the

12:42:42  9   only sources of information that you have to rely upon.

12:42:46  10           Therefore, it is essential that you not

12:42:49  11  communicate with anyone about the case, because if you do,

12:42:54  12  then it's almost unavoidable that other information will be

12:42:58  13  a part of what you have before you, and that, quite

12:43:01  14  honestly, jeopardizes and could put at serious risk the

12:43:07  15  entire process.

12:43:07  16           And there's been a tremendous amount of work and

12:43:11  17  effort and resources that have gone into this trial so far.

12:43:14  18  The last thing I want to do is to have to order a mistrial

12:43:17  19  and start over with a new jury.  And so, please, do not

12:43:20  20  discuss the case with anyone.

12:43:22  21           And I can tell you, ladies and gentlemen, unless

12:43:24  22  you live alone, when you get home tonight, wherever that

12:43:28  23  is, whoever is there, the first question out of their mouth

12:43:31  24  is going to be, well, tell me what happened in federal

12:43:34  25  court in Marshall today.  When you get that question, don't

12:43:38  1   even try to answer it.

12:43:39  2         Just smile and say, that very stern federal judge

12:43:43  3   told me not to talk about this case, and I can't do that.

12:43:47  4   After this trial is over, after I'm no longer a juror and

12:43:52  5   I've been released by the judge, then I can talk to you.

12:43:57  6   But until that happens, I'm under strict orders from the

12:44:00  7   Court not to discuss the case at all.  So let that be your

12:44:04  8   answer.  Don't even try to answer that inevitable question

12:44:07  9   about tell me what happened in federal court today.

12:44:09  10        Also, ladies and gentlemen, when I say "don't

12:44:11  11  communicate about the case," I also mean not to communicate

12:44:15  12  among the eight of yourselves.  You have not heard any

12:44:18  13  evidence in this case.

12:44:20  14        And until you have heard all the evidence and

12:44:23  15  until I instruct you to retire to the jury room after

12:44:26  16  you've received my final instructions on the law and you've

12:44:30  17  heard closing arguments from the attorneys, then and only

12:44:34  18  then when I instruct you to retire to the jury room and to

12:44:36  19  deliberate on those questions in the verdict form, then may

12:44:41  20  you discuss the case among yourselves.  But until then, you

12:44:44  21  must not discuss the case among the eight of yourselves.

12:44:47  22        It's almost in my mind, ladies and gentlemen, like

12:44:51  23  a light switch.  It's off until you've heard all of the

12:44:54  24  evidence, you've received my instructions on the law, and

12:44:58  25  counsel have presented their closing arguments.  And then

12:45:01  1   at the moment I tell you, ladies and gentlemen, you may

12:45:04  2   retire to the jury room and deliberate on your verdict, the

12:45:07  3   light switch gets switched on.

12:45:09  4            And at that moment, it is no longer that you can't

12:45:13  5   discuss the case among yourselves.  At that moment, it

12:45:16  6   becomes you must discuss the case among the eight of you in

12:45:20  7   an effort to reach a unanimous decision about each of the

12:45:23  8   questions in that verdict form.

12:45:25  9            So until that light switch is turned on, when all

12:45:29  10  the evidence is in, when my final instructions have been

12:45:34  11  given to you, when counsel have presented their closing

12:45:37  12  arguments, until that moment when I direct you to retire

12:45:40  13  and consider and deliberate on your verdict, you must not

12:45:44  14  discuss the case among the eight of yourselves in any way.

12:45:47  15           And when I say also "don't communicate about the

12:45:49  16  case," that's much more than oral communication.  Don't

12:45:54  17  email your cousin in West Virginia or your aunt in Arizona,

12:46:01  18  don't text message anybody, don't go on social media, if

12:46:05  19  you are a social media or social platform user, whether

12:46:10  20  it's Facebook or Instagram or Twitter or any of the others

12:46:14  21  out there, don't post or put up anything on any social

12:46:17  22  media site about this case.

12:46:20  23           And also, don't do any research about this case.

12:46:23  24  That's outside information, too.  Don't go online and look

12:46:28  25  up PMC, don't look up Apple, don't look up any of the

12:46:32   1   devices and products you're going to hear about in this

12:46:36   2   case, don't do any research about these lawyers.

12:46:38   3        In short, don't do any research at all, either

12:46:41   4   online or if you're old school and have a set of

12:46:45   5   encyclopedias, don't pull one off the shelf and do any

12:46:49   6   research.  No research whatsoever.

12:46:50   7        Again, it all circles back and it all comes back

12:46:54   8   to that fundamental concept that the sole and only

12:46:58   9   information that you should have to draw upon at the end of

12:47:02   10  this trial when you begin to deliberate on your verdict and

12:47:05   11  answer those questions must be limited to what was

12:47:11   12  presented in this courtroom through the sworn testimony of

12:47:14   13  the witnesses and through the exhibits the Court has

12:47:17   14  reviewed, considered, and admitted into evidence.  That's

12:47:20   15  it.

12:47:20   16       And if there is any other outside information

12:47:23   17  whatsoever, it jeopardizes the entire process.  So please

12:47:29   18  keep that in mind as we go throughout the trial.  As a

12:47:32   19  matter of fact, ladies and gentlemen, I have a habit that

12:47:36   20  every time you get up out of those chairs, whether it's to

12:47:38   21  go to lunch, whether it's to take a recess, whether it's to

12:47:41   22  go home for the evening, you're probably going to hear me

12:47:44   23  say, don't discuss the case with anyone.

12:47:47   24       You're going to be tired of hearing me remind you

12:47:49   25  about it until this trial is over.  But it's because it's

12:47:53   1   that critical and vital that I'm probably going to remind

12:47:58   2   you over and over again about it.

12:47:59   3          So, please, keep that instruction in the forefront

12:48:02   4   of your minds.

12:48:03   5          Also, ladies and gentlemen, I don't think this

12:48:09   6   will happen, but it's not outside the realm of possibility.

12:48:14   7   This is an important case.  This is important to both of

12:48:18   8   these parties.  There are no small insignificant cases that

12:48:23   9   get to trial before a jury in a United States District

12:48:26  10   Court.  Just doesn't happen.  They don't make it this far.

12:48:29  11          So it is possible that some outside third party

12:48:35  12   might attempt to contact you and influence you about your

12:48:39  13   decisions in this case.  I don't think that's likely.  But

12:48:42  14   it has happened in the past.

12:48:45  15          If at anywhere between now and the time I've

12:48:47  16   discharged you from jurors after I've accepted your

12:48:51  17   unanimous verdict, if at any time between now and then

12:48:54  18   anybody attempts to communicate with you in the way that

12:48:58  19   you feel uncomfortable with, you feel awkward, you feel

12:49:01  20   it's inappropriate in any way whatsoever, then you should

12:49:05  21   immediately inform Ms. Clendening, she will advise me, and

12:49:08  22   the Court will deal with it.

12:49:10  23          Again, I don't think it's likely, but it's within

12:49:12  24   the realm of possibility.  And so I need to put you on

12:49:16  25   notice about that.

12:49:17   1          Also, ladies and gentlemen, getting back to my

12:49:25   2   first instruction about having a defined and limited

12:49:28   3   universe of information from which to draw upon at the end

12:49:31   4   of this trial.

12:49:32   5          To help facilitate that, I've instructed these

12:49:36   6   lawyers and these parties and all their support staff that

12:49:40   7   if they are to pass you on the front steps or the walkway

12:49:43   8   or in the parking lot or in the hallway or anywhere,

12:49:47   9   they're not to speak to you.

12:49:49  10          So if somebody related to one of these two parties

12:49:54  11   walks right by you one morning, don't think they're being

12:49:57  12   rude.  Don't hold it against them.  Don't think they're

12:50:00  13   being unfriendly.  We are genuinely pretty friendly people

12:50:05  14   in East Texas.  And I know when somebody walks right by me

12:50:08  15   and doesn't -- pretends like I'm not there, it can

12:50:14  16   sometimes be offensive.

12:50:16  17          Understand in this case, that's what I've

12:50:18  18   instructed them to do.  They're not going to stop and say,

12:50:22  19   good morning.  How are you?  Did you have a good night?

12:50:25  20   That's a nice suit you're wearing or nice tie or nice dress

12:50:29  21   or whatever, that's not going to happen.

12:50:30  22          And when it doesn't happen, understand that's

12:50:34  23   because I've instructed them and everybody related to this

12:50:35  24   trial, on both sides, not to do.

12:50:37  25          Again, you're not to communicate with anybody in

12:50:39  1  any way that could possibly open the door to having any

12:50:45  2  information before you other than what comes out in the

12:50:48  3  evidence through this trial, the sworn testimony of the

12:50:50  4  witnesses, the admitted exhibits from the Court or the --

12:50:53  5  that the Court has admitted.

12:50:55  6       That's it.  So don't hold that against anybody.

12:50:59  7  This is not a huge courthouse.  There's certainly larger

12:51:04  8  ones.  And it's entirely possible that sometimes between

12:51:07  9  now and the time when we're finished, you'll pass one or

12:51:11  10 more of these people.

12:51:11  11      I suspect you're going to see that gallery almost

12:51:16  12 full of people once we start that trial, and 99 percent of

12:51:19  13 them are going to be associated with the Plaintiff or the

12:51:21  14 Defendant.  There are big support staffs that are involved

12:51:23  15 in a trial like this.

12:51:26  16      And there are going to be more than three people

12:51:29  17 on each side of the counsel table, as I told you earlier.

12:51:32  18 It takes a lot of people to try a case like this.  But

12:51:35  19 every one of them is not going to visit with you, they're

12:51:37  20 not going to talk to you, they're not going to engage in

12:51:40  21 friendly conversation.  And when that happens, just

12:51:42  22 remember, that's because I instructed them not to.  It's

12:51:45  23 not because they're being unfriendly.  And you're not to

12:51:48  24 hold that against them in any way.

12:51:49  25      Also, ladies and gentlemen, the lawyers during the

12:51:55   1   trial, you're probably going to see smartphones in their

12:51:59   2   hands.  You're probably going to see tablets in their

12:52:01   3   hands.  You're going to see laptop computers on these

12:52:05   4   tables.

12:52:06   5        There's a lot of electronics that goes into trying

12:52:08   6   a case like this, and they are all more or less the legal

12:52:13   7   pads and pencils of yesteryear brought forward.  They are

12:52:18   8   the modern tools which trial lawyers use to try cases and

12:52:21   9   they're entitled to use those, but they're not entitled to

12:52:22   10  disrupt this trial.

12:52:24   11       And everybody outside the jury box is on notice

12:52:26   12  from me that any devices brought into this courtroom have

12:52:30   13  to be silenced.  And if that's violated, I'll take direct

12:52:34   14  and appropriate action.

12:52:36   15       However, I'm going to ask each of you if you have

12:52:42   16  a smartphone, if you have a smartwatch, if you have any

12:52:48   17  smart device, I'm going to ask you, if you have it here

12:52:50   18  today, to leave it in the jury room and not bring it back

12:52:53   19  into the courtroom.  I'm going to ask you starting tomorrow

12:52:56   20  that you not bring it into the courthouse.

12:53:00   21       Either leave it at home, or if you need to over a

12:53:02   22  lunch break check an email on an important business matter

12:53:05   23  or something personal, go to your car over the lunch break

12:53:08   24  and check it there.  But don't bring it into the building.

12:53:10   25       Not only is it a possible disruption, it's also a

12:53:15  1  temptation to do research.  Because all those smart

12:53:19  2  devices, be it this small or this small or this small,

12:53:22  3  they're all small computers, they're all connected to the

12:53:27  4  Internet, and it's tempting to do just what I told you not

12:53:31  5  to, and that's research about anything involved in the

12:53:35  6  case.

12:53:35  7        You might hear a word you're not sure of.  If

12:53:37  8  you've got a smartphone, during recess, you might be

12:53:41  9  tempted to go online and see if you can get a better

12:53:44  10  definition of that word.  That's not proper.

12:53:47  11        So to avoid the temptation, if you have a smart

12:53:50  12  device with you today, phone, watch, tablet, anything like

12:53:53  13  that, leave it in the jury room, and when you come back

12:53:56  14  tomorrow, don't bring it into the courtroom, if you would

12:53:58  15  do that for me, please.

12:53:59  16        Now, with those instructions, your lunch should be

12:54:02  17  waiting for you in the jury room.  If you'll take the mask

12:54:05  18  and shields and so forth that you see close by with you,

12:54:09  19  figure those out over the lunch hour, and then when we have

12:54:11  20  you back in here, we'll begin with some additional

12:54:14  21  instructions I need to give you on the record, and then

12:54:18  22  we'll proceed to hear the opening statements from the

12:54:20  23  lawyers in the case.

12:54:20  24        Let me just give you a very, very brief high-level

12:54:25  25  roadmap of how this is going to go.

12:54:27  1          When you come back in from lunch, I'll give you

12:54:30  2   some additional instructions on the law.  Then counsel for

12:54:33  3   the Plaintiff will give you opening statement.  It's not an

12:54:38  4   opening argument, it's an opening statement to give you an

12:54:41  5   idea of what they expect the evidence is going to show over

12:54:43  6   the course of the trial.

12:54:44  7          Then the Defendant's lawyer will get up and give

12:54:49  8   the Defendant's opening statement.  Again, what the

12:54:52  9   Defendant expects the evidence is going to show you over

12:54:54  10  the course of the trial.

12:54:56  11         Then after that, the Plaintiff will put on the

12:54:58  12  Plaintiff's case.  It's called the Plaintiff's

12:55:00  13  case-in-chief.  And the Plaintiff will call their first

12:55:02  14  witness, and we will go through their witnesses one at a

12:55:05  15  time.

12:55:05  16         And when the Plaintiff is through directly

12:55:08  17  examining each witness, the Defendant will cross-examine

12:55:11  18  those witnesses.  And when the Plaintiff has put on all

12:55:15  19  their witnesses, then the Plaintiff will rest their

12:55:19  20  case-in-chief.

12:55:19  21         At that point, the Defendant will come forward and

12:55:23  22  put on their case-in-chief, and they will call their

12:55:25  23  witnesses, and the defense lawyers will directly examine

12:55:28  24  the defense witnesses and the Plaintiff's lawyers will

12:55:31  25  cross-examine the defense witnesses.  And when all the

12:55:37  1    defense witnesses have been put on, then the Defendants

12:55:39  2    will rest their case-in-chief.

12:55:41  3              Once the Defendant has rested its case-in-chief,

12:55:45  4    then the Plaintiff has an opportunity, if it chooses to, to

12:55:47  5    call what are known as rebuttal witnesses.  And one or more

12:55:51  6    rebuttal witnesses comprise what's called the Plaintiff's

12:55:53  7    rebuttal case.  The Plaintiff doesn't have to do that.  The

12:55:58  8    Plaintiff has the right to do that.

12:55:59  9              If the Plaintiff calls rebuttal witnesses, then

12:56:02  10   we'll go through the same process of direct examination by

12:56:06  11   the Plaintiff's lawyers and cross-examination by the

12:56:09  12   Defendant's lawyers.  And if there's a rebuttal case when

12:56:12  13   the rebuttal witnesses are finished, then the Plaintiff

12:56:14  14   will rest their rebuttal case.

12:56:16  15             If there is no rebuttal case, or when the rebuttal

12:56:19  16   case has been presented and the Plaintiff rests the

12:56:21  17   rebuttal case, then you will have heard all the evidence.

12:56:27  18             And when you've heard all the evidence in this

12:56:29  19   case, I will give you lengthy and detailed instructions on

12:56:32  20   the law that you are to apply.  Those are called the

12:56:37  21   Court's final instructions to the jury.  They're also

12:56:39  22   sometimes called, and you may have heard them referred to,

12:56:42  23   as the Court's charge to the jury.

12:56:44  24             Once I've given you my charge, my final

12:56:47  25   instructions, then counsel for the Plaintiff will present a

12:56:50  1   closing argument, the Defendant will present a closing

12:56:53  2   argument, and then the Plaintiff gets a final closing

12:56:56  3   argument.

12:56:56  4           The Plaintiff gets to go first because the

12:56:59  5   Plaintiff has the burden of proof.  And then once you've

12:57:03  6   heard the closing arguments from both Plaintiff's counsel

12:57:05  7   and defense counsel, then I will instruct you to retire to

12:57:09  8   the jury room, to take the written verdict form with you.

12:57:14  9           And I'm also going to give you your own written

12:57:16  10  copy of the lengthy instructions I'm going to give you

12:57:19  11  orally, and you'll have a written copy for each of the

12:57:22  12  eight of you to look at in the jury room.  And you'll take

12:57:26  13  those eight copies of my instructions, the one copy of the

12:57:29  14  written verdict with the questions in it, and you'll take

12:57:31  15  that to the jury room.

12:57:33  16          And you know what, that's when the light switch

12:57:35  17  switches on, and that's when you're required to discuss the

12:57:38  18  evidence you've heard with each other and answer those

12:57:41  19  questions in the verdict form in the best attempt you can

12:57:45  20  muster to give the Court a unanimous answer to each of

12:57:48  21  those questions, because your answers to those questions

12:57:51  22  have to be unanimous.

12:57:52  23          So that's an overview of how it's going to be

12:57:56  24  structured.

12:57:57  25          Also, while we're covering some basic housekeeping

12:58:02  1   matters, let me tell you this.  I have learned over my time

12:58:08  2   on the bench, and I believe this, that most folks in this

12:58:11  3   part of the world would rather come early and stay late and

12:58:16  4   be away from home and be away from work a shorter number of

12:58:20  5   days than coming late, going home early, and having a much

12:58:20  6   longer period of time that they're coming back and forth

12:58:27  7   and being away from their homes and their works.

12:58:28  8          Some federal courts in big cities where it takes

12:58:31  9   people a long time to get there start at 10:00 o'clock in

12:58:34  10  the morning, and they quit at 4:00 o'clock in the

12:58:37  11  afternoon.  And sometimes in those cases it takes 10 days

12:58:40  12  to what I can do in five days.  And I've learned that

12:58:43  13  people in East Texas would rather be gone five days and

12:58:47  14  work a longer day than be gone 10 days and work a shorter

12:58:51  15  day.

12:58:51  16         So we're going to try as best we can to start each

12:58:55  17  day beginning in the morning, because you're already here

12:58:58  18  today, but we're going to start each day beginning in the

12:59:02  19  morning at 8:30.  And I'm going to ask you to be assembled

12:59:04  20  in the jury room before 8:30 and ready to go at 8:30, which

12:59:08  21  means you probably need to plan to get to the courthouse

12:59:10  22  here in Marshall about 8:15.

12:59:14  23         And there will be breakfast, snacks provided by

12:59:19  24  the clerk's office each morning for you.  And we'll start

12:59:21  25  about 8:30 in the morning.  I'm not going to stop at 4:00

12:59:28   1   o'clock.  I'm not going to stop at 5:00 o'clock.  I'm

12:59:30   2   probably going to stop closer to 6:00 o'clock each day, and

12:59:34   3   then let you be recessed for the day and return to your

12:59:37   4   homes.

12:59:38   5        That's not an exact science.  Let me give you an

12:59:43   6   example.  If we have a witness on the witness stand who

12:59:45   7   starts at 4:30 and they have two hours of testimony to

12:59:51   8   give, I'm going to try to get that testimony complete and

12:59:56   9   not break it so that I can send you home when that witness

12:59:59   10  finishes.

12:59:59   11       I think it's much easier for you to follow the

01:00:02   12  evidence if we don't break the witnesses between different

01:00:08   13  days, and try to have as compact and succinct a narrative

01:00:14   14  of this case and avoid being disjointed and disjunctive if

01:00:17   15  we can.

01:00:18   16       So we may have a witness that finishes at 5:15 and

01:00:24   17  the next witness is two hours long, and I'm not going to

01:00:26   18  start a two-hour witness at 5:15.  So there are days you

01:00:30   19  might be out of here before 6:00 o'clock.

01:00:32   20       There are days you might be out of here at 6:00

01:00:35   21  o'clock or a few minutes after.  I'm just going to have to

01:00:38   22  roll with the punches, as they say, and deal with the

01:00:40   23  witnesses that these parties are going to call as a part of

01:00:43   24  their respective cases to be put on.

01:00:45   25       So don't go home thinking that this will be 9:00

01:00:49  1  to 5:00.  It will probably be a little longer than that.

01:00:52  2  But I promise you if we do that, I think there's a good

01:00:55  3  chance that we can finish this case this week, at the very

01:00:59  4  outside Monday of next week.

01:01:01  5          If I didn't do it this way, it'd probably take all

01:01:04  6  of next week to finish this case.  And to avoid stretching

01:01:09  7  it out over a great number of days -- a greater number of

01:01:12  8  days, I would prefer to do it that way.  And over the last

01:01:16  9  10 years, jurors like yourselves have told me they would

01:01:19  10 prefer to do it that way.

01:01:21  11         So I'm not going to take a poll and I'm not going

01:01:24  12 to ask you to vote, but I'm going to tell you based on

01:01:26  13 that, that's what I intend to do.  And that way you can

01:01:26  14 have an idea of what to expect, and you can have an idea to

01:01:30  15 let everybody that is at home with you know when to expect

01:01:33  16 you and when not to expect you.  I hope that will be

01:01:36  17 helpful to you.

01:01:36  18         All right.  With those instructions, ladies and

01:01:39  19 gentlemen, as I say, lunch should be waiting for you in the

01:01:41  20 jury room.  It's 1:00 o'clock.  We're going to do our best

01:01:47  21 to start back at 1:45.  With that, the jury is excused for

01:01:54  22 lunch.

01:01:55  23         COURT SECURITY OFFICER:  All rise.

01:01:58  24         (Jury out.)

01:02:24  25         THE COURT:  Be seated, please.  Who should I

01:02:26  1  expect to present opening statements for the Plaintiff?

01:02:28  2          MR. KLINE:  That would be me, Your Honor.  Doug

01:02:31  3  Kline.

01:02:31  4          THE COURT:  All right.  And who should I expect to

01:02:35  5  present opening for the Defendant?

01:02:37  6          MS. SMITH:  Mr. Sernel.  Marc Sernel.

01:02:40  7          THE COURT:  All right.  All right, counsel, we'll

01:02:41  8  break for lunch and we will reconvene as close to 1:45 as

01:02:46  9  we can.  Are there any questions or issues I need to know

01:02:48 10  about from either Plaintiff or Defendant at this juncture?

01:02:56 11          MR. AROVAS:  No, Your Honor.

01:02:56 12          THE COURT:  All right.  We stand in recess for

01:02:58 13  lunch.

         14          (Recess.)

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                           <u>CERTIFICATION</u>

2

3            I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    <u>/S/ Shelly Holmes          </u>            <u>3/15/2021   </u>
     SHELLY HOLMES, CSR, TCRR                  Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25