```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   PERSONALIZED MEDIA           )(

 5   COMMUNICATIONS, LLC,         )(

 6        PLAINTIFF,              )(    CIVIL ACTION NO.

 7                                )(    2:15-CV-1366-JRG-RSP

 8   VS.                          )(    MARSHALL, TEXAS

 9                                )(

10   APPLE INC.,                  )(    MARCH 15, 2021

11        DEFENDANT.              )(    1:53 P.M.

12                    TRANSCRIPT OF JURY TRIAL

13        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14             UNITED STATES CHIEF DISTRICT JUDGE

15

16   FOR THE PLAINTIFF:      Mr. Douglas J. Kline
                             Mr. J. Anthony Downs
17                           Mr. Kevin P. Martin
                             Mr. Robert Frederickson, III
18                           GOODWIN PROCTER, LLP
                             100 Northern Avenue
19                           Boston, MA 02210

20   COURT REPORTER:        Ms. Shelly Holmes, CSR, TCRR
                             Official Court Reporter
21                           United States District Court
                             Eastern District of Texas
22                           Marshall Division
                             100 E. Houston
23                           Marshall, Texas  75670
                             (903) 923-7464
24
     (Proceedings recorded by mechanical stenography, transcript
25   produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFF:        Ms. Alexandra D. Valenti
                               Ms. Autumn E. Soucy
 2                             GOODWIN PROCTER, LLP
                               The New York Times Building
 3                             620 Eighth Avenue
                               New York, NY 10018-1405
 4
                               Mr. S. Calvin Capshaw, III
 5                             Ms. Elizabeth DeRieux
                               CAPSHAW DERIEUX, LLP
 6                             114 E. Commerce Avenue
                               Gladewater, TX 75647
 7
     FOR THE DEFENDANT:        Mr. Gregory S. Arovas
 8                             Mr. Robert A. Appleby
                               Mr. Alan Rabinowitz
 9                             Mr. Jonathan D. Brit
                               KIRKLAND & ELLIS, LLP
10                             601 Lexington Avenue
                               New York, NY 10022
11
                               Mr. Marcus E. Sernel
12                             Ms. Meredith Zinanni
                               Mr. Jake Rambeau
13                             KIRKLAND & ELLIS, LLP
                               300 North LaSalle Street
14                             Suite 2400
                               Chicago, IL 60654
15
                               Mr. Ellisen S. Turner
16                             KIRKLAND & ELLIS, LLP
                               2049 Century Park East
17                             Suite 3700
                               Los Angeles, CA 90067
18
                               Mr. Sean M. McEldowney
19                             KIRKLAND & ELLIS, LLP
                               655 15th Street NW
20                             Suite 1200
                               Washington, DC 20005
21
                               Ms. Melissa R. Smith
22                             GILLAM & SMITH, LLP
                               303 South Washington Avenue
23                             Marshall, TX 75670

01:26:07  24
01:26:07
          25
```

01:26:07  1              (Jury out.)

01:26:07  2              COURT SECURITY OFFICER:  All rise.

01:26:08  3              THE COURT:  Be seated, please.

01:53:00  4              Counsel, in the last trial, I authorized up to

01:53:10  5    four people at each counsel table.  I'm going to do that in

01:53:13  6    this trial.  I know you had three at each counsel table for

01:53:16  7    voir dire.  But now that your entire trial teams are here

01:53:21  8    in the courtroom, I have no problem with you adding a

01:53:23  9    fourth person at each table, if you'd like to.  But let's

01:53:28  10   don't go over four.

01:53:29  11             All right.  I'm prepared to give my preliminary

01:53:31  12   instructions to the jury.

01:53:33  13             Are there any issues we need to take up before

01:53:35  14   that?

01:53:36  15             MR. KLINE:  Your Honor, the only thing is we've

01:53:39  16   been discussing amongst us a stipulation regarding the fact

01:53:44  17   that the accused technology has been the same with respect

01:53:47  18   to the issues that bear on infringement in this case.  And

01:53:52  19   Judge Payne made an order that we would read a stipulation

01:53:54  20   into the record.  We're just working out what the details

01:53:58  21   of that stipulation will be, so I -- with apologies, we

01:54:00  22   don't have it ready to read right now, Your Honor, but at

01:54:03  23   some point we will want to do that.

01:54:06  24             THE COURT:  Whenever you've reached a complete

01:54:08  25   stipulation, let me know, and I'll be glad to talk then

01:54:11  1   about the most opportune time to present it to the jury.

01:54:16  2           MR. KLINE:  Thank you, Your Honor.

01:54:16  3           THE COURT:  Anything from the Defendant before I

01:54:18  4   bring in the jury?

01:54:26  5           MR. SERNEL:  No, Your Honor.

01:54:28  6           THE COURT:  All right.  Let's bring in the jury,

01:54:33  7   please.

01:54:33  8           COURT SECURITY OFFICER:  All rise.

01:54:34  9           (Jury in.)

01:54:37  10          THE COURT:  Welcome back, ladies and gentlemen.

01:54:52  11  Please have a seat.

01:54:52  12          Thank you for being on time, ladies and gentlemen.

01:55:05  13  We're going to try to keep things running on generally the

01:55:08  14  time frame that I told you about during jury selection.

01:55:10  15          I now have some preliminary instructions that I

01:55:13  16  need to give you on the record before we start with the

01:55:19  17  opening statements from the attorneys and then get on to

01:55:21  18  the evidence in the case.

01:55:21  19          You've now been sworn as the jurors in this case.

01:55:26  20  And as the jury, you are the sole judges of the facts and,

01:55:31  21  as such, you will make the final determination about what

01:55:35  22  the facts are in this case.

01:55:36  23          As the judge, I will give you instructions on the

01:55:39  24  law, I will deal with and decide any questions of law,

01:55:44  25  evidence, or procedure that might arise during the course

01:55:46   1   of the trial, and I'm responsible for managing the flow of

01:55:51   2   the evidence efficiently and maintaining the proper decorum

01:55:54   3   of the courtroom.

01:55:55   4        At the end of the evidence, I'll give you detailed

01:55:58   5   instructions about the law to apply in deciding this case,

01:56:03   6   and I'll give you a list of questions that you are then to

01:56:05   7   answer.  This list of questions is called the verdict form,

01:56:10   8   and your answers to the questions will need to be

01:56:14   9   unanimous, and those unanimous answers to those questions

01:56:17  10   will constitute the jury's verdict in this case.

01:56:22  11        Now, let me briefly tell you what the case is

01:56:24  12   about.

01:56:25  13        As has been mentioned, this case involves a

01:56:28  14   dispute regarding one certain United States patent.  I know

01:56:32  15   that you've each seen the video, the film prepared by the

01:56:36  16   Federal Judicial Center, but I need to give you some

01:56:39  17   additional instructions now and on the record about a

01:56:41  18   patent and how one is obtained.

01:56:43  19        Patents are granted or denied by the United States

01:56:48  20   Patent and Trademark Office, an agency of the United States

01:56:53  21   Government, which you will hear referred to throughout the

01:56:55  22   trial for short as the PTO.

01:56:58  23        A valid United States patent gives the

01:57:01  24   patentholder the right for a limited term to prevent others

01:57:06  25   from making, using, offering to sell, or selling the

01:57:09  1   patented invention within the United States or from

01:57:13  2   importing it into the United States without the

01:57:16  3   patentholder's permission.

01:57:17  4         A patent is a form of property called intellectual

01:57:21  5   property.  And like all other forms of property, a patent

01:57:26  6   can be bought or sold.

01:57:27  7         A violation of the patentholder's rights is called

01:57:31  8   infringement.  The patentholder may try to enforce a patent

01:57:35  9   against persons it believes to be infringers by filing a

01:57:39  10  lawsuit in federal court, and that's what we have before us

01:57:42  11  in this case.

01:57:43  12        The process of obtaining a patent is called patent

01:57:48  13  prosecution.  To obtain a patent, one must first file an

01:57:53  14  application with the PTO.  As I've mentioned, the PTO is an

01:57:58  15  agency of the United States Government, and it employs

01:58:00  16  trained examiners who review applications for patents.

01:58:03  17        The application submitted to the PTO includes

01:58:08  18  within it what's called a specification.  The specification

01:58:13  19  contains a written description of the claimed invention

01:58:16  20  telling what the invention is, how it works, how to make

01:58:20  21  it, and how to use it.

01:58:21  22        The specification concludes or ends with one or

01:58:25  23  more numbered sentences.  These numbered sentences are the

01:58:29  24  patent claims.  When a patent is granted by the PTO, it's

01:58:34  25  the claims, ladies and gentlemen, that define the

01:58:37  1  boundaries of its protection and give notice to the public

01:58:41  2  of those boundaries.

01:58:42  3        Now, patent claims may exist in two forms referred

01:58:47  4  to as independent claims and as dependent claims.  An

01:58:53  5  independent patent claim does not refer to any other claim

01:58:57  6  in the patent.  It's independent.  It stands alone.  It's

01:59:01  7  not necessary to look at any other claim to determine what

01:59:05  8  an independent claim covers.

01:59:06  9        On the other hand, a dependent claim refers to at

01:59:11 10  least one other claim in the patent.  A dependent claim

01:59:16 11  includes each of the limitations or elements of the other

01:59:20 12  claim or claims to which it refers or as we sometimes say

01:59:25 13  from which it depends, as well as those additional

01:59:28 14  limitations or elements recited within the dependent claim

01:59:32 15  itself.

01:59:33 16        Therefore, to determine what a dependent patent

01:59:37 17  claim covers, it's necessary to look at both the dependent

01:59:45 18  claim itself and the independent claim or claims from which

01:59:48 19  it refers or from which it depends.

01:59:50 20        Now, the claims of the patent-in-suit use the word

01:59:55 21  "comprising."  Comprising means including or containing.

02:00:00 22        A claim that includes the word "comprising" is not

02:00:05 23  limited to the methods or devices having only the elements

02:00:08 24  that are recited in the claim but also covers methods or

02:00:12 25  devices that add additional elements.

02:00:15   1          Let me give you an example.  Take, for example, a

02:00:18   2   claim that covers a table.  If the claim recites a table

02:00:23   3   comprising a tabletop, legs, and glue, the claim would

02:00:28   4   cover any table that contains these structures, even if the

02:00:32   5   table also contains other or additional structures, such as

02:00:37   6   a leaf to go in the tabletop or wheels to go on the ends of

02:00:41   7   the legs.

02:00:41   8          Now, that's a simple example using the word

02:00:45   9   "comprising" and what it means.  In other words, ladies and

02:00:49   10  gentlemen, it can have other features in addition to those

02:00:51   11  that are covered by the patent.

02:00:53   12         Now, to help you follow the evidence, I'm going to

02:00:56   13  give you a brief summary of the positions of the two

02:00:59   14  competing parties.

02:01:00   15         As you know, the party that initiates or brings a

02:01:04   16  lawsuit is called the Plaintiff.  The Plaintiff in this

02:01:06   17  case is Personalized Media Communications, LLC, which

02:01:12   18  you're going to hear referred to throughout the trial as

02:01:14   19  either Plaintiff or as PMC.  You may hear them called

02:01:22   20  Personalized Media, but I suspect you're mostly going to

02:01:26   21  hear them called the Plaintiff or PMC.

02:01:29   22         And as you know, the party against whom a lawsuit

02:01:33   23  is initiated or brought is called the Defendant, and the

02:01:35   24  Defendant in this case is Apple Inc., which you're going to

02:01:37   25  probably hear referred to either simply as the Defendant or

02:01:40   1   as Apple.

02:01:41   2         Now, as I told you during jury selection, this

02:01:43   3   case is a case of alleged patent infringement.  And as I

02:01:47   4   may have mentioned, there is only one United States patent

02:01:51   5   that's been asserted in this case.  That patent is United

02:01:55   6   States Patent No. 8,191,091.  And as you may know, patents

02:02:02   7   are commonly referred to by their last three digits in the

02:02:06   8   patent number.

02:02:07   9         So in this case, U.S. Patent No. 8,191,091 --

02:02:12  10   excuse me, 8,191,091 will be referred to and you're going

02:02:21  11   to hear it referred to regularly as the '091 patent, the

02:02:25  12   last three digits.  You may also hear it referred to from

02:02:29  13   time to time throughout the case as the patent-in-suit, and

02:02:30  14   you may also hear others refer to it as the asserted

02:02:36  15   patent.  So whether it's the '091 patent, the

02:02:38  16   patent-in-suit, or the asserted patent, those all refer to

02:02:42  17   the one patent that is at issue in this case.  And that

02:02:47  18   patent generally relates to programming communications.

02:02:51  19         Now, the Plaintiff, PMC, contends that the

02:02:54  20   Defendant, Apple, is willfully infringing certain claims of

02:03:00  21   the patent-in-suit by importing, making, or selling

02:03:04  22   products that include their patented technology.

02:03:07  23         PMC also contends that Apple has induced or

02:03:13  24   contributed to and continues to induce or contribute to

02:03:18  25   infringement by others.

02:03:19  1          PMC also contends that it is entitled to money

02:03:24  2   damages as a result of that infringement.

02:03:27  3          The Defendant, Apple, denies that it is infringing

02:03:31  4   the claims of the patent-in-suit.

02:03:35  5          Now, ladies and gentlemen, I know there are many

02:03:37  6   new words and concepts that have been thrown at you since

02:03:41  7   you arrived here for jury duty this morning.  I'm going to

02:03:45  8   define a lot of those words and concepts for you as we go

02:03:48  9   through these instructions.  The attorneys from both sides

02:03:51  10  of the case are going to mention them and discussing

02:03:55  11  them -- and discuss them in their opening statements.

02:03:57  12         The witnesses that you hear called during the

02:03:59  13  trial are going to help you through their testimony to

02:04:04  14  understand these words and concepts.  So, please, do not

02:04:07  15  feel overwhelmed at this point.  I promise you, it will all

02:04:10  16  come together as we go through the trial.

02:04:16  17         Now, one of your jobs in this case is to decide

02:04:18  18  whether or not the asserted claims of the asserted patent

02:04:22  19  have been infringed.  If you decide that any claim of the

02:04:27  20  patent-in-suit has been infringed by the Defendant, Apple,

02:04:31  21  then you'll need to decide whether or not that infringement

02:04:36  22  has been willful.

02:04:37  23         You'll also need to decide what amount of money

02:04:41  24  damages, if any, should be awarded to the Plaintiff as

02:04:44  25  compensation for that infringement.

02:04:47   1          Now, my job in this case is to tell you what the
02:04:51   2   law is, to handle rulings on evidence and procedure, and to
02:04:54   3   oversee the trial as effectively and efficiently as
02:04:58   4   possible.
02:04:58   5          In determining the law, it's specifically my job
02:05:02   6   to determine the meaning of any of the claim language from
02:05:07   7   within the asserted patent that needs to be interpreted.
02:05:11   8   I've already determined the meanings of certain language
02:05:17   9   from the claims in the patent-in-suit, and you must accept
02:05:19  10   those meanings or definitions that I give you and use those
02:05:23  11   meanings or definitions when you decide whether any claim
02:05:27  12   of the patent-in-suit has or has not been infringed.  And
02:05:33  13   you're going to be given a document in a few minutes that
02:05:35  14   will reflect those meanings or definitions that the Court
02:05:38  15   has already reached.
02:05:40  16          Now, for any claim term, language within the
02:05:45  17   asserted claims, for which I've not provided you with a
02:05:48  18   specific definition or construction, you should apply the
02:05:52  19   plain and ordinary meaning.  But if I have provided you
02:05:56  20   with a definition, sometimes called a construction, you're
02:05:59  21   to apply my definition and that meaning to those terms
02:06:03  22   throughout the case.
02:06:04  23          However, my interpretation of the language of the
02:06:09  24   asserted claims should not be taken by you as an indication
02:06:13  25   that I have any opinion regarding the issue of

02:06:17   1   infringement.  That issue, ladies and gentlemen, is yours

02:06:19   2   alone to decide.

02:06:21   3          And I'll provide you with more detailed

02:06:24   4   instructions on the meaning of the claims before you retire

02:06:27   5   to deliberate and reach your verdict.

02:06:29   6          In deciding the issues that are before you, you'll

02:06:32   7   be asked to consider specific legal rules, and I'll give

02:06:36   8   you an overview of those rules now, and then at the

02:06:39   9   conclusion of the case, I'll give you more detailed

02:06:42   10  instructions.

02:06:42   11         The first issue that you're asked to decide is

02:06:46   12  whether the Defendant, Apple, has infringed any of the

02:06:51   13  asserted claims of the '091 patent.

02:06:54   14         Infringement is assessed on a claim-by-claim

02:06:57   15  basis.  And PMC, the Plaintiff, must show by a

02:07:02   16  preponderance of the evidence that a claim has been

02:07:06   17  infringed.  Therefore, there may be infringement as to one

02:07:10   18  claim but no infringement as to another claim.

02:07:13   19         There are also a few different ways that a patent

02:07:16   20  can be infringed.  I'll explain the requirements for each

02:07:19   21  of these types of infringement to you in detail at the

02:07:23   22  conclusion of the case.

02:07:24   23         But, in general, a Defendant may infringe the

02:07:29   24  asserted patent by making, using, selling, or offering for

02:07:33   25  sale in the United States or importing into the United

02:07:38  1  States a product meeting all the requirements of a claim of

02:07:43  2  the asserted patent and without the patent owner's

02:07:44  3  permission.

02:07:45  4       As I say, I'll provide you with more detailed

02:07:51  5  instructions on the requirements for infringement at the

02:07:54  6  conclusion of the case.

02:07:54  7       If you decide that any claim of the patent-in-suit

02:07:58  8  has been infringed, you'll then need to decide whether the

02:08:03  9  Defendant's infringement has been willful.

02:08:05  10      You'll need also to decide what amount of money

02:08:10  11  damages should be awarded to the Plaintiff, PMC, to

02:08:14  12  compensate it for that infringement.

02:08:15  13      A damage award in a patent case like this must be

02:08:19  14  adequate to compensate the patentholder for the

02:08:23  15  infringement, and in no event may a damage award be less

02:08:28  16  than what the patentholder would have received if it had

02:08:30  17  been willing -- if it had been paid, rather, a reasonable

02:08:34  18  royalty for the use of its patent.

02:08:37  19      However, ladies and gentlemen, the damages you

02:08:39  20  award, if any, are meant to compensate the patentholder.

02:08:43  21  They are not meant to punish the Defendant.  And you may

02:08:47  22  not include in any damages award an additional amount as a

02:08:51  23  fine or a penalty above what's necessary to fully

02:08:56  24  compensate the patentholder for the infringement.

02:08:59  25      Additionally, damages cannot be speculative, and

02:09:03  1    PMC, the Plaintiff, has the burden to prove the amounts of

02:09:07  2    its damages by a preponderance of the evidence.

02:09:11  3         I'll give you more detailed instructions on the

02:09:15  4    calculation of damages for the Defendant's alleged

02:09:20  5    infringement of the patent-in-suit at the conclusion of the

02:09:22  6    trial, including by giving you specific instructions with

02:09:26  7    regard to the calculation of a reasonable royalty.

02:09:30  8         However, the fact that I'm instructing you on

02:09:34  9    damages now does not mean that PMC is or is not entitled to

02:09:38  10   recover damages.

02:09:40  11        Now, ladies and gentlemen, you're going to be

02:09:43  12   hearing over the course of this trial from a number of

02:09:46  13   witnesses, and I want you to keep an open mind while you're

02:09:49  14   listening to the evidence and not decide any of the facts

02:09:53  15   until you've heard all of the evidence.

02:09:55  16        This is important.  While the witnesses are

02:09:59  17   testifying, remember, you, the members of the jury, will

02:10:05  18   have to decide and determine the degree of credibility and

02:10:09  19   believability to allocate to the witnesses and the evidence

02:10:14  20   that's presented.

02:10:15  21        So while the witnesses are testifying, you should

02:10:18  22   be asking yourselves things like this:  Does the witness

02:10:22  23   impress you as being truthful?  Does he or she have a

02:10:25  24   reason not to tell the truth?  Does he or she have a

02:10:29  25   personal interest in the outcome of the case?  Does the

02:10:32   1   witness seem to have a good memory?  Did he or she have an

02:10:37   2   opportunity and ability to observe accurately the things

02:10:41   3   that they've testified about?  And did the witness appear

02:10:44   4   to understand the questions clearly and answer them

02:10:46   5   directly?  And, of course, does the witness's testimony

02:10:51   6   differ from the testimony of other witnesses?  And if it

02:10:55   7   does, how does it differ?

02:10:57   8        These are some of the things you should keep in

02:11:00   9   mind and be thinking about while you're listening to each

02:11:02  10   and every witness throughout the trial.

02:11:05  11        I also want to talk to you briefly about expert

02:11:10  12   witnesses.

02:11:11  13        When knowledge of a technical subject may be

02:11:14  14   helpful to you, the jury, a person who has special training

02:11:19  15   and experience in that particular technical field, we call

02:11:22  16   them an expert witness, is permitted to testify to you

02:11:26  17   about his or her opinions on technical matters.

02:11:30  18        However, ladies and gentlemen, you're not required

02:11:34  19   to accept an expert witness's or any witness's, for that

02:11:41  20   matter, opinions at all.  It's up to you to decide whether

02:11:43  21   you believe an expert witness or any witness, for that

02:11:46  22   matter, and whether you believe what they tell you is

02:11:49  23   correct or incorrect and whether or not you want to believe

02:11:52  24   what they say.

02:11:53  25        That decision is solely yours as members of this

02:11:57  1   jury.

02:11:57  2          Now, I anticipate that there will be expert

02:12:00  3   witnesses testifying in support of each of the sides of

02:12:05  4   this case.  But when an expert witness is called to the

02:12:08  5   witness stand and you listen to their qualifications, you

02:12:13  6   hear their testimony, and in that testimony they give you

02:12:15  7   an opinion and they explain the basis for that opinion, you

02:12:18  8   will have to evaluate what they say, whether you believe

02:12:22  9   it, and to what degree, if any, that you want to give that

02:12:25 10   opinion weight.

02:12:26 11          Remember, ladies and gentlemen, judging and

02:12:30 12   evaluating the credibility and the believability of each

02:12:34 13   and every witness is an important part of your job as

02:12:38 14   jurors.

02:12:38 15          Now, during the trial, it's possible that there

02:12:43 16   will be testimony presented from one or more witnesses that

02:12:47 17   will be presented to you through what's called a

02:12:49 18   deposition.

02:12:50 19          In trials like this, it's very difficult to get

02:12:54 20   every witness here in person at the same time.  So before

02:12:58 21   the trial begins, the lawyers for both sides take the

02:13:02 22   depositions of each of the witnesses.

02:13:05 23          In a deposition, the witness is present, they are

02:13:09 24   sworn and placed under oath, just like they were in court

02:13:12 25   today.  A court reporter is present.  Every question that's

02:13:16   1   asked of them and every answer that they give is taken down

02:13:20   2   and transcribed accurately.  And during the course of this

02:13:25   3   trial, if they are not able to be present, then portions of

02:13:29   4   those questions and answers presented in that deposition

02:13:33   5   can be played back or presented to you, the jury, as

02:13:37   6   testimony from that witness by way of a deposition.

02:13:40   7        Now, it's important for you to understand, ladies

02:13:45   8   and gentlemen, depositions usually go on for hours and

02:13:47   9   hours.  And you're not going to be required when a witness

02:13:52  10   is presented to you by deposition to listen to hours and

02:13:56  11   hours of their testimony.

02:13:57  12        In that case, where the witness can't be here in

02:14:03  13   person and their testimony is presented through a

02:14:05  14   deposition, both the Plaintiff and the Defendant will

02:14:06  15   select portions of that testimony given over those hours

02:14:12  16   and hours that they think is particularly relevant, and

02:14:14  17   then those portions will be spliced together and played to

02:14:18  18   you as a deposition witness or as deposition witness

02:14:23  19   testimony.

02:14:23  20        That means if, in listening to a video where a

02:14:28  21   witness is shown to you and they are testifying, if it

02:14:31  22   looks like there is a break or a splice, that's probably

02:14:34  23   because there is a break or a splice, and these

02:14:37  24   designations from both Plaintiff and the

02:14:41  25   counter-designations from Defendants and vice versa are put

02:14:44  1   together, and all those hours of other things you don't

02:14:47  2   need to hear are cut out.

02:14:49  3        And if you hear a voice asking questions that

02:14:52  4   later in the deposition sounds like a very different voice,

02:14:55  5   it's because it is a very different person.  And you're not

02:14:58  6   being required to listen to everything that went on for

02:15:00  7   hours and hours, just the relevant portions as the

02:15:04  8   Plaintiff chooses and as the Defendant chooses and as the

02:15:08  9   Court approves are played to you from these deposition

02:15:11  10  witnesses.

02:15:12  11       So if you see something that looks like a

02:15:14  12  connection, if you hear a change in voice, don't let that

02:15:17  13  bother you.  That's just part of presenting the relevant

02:15:20  14  and the important parts to you where the witness can't be

02:15:23  15  here to testify live from the witness stand and a

02:15:26  16  deposition is used.  And it saves you all those hours of

02:15:29  17  other questions and answers you don't need to hear or

02:15:33  18  listen to.  So keep that in mind.

02:15:35  19       But deposition testimony is entitled to the same

02:15:41  20  consideration and, insofar as possible, is to be judged by

02:15:44  21  you, the jury, as to credibility, weight, and otherwise

02:15:47  22  considered in the same way as if the witness had been

02:15:52  23  present in open court and given their testimony under oath

02:15:55  24  from the witness stand.

02:15:56  25       Also, ladies and gentlemen, during the course of

02:16:01   1   the trial, it's possible that the lawyers will make certain

02:16:03   2   objections.   When they do, I will give rulings on those

02:16:07   3   objections.   It's the duty of an attorney to object in a

02:16:11   4   case when they believe the other side is trying to offer

02:16:13   5   testimony that is not proper under the rules of the Court

02:16:18   6   or the Rules of Evidence.

02:16:18   7          And upon the Court allowing the testimony or other

02:16:24   8   evidence to be introduced over the objection of an

02:16:27   9   attorney, the Court does not, unless expressly stated,

02:16:31   10  indicate any opinion as to the weight or effect of that

02:16:34   11  testimony.

02:16:35   12          As I've said before, you, the members of the jury,

02:16:40   13  are the sole judges of the credibility and believability of

02:16:43   14  all the witnesses, and you are the sole judges of the

02:16:47   15  proper amount of weight and effect to give to all of the

02:16:50   16  evidence.

02:16:50   17          Now, I'd like to compliment the lawyers on both

02:16:55   18  sides of this case because prior to today, through many

02:17:00   19  hours of pre-trial hearings, they have worked with the

02:17:02   20  Court to go through and prepare for this trial a list of

02:17:07   21  exhibits that you will see over the course of the trial.

02:17:10   22          And through these pre-trial procedures, they have

02:17:14   23  had the opportunity to make objections and the objections

02:17:17   24  have been responded to and the Court has heard and

02:17:21   25  considered both the motion and the opposition, the --

02:17:26  1   we've -- I've considered the exhibit and any objections to

02:17:29  2   it, I've applied the Rules of Evidence and considered it

02:17:32  3   from the viewpoint of proper admissibility in this trial,

02:17:36  4   and I've ruled on all those.

02:17:38  5        So you will not have to listen to all that when

02:17:41  6   it -- those documents are presented as exhibits in the

02:17:44  7   case.  The Court has already pre-determined the documents

02:17:48  8   that are admissible as exhibits and has excluded the

02:17:52  9   documents the Court has found not to be admissible in

02:17:55  10  evidence.

02:17:56  11        And all of that has taken many hours that you were

02:17:59  12  not privileged to sit through and watch and you're not

02:18:04  13  going to have to see that as part of the trial.  We've done

02:18:08  14  that for you and we've done that in advance.  And I want to

02:18:12  15  compliment the lawyers on both sides for have worked

02:18:15  16  diligently with the Court in accomplishing that.  And

02:18:16  17  whether you understand it or not, that saved you many hours

02:18:18  18  sitting in those chairs as a part of this trial.

02:18:21  19        So when an attorney in the case shows you an

02:18:24  20  exhibit that's been pre-admitted by the Court, they don't

02:18:27  21  have to offer it and draw an objection and hear arguments

02:18:30  22  on it and let the Court consider it and rule on it.  All

02:18:35  23  that's been already done.  And they can present it to you

02:18:37  24  without any formal predicate, and they can put it in a

02:18:40  25  proper context for you to consider.  And that has saved you

02:18:44  1  a considerable amount of time, I promise you.

02:18:50  2  Now, even though that's been done, it's still

02:18:53  3  possible that during the course of the trial objections are

02:18:55  4  going to arise.  If I should -- if I should sustain an

02:18:58  5  objection to a question addressed to a witness, then you

02:19:03  6  must disregard the question entirely, and you may draw no

02:19:07  7  inference about its wording or speculate about what the

02:19:10  8  witness would have said if I had allowed them to answer the

02:19:13  9  question.

02:19:13  10  On the other hand, however, if I overrule an

02:19:18  11  objection to a question addressed to a witness, then you

02:19:21  12  should consider the question and the answer just as if no

02:19:25  13  objection had been made in the first place.

02:19:27  14  You should know, ladies and gentlemen, that the

02:19:31  15  law of the United States permits a United States District

02:19:36  16  Judge -- it allows a United States District Judge to

02:19:41  17  comment to the jury regarding evidence during a trial.  But

02:19:44  18  those comments from the judge on the evidence to the jury

02:19:46  19  are simply expressions of the judge's own opinion, and the

02:19:49  20  jury is free to disregard those comments in their entirety.

02:19:54  21  Because as I've told you, you, the jury, are the sole

02:19:57  22  judges of the facts in this case, and you are the sole

02:20:00  23  judges of the credibility and believability of the

02:20:04  24  witnesses and how much weight you want to give to all the

02:20:07  25  evidence produced in this trial.

02:20:08   1          And even though the law permits me as a United

02:20:13   2   States District Judge to comment to you on the evidence in

02:20:16   3   this case, I'm going to try very hard not to do that.

02:20:21   4          Also, ladies and gentlemen, our court reporter

02:20:26   5   seated in front of me, Ms. Holmes, is taking down

02:20:30   6   everything that's said over the course of the trial.  She

02:20:32   7   took down everything that was said during jury selection

02:20:34   8   this morning.  That's why I will do my best to make sure no

02:20:38   9   two people talk at the same time so that she can accurately

02:20:42  10   take down what is said.

02:20:43  11          But the written transcript of everything that's

02:20:46  12   said is not going to be available to you to consider during

02:20:50  13   your deliberations when you consider the verdict and the

02:20:54  14   questions therein after you've heard all the evidence.

02:20:57  15   That means, ladies and gentlemen, that you're going to have

02:21:02  16   to rely on your memories of the evidence and the testimony

02:21:05  17   that's presented over the course of this trial.

02:21:07  18          Now, in a moment, you're each going to receive a

02:21:11  19   juror notebook.  In these notebooks, you will find a legal

02:21:14  20   pad in the back that you can take notes on throughout the

02:21:16  21   trial if you choose to do that.  It's up to you each of you

02:21:21  22   to decide whether or not you want to take notes during the

02:21:24  23   course of the trial, and if you do, how detailed do you

02:21:27  24   want those notes to be.

02:21:31  25          But you should remember that notes taken during

02:21:35  1    the trial are for your own personal use, and you still have

02:21:38  2    to rely on your memory of the evidence, and that's why you

02:21:40  3    should pay very close attention to the testimony of each

02:21:42  4    and every witness.

02:21:43  5         Also, you should not abandon your own recollection

02:21:50  6    about the evidence in this case because some other juror's

02:21:54  7    notes indicate something differently.  Your notes, if you

02:21:57  8    take them, are to refresh your recollection, and that's the

02:22:00  9    only reason that you should be keeping them, if you choose

02:22:04  10   to keep them.

02:22:05  11        I'm now going to ask our Court Security Officer to

02:22:10  12   pass out these juror notebooks to each member of the jury.

02:22:39  13        In these notebooks, ladies and gentlemen, you'll

02:23:47  14   see that you each have in each notebook a complete copy of

02:23:52  15   the '091 patent, the patent-in-suit.  You'll also find in

02:23:58  16   these notebooks a chart containing portions of the claim

02:24:03  17   language of the asserted claims that the Court has

02:24:06  18   previously construed or defined, and you'll find the

02:24:09  19   definitions that the Court has provided directly across the

02:24:13  20   page from that claim language that I have construed.

02:24:15  21        And as I've said, you are to apply my definitions

02:24:19  22   and meanings for that language throughout the trial.

02:24:22  23        You're also going to find a section of witness

02:24:27  24   pages in the notebooks.  They should be tabbed and

02:24:32  25   available for you to flip through quickly so that each

02:24:34   1   person that testifies should have a page with their picture
02:24:37   2   on it and their name on it and then some blank lines for
02:24:41   3   you to take additional notes on if you wish.
02:24:43   4        I found that jurors benefit, especially in a trial
02:24:48   5   like this, from being able to go back and see a picture of
02:24:51   6   the persons that testified during the trial and to make
02:24:55   7   sure they connect the right memories with the testimony
02:24:59   8   that was given by those particular witnesses.  So we supply
02:25:02   9   those witness pages for you.
02:25:03   10        And you'll also find, as I mentioned, a legal pad
02:25:07   11   in the back of those notebooks for additional note-taking.
02:25:12   12   And there's supposed to be a ballpoint pen in the front
02:25:15   13   flap.  I noticed a few of them got loose as they were being
02:25:19   14   passed out.  If you don't find a ballpoint pen or you don't
02:25:23   15   have a pen, we'll take -- we'll make sure that you get one.
02:25:26   16   If anybody doesn't have a pen or doesn't find one in their
02:25:29   17   notebooks, raise your hand, and I'll make sure you get a
02:25:32   18   pen.
02:25:33   19        Okay.  I think everybody has a pen then.
02:25:36   20        Are we missing one?  Do we have one of those pens
02:25:40   21   that dropped out?  Let's take the one -- yes, and pass it
02:25:47   22   down to -- pass it down to Juror No. 2 if you don't mind.
02:25:58   23        You got one?
02:25:59   24        All right.  Anybody else not have a pen.  All
02:26:02   25   right.  I assume everybody does, good.

02:26:05   1          Ladies and gentlemen, you should keep these

02:26:08   2   notebooks in your possession throughout the trial.  At the

02:26:10   3   end of the day, you should leave them on the table closed

02:26:12   4   in the jury room, and they should be there in the morning

02:26:15   5   when you come back.  And when you're in the courtroom, you

02:26:17   6   should have them in your possession just like you have them

02:26:20   7   now.

02:26:21   8          Now, there will be times during the trial that

02:26:24   9   we'll take a short recess, and you're not going to be out

02:26:27   10  of the jury box very long.  And in those cases, I will

02:26:31   11  probably say something like, ladies and gentlemen, you may

02:26:33   12  simply close your notebooks and leave them in your chairs.

02:26:37   13  If you're not to be gone very long, I'll probably just

02:26:42   14  instruct you to leave them in your chairs and there'll be

02:26:45   15  there when you come back.

02:26:47   16         But unless I give you instructions like that, they

02:26:50   17  should be in your possession at all times.  They should not

02:26:53   18  be left lying around where anybody but members of the jury

02:26:56   19  could have access to them or see them.  So keep them in

02:26:59   20  your possession.  And unless I give you instructions, don't

02:27:03   21  leave the courtroom without taking them to the jury room

02:27:05   22  with you.

02:27:05   23         Now, in a minute, we're going to hear opening

02:27:15   24  statements from the lawyers for both the Plaintiff and the

02:27:16   25  Defendant.  And these opening statements, as I mentioned,

02:27:19  1   are intended to give you a roadmap about what each side

02:27:22  2   expects that the evidence is going to show you.

02:27:24  3          And you should remember, ladies and gentlemen,

02:27:27  4   throughout this trial, now and throughout the very end of

02:27:31  5   it, what the lawyers tell you is not evidence.  I'll say

02:27:36  6   that again, what the lawyers tell you is not evidence.  The

02:27:39  7   evidence is the sworn testimony of the witnesses presented

02:27:43  8   from the witness stand under oath and subject to

02:27:47  9   cross-examination, whether they're presented live or by

02:27:52  10  deposition, as I've already explained to you.

02:27:53  11         Also, the evidence in this case are those

02:27:56  12  documents and other things that the Court has already

02:27:59  13  considered and determined are properly admissible and --

02:28:04  14  excuse me -- and that come into the trial as exhibits.

02:28:08  15         Now, what the lawyers tell you is simply their

02:28:12  16  impression of what the evidence is, and they have a duty to

02:28:16  17  try and point out to you what they believe the evidence

02:28:18  18  shows but, remember, what they tell you is not evidence.

02:28:26  19         Now, as I mentioned during jury selection and

02:28:28  20  before you recessed for lunch, after the opening

02:28:30  21  statements, the Plaintiff will put on its case-in-chief and

02:28:34  22  call its witnesses.  And when the Plaintiff has called all

02:28:37  23  its witnesses in its case-in-chief, the Plaintiff will rest

02:28:41  24  its case-in-chief.

02:28:43  25         Then the Defendant will proceed to put on its

| | | |
|---|---|---|
| 02:28:46 | 1 | case-in-chief and call its witnesses.  And when those |
| 02:28:49 | 2 | witnesses have testified, then the Defendant will rest the |
| 02:28:52 | 3 | Defendant's case-in-chief. |
| 02:28:53 | 4 | When the Defendant rests, the Plaintiff will have |
| 02:29:00 | 5 | an opportunity, if it chooses, to call rebuttal witnesses. |
| 02:29:03 | 6 | If it doesn't, then that will be a conclusion -- that will |
| 02:29:07 | 7 | be the conclusion of the evidence.  If the Plaintiff does |
| 02:29:09 | 8 | call rebuttal witnesses, then when those rebuttal witnesses |
| 02:29:12 | 9 | have testified and are complete, then you will have heard |
| 02:29:15 | 10 | all the evidence in this case. |
| 02:29:16 | 11 | And at that point, I will give you my final |
| 02:29:19 | 12 | instructions on the law that you are to apply.  And when I |
| 02:29:22 | 13 | give you those instructions after you've heard all the |
| 02:29:25 | 14 | evidence, ladies and gentlemen, I'm going to give them to |
| 02:29:27 | 15 | you verbally on the record in open court, but I'm also |
| 02:29:31 | 16 | going to have those instructions reduced to writing, and |
| 02:29:36 | 17 | you're each going to have your own individual copy of those |
| 02:29:40 | 18 | instructions in writing to take with you to the jury room |
| 02:29:43 | 19 | so that you can refer back to my instructions that I've |
| 02:29:45 | 20 | given you, both orally in the courtroom and that you'll |
| 02:29:48 | 21 | have in writing in your own possession when you retire to |
| 02:29:51 | 22 | the jury room. |
| 02:29:52 | 23 | Those final instructions from the Court to the |
| 02:29:57 | 24 | jury are called the Court's final instructions on the law. |
| 02:30:00 | 25 | They are sometimes called the Court's charge to the jury. |

02:30:03   1          And when I've presented my charge to you, the

02:30:08   2   jury, after that, the lawyers will present their closing

02:30:10   3   arguments.  And after the lawyers for both sides have

02:30:13   4   presented their closing arguments, then I'll instruct you

02:30:17   5   to retire to the jury room and to deliberate on the

02:30:21   6   evidence and to answer the questions in the verdict form

02:30:25   7   and return a verdict in this case.

02:30:27   8          Let me repeat my earlier instruction to you.

02:30:31   9   You're not to discuss this case among yourselves throughout

02:30:34   10  this trial until I tell you that, after all the evidence is

02:30:39   11  in, you may retire to the jury room and deliberate on your

02:30:43   12  verdict.

02:30:44   13         At that point, the switch goes 180 degrees, and

02:30:47   14  you go from not being able to discuss the evidence among

02:30:50   15  yourselves to being where you must discuss the evidence

02:30:53   16  among yourselves to reach a unanimous decision about the

02:30:58   17  various questions included in the verdict form.

02:31:00   18         Let me also remind you, as I did before lunch,

02:31:05   19  throughout this trial, you see the courtroom is nearly full

02:31:08   20  of people.  There are almost all here -- there may be one

02:31:13   21  or two bystanders, but almost everyone in the gallery is

02:31:17   22  associated with one side of this case or the other.  None

02:31:19   23  of these people are going to speak to you over the course

02:31:22   24  of the next week.  If you pass them on the sidewalk or in

02:31:25   25  the parking lot, they're going to walk right by you.  And

02:31:29   1   when they do that, don't think they're being rude.  Don't

02:31:32   2   hold it against them.  Don't be offended by it.  They're

02:31:35   3   simply doing what the Court has instructed everybody

02:31:39   4   associated with each side of this case to do, and that is

02:31:41   5   to not communicate with the jury in any way.

02:31:43   6           All right.  Ladies and gentlemen, with those

02:31:45   7   instructions, we're now going to proceed to hear the

02:31:48   8   opening statements from both the Plaintiff and then from

02:31:49   9   the Defendant.

02:31:50   10           Plaintiff, you may now present your opening

02:31:52   11   statement to the jury.

02:31:54   12           MR. KLINE:  Thank you, Your Honor.

02:31:58   13           THE COURT:  Would you like a warning on your time?

02:32:01   14           MR. KLINE:  I would, please.  Thank you, Your

02:32:11   15   Honor.

02:32:11   16           THE COURT:  And what kind of warning would you

02:32:13   17   like, at what point?

02:32:14   18           MR. KLINE:  Five minutes would be good, Your

02:32:17   19   Honor.  Thank you very much.

02:32:17   20           THE COURT:  All right.  Please proceed when you're

02:32:19   21   ready, counsel.

02:32:19   22           MR. KLINE:  Good afternoon.  My name is Doug

02:32:40   23   Kline, and I'm very proud to stand before you on behalf of

02:32:42   24   my client, PMC.

02:32:44   25           I also stand before you on behalf of all the

02:32:48  1    people who have devoted many years of their time, energy,

02:32:51  2    and ideas to making PMC the great company that it is today.

02:32:55  3         Many of these folks are here with us, and over the

02:32:59  4    course of this trial, you'll get a chance to hear from some

02:33:02  5    of them directly.

02:33:03  6         Thank you for taking the time to help us resolve

02:33:05  7    this very important dispute between PMC and Apple.

02:33:09  8         You were also generous to share a bit about

02:33:14  9    yourselves with us earlier.  And so in fairness, let me

02:33:18  10   tell you just a little bit about me.  I live in a small

02:33:20  11   town north of Boston.  I've lived there my whole life.  My

02:33:24  12   wife and I met in middle school, and we're coming being up

02:33:27  13   on 35 years of being married.  We have three grown

02:33:30  14   children, and now we have two grandchildren.  My wife is a

02:33:34  15   hospice visitor.  With me are my colleagues, several of

02:33:38  16   whom you'll get to meet.

02:33:39  17        On their feet, you'll hear from my partner, Ms.

02:33:46  18   Alexandra Valenti, my partner, Mr. Tony Downs, and my

02:33:50  19   partner, Mr. Robert Frederickson.

02:33:52  20        Also with us at counsel table is PMC's senior vice

02:33:58  21   president and general counsel, Mr. Tom Scott.

02:34:00  22        Now, as you heard from His Honor, at the end of

02:34:06  23   this trial you'll be asked to decide whether Apple has

02:34:09  24   infringed PMC's United States patent that we call the '091

02:34:12  25   patent.  This is what we call the ribbon copy of the

02:34:18   1   patent.  It was published by the United States Patent and

02:34:20   2   Trademark Office on May 29th of 2012.  And if you find

02:34:23   3   infringement, you'll be asked to decide the amount of

02:34:26   4   damages that Apple should pay for that infringement.

02:34:29   5         To help you begin to understand the issues in this

02:34:36   6   case, I'd like to talk with you this morning about four

02:34:39   7   things.

02:34:39   8         First, I'll give you a brief overview of what this

02:34:43   9   case is about and, in particular, about some of the legal

02:34:45  10   and technical issues that will be presented to you.

02:34:50  11         Next, I'll tell you a little more about PMC, its

02:34:54  12   founder and inventor, Mr. John Harvey, and the patent

02:34:57  13   that's at issue in this case.

02:35:01  14         After that, I'll talk generally about how Apple's

02:35:04  15   FairPlay technology works and some of the evidence you'll

02:35:06  16   hear describing FairPlay.

02:35:09  17         And then, finally, during this opening statement,

02:35:12  18   I'll tell you a little bit about the long history between

02:35:16  19   PMC and Apple, how we ended up here, and what PMC is asking

02:35:19  20   from you.

02:35:19  21         Ladies and gentlemen, this case is about doing the

02:35:25  22   right thing.  As you've heard, my client, PMC, owns the

02:35:33  23   patent that you'll hear a lot about during the course of

02:35:35  24   this trial.

02:35:36  25         Patents are property rights, and no one, not even

02:35:41  1  Apple Incorporated, is allowed to make, use, or sell a

02:35:45  2  patented invention without paying for it.  That's why we're

02:35:47  3  here.  Apple is using PMC's patented technology and we're

02:35:55  4  here asking you to hold them accountable.

02:35:57  5      Now, as I think you saw during the video this

02:35:59  6  morning and His Honor discussed, a patent is much like a

02:36:02  7  deed to a piece of real estate.  A landowner has the right

02:36:10  8  to use the land, perhaps by building a house on it.  A

02:36:13  9  landowner can keep other people off of his land by building

02:36:18 10  a fence around it.  Now, imagine that landowner has oil on

02:36:21 11  his land and owns the mineral rights, the landowner can

02:36:26 12  grant the license to an oil company to come on to his land

02:36:30 13  and pump that oil.  The landowner and the oil company may

02:36:33 14  agree to a royalty that the oil company will pay for each

02:36:39 15  barrel of oil pumped from the land.

02:36:41 16      Patents work much the same way.  Just like a deed

02:36:45 17  sets out the metes and bounds of a piece of proper, patent

02:36:48 18  claims set the boundaries of what the patentholder owns.

02:36:52 19  The owner of a patent has the right to exclude others from

02:36:54 20  making, using, offering for sale, or selling the invention.

02:37:00 21  This is a right conferred by our Constitution of the United

02:37:04 22  States, it allows Congress to grant to inventors the

02:37:10 23  exclusive rights to their discoveries.

02:37:11 24      Now, I imagine that some of you may have

02:37:14 25  downloaded music, movies, TV shows, books, and apps on to

| | | |
|---|---|---|
| 02:37:18 | 1 | your phone or your computer.  The technology in this case |
| 02:37:20 | 2 | was invented by a team led by PMC's founder, Mr. Harvey, |
| 02:37:26 | 3 | and it's critical to protecting downloaded programming |
| 02:37:30 | 4 | against piracy and getting it into a format on your phone |
| 02:37:34 | 5 | or computer that let's you use it, say run the app, listen |
| 02:37:37 | 6 | to the music, watch the movie or the TV show. |
| 02:37:41 | 7 | Mr. Harvey is with us here today. |
| 02:37:45 | 8 | And if you could just please stand up for a |
| 02:37:46 | 9 | moment, Mr. Harvey, so the jury can see you.  Thank you. |
| 02:37:49 | 10 | You will learn over the next few days about |
| 02:37:52 | 11 | Mr. Harvey about the inventions that he made and patented. |
| 02:37:55 | 12 | You'll learn what an incredible visionary Mr. Harvey is. |
| 02:38:00 | 13 | His pioneering inventions have turned out to be even |
| 02:38:02 | 14 | farther ahead of their time than anybody could have |
| 02:38:06 | 15 | predicted.  Many of today's technologies still rely upon |
| 02:38:10 | 16 | foundational building blocks that Mr. Harvey invented.  One |
| 02:38:15 | 17 | of those building blocks is the invention covered by PMC's |
| 02:38:21 | 18 | '091 patent.  You'll hear it referred to as the '091 |
| 02:38:23 | 19 | patent.  As a shorthand, I will refer to Mr. Harvey's |
| 02:38:29 | 20 | invention as his key management invention. |
| 02:38:33 | 21 | The patent covers foundational technology for |
| 02:38:38 | 22 | decrypting programming that has been encrypted. |
| 02:38:41 | 23 | Apple encrypts the programming that it sells |
| 02:38:45 | 24 | through its iTunes Store to protect it against piracy.  To |
| 02:38:50 | 25 | use the programming, listen to the music, watch the movie, |

| | | |
|---|---|---|
| 02:38:55 | 1 | you have to decrypt it. |
| 02:38:57 | 2 | Now, you can think about encryption like a lock. |
| 02:39:00 | 3 | Information can be encrypted or locked so that it's |
| 02:39:03 | 4 | unusable. |
| 02:39:05 | 5 | In the case of video, that means you can't watch |
| 02:39:07 | 6 | it. |
| 02:39:10 | 7 | The encrypted information can be decrypted, you |
| 02:39:13 | 8 | might say unlocked, with a decryption key.  Think about a |
| 02:39:19 | 9 | decryption key like a key or combination that opens the |
| 02:39:23 | 10 | lock.  With the right key, decryption unlocks encrypted |
| 02:39:30 | 11 | information to make it useable.  In the case of video, for |
| 02:39:33 | 12 | example, that means you can watch it. |
| 02:39:35 | 13 | Mr. Harvey's key management invention provides a |
| 02:39:39 | 14 | very secure and efficient solution for decrypting encrypted |
| 02:39:42 | 15 | information.  It protects against piracy without making |
| 02:39:46 | 16 | authorized use of the information clumsy or complicated to |
| 02:39:50 | 17 | the user. |
| 02:39:50 | 18 | The evidence that you will see and hear this week |
| 02:39:52 | 19 | will show that Apple uses Mr. Harvey's patented key |
| 02:39:56 | 20 | management invention to protect the programming that Apple |
| 02:40:00 | 21 | sells through its iTunes Stores, protect it against piracy |
| 02:40:04 | 22 | so that people can't steal or copy it. |
| 02:40:07 | 23 | Now, you'll hear Apple's witnesses testify about |
| 02:40:11 | 24 | how important it was to Apple to be able to offer all of |
| 02:40:15 | 25 | this content, movies, TV shows, music, other programming, |

02:40:19  1  through its iTunes Stores.

02:40:21  2       Apple wanted this program to distinguish its

02:40:24  3  iPhone from Apple's competitors.  But Apple had a problem.

02:40:28  4  It doesn't own most of the content that it sells and rents

02:40:32  5  through iTunes.  Apple had to convince content creators and

02:40:37  6  owners to let Apple sell and rent their content through

02:40:41  7  iTunes.  The content providers agree, but only after Apple

02:40:46  8  promised to provide strong anti-piracy protection.

02:40:51  9       Think about it:  You might spend five years of

02:40:54  10  your life to write a book, millions of dollars to make a

02:40:58  11  super hero movie.  One copy of the book, one DVD of the

02:41:03  12  movie stolen from a Walmart shelf, that would be

02:41:06  13  disappointing.  But a pirated copy of the book, illegally

02:41:12  14  downloaded, copied millions of times, distributed around

02:41:16  15  the world instantly over the Internet, that's a disaster.

02:41:19  16       Mr. Harvey's key management invention helps to

02:41:25  17  prevent this.

02:41:25  18       Apple promised music companies, movie studios,

         19  book publishers, it would protect their programming against

02:41:33  20  piracy with technology that, as we've heard, Apple calls

02:41:35  21  FairPlay.  The promise worked.  Companies agreed to let

02:41:41  22  Apple sell their programming through iTunes.  iTunes took

02:41:46  23  off, and so did the sale of iPhones and Mac computers.  In

02:41:51  24  fact, since PMC's '091 patent issued in 2012, Apple has

02:41:55  25  used FairPlay to deliver more than 70 billion downloads to

02:42:00    1    its customers.

02:42:02    2            That number is growing by millions every single

02:42:05    3    day.  The evidence that you will see and hear this week

02:42:09    4    will show that FairPlay uses Mr. Harvey's patented key

02:42:13    5    management invention to protect those downloads.

02:42:15    6            Now, let me pause and set one thing straight right

02:42:23    7    off the bat.

02:42:24    8            Neither PMC nor Mr. Harvey is going to claim at

02:42:29    9    this trial, or has claimed anywhere else, that Mr. Harvey

02:42:32   10    invented the Internet or the iPhone or the iTunes Store.

02:42:36   11    PMC doesn't claim that Mr. Harvey invented everything that

02:42:39   12    FairPlay does.  Don't get confused about that.  But

02:42:44   13    Mr. Harvey did invent pioneering, foundational technology

02:42:48   14    for preventing piracy, including how to manage the keys

02:42:52   15    needed to unlock encrypted information.

02:42:58   16            FairPlay uses Mr. Harvey's '091 invention for key

02:43:03   17    management.

02:43:03   18            Again, a copy -- this is the cover sheet of PMC's

02:43:10   19    '091 patent.  You can see it's entitled Signal Processing

02:43:14   20    Apparatus and Methods.  The patent identifies PMC's

02:43:18   21    founder, Mr. Harvey, as its first named inventor.  It also

02:43:23   22    names Mr. James Cuddihy as a co-inventor.  You'll hear from

02:43:26   23    Mr. Harvey directly, so I'll leave it to him to tell you

02:43:32   24    about his friend and colleague, Mr. Cuddihy.

02:43:35   25            PMC filed the application for this patent on

02:43:37   1    June 7th of 1995.  The United States Patent and Trademark

02:43:42   2    Office examined the application, determined that

02:43:44   3    Mr. Harvey's key management invention was new, and issued

02:43:46   4    the '091 patent on May 29th of 2012.

02:43:50   5         Now, you may notice that it did take some time for

02:43:54   6    the Patent Office to examine the '091 patent.  Toward the

02:43:58   7    front of the patent -- toward the front of the patent in

02:44:02   8    your notebook, you can see that the '091 patent lists 33

02:44:06   9    pages of prior art, patents, articles, and other

02:44:10  10    information that the Patent Office considered before

02:44:13  11    granting the patent.  Thousands of prior art references.

02:44:17  12         The Patent Office considered all of this material

02:44:21  13    in the course of its examination, and that takes time.

02:44:26  14         Now, I mentioned that it's the claims, and the

02:44:28  15    Court mentioned that it's the claims that defined the

02:44:32  16    boundaries of a patent.  Claim 13 of PMC's '091 patent

02:44:38  17    describes a method of decrypting programming at a receiver

02:44:41  18    station.

02:44:42  19         Claim 13 appears towards the very end of the

02:44:45  20    patent at Column 285.

02:44:47  21         I'll talk more about what the claim describes in a

02:44:51  22    moment, but I would like to point out at least one thing

02:44:54  23    about the claim.

02:44:54  24         Notice, it describes decrypting programming at a

02:45:00  25    receiver station.  It does not say how or when the

02:45:05   1   programming got to the receiver station or where the

02:45:09   2   programming came from.  The claim simply describes a method

02:45:14   3   for decrypting encrypted programming at the receiver

02:45:19   4   station.

02:45:19   5          Now, the evidence that you will see and hear this

02:45:24   6   week will show that Apple has been infringing PMC's '091

02:45:29   7   patent for nine years by using Apple's FairPlay technology.

02:45:32   8          Apple refers to FairPlay as digital rights

02:45:38   9   management technology.  You'll see documents and hear

02:45:41   10  witnesses refer to it as DRM technology.  I have no doubt

02:45:46   11  Apple may tell you that digital rights management

02:45:49   12  technology is new and that PMC's patented key management

02:45:51   13  invention is old and, therefore, doesn't apply to DRM.

02:45:56   14  It's not the case.

02:45:57   15         The Patent Office agreed in 2012 that Mr. Harvey's

02:46:00   16  key management invention was new.  Digital rights

02:46:03   17  management, DRM, it's just a name.  It doesn't change the

02:46:06   18  fact that Apple's FairPlay DRM technology uses PMC's

02:46:11   19  foundational key management invention to make the

02:46:15   20  decryption of Apple's encrypted programming very secure and

02:46:19   21  very efficient on your phone.

02:46:21   22         Apple does this by managing the decryption keys

02:46:27   23  that its customers need to unlock Apple's encrypted

02:46:29   24  programming.

02:46:30   25         Claim 13 of PMC's '091 patent covers the technique

| 02:46:37 | 1 | that Apple uses to instruct your phone how to locate and |
| 02:46:43 | 2 | how to unlock the decryption keys that it needs. |
| 02:46:45 | 3 | Apple has known about and has been using PMC's key |
| 02:46:51 | 4 | management technology for a long time, nine years.  But |
| 02:46:55 | 5 | after many years of talking with PMC about licensing, Apple |
| 02:46:59 | 6 | has refused to pay PMC for permission to use PMC's |
| 02:47:03 | 7 | technology.  That makes Apple an infringer. |
| 02:47:07 | 8 | Turning to Mr. Harvey, PMC, and the '091 patent. |
| 02:47:12 | 9 | Mr. Harvey, as I mentioned, he's the first named |
| 02:47:17 | 10 | inventor on the patent.  He's the founder of the company. |
| 02:47:20 | 11 | He first became interested in communication networks as a |
| 02:47:24 | 12 | young boy.  That's Mr. Harvey with his little brother in |
| 02:47:26 | 13 | the center, and Mr. Harvey on the sides.  He attended |
| 02:47:31 | 14 | college in the 1960s on an ROTC scholarship. |
| 02:47:36 | 15 | After college he served in the Navy.  He started |
| 02:47:40 | 16 | as a communications officer in the Naval School Command. |
| 02:47:45 | 17 | He served as a cryptography board member, an electronics |
| 02:47:46 | 18 | material officer, and an operations officer.  During the |
| 02:47:50 | 19 | Vietnam War Mr. Harvey went to sea on a destroyer, the USS |
| 02:47:58 | 20 | Harry Hubbard.  He later served on a cable laying ship, the |
| 02:48:01 | 21 | USS Aeolus.  Mr. Harvey designed the Aeolus's radio |
| 02:48:04 | 22 | controller.  He managed the equipment and the ship |
| 02:48:06 | 23 | personnel handling fleet broadcasts. |
| 02:48:09 | 24 | Mr. Harvey himself will tell you more about his |
| 02:48:14 | 25 | experience in the Navy and on the Aeolus, and how much he |

02:48:17  1  enjoyed his opportunity to work with the most advanced

02:48:20  2  communication technology and engineers at the time.  He'll

02:48:22  3  talk about how his naval experience shaped his thinking and

02:48:25  4  sowed the seeds that would eventually bottom PMC.

02:48:30  5       In 1973, Mr. Harvey met Ms. Mary Kazie Metzger.

02:48:37  6  Ms. Metzger is here with us today.

02:48:39  7       And if you don't mind, Ms. Metzger, can you please

02:48:42  8  stand so the jury can see you?  Thank you.

02:48:45  9       Ms. Metzger will be our first witness.  She joined

02:48:49  10  PMC in 1994.  Today, she's the chief executive officer of

02:48:53  11  the company.  Ms. Metzger is herself a pioneer in the cable

02:48:56  12  and satellite communications industry.  She'll tell us

02:49:00  13  about her career in that industry, her decision to join

02:49:04  14  Mr. Harvey at PMC.

02:49:05  15       Ms. Metzger's experience and contacts was critical

02:49:10  16  to PMC's early effort to help find investors and partners

02:49:14  17  to commercialize the technology that Mr. Harvey invented,

02:49:17  18  to get it into the hands of consumers.  Ms. Metzger's hard

02:49:20  19  work has been an important part of the hard-earned success

02:49:23  20  that PMC has been able to achieve over the years.

02:49:26  21       I should add, in addition to being PMC's chief

02:49:30  22  executive officer, Ms. Metzger is married to Mr. Harvey.

02:49:34  23  They were married in 1977, and they've been together ever

02:49:37  24  since, 44 years.

02:49:40  25       But for the moment, back to Mr. Harvey.

02:49:42  1          After he got out of the Navy, Mr. Harvey continued
02:49:47  2   to work in fields that gave him more exposure to
02:49:50  3   complicated computer systems and communication networks.
02:49:53  4   He began writing computer programs for automating complex
02:49:57  5   financial and accounting processes.  But in 1980,
02:50:00  6   Mr. Harvey decided to stop working for other people, to
02:50:03  7   devote himself full time to his life's passion, inventing
02:50:07  8   new communication systems and technologies.  He founded PMC
02:50:11  9   in 1981 and filed his first patent application the same
02:50:15  10  year.
02:50:16  11         That first patent application described inventions
02:50:19  12  that Mr. Harvey conceived relating to the coordination of
02:50:23  13  multi-media presentations, network automation, and many
02:50:27  14  other innovations.
02:50:28  15         PMC's first patent, the '490 patent, issued on
02:50:34  16  September 15th of 1987.  But Mr. Harvey didn't stop there.
02:50:40  17  He spent the next six years building on his original ideas.
02:50:44  18  He filed a second patent application in 1987.  That
02:50:48  19  application adds to the work that Mr. Harvey described in
02:50:51  20  his first application, and it describes additional
02:50:53  21  inventions that Mr. Harvey conceived after he had filed his
02:50:56  22  first application.
02:51:00  23         Mr. Harvey's 1987 application was nearly 550 pages
02:51:05  24  long.  This is a copy of it.
02:51:06  25         It included 23 pages of technical drawings.  As a

02:51:13  1  patent, in your book, it runs to over 275 columns.

02:51:19  2       The United States Patent Office has issued more

02:51:21  3  than 100 patents based on Mr. Harvey's original two patent

02:51:25  4  applications.

02:51:27  5       The '091 patent in this case is one of them.

02:51:30  6       PMC filed the application for the '091 patent to

02:51:34  7  cover Mr. Harvey's key management invention, as I

02:51:38  8  mentioned.  It's what's called a continuation application

02:51:40  9  of Mr. Harvey's '87 application.  The Patent Office

02:51:44  10  examined it, agreed that the invention was new, and issued

02:51:48  11  the patent, as I mentioned, on May 29th of 2012.

02:51:54  12       Now, I also expect that you'll hear from Apple

02:51:57  13  that it must -- how can it be infringing a patent that PMC

02:52:02  14  filed so long ago.

02:52:03  15       Apple ignores that the patent expressly describes

02:52:05  16  a system for, quote, decrypting programming and instruction

02:52:10  17  signals that are encrypted and for identifying those who

02:52:13  18  pirate programming and inhibiting piracy.

02:52:16  19       Apple ignores that 23 companies have taken

02:52:21  20  licenses to PMC's intellectual property, including the '091

02:52:25  21  patent.  Those companies include Cisco in 2011, Motorola in

02:52:30  22  2011, Sony in 2012, Samsung in 2017, LG just two years ago,

02:52:38  23  2019.  You can see many more on your screen.

02:52:40  24       Instead, Apple will cherry-pick parts of PMC's

02:52:47  25  patent that describes other inventions that Mr. Harvey

02:52:50  1  made, inventions relating to broadcast television, other

02:52:55  2  innovations, and say, that's not what we do.

02:52:58  3        But PMC is not accusing Apple of infringing all of

02:53:02  4  its patents.  This case is about PMC's '091 patent and the

02:53:06  5  claims in that patent that describe Mr. Harvey and

02:53:09  6  Mr. Cuddihy's key management invention.  PMC is accusing

02:53:12  7  Apple of infringing those claims.

02:53:14  8        So let me talk a little bit about Apple's FairPlay

02:53:19  9  technology.  If you've downloaded a song, a movie, a TV

02:53:23  10 show or an app, you've probably used Apple's FairPlay

02:53:27  11 technology without even knowing it.

02:53:28  12       As you heard this morning from His Honor, PMC must

02:53:32  13 prove infringement by a preponderance of the evidence.  You

02:53:35  14 also heard that to prove infringement, PMC must show that

02:53:39  15 each and every element of PMC's patent claims is present in

02:53:42  16 Apple's FairPlay system.  We embrace that burden.  And we

02:53:47  17 retained two experts analyze how FairPlay works.

02:53:50  18       Dr. Cory Plock is an adjunct professor of computer

02:53:55  19 science at New York University.  He reviewed the computer

02:53:58  20 source code that Apple produced in this litigation and that

02:54:02  21 defines the operation of FairPlay.  Dr. Plock will testify

02:54:05  22 by video.

02:54:05  23       He also studied technical documents that Apple

02:54:09  24 produced, sworn testimony that Apple's witnesses gave

02:54:13  25 describing the importance and operation of FairPlay.

02:54:15  1          Dr. Alf Weaver is professor emeritus of computer

02:54:24  2   science at the University of Virginia.  Dr. Weaver is here

02:54:28  3   with us today.

02:54:28  4          He analyzed Apple's infringement.  He reviewed

02:54:33  5   Dr. Plock's analysis, many Apple technical documents, the

02:54:37  6   sworn testimony of Apple's witnesses, and PMC's '091

02:54:41  7   patent.  He will walk us through his element-by-element

02:54:45  8   analysis to show exactly how FairPlay meets each element of

02:54:51  9   the claims to explain his analysis and the conclusion that

02:54:54  10  he reached that Apple infringes PMC's patent.

02:54:57  11         Let me give you a general overview, though, of how

02:55:03  12  FairPlay works.  Say you want to purchase the movie Toy

02:55:07  13  Story from the iTunes Store.  You'd open the iTunes app on

02:55:10  14  your phone, search for, and select Toy Story and click buy.

02:55:18  15         Once you authorize payment, you are done.

02:55:21  16  FairPlay and iTunes take over.  They work together to send

02:55:25  17  to your phone all the information you need to receive,

02:55:29  18  decrypt, and play Toy Story.

02:55:31  19         Now, the copy of Toy Story that you receive, it's

02:55:38  20  encrypted.  Without FairPlay, you wouldn't able to do

02:55:41  21  anything with this copy.  You need a content key to unlock

02:55:49  22  your encrypted copy of FairPlay.  Apple also encrypts the

02:55:56  23  content key itself.  So you need an account key to unlock

02:55:59  24  the content key.  And your phone needs security information

02:56:04  25  to find the right account key.

02:56:07  1          FairPlay takes care of all of this.  All you do is

02:56:11  2   click buy.  FairPlay and iTunes do the rest.

02:56:15  3          Dr. Plock and Dr. Weaver will describe FairPlay in

02:56:20  4   much more detail.  Their testimony and other evidence that

02:56:24  5   you will see and hear this week will show this is the

02:56:26  6   method of decrypting programming that Claim 13 of PMC's

02:56:33  7   '091 patent describes.

02:56:33  8          So, finally, let me talk about PMC and Apple's

02:56:37  9   history.

02:56:38  10         You'll hear testimony from PMC's former president,

02:56:44  11  Gerald Holtzman, about the long history of his discussions

02:56:46  12  with Apple and PMC's offers to grant to Apple permission to

02:56:49  13  use PMC's invention in exchange for a royalty.

02:56:55  14         Here's a photograph of Mr. Holtzman.  I'm sorry to

02:56:59  15  tell you Mr. Holtzman passed away three years ago.  We have

02:57:03  16  video, though, of a deposition that Mr. Holtzman gave in

02:57:05  17  this case, and we'll watch some of that video, I think,

02:57:09  18  later today.

02:57:09  19         You'll hear Mr. Holtzman describe that over a

02:57:12  20  period of about six years, PMC and Apple discussed PMC's

02:57:15  21  technology and its offers to license the technology to

02:57:19  22  Apple.

02:57:19  23         This is the timeline from 2008 until 2014 or so, a

02:57:25  24  period over which PMC and Apple discussed partnering

02:57:27  25  together concerning PMC's intellectual property.

02:57:31    1          The blue dots indicate some of the instances where

02:57:34    2    PMC reached out to Apple.  The red dots indicate each time

02:57:39    3    Apple reached out to PMC often asking for more information.

02:57:41    4          THE COURT:  Five minutes remaining.

02:57:43    5          MR. KLINE:  Teams of people from PMC and Apple

02:57:46    6    even met in person on several occasions to discuss PMC's

02:57:49    7    technology.

02:57:49    8          But PMC eventually had to face the fact that Apple

02:57:55    9    was not going to agree to pay for permission to use PMC's

02:57:58   10    technology.  You'll hear Mr. Holtzman testify that PMC

02:58:02   11    filed this lawsuit only when it felt it had no alternative.

02:58:05   12          Apple now claims that it doesn't need a license to

02:58:11   13    PMC's technology.

02:58:14   14          As you listen to the testimony this week, though,

02:58:16   15    ask yourself, why would Apple spend so much time talking

02:58:21   16    with PMC about PMC's technology and PMC's patents, attend

02:58:26   17    so many meetings with PMC if it didn't think it needed a

02:58:30   18    license from PMC?  Why did Apple ask PMC for more

02:58:33   19    information about its technology and intellectual property?

02:58:33   20    Why did Apple string PMC out for so long?

02:58:37   21          So after you've heard the evidence in this case,

02:58:39   22    PMC will ask you to find that Apple has infringed PMC's

02:58:43   23    patent and to award damages sufficient to compensate PMC

02:58:49   24    for Apple's infringement.

02:58:50   25          So what should Apple Pay for having infringed

02:58:54  1    PMC's '091 patent?  Later this week you'll hear from

02:58:56  2    Mr. Michael Pellegrino, an intellectual property valuation

02:59:01  3    expert and damage calculation expert.

02:59:03  4         He studied the issues in this case.  He reviewed

02:59:06  5    Apple financial information relating to the more than 70

02:59:09  6    billion downloads that Apple has delivered to its customers

02:59:13  7    using FairPlay.  He reviewed licenses that Apple has

02:59:16  8    entered into, including licenses that Apple has entered

02:59:20  9    into for DRM technology.  He reviewed documents and

02:59:25 10    testimony of Apple's witnesses.

02:59:26 11         Mr. Pellegrino also reviewed licenses that other

02:59:32 12    companies had taken for permission to use PMC's technology

02:59:33 13    and what other companies would pay for those rights.

02:59:34 14         Based on all of this information in his expert

02:59:40 15    analysis, Mr. Pellegrino concluded that Apple should pay to

02:59:43 16    PMC a reasonable royalty of just under half a penny each

02:59:49 17    time it infringed PMC's patent, which is each time Apple

         18    used FairPlay to deliver a song, an Apple TV show, a movie

02:59:58 19    or book to one of its customers.  This is a very small

03:00:00 20    percentage of the profit that Apple makes of FairPlay which

03:00:05 21    is itself a very small percentage of the profit that Apple

03:00:07 22    makes from iTunes.

03:00:08 23         The patent statute provides that when infringement

03:00:14 24    is found, damages shall be awarded that are no less than a

03:00:17 25    reasonable royalty for the use made of the invention by the

03:00:20  1   infringer.  No less than this amount.  Multiplying

03:00:25  2   Mr. Pellegrino's reasonable royalty by the more than 70

03:00:29  3   billion times that Apple has infringed PMC's patent over

03:00:31  4   the last nine years works out to be a little more than $300

03:00:36  5   million.

03:00:39  6        PMC recognizes that's a lot of money to ask you to

03:00:44  7   award PMC to compensate it for Apple's infringement.  It's

03:00:48  8   a lot of money, though, because Apple has infringed PMC's

03:00:52  9   patents -- patent so many times, for so long, 70 billion

03:00:57  10  times over nine years and counting.

03:00:58  11       PMC does not begrudge Apple the success that Apple

03:01:02  12  has achieved.  To the contrary, PMC respects it.  All PMC

03:01:07  13  is asking is that Apple Pay a fair and reasonable fee for

03:01:11  14  its use of PMC's patented technology, no more, no less.

03:01:17  15       Thank you for taking the time to be with us here

03:01:21  16  today and all week.  Thank you very much for helping us to

03:01:23  17  resolve this important case.

03:01:27  18       THE COURT:  All right.  Defendant may now present

03:01:33  19  its opening statement to the jury.

03:01:38  20       Would you like a warning on your time, counsel?

03:01:40  21       MR. SERNEL:  Your Honor, I'd appreciate a

03:01:42  22  five-minute warning.

03:01:43  23       THE COURT:  All right.  You may proceed when

03:01:44  24  you're ready.

03:01:45  25       MR. SERNEL:  Can you pull up my slides?

03:01:57  1          Ladies and gentlemen, let me start on a point that

03:02:08  2    we can all agree upon.  We can all agree that patents are

03:02:12  3    important and respecting the patent rights of others is

03:02:16  4    important.

03:02:17  5          The problem in this case is what PMC is trying to

03:02:23  6    do with its patent.  PMC is trying to use its patent to

03:02:27  7    claim credit for something that it did not invent.  PMC is

03:02:35  8    trying to use its patent to claim credit for Apple's hard

03:02:39  9    work and innovation, innovation that occurred many years

03:02:41  10   later to address a different problem and set of problems to

03:02:47  11   achieve a different solution.  Apple's hard work and

03:02:53  12   innovation deserve respect, too, and the evidence in this

03:02:56  13   case is going to show that Apple did not use PMC's patent

03:03:01  14   and does not infringe PMC's patent.

03:03:03  15         Now, we absolutely give credit to PMC for coming

03:03:12  16   up with an innovation, and you're going to hear about how

03:03:14  17   that innovation came up in the 1980s to address a

03:03:18  18   particular problem that existed at the time with broadcast

03:03:22  19   media and how to personalize broadcast media.  We don't

03:03:27  20   take that away from PMC.  They came up with a very

03:03:30  21   interesting idea to address a problem at that time.

03:03:32  22         But the evidence is also going to show you that

03:03:34  23   Apple has come up with interesting and great ideas and

03:03:37  24   innovation to address different problems, 16-plus years

03:03:42  25   later, with the advent of the Internet and downloading

03:03:46    1    content over the Internet.  The evidence is going to show

03:03:48    2    you that there were thousands of hours of time spent

03:03:51    3    developing a new system to figure out how to safely and

03:03:56    4    securely download content over the Internet and protect

03:03:59    5    Apple users from modern-day hacker technology.

03:04:03    6         The evidence in this case is going to show you

03:04:06    7    that PMC's idea would not work to address the problems that

03:04:11    8    Apple solved with Internet downloads.  And, in fact, it

03:04:15    9    would be exactly the wrong way to do it to protect those

03:04:18   10    downloads.

03:04:18   11         So ultimately, the question you're going to be

03:04:21   12    asked to answer in this case is, who has done the taking?

03:04:25   13    Has the taking been done by Apple?  Has Apple used PMC's

03:04:29   14    patent?  Or has the taking been done by PMC to try to take

03:04:35   15    credit for Apple's innovation and hard work?

03:04:38   16         Ladies and gentlemen, the evidence is going to

03:04:40   17    show you that PMC is doing the taking.  They're the ones

03:04:43   18    that have tried to take credit for what they did not

03:04:47   19    invent.  Apple did not use PMC's patent.  Apple does not

03:04:50   20    infringe PMC's patent.

03:04:52   21         Now, you met Mrs. Smith, my colleague, during jury

03:04:59   22    selection.  My name is Marc Sernel.  With the two of us,

03:05:04   23    Mr. Ellisen Turner and Mr. Greg Arovas, we'll be presenting

03:05:07   24    the majority of Apple's case.

03:05:08   25         You'll also meet during the trial, Mr. Roger

03:05:12  1   Pantos.  He's one of the key engineers that was

03:05:14  2   instrumental in developing the FairPlay software to address

03:05:18  3   these issues with Internet content downloads.

03:05:22  4        And you all shared some information with us during

03:05:24  5   jury selection.  I thought it was only fair to tell you a

03:05:27  6   little bit about myself.

03:05:28  7        My name is Marc Sernel.  I am married.  My wife

03:05:32  8   and I will be celebrating our 25th year anniversary in

03:05:38  9   December.  We grew up in the same hometown that we still

03:05:42  10  live in.  We have two children that are in high school,

03:05:44  11  that attend the same high school that we attended many,

03:05:47  12  many years ago.  We have a senior that's a daughter.  A son

03:05:50  13  that's a freshman.  And we also lost a son three years ago

03:05:55  14  who was a twin of our son, but Ryan is in our hearts all

03:05:59  15  the time, and we think about him every day.

03:06:00  16       Now, I want to thank you for your attention and

03:06:05  17  time in this case.  We appreciate you doing this,

03:06:08  18  especially during this time where we have to wear masks and

03:06:11  19  during a pandemic.  We very much thank you for your

03:06:14  20  attention.  It's very important to Apple and Mr. Pantos,

03:06:18  21  who developed this technology, that you're going to

03:06:21  22  consider all of the evidence in this case.

03:06:23  23       So this case is about patents.  Let's talk about

03:06:28  24  what a patent is all about.

03:06:30  25       You heard during the patent video that a patent is

| | | |
|---|---|---|
| 03:06:33 | 1 | like a land deed, and a land deed, as you know, has precise |
| 03:06:39 | 2 | measurements at the end of it that define the specific |
| 03:06:43 | 3 | property right of the land deed. |
| 03:06:45 | 4 | Just like a land deed, a patent has specific |
| 03:06:50 | 5 | measurements and a claim at the end that defines what the |
| 03:06:55 | 6 | patent covers.  And you will see that at the end of this |
| 03:07:00 | 7 | claim, it's got specific words and requirements that set |
| 03:07:03 | 8 | out what you can consider to be a fence line, sort of the |
| 03:07:07 | 9 | property line for the patent. |
| 03:07:08 | 10 | PMC's patent in this case, the '091 patent, has a |
| 03:07:13 | 11 | particular claim, Mr. Kline showed it to you, Claim 13, |
| 03:07:17 | 12 | that will define what that property boundary is, the red |
| 03:07:21 | 13 | fence for PMC's patent.  And the question is going to be: |
| 03:07:25 | 14 | Has Apple done anything to build on PMC's property? |
| 03:07:33 | 15 | FairPlay, you will hear evidence about, also |
| 03:07:35 | 16 | staked out land, has staked out land at a different time, |
| 03:07:40 | 17 | many years later, to deal with the problems they were |
| 03:07:42 | 18 | dealing with at the time with respect to Internet content |
| 03:07:48 | 19 | downloads.  And PM -- FairPlay has its own patents |
| 03:07:50 | 20 | associated with it, which you'll hear about, that |
| 03:07:52 | 21 | provide -- that show the value of all of the hard work that |
| 03:07:55 | 22 | Apple's engineers put into FairPlay. |
| 03:07:57 | 23 | So, again, ultimately, the question is going to be |
| 03:08:00 | 24 | did PMC -- or did Apple try to build on PMC's land?  And I |
| 03:08:06 | 25 | think the evidence is going to show you that PMC is trying |

03:08:09    1    to stretch their patent to cover what Apple has done, and

03:08:13    2    the patent -- Apple has not used PMC's patent and, in fact,

03:08:17    3    not infringed PMC's patent.  And the evidence is going to

03:08:20    4    show you that Apple developed its technology to address a

03:08:24    5    different set of problems at a much later point in time

03:08:28    6    that required a much different solution.

03:08:30    7         So now let's go back -- back in time.  September

03:08:37    8    1987.  What were you all doing in September 1987?  Let's

03:08:42    9    think back.

03:08:44   10         I was a senior in high school.  Starting my senior

03:08:47   11    year of high school, 1987.  Little did we know in September

03:08:52   12    1987, PMC was filing the last of its patent applications

03:08:58   13    with new information, new innovations in their patent

03:09:02   14    filings.  This is the last time, September 1987, that PMC

03:09:06   15    had any new idea that they put into a patent filing.

03:09:11   16         And so we can look at that, it's sort of frozen in

03:09:15   17    time, this was the last time they did any innovative work,

03:09:18   18    September 1987.

03:09:20   19         And so what problem was PMC trying to solve in

03:09:25   20    September 1987?

03:09:26   21         And to do that, let's think about what kinds of

03:09:33   22    communications, what kinds of media, what kinds of

03:09:36   23    entertainment were people watching and how did they get it

03:09:41   24    at that point in time?

03:09:42   25         And so when you think of September 1987, what

03:09:45   1   kinds of things were we able to get our hands on for

03:09:48   2   entertainment?

03:09:48   3        One thing we had was -- still we had the TVs with

03:09:51   4   the antennas where you could get a signal over the air and

03:09:55   5   receive broadcasts of television.

03:09:57   6        Cable television had just come around in that era,

03:10:00   7   and so you could receive cable television.

03:10:02   8        You also could go to the record store and get

03:10:04   9   records or cassettes.  If you wanted to listen to specific

03:10:08   10  music, you could get records or cassettes from the record

03:10:13   11  store.

03:10:13   12       For a computer, there wasn't the ability at that

03:10:17   13  time to download something, to get something over the

03:10:19   14  Internet.  The Internet did not exist until many years

03:10:22   15  later.  But what you had to do is go get a computer disk,

03:10:26   16  get a floppy disk and put it in a computer and -- for a

03:10:28   17  game or any kind of program that you wanted to use.

03:10:31   18       And then if you wanted to watch a movie, you

03:10:33   19  wanted to watch a specific movie, you went to something

03:10:40   20  that was fairly new, a video rental store, a Blockbuster

03:10:40   21  Video, to go get a VHS tape to watch your favorite movie.

03:10:45   22       So what's -- what about this entertainment at that

03:10:48   23  time that led PMC to think about their invention and what

03:10:51   24  problem they were trying to solve?  If you think about it,

03:10:54   25  there's two ways that people were able to get their hands

03:10:57  1  on this entertainment at that time.

03:10:58  2          One way was by getting a physical copy, a computer

03:11:03  3  disk, a record, a cassette, a VHS tape, physically go get

03:11:06  4  something so they could watch a particular thing.  That was

03:11:09  5  one way.

03:11:09  6          The second way was to get access to broadcasts,

03:11:13  7  watch whatever channels were on TV.  Same thing with radio,

03:11:17  8  whatever radio stations that you could tune your radio to,

03:11:21  9  you could listen to that.

03:11:24  10         And so it was the second way, this broadcast

03:11:26  11  technology that PMC tried to solve one of the limitations

03:11:30  12  with that.

03:11:31  13         And so their idea was, let's try to take this

03:11:34  14  broadcast technology and personalize it.  Let's try to

03:11:37  15  personalize it so that people can receive more specific

03:11:42  16  information that they want, not just get the signals that

03:11:46  17  are blasted over the TV airwaves or radio waves, but get

03:11:53  18  specific information that is personalized to that consumer,

03:11:55  19  that viewer.  That was the idea of PMC, and we're going to

03:11:57  20  see how they bake that into their claims that they then

03:12:01  21  sought from the Patent Office.

03:12:02  22         This is a section of PMC's patent.  And you can

03:12:08  23  see here that the idea that PMC had in 1987 to solve this

03:12:13  24  problem with broadcast media was to embed signals in

03:12:18  25  programming, and then they talked about the advantages of

03:12:21   1   doing that.  They -- their idea was, okay, for these

03:12:26   2   broadcast signals, let's stick particular -- broadcast

03:12:31   3   transmissions, let's stick particular signals in those

03:12:35   4   transmissions, embed them in there together.  And we had

03:12:37   5   certain advantages that could flow with that.

03:12:39   6         And one of the advantages was, obviously, the

03:12:43   7   signals can't get disassociated from the programming.

03:12:46   8   There's other things about when you put them in -- put them

03:12:48   9   together, advantages that they talk about in their patent.

03:12:51   10  And so this was PMC's idea, how do we personalize broadcast

03:12:55   11  or programming for a particular consumer?

03:13:00   12        And let's think about how this would be done.  You

03:13:02   13  can see here, this is just a simple graphic showing how TV

03:13:07   14  airwaves were sent to houses at the time, and everybody

03:13:10   15  basically got the same channels, right?  You just -- you

03:13:14   16  turn on your TV, whatever channel -- channels came in over

03:13:18   17  the airwaves, that's what you had to watch.

03:13:21   18        PMC's idea was -- said, let's take these

03:13:25   19  particular signals, embed them in together with the

03:13:28   20  programming, such that we could then personalize what

03:13:32   21  people would get.

03:13:33   22        And so we could use these red signals to

03:13:37   23  personalize what each individual homeowner might be able to

03:13:40   24  see on their TV as part of their viewing experience.  This

03:13:45   25  was the PMC idea in 1987 that they were trying to solve

03:13:49  1  with this personalization idea.

03:13:51  2        And so there's an example in PMC's patent about,

03:13:54  3  okay, how would this exactly work?  What they talk about

03:13:56  4  here is with respect to a TV show at the time, Wall Street

03:14:02  5  Week, how would we personalize that?  And the idea was,

03:14:04  6  when we stick these red signals in with the programming,

03:14:08  7  you can personalize it such that maybe your own stock

03:14:12  8  information, your own stock portfolio information would be

03:14:15  9  included, like, on the bottom or as part of the Wall Street

03:14:19  10  Week programming.

03:14:20  11        That was their idea, try to personalize what

03:14:22  12  you're watching so you're not just watching a TV show that

03:14:27  13  everybody gets.  You're personalizing it in some way for

03:14:30  14  the person who's watching it.

03:14:32  15        That was PMC's idea.  And, again, it was based on

03:14:37  16  sticking these signals in, embedding signals together with

03:14:41  17  the programming.

03:14:41  18        And then, ultimately, they came up with a business

03:14:44  19  plan to try to develop a business based on this idea;

03:14:47  20  again, this personalization idea, personalized television,

03:14:51  21  personalizing this programming based on putting the signals

03:14:55  22  in.  And that's ultimately what PMC's name is, Personalized

03:14:59  23  Media Communications.  Personalized media means sticking

03:15:06  24  signals in with programming transmissions.  That was PMC's

03:15:10  25  idea, 1987.

```
03:15:11    1        Now, let's talk a little bit about Apple.  We have
03:15:14    2   to jump forward in time to talk about Apple.
03:15:16    3        The first relevant part of this is in the late
03:15:20    4   1990s, and you know between '87 and the late 1990s what
03:15:25    5   happened was the Internet revolution.  A ground-breaking
03:15:30    6   change on how we all can access information.  We have
03:15:33    7   access to information across the globe at our fingertips
03:15:37    8   because of the Internet and the information highway.
03:15:40    9        And Apple developed a series of products that took
03:15:43   10   advantage of the Internet, the first of which was the iMac,
03:15:50   11   Internet Mac, which came out in 1988.  Subsequent to that,
03:15:53   12   there were multiple other "i" products that had Internet
03:15:58   13   capability and could use this great power of the Internet,
03:16:02   14   harness this power of the Internet to make things available
03:16:06   15   on Apple devices that never before could be made available.
03:16:12   16        One other thing that Apple did was -- in trying to
03:16:15   17   harness this power of the Internet was the development of,
03:16:18   18   in 2003, the Internet iTunes Store.  And the iTunes Store
03:16:23   19   was an attempt to try to say, okay, we've got this ability
03:16:27   20   now to transmit things over the Internet.  Let's make a
03:16:31   21   store available where people could buy music.
03:16:34   22        It used to be that you had to go to the record
03:16:36   23   store to get an album or a cassette.  The iTunes Internet
03:16:45   24   Store allowed people to download their favorite music on to
03:16:48   25   a device.  In this case, up on the screen you can see an
```

03:16:53  1    iPod where people could download 50 to 100 songs, have that

2    on that device and be able to listen to their favorite

03:16:57  3    music.  The iTunes Store was the first attempt to allow

03:17:00  4    people to download this kind of information.

03:17:02  5         Now, there was amazing opportunities afforded by

03:17:09  6    the Internet, opened up a whole new realm of things that

03:17:12  7    could be done, but there were also a series of huge

03:17:15  8    challenges and problems associated with the Internet and

03:17:20  9    transactions over the Internet.

03:17:22  10        And you can think about it with the iTunes Store,

03:17:26  11   you know, there's credit card information that needs to be

03:17:29  12   exchanged, there's content being distributed over the

03:17:32  13   Internet.  And that raises lots of possibilities about --

03:17:36  14   of someone getting in the middle, stealing content,

03:17:40  15   stealing credit card information.  There's things like

03:17:44  16   hackers and viruses and malware and all kinds of scary

03:17:49  17   words associated with Internet transactions and Internet

03:17:52  18   communications.

03:17:52  19        And so Apple needed -- when they were setting up

03:17:55  20   this iTunes Store -- to come up with a whole lot of

03:17:58  21   innovations to figure out how are we going to make this

03:18:02  22   safe and secure?  We're not going to allow people to steal

03:18:07  23   things that are being transmitted over the Internet, and we

03:18:10  24   need to protect Apple users from, you know, things like

03:18:12  25   viruses and many other problems associated with the

03:18:16  1  Internet.

03:18:17  2          And so what did Apple come up with?  Apple came up

03:18:20  3  with FairPlay.  Now, FairPlay is software that helps to,

03:18:25  4  again, protect both the content and the users to ensure

03:18:28  5  that these bad things can't happen.

03:18:31  6          FairPlay is actually a collection -- it's a word

03:18:34  7  that talks about a collection of various technology that

03:18:38  8  protects these transactions and protects Apple users.

03:18:42  9  We're going to focus on one part of FairPlay in this case.

03:18:46  10          But there's sort of a foundational approach of

03:18:50  11  FairPlay that is the reason why it does not use PMC's

03:18:54  12  technology and would not use it because it just makes no

03:18:58  13  sense in the context of Internet downloads, and that is

03:19:03  14  ensuring that everything, everything is separated in terms

03:19:08  15  of how it's approached, separating everything from the

03:19:13  16  encrypted content, separate transmissions.

03:19:16  17          And we're going to look right here.  This is kind

03:19:18  18  of at the microlevel, when the security information is sent

03:19:23  19  to an Apple device, you will see here -- Mr. Kline talked

03:19:26  20  about a lock.  When you see a lock, you can think about

03:19:29  21  encrypted, okay?  A lock on a certain portion of it that's

03:19:34  22  encrypted.  And you'll see documents in this case that

03:19:37  23  talks -- calls that the private portion.  Private portion

03:19:40  24  equals encrypted equals locked.

03:19:44  25          And you see in these documents how there's a

| | | |
|---|---|---|
| 03:19:47 | 1 | separation of the locked portion, the encrypted portion |
| 03:19:51 | 2 | from the other pieces.  Apple takes a separation approach, |
| 03:19:56 | 3 | separates this information to ensure that only certain |
| 03:19:59 | 4 | informations in the encrypted part and other things are |
| 03:20:03 | 5 | kept separate, even at the smallest level when you look at |
| 03:20:06 | 6 | the security information that's sent to Apple devices, |
| 03:20:10 | 7 | separation is key to what Apple does. |
| 03:20:11 | 8 | Apple separates in other respects, too, when you |
| 03:20:17 | 9 | take a 20,000-foot view.  When information is sent to an |
| 03:20:22 | 10 | Apple device, it's not sent together.  Remember back to how |
| 03:20:25 | 11 | PMC does it, it says it embeds the signals in the |
| 03:20:28 | 12 | programming, put them together?  With respect to Apple's |
| 03:20:31 | 13 | approach, that -- there's no way they could send all these |
| 03:20:37 | 14 | things together because it would be too insecure.  People |
| 03:20:40 | 15 | could steal one package and have everything it needs to |
| 03:20:42 | 16 | cause a lot of mischief. |
| 03:20:44 | 17 | And so what Apple does is it separates these |
| 03:20:47 | 18 | transmissions and says, okay, we're going to send the |
| 03:20:50 | 19 | security information from one place out on the West Coast, |
| 03:20:54 | 20 | we're going to send the programming information -- |
| 03:20:58 | 21 | encrypted programming in a completely separate |
| 03:21:01 | 22 | transmission, separating the transmissions from separate |
| 03:21:05 | 23 | servers, and they're even sent at separate times. |
| 03:21:08 | 24 | And so Apple tries to separate multiple levels of |
| 03:21:11 | 25 | separation in terms of how they do this, the exact opposite |

03:21:16   1   of the PMC approach, which is to put the signals in with

03:21:20   2   the programming or the encrypted information.

03:21:25   3        And you can see here, it's even separate server

03:21:29   4   networks.  It would be a lot easier for Apple to simply

03:21:32   5   say, okay, I'm going to send it from one server, send all

03:21:35   6   the information to the device, and then you've got it.

03:21:37   7        But what Apple does is it set up a completely

03:21:40   8   different server network for the -- for the security

03:21:43   9   information.  There's only two of them in the United

03:21:46   10   States, one in Nevada, one in North Carolina.  Separate all

03:21:51   11   that out, send that separately from the content, and so the

03:21:56   12   content, the movies, the songs, the apps, come from a whole

03:22:00   13   different set of servers.  Again, separation at every

03:22:03   14   level.  Multiple levels of separation in terms of what

03:22:06   15   Apple does, exactly 180 degrees the opposite approach of

03:22:10   16   what PMC's idea was in 1987.

03:22:13   17        And you're going to hear about FairPlay and this

03:22:17   18   separation approach and why they did it from two engineers

03:22:21   19   that work at Apple.

03:22:22   20        The first is the senior engineer in charge of the

03:22:26   21   project, Dr. Bud Tribble.  And he's going to tell you about

03:22:29   22   the architecture and kind of what they -- what they thought

03:22:32   23   about when they first sat down to design the FairPlay

03:22:36   24   system in 2003.

03:22:37   25        You're also going to hear from Mr. Pantos, as we

| | | |
|---|---|---|
| 03:22:41 | 1 | referenced before, who was the engineer who was |
| 03:22:43 | 2 | instrumental of putting together specific pieces of this, |
| 03:22:48 | 3 | and he will also explain why Apple did what it did and why |
| 03:22:51 | 4 | the separate approach is so important for Internet content |
| 03:22:55 | 5 | downloads. |
| 03:22:55 | 6 | And so you're going to see, in terms of the timing |
| 03:22:59 | 7 | of this, you know, this Internet file sharing only came |
| 03:23:04 | 8 | around in the late 1990s when the Internet revolution was |
| 03:23:08 | 9 | picking up steam. |
| 03:23:09 | 10 | FairPlay came about in the 2003/2004 time frame |
| 03:23:16 | 11 | that set up this safe and secure platform for being able to |
| 03:23:20 | 12 | sell music via iTunes first. |
| 03:23:23 | 13 | Ultimately, iTunes was expanded to movies and |
| 03:23:27 | 14 | other types of media, and then you'll hear about in 2008, |
| 03:23:31 | 15 | how Apple developed the App Store and that the App Store |
| 03:23:35 | 16 | now uses FairPlay for these safe and secure downloads and |
| 03:23:37 | 17 | protection of Apple devices.  And along the way, obviously |
| 03:23:42 | 18 | Apple came up with the iPhone and iPad, et cetera, to use |
| 03:23:49 | 19 | iTunes and the App Store to allow people to have these then |
| 03:23:50 | 20 | on their devices. |
| 03:23:51 | 21 | I'll note that Mr. Kline's timeline that he showed |
| 03:23:54 | 22 | you with the Apple and PMC interactions didn't go back to |
| 03:24:00 | 23 | 2003.  And you can see here, 2003 is when FairPlay came |
| 03:24:09 | 24 | about.  The PMC patent didn't issue until 2012, nine years |
| 03:24:14 | 25 | later.  And Apple had been doing that, had developed it in |

03:24:18  1   2003, separate and apart from any of PMC's technology, not

03:24:25  2   using PMC's technology or its patent.

03:24:27  3        So let's talk a little bit about non-infringement

03:24:33  4   and how to think about infringement and the infringement

03:24:35  5   analysis.

03:24:41  6        Let's think about a simple patent claim, and I've

03:24:44  7   got one here -- a patent claim to a soccer ball.  A soccer

03:24:48  8   ball, you can think about, might have five requirements

03:24:51  9   that would be in the patent claim.  It would be a ball made

03:24:54  10  of leather, stitched together, filled with compressed air

03:24:57  11  and round.  And so these would be the five requirements in

03:25:00  12  the patent claim for the soccer ball, all of which would

03:25:05  13  need to be met or -- to have infringement of a soccer ball

03:25:08  14  patent.

03:25:08  15       Let's say you came up with something that was a

03:25:12  16  football and said, okay, I've got a football, I should be

03:25:16  17  free and clear of the soccer-ball patent.  But the person

03:25:19  18  with the soccer-ball patent said they thought you infringed

03:25:22  19  their soccer-ball patent.

03:25:23  20       If you think about the analysis, the way the

03:25:26  21  analysis would work is, well, four of the five requirements

03:25:30  22  actually match up.  A football is a ball, it's made of

03:25:35  23  leather, it's stitched together, and it's filled with

03:25:38  24  compressed air.  But the fifth, the shape, because it's

03:25:44  25  oblong, it would not infringe the soccer-ball patent.  And

| | | |
|---|---|---|
| 03:25:47 | 1 | just like a football is not a soccer ball, one difference |
| 03:25:50 | 2 | makes -- or one little difference makes all the difference |
| 03:25:53 | 3 | in the world.  One difference means there's no |
| 03:25:56 | 4 | infringement, and that's the way I would suggest that you |
| 03:26:00 | 5 | think about the way you judge infringement. |
| 03:26:03 | 6 | So let's take a quick look at PMC's '091 Claim 13. |
| 03:26:11 | 7 | You can see this is a lot more complicated than a simple |
| 03:26:15 | 8 | soccer ball patent.  It's got a lot of requirements, a |
| 03:26:20 | 9 | method of decrypting programming, and then multiple |
| 03:26:22 | 10 | specific steps to set forth exactly what is required for |
| 03:26:24 | 11 | Apple to be found to be infringing this patent, to be |
| 03:26:27 | 12 | inside that red fence. |
| 03:26:29 | 13 | And I would submit to you, this is not simply key |
| 03:26:32 | 14 | management.  I think you're going to hear evidence in this |
| 03:26:34 | 15 | case that PMC did not, did not invent the concept -- the |
| 03:26:40 | 16 | basic concept of key management. |
| 03:26:41 | 17 | This requires much, much more than just a simple |
| 03:26:45 | 18 | key management.  It requires specific steps be followed in |
| 03:26:49 | 19 | order for infringement to be found, and the evidence is |
| 03:26:52 | 20 | going to show you that multiple of these steps are not met, |
| 03:26:57 | 21 | are not used by Apple's technology. |
| 03:27:00 | 22 | The first one we'll focus on and the evidence will |
| 03:27:05 | 23 | show you is this concept of an instruct-to-enable signal |
| 03:27:11 | 24 | being put in the transmission, the encrypted transmission, |
| 03:27:19 | 25 | the locked transmission. |

| | | |
|---|---|---|
| 03:27:19 | 1 | THE COURT:  Five minutes remaining. |
| 03:27:20 | 2 | MR. SERNEL:  Remember before we talked about how |
| 03:27:21 | 3 | PMC's idea was putting the signals on, embedding the |
| 03:27:26 | 4 | signals in the programming transmission.  That's what this |
| 03:27:32 | 5 | claim is all about, instruct-to-enable signal in the |
| 03:27:36 | 6 | transmission.  Embedded in. |
| 03:27:37 | 7 | Apple's approach is exactly the opposite.  It |
| 03:27:40 | 8 | doesn't put the signals in the locked transmission.  It |
| 03:27:43 | 9 | does everything it can to separate the signal from the |
| 03:27:48 | 10 | transmission.  We saw how there's a public part and a |
| 03:27:51 | 11 | private part that's sent.  We saw how they separate the |
| 03:27:59 | 12 | server network.  They send separate transmissions at |
| | 13 | separate times. |
| 03:28:00 | 14 | Apple takes the exact opposite approach.  The |
| 03:28:02 | 15 | advantages that PMC sought with what they did in the 1980s |
| 03:28:06 | 16 | to solve their problem are absolutely disadvantages for |
| 03:28:10 | 17 | doing it that way in the context of Internet downloads. |
| 03:28:14 | 18 | Apple did it the opposite way, does not use this |
| 03:28:18 | 19 | requirement of PMC's patent.  There's no infringement of |
| 03:28:21 | 20 | this requirement. |
| 03:28:22 | 21 | And we talked about the separateness.  There's |
| 03:28:26 | 22 | multiple levels of separation.  It's not signals in, not |
| 03:28:31 | 23 | sending it together.  It is sending everything separate. |
| 03:28:35 | 24 | Now, there's also a few other requirements of |
| 03:28:40 | 25 | PMC's specific method of decrypting programming that are |

03:28:44  1   not met.  We'll -- the evidence-- we'll get into these

03:28:49  2   throughout the trial.  There's a lot of words here and a

03:28:51  3   lot of details.

03:28:54  4        Bottom line is these are ways of doing something

03:28:56  5   to address what PMC was addressing in the 1980s, sending

03:29:00  6   signals that enumerate operations.  You'll hear from

03:29:04  7   Mr. Pantos and other witnesses why that's exactly the wrong

03:29:07  8   way to do it.  You couldn't do it that way.  It's unsafe to

03:29:11  9   send signals like that in these transmissions.

03:29:15  10        And determining a way, determining different ways

03:29:17  11   of doing this, you're going to hear from our witnesses why

03:29:20  12   that's exactly the opposite way than how they did it

03:29:23  13   because you need to ensure the safety and security of

03:29:29  14   Internet downloads.

03:29:30  15        You're going to see at the end of this case that

03:29:32  16   there's multiple reasons -- we only have to show you one,

03:29:35  17   but there's multiple things that PMC will not be able to

03:29:39  18   show Apple does.  Apple's FairPlay does not infringe.

03:29:44  19        And at the end of the day, I think the evidence is

03:29:48  20   going to show you that Apple came up with its own

03:29:52  21   technology at a different time to address a different set

03:29:55  22   of challenges to come up with a very different solution.

03:30:02  23   It did not use PMC's patent at all.  It did not infringe

03:30:06  24   PMC's patent at all.  And ultimately we'll come back at the

03:30:12  25   end of this case, walk you through that evidence, and I

03:30:14  1   think you'll be finding that there's no infringement by the

03:30:18  2   FairPlay technology.

03:30:19  3           I thank you very much for your time and attention.

03:30:22  4   I thank you very much for the time and attention you're

03:30:26  5   going to give us this week, and I look forward to coming

03:30:29  6   back and talk to you at the end of the case about what the

03:30:31  7   evidence has shown.

03:30:32  8           Thank you very much.

03:30:33  9           THE COURT:  Counsel, does either party wish to

03:30:37  10  invoke the rule?

03:30:39  11          MR. SERNEL:  Yes, please.

03:30:40  12          THE COURT:  And do I understand that the rule as

03:30:46  13  invoked would be to exclude expert witnesses so that they

03:30:49  14  could remain in the courtroom, or do you wish them to be

03:30:53  15  covered by the rule, as well?

03:30:56  16          MR. KLINE:  I would just say just fact witnesses.

03:30:58  17          MR. SERNEL:  Just fact witnesses.

03:30:59  18          THE COURT:  All right.  Ladies and gentlemen,

03:31:05  19  we're going to take a short recess, but given the

03:31:09  20  invocation of the rule as specified by counsel, when we

03:31:14  21  come back, if you are a fact witness, not an expert

03:31:17  22  witness, then you are required to remain outside the

03:31:19  23  courtroom until you're called to testify as a fact witness

03:31:22  24  in the case.  But expert witnesses and designated corporate

03:31:28  25  representatives would be outside of the rule.

```
03:31:30   1          Ladies and gentlemen of the jury, we're going to
03:31:32   2    take a brief recess, and we're going to try to make it
03:31:35   3    short.  When we come back, we'll start with the Plaintiff's
03:31:37   4    first witness.  This is one of those opportunities you can
03:31:39   5    simply leave your notebooks closed in your chairs.  I'm
03:31:43   6    going to try to keep this to about 10 minutes, and we'll be
03:31:46   7    back and proceed with Plaintiff's first witness at that
03:31:49   8    time.
03:31:49   9          The jury is excused for recess at this time.
03:31:53  10          COURT SECURITY OFFICER:  All rise.
03:31:55  11          (Jury out.)
03:31:55  12          THE COURT:  The Court stands in recess.
03:48:37  13          (Recess.)
03:48:38  14          COURT SECURITY OFFICER:  All rise.
03:48:39  15          THE COURT:  Be seated, please.
03:48:39  16          Plaintiffs, are you prepared to call your first
03:48:48  17    witness?
03:48:49  18          MR. KLINE:  Yes, we are, Your Honor.
03:48:51  19          THE COURT:  All right.  Let's bring in the jury,
03:48:53  20    please.
03:48:53  21          COURT SECURITY OFFICER:  All rise.
03:48:54  22          (Jury in.)
03:48:54  23          THE COURT:  Please be seated.
03:49:23  24          Plaintiff, call your first witness.
03:49:29  25          MR. KLINE:  Your Honor, Plaintiffs call Ms. Mary
```

```
03:49:32   1   Kazie Metzger.
03:49:33   2            THE COURT:  All right.  Ms. Metzger, if you'll
03:49:36   3   come forward and be sworn, please.
03:49:52   4            (Witness sworn.)
03:49:53   5            THE COURT:  Please come around, have a seat on the
03:49:57   6   witness stand.
03:49:58   7            Do we have binders to distribute?
03:50:06   8            MR. KLINE:  I think, Your Honor, you have a
03:50:08   9   binder.  I think we handed it up during the recess.  And
03:50:10  10   there's a binder on the witness's station, and we've handed
03:50:15  11   -- I guess we're handing out now.
03:50:18  12            THE COURT:  That's what prompted my question.
03:50:20  13            MR. KLINE:  Pardon me, Your Honor.
03:50:22  14            THE WITNESS:  May I take this off?
03:50:24  15            THE COURT:  Yes, please.  And if you'll adjust the
03:50:27  16   microphone.  And there's water in the pitcher if you need
03:50:30  17   it.
03:50:30  18            All right.  Mr. Kline, you may proceed.
03:50:33  19            MR. KLINE:  Thank you, Your Honor.
          20      MARY KATHERINE METZGER, PLAINTIFF'S WITNESS, SWORN
          21                        DIRECT EXAMINATION
03:50:33  22   BY MR. KLINE:
03:50:33  23   Q.  Good afternoon, Ms. Metzger.  Would you state your name
03:50:37  24   for the record, please?
03:50:37  25   A.  Mary Katherine Metzger.
```

| | | |
|---|---|---|
| 03:50:39 | 1 | Q.  And where do you work? |
| 03:50:40 | 2 | A.  I work at PMC, Personalized Media. |
| 03:50:43 | 3 | Q.  What does PMC do? |
| 03:50:45 | 4 | A.  PMC develops technology, and then we look for partners |
| 03:50:48 | 5 | to -- for them to implement that technology, and then we |
| 03:50:51 | 6 | ensure access to our technology. |
| 03:50:54 | 7 | Q.  Generally speaking, what industries are PMC's licensing |
| 03:50:59 | 8 | partners are? |
| 03:51:00 | 9 | A.  Telecommunications and Internet activity, |
| 03:51:02 | 10 | transmissions. |
| 03:51:03 | 11 | Q.  What is your position at the company? |
| 03:51:05 | 12 | A.  I'm the CEO. |
| 03:51:11 | 13 | Q.  Where are PMC's headquarters based? |
| 03:51:14 | 14 | A.  The headquarters are in Sugar Land, Texas. |
| 03:51:17 | 15 | Q.  How many people work for the company? |
| 03:51:18 | 16 | A.  There are 10 of us. |
| 03:51:19 | 17 | Q.  What are their jobs? |
| 03:51:20 | 18 | A.  We have two lawyers, three engineers, two support |
| 03:51:28 | 19 | staff, another business person, and myself and the named, |
| 03:51:35 | 20 | inventor, Mr. John Harvey. |
| 03:51:36 | 21 | THE COURT:  Ms. Metzger, pull the microphone a |
| 03:51:39 | 22 | little closer to you, please. |
| 03:51:40 | 23 | THE WITNESS:  I'm sorry. |
| 03:51:42 | 24 | THE COURT:  Go ahead, counsel. |
| 03:51:44 | 25 | MR. KLINE:  Thank you, Your Honor. |

03:51:44   1   Q.  (By Mr. Kline)  You mentioned Mr. Harvey.  Again,

03:51:46   2   what's your relationship to Mr. Harvey?

03:51:48   3   A.  Mr. Harvey is my husband.

03:51:49   4   Q.  Do the two of you work out of the company Sugar Land

03:51:53   5   office?

03:51:53   6   A.  No.  We have a home office in New York.

03:51:55   7   Q.  Has PMC always been based in Sugar Land?

03:51:59   8   A.  No.  When it was founded, it was in New York where we

03:52:04   9   had been living.

03:52:04  10   Q.  And when did it move to Sugar Land?

03:52:06  11   A.  It moved to Sugar Land in -- I guess it was about 2012.

03:52:12  12   Q.  Why is that?

03:52:13  13   A.  Well, at the time, there were seven people working for

03:52:17  14   the company, five of them living in Sugar Land, and it was

03:52:22  15   a practical location.  Most of the people who were working

03:52:26  16   for the company were in Texas.

03:52:28  17   Q.  Where were you born, Ms. Metzger?

03:52:29  18   A.  I was born in Alexandria, Louisiana.

03:52:33  19   Q.  Did you grow up there?

03:52:34  20   A.  No.  My dad was in the oil business, and we moved to

03:52:37  21   Texas when I was four.  We lived in Dallas, and then Fort

03:52:41  22   Worth, and then Corpus Christi, and then my parents moved

03:52:45  23   to Houston when I was in college.

03:52:46  24   Q.  Where did you go to high school?

03:52:47  25   A.  I went to Corpus Christi Ray High School.

| | | |
|---|---|---|
| 03:52:51 | 1 | Q.  Do you still have family here in Texas? |
| 03:52:53 | 2 | A.  Yes, I do.  My sister and my nephew live in Houston. |
| 03:52:58 | 3 | And until last fall, my 104-year-old mother lived in |
| 03:53:03 | 4 | Houston. |
| 03:53:03 | 5 | Q.  I think you mentioned this but did you attend college, |
| 03:53:07 | 6 | Ms. Metzger? |
| 03:53:07 | 7 | A.  Yes.  I went to Duke in North Carolina. |
| 03:53:11 | 8 | Q.  What year did you graduate? |
| 03:53:13 | 9 | A.  1968. |
| 03:53:13 | 10 | Q.  What did you do after you graduated college? |
| 03:53:16 | 11 | A.  I went to Harvard Business School. |
| 03:53:18 | 12 | Q.  How big was your class at Harvard? |
| 03:53:20 | 13 | A.  There were 750 of us as HBS. |
| 03:53:24 | 14 | Q.  Was that even split, male/female? |
| 03:53:27 | 15 | A.  No.  There were 30 women and the rest were men. |
| 03:53:30 | 16 | Q.  When did you graduate from the Harvard Business School? |
| 03:53:33 | 17 | A.  That was in 1970. |
| 03:53:34 | 18 | Q.  Did you go into the telecommunications industry after |
| 03:53:38 | 19 | you left Harvard Business School? |
| 03:53:40 | 20 | A.  No, I spent a couple of years in banking in New York, |
| 03:53:43 | 21 | and then I joined the RCA company, and then spent the rest |
| 03:53:48 | 22 | of my non-PMC career in telecommunications in New York -- |
| 03:53:56 | 23 | in the New York area. |
| 03:53:57 | 24 | Q.  When did you join the RCA company? |
| 03:54:01 | 25 | A.  That was in 1972. |

| | | |
|---|---|---|
| 03:54:02 | 1 | Q.  And what was your first role there? |
| 03:54:05 | 2 | A.  I was working at what was called Corporate Staff, and |
| 03:54:09 | 3 | we were looking at new investments and new business |
| 03:54:14 | 4 | opportunities. |
| 03:54:15 | 5 | Q.  Did your role stay the same at RCA? |
| 03:54:19 | 6 | A.  No, they were developing a new division, a new |
| 03:54:21 | 7 | subsidiary called RCA American communications, and it was |
| 03:54:25 | 8 | the first domestic communications satellite businesses in |
| 03:54:29 | 9 | the mid '70s. |
| 03:54:30 | 10 | Q.  Was that called RCA Americom? |
| 03:54:36 | 11 | A.  Yes, it eventually became RCA Americom. |
| 03:54:40 | 12 | Q.  What was your role at RCA Americom? |
| 03:54:43 | 13 | A.  We were looking at new investments and how to expand |
| 03:54:46 | 14 | the satellite system.  And so I worked -- I was always |
| 03:54:49 | 15 | in -- looking at financial analysis of whether something |
| 03:54:53 | 16 | was a good investment. |
| 03:54:54 | 17 | Q.  How long were you at RCA Americom? |
| 03:54:57 | 18 | A.  I was at RCA Americom until 1979. |
| 03:55:01 | 19 | Q.  What did you do next? |
| 03:55:03 | 20 | A.  I was recruited by a company that was called |
| 03:55:06 | 21 | TelePrompTer, which was at the time the largest cable |
| 03:55:10 | 22 | television company.  And I was there for a number of years. |
| 03:55:12 | 23 | Q.  What was your role at -- I'm sorry.  What year did you |
| 03:55:16 | 24 | join TelePrompTer? |
| 03:55:17 | 25 | A.  I joined TelePrompTer in 1979. |

03:55:19  1   Q.  And what was your role when you first joined the

03:55:21  2   company?

03:55:22  3   A.  Again, it was working on -- it was at the time where

03:55:25  4   cable television was expanding greatly, and we were looking

03:55:28  5   at new investments and building new cable systems.

03:55:32  6   Q.  Did your role stay the same, or did it change over time

03:55:35  7   at TelePrompTer?

03:55:36  8   A.  Well, TelePrompTer was bought by -- by Westinghouse,

03:55:41  9   and it became Group W Cable, and we were looking to expand

03:55:46  10  the services and businesses over the cable systems, and so

03:55:50  11  my title became vice president of strategic planning.  But,

03:55:55  12  again, we were looking at new investments and new business

03:55:58  13  opportunities.

03:55:59  14  Q.  What were some of the new business opportunities?

03:56:01  15  A.  Well, we were looking at adding data and -- over the

03:56:05  16  cable systems, and also like adding stereo -- stereo --

03:56:12  17  audio to cable systems and pay-per-view services.  So it

03:56:17  18  was a time of high growth.  It was a pretty exciting time.

03:56:21  19  Q.  How long did you work at TelePrompTer?

03:56:24  20  A.  Well, TelePrompTer became Group W Cable, and I was

03:56:28  21  there until 1986 when Group W Cable was sold to a group of

03:56:33  22  cable operators that divided up the cable systems, and so

03:56:35  23  the Corporate Staff kind of became redundant.  And so that

03:56:39  24  was when most of us at Corporate Staff moved on.

03:56:42  25  Q.  When you moved on from TelePrompTer, what did you do

| | | |
|---|---|---|
| 03:56:45 | 1 | next professionally? |
| 03:56:46 | 2 | A.  I and three of my colleagues started a business called |
| 03:56:49 | 3 | Primetime 24, and what we did is we took the networks, ABC, |
| 03:56:59 | 4 | NBC, and CBS off air, and put them up on the satellite and |
| 03:57:03 | 5 | sold them to -- back to our satellite dishes, out in -- |
| 03:57:07 | 6 | particularly in rural counties where there was no broadcast |
| 03:57:11 | 7 | television at the time. |
| 03:57:11 | 8 | Q.  How long were you with Primetime 24? |
| 03:57:14 | 9 | A.  Until about 1991. |
| 03:57:17 | 10 | Q.  What did you do next professionally? |
| 03:57:20 | 11 | A.  I was doing some consulting in the programming and |
| 03:57:23 | 12 | satellite business, and I did that until, like, 1994. |
| 03:57:28 | 13 | Q.  What did you do professionally after that? |
| 03:57:30 | 14 | A.  I -- in 1994, I joined PMC full-time as an employee. |
| 03:57:40 | 15 | Q.  Who founded PMC? |
| 03:57:41 | 16 | A.  Mr. John Harvey, who's my husband, was the founder of |
| 03:57:46 | 17 | PMC. |
| 03:57:46 | 18 | Q.  When did you meet Mr. Harvey? |
| 03:57:50 | 19 | A.  I met Mr. Harvey in 1973. |
| 03:57:52 | 20 | Q.  And where were you working at that time? |
| 03:57:54 | 21 | A.  At that time, I was at RCA in New York. |
| 03:57:57 | 22 | Q.  How did you happen to meet Mr. Harvey in 1973? |
| 03:58:01 | 23 | A.  My former roommate's boyfriend knew John and then he |
| 03:58:06 | 24 | introduced us at a dinner party.  It was a set-up. |
| 03:58:10 | 25 | Q.  Did you have a lot in common right away? |

03:58:12  1   A.  Well, he was extremely interested in computers and

03:58:17  2   communication systems, and we were both MBAs.  And so we

03:58:22  3   had similar families and we kind of had a lot to talk

03:58:26  4   about, so...

03:58:26  5   Q.  And when did you get married?

03:58:28  6   A.  In 1977.

03:58:29  7   Q.  Any children?

03:58:30  8   A.  Yes, we have two daughters, one born in 1981 and one

03:58:35  9   that was born in 1986.

03:58:36  10  Q.  What did Mr. Harvey do for work at the time you were

03:58:40  11  married?

03:58:40  12  A.  He was in finance.  He was -- at that moment I think he

03:58:45  13  was at Pfizer, you know, with a pharmaceutical company, as

03:58:49  14  a controller, you know, financial person.

03:58:53  15  Q.  Did that change?

03:58:54  16  A.  Yes.  And by about 1980, it was clear that he had this

03:59:00  17  passion for telecommunications and where computers and

03:59:06  18  communications came together.  And he really wanted to

03:59:10  19  follow that full-time, and so -- and so he did.

03:59:14  20  Q.  Did he follow that on his own?

03:59:16  21  A.  I'm --

03:59:18  22  Q.  You said the work in communications.

03:59:21  23  A.  Well, he -- what he wanted to do was to see how

03:59:26  24  telecommunications and computers could come together to

03:59:29  25  make more interesting services and products, and so that's

| | | |
|---|---|---|
| 03:59:33 | 1 | what he wanted to pursue, his passion. |
| 03:59:35 | 2 | Q.  And did he pursue that on his own or with anybody else? |
| 03:59:39 | 3 | A.  Well, at first it was on his own, and then I introduced |
| 03:59:41 | 4 | him to Mr. Jim Cuddihy, who is the other named inventor, |
| 03:59:47 | 5 | who I had been a colleague of at RCA Americom.  And |
| 03:59:54 | 6 | Mr. Cuddihy is an engineer, and so his skills and my |
| 04:00:01 | 7 | husband's creativity, they work well together, and they -- |
| 04:00:04 | 8 | I introduced them, and they worked together and have since. |
| 04:00:07 | 9 | Q.  When did you introduce Mr. Harvey and Mr. Cuddihy? |
| 04:00:11 | 10 | A.  I guess that was in the late 1980s -- no, no, sorry. |
| 04:00:20 | 11 | Late 1970s.  Sorry. |
| 04:00:22 | 12 | Q.  Did the work together turn out to be fruitful to you? |
| 04:00:26 | 13 | A.  Well, yes, it's actually pretty exciting.  103 patents |
| 04:00:31 | 14 | have been issued in -- with both of their names.  And the |
| 04:00:36 | 15 | Cuddihy family and we have continued to be friends.  And so |
| 04:00:41 | 16 | it's -- it's been -- they -- he also lives in the city, in |
| 04:00:46 | 17 | New York City.  And so it's been a very good collaboration, |
| 04:00:49 | 18 | and we're very happy about that. |
| 04:00:51 | 19 | Q.  Ms. Metzger, if you wouldn't mind, you have a binder -- |
| 04:00:55 | 20 | A.  Yes. |
| 04:00:55 | 21 | Q.  -- on your desk, I think, there. |
| 04:00:57 | 22 | If you could turn to PTX-0002 in your binder, you |
| 04:01:03 | 23 | should have a tab. |
| 04:01:04 | 24 | A.  Yes. |
| 04:01:04 | 25 | Q.  Do you have that? |

| | | |
|---|---|---|
| 04:01:05 | 1 | A.  Yes, I do. |
| 04:01:05 | 2 | Q.  Do you recognize that document? |
| 04:01:06 | 3 | A.  Yes.  This is a document that shows the -- sorry, 002? |
| 04:01:17 | 4 | Q.  002.  Maybe if you look at the second page it will help |
| 04:01:21 | 5 | you -- |
| 04:01:21 | 6 | A.  I'm sorry.  I'm sorry.  Okay.  This is the -- oh, I |
| 04:01:31 | 7 | see.  This is the -- this is a copy of the patent. |
| 04:01:33 | 8 | Q.  You say the patent.  Which patent?  It's on your |
| 04:01:38 | 9 | screen. |
| 04:01:38 | 10 | A.  Oh, I'm sorry.  This is the -- as it's been referred to |
| 04:01:41 | 11 | here as the '091 patent.  It's the patent that's being |
| 04:01:44 | 12 | discussed or being litigated in this case. |
| 04:01:47 | 13 | Q.  Who owns that patent? |
| 04:01:48 | 14 | A.  The patent is owned by Personalized Media, PMC. |
| 04:01:54 | 15 | Q.  Is that the Plaintiff in this case? |
| 04:01:56 | 16 | A.  Yes, that's the Plaintiff in this case. |
| 04:01:57 | 17 | Q.  And when was PMC officially founded? |
| 04:02:00 | 18 | A.  In 1987. |
| 04:02:01 | 19 | Q.  Under what name?  Oh, I'm sorry. |
| 04:02:05 | 20 | A.  It was founded under the name -- the National Cable |
| 04:02:10 | 21 | Clearinghouse. |
| 04:02:11 | 22 | Q.  Did the name eventually change? |
| 04:02:13 | 23 | A.  Yes, the -- as the business -- as the ideas evolved, it |
| 04:02:17 | 24 | became PMC. |
| 04:02:19 | 25 | Q.  When the company was first founded, were you involved |

04:02:22   1   and working at the company?

04:02:23   2   A.  Only a little bit.  I was on the board.  But primarily,

04:02:33   3   I was working full-time at -- you know, in the cable and

04:02:39   4   satellite business.  And so I was busy doing other things.

04:02:42   5   But I did introduce Mr. Harvey to, you know, colleagues and

04:02:47   6   people I knew in the industry.

04:02:48   7   Q.  And what year did you join the company full-time?

04:02:51   8   A.  I joined the company full-time in 1994.

04:02:54   9   Q.  And why?

04:02:55  10   A.  Well, the patents were -- a number of the patents were

04:03:00  11   beginning to issue.  And we were, you know, a very small

04:03:04  12   company, and so I knew people in the industry, I had people

04:03:07  13   that I knew.  And we were raising money, and we were also

04:03:10  14   looking for partners to develop the technology.  And so it

04:03:15  15   made sense for me to spend my time and efforts to try and,

04:03:21  16   you know, help grow the business.

04:03:22  17   Q.  And were you able to attract investors to the company?

04:03:27  18   A.  Yes, yes, we did.  At that time, we attracted about 40

04:03:32  19   investors to the company.  And that's grown to like 52 as

04:03:38  20   people -- as people have inherited shares and stuff over

04:03:42  21   time.

04:03:42  22   Q.  Aside from helping the company raise money when you

04:03:46  23   joined, do you have any other role at PMC?

04:03:48  24   A.  Yes, I was helping to introduce Mr. Harvey and his

04:03:57  25   colleague at the time, Mr. McCandless, to colleagues that I

04:04:02   1   knew in the industry, in the telecommunications industry.
04:04:05   2   And I was -- I would go to trade shows and talk to people
04:04:10   3   about what we were -- what PMC was doing and whether there
04:04:15   4   was opportunities for them to utilize some of our
04:04:20   5   technology.
04:04:20   6   Q.   And were you able to find any companies in that regard?
04:04:23   7   A.   Well, the first one that was very exciting was a
04:04:28   8   company called StarSight, and it was the original
04:04:31   9   electronic program guide company.  So having interactive
04:04:35  10   program guide, which was a real advancement in those days.
04:04:39  11   As cable expanded and satellite distribution expanded, all
04:04:44  12   the sudden there were a lot of channels, and you had to
04:04:47  13   figure out what was on, and StarSight was one of the -- was
04:04:50  14   the first company that developed that technology to sell.
04:04:56  15   Q.   And how many licensees has PMC partnered with over
04:05:00  16   time?
04:05:01  17   A.   Over 20.
04:05:05  18   Q.   And if we could show you what's been marked as
04:05:09  19   Plaintiff's Demonstrative Exhibit KM-1.  Do you recognize
04:05:13  20   this?
04:05:14  21   A.   Yes, I do.
04:05:14  22   Q.   What is it?
04:05:15  23   A.   This is a list with the logos of our licensees.
04:05:18  24   Q.   And the companies that are listed here, did each of
04:05:26  25   these licensing partners obtain the right to use PMC's

04:05:31  1  patented technology?

04:05:32  2  A.  Yes.  Each of these we had an agreement whereby they

04:05:36  3  paid us compensation to use the patents.

04:05:38  4  Q.  And are PMC's agreements with all those companies the

04:05:41  5  same?  Is it a cookie-cutter agreement?

04:05:44  6  A.  Not at all.  Each one was individually negotiated.

04:05:48  7  They're really quite different companies.  DirecTV is

04:05:51  8  certainly different from Cisco or Sony.  And so each one

04:05:54  9  was separately negotiated.  And we came to agreements.

04:05:59  10  Q.  Did any of those negotiations result in any of these

04:06:04  11  companies investing in the company?

04:06:06  12  A.  Yes.  As it turns out, the -- Gemstar that became TiVo,

04:06:15  13  invested in the company, so did Cisco, and so did Motorola.

04:06:17  14  Q.  What was PMC's first agreement with another company?

04:06:22  15  A.  The first agreement was -- back to the company

04:06:27  16  StarSight, and that was in 1994.  And so that was a very

04:06:30  17  important agreement for us, because that was an agreement

04:06:34  18  where a company that had patents and had technology saw

04:06:40  19  that we added to their capabilities.  And so that was a

04:06:44  20  very important first license.

04:06:47  21  Q.  If you could turn in your binder, please, to PTX-503.

04:06:52  22          And it's also on your screen, if that's easier.

04:06:56  23  The entire document is in your binder, whatever is easier

04:07:00  24  for you.

04:07:00  25  A.  It's kind of a big book.

04:07:03   1           Yes, I recognize this.

04:07:04   2   Q.  What is it?

04:07:06   3   A.  This is the agreement between our company and StarSight

04:07:12   4   Telecast in 1994.

04:07:14   5   Q.  Just generally, what were the terms of the agreement?

04:07:16   6   A.  They paid us cash compensation, we got stock options,

04:07:23   7   but importantly, they agreed to help us develop our

04:07:25   8   technology and to introduce us potentially to other

04:07:31   9   potential partners.

04:07:31  10   Q.  And did they follow through on that agreement, make any

04:07:35  11   introductions?

04:07:36  12   A.  Yes, they did.  They introduced us to Sony and that

04:07:38  13   ultimately led to an agreement between our company and

04:07:43  14   Sony.

04:07:43  15   Q.  So how did the StarSight agreement lead to a

04:07:46  16   relationship with Sony?

04:07:47  17   A.  Well, they literally introduced us to the -- to Sony

04:07:55  18   management and -- because we'd kind of gotten a Good

04:08:01  19   Housekeeping seal of approval by StarSight licensing us,

04:08:04  20   then we got in to talk to Sony, and then Sony took a

04:08:09  21   license from us.

04:08:10  22   Q.  So if you could turn, please, to PTX-504.  Do you have

04:08:15  23   that?  And it's on your screen if that's easier.

04:08:17  24   A.  Yes, I see this, uh-huh.

04:08:19  25   Q.  Do you recognize the document?

| | | |
|---|---|---|
| 04:08:19 | 1 | A.  Yes, I do. |
| 04:08:20 | 2 | Q.  What is it? |
| 04:08:21 | 3 | A.  This is the agreement in 1995 that's among PMC and |
| 04:08:31 | 4 | Sony, and StarSight was also a party to the agreement. |
| 04:08:34 | 5 | Q.  And this agreement that we've marked as PTX-504, does |
| 04:08:40 | 6 | it include a license to rights under PMC's '091 patent, the |
| 04:08:45 | 7 | patent that's at issue here? |
| 04:08:46 | 8 | A.  Yes. |
| 04:08:46 | 9 | Q.  Did Sony make any payments to PMC under the agreement? |
| 04:08:53 | 10 | I'm just asking if they made any payments, not the amount |
| 04:08:56 | 11 | of payments. |
| 04:08:58 | 12 | A.  Yes, they made payments. |
| 04:09:01 | 13 | Q.  How were those payments structured? |
| 04:09:03 | 14 | A.  Those payments were structured as a per-unit box.  At |
| 04:09:07 | 15 | the time they were making satellite receiver boxes for the |
| 04:09:13 | 16 | Acura dish business and so they paid us on a per-box basis. |
| 04:09:15 | 17 | Q.  Is this the only agreement that PMC has entered into |
| 04:09:18 | 18 | with Sony? |
| 04:09:18 | 19 | A.  No, happily in part because I think they knew us, but |
| 04:09:22 | 20 | we contacted them, again, and in 2012, they entered into a |
| 04:09:28 | 21 | much broader license with us, and they were going into |
| 04:09:35 | 22 | smart TVs and PlayStation, which is, of course, an |
| 04:09:40 | 23 | enormously successful product of theirs, and so in 2012, |
| 04:09:44 | 24 | they entered into a much broader license with us. |
| 04:09:46 | 25 | Q.  If you could turn to PTX-502, please.  You have it |

| 04:09:52 | 1 | there on your screen. |
| 04:09:54 | 2 | A.   Yes. |
| 04:09:54 | 3 | Q.   Do you recognize that document? |
| 04:09:56 | 4 | A.   Yes. |
| 04:09:58 | 5 | Q.   What is it? |
| 04:09:59 | 6 | A.   This is the 2012 agreement between PMC and Sony |
| 04:10:08 | 7 | Corporation. |
| 04:10:08 | 8 | Q.   Did your relationship with StarSight, which led you to |
| 04:10:12 | 9 | Sony, did that lead to any other important agreements for |
| 04:10:15 | 10 | the company? |
| 04:10:16 | 11 | A.   Yes, it did.  StarSight was ultimately purchased by a |
| 04:10:21 | 12 | company then called Gemstar, and it -- and so they |
| 04:10:26 | 13 | contacted us because they wanted a broader license than the |
| 04:10:30 | 14 | StarSight license had been.  And so we ultimately ended up |
| 04:10:33 | 15 | with an agreement with Gemstar that -- whereby they bought |
| 04:10:40 | 16 | 30 percent of the company and also bought -- paid for a |
| 04:10:44 | 17 | license -- several licenses, actually. |
| 04:10:46 | 18 | Q.   I'd like to show you a document -- it's in your |
| 04:10:50 | 19 | binder -- PTX-492.  It will come up on the screen also. |
| 04:10:57 | 20 | A.   The binder has kind of come apart. |
| 04:11:00 | 21 | Q.   Sure.  Sorry. |
| 04:11:01 | 22 | A.   Yes.  This is -- 492 -- |
| 04:11:04 | 23 | Q.   Yes. |
| 04:11:05 | 24 | A.   -- is -- this is the agreement between Gemstar and PMC |
| 04:11:15 | 25 | for this variety of licenses, and then they also invested |

228

| | | |
|---|---|---|
| 04:11:18 | 1 | in the company. |
| 04:11:19 | 2 | Q.  You say "a variety of licenses."  Did that include |
| 04:11:21 | 3 | rights to practice the technology described in the '091 |
| 04:11:25 | 4 | patent at issue in this case? |
| 04:11:26 | 5 | A.  Yes, it did. |
| 04:11:27 | 6 | Q.  Does PMC have -- has PMC ever entered into any |
| 04:11:33 | 7 | agreement with Cisco? |
| 04:11:34 | 8 | A.  Yes, it has. |
| 04:11:35 | 9 | Q.  If you could turn to PTX-490, please.  490. |
| 04:11:41 | 10 | A.  Yes, I see that. |
| 04:11:42 | 11 | Q.  And what is that? |
| 04:11:45 | 12 | A.  This is the agreement with Cisco Systems between |
| 04:11:56 | 13 | Personalized Media. |
| 04:11:56 | 14 | Q.  Generally, what were the terms? |
| 04:11:58 | 15 | A.  The terms there were they took a license to our patent |
| 04:12:01 | 16 | portfolio, and they also made an investment in the company. |
| 04:12:03 | 17 | Q.  The license that they took, did that include a grant of |
| 04:12:06 | 18 | rights under the '091 patent? |
| 04:12:08 | 19 | A.  Yes, it did. |
| 04:12:11 | 20 | Q.  Could you turn, please, to PX-501? |
| 04:12:19 | 21 | A.  Yes, I see it. |
| 04:12:22 | 22 | Q.  Do you recognize the document? |
| 04:12:23 | 23 | A.  Yes, this is also a license and investment agreement |
| 04:12:27 | 24 | between PMC and Motorola. |
| 04:12:29 | 25 | Q.  Did the license include rights to the '091 patent? |

```
04:12:32   1   A.  Yes, it did.

04:12:33   2   Q.  Thank you.

04:12:35   3         So sorry -- again, overall, how long have you been

04:12:40   4   with the company?

04:12:41   5   A.  Since 1994.

04:12:42   6   Q.  Good decision?

04:12:43   7   A.  Yes.  I think so.  I think we've been successful.

04:12:48   8   Q.  And in what way?

04:12:49   9   A.  Well, like I said, we have over 20 licensees.  We and

04:12:57  10   our partners, our investors, have made money.  And I think

04:13:04  11   we've done well.

04:13:05  12   Q.  If I could ask you to turn to PTX-1154.  Do you see

04:13:11  13   that?

04:13:12  14   A.  Yes.

04:13:13  15   Q.  What is that?  Do you recognize it?

04:13:16  16   A.  Yes, this is the cover of a magazine that -- if I --

04:13:21  17   Q.  Sure, yes.

04:13:23  18   A.  This is the cover -- this the physical magazine.  It's

04:13:26  19   called Inventor's Digest.  And Mr. Harvey was on the cover

04:13:34  20   of this magazine in 2012.

04:13:36  21   Q.  And how does it describe Mr. Harvey?

04:13:39  22   A.  It says:  Inventor John Harvey, a 30-year overnight

04:13:43  23   success.

04:13:43  24   Q.  What do you take that to mean?

04:13:44  25   A.  Well, as you probably remember, the original patent was
```

04:13:49  1   filed in 1981, and we got our first patent in 1987.  But

04:13:55  2   this is -- but in the 2011/'12 period where a lot of these

04:14:05  3   patents issued, including the '091 patent, that -- that

04:14:08  4   Mr. Harvey was being recognized as -- all of this hard work

04:14:13  5   had come into fruition.  So we were very pleased about

04:14:16  6   this.

04:14:21  7   Q.  Who handles license negotiations for the company?

04:14:25  8   A.  Today, Mr. Tom Scott, who is here today and -- who is a

04:14:31  9   patent lawyer, and Mr. Boyd Lemna, who is an engineer.

04:14:35  10  They are the part of it --

04:14:36  11  Q.  Oh, I'm sorry.  Have they always handled the license

04:14:39  12  negotiations for PMC?

04:14:40  13  A.  They have been part of it, but our principal patent --

04:14:45  14  or license negotiator was a gentlemen named Gerald

04:14:50  15  Holtzman, and he -- he unfortunately passed away three

04:14:55  16  years ago, and when that happened, we -- between Mr. Scott

04:14:59  17  and Mr. Lemna, we've continued with that team.

04:15:02  18  Q.  What was Mr. Holtzman's role at PMC?

04:15:07  19  A.  Well, he had a -- he was a lawyer, and he had given us

04:15:13  20  some kind of friendly advice from the early days.  But then

04:15:20  21  in the early 2000s, he was working with us more and more,

04:15:24  22  and then he ultimately -- he, you know, came on staff full

04:15:27  23  time.

04:15:28  24  Q.  How did you meet Mr. Holtzman?

04:15:30  25  A.  Mr. Holtzman and I were in the same physics class at

| | | |
|---|---|---|
| 04:15:35 | 1 | Corpus Christi Ray High School when we were seniors in high |
| 04:15:41 | 2 | school.  And we had stayed -- our families had stayed |
| 04:15:45 | 3 | friends over years. |
| 04:15:46 | 4 | Q.  Do you know whether Mr. Holtzman was involved in |
| 04:15:49 | 5 | negotiations with Apple on behalf of PMC? |
| 04:15:51 | 6 | A.  Yes, I do. |
| 04:15:51 | 7 | Q.  And did he keep you informed of his progress in that |
| 04:15:55 | 8 | regard? |
| 04:15:55 | 9 | A.  Yes.  Mr. Holtzman was one of the people living in |
| 04:16:02 | 10 | Sugar Land, Texas, and virtually every morning on his way |
| 04:16:05 | 11 | to work, driving to work, he would call me and we would |
| 04:16:08 | 12 | discuss not only his interaction with Apple, but with all |
| 04:16:11 | 13 | the companies that we were reaching out to and talking to |
| 04:16:15 | 14 | and potentially having licenses with and many of them that |
| 04:16:20 | 15 | you saw on that page. |
| 04:16:21 | 16 | Q.  Do PMC employees use company email for their business |
| 04:16:27 | 17 | communications? |
| 04:16:27 | 18 | A.  Yes, we, like almost everybody else, extensively use |
| 04:16:32 | 19 | email. |
| 04:16:33 | 20 | Q.  Did Mr. Holtzman? |
| 04:16:33 | 21 | A.  Yes, he did. |
| 04:16:34 | 22 | Q.  If you could turn to PTX-69, please.  And it's on your |
| 04:16:44 | 23 | screen, too. |
| 04:16:46 | 24 | A.  Maybe that's easier. |
| 04:16:47 | 25 | Q.  Whatever is easiest. |

| | | |
|---|---|---|
| 04:16:49 | 1 | A.  Yes, I see this.  This is -- |
| 04:16:50 | 2 | Q.  Do you recognize -- |
| 04:16:51 | 3 | A.  I'm sorry -- |
| 04:16:52 | 4 | Q.  I'm sorry.  Do you recognize the document? |
| 04:16:53 | 5 | A.  Yes, I do. |
| 04:16:54 | 6 | Q.  And? |
| 04:16:56 | 7 | A.  This is an email from Mr. Holtzman to a Mr. Edward |
| 04:17:00 | 8 | Scott at Apple. |
| 04:17:01 | 9 | Q.  What's the date of the document? |
| 04:17:03 | 10 | A.  The date is October of 2009. |
| 04:17:08 | 11 | Q.  What's the subject line? |
| 04:17:09 | 12 | A.  The subject line is PMC Intellectual Property. |
| 04:17:17 | 13 | Q.  In looking at Mr. Holtzman's email, can you read the |
| 04:17:20 | 14 | first paragraph for the jury? |
| 04:17:23 | 15 | A.  Sure.  It says:  Your email yesterday requested details |
| 04:17:25 | 16 | concerning PMC's pending patent applications.  I |
| 04:17:29 | 17 | synthesized these materials trying to avoid overwhelming |
| 04:17:33 | 18 | you with information and hope I'm responsive to your |
| 04:17:37 | 19 | request. |
| 04:17:38 | 20 | Q.  Could you turn to Page 2 of the document?  You'll see a |
| 04:17:40 | 21 | list there. |
| 04:17:41 | 22 | A.  Yes, I see this is a list of attachments. |
| 04:17:44 | 23 | Q.  And -- |
| 04:17:45 | 24 | A.  I think there's even another page where there's like 12 |
| 04:17:49 | 25 | attachments. |

04:17:49  1   Q.  If we come back, please, though.

04:17:52  2        Item No. 2, what is that?

04:17:55  3   A.  No. 2 says:  A description of the relationship between

04:17:59  4   the issued PMC patents and the pending PMC patent

04:18:03  5   applications illustrating the chain of property --

04:18:07  6   priority.

04:18:08  7   Q.  Do you know whether Mr. Holtzman provided that to

04:18:14  8   Mr. Scott at Apple?

04:18:15  9   A.  Yes, this Item 2 was an attachment to this email.

04:18:19  10  Q.  If you could look at PTX-77, please.

04:18:24  11  A.  Yes, this is Item -- this is the second attachment

04:18:28  12  showing the priority application.

04:18:34  13  Q.  Thank you.

04:18:35  14        And I'd like to look at one last, I think,

04:18:38  15  document.  PTX-521.

04:18:40  16  A.  Yes, I see it.

04:18:41  17  Q.  Do you recognize the document?

04:18:43  18  A.  Yes, this is from January of 2010.  And it says:  Ed,

04:18:52  19  thanks for your prompt reply.  To assist your review, I'm

04:18:55  20  attaching a summary of each of the 55 pending applications

04:18:58  21  which are beginning to issue as patents (with either a 1981

04:19:03  22  or a 1987 priority), and the claims of some of our cases

04:19:09  23  that will issue first.  (Notices of allowances, NOAs, are

04:19:21  24  expected to issue -- are expected in the next 30 days.)

04:19:23  25  This shorthands some of the information I sent in my email

| | | |
|---|---|---|
| 04:19:27 | 1 | of 10/30, which provides fuller background.  The portfolio |
| 04:19:33 | 2 | really is fundamental to many of Apple's businesses.  It is |
| 04:19:37 | 3 | sound and well-prosecuted.  It would be really important to |
| 04:19:40 | 4 | Apple. |
| 04:19:40 | 5 | Q.  If you could turn to the next page of this document. |
| 04:19:47 | 6 |     And what is that? |
| 04:19:48 | 7 | A.  This is what Mr. Holtzman was referring to.  It's the |
| 04:19:53 | 8 | description of 55 different patent applications, and he |
| 04:20:02 | 9 | gives the application number and our shorthand description, |
| 04:20:07 | 10 | and then a description -- a written description of each of |
| 04:20:11 | 11 | these 55 applications. |
| 04:20:13 | 12 | Q.  Was PMC ever able to reach an agreement with Apple? |
| 04:20:16 | 13 | A.  No, we were not. |
| 04:20:17 | 14 | Q.  What happened? |
| 04:20:18 | 15 | A.  Well, after six years of discussions and meetings and |
| 04:20:23 | 16 | back and forth, basically we gave up in 2014, that after |
| 04:20:30 | 17 | six years that we didn't think we'd come to an agreement. |
| 04:20:33 | 18 | Q.  And who authorized PMC to file this lawsuit? |
| 04:20:36 | 19 | A.  I did. |
| 04:20:37 | 20 | Q.  Why? |
| 04:20:37 | 21 | A.  We thought that they -- that after six years of back |
| 04:20:44 | 22 | and forth and asking for information and we provided it and |
| 04:20:49 | 23 | we didn't get anywhere after six years, we felt like the |
| 04:20:52 | 24 | only way we could protect our rights was to come to court. |
| 04:20:57 | 25 | Q.  Thank you very much, Ms. Metzger. |

```
04:21:03    1            MR. KLINE:  No further questions at the moment,
04:21:05    2   Your Honor.
04:21:05    3            THE COURT:  You pass the witness?
04:21:06    4            MR. KLINE:  Yes, I pass the witness.  Thank you.
04:21:08    5            THE COURT:  All right.  Cross-examination by the
04:21:09    6   Defendant.
04:21:10    7            THE WITNESS:  May I just get a --
04:21:12    8            THE COURT:  Help yourself.
04:21:22    9            MS. SMITH:  Your Honor, may I pass up a couple of
04:21:24   10   binders, please?
04:21:26   11            THE COURT:  You may.
04:22:06   12            All right.  Ms. Smith, you may proceed.
04:22:07   13            MS. SMITH:  Thank you, Your Honor.
           14                          CROSS-EXAMINATION
04:22:08   15   BY MS. SMITH:
04:22:08   16   Q.  Good afternoon, Ms. Metzger.  My name is Melissa Smith
04:22:11   17   and I represent Apple.  Welcome to Marshall.
04:22:13   18   A.  Thank you.
04:22:13   19   Q.  Now, Ms. Metzger, you had a nice conversation with your
04:22:21   20   lawyer about a lot of different things, but you understand
04:22:27   21   that the first question that Judge Gilstrap has for this
04:22:29   22   jury, the question that this jury is going to be concerned
04:22:33   23   about, is whether or not Apple infringes your husband's
04:22:39   24   '091 patent.  Do you have that understanding?
04:22:40   25   A.  Yes.
```

```
04:22:41   1   Q.  And you understand that the jury is going to go about
04:22:46   2   their work deciding that question by comparing the claims
04:22:51   3   in the patent to the accused product that Apple makes,
04:22:54   4   FairPlay.  Do you have that understanding?
04:22:55   5   A.  Yes, I do.
04:22:56   6   Q.  Okay.  Now, you don't have a technical degree, do you,
04:23:03   7   ma'am?
04:23:03   8   A.  No, I do not.
04:23:04   9   Q.  Okay.  And you're not going to offer any expert
04:23:06   10  testimony as to infringement, are you?
04:23:08   11  A.  No, I'm not.
04:23:09   12  Q.  You've not read -- you looked at the '091 patent with
04:23:14   13  your lawyer; is that correct?
04:23:15   14  A.  Looked at.  I have not read it.  But I have looked at
04:23:22   15  it.
04:23:23   16  Q.  You beat me to the punch.  But you have not read the
04:23:26   17  '091 patent, have you?
04:23:27   18  A.  I have not read the '091 patent.
04:23:29   19  Q.  And you own Apple products, do you not?
04:23:33   20  A.  I do.
04:23:33   21  Q.  A whole host of Apple products; is that correct?
04:23:35   22  A.  I own an iPad and an iPhone.
04:23:39   23  Q.  But you're not holding yourself out as a -- as any kind
04:23:42   24  of technical expert in how Apple products work; is that
04:23:45   25  correct?
```

```
04:23:45   1   A.  No, I'm not an expert.
04:23:47   2   Q.  And you call him Mr. Harvey, but you -- this is your
04:23:56   3   husband?
04:23:57   4   A.  I think the protocol in this Court is to call people by
04:24:02   5   their full names.
04:24:03   6   Q.  Of course.  This is Mr. Harvey?
04:24:06   7   A.  This is Mr. Harvey.
04:24:07   8   Q.  And you spoke to the jury about that magazine article,
04:24:10   9   but you brought that up more as a proud wife; is that
04:24:14  10   correct?
04:24:14  11   A.  No, it was -- no, it was important to our business.
04:24:15  12   Q.  Okay.  But that has nothing to do with what the jury is
04:24:20  13   here to do today, to compare the claims to the accused
04:24:25  14   product; is that correct?
04:24:25  15   A.  The jury's responsibility is claims versus the patent.
04:24:28  16   Q.  Thank you, ma'am.
04:24:30  17        Now, your husband, Mr. Harvey's, invention was
04:24:37  18   made about 35 years ago; is that correct?
04:24:43  19        MR. KLINE:  Objection.  Beyond the scope.
04:24:45  20        THE COURT:  Overruled.
04:24:46  21   Q.  (By Ms. Smith)  Ma'am, was your husband's invention
04:24:49  22   created about 35 years ago?
04:24:52  23   A.  The -- and what he -- I really don't understand the
04:24:57  24   question, because there was a disclosure, and then there
04:25:07  25   was the claims were filed later, but it was --
```

| | | |
|---|---|---|
| 04:25:11 | 1 | Q.  Okay. |
| 04:25:12 | 2 | A.  I mean, I don't think that's a real question. |
| 04:25:17 | 3 | Q.  Okay.  Let me make it easier.  The -- there were two |
| 04:25:20 | 4 | patent filings.  One -- and that we're going to be talking |
| 04:25:24 | 5 | about today.  One was in 1987; is that correct? |
| 04:25:26 | 6 | A.  Yes. |
| 04:25:26 | 7 | Q.  And that's about 34, 35 years ago? |
| 04:25:30 | 8 | A.  Right. |
| 04:25:31 | 9 | Q.  Okay.  Now, you said that your company dealt with |
| 04:25:34 | 10 | Internet transmissions.  Do you remember telling your |
| 04:25:36 | 11 | lawyer that? |
| 04:25:36 | 12 | A.  Yes. |
| 04:25:36 | 13 | Q.  Okay.  Mr. Harvey, your husband, certainly wasn't |
| 04:25:44 | 14 | talking to you about the Internet back in the '80s, was he? |
| 04:25:46 | 15 | A.  He was talking about data transmissions and other |
| 04:25:51 | 16 | telecommunications. |
| 04:25:52 | 17 | Q.  But he wasn't talking about the Internet back in 1981, |
| 04:25:55 | 18 | was he? |
| 04:25:56 | 19 | A.  Nobody was talking about the Internet in 1981. |
| 04:25:59 | 20 | Q.  And he certainly wasn't talking about, back in 1981, |
| 04:26:04 | 21 | about predicting the way technology would develop, was he? |
| 04:26:08 | 22 | A.  I'm not sure that I agree with that.  He was -- he had |
| 04:26:15 | 23 | a vision of how technology was going to develop, and that's |
| 04:26:18 | 24 | why he filed a 500-page patent application describing all |
| 04:26:23 | 25 | the things that he thought were going to come to pass. |

| | | |
|---|---|---|
| 04:26:26 | 1 | Q.  Okay.  Now, Ms. Metzger, I'm going to direct your |
| 04:26:30 | 2 | attention to your notebook in front of you. |
| 04:26:33 | 3 | And you've given some testimony previously, |
| 04:26:36 | 4 | haven't you? |
| 04:26:38 | 5 | Did you get your notebook? |
| 04:26:40 | 6 | A.  No. |
| 04:26:40 | 7 | Q.  I apologize.  I handed two notebooks up.  I don't think |
| 04:26:43 | 8 | one of them made it to you.  I apologize, Ms. Metzger. |
| 04:26:50 | 9 | THE WITNESS:  Thank you, Your Honor. |
| 04:27:00 | 10 | Q.  (By Ms. Smith)  All right.  If you'll take a look at |
| 04:27:02 | 11 | the testimony from 7/10 of '13.  It should be about the |
| 04:27:07 | 12 | fourth tab on your -- in your binder. |
| 04:27:10 | 13 | A.  Yes, I see it. |
| 04:27:11 | 14 | Q.  All right.  If you will go to Page 227. |
| 04:27:30 | 15 | A.  Okay.  So this is from July of 2013? |
| 04:27:34 | 16 | Q.  Yes, ma'am.  Yes, ma'am. |
| 04:27:35 | 17 | A.  Uh-huh. |
| 04:27:36 | 18 | Q.  So we're looking at Page 227. |
| 04:27:40 | 19 | A.  Yes. |
| 04:27:40 | 20 | Q.  And if you'll go down to Lines 13 through 16. |
| 04:27:44 | 21 | A.  Uh-huh.  Yes. |
| 04:27:51 | 22 | Q.  And does that help refresh your recollection about your |
| 04:27:54 | 23 | conversations with your husband back in the '80s? |
| 04:27:57 | 24 | A.  Well, what it says is I recall no conversations |
| 04:28:07 | 25 | predicting the way telecommunication -- technology would |

04:28:11    1   develop.

04:28:11    2   Q.  And that was my question.  Thank you, ma'am.

04:28:13    3          But technology has changed a little bit in the

04:28:15    4   last 35 years, hasn't it?

04:28:18    5   A.  Yes, it has.

04:28:19    6   Q.  And Personalized Media hasn't had any patented

04:28:25    7   inventions in the last 35 years?  No new patent filings?

04:28:30    8   A.  No new patent filings since --

04:28:33    9   Q.  And Apple has come up with a whole lot of patent

04:28:36   10   filings and a whole lot of inventions in the past 35 years,

04:28:40   11   has it not?

04:28:40   12   A.  Yes, it has.

04:28:42   13   Q.  Okay.  You'd agree Apple is an innovative company?

04:28:45   14   A.  Yes.

04:28:45   15   Q.  You'd even agree that Apple has created entirely new

04:28:50   16   industries?

04:28:50   17   A.  Yes, I would.

04:28:52   18   Q.  Okay.  And PMC, Personalized Media, hasn't sold any

04:28:58   19   commercial products in the past 10 years, has it?

04:29:01   20   A.  We haven't sold any products, no.

04:29:04   21   Q.  Okay.  And PMC hasn't sold any products in the last 20

04:29:07   22   years, has it?

04:29:08   23   A.  No.

04:29:08   24   Q.  And PMC has not sold any products in the last 35 years,

04:29:12   25   has it?

| | | |
|---|---|---|
| 04:29:13 | 1 | A.  No. |
| 04:29:18 | 2 | Q.  Okay. |
| 04:29:19 | 3 | MS. SMITH:  Now, if I could have PTX-69, please. |
| 04:29:24 | 4 | Q.  (By Ms. Smith)  Now, you showed the jury this document, |
| 04:29:28 | 5 | did you not? |
| 04:29:28 | 6 | A.  Oh, yes. |
| 04:29:29 | 7 | Q.  And where is your name on this email? |
| 04:29:31 | 8 | A.  My name is not on this email. |
| 04:29:33 | 9 | Q.  Okay. |
| 04:29:34 | 10 | MS. SMITH:  If I could see PTX-521, please. |
| 04:29:37 | 11 | Q.  (By Ms. Smith)  Does this look like the second email |
| 04:29:41 | 12 | you showed the jurors? |
| 04:29:42 | 13 | A.  Yes, it is. |
| 04:29:43 | 14 | Q.  Where is your name on that email? |
| 04:29:44 | 15 | A.  My name is not on this email. |
| 04:29:46 | 16 | Q.  But who we do see is a Mr. Gerald Holtzman; is that |
| 04:29:50 | 17 | correct? |
| 04:29:50 | 18 | A.  Yes. |
| 04:29:51 | 19 | Q.  And you're aware that Mr. Holtzman is going to come and |
| 04:29:55 | 20 | testify in this trial; is that right? |
| 04:29:56 | 21 | A.  He's going to what?  He's passed away. |
| 04:30:00 | 22 | Q.  I apologize. |
| 04:30:00 | 23 | A.  He's going to testify by deposition. |
| 04:30:04 | 24 | Q.  By deposition.  Of course, by deposition. |
| 04:30:05 | 25 | Are you also aware there's going to be a couple of |

| | | |
|---|---|---|
| 04:30:07 | 1 | Apple employees that come and testify about licensing, as |
| 04:30:10 | 2 | well, in this trial? |
| 04:30:11 | 3 | A.  Yes, of course. |
| 04:30:12 | 4 | Q.  Okay.  Respectfully, ma'am, would you -- would you |
| 04:30:17 | 5 | agree that, if you want to know the whole story about how |
| 04:30:19 | 6 | these transactions took place, the best source might be the |
| 04:30:22 | 7 | folks that were actually involved? |
| 04:30:32 | 8 | A.  I'm not sure what -- I'm sorry, but I'm not sure what |
| 04:30:34 | 9 | your question was. |
| 04:30:35 | 10 | Q.  Well, you weren't involved in any of the discussions |
| 04:30:39 | 11 | with Apple, were you? |
| 04:30:41 | 12 | A.  I wasn't personally involved in the discussions, but I |
| 04:30:46 | 13 | was informed of them, of course. |
| 04:30:47 | 14 | Q.  But you weren't involved in any of the discussions with |
| 04:30:50 | 15 | Apple? |
| 04:30:50 | 16 | A.  I was not in the meetings with Apple. |
| 04:30:57 | 17 | MS. SMITH:  You can take that down. |
| 04:30:59 | 18 | Q.  (By Ms. Smith)  Now, you hold yourself out as having |
| 04:31:04 | 19 | led PMC's licensing program for the last 25 years; is that |
| 04:31:07 | 20 | correct? |
| 04:31:07 | 21 | A.  No, I said that I was the CEO. |
| 04:31:12 | 22 | Q.  Okay. |
| 04:31:12 | 23 | MS. SMITH:  If we could see DTX-1493, please, at |
| 04:31:17 | 24 | 3. |
| 04:31:18 | 25 | Q.  (By Ms. Smith)  Do you recognize that, ma'am? |

04:31:19   1    A.  Yes.  Yes, this is from our website.

04:31:28   2    Q.  All right.  If you could look at that first line, it

04:31:31   3    says:  Ms. Metzger has led PMC's licensing program since

04:31:35   4    1994.  Do you dispute that?

04:31:36   5    A.  What I'm saying -- what we were saying is that I've

04:31:40   6    been involved in the company since 1994, and I -- of

04:31:42   7    course, I'm the CEO, so I know about the licenses, I

04:31:45   8    approve of the licenses.  But what we were talking about

04:31:49   9    before is whether I personally negotiated the licenses,

04:31:53  10    and, no, I don't.

04:31:55  11    Q.  Okay.

04:31:55  12            MS. SMITH:  I'll object to non-responsive, Your

04:32:02  13    Honor.

04:32:02  14            THE COURT:  Overruled.

04:32:04  15            MS. SMITH:  Thank you.

04:32:05  16    Q.  (By Ms. Smith)  Now, you showed the jury a few PMC

04:32:08  17    licenses, correct?

04:32:09  18    A.  Yes.

04:32:09  19    Q.  And you've hired a -- your attorneys have hired a

04:32:12  20    damage expert to come to trial; is that correct?

04:32:14  21    A.  Yes.

04:32:14  22    Q.  And his name is Mr. Pellegrino?

04:32:16  23    A.  Yes.

04:32:17  24    Q.  And you gave all those licenses that you discussed with

04:32:19  25    the jury to Mr. Pellegrino, did you not?

| | | |
|---|---|---|
| 04:32:21 | 1 | A.  The company did.  The attorneys did. |
| 04:32:23 | 2 | Q.  Okay.  Are you aware that your own damage expert said |
| 04:32:29 | 3 | about those licenses, and I quote:  I do not find any of |
| 04:32:34 | 4 | the agreements sufficiently comparable to the license at |
| 04:32:38 | 5 | issue between PMC and Apple? |
| 04:32:42 | 6 | A.  So you said am I aware that he said that? |
| 04:32:45 | 7 | Q.  Yes. |
| 04:32:46 | 8 | A.  No, I'm not. |
| 04:32:47 | 9 | Q.  Would it surprise you to know that he said that? |
| 04:32:49 | 10 | A.  I don't know in what context he said that. |
| 04:32:52 | 11 | Q.  Now, you talked about the Sony license, do you recall |
| 04:32:57 | 12 | that? |
| 04:32:57 | 13 | A.  Yes, of course. |
| 04:32:57 | 14 | Q.  And you mentioned that that license was a per-unit box; |
| 04:33:00 | 15 | is that correct? |
| 04:33:00 | 16 | A.  Yes. |
| 04:33:04 | 17 | Q.  Now, if a licensee prefers a lump sum instead of a |
| 04:33:10 | 18 | running royalty or a per-unit box, PMC accommodates the |
| 04:33:13 | 19 | licensee's preference for lump sum; is that correct? |
| 04:33:16 | 20 | A.  Yes, we have. |
| 04:33:17 | 21 | Q.  I want to talk to you a little bit about the companies |
| 04:33:25 | 22 | that you said invested in PMC. |
| 04:33:29 | 23 | Let's start with Cisco.  That was one of the |
| 04:33:31 | 24 | companies that you said invested in PMC? |
| 04:33:34 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 04:33:34 | 1 | Q.  Okay.  Does Cisco still own any shares of PMC? |
| 04:33:37 | 2 | A.  No, they decided to exchange those back for another |
| 04:33:43 | 3 | license. |
| 04:33:45 | 4 | MS. SMITH:  And if I could see PTX-490, please. |
| 04:33:59 | 5 | There we go, thank you. |
| 04:34:00 | 6 | Q.  (By Ms. Smith)  And if I can direct your attention to |
| 04:34:02 | 7 | the date on the top left.  That says May 18th, 2011, does |
| 04:34:06 | 8 | it not? |
| 04:34:07 | 9 | A.  Yes, it does. |
| 04:34:07 | 10 | Q.  And you told the jurors that that included the rights |
| 04:34:10 | 11 | to the '091 patent, did you not? |
| 04:34:11 | 12 | A.  I -- the '091 application was included in this. |
| 04:34:18 | 13 | Q.  Okay.  And the '091 actually was only an application, |
| 04:34:23 | 14 | it didn't actually issue as a patent until May of 2012; is |
| 04:34:27 | 15 | that correct? |
| 04:34:27 | 16 | A.  Yes, that's true. |
| 04:34:28 | 17 | Q.  You mentioned Motorola? |
| 04:34:34 | 18 | A.  Yes. |
| 04:34:34 | 19 | Q.  And does Motorola still own -- in this modern day, does |
| 04:34:42 | 20 | Motorola own the shares in PMC? |
| 04:34:45 | 21 | A.  They actually decided to trade the ownership shares |
| 04:34:48 | 22 | back to -- for a broader license. |
| 04:34:51 | 23 | Q.  Okay.  And TV Guide, does TV Guide or Gemstar, what it |
| 04:34:58 | 24 | was called back in the day, do they own any shares of PMC |
| 04:35:02 | 25 | currently? |

| 04:35:02 | 1 | A.   No. |
| 04:35:16 | 2 | MS. SMITH:   Now, if I could see PTX-77. |
| 04:35:20 | 3 | Q.   (By Ms. Smith)   You took a look at this with your |
| 04:35:23 | 4 | lawyer. |
| 04:35:23 | 5 | A.   Yes. |
| 04:35:23 | 6 | Q.   Now, you'd agree that none of these applications that |
| 04:35:26 | 7 | issued are the applications for the '091 patent, are they? |
| 04:35:29 | 8 | A.   I believe down to the next to the last paragraph, it |
| 04:35:33 | 9 | says:   55 other actively persecuted -- prosecuted |
| 04:35:40 | 10 | applications remain pending. |
| 04:35:41 | 11 | Q.   And so my question is, is the application for the '091 |
| 04:35:46 | 12 | patent listed on this list? |
| 04:35:49 | 13 | A.   Is the number -- |
| 04:35:54 | 14 | Q.   Yes, ma'am. |
| 04:35:55 | 15 | A.   -- of the application? |
| 04:35:56 | 16 | Q.   Yes, ma'am. |
| 04:35:57 | 17 | A.   The number of the application is not on this list. |
| 04:35:59 | 18 | It's in the 55 others. |
| 04:36:01 | 19 | Q.   Thank you.   Now, as CEO of PMC, you don't make |
| 04:36:16 | 20 | allegations about patent infringement lightly, do you? |
| 04:36:20 | 21 | A.   Absolutely not. |
| 04:36:20 | 22 | Q.   You give some serious thought before suing somebody, |
|  | 23 | don't you? |
| 04:36:29 | 24 | A.   Absolutely. |
| 04:36:29 | 25 | Q.   You don't sue first and ask questions later, do you? |

04:36:32   1    A.  I'm not sure what that means.

04:36:35   2    Q.  Well, you need all the -- you need to understand all

04:36:38   3    the facts --

04:36:39   4    A.  Yes, that we don't sue somebody willy-nilly.  We -- the

04:36:45   5    lawyers and the engineers study our patents compared to

04:36:50   6    what we believe infringers are doing.

04:36:54   7    Q.  And as CEO of Personalized Media, you used the words

04:36:58   8    that you authorized this litigation, the filing of this

04:37:01   9    suit, did you not?

04:37:02  10    A.  Yes, I agreed to -- that we were going to file the

04:37:07  11    suit.

04:37:08  12    Q.  But it's a fact, is it not, that when Personalized

04:37:12  13    Media filed this lawsuit, you'd never even heard of

04:37:15  14    FairPlay before, had you?

04:37:16  15    A.  You mean the name, FairPlay, as -- as the encryption

04:37:29  16    mechanism?

04:37:29  17    Q.  I mean, you'd never heard of FairPlay when you filed

04:37:33  18    this lawsuit accusing FairPlay, ma'am.

04:37:36  19    A.  FairPlay is not a term that I was familiar with.

04:37:39  20    Q.  In fact, it was over a year after you filed this

04:37:42  21    lawsuit that someone asked you in testimony if you knew

04:37:47  22    what FairPlay was, and you said you didn't; is that

04:37:49  23    correct?

04:37:49  24    A.  No, I didn't know what FairPlay was.  I certainly knew

04:37:53  25    the products were encrypted and protected.

248

04:37:57  1    Q.  Thank you, ma'am.

04:37:58  2            MS. SMITH:  I'll pass the witness.

04:38:00  3            THE COURT:  Redirect by the Plaintiff?

04:38:01  4            MR. KLINE:  Nothing further, Your Honor.

04:38:02  5            THE COURT:  All right.  You may step down,

04:38:04  6    Ms. Metzger.

04:38:06  7            THE WITNESS:  Excuse me, this book has come apart.

04:38:09  8            THE COURT:  Just leave it there, please.

04:38:24  9            Plaintiff, call your next witness.

04:38:26  10           MR. KLINE:  PMC calls Gerald Holtzman by videotape

04:38:32  11   designations, Your Honor.

04:38:32  12           THE COURT:  All right.  Do you have the time

04:38:34  13   allocations on this deposition?

04:38:37  14           MR. KLINE:  51 minutes.  51 minutes, 32 seconds, I

04:38:44  15   believe, Your Honor.

04:38:44  16           THE COURT:  Is it that all charged to the

04:38:45  17   Plaintiff?

04:38:46  18           MR. KLINE:  I don't -- do you know?

04:38:47  19           THE COURT:  Or is that just the total?

04:38:49  20           MS. VALENTI:  Excuse me, Your Honor.  The

04:38:51  21   Plaintiffs are for 39, 35.  39 minutes, 35 seconds.

04:38:56  22           And for the Defendant, 11 minutes, 57 seconds.

04:39:00  23           THE COURT:  Thank you.  Let's proceed with the

04:39:02  24   witness by deposition.

04:39:06  25           (Videoclip played.)

04:39:08   1   Q.   Good morning, sir.   Could you please state your full

04:39:16   2   name for the record?

04:39:17   3   A.   Gerald T. Holtzman.

04:39:19   4   Q.   And what is your current home address?

04:39:21   5   A.   2 Farrell Ridge Drive, Sugar Land, Texas.

04:39:28   6   Q.   And who is your current employer?

04:39:30   7   A.   Personalized Media Communications.

04:39:33   8   Q.   What is your current position with PMC?

04:39:36   9   A.   President.

04:39:38  10   Q.   Okay.   I just wanted to quickly go through some of your

04:39:41  11   background to start before we get into the other things.

04:39:44  12          It's correct that you have a BA in -- from Rice,

04:39:50  13   and you got that in 1968; is that correct?

04:39:52  14   A.   Yes.

04:39:53  15   Q.   And what was that degree in?

04:39:55  16   A.   Political science.

04:39:57  17   Q.   Your next degree is a JD from University of Texas

04:40:02  18   School of Law in 1973?

04:40:04  19   A.   Yes.

04:40:04  20   Q.   And are you a member of the Texas Bar?

04:40:10  21   A.   Yes, but I'm inactive.

04:40:13  22   Q.   Okay.   Did you become a member of the Texas Bar in

04:40:16  23   1973?

04:40:16  24   A.   I did.

04:40:16  25   Q.   And when did you maintain active membership in the

04:40:23  1   Texas Bar until?

04:40:24  2   A.  2015.

04:40:25  3   Q.  Have you ever been a member of the Patent Bar?

04:40:28  4   A.  No.

04:40:29  5   Q.  Do you consider yourself an expert in patent law?

04:40:31  6   A.  Absolutely not.

04:40:32  7   Q.  When you graduated from University of Texas School of

04:40:37  8   Law in 1973, you went to Fulbright & Jaworski; is that

04:40:43  9   correct?

04:40:43  10  A.  Yes, sir.

04:40:43  11  Q.  You then started up your own firm in 1977; is that

04:40:47  12  correct?

04:40:47  13  A.  Yes, sir.

04:40:52  14  Q.  And so, then you had your own firm, Holtzman &

04:40:56  15  Urquhart; is that correct?

04:40:57  16  A.  Correct.

04:40:57  17  Q.  For about 20 years?

04:41:02  18  A.  I think that's about right.

04:41:03  19  Q.  Did you have any experience with patent licensing when

04:41:06  20  you worked at Holtzman & Urquhart?

04:41:18  21  A.  Yes.

04:41:19  22  Q.  What was the extent of your work in the area of patent

04:41:21  23  licensing when you were at your own firm, Holtzman &

04:41:27  24  Urquhart?

04:41:27  25  A.  In 1995, I was requested by a friend and client to

| | | |
|---|---|---|
| 04:41:31 | 1 | assist them in negotiating or in preparing for a mediation |
| 04:41:40 | 2 | in some patent litigation that they were involved in, in |
| 04:41:45 | 3 | which they were represented by another law firm.  And they |
| 04:41:48 | 4 | requested that I assist them in preparing for the mediation |
| 04:41:52 | 5 | and then in negotiating during that mediation in order to |
| 04:41:55 | 6 | resolve their dispute. |
| 04:41:57 | 7 | Q.  And so 1995 was your first foray into this area of |
| 04:42:03 | 8 | patent licensing? |
| 04:42:04 | 9 | A.  Yes. |
| 04:42:05 | 10 | Q.  Who was the friend or client that approached you in |
| 04:42:09 | 11 | 1995 to do this? |
| 04:42:10 | 12 | A.  The friend was Kazie Metzger, and the client was |
| 04:42:15 | 13 | Personalize -- I think they were called Personalized Mass |
| 04:42:25 | 14 | Media Corporation at the time. |
| 04:42:25 | 15 | Q.  Okay.  And who was that litigation with that PMMC had |
| 04:42:29 | 16 | in 1995? |
| 04:42:30 | 17 | A.  The Weather Channel. |
| 04:42:32 | 18 | Q.  And did you successfully negotiate a license between |
| 04:42:38 | 19 | PMMC and The Weather Channel? |
| 04:42:40 | 20 | A.  I participated in successfully negotiating the business |
| 04:42:55 | 21 | terms -- the economic business terms of that settlement.  I |
| 04:42:57 | 22 | had absolutely nothing to do with negotiating the actual |
| 04:43:00 | 23 | patent license itself. |
| 04:43:02 | 24 | Q.  Is it correct that the first time that PMMC or anything |
| 04:43:07 | 25 | that Ms. Metzger or Mr. Harvey were doing became a client |

04:43:12   1   of your firm was this 1995 retention for the patent

04:43:17   2   licensing help?

04:43:18   3   A.   That's correct.

04:43:18   4   Q.   And after the negotiation of the deal with The Weather

04:43:30   5   Channel, did you continue in an ongoing relationship with

04:43:35   6   PMMC or then PMC?

04:43:37   7   A.   Not really.  Kazie would continue to keep me up-to-date

04:43:54   8   generally on what the company was doing, more in capacity

04:43:56   9   as friends than in any professional capacity.

04:44:00   10          And -- and I think the next time I got involved

04:44:16   11   with them in a business capacity involved discussions that

04:44:21   12   she asked me to participate in that I think were arising in

04:44:28   13   '97 or '98.

04:44:29   14   Q.   And what specific conversations were those?

04:44:33   15   A.   They had been approached by a company -- they, PMC, had

04:44:43   16   been approached by a company by the name of United Video

04:44:46   17   about the possibility of licensing technology, PMC

04:44:49   18   technology, to -- to United Video.

04:44:56   19   Q.   And did you engage in then conversations with United

04:45:02   20   Video on behalf of PMMC?

04:45:04   21   A.   Began to, along with Kazie, and John from time to time,

04:45:10   22   but primarily Kazie.  By then, I'm pretty certain the

04:45:13   23   company was PMC.

04:45:14   24   Q.   In 2014, you ceased being the general counsel of PMC;

04:45:20   25   is that correct?

04:45:20   1   A.  I think it was 2014.

04:45:23   2   Q.  And that role was handed over to Tom Scott; is that

04:45:27   3   correct?

04:45:28   4   A.  I think that's about the correct time.

04:45:30   5   Q.  And at that time, you became president of PMC; is that

04:45:36   6   correct?

04:45:36   7   A.  That's correct.

04:45:36   8   Q.  Has PMC ever made a commercial product?

04:45:44   9   A.  Made a commercial product?  By that, do you mean

04:45:48   10  responsible for building a product that was sold

04:45:52   11  commercially?  No, not to my knowledge.

04:45:55   12  Q.  Has PMC ever sold any services?

04:46:00   13  A.  No, I don't think so.

04:46:11   14  Q.  Can you estimate for me how much money you think you've

04:46:15   15  made via compensation and/or equity interest in PMC?

04:46:23   16  A.  I really don't know that I could do that.  I mean, it

04:46:33   17  would take me a while.

04:46:35   18  Q.  Fair to say it's at least $10 million?

04:46:38   19  A.  No, it hasn't been $10 million.

04:46:40   20  Q.  Has it been at least $5 million?

04:46:42   21  A.  Since day one?  I'd be comfortable saying, yeah, it's

04:47:00   22  probably -- that's probably -- I don't -- I don't know, but

04:47:03   23  it's certainly not more than $5 million.

04:47:08   24  Q.  Now, at some point in time, PMC approached Apple about

04:47:16   25  a potential business relationship; is that fair?

04:47:21  1   A.  Yes.

04:47:22  2   Q.  Whose idea was it at PMC to approach Apple?

04:47:27  3   A.  Mine.

04:47:29  4   Q.  And why did you decide to reach out to Apple?

04:47:37  5   A.  Well, because, as best as I could tell with my limited

04:47:43  6   technical knowledge, it seemed that -- that Apple was

04:47:51  7   engaging in a number of -- of business lines that certainly

04:47:54  8   intersected with our intellectual property, as I understood

04:47:58  9   it, and certainly was demonstrably successful in exploiting

04:48:08  10  those technologies.  And seemed to be an appropriate

04:48:13  11  candidate to talk to about our -- our technology.

04:48:21  12       I also believed that -- and read about a number of

04:48:31  13  conflicts going on in the tech business between the Apple

04:48:35  14  platform and, for example, the Google platform, and thought

04:48:41  15  naively that a company such as Apple might be interested --

04:48:46  16  once it learned the nature of the scope of our intellectual

04:48:53  17  property, might be interested in acquiring exclusive rights

04:48:56  18  in certain of our property to supplement whatever rights it

04:48:59  19  may have to enable it to -- to establish bulkheads and

04:49:09  20  beachheads in various of its product lines.

04:49:12  21  Q.  Let me show you what I've marked as Exhibit 8, which is

04:49:16  22  PMC-APL_02925142 through 144.

04:49:26  23  A.  Yes, sir.  Excuse me.

04:49:28  24  Q.  And this appears to be an email that you sent in May of

04:49:34  25  2008 to Daniel Cooperman at Apple; is that correct?

04:49:40    1    A.  Yes, sir.

04:49:41    2    Q.  And is this the first communication you recall having

04:49:45    3    with Apple?

04:49:46    4    A.  Yes.

04:49:50    5    Q.  Mr. Cooperman, at the time, was the general counsel of

04:49:53    6    Apple?

04:49:53    7    A.  Yes.

04:49:54    8    Q.  And did you have any prior relationship with

04:49:59    9    Mr. Cooperman prior to this email to him?

04:50:02   10    A.  No.

04:50:02   11    Q.  And so Mr. Cooperman hadn't asked you to -- to reach

04:50:09   12    out to him?  This was you reaching out to Mr. Cooperman,

04:50:14   13    correct?

04:50:14   14    A.  I think you might refer to this as a cold call.

04:50:18   15    Q.  You can see in the first sentence, if says:  I write to

04:50:22   16    present to Apple a potential business transaction involving

04:50:25   17    the acquisition of the intellectual property of PMC.

04:50:28   18         Do you see that?

04:50:29   19    A.  I do.

04:50:30   20    Q.  Let me mark as Exhibit 9 -- keep that one still

04:50:34   21    handy --

04:50:35   22    A.  Okay.

04:50:35   23    Q.  -- but Exhibit 9 is going to be Bates No.

04:50:42   24    PMC-APL0_2925145 through 152.

04:50:45   25         So if you -- if you turn to the -- I'm -- I'm

256

04:50:49  1  still on Exhibit 8, and if you turn to the second page of

04:50:56  2  that email, which is ending Bates No. 143, you can see

04:51:00  3  there's a reference to:  I've attached a summary of PMC's

04:51:06  4  portfolio.

04:51:06  5          Do you see that?

04:51:07  6  A.  Yes.

04:51:08  7  Q.  And then my question for you is -- and it's -- I'm

04:51:16  8  representing to you it's my understanding that the summary

04:51:18  9  of PMC's portfolio that was attached was what we've now

04:51:26  10 marked as Exhibit 9 that is the document that's entitled

04:51:31  11 "PMC - The Company."

04:51:36  12          Is that consistent with your understanding?

04:51:38  13 A.  I think that's a reasonable conclusion.

04:51:51  14 Q.  Would you character yourself -- characterize

04:51:54  15 yourself as a technical guy or a non-technical guy?

04:51:56  16 A.  I am completely a non-technical guy.

04:51:59  17 Q.  And how about analyzing the claims of the patents?

04:52:02  18 Have you gotten involved in looking at the claims and

04:52:04  19 figuring out what they cover or don't cover?

04:52:06  20 A.  That's not what I do.

04:52:07  21 Q.  Fair to say that Apple, in your dealings with them,

04:52:11  22 dealt with you in good faith?

04:52:12  23 A.  I have no reason to believe that they did not.

04:52:15  24 Q.  And were you the person that was principally directly

04:52:22  25 communicating with Apple on behalf of PMC?

04:52:24   1   A.   Yes.

04:52:24   2   Q.   You were essentially plugged into all of the

04:52:29   3   communications that PMC had with Apple?

04:52:30   4   A.   I believe I was.

04:52:32   5   Q.   And when you were communicating with Apple in May in

04:52:37   6   2008, would you have had an understanding as to which of

04:52:40   7   these categories you believed Apple might be using or --

04:52:45   8   and/or have interest in?

04:52:46   9   A.   I believed that Apple products involved the sort of

04:52:55   10  stuff on a very unsophisticated basis.

04:53:00   11       You know, I -- I knew, for example, that the

04:53:07   12  iTunes Store would probably be involved with storing --

04:53:10   13  with -- with ratings and billings.  I believe that their

04:53:15   14  DRM system would require security decryption and access

04:53:20   15  control.

04:53:21   16       I believed that the smartphone did targeted,

04:53:27   17  personalized advertising because I got it.  So that -- that

04:53:32   18  was about as unsophisticated as -- I mean, excuse me, as

04:53:36   19  sophisticated as it got.

04:53:38   20  Q.   So you're a --

04:53:39   21  A.   No one -- no one ever told me from Apple that your

04:53:44   22  patents don't intersect with our products.

04:53:49   23  Q.   And here is Exhibit 10, Bates No. PMC-APL_02430710.

04:54:01   24       You can see Exhibit 10 looks like it's an email

04:54:04   25  from you to Mr. Cooperman dated August 2009, correct?

| | | |
|---|---|---|
| 04:54:09 | 1 | A.  Yes, sir. |
| 04:54:11 | 2 | Q.  In the third paragraph, the one that starts with the |
| 04:54:15 | 3 | No. 1, you refer to the key elements of the PMC story, and |
| 04:54:19 | 4 | the first one is:  A seminal patent position in platform |
| 04:54:24 | 5 | agnostic control and distribution of digital video based |
| 04:54:27 | 6 | upon the interaction of control signals and information |
| 04:54:30 | 7 | maintained at receiver sites, whether television, a |
| 04:54:37 | 8 | computer, or mobile device. |
| 04:54:38 | 9 | A.  That's what it says. |
| 04:54:39 | 10 | Q.  And when you're talking about platform agnostic |
| 04:54:42 | 11 | control, what do you mean by that? |
| 04:54:43 | 12 | A.  Well, platform agnostic control to me means it doesn't |
| 04:54:49 | 13 | matter whether you're talking about television, computers, |
| 04:54:52 | 14 | or mobile phones.  Whatever platform this video is |
| 04:54:57 | 15 | delivered over, we believe that the technology relates to |
| 04:55:01 | 16 | it. |
| 04:55:02 | 17 | Q.  Sitting here today, are you aware of anything you would |
| 04:55:05 | 18 | have told Apple in these various communications that was |
| 04:55:08 | 19 | just flat out wrong or inaccurate? |
| 04:55:11 | 20 | A.  No.  And -- and nor -- nor until the very end of our |
| 04:55:15 | 21 | discussions, frankly, that -- did Apple ever suggest to -- |
| 04:55:24 | 22 | to me or anybody with me that our patents didn't cover |
| 04:55:26 | 23 | these types of platforms. |
| 04:55:29 | 24 | It was really towards the end of our discussions, |
| 04:55:39 | 25 | really, that I began hearing that management believes |

04:55:44  1    that -- that -- that the -- that the licensing people, the

04:55:53  2    out-licensing people -- in-licensing, I'm sorry, people

04:55:56  3    were having difficulty convincing their management that

04:55:59  4    litigators couldn't prove that our patents were reserved to

04:56:07  5    television and not anything else.

04:56:09  6    Q.  Let me show what you I've marked as Exhibit 11,

04:56:16  7    PMC-APL_02430711 through 727.

04:56:20  8    A.  Okay.

04:56:21  9    Q.  And, again, I'm going to ask you to go between

04:56:25  10   exhibits.  I apologize.  But the email -- August 2009 email

04:56:33  11   indicates that you're:  Attaching a current summary of PMC

04:56:37  12   and our IP.

04:56:38  13          And then the question for you is, is what I've

04:56:45  14   marked as Exhibit 11, to the best of your understanding,

04:56:48  15   the attachment that you provide along with the August 2009

04:56:55  16   email?

04:56:56  17   A.  I have no reason to believe it's not.

04:56:58  18   Q.  When do you first recall receiving a communication back

04:57:04  19   from Apple in response to your inquiries?

04:57:07  20   A.  Sometime in 2009, I heard from somebody that

04:57:14  21   Mr. Cooperman referred our -- my letters to -- or my emails

04:57:23  22   to -- I can't give you an exact date.  I believe it was

04:57:27  23   2009.

04:57:28  24   Q.  Exhibit 12 is going to be PMC-APL_02430664 and 665.

04:57:39  25          You can see Exhibit 12, if you flip to the second

04:57:42   1   page, there's an email Mr. Scott wrote to you saying:   I

04:57:50   2   apologize for not getting back to you.   I realized,

04:57:53   3   belatedly, it did not have the materials to review.   So can

04:57:56   4   you please forward them to me?   Thank you.

04:58:00   5            That's in October 2009.   Do you see that?

04:58:02   6   A.   Yes, sir.

04:58:02   7   Q.   And would that have followed some kind of phone or

04:58:05   8   other response from Mr. Scott?

04:58:07   9   A.   I'm pretty sure I'd gotten an email from him before

04:58:12   10  then with him telling me that Dan Cooperman had asked him

04:58:15   11  to reach out to me.

04:58:16   12  Q.   Okay.   And then --

04:58:17   13  A.   And I sent him, my belief, materials in response to the

04:58:21   14  reach-out.   And this was, all right, I've delayed as long

04:58:30   15  as I can, and now I'm telling you I don't have the

04:58:33   16  materials you sent me.   So send them back to me so I can

04:58:38   17  delay once more.

04:58:39   18  Q.   Eventually, you then did have a phone conversation with

04:58:44   19  Mr. Scott?

04:58:47   20  A.   I had a number of phone conversations with Mr. Scott,

04:58:50   21  yes.   Eventually, I did.

04:58:52   22  Q.   And what were the nature of those initial phone

04:58:56   23  conversations with Mr. Scott?

04:58:58   24  A.   Sort of trying to determine what information would be

04:59:01   25  useful to him.   I appreciated the fact that -- that people

04:59:07  1  are very busy and that learning about our portfolio and --

04:59:12  2  and its breadth, in a way, when -- especially when you're

04:59:17  3  cold-calling, is an imposition.

04:59:19  4        So I wanted to be of whatever help I could be

04:59:24  5  in -- in getting him to take an honest look at our stuff.

04:59:29  6  Q.  And I'm going to mark as the next in order, lucky

04:59:36  7  number 13, is APLPMC00008679 through 8686.

04:59:46  8        You can see this is an email from you to Mr. Scott

04:59:51  9  at Apple dated October 30, 2009; is that correct?

04:59:57  10  A.  Yes, sir.

04:59:57  11  Q.  And it contains a series of attachments relating to

05:00:03  12  various information regarding PMC patents, patent

05:00:09  13  applications, and/or decisions relating to those?

05:00:12  14  A.  Yes, sir.

05:00:12  15  Q.  And was this specific information that Mr. Scott had

05:00:18  16  requested, or was this information selected by you to help

05:00:22  17  provide more context as to PMC's intellectual property?

05:00:25  18  A.  Probably both.  I think I may have been responding

05:00:30  19  to -- no, that's just pure speculation.  I'm guessing based

05:00:37  20  on memory that may be faulty.  So probably -- I know it was

05:00:40  21  a result of both.  He asked for certain things, and I

05:00:43  22  thought there were certain things he should see.

05:00:45  23  Q.  Now, at this time, again, it was more general

05:00:53  24  information regarding PMC's patents and portfolio as

05:00:56  25  opposed to any specific assertion that Apple -- specific

262

05:01:01  1  Apple technology was using the patents; is that fair?

05:01:10  2  A.  Well, I -- I -- yeah, that's -- I think that's fair.  I

05:01:14  3  think by this time -- I know I had conversations with Ed

05:01:21  4  about there wasn't any need for us to make a formal

05:01:24  5  assertion because our goal wasn't to sue the company.  Our

05:01:28  6  goal was to try to make a deal with the company.

05:01:32  7       And nor was there ever anything communicated to

05:01:41  8  me, by Ed or anyone else at Apple, that indicated to me

05:01:46  9  that Apple took the position that -- that it operated clear

05:01:52  10  of the patents.  It was just not something we discussed.

05:01:55  11       Apple was always interested in the technology,

05:02:00  12  always interested in trying to -- to reach a deal with us.

05:02:04  13  We remained, of course, interested in trying to reach a

05:02:08  14  deal with Apple.  So it wasn't confrontational in any way,

05:02:14  15  the relationship.  Certainly with Ed and -- well, with

05:02:16  16  everybody, as I think you'll see from -- if I remember all

05:02:19  17  of our correspondence well.

05:02:23  18  Q.  When you were sending stuff to Apple, both in 2009 and

05:02:26  19  then through the years subsequent to that, did you have the

05:02:30  20  sense that Apple was reviewing the information that you

05:02:32  21  sent and giving it due consideration?

05:02:37  22  A.  I have the feeling that for a period of time, for as

05:02:40  23  long as they could, Apple's primary goal was to make it

05:02:43  24  take as long as possible, discussions, drag them on as long

05:02:47  25  as possible, so long as I didn't indicate to them that I

05:02:55  1  was going to allow that to happen.  And for a while, I

05:02:59  2  didn't ever indicate that that was a problem for us.

05:03:02  3       Frankly, I wrote Mr. Cooperman two years before we

05:03:06  4  even had new patents issue.  Again, naively thinking that

05:03:15  5  if, in fact, Apple was interested in doing something

05:03:18  6  creative with us, that it might want to have a hand in

05:03:24  7  looking at what was being prosecuted.

05:03:26  8       So when I first reached out to Apple, these 90

05:03:34  9  patents that have issued since 2010, were still in front of

05:03:41  10  the Patent Office.

05:03:42  11       So, no, I can hardly expect somebody to enter into

05:03:47  12  a deal based on unpublished applications.  They weren't

05:03:51  13  even -- they weren't even published because of the date of

05:03:53  14  filing.

05:03:54  15  Q.  Did you ever share any of the -- the unpublished,

05:03:59  16  still-non-public applications with Apple as part of these

05:04:04  17  conversations?

05:04:04  18  A.  Oh, I think I did.  And when I say to you that -- that

05:04:08  19  I provided confidential information to Apple, I believe

05:04:15  20  that would be of the nature of the type of information I

05:04:18  21  provided because an unpublished application is, in fact,

05:04:22  22  confidential information.  So that's -- that's what I think

05:04:24  23  I was talking about.

05:04:26  24  Q.  Okay.  I've marked as Exhibit 14 APL-PMC_00008991

05:04:38  25  through 9001.

05:04:40  1          I believe this is one of the attachments that you

05:04:42  2  included in the October 30, 2009, email to Mr. Scott at

05:04:47  3  Apple.

05:04:47  4          Do you have any reason to believe that that's

05:04:51  5  incorrect?

05:04:55  6  A.  No, I don't.

05:04:55  7  Q.  And would this just be a further evolution of the sort

05:05:03  8  of PMC overview document that we previously saw attached to

05:05:10  9  prior emails that you had sent to Apple?

05:05:13  10  A.  Well, it's certainly different, and I think it's trying

05:05:18  11  to provide a different type of information to Apple than we

05:05:24  12  had provided before.  This is less about the technical

05:05:27  13  elements of the -- of the portfolio than a certain

05:05:35  14  valuation type of -- not valuation in dollars and cents,

05:05:41  15  but valuation of the portfolio information that I thought

05:05:44  16  could be useful to Ed.

05:05:45  17  Q.  So when PMC did identify specific patents to Apple with

05:05:49  18  specific claims of infringement, you would agree with me

05:05:51  19  that Apple responded and said, no, we think we don't

05:05:56  20  infringe those patents, and here's why?

05:06:00  21  A.  I think Apple responded with its claim charts or its

05:06:06  22  explanation of why they believed that our assertion was

05:06:09  23  incorrect.

05:06:11  24  Q.  And so you agree that in these original meetings or --

05:06:18  25  or conversations and then meetings between PMC and Apple,

05:06:21   1   PMC did not identify specific patents to Apple as ones that

05:06:27   2   they thought that Apple might be infringing?

05:06:30   3   A.  We did not provide -- I'll try with my limited

05:06:37   4   technical -- we did not provide -- try to provide any

05:06:42   5   evidence that Apple was using a particular patent in any

05:06:51   6   particular infringing sort of way.  Rather, what we were

05:06:54   7   trying to do was to explain the -- the PMC patent portfolio

05:06:58   8   and allow Apple to make its own conclusions.

05:07:02   9   Q.  And then later on, you know, as the conversations

05:07:07  10   developed over the years, there did come a point in time

05:07:10  11   when PMC did identify specific patents, provided claim

05:07:15  12   charts for Apple to consider whether they might be

05:07:20  13   infringing?

05:07:20  14   A.  In response to a specific request to do so, yes.

05:07:23  15   Q.  And then in response to PMC doing that, identifying

05:07:28  16   specific patents and how they might be infringed, then

05:07:32  17   Apple responded with specifics as to why they thought they

05:07:37  18   didn't infringe; is that --

05:07:39  19   A.  I think that's fair.

05:07:40  20   Q.  Let me mark as Exhibit 15 what's Bates numbered

05:07:48  21   PMC-APL_01613678 through 704.

05:07:53  22          Mr. Holtzman, you can see this looks like this is

05:07:57  23   a set of maybe PowerPoint or some kind of other slides that

05:08:03  24   you and Mr. Lemna presented at a meeting with Apple in

05:08:08  25   April 2010; is that correct?

| | | |
|---|---|---|
| 05:08:10 | 1 | A.  Yes. |
| 05:08:17 | 2 | Q.  Do you recall who attended the meeting other than |
| 05:08:19 | 3 | yourself and Mr. Lemna? |
| 05:08:20 | 4 | A.  Yes. |
| 05:08:20 | 5 | Q.  Who did? |
| 05:08:21 | 6 | A.  Mr. Scott and Boris Teksler, T-e-k-s-l-e-r. |
| 05:08:32 | 7 | Q.  And you recall Mr. Teksler was involved in the |
| 05:08:35 | 8 | licensing part of Apple? |
| 05:08:36 | 9 | A.  To my understanding, he directed it. |
| 05:08:39 | 10 | Q.  And you can flip through the presentation to confirm |
| 05:08:51 | 11 | this.  But is it fair to say that in this presentation, you |
| 05:08:54 | 12 | were more giving a general presentation regarding PMC's |
| 05:08:58 | 13 | portfolio to -- rather than providing specific notice to |
| 05:09:04 | 14 | Apple of infringement or potential infringement of certain |
| 05:09:07 | 15 | patents? |
| 05:09:10 | 16 | A.  You know, it's funny.  I don't want to sound like an |
| 05:09:14 | 17 | idiot, that -- that I just was willing to just never come |
| 05:09:24 | 18 | to grips with what was really going on here.  But at this |
| 05:09:29 | 19 | juncture, I still had reason to believe from things that |
| 05:09:33 | 20 | Scott was telling me that Apple still had an interest in |
| 05:09:36 | 21 | talking with us about acquiring exclusive rights in our |
| 05:09:43 | 22 | technology to assist them in whatever way they thought they |
| 05:09:47 | 23 | might be assisted. |
| 05:09:50 | 24 | Because, for example, you'll see in the back, you |
| 05:09:55 | 25 | know, they had -- Ed had asked us:  Give us some idea of |

05:09:59  1  who you think is covered by this stuff.

05:10:02  2       Now, you'll see everybody and their mother except

05:10:07  3  for Apple, okay?  Wasn't any reason to put Apple.  There

05:10:13  4  was an assumption that we believed that Apple was

05:10:18  5  implicated by our technology.

05:10:20  6       But I was led to believe that they were still

05:10:26  7  interested in discussing a proactive business use for

05:10:30  8  the -- for the patents beyond simply licensing them for

05:10:35  9  their own use.  And our discussions were directed in

05:10:41  10  that -- in that vein.

05:10:45  11  Q.  And so your recollection of the April 2010 meeting with

05:10:51  12  Mr. Holtzman and Lemna -- or, sorry, with Mr. Teksler and

05:10:56  13  Scott was that they might -- Apple might be considering

05:11:01  14  acquisition of -- or license -- exclusive licensing of

05:11:06  15  certain PMC technology to potentially assert against

05:11:08  16  others?

05:11:09  17  A.  That's what I thought, among what I thought.  I thought

05:11:12  18  they were interested in -- in protecting their own use, and

05:11:19  19  to the extent that they felt it was useful, to be able to

05:11:24  20  use it for whatever other purposes they wanted to.  I

05:11:27  21  didn't care.

05:11:28  22  Q.  So, yeah, I'm just kind of saying, where did it go from

05:11:33  23  here?  You came out there.  You gave a presentation.  This

05:11:36  24  is the first in-person meeting you're having.  Mr. Teksler

05:11:40  25  is involved.  Where does it go from there?

05:11:42   1   A.  My recollection, and it is recollection, is that they

05:11:45   2   had asked for additional information, which we provided,

05:11:49   3   and then I think there was a -- a period of time that Ed

05:11:59   4   sort of disappeared, and I pinged him from time to time.

05:12:08   5   And I think that, subsequently, a -- another meeting was

05:12:13   6   held with Ed where I got him together with Tom Scott, and I

05:12:19   7   think it was in Washington, to have further discussions

05:12:24   8   about the portfolio.

05:12:25   9          It was at this time, to be candid with you, that I

05:12:35   10  really began to believe that Apple was just trying to put

05:12:38   11  it into the deep freeze, and -- just my personal sense.

05:12:51   12         And I do remember, if I'm correct about that

05:12:53   13  meeting in Washington, and I believe I am, that I -- I

05:12:58   14  continued to press Mr. Scott for some -- Ed Scott, Apple's

05:13:05   15  Mr. Scott -- about some sort of status update when he

05:13:16   16  informed -- either he informed us or a fellow at Apple

05:13:21   17  informed us that we'd been passed along to him for further

05:13:25   18  handling.

05:13:27   19  Q.  And who were you passed along to?

05:13:32   20  A.  Pat Murphy.

05:13:34   21  Q.  I'm going to mark as Exhibit 16 an email that's Bates

05:13:40   22  numbered PMC-APL_02430086.

05:13:46   23         You can see this is an email dated April 12th,

05:13:49   24  2010, from you to Mr. Scott and Mr. Teksler, correct?

05:13:56   25  A.  Yes.

05:13:56   1   Q.  And is there a reason why you sent this email that's

05:13:58   2   apparently clarifying what is meant when the PMC portfolio

05:14:08   3   speaks of transmitted control signals?

05:14:10   4   A.  Well, my recollection is clear that it was sent in

05:14:14   5   response to questions that they raised during our meeting.

05:14:19   6   Q.  I've marked a couple of exhibits here.  Exhibit 17 is

05:14:25   7   Bates numbered APLPMC00009243.  And then Exhibit 18 is

05:14:34   8   APLPMC00009244.

05:14:38   9        We'll start with 17.

05:14:42  10        Mr. Holtzman, this appears to be an email from you

05:14:47  11   to Mr. Scott, cc'ing Mr. Teksler, dated January 2011,

05:14:55  12   correct?

05:14:55  13   A.  Yes.

05:14:56  14   Q.  And as part of this January 2011 communication, you

05:15:06  15   attach a draft of a potential term sheet; is that correct?

05:15:11  16   A.  Yes.

05:15:14  17   Q.  And the term sheet that you attached is what we've

05:15:20  18   marked as Exhibit 18; is that correct?

05:15:22  19   A.  Yes.

05:15:23  20   Q.  Now, is this the first term sheet or any kind of demand

05:15:29  21   or offer that PMC provided to Apple?

05:15:34  22   A.  Well, certainly the first term sheet, although my

05:15:40  23   recollection is that Ed and I would have talked about

05:15:44  24   numbers prior to this time, but never for the term that's

05:15:49  25   contained in the -- in the term sheet, never for the

05:15:55  1  temporal term contained in the term sheet.

05:15:57  2  Q.  Do you recall any written draft agreement or term sheet

05:16:01  3  provided to Apple prior to what you sent here in January

05:16:06  4  2011?

05:16:06  5  A.  I don't recall one.

05:16:09  6  Q.  And that would be a portfolio-wide license to all of

05:16:13  7  PMC's patents and any pending patent applications?

05:16:18  8  A.  That would have been the intent.

05:16:19  9  Q.  Have all of PMC's licensing deals all been

05:16:25  10  portfolio-wide licenses?

05:16:27  11  A.  I think so.

05:16:38  12  Q.  Has anyone specifically called out particular patents,

05:16:44  13  anyone you've ever negotiated with, to take licenses to

05:16:48  14  particular patents as opposed to others?

05:16:52  15  A.  No.

05:16:53  16  Q.  And that is consistent with my next exhibit.  So let's

05:16:54  17  mark that as Exhibit 19.

05:16:54  18  A.  That's good.  I was right.

05:16:56  19  Q.  It's PMC-APL_02926553 through 6555.

05:17:03  20      You can see here that this is an email -- I guess

05:17:14  21  you emailed it to yourself, but the lower email is an email

05:17:18  22  from yourself to Mr. Murphy dated July 19th, 2011,

05:17:23  23  correct --

05:17:23  24  A.  Yes.

05:17:23  25  Q.  -- and so somewhere in between the last communication

05:17:27  1   we looked at in January of 2011 and then July 2011, you

05:17:32  2   were transitioned to speaking with Mr. Murphy; is that

05:17:38  3   correct?

05:17:38  4   A.  That's my understanding.

05:17:39  5   Q.  You could see here it says:  Hello, Patrick.  Further

05:17:45  6   to our licensing discussions, and as you have requested, we

05:17:49  7   have completed five claim charts to provide Apple with

05:17:52  8   insight regarding how Apple products and services use the

05:17:55  9   PMC portfolio.

05:17:55  10          Do you see that?

05:17:56  11  A.  Yes.

05:17:57  12  Q.  And so in 2011, Apple requested PMC to identify some

05:18:03  13  specifics as to particular patents and how they might be

05:18:10  14  used by Apple's technology; is that correct?

05:18:12  15  A.  That's what it says.

05:18:13  16  Q.  And is that consistent with your recollection?

05:18:15  17  A.  It is.

05:18:16  18  Q.  And then PMC complied with Apple's request and provided

05:18:24  19  five claim charts mapping five of PMC's patents against

05:18:28  20  Apple's technology, correct?

05:18:31  21  A.  Not all of Apple's technology.  Certain aspects of it

05:18:35  22  is my understanding.

05:18:37  23  Q.  Now, eventually there was a meeting had where PMC and

05:18:44  24  Apple sat down and discussed the claim charts and the five

05:18:49  25  patents that PMC had identified to Apple?

05:18:52  1   A.  There was.

05:18:52  2   Q.  And is it correct that at the meeting, Apple provided a

05:18:58  3   presentation of their own in response to the five claim

05:19:02  4   charts that PMC had provided?

05:19:04  5   A.  Yes.

05:19:04  6   Q.  Let's mark as Exhibit 25 what's Bates numbered

05:19:12  7   PMC-APL_02926470 through 499.

05:19:18  8       You certainly remember Apple making a presentation

05:19:21  9   to PMC on or about November 2011 and you believe -- or have

05:19:27  10  no reason to believe that what I've marked here as

05:19:29  11  Exhibit 25 is not that presentation?

05:19:31  12  A.  That's correct.

05:19:32  13  Q.  If we turn the page, it's the third slide ending Bates

05:19:38  14  No. 6472, you can see at the top it's entitled General

05:19:46  15  Issues, just to make sure we're on the same page.

05:19:49  16      And the first bullet there, it says:  PMC's

05:19:53  17  infringement contentions are based on information that does

05:19:55  18  not accurately describe the operation of Apple's products.

05:19:58  19      Do you see that?

05:19:59  20  A.  That's what it says.

05:20:01  21  Q.  And do you remember Apple sending the message back to

05:20:04  22  PMC saying that PMC's claim charts were not based on

05:20:08  23  accurate information as to how Apple's products worked?

05:20:11  24  A.  I don't know what -- I don't remember exactly what they

05:20:14  25  said.  These issues were raised during that meeting.  I

05:20:19  1  don't know how they said it or what words they used.

05:20:24  2  Q.  Then without belaboring the details of it, you know,

05:20:28  3  Apple did give you a -- a, you know, 30-page presentation

05:20:34  4  detailing specifics as to why they thought they didn't

05:20:38  5  infringe, and the patents were invalid, correct?

05:20:40  6  A.  They gave me what has been marked as Exhibit 25, which,

05:20:46  7  you know, I found to be -- yeah, I mean, they gave me

05:20:51  8  Exhibit 25.

05:20:51  9  Q.  I mean, sometimes when you're in these licensing

05:20:54  10  discussions, people tell you, we don't infringe, and we

05:20:57  11  think the patents are invalid.  But they don't back it up

05:21:01  12  with anything?

05:21:01  13  A.  They don't hand me 25 pages.

05:21:04  14  Q.  Now, you understand that none of the five patents that

05:21:08  15  were identified to Apple in the pre-lawsuit discussions

05:21:10  16  were included in the actual lawsuit that was filed against

05:21:13  17  Apple; is that right?

05:21:14  18  A.  I guess I didn't know that.

05:21:19  19  Q.  So my next question is, do you have an explanation as

05:21:22  20  to why, when PMC decided to sue Apple, it did not sue Apple

05:21:29  21  on any of the five patents it had focused on in the

05:21:33  22  pre-suit discussions?

05:21:34  23  A.  I can only speculate.

05:21:38  24  Q.  Okay.  So there's this period of relative quiet

05:21:41  25  starting in later 2011, extending for a year or two, you

| | | |
|---|---|---|
| 05:21:45 | 1 | said, and then you said Jayna Whitt at Apple became the |
| 05:21:51 | 2 | point of contact that you had? |
| 05:21:54 | 3 | A.  Correct. |
| 05:21:55 | 4 | Q.  Did you ever have any in-person meeting meetings with |
| 05:21:59 | 5 | Ms. Whitt? |
| 05:21:59 | 6 | A.  I did. |
| 05:22:00 | 7 | Q.  How many? |
| 05:22:01 | 8 | A.  Two, I believe. |
| 05:22:02 | 9 | Q.  And the first meeting that you recall having with |
| 05:22:07 | 10 | Ms. Whitt, who else was present? |
| 05:22:10 | 11 | A.  Heather Mewes, M-e-w-e-s, and a summer clerk, an intern |
| 05:22:22 | 12 | who was at law school at -- I think at Berkeley. |
| 05:22:25 | 13 | Q.  And what was discussed at this meeting -- this first |
| 05:22:29 | 14 | meeting that you had with Ms. Whitt, Ms. Mewes, and the |
| 05:22:33 | 15 | intern? |
| 05:22:35 | 16 | A.  Went back through the history with Patrick, and -- and, |
| 05:22:41 | 17 | you know, basically, they made it clear that Apple had a |
| 05:22:48 | 18 | continued interest or continuing interest in trying to get |
| 05:22:51 | 19 | a deal with us, and how were we going to go about coming up |
| 05:22:56 | 20 | with numbers that we could all live with. |
| 05:22:58 | 21 | Q.  Were there any more claim charts or specifics that -- |
| 05:23:03 | 22 | specific patents identified by PMC to Apple when you were |
| 05:23:06 | 23 | talking to Ms. Whitt? |
| 05:23:07 | 24 | A.  No.  The only time I ever heard -- to make it easier |
| 05:23:14 | 25 | for you, the only time I ever heard that our patents were |

05:23:17   1   invalid and not infringed was in that meeting with Pat
05:23:20   2   Murphy.
05:23:21   3   Q.  Yeah.  And my question was more going at:  Did you ever
05:23:24   4   come back to Apple after the meeting with Mr. Murphy --
05:23:28   5   A.  Oh, okay.
05:23:29   6   Q.  -- to say, hey, here's another set of patents for you
05:23:32   7   guys to take a look at?
05:23:33   8   A.  No, sir.
05:23:34   9   Q.  Let me mark as Exhibit 27 what's Bates-numbered
05:23:39  10   PMC-APL_03354070 through 072.
05:23:45  11        You can see Exhibit 27 is an email you sent to
05:23:57  12   Jayna Whitt at Apple, cc to Heather Mewes, dated
05:24:02  13   October 22, 2013, correct?
05:24:03  14   A.  Yes, sir.
05:24:04  15   Q.  The second line says:  Reflecting on our discussions
05:24:09  16   and suspecting that our differences in valuation may stem
05:24:12  17   from your sense that our patents are focused in the
05:24:14  18   television and not the Internet space.  I offer this
05:24:17  19   additional information for you and others to consider when
05:24:20  20   considering the relevance of the PMC/Harvey patents.
05:24:25  21        Do you see that?
05:24:26  22   A.  Yeah, I see it.
05:24:27  23   Q.  And so by this time, Apple was communicating to you the
05:24:32  24   notion that the patents were focused on television and not
05:24:36  25   the Internet space; is that fair?

05:24:39  1   A.  Jayna had made it clear that her management, in terms

05:24:49  2   of discussing valuation, believed that the focus of the

05:24:53  3   patents was more on television than as to the Apple

05:24:57  4   patent -- products.

05:24:58  5   Q.  So I'm -- I'm looking still at the communication you

05:25:01  6   had with Ms. Whitt in October 2013.  This is Exhibit 27.

05:25:09  7   And you give her a long set of reasons why -- and -- and

05:25:16  8   you conclude at the end of the email, looking at Page 3 of

05:25:19  9   the email, with the conclusion:  We are relevant to Apple's

05:25:25  10  Internet business.

05:25:25  11          And, essentially, the substance of this email is

05:25:27  12  trying to make that point to her.  Is that a fair

05:25:31  13  characterization of what you were trying to accomplish via

05:25:34  14  this communication to Ms. Whitt?

05:25:36  15  A.  I think the letter speaks for itself.

05:25:38  16          It's very clear that we believe the patent's

05:25:42  17  relevant -- our patent's relevance to the Internet.

05:25:46  18  Q.  You think Apple is sort of a different animal compared

05:25:52  19  to the other people you've licensed in the past?

05:25:55  20  A.  I think Apple is unique.

05:25:57  21  Q.  Unique in what way?

05:25:59  22  A.  Unique as to scale.  Unique in that sense.

05:26:06  23  Q.  So we talked about the first meeting that you had with

05:26:09  24  Ms. Whitt and Ms. Mewes.  You said there was a second

05:26:12  25  meeting?

05:26:14  1    A.  Yeah, there was.  And --

05:26:15  2    Q.  Who attended that one?

05:26:17  3    A.  I -- I think it was Heather, and that Jayna couldn't

05:26:22  4    make it, so I wound up meeting with just Heather.

05:26:26  5    Q.  And what was the nature of that discussion with

05:26:28  6    Ms. Mewes?

05:26:29  7    A.  Just we couldn't get anywhere.  You know, I had made a

05:26:35  8    number of offers of -- of trying to find creative ways to

05:26:38  9    structure something that could be paid -- you know, pay us

05:26:43  10   something and then, you know, if something happens, then

05:26:47  11   you pay more or -- you know, and so forth.  And we just

05:26:50  12   talked it around and talked it around and talked it around.

05:26:54  13        And at the end of the day, you know, Jayna -- I

05:26:59  14   mean, Heather was just honest enough to -- to say that we

05:27:02  15   just have a -- a management dispute as to how valuable your

05:27:05  16   patents are to us.  We believe they're valuable to us.

05:27:09  17   They're just nowhere near as valuable as you think they

05:27:13  18   are.  And I understand that.

05:27:14  19        So there we are with what I consider to be a

05:27:20  20   legitimate business dispute.  And, unfortunately, today, in

05:27:26  21   this world, there seems to be only way to resolve those.

05:27:32  22   Q.  Now, in all these conversations with Ms. Mewes and

05:27:35  23   Ms. Whitt, it sounds like you had pivoted away from talking

05:27:40  24   about specific patents or positions or defenses and you

05:27:43  25   were more focused on potential business terms; is that

|     |     |
| --- | --- |
|     | 1 |
| 05:27:48 | 2 |
| 05:27:53 | 3 |
| 05:27:57 | 4 |
| 05:28:02 | 5 |
| 05:28:08 | 6 |
| 05:28:10 | 7 |
| 05:28:13 | 8 |
| 05:28:16 | 9 |
| 05:28:20 | 10 |
| 05:28:24 | 11 |
| 05:28:28 | 12 |
| 05:28:33 | 13 |
| 05:28:38 | 14 |
| 05:28:42 | 15 |
| 05:28:53 | 16 |
| 05:28:56 | 17 |
| 05:29:01 | 18 |
| 05:29:05 | 19 |
| 05:29:08 | 20 |
| 05:29:12 | 21 |
| 05:29:16 | 22 |
| 05:29:25 | 23 |
| 05:29:25 | 24 |
| 05:29:26 | 25 |

fair?

A.  So were they.  Yeah.  It was never -- you know, it was never -- it was never a focus on the -- I'm going to make up -- in the '304 patent or -- or a focus on a claim chart or a focus on a 112 defense.  It was on a, here's what this stuff we think is worth to us.

And for Apple, that needs to be as low as possible, and for me, that needs to be as high as possible, and we just weren't able to reach an understanding.

Q.  Exhibit 29 will be Apple's first Notice of Deposition of Personalized Media Communications pursuant to 30 -- Federal Rules of Civil Procedure 30(b)(6).

So, Mr. Holtzman, I think you were identified for one topic in this 30(b)(6) notice, and I wanted to just point you to it quickly if you could grab it.  Topic 15. It's on Page 7.  I'll read it to you.

The topic is PMC's policies, practices, and/or customs for assessing the royalty payment agreed to and received, compared to the expected and/or forecasted royalty payment and any assessments of equivalent value if the form of royalty payment changed, i.e., PMC's forecast in per-unit royalty compared to the agreed-upon lump sum royalty payment.

Do you see that topic now?

A.  I do.

05:29:27  1   Q.  And do you understand that you've been identified by

05:29:30  2   PMC as the person from PMC to testify on behalf of the

05:29:32  3   company for this topic?

05:29:34  4   A.  I understand that I was designated to testify about

05:29:37  5   that matter post-2001.

05:29:40  6   Q.  Do you agree that the proper way to look at valuing

05:29:45  7   any, you know, license that Apple might take would be to

05:29:47  8   look at it from a lump sum perspective as opposed to a

05:29:51  9   royalty perspective?

05:29:52  10  A.  Technically not, but that's the way people have dealt

05:29:55  11  business with us.  You know, we -- we haven't negotiated

05:30:00  12  lump sum royalties.  I mean, we haven't negotiated unit

05:30:05  13  royalties.  We've negotiated lump sum payments.

05:30:09  14  Q.  I think you've previously testified -- I've seen a

05:30:13  15  transcript where you've said 99 percent of PMC's licenses

05:30:16  16  have been of the lump sum variety as opposed to ongoing

05:30:20  17  royalty; is that correct?

05:30:24  18  A.  Yeah.

05:30:25  19          ATTORNEY:  You have to answer.  Okay.

05:30:26  20  A.  Yes.

05:30:27  21  Q.  In the past 20 years, all the licenses that PMC has

05:30:30  22  done have been lump sum licenses?

05:30:33  23  A.  To my knowledge.

05:30:34  24  Q.  Has Apple communicated to you that their typical

05:30:39  25  practice is to negotiate lump sum as opposed to ongoing

| 05:30:42 | 1 | royalty agreements? |
| 05:30:44 | 2 | A.  Well, you know, the only -- the only knowledge I have |
| 05:30:48 | 3 | about that is -- is I think I heard that from either |
| 05:30:54 | 4 | Heather or Jayna, and I certainly heard that from David |
| 05:31:01 | 5 | Melaugh at mediation. |
| 05:31:03 | 6 | Q.  Are you aware of any license that PMC has that was |
| 05:31:09 | 7 | specifically driven or -- or consummated because of the -- |
| 05:31:19 | 8 | the parties seeking rights to the patents that are asserted |
| 05:31:21 | 9 | in this case? |
| 05:31:22 | 10 | A.  No.  Because everybody that talks to us knows we're |
| 05:31:27 | 11 | talking about a portfolio license. |
| 05:31:28 | 12 | Q.  Right.  So -- |
| 05:31:29 | 13 | A.  We've never really divvied out patents. |
| 05:31:33 | 14 |         (Videoclip ends.) |
| 05:31:33 | 15 |         THE COURT:  Does that complete this witness by |
| 05:31:38 | 16 | deposition? |
| 05:31:39 | 17 |         MR. KLINE:  It does, Your Honor. |
| 05:31:40 | 18 |         THE COURT:  Call your next witness. |
| 05:31:43 | 19 |         MR. KLINE:  PMC calls Heather Mewes by |
| 05:31:49 | 20 | deposition -- I mean, by designation, Your Honor. |
| 05:31:51 | 21 |         Would you like the allocations? |
| 05:31:53 | 22 |         THE COURT:  Yes, please. |
| 05:31:53 | 23 |         MR. KLINE:  The Plaintiff has allocated 7 minutes |
| 05:31:57 | 24 | and 23 seconds.  The Defendant has allocated 9 minutes and |
| 05:32:01 | 25 | 24 seconds. |

05:32:02  1        THE COURT:  Proceed with this witness by

05:32:03  2   deposition.

05:32:04  3            (Videoclip played.)

05:32:13  4   Q.  Could you please identify yourself for the record?

05:32:17  5   A.  Heather Mewes.

05:32:17  6   Q.  And could you please state your address?

05:32:19  7   A.  I'm at 698 Orvis Avenue in San Jose, California.

05:32:25  8   Q.  And you have a law degree as well, correct?

05:32:27  9   A.  I do.

05:32:28  10  Q.  And where is that from?

05:32:29  11  A.  That's from the University of California at Berkley.

05:32:32  12  Q.  And what was your first title at Apple?

          13  A.  I was senior counsel.

05:32:34  14  Q.  What were your responsibilities in that position?

05:32:35  15  A.  They varied.  So I was in a licensing practice,

05:32:38  16  licensing group, but that could involve matters like

05:32:47  17  parties coming to us and asking us to take a license.  It

05:32:51  18  could involve IP advice generally in a variety of areas.

05:32:58  19  Q.  When you started at Apple as a senior counsel, what was

05:33:00  20  the specific name of the group that you worked for?

05:33:02  21  A.  IP transactions.

05:33:04  22  Q.  And was that part of the broader structure of the

05:33:08  23  general counsel's office at Apple?

05:33:11  24  A.  So -- I'm sorry.  The IP transactions group actually

05:33:15  25  sits in the licensing -- licensing group.

05:33:17  1   Q.  And does the IP and licensing group sit within some

05:33:20  2   broader group or office?

05:33:22  3   A.  Within the general counsel.

05:33:24  4   Q.  So I know you said that there was a reorganization at

05:33:28  5   some point, but back when you started as a senior counsel

05:33:34  6   in 2012, did the IP transactions group handle licensing

05:33:39  7   negotiations?

05:33:40  8   A.  Yes.

05:33:41  9   Q.  Were you personally involved in licensing negotiations?

05:33:46  10  A.  Yes.

05:33:46  11  Q.  Would Apple look into the status of any pending

05:33:53  12  applications as it was evaluating whether or not to

05:33:55  13  purchase an asset?

05:33:56  14  A.  So it might.  I mean, I think we generally rely on

05:34:01  15  information that's provided to us.

05:34:02  16  Q.  So as a general practice, Apple wouldn't say, go to the

05:34:08  17  USPTO website and pull whatever relevant information they

05:34:11  18  could find on the patent application?

05:34:13  19  A.  If we were going to complete an acquisition, we'd

05:34:16  20  probably check that.  But we certainly don't expect parties

05:34:20  21  to be dealing unfairly with us and sharing false

05:34:24  22  information.

05:34:24  23  Q.  When a letter patentholder comes into Apple accusing

05:34:32  24  Apple for infringement, how is that generally handled?

05:34:36  25  A.  So that kind of letter would come to the IP

```
05:34:39   1   transactions team.  Somebody on our team would take
05:34:43   2   leadership on it.  We would look at the letter.  In some
05:34:46   3   cases, things come to us, for example, as I mentioned
05:34:49   4   earlier, with pretty detailed information, like claim
05:34:53   5   charts and things that.  In that case, we might just let
05:34:56   6   the party know we're evaluating it and go ahead and do our
           7   evaluation.
05:35:00   8        In some cases, things come to us with -- with very
05:35:03   9   little information, just a patent number or something like
05:35:05  10   that.  And so we might write to the party and say, could
05:35:08  11   you please provide some more information so we can
05:35:12  12   understand why you think this is relevant to us.
05:35:13  13   Q.  Is there a practice about how such a letter would be
05:35:16  14   handled?
05:35:16  15   A.  Yeah.  So I said as -- generally, when a letter comes
05:35:20  16   in with some kind of assertion that Apple is infringing a
05:35:23  17   patent, it's something -- we respect the intellectual
05:35:25  18   property of third parties, and so we take it very
05:35:29  19   seriously.
05:35:30  20        And what that means is we do investigate each one
05:35:33  21   of these letters that comes to us.  Like I said, we --
05:35:36  22   we'll write back.  We will ask for information.  We will
05:35:38  23   work with our engineers, with outside counsel, with experts
05:35:44  24   to make sure we understand the allegations, and we'll have
05:35:48  25   a dialog.
```

05:35:50   1        We try to provide written feedback to parties who

05:35:56   2   come to us with serious allegations and provide an

05:35:59   3   explanation of our view.  And some cases we'll have a

05:36:06   4   dialog about taking a license and what the value of that

05:36:09   5   license is, and, you know, we'll -- in some cases we're

05:36:13   6   able to reach agreement and in some cases we're not.

05:36:16   7   Q.  And who is Mr. Scott?

05:36:17   8   A.  So he's an attorney that was no longer at Apple but was

05:36:20   9   in the licensing and strategy group previously.

05:36:24   10  Q.  Do you know if Apple ever does clearance searches?

05:36:27   11  A.  I'm not aware of any.  I mean, it's something we would

05:36:31   12  consider if it makes sense in a particular circumstance,

05:36:33   13  but it's certainly not a policy to do clearance searches

05:36:37   14  because we've generally made the evaluation that they don't

05:36:40   15  make sense.

05:36:41   16  Q.  Whether Apple receives communications from a

05:36:45   17  patentholder seeking to sell its intellectual property to

05:36:50   18  Apple, does Apple attempt to determine -- determine the

05:36:54   19  scope of that -- those patents?

05:36:55   20  A.  I mean, we would certainly look at the disclosure in

05:37:01   21  the patents to understand what's there.  I'm not sure our

05:37:05   22  focus would be on claims necessarily.  I think we'd look at

05:37:10   23  some of that, especially if there's applications open, I

05:37:14   24  think the focus would not be on claims.

05:37:17   25  Q.  What would it be on?

05:37:19   1   A.  Well, in an acquisition context, and particularly if

05:37:22   2   you have an opportunity to continue prosecuting patents,

05:37:27   3   you might be focused on what's actually disclosed in the

05:37:30   4   specification so you can understand what might be supported

05:37:32   5   in the future.

05:37:33   6   Q.  So Apple would focus on the specification more than the

05:37:41   7   claims?

05:37:41   8   A.  It's more likely in an acquisition context but, again,

05:37:45   9   it depends on the circumstance.  And like I said, it may be

05:37:50   10  that you're in an area that we're just not interested in

05:37:52   11  buying it in so we might not get that far.

05:37:55   12  Q.  The court reporter has handed you Exhibit 9 marked with

05:37:59   13  the Bates number APL-PMC_00002989.

05:38:05   14          All right.  Have you seen this document before?

05:38:06   15  A.  I don't recall it specifically, but I may have.

05:38:09   16  Q.  When you became responsible for this matter, did you go

05:38:14   17  back and look at correspondence between Apple and PMC?

05:38:19   18  A.  Yes.

05:38:19   19  Q.  Why?

05:38:19   20  A.  Because I want to be familiar with the history between

05:38:22   21  the parties.

05:38:23   22  Q.  Turning back to the document in front of you, the email

05:38:26   23  from Mr. Scott states:  You're right.  I've described

05:38:32   24  several pending patent applications, but I've not received

05:38:34   25  any details.  How do I get this information?

05:38:36   1         Did I read that correctly?

05:38:38   2   A.  Certainly the gist of it.  I wasn't paying attention

05:38:43   3   word-for-word.

05:38:45   4   Q.  Do you know why Mr. Scott would have wanted the

05:38:51   5   information regarding the pending patent applications?

05:38:53   6   A.  So as I said, we'd be interested primarily, I think, in

05:38:57   7   the disclosures of those applications.

05:38:59   8   Q.  This email is dated October 29th, 2009, correct?

05:39:05   9   A.  Yes.

05:39:06   10  Q.  Would Apple have considered these communications to be

05:39:13   11  a negotiation?

05:39:14   12  A.  So it's -- Mr. Holtzman is trying to sell his IP to

05:39:20   13  Apple, so it's a negotiation in the sense that he would

05:39:23   14  like a transaction to happen.  Like I said, you know,

05:39:27   15  the -- I don't see anything in here to indicate that we

05:39:32   16  expressed interest in purchasing, so I'm not sure it's --

05:39:35   17  it's a negotiation in the sense of, hey, you want this

05:39:40   18  price, and I want that price.  But there's an exchange of

05:39:44   19  information and -- and some evaluation that was done.

05:39:47   20  Q.  In the acquisition's context, would it be routine for

05:39:53   21  this to go on for several months to several years of back

05:39:57   22  and forth?

05:39:57   23  A.  I'd say it's not unusual, I mean, in part because, like

05:40:01   24  I said, it's a sales process for Mr. Holtzman's position.

05:40:05   25  And so what's going on I think here is, you know, there's

05:40:09   1   an initial look at it and Mr. -- and you can see from the

05:40:12   2   earlier documents that Mr. Scott looked at it.  Clearly, at

05:40:16   3   that point in time, we didn't have interest.

05:40:18   4        Mr. Holtzman is continuing to keep in touch

05:40:21   5   because he's still continuing interest in making sales.

05:40:25   6   He's providing more information, and we're continuing to

05:40:28   7   evaluate that information, and, you know, like I said, we

05:40:30   8   didn't shut the door on it.  We're happy to hear what other

05:40:34   9   information -- if they have different reasons to explain

05:40:36  10   why they think we should acquire.  We're happy to listen to

05:40:39  11   those.  We're open to it.

05:40:42  12   Q.  Good afternoon, Ms. Mewes.  I'm going to hand you what

05:40:50  13   has been pre-marked as Mewes Exhibit 18.

05:40:53  14        Have you seen this document before?

05:40:54  15   A.  Just give me a second.

05:40:55  16        Yes, I have.

05:40:56  17   Q.  And it bears the Bates number PMC-APL_03447039.

05:41:10  18   A.  Uh-huh.

05:41:10  19   Q.  What is this document?

05:41:11  20   A.  So there was a point in time where PMC made clear that

05:41:18  21   it was asking Apple to take a license to its portfolio.  I

05:41:21  22   think that was in 2011.  And so consistent with our

05:41:27  23   practice, we asked for some further information about the

05:41:32  24   allegations.  I think it took them a while to get back to

05:41:34  25   us with that, and there was an -- I think it was an

05:41:38  1  in-person meeting.  I don't recall.  But either way, there

05:41:41  2  was a presentation that PMC provided with some claim

05:41:45  3  charts, and this is our response to the claim charts and

05:41:49  4  presentation that PMC did.  It was Apple's response.

05:41:54  5  Q.  Was this presentation given at a meeting?

05:41:58  6  A.  Yes, that's my understanding.

05:41:59  7  Q.  Did Apple take any actions as a result of your first

05:42:04  8  meeting with Mr. Holtzman?

05:42:06  9  A.  I think it was a cordial -- as I said, it was a cordial

05:42:12  10  discussion.  I think we communicated our views, which were

05:42:15  11  consistent with what we had previously communicated, that

05:42:17  12  we didn't think the patents identified to us were relevant,

05:42:21  13  and we thought that there was pretty significant issues

05:42:25  14  even on 112 without looking further into validity.

05:42:28  15      So I'm not sure that we thought that there was

05:42:32  16  actions out of the meeting.  I don't recall if Mr. Holtzman

05:42:37  17  may have suggested providing more information.  I'm sure we

05:42:41  18  would have been open to that.

05:42:43  19  Q.  The court reporter has handed you Mewes Exhibit 24,

05:42:47  20  bearing Bates No. APL-PMC_00006851.

05:42:55  21      Have you seen this document before?

05:42:56  22  A.  Yeah, I think so.  There's not much to it.

05:43:03  23  Q.  If you could turn to the back, which is the -- the

05:43:06  24  first email in the chain.  It looks like there's one dated

05:43:11  25  March 20th, 2014, where Mr. Holtzman is checking to see if

05:43:15   1   there's any new information; is that correct?

05:43:17   2   A.   Uh-huh, yes.

05:43:18   3   Q.   And on the March 21st email where you said there was

05:43:26   4   nothing new to report at this point, what did you mean by

05:43:33   5   that?

05:43:33   6   A.   So I think we had some prior discussions, as I

05:43:38   7   mentioned, with Mr. Holtzman, I think where we had

05:43:41   8   communicated our position basically that we did not think

05:43:44   9   that the -- the five patents that were identified to us

05:43:47   10   were particularly relevant to Apple and that we thought

05:43:54   11   there was generally some significant issues with the

05:43:57   12   portfolio and its application with respect to Internet

05:44:02   13   companies or companies like Apple.

05:44:03   14          And so I think at that point, you know, he was

05:44:12   15   asking, you know, is anything changed.  And I think the

05:44:16   16   answer was nothing had changed.

05:44:17   17   Q.   In the documents, it looks like you spoke with

05:44:20   18   Mr. Holtzman perhaps in August and December of 2014; is

05:44:23   19   that correct?

05:44:23   20   A.   That's generally right.  I think so.

05:44:25   21   Q.   And there may have been another call or two during the

05:44:28   22   time frame, as well, correct?

05:44:30   23   A.   Yeah.  Certainly possible.

05:44:33   24   Q.   And in these calls, you reiterated what Apple's

05:44:36   25   position was to Mr. Holtzman; is that correct?

05:44:38  1   A.  As I said, I don't specifically remember, but this is

05:44:41  2   my recollection of sort of a series of calls is -- is -- I

05:44:45  3   think he understood very well what our position was.  We

05:44:48  4   would reiterate it if it was appropriate.

05:44:51  5   Q.  Do you remember what the last communication with

05:44:55  6   Mr. Holtzman was?

05:44:56  7   A.  He let me know that they had sued us.

05:44:59  8   Q.  Do you know what the first point in time was that Apple

05:45:04  9   learned that PMC believes that Apple's products infringe

05:45:09 10   the patents-in-suit?

05:45:11 11   A.  So I think with respect to the patents-in-suit, the

05:45:17 12   first time we learned of those was when the complaints --

05:45:21 13   or, rather, at least learned of the assertion of the

05:45:25 14   infringement was with respect to the complaints that were

05:45:28 15   filed.

05:45:29 16   Q.  Apple has received the complaint in this case, correct?

05:45:32 17   A.  That's right.

05:45:33 18   Q.  And PMC is also serving infringement contentions in

05:45:35 19   this case, correct?

05:45:36 20   A.  That's my understanding, yes.

05:45:37 21   Q.  And both of these documents list specific products,

05:45:42 22   software, et cetera, that Apple sells that PMC asserts

05:45:48 23   infringed its patents, correct?

05:45:49 24   A.  So I think that's correct, but...

05:45:53 25   Q.  Apple continues to sell the products that are listed in

05:45:58  1  the complaint and infringement contentions, correct?

05:46:04  2  A.  I'm not sure exactly which products, but I assume the

05:46:07  3  answer is -- is yes, that the products that, for example,

05:46:11  4  you're talking about an iPhone or iTunes, Apple has

05:46:15  5  continued to sell those products, yes.

05:46:17  6  Q.  So Apple continues to sell iPhones, Apple TVs, iPads,

05:46:22  7  et cetera; is that correct?

05:46:23  8  A.  That's correct.

05:46:23  9  Q.  The court reporter has handed you an exhibit marked

05:46:29  10  Mewes 27 bearing Bates Nos. APL-PMC_003 -- excuse me --

05:46:38  11  636870.

05:46:39  12          Have you seen this document before?

05:46:41  13  A.  Yes.

05:46:41  14  Q.  What is it, please?

05:46:42  15  A.  It is a license between Apple and Intertrust.

05:46:52  16  Q.  And was it entered into on or about March 17th, 2014?

05:46:58  17  A.  Yes.

05:46:58  18  Q.  And on the first page of the license, it references

05:47:06  19  litigation in the Northern District of California, correct?

05:47:09  20  A.  Yes.

05:47:10  21  Q.  So did Intertrust sue Apple in the Northern District of

05:47:16  22  California regarding the patents that the license relates

05:47:20  23  to?

05:47:20  24  A.  I think they made claims -- I think it was like 15 to

05:47:26  25  20 patents and, of course, they're licensing hundreds of

| | | |
|---|---|---|
| 05:47:29 | 1 | patents. |
| 05:47:30 | 2 | Q.  But Intertrust did sue Apple in the Northern District |
| 05:47:34 | 3 | of California, correct? |
| 05:47:35 | 4 | A.  That's correct. |
| 05:47:35 | 5 | Q.  Do you know what this license relates to? |
| 05:47:37 | 6 | A.  There's a descript -- general description of the |
| 05:47:43 | 7 | patents by subject matter in the license.  Let's see. |
| 05:47:53 | 8 | Yeah.  So Page 14 of the license indicates that at least |
| 05:47:59 | 9 | the following areas are included, the digital rights |
| 05:48:03 | 10 | management, secure computing, targeted advertising, big |
| 05:48:07 | 11 | data security and privacy management, and then you can |
| 05:48:14 | 12 | obviously see that there's hundreds of patents listed. |
| 05:48:17 | 13 | Q.  And on the first page of the license, it also was |
| 05:48:24 | 14 | associating categories in the second paragraph, correct? |
| 05:48:28 | 15 | A.  Yeah, it does. |
| 05:48:29 | 16 | Q.  So this license relates to digital rights management |
| 05:48:33 | 17 | among other things, correct? |
| 05:48:35 | 18 | A.  Among many other things. |
| 05:48:36 | 19 | Q.  What Apple products are covered by this license? |
| 05:48:38 | 20 | A.  So if you look on Page 1 of the license, you'll see |
| 05:48:42 | 21 | that the licensed product definition incorporates all Apple |
| 05:48:47 | 22 | products. |
| 05:48:48 | 23 | Q.  Do you know what the dollar amount for the Intertrust |
| 05:48:52 | 24 | license was? |
| 05:48:52 | 25 | A.  █████████████████████████████   ███████ |

| 05:48:59 | 1 | ▆▆▆▆▆▆ |
| 05:48:59 | 2 | Q.  Which bears Bates No. APL-PMC_00636662. |
| 05:49:07 | 3 | Have you seen this document before? |
| 05:49:09 | 4 | A.  Yes. |
| 05:49:11 | 5 | Q.  And what is it? |
| 05:49:12 | 6 | A.  It's a license agreement between Apple and a company |
| 05:49:17 | 7 | called Digeo Interactive. |
| 05:49:19 | 8 | Q.  Do you know how much this was -- the consideration was |
| 05:49:24 | 9 | in this license? |
| 05:49:25 | 10 | A.  ▆▆▆▆▆ |
| 05:49:28 | 11 | (Videoclip ends.) |
| 05:49:28 | 12 | THE COURT:  Does that complete this witness by |
| 05:49:32 | 13 | deposition? |
| 05:49:33 | 14 | MR. KLINE:  It does, Your Honor. |
| 05:49:34 | 15 | THE COURT:  Call your next witness. |
| 05:49:37 | 16 | MR. KLINE:  PMC calls Jayna Whitt by deposition |
| 05:49:40 | 17 | designation, Your Honor.  The total time of the video is 21 |
| 05:49:46 | 18 | and 12 seconds.  It's allocated 13 minutes and 17 seconds |
| 05:49:50 | 19 | to the Plaintiff, 7 minutes and 56 seconds to the |
| 05:49:53 | 20 | Defendant. |
| 05:49:54 | 21 | THE COURT:  Proceed with this witness by |
| 05:49:56 | 22 | deposition. |
| 05:49:57 | 23 | (Videoclip played.) |
| 05:50:00 | 24 | Q.  Good morning, Ms. Whitt.  Could you please state your |
| 05:50:04 | 25 | name for the record? |

05:50:04   1   A.   Good morning.   My name is Jayna Whitt.

05:50:07   2   Q.   And who is your current employer?

05:50:09   3   A.   Apple.

05:50:10   4   Q.   And have you worked at Apple since 2006?

05:50:16   5   A.   I have, yes.

05:50:17   6   Q.   And what's your current title?

05:50:18   7   A.   I'm currently principal counsel.

05:50:20   8   Q.   What's your general high-level understanding of

05:50:23   9   FairPlay?

05:50:23   10   A.   I -- I just think of it as our -- as DRM, digital

05:50:32   11   rights management.

05:50:32   12   Q.   And what's digital rights management?

05:50:33   13   A.   I think of it as -- I don't know that I can accurately

05:50:46   14   define that.   I generally tend to think of it as some sort

05:50:59   15   of security, for digital -- for digital files.

05:51:04   16   Q.   So when an individual or entity contacts Apple and they

05:51:14   17   provide a patent that they are interested in potentially

05:51:17   18   licensing to Apple, what does Apple do with that

05:51:22   19   information?

05:51:22   20   A.   So after we establish contact, which -- you know, to

05:51:29   21   get the person a point person, that person is basically the

05:51:34   22   manager of the negotiations with that person or the

05:51:38   23   discussions with that person, and -- and it will go from

05:51:40   24   there.   So it just depends upon the type of party and what

05:51:44   25   they are willing to share with us in terms of their

05:51:46  1  positions.

05:51:47  2        We're -- we're very much at the beginning

05:51:50  3  listening and just trying to establish, you know, a rapport

05:51:57  4  with people so that we can have a candid discussion.

05:52:00  5  Q.  Does Apple look into the -- the patent or patents that

05:52:09  6  the individual provides to Apple?

05:52:11  7  A.  Yes, we do.

05:52:15  8        But we also really need to have the dialog with

05:52:20  9  the party about what they believe their patents cover

05:52:24  10  because patents are complicated and get litigated a lot.

05:52:29  11  So they're not always -- we -- we rely a lot on the party

05:52:35  12  to give us their positions and to explain to us, you know,

05:52:39  13  what they invented and explain to us the -- the -- excuse

05:52:44  14  me -- the value that they associate with their -- their

05:52:50  15  offering.

05:52:50  16  Q.  If the patent number or numbers is provided in the

05:52:55  17  initial letter, will the individual Apple assigned to that

05:53:01  18  file look at the patents?

05:53:04  19  A.  Yes.

05:53:07  20  Q.  And will the individual at Apple who is assigned to

05:53:10  21  that file look at the patent family more broadly?

05:53:18  22  A.  Generally, they'll consider that, sure.  And, again, it

05:53:22  23  kind of depends upon what information the party provides.

05:53:27  24  We always ask for claim charts.  We always ask for as much

05:53:32  25  information as, you know, the -- the other party is willing

05:53:34   1   to provide because it really is the only way we can -- we

05:53:38   2   can try to come to -- to a meeting of the minds with

05:53:42   3   parties.  So we really ask as much as they can provide.

05:53:46   4   And most -- most parties are -- are pretty good about

05:53:48   5   giving us additional information.  And then we can really

05:53:51   6   kind of evaluate it and discuss the merits with the party.

05:53:54   7   Q.  Is any effort done to investigate or track any

05:54:05   8   still-pending applications that are related to patents that

05:54:10   9   individuals put forth to Apple?

05:54:13   10  A.  No.  We usually ask parties to keep us apprised.

05:54:18   11          So once we -- once we make contact and we ask for

           12  information, we also --

05:54:21   13          (Interruption by counsel.)

05:54:21   14          MR. KLINE:  Pardon me, Your Honor.

05:54:22   15          THE COURT:  Stop the video.

05:54:23   16          (Videoclip ends.)

05:54:24   17          THE COURT:  Just a moment.  Stop the video.

05:54:26   18          MR. KLINE:  I have to apologize, Your Honor.  Our

05:54:29   19  next -- Mr. Harvey, our next witness, had come in to be

05:54:34   20  prepared to testify.  And he's sequestered, so I just

05:54:37   21  wanted to get him out.  Pardon me, Your Honor.

05:54:39   22          THE COURT:  That's fine.  Let's go ahead with the

05:54:41   23  video.

05:54:42   24          (Videoclip played.)

05:54:44   25  A.  That -- you know, we're really hoping the party can --

| | | |
|---|---|---|
| 05:54:47 | 1 | can provide us with the support for whatever value they're |
| 05:54:49 | 2 | associating with their patents. |
| 05:54:51 | 3 | And if the discussion ends and -- and we don't |
| 05:54:57 | 4 | have a license, then we usually ask the party to just come |
| 05:55:03 | 5 | back to us if they have, you know, additional information |
| 05:55:06 | 6 | or want to discuss the matter further. |
| 05:55:08 | 7 | Q.  So you said that currently Apple doesn't track pending |
| 05:55:12 | 8 | applications, but rather asks the individual with the |
| 05:55:16 | 9 | patent or patents to inform Apple of any new patents or |
| 05:55:21 | 10 | things of that nature; is that correct? |
| 05:55:25 | 11 | A.  That's right.  It's just not practical for us to be |
| 05:55:27 | 12 | able to -- to track -- there are so many patents that |
| 05:55:31 | 13 | people come to us with.  Especially, you know, there's a |
| 05:55:34 | 14 | lot of parties who have large portfolios, and it's not |
| 05:55:38 | 15 | practical for us to do that. |
| 05:55:39 | 16 | So we really have to rely on the party to -- you |
| 05:55:42 | 17 | know, to come back to us and hopefully explain more if |
| 05:55:45 | 18 | something changes anywhere in their portfolio. |
| 05:55:49 | 19 | Q.  And has that been Apple's way of handling individuals |
| 05:55:55 | 20 | who come forward with -- with patents for the entire time |
| 05:56:02 | 21 | that you've worked at Apple? |
| 05:56:06 | 22 | A.  Yes.  That's -- that's the standard -- that's the |
| 05:56:09 | 23 | standard practice since I've been at Apple. |
| 05:56:11 | 24 | Q.  Are you aware of any instances where Apple did track |
| 05:56:16 | 25 | pending applications or prosecution -- changes in |

05:56:21  1  prosecution history in patents that individuals had brought

05:56:24  2  to Apple to license?

05:56:29  3  A.  No, I'm not.  Not unless, you know, fortuitously

05:56:34  4  someone may, you know, happen to see additional information

05:56:37  5  or something.  I mean, they're not going to ignore relevant

05:56:41  6  information.  But because we don't -- it's not practical to

05:56:45  7  track so many patents, again, we just -- we -- we hope that

05:56:48  8  people come back and let us know if there's something

05:56:51  9  significant that they think should change the analysis that

05:56:54  10  we've done.

05:56:55  11  Q.  When whoever at Apple has been assigned to a particular

05:56:59  12  file is doing an analysis of a patent or a patent family,

05:57:04  13  at that point in time, does an individual at Apple ever

05:57:11  14  look into pending applications or pending claims?

05:57:13  15  A.  So we'll look at anything that someone brings to our

05:57:17  16  attention, including pending applications.  And so we

05:57:20  17  will -- we'll review anything a party wants to discuss.

05:57:22  18         And sometimes, you know, that means, like you're

05:57:26  19  referencing, kind of digging into pending applications.

05:57:29  20  And we're ready to do that with someone.  We just, you

05:57:32  21  know, need them -- they're their patents, and so they know

05:57:36  22  them and they know, you know, what they think they

05:57:39  23  invented.  And so we rely on them to explain it to us, and

05:57:42  24  really, again, show us what they see as the value.

05:57:47  25  Q.  Does Apple ever independently look into the pending

05:57:54   1   applications or pending claims in reviewing a patent or a

05:57:57   2   group of patents?

05:57:58   3   A.  I don't understand what you -- what you mean.

05:58:05   4        We will -- we will review all of the patents that

05:58:08   5   are brought to our attention, whether they're applications

05:58:12   6   or issued patents.

05:58:14   7   Q.  Is there a point in time where that individual needs to

05:58:19   8   discuss the -- the file with someone more senior in terms

05:58:24   9   of making decisions about what to do with a particular

05:58:29  10   file?

05:58:32  11   A.  Yes, there may.  It just depends on -- it depens on the

05:58:37  12   matter.

05:58:37  13        Some matters are -- are very easily resolved, in

05:58:44  14   the sense that, you know, oftentimes, parties will come to

05:58:47  15   us.  They have an offering.  We evaluate it, and a lot of

05:58:53  16   the time, it's not applicable or not of interest to us.  So

05:58:58  17   some of those -- you know, a lot of those can be dealt with

05:59:02  18   pretty -- relatively quickly.

05:59:05  19        Whereas someone who comes to us with a really

05:59:08  20   large portfolio that they're trying to, you know, ask for

05:59:12  21   something more significant, then we will take as much time

05:59:16  22   as needed to work with that party to analyze it and -- and

05:59:21  23   discuss it fully until we feel like we've exhausted the

05:59:25  24   possibilities.

05:59:27  25   Q.  As part of that analysis, does Apple look into or

| | | |
|---|---|---|
05:59:33 | 1 | consider what the length of the term left on the patent is?
05:59:38 | 2 | A.  We -- we -- we will look at all of those factors.  So
05:59:46 | 3 | if we're really engaged in a discussion with someone and
05:59:50 | 4 | they've -- you know, we're going -- we're really looking
05:59:53 | 5 | into the patents, we will consider all sorts of things.
05:59:57 | 6 | We'll consider the strength of the patents, the
06:00:00 | 7 | prior art, you know, whether -- we have a lot of our own
06:00:04 | 8 | patents, you know, what our development history is.  There
06:00:07 | 9 | are a host of things.
06:00:08 | 10 | And we always consider, of course, what --
06:00:10 | 11 | anything the party wants to bring to our attention.  And,
06:00:14 | 12 | you know, we try to take into account the party's position
06:00:18 | 13 | as well to try to reach compromises in every case, no
06:00:22 | 14 | matter what the vantage point of the other party is, so we
06:00:26 | 15 | try to understand that.
06:00:27 | 16 | Q.  And in terms of -- of interacting with individuals who
06:00:30 | 17 | come to Apple with patents, is there a practice of what
06:00:37 | 18 | means of communication that the person assigned to the file
06:00:40 | 19 | will using in terms of telephone calls versus emails or
06:00:46 | 20 | in-person meetings?
06:00:48 | 21 | A.  It really depends.  It really depends on the party
06:00:55 | 22 | who's coming to us.  They usually have requests to
06:00:59 | 23 | communicate in some -- in some fashion, you know, to their
06:01:02 | 24 | preference.
06:01:02 | 25 | Maybe they're far away and they don't want to

| | | |
|---|---|---|
| 06:01:06 | 1 | travel and they just want to talk to us by phone.  And |
| 06:01:10 | 2 | that's fine, too.  We'll accommodate pretty much anything |
| 06:01:13 | 3 | that anyone asks for in terms of meetings or discussions, |
| 06:01:16 | 4 | calls, things like that.  We just try to be responsive and |
| 06:01:21 | 5 | we try to listen and understand so that if there's any |
| 06:01:23 | 6 | chance we can, you know, resolve things with a party, we'll |
| 06:01:26 | 7 | do that. |
| 06:01:27 | 8 | Q.  Ms. Whitt, when did you first become aware of PMC? |
| 06:01:30 | 9 | A.  I'm not sure.  I don't think I was aware of PMC until |
| 06:01:50 | 10 | around the 2013 time frame.  But I'm -- I would need to |
| 06:01:56 | 11 | look back to be sure. |
| 06:01:57 | 12 | Q.  And do you recall in the 2013 time period what |
| 06:02:06 | 13 | interactions you had with PMC? |
| 06:02:08 | 14 | A.  I remember meeting Mr. Gerald Holtzman and speaking |
| 06:02:17 | 15 | with him a few times. |
| 06:02:21 | 16 | Q.  At the time when you began interacting with PMC in |
| 06:02:28 | 17 | approximately 2013, did you review those previous contacts |
| 06:02:32 | 18 | between Apple and PMC? |
| 06:02:33 | 19 | A.  My normal practice would be to do so at the time.  And |
| 06:02:39 | 20 | I also would have relied on Heather Mewes, who was on my |
| 06:02:46 | 21 | team working on this matter, to review, evaluate, and -- |
| 06:02:52 | 22 | and brief me on what her evaluation was. |
| 06:02:58 | 23 | Q.  Did Ms. Mewes begin interacting with PMC prior to when |
| 06:03:03 | 24 | you did? |
| 06:03:05 | 25 | A.  I believe so, yes.  At least one meeting anyway. |

06:03:13   1   Q.  And prior to you and Ms. Mewes's involvement with PMC,

06:03:22   2   who at Apple had been involved in the communications with

06:03:26   3   PMC?

06:03:29   4   A.  I think it was primarily Ed Scott.  And then it -- for

06:03:39   5   a short time it was Patrick Murphy.  And for some of the

06:03:43   6   time that spans -- that overlaps both of them, I believe

06:03:48   7   Boris -- Boris Teksler was also involved.

06:03:51   8   Q.  And what group was Mr. Teksler in?

06:03:53   9   A.  Boris was in the licensing and strategy team.  He

06:03:57  10   headed up that team for a number of years.

06:04:00  11        And Ed Scott, I believe, got the licensing team

06:04:07  12   involved when -- when PMC indicated that -- that it thought

06:04:18  13   we should consider a license versus buying the assets,

06:04:22  14   because the first inquiry was to sell the assets.

06:04:25  15   Q.  And do you recall approximately when that first inquiry

06:04:29  16   was?

06:04:32  17   A.  I think it was in 2008, if my memory is serving

06:04:40  18   correctly.

06:04:41  19   Q.  And you said that you -- you and Ms. Mewes took over

06:04:48  20   sometime in approximately 2013; is that correct?

06:04:51  21   A.  I believe so, yes.

06:04:52  22   Q.  And I've marked that as Exhibit 1 for this deposition,

06:04:58  23   for the record.

06:05:01  24        Is this an email that you sent to Mr. Holtzman

06:05:05  25   from PMC in 2013?

06:05:08   1   A.  Yes, it is.  It was after our meeting.

06:05:10   2   Q.  And if you look at the -- the bottom portion of the

06:05:14   3   document, do you see that there's an email from

06:05:17   4   Mr. Holtzman to you?

06:05:18   5   A.  Yes, dated September 11th.

06:05:24   6   Q.  And do you recall whether this meeting was in person?

06:05:30   7   A.  Yes, it was, and it was in our office in Sunnyvale.

06:05:35   8   Q.  Do you recall who was present at the meeting?

06:05:42   9   A.  Heather Mewes, myself, and we had a summer intern,

06:05:49   10  Marta Belcher.

06:05:53   11  Q.  And was this the first time that you met Mr. Holtzman?

06:05:56   12  A.  I believe so.

06:05:59   13  Q.  Do you remember whether PMC discussed its patents with

06:06:07   14  you at the meeting?

06:06:08   15  A.  Do you mean substantively?

06:06:10   16       I don't believe that it was a substantive patent

06:06:13   17  discussion.

06:06:13   18  Q.  Do you have recollection of how long the meeting was?

06:06:18   19  A.  I don't recall.  It would have been maybe an hour,

06:06:25   20  maybe an hour and a half.

06:06:26   21  Q.  Do you recall if you did any preparatory work prior to

06:06:31   22  this meet in September 2013 with Mr. Holtzman?

06:06:38   23  A.  I normally would have info -- yeah, I normally would

06:06:45   24  have had someone provide me information, or I would have

06:06:48   25  looked things up prior to a meeting of this nature.  So I

06:06:52   1   likely did.

06:06:53   2         I don't have a distinct memory of -- sitting here

06:06:58   3   right now, what I did or didn't review before the meeting.

06:07:03   4   But I'm sure I would have tried to, you know, understand

06:07:06   5   who I was meeting with beforehand and, you know, what the

06:07:10   6   general matter was about.

06:07:11   7   Q.  Do you recall whether you ever looked at any claim

06:07:17   8   charts that PMC had prepared for Apple?

06:07:21   9   A.  I remember that we received them.  I don't have -- I'm

06:07:32   10  not sure that I recall --  I don't know that I recall the

06:07:35   11  specifics of -- of them at all.

06:07:40   12  Q.  Do you know whether Apple ever put together any

06:07:43   13  presentations or information regarding its analysis of

06:07:46   14  PMC's claim charts?

06:07:47   15  A.  Yes.  So before we met with Mr. Holtzman, we did, you

06:07:59   16  know, review the communications that the companies had had

06:08:03   17  thus far.  And, yes, we would have looked at all of that

06:08:07   18  material and understood what the status was as much as we

06:08:13   19  could have before that meeting.

06:08:16   20  Q.  So do you have in front of you a document with

06:08:19   21  beginning Bates PMC-APL_03447039 through 7068 entitled

06:08:35   22  Personalized Media Communications Discussions, November

06:08:37   23  14th, 2011?

06:08:39   24  A.  Yes, I -- I have that.  It's -- it looks like a 30 --

06:08:44   25  30-page slide deck.

06:08:45   1   Q.  And would this have been prepared by Apple?

06:08:47   2   A.  Yes, this was -- so this was prepared by Apple after

06:09:01   3   Personalized Media Communications gave us some claim charts

06:09:04   4   to review.  We -- and we -- we analyzed those.

06:09:07   5        And this is the presentation back to them

06:09:11   6   explaining our positions with respect to the claim charts

06:09:17   7   and the potential that we would need to take a license

06:09:20   8   versus just, you know, sort of want to, even though we're

06:09:23   9   not practicing.

06:09:24   10        So we looked at those -- at those claim charts and

06:09:28   11   analyzed them.  And this would be -- this is the

06:09:31   12   presentation that we gave to PMC to -- to help them

06:09:35   13   understand, you know, why we seemed to make the assessment

06:09:39   14   that we did.

06:09:40   15   Q.  And is the conversation that Mr. Holtzman was referring

06:09:43   16   to having occurred in October of 2013 one of those

06:09:48   17   conversations that -- that you made reference to?

06:09:50   18   A.  Yes, it is.

06:09:51   19   Q.  Do you have any recollection of what you discussed on

06:09:57   20   the call on October 21st with Mr. Holtzman?

06:10:03   21   A.  I recall having a conversation about what we thought of

06:10:12   22   the applicability of the patents -- or I should say that

06:10:16   23   the patents -- we didn't believe that the patents were

06:10:18   24   applicable to our business.

06:10:18   25        And so, you know, we had discussions about whether

| | | |
|---|---|---|
| 06:10:24 | 1 | we could attribute the kind of value that Mr. Holtzman was |
| 06:10:32 | 2 | assigning to the patents. |
| 06:10:34 | 3 | And we -- after doing our evaluation, we didn't -- |
| 06:10:38 | 4 | we didn't agree with the way that the claim charts -- what |
| 06:10:45 | 5 | the claim charts were pointing to, and -- and we didn't |
| 06:10:48 | 6 | believe that the patents were applicable to our business at |
| 06:10:52 | 7 | that time. |
| 06:10:52 | 8 | Q.  Is it standard practice when Apple enters into a patent |
| 06:10:56 | 9 | license to license all of the patents that a patent hold -- |
| 06:11:06 | 10 | that a patentholder may own? |
| 06:11:09 | 11 | A.  In normal instances, yes.  We really try to reach |
| 06:11:15 | 12 | agreement with parties once for everything so that we don't |
| 06:11:17 | 13 | have to, you know, have surprises later after we've, you |
| 06:11:24 | 14 | know, resolved and are licensed, you know, we generally |
| 06:11:30 | 15 | want it -- want it to be a real resolution. |
| 06:11:33 | 16 | So it's usually all of the patent portfolio, but |
| 06:11:37 | 17 | sometimes it can be less.  So even though the norm is -- is |
| 06:11:42 | 18 | everything, there are exceptions. |
| 06:11:44 | 19 | (Videoclip ends.) |
| 06:11:44 | 20 | THE COURT:  Does that complete this witness by |
| 06:11:49 | 21 | deposition? |
| 06:11:49 | 22 | MR. KLINE:  It does, Your Honor. |
| 06:11:50 | 23 | THE COURT:  All right.  Thank you. |
| 06:11:51 | 24 | Ladies and gentlemen of the jury, we're going to |
| 06:12:01 | 25 | stop for the day at this point. |

06:12:03   1          I'm going to ask you, as you leave in a few

06:12:06   2   minutes, if you'll take those notebooks and close them and

06:12:09   3   leave them on the table in the jury room.  I'm going to

06:12:13   4   remind you of all the instructions I've given you,

06:12:15   5   including among them not to discuss this case with anyone,

06:12:20   6   and remember, unless you live at -- unless you live alone

06:12:24   7   when you get home, you're going to get a question right off

06:12:27   8   the bat.  Don't even try to answer.

06:12:29   9          Please follow all the instructions I've given you.

06:12:33  10   Please plan to be here tomorrow morning assembled and ready

06:12:37  11   to go at 8:30.  We're going to do our best on our end to be

06:12:40  12   ready to go with you at 8:30 tomorrow morning.  Travel

06:12:44  13   safely to your homes.

06:12:47  14          And with that, ladies and gentlemen of the jury,

06:12:48  15   you're excused until tomorrow morning.

06:12:49  16          COURT SECURITY OFFICER:  All rise.

06:12:50  17          (Jury out.)

06:13:15  18          THE COURT:  Be seated, please.

06:13:15  19          Counsel, for your benefit, the Plaintiff has used

06:13:24  20   1 hour and 31 minutes today of their designated trial time.

06:13:30  21          And the Defendants have used 45 minutes of their

06:13:33  22   designated trial time for a total of 2 hours and 16 minutes

06:13:37  23   of total designated trial time used today.

06:13:39  24          Let me remind counsel to continue with your

06:13:44  25   diligent meet and confer efforts so that hopefully tomorrow

06:13:48   1   morning we'll have hopefully a small number of disputes, if

06:13:53   2   any, to go over.  I'll be available in chambers by 7:30 to

06:13:58   3   meet with you if that's necessary.

06:13:59   4          Mr. Kline, I assume you're going to begin tomorrow

06:14:04   5   with Mr. Harvey; is that correct?

06:14:07   6          MR. KLINE:  That's correct, Your Honor.  And he'll

06:14:10   7   be live obviously.

06:14:11   8          THE COURT:  All right.  Are there any issues that

06:14:14   9   either the Plaintiff or Defendant need to raise with the

06:14:16   10  Court before we recess for the day?

06:14:18   11          MR. KLINE:  Not that I know of, Your Honor.

06:14:19   12          THE COURT:  Anything from Defendant?

06:14:25   13          MR. AROVAS:  No, Your Honor.

06:14:25   14          THE COURT:  All right.  Counsel, we stand in

06:14:26   15  recess until tomorrow morning.

06:14:29   16          MR. KLINE:  Thank you.

06:14:30   17          COURT SECURITY OFFICER:  All rise.

06:14:31   18          (Recess.)

           19

           20

           21

           22

           23

           24

           25

1              CERTIFICATION

2

3        I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                    3/15/2021
     SHELLY HOLMES, CSR, TCRR             Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25