```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4  PERSONALIZED MEDIA            )(

 5  COMMUNICATIONS, LLC,          )(

 6      PLAINTIFF,                )(   CIVIL ACTION NO.

 7                                )(   2:15-CV-1366-JRG-RSP

 8  VS.                           )(   MARSHALL, TEXAS

 9                                )(

10  APPLE INC.,                   )(   MARCH 19, 2021

11      DEFENDANT.                )(   8:33 A.M.

12                  TRANSCRIPT OF JURY TRIAL

13        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14            UNITED STATES CHIEF DISTRICT JUDGE

15

16  FOR THE PLAINTIFF:       Mr. Douglas J. Kline
                             Mr. J. Anthony Downs
17                           Mr. Kevin P. Martin
                             Mr. Robert Frederickson, III
18                           GOODWIN PROCTER, LLP
                             100 Northern Avenue
19                           Boston, MA 02210

20  COURT REPORTER:          Ms. Shelly Holmes, CSR, TCRR
                             Official Court Reporter
21                           United States District Court
                             Eastern District of Texas
22                           Marshall Division
                             100 E. Houston
23                           Marshall, Texas  75670
                             (903) 923-7464
24

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
```

```
 1  FOR THE PLAINTIFF:       Ms. Alexandra D. Valenti
                             Ms. Autumn E. Soucy
 2                           GOODWIN PROCTER, LLP
                             The New York Times Building
 3                           620 Eighth Avenue
                             New York, NY 10018-1405
 4
                             Mr. S. Calvin Capshaw, III
 5                           Ms. Elizabeth DeRieux
                             CAPSHAW DERIEUX, LLP
 6                           114 E. Commerce Avenue
                             Gladewater, TX 75647
 7
    FOR THE DEFENDANT:       Mr. Gregory S. Arovas
 8                           Mr. Robert A. Appleby
                             Mr. Alan Rabinowitz
 9                           Mr. Jonathan D. Brit
                             KIRKLAND & ELLIS, LLP
10                           601 Lexington Avenue
                             New York, NY 10022
11
                             Mr. Marcus E. Sernel
12                           Ms. Meredith Zinanni
                             Mr. Jake Rambeau
13                           KIRKLAND & ELLIS, LLP
                             300 North LaSalle Street
14                           Suite 2400
                             Chicago, IL 60654
15
                             Mr. Ellisen S. Turner
16                           KIRKLAND & ELLIS, LLP
                             2049 Century Park East
17                           Suite 3700
                             Los Angeles, CA 90067
18
                             Mr. Sean M. McEldowney
19                           KIRKLAND & ELLIS, LLP
                             655 15th Street NW
20                           Suite 1200
                             Washington, DC 20005
21
                             Ms. Melissa R. Smith
22                           GILLAM & SMITH, LLP
                             303 South Washington Avenue
23                           Marshall, TX 75670

24

25
```

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | Jury out.)                                           |
| 08:05:59 |    |                                                      |
| 08:05:59 | 2  | COURT SECURITY OFFICER:  All rise.                   |
|          |    |                                                      |
| 08:06:00 | 3  | THE COURT:  Be seated, please.                       |
|          |    |                                                      |
| 08:33:45 | 4  | As you'll recall, counsel, we finished the           |
| 08:33:55 | 5  | evidence about 2:00 o'clock yesterday afternoon.  After |
| 08:33:59 | 6  | that, the Court took up outside of the presence of the jury |
| 08:34:03 | 7  | motions from both Plaintiff and Defendant presented under |
| 08:34:09 | 8  | Rule 50(a) of the Federal Rules of Civil Procedure.  After |
| 08:34:14 | 9  | hearing extensive argument on each motion from both sides, |
| 08:34:17 | 10 | the Court gave you rulings from the bench on those motions |
| 08:34:21 | 11 | under Rule 50(a).                                     |
| 08:34:22 | 12 | Subsequent to the 50(a) practice, the Court then     |
| 08:34:25 | 13 | subsequently convened an informal charge conference where |
| 08:34:32 | 14 | for a considerable period of time the Court met with |
| 08:34:35 | 15 | counsel from both sides informally off the record and |
| 08:34:38 | 16 | discussed at length various provisions in the proposed |
| 08:34:47 | 17 | final jury instructions and verdict form where the parties |
| 08:34:49 | 18 | had differing opinions.                               |
| 08:34:53 | 19 | There were also times where the Court had            |
| 08:34:55 | 20 | questions about language submitted that neither party had |
| 08:34:58 | 21 | objected to.  It was a thorough, helpful to the Court, and |
| 08:35:03 | 22 | open fulsome discussion with input on any issue that either |
| 08:35:09 | 23 | party or the Court felt should be addressed within the then |
| 08:35:15 | 24 | current version of the final jury instructions and verdict |
| 08:35:18 | 25 | form.                                                 |

08:35:18   1           After the conclusion of the informal charge

08:35:21   2   conference yesterday, late afternoon, early evening, the

08:35:31   3   Court recessed and has then taken the opportunity to digest

08:35:34   4   and consider all the input it received during the informal

08:35:37   5   charge conference and has applied that to the existing

08:35:44   6   iterations of the final jury instructions and verdict form

08:35:47   7   and has produced overnight what it believes should be the

08:35:51   8   proper and correct final jury instruction and verdict form

08:35:55   9   in this case.

08:35:57   10          Something over 30 minutes ago, I provided written

08:36:02   11   copies and on request PDF emailed copies of the same to

08:36:07   12   both sides.  They've had an opportunity to review those

08:36:11   13   areas of those documents where there have been discussions.

08:36:17   14          And at this point, the Court is prepared to

08:36:20   15   conduct a formal charge conference on the record so that

08:36:22   16   either party may offer objections where they feel something

08:36:27   17   has been included which shouldn't be or something has been

08:36:31   18   omitted that should have been included.

08:36:33   19          As I indicated to you yesterday, we'll do this on

08:36:38   20   a page-by-page basis so that nothing is overlooked.  We'll

08:36:42   21   begin with the final jury instructions.  And as I mentioned

08:36:46   22   yesterday, it's my practice and my request that there be a

08:36:49   23   single spokesman for both Plaintiff and Defendant who are

08:36:54   24   positioned at the podium together to expedite the process

08:36:58   25   of going through this and hearing any objections that might

08:37:00  1  be made.

08:37:01  2          So with that if whoever is going to act for

08:37:04  3  Defendant and Plaintiff will go to the podium, we'll begin

08:37:06  4  with the final jury instructions.

08:37:09  5          And we'll turn our attention to Page 1 of those

08:37:13  6  instructions.

08:37:15  7          Looking at Page 1 of the final jury instructions,

08:37:17  8  is there objection here from either party?

08:37:20  9          MR. MARTIN:  Not for Plaintiff, Your Honor.

08:37:22  10          MR. MCELDOWNEY:  Not from Defendant, Your Honor.

08:37:24  11          THE COURT:  Turning then to Page 2, is there

08:37:26  12  objection here from either party?

08:37:28  13          MR. MARTIN:  Not for Plaintiff, Your Honor.

08:37:30  14          MR. MCELDOWNEY:  Not from Defendant, Your Honor.

08:37:32  15          THE COURT:  Turning then to Page 3 of the final

08:37:35  16  jury instructions, is there objection here from either

08:37:38  17  party?

08:37:38  18          MR. MARTIN:  Not for Plaintiff, Your Honor.

08:37:40  19          MR. MCELDOWNEY:  Not from Defendant.

08:37:41  20          THE COURT:  Next is Page 4.  Is there any

08:37:44  21  objection here from either party?

08:37:46  22          MR. MARTIN:  Not for Plaintiff, Your Honor.

08:37:47  23          MR. MCELDOWNEY:  Not from Defendant.

08:37:48  24          THE COURT:  Turning next to Page 5, is there

08:37:54  25  objection here from either party?

08:37:56  1          MR. MARTIN:  Not for Plaintiff, Your Honor.

08:37:58  2          MR. MCELDOWNEY:  Not from Defendant, Your Honor.

08:38:00  3          THE COURT:  Turning next then, counsel, to Page 6,

08:38:05  4  is there objection here from either party?

08:38:07  5          MR. MARTIN:  Your Honor, this is -- I apologize --

08:38:09  6  not an objection, it's an observation that the text

08:38:12  7  beginning at the very bottom of Page 6 also seems to start

08:38:16  8  appearing almost verbatim again on Page 9.

08:38:21  9          THE COURT:  On Page 9?

08:38:22  10          MR. MARTIN:  Yeah, the "you will first need to

08:38:25  11  understand" language at the very bottom of Page 6 then

08:38:29  12  appears again on Page 9, Your Honor.  I don't know if that

08:38:31  13  was intentional or...

08:38:50  14          THE COURT:  Well, there are some intended

08:38:55  15  redundancies in here. I don't find that that's a problem.

08:38:55  16  And unless either side wishes to object, we'll leave it

08:39:02  17  like it is.

08:39:02  18          MR. MARTIN:  No objection, Your Honor.

08:39:03  19          MR. MCELDOWNEY:  No objection from Apple either.

08:39:04  20          THE COURT:  All right.  Then we'll turn next to

08:39:06  21  Page 7 of the final jury instructions.  Is there objection

08:39:08  22  here from either party?

08:39:09  23          MR. MARTIN:  No, Your Honor.

08:39:10  24          MR. MCELDOWNEY:  No, Your Honor.

08:39:13  25          THE COURT:  Next is Page 8.  Is there objection

08:39:15  1  here from either party?

08:39:17  2          MR. MARTIN:  No, Your Honor.

08:39:17  3          MR. MCELDOWNEY:  In the end of the first

08:39:23  4  paragraph, Your Honor, Apple would propose that the last

08:39:25  5  sentence start with the word "however."

08:39:30  6          THE COURT:  Instead of the word "if."

08:39:38  7          MR. MCELDOWNEY:  Just to indicate that it's a

08:39:43  8  transition.

08:39:44  9          THE COURT:  So you're suggesting that I add the

08:39:46  10  word "however" before the word "if."

08:39:49  11          MR. MCELDOWNEY:  That's correct.

08:39:50  12          THE COURT:  So the last sentence would begin,

08:39:56  13  "however if a method is missing"?

08:39:58  14          MR. MCELDOWNEY:  That's correct, Your Honor.

08:39:59  15          THE COURT:  All right.  I'll make that change.

08:40:02  16  However, I'm more concerned about legal issues than I am

08:40:05  17  substance or semantics.

08:40:07  18          MR. MCELDOWNEY:  Understood, Your Honor.

08:40:08  19          THE COURT:  It's quite possible in reading this  I

08:40:12  20  may add a word here or there that's not in the text for

08:40:15  21  purely semantic or flow of presentation purposes, but I'll

08:40:21  22  add the word "however" here.

08:40:23  23          Anything else on Page 8 from either party?

08:40:25  24          MR. MARTIN:  No, Your Honor.

08:40:26  25          THE COURT:  For Defendant?

08:40:30  1            MR. MCELDOWNEY:  Sorry.  No, Your Honor.

08:40:31  2            THE COURT:  All right.  Turning then to Page 9 of

08:40:35  3    the final jury instructions, is there objection here from

08:40:38  4    either party?

08:40:39  5            MR. MARTIN:  Not by Plaintiff, Your Honor.

08:40:40  6            MR. MCELDOWNEY:  Not from Apple either, Your

08:40:42  7    Honor.

08:40:42  8            THE COURT:  Next is Page 10.  Is there objection

08:40:45  9    here from either party?

08:40:46  10           MR. MARTIN:  No, Your Honor.

08:40:48  11           MR. MCELDOWNEY:  No, Your Honor.

08:40:53  12           THE COURT:  Turning to Page 11, is there objection

08:40:55  13   here from either party?

08:40:56  14           MR. MARTIN:  No, Your Honor.

08:40:57  15           MR. MCELDOWNEY:  Two issues from Apple, Your

08:41:08  16   Honor.

08:41:08  17           In Point 2 for inducement, Apple would propose

08:41:13  18   that it read:  "Apple has taken action intending to cause

08:41:17  19   those infringing acts" just to make clear that it's the

08:41:21  20   acts at issue.

08:41:22  21           THE COURT:  Tell me where on the page you are,

08:41:25  22   counsel.

08:41:25  23           MR. MCELDOWNEY:  I'm sorry, Your Honor.  I'm

08:41:26  24   getting ahead of myself or getting ahead of you.

08:41:30  25           No objection on Page 11.

08:41:32   1            THE COURT:  All right.  Then let's turn to Page

08:41:34   2   12.  Is there objection here from either party?

08:41:37   3            MR. MARTIN:  Your Honor, PMC objects to the third

08:41:41   4   point under the definition of induced infringement on the

08:41:46   5   basis that it's unclear whether willful blindness extends

08:41:51   6   only to the infringing acts or also extends to the

08:41:54   7   existence of the asserted patent.

08:41:57   8            THE COURT:  All right.  Is there objection from

08:42:05   9   Apple to anything on Page 12?

08:42:07  10            MR. MCELDOWNEY:  As to point 2, Your Honor, Apple

08:42:09  11   would propose that it read "Apple has taken action

08:42:13  12   intending to cause those infringing acts" to make clear

08:42:17  13   that it's a reference back to the acts at issue in Point 1.

08:42:21  14            And as to Point 3, Your Honor, I think there needs

08:42:24  15   to be a temporal connection to when the knowledge occurs so

08:42:29  16   that that would be the first point at which indirect

08:42:32  17   infringement could be found.  I think that comes out in a

08:42:35  18   later instruction, but I think it should be made clear here

08:42:38  19   is our position.

08:42:42  20            THE COURT:  All right.  Anything else from either

08:42:43  21   party on Page 12?

08:42:45  22            MR. MARTIN:  No, Your Honor.

08:42:45  23            THE COURT:  Those objections are overruled.

08:42:47  24            Let's turn to Page 13.  Any objection here from

08:42:50  25   either party?

08:42:51  1          MR. MARTIN:  Your Honor, Plaintiff objects to

08:42:53  2   the -- in the first paragraph on Page 13 to the sentences

08:42:58  3   beginning "nor is it sufficient that the company" and --

08:43:03  4   and a "mere fact that the company" which app -- which PMC

08:43:08  5   simply believes are confusing in light of the instructions

08:43:11  6   which came on the preceding page as to what is induced

08:43:15  7   infringement.

08:43:17  8          And then the final sentence, Your Honor, in that

08:43:26  9   paragraph:  PMC believes that the specific intent should be

08:43:29  10  with respect to the infringing acts rather than to

08:43:33  11  infringement of the patent, as long as the sufficient

08:43:39  12  knowledge is in place.

08:43:41  13         As to the bottom of the page, Your Honor, in the

08:43:44  14  discussion of contributory infringement, PMC objects to the

08:43:49  15  absence of an instruction concerning willful blindness with

08:43:53  16  respect to contributory infringement and believes that

08:43:56  17  willful blindness having been mentioned with respect to

08:44:03  18  inducement, the jury might believe that willful blindness

08:44:03  19  is not sufficient for contributory infringement.

08:44:05  20         THE COURT:  Anything else from Plaintiff, rather,

08:44:07  21  on Page 13?

08:44:08  22         MR. MARTIN:  No, Your Honor.

08:44:09  23         THE COURT:  Anything from Defendant on Page 13?

08:44:11  24         MR. MCELDOWNEY:  No objection as written, Your

08:44:14  25  Honor.

| | | |
|---|---|---|
| 08:44:14 | 1 | THE COURT:  Okay.  Plaintiff's objections with |
| 08:44:16 | 2 | regard to Page 13 are overruled. |
| 08:44:18 | 3 | Turn next to Page 14 of the final jury |
| 08:44:23 | 4 | instructions.  Does either party have an objection here? |
| 08:44:27 | 5 | MR. MARTIN:  No, Your Honor. |
| 08:44:28 | 6 | MR. MCELDOWNEY:  No, Your Honor. |
| 08:44:29 | 7 | THE COURT:  Next is Page 15, does either party |
| 08:44:32 | 8 | have an objection here? |
| 08:44:33 | 9 | MR. MARTIN:  No, Your Honor. |
| 08:44:34 | 10 | MR. MCELDOWNEY:  No, Your Honor. |
| 08:44:36 | 11 | THE COURT:  Next is Page 16.  Does either party |
| 08:44:40 | 12 | have an objection here? |
| 08:44:41 | 13 | MR. MARTIN:  No, Your Honor. |
| 08:44:41 | 14 | MR. MCELDOWNEY:  No, Your Honor. |
| 08:44:43 | 15 | THE COURT:  Turning next to Page 17.  Does either |
| 08:44:46 | 16 | party object to anything on Page 17? |
| 08:44:49 | 17 | MR. MARTIN:  Plaintiff does not, Your Honor. |
| 08:44:51 | 18 | MR. MCELDOWNEY:  Apple objects in the last |
| 08:44:56 | 19 | paragraph on Page 17, the sentence that starts "The filing |
| 08:45:00 | 20 | of the complaint," Apple does not believe that that filing |
| 08:45:03 | 21 | of the complaint is sufficient for knowledge and intent on |
| 08:45:07 | 22 | inducement or contributory infringement, Your Honor. |
| 08:45:09 | 23 | THE COURT:  All right.  Anything further on Page |
| 08:45:15 | 24 | 17? |
| 08:45:15 | 25 | MR. MARTIN:  No, Your Honor. |

08:45:17  1           THE COURT:  Anything further from Defendant?

08:45:18  2           MR. MCELDOWNEY:  No, Your Honor.

08:45:29  3           THE COURT:  All right.  Defendant's objection on

08:45:32  4  Page 17 is overruled.

08:45:33  5           Turning next to Page 18, is there any objection

08:45:37  6  here from either party?

08:45:38  7           MR. MARTIN:  Not for Plaintiff, Your Honor.

08:45:41  8           MR. MCELDOWNEY:  Not from Defendant, Your Honor.

08:45:46  9           THE COURT:  I'll assume there's no objection on

08:45:47  10 Page 19, but I'll ask.  Is there objection here from either

08:45:51  11 party?

08:45:52  12          MR. MARTIN:  No, Your Honor.

08:45:52  13          MR. MCELDOWNEY:  No, Your Honor.

08:45:53  14          THE COURT:  Turning then to Page 20, is there

08:45:55  15 objection here from either party?

08:45:57  16          MR. MARTIN:  No, Your Honor.

08:45:58  17          MR. MCELDOWNEY:  No, Your Honor.

08:45:59  18          THE COURT:  Page 21 being the final page of the

08:46:04  19 proposed final jury instructions, is there any objection

08:46:07  20 here from either party?

08:46:08  21          MR. MARTIN:  No, Your Honor.

08:46:09  22          MR. MCELDOWNEY:  No, Your Honor.

08:46:10  23          THE COURT:  All right.  Let me ask counsel to turn

08:46:13  24 your attention to the verdict form, which has been provided

08:46:16  25 to you.

08:46:19  1          We'll follow the same approach.  Begin with the

08:46:21  2   cover page where the style of the case is set forth.  Is

08:46:26  3   there objection to anything on Page 1 of the verdict form?

08:46:29  4          MR. MARTIN:  No, Your Honor.

08:46:30  5          MR. MCELDOWNEY:  No, Your Honor.

08:46:30  6          THE COURT:  All right.  Page 2 where definitions

08:46:35  7   are supplied, is there objection here from either party?

08:46:38  8          MR. MARTIN:  Not by Plaintiff, Your Honor.

08:46:39  9          MR. MCELDOWNEY:  No, Your Honor.

08:46:41  10          THE COURT:  Page 3, is there any objection to

08:46:44  11   anything on this Page of the verdict form?

08:46:46  12          MR. MARTIN:  No, Your Honor.

08:46:47  13          MR. MCELDOWNEY:  No, Your Honor.

08:46:48  14          THE COURT:  Turning next to Page 4 of the verdict

08:46:53  15   form where Question 1 is located, is there objection here

08:46:57  16   from either party?

08:46:58  17          MR. MARTIN:  No, Your Honor.

08:46:59  18          MR. MCELDOWNEY:  Apple objects and would propose,

08:47:06  19   as it did in the submission, that there be a question as to

08:47:09  20   whether all the claimer elements are met and separately

08:47:13  21   whether there is indirect infringement, Your Honor.

08:47:15  22          THE COURT:  That objection is overruled.

08:47:16  23          We'll turn to Page 5 where Question 2a is located.

08:47:21  24   Is there objection here from either party?

08:47:23  25          MR. MARTIN:  Not by Plaintiff, Your Honor.

08:47:24    1        MR. MCELDOWNEY:  Apple objects -- or thinks that

08:47:35    2   there is -- an issue between Questions 2a and 2b.  And I

08:47:45    3   think -- well, it could be resolved either by a

08:47:50    4   modification of 2a or 2b.

08:47:52    5        The issue, Your Honor, is that in Question 2b, the

08:47:56    6   way it's written, it sounds as if a lump sum could not be

08:48:01    7   awarded in the case because 2a says that the damages are

08:48:06    8   only through June 30th, 2020, whereas, 2b says that a lump

08:48:13    9   sum would include future use.  And I think the jury could

08:48:17   10   infer, therefore, that they cannot answer lump sum because

08:48:22   11   that would include future use, whereas, 2a says the damages

08:48:27   12   are only through June 30th, 2020.

08:48:30   13        THE COURT:  Well, the typical structure of this

08:48:32   14   type of question says for the running royalty, damages

08:48:39   15   through the date of the trial.  And the evidence presented

08:48:41   16   in this case stops in June 30th, 2020, as to damages.  It

08:48:49   17   doesn't stop in March of 2021.  So really we're talking

08:48:54   18   about the difference from saying as to a running royalty,

08:48:58   19   damages through the date of trial versus damages through

08:49:00   20   June 30th, 2020.

08:49:02   21        I don't know how that implies to the jury that a

08:49:06   22   running royalty would not go beyond the date of the

08:49:10   23   evidence presented.

08:49:14   24        MR. MCELDOWNEY:  It's --

08:49:15   25        THE COURT:  In other words, counsel, if you say

08:49:17   1   there's some confusion here, I'm trying to understand the

08:49:19   2   confusion.

08:49:20   3          MR. MCELDOWNEY:  No.  Understood.

08:49:21   4          So in 2b, Your Honor, the lump sum is stated as

08:49:25   5   representing damages for past and future use.

08:49:30   6          In 2a, the question is damages resulting from

08:49:34   7   infringement through June 30th.

08:49:37   8          And I think there could be confusion as to whether

08:49:41   9   the jury can award a lump sum that includes future use if

08:49:48  10   2a is expressly limited to the period through June 30th.

08:49:51  11   And so it's not the June through March issue I'm concerned

08:49:56  12   about, it's that the lump sum would capture future use.

08:50:02  13          The proposal that I think would address the

08:50:08  14   concern here is in 2a to simply say "damages resulting from

08:50:14  15   infringement" and leave off "through June 30, 2020."

08:50:26  16          And then, similarly, in 2b, not include the

08:50:31  17   "through June 30, 2020."

08:50:35  18          THE COURT:  Well, interesting enough, my

08:50:38  19   recollection is we discussed this at length in the informal

08:50:42  20   charge conference.  I raised the issue of the damages

08:50:46  21   evidence ending at June 30th and not having been updated

08:50:50  22   through the date of trial, which is often the case.

08:50:53  23          And my recollection is both sides, including the

08:50:56  24   Defendant, agreed it would be best to make it clear that

08:50:59  25   the damages evidence was only through June the 30th so that

08:51:04  1   an award would not be later argued to be through the date
08:51:08  2   the verdict's returned, even though the evidence presented
08:51:14  3   on damages ended on June the 30th of last year.
08:51:16  4          I don't know if you had a change of mind since
08:51:19  5   yesterday, or you've now determined that what you thought
08:51:21  6   was clear yesterday is now confusing.
08:51:24  7          MR. MCELDOWNEY:  So I think yesterday at the
08:51:26  8   informal charge conference what was said was that we did
08:51:29  9   need to confer with our client because the issue was one we
08:51:34  10  hadn't discussed previously.  But also the language in this
08:51:37  11  proposed verdict form is different than the proposals that
08:51:41  12  were at issue yesterday.
08:51:42  13         And this issue of lump sum being for future
08:51:46  14  damages versus a date that is defined as ending for damages
08:51:49  15  on June 30th wasn't presented in the proposals that were
08:51:53  16  submitted.  So it's --
08:51:53  17         THE COURT:  So it's --
08:51:56  18         MR. MCELDOWNEY:  -- just an issue I just
08:51:58  19  identified this morning, Your Honor.
08:51:59  20         THE COURT:  Does Plaintiff's counsel have any
08:52:01  21  opinion on this objection?
08:52:02  22         MR. MARTIN:  Your Honor, Plaintiff's counsel would
08:52:04  23  be okay with Question 2a asking what sum of money, if any,
08:52:10  24  paid now in cash, has PMC proven by a preponderance of the
08:52:14  25  evidence would compensate PMC for its damages, period; if

08:52:19  1   then, Question 2b remained the way it is.

08:52:23  2           So that the jury would be asked, was that amount

08:52:26  3   in the prior question a lump sum for past and future

08:52:29  4   damages or a running royalty through June 30th, 2020.  You

08:52:32  5   could actually bring that, which is the closing date of

08:52:38  6   damages language from 2a over to 2b, and I think that would

08:52:43  7   capture everything Plaintiff's counsel was hoping to do

08:52:45  8   yesterday, Your Honor.

08:52:46  9           THE COURT:  All right.  Here's the Court's ruling

08:52:49  10  on this objection.  The final jury instructions, which

08:52:59  11  we've just gone over, make it clear that the evidence

08:53:02  12  presented on damages during the trial did not go past June

08:53:06  13  the 30th of 2020.

08:53:08  14          With that instruction included in the charge to

08:53:11  15  the jury, I'm persuaded, as I sit here, that it's not

08:53:15  16  necessary to spell out June the 30th, 2020, in the verdict

08:53:21  17  form questions.

08:53:22  18          Accordingly, I'm going to modify Question 2a to

08:53:26  19  end after the word "infringement" on the third line so that

08:53:30  20  the question would now read:  "What sum of money, if any,

08:53:36  21  now paid in cash, has PMC proven by a preponderance of the

08:53:39  22  evidence would compensate PMC for its damages resulting

08:53:42  23  from infringement."

08:53:46  24          And Question 2b would be similarly modified to end

08:53:51  25  with a period inserted on the last line after the word

08:53:57   1   "royalty," so that the question, as modified, would now

08:54:01   2   read:  "Is the amount you awarded in Question 2a a lump sum

08:54:07   3   representing damages for past and future use of the claimed

08:54:09   4   methods, or is the amount you awarded in Question 2a a

08:54:13   5   running royalty?"

08:54:15   6            And that's the action the Court's going to take,

08:54:19   7   to the extent either party has an objection to that, that

08:54:23   8   objection is overruled.

08:54:26   9            All right.  Are there any other objections on

08:54:28   10  Pages 5 or 6 of the verdict form?

08:54:31   11           MR. MARTIN:  No other objections by Plaintiff,

08:54:35   12  Your Honor.

08:54:35   13           MR. MCELDOWNEY:  Not from Apple, Your Honor.

08:54:37   14           THE COURT:  Then the last page, Page 7, of the

08:54:40   15  verdict form includes the date and signature for the

08:54:44   16  foreperson.

08:54:44   17           Is there objection to anything on Page 7 of the

08:54:49   18  verdict form?

08:54:50   19           MR. MARTIN:  No, Your Honor.

08:54:51   20           MR. MCELDOWNEY:  No, Your Honor.

08:54:52   21           THE COURT:  All right.  Thank you, counsel.

08:54:54   22           With those changes, that will complete the formal

08:54:58   23  charge conference.

08:55:00   24           I need a few minutes to print clean copies of the

08:55:05   25  final jury instructions and verdict form.  As I indicated

08:55:12   1   to you yesterday and before, I think, my practice is to

08:55:15   2   give the final jury instructions orally to the jury, hear

08:55:20   3   the parties' respective closing arguments, and then at the

08:55:24   4   time I instruct the jury to retire and deliberate on its

08:55:26   5   verdict, I will send into the jury room eight printed

08:55:29   6   copies of the final jury instructions in written form so

08:55:33   7   that each juror will have their own copy, as well as one

08:55:38   8   clean copy of the verdict form.

08:55:40   9         It will take me a few minutes to have those copies

08:55:43   10  printed.  As soon as I have that done, it's my intention to

08:55:46   11  bring in the jury and proceed with the Court's final

08:55:49   12  instructions, followed by closing arguments.

08:55:53   13        I want to cover two other things before we recess.

08:55:56   14        Number one, I want to make it clear to everyone

08:56:00   15  present, including those that are in the gallery, as well

08:56:04   16  as those beyond the bar, the Court considers its final

08:56:09   17  instructions to the jury and  closing arguments presented

08:56:12   18  after all the evidence by counsel to be the most serious

08:56:16   19  parts of a very serious process.

08:56:19   20        Therefore, if you need to come or go, if you need

08:56:23   21  to visit the restroom, if you need to shuffle any papers,

08:56:27   22  if you need to do anything that might be disruptive, do it

08:56:32   23  now and don't do it once I bring in the jury.  I want

08:56:36   24  complete stillness, quiet, and respect shown to the parties

08:56:40   25  and the Court during this process.

08:56:44  1          Additionally, one other thing, this morning when

08:56:49  2    the jurors arrived, I was informed by Ms. Clendening, our

08:56:54  3    deputy in charge, that one of the jurors brought with him a

08:56:59  4    small carpenter's level.  I have not seen it.

08:57:05  5          But it's been described to me as approximately 12

08:57:07  6    inches in length with the typical bubbles and inserts that

08:57:15  7    a carpenter's level has with it.  When it was detected by

08:57:19  8    the Court Security Officer and he inquired about it, he was

08:57:24  9    told I want to use it with the jury to demonstrate truth.

08:57:28  10          I informed both local counsel of that as soon as

08:57:32  11    it came to my attention since lead counsel were not yet at

08:57:37  12    the courthouse, and I've given local counsel an opportunity

08:57:39  13    to review this with their lead counsel.

08:57:43  14          My instructions upon learning of this was to tell

08:57:46  15    the Court Security Officer, through Ms. Clendening, that

08:57:49  16    the Court Security Officers were to retain the carpenter's

08:57:53  17    level and keep it in their possession and tell the juror

08:57:59  18    that the Court would consult with the parties and would

08:58:02  19    advise later whether he could have it in the jury room with

08:58:06  20    him or whether he could not have it in the jury room with

08:58:09  21    him during deliberations.

08:58:11  22          So I want to take an opportunity to get a reaction

08:58:15  23    from both Plaintiff and Defendant on the record.  Again, I

08:58:18  24    tried to give both sides a heads-up so that this would be

08:58:23  25    something you have a minute or -- or some period of time --

08:58:26  1  several minutes to think about and consider.

08:58:30  2          That being said, does Plaintiff have any objection

08:58:32  3  to the use of that carpenter's level by any member of the

08:58:35  4  jury during their deliberations?

08:58:37  5          MS. DERIEUX:  Plaintiff has no objection, Your

08:58:39  6  Honor.

08:58:39  7          THE COURT:  Does Defendant have any objection?

08:58:48  8          MS. SMITH:  Your Honor, Melissa Smith for Apple.

08:58:50  9  I understand that the juror proposes to use the level as a

08:58:53  10  demonstrative during deliberations to influence other

08:58:56  11  jurors' decision-making.  This Court's longstanding rule is

08:59:00  12  that party demonstratives do not go back with the jury in

08:59:04  13  deliberations.  So Apple would object to the jurors being

08:59:06  14  able to bring in their own demonstratives, as well.

08:59:09  15          THE COURT:  All right.  That objection is

08:59:10  16  sustained, and I will instruct Ms. Clendening to advise the

08:59:14  17  juror that the level will be retained by the Court Security

08:59:18  18  Officers, and when he leaves the courthouse today, he may

08:59:24  19  recover his level and take it home with him.

08:59:26  20          MS. SMITH:  Thank you, Your Honor.

08:59:28  21          THE COURT:  All right.  Is either Plaintiff or

08:59:29  22  Defendant aware of anything else that needs to be raised

08:59:32  23  with the Court before I come back and begin final jury

08:59:34  24  instructions?

08:59:35  25          MS. DERIEUX:  Nothing further from Plaintiff, Your

| | | |
|---|---|---|
| 08:59:37 | 1 | Honor. |
| 08:59:37 | 2 | THE COURT:  Anything additional from Defendant? |
| 08:59:39 | 3 | MR. MCELDOWNEY:  No, Your Honor. |
| 08:59:39 | 4 | THE COURT:  All right.  We stand in recess. |
| 08:59:41 | 5 | COURT SECURITY OFFICER:  All rise. |
| 08:59:42 | 6 | (Recess.) |
| 09:06:17 | 7 | (Jury out.) |
| 09:06:19 | 8 | COURT SECURITY OFFICER:  All rise. |
| 09:06:26 | 9 | THE COURT:   Be seated, please. |
| 09:17:10 | 10 | Let's bring in the jury, please. |
| 09:17:41 | 11 | COURT SECURITY OFFICER:  Yes, sir. |
| 09:17:42 | 12 | All rise. |
| 09:17:43 | 13 | (Jury in.) |
| 09:17:44 | 14 | THE COURT:  Good morning, ladies and gentlemen. |
| 09:18:12 | 15 | Welcome back.  Please have a seat. |
| 09:18:13 | 16 | Ladies and gentlemen of the jury, you've now heard |
| 09:18:26 | 17 | all the evidence in this case, and I'll now instruct you on |
| 09:18:30 | 18 | the law that you must apply. |
| 09:18:31 | 19 | Each of you are going to have your own individual |
| 09:18:35 | 20 | printed copies of these instructions that I'm giving you |
| 09:18:38 | 21 | orally now.  So you do not necessarily need to make notes |
| 09:18:44 | 22 | because you're going to have your own hard copy when you |
| 09:18:46 | 23 | retire to the jury room, unless you particularly want to |
| 09:18:49 | 24 | make notes. |
| 09:18:50 | 25 | It's your duty to follow the law as I give it to |

09:18:54  1  you.  On the other hand, as I've said, you, the jury, are

09:18:57  2  the sole judges of the facts in this case.

09:19:00  3         Do not consider any statement that I've made over

09:19:04  4  the course of the trial or make during the course of these

09:19:07  5  instructions as an indication to you that I have any

09:19:11  6  opinion about the facts in this case.

09:19:14  7         You're about to hear closing arguments from the

09:19:19  8  attorneys for both of the parties.  Statements and

09:19:22  9  arguments of the attorneys are not evidence, and they are

09:19:25  10  not instructions on the law.  They're intended only to

09:19:33  11  assist the jury in understanding the evidence and the

09:19:35  12  parties' contentions.

09:19:36  13         A verdict form has been prepared for you, and you

09:19:39  14  will take this to the jury room after I instruct you to

09:19:44  15  retire and deliberate, and you -- when you've reached a

09:19:50  16  unanimous agreement as to your verdict, you'll have your

09:19:54  17  foreperson fill in the blanks in the jury -- in the verdict

09:19:57  18  form reflecting that unanimous agreement.  Then your

09:20:01  19  foreperson should sign it and date it on the last page.

09:20:03  20         Answer the questions as directed in the verdict

09:20:07  21  form from the facts as you find them to be.  Do not decide

09:20:11  22  who you think should win this case and then answer the

09:20:15  23  questions to reach that result.  Your answers and your

09:20:19  24  verdict, ladies and gentlemen, must be unanimous.

09:20:21  25         In determining whether any facts have been proven

09:20:26 1 in this case, you may, unless otherwise instructed,

09:20:30 2 consider the testimony of all the witnesses, regardless of

09:20:34 3 who may have called them, and you may consider all the

09:20:37 4 exhibits received and admitted into evidence and presented

09:20:40 5 to you over the course of the trial, regardless of who may

09:20:43 6 have introduced them.

09:20:44 7          You, the jurors, are the sole judges of the

09:20:49 8 credibility of all the witnesses and the weight and effect

09:20:52 9 to give to all the evidence.

09:20:54 10          In deciding the facts in this case, you may have

09:20:58 11 to decide which testimony to believe and which testimony

09:21:01 12 not to believe. You alone are to determine the questions of

09:21:06 13 credibility or truthfulness of the witnesses.

09:21:09 14          In weighing the testimony of the witnesses, you

09:21:12 15 may consider the witness's manner and demeanor on the

09:21:15 16 witness stand, any feelings or interest they may have in

09:21:18 17 the case, any prejudice or bias about the case that the

09:21:22 18 witness may have, and you may consider the consistency or

09:21:25 19 inconsistency of their testimony considered in the light of

09:21:30 20 the circumstances.

09:21:34 21          Has the witness been contradicted by other

09:21:36 22 evidence?  Has he or she made statements at other times or

09:21:40 23 places contrary to what he or she said on the witness

09:21:43 24 stand?

09:21:43 25          You must give the testimony of each witness the

09:21:46  1    amount of credibility and weight that you think it

09:21:49  2    deserves.

09:21:49  3            You must also keep in mind, ladies and gentlemen,

09:21:53  4    that a simple mistake does not mean that a witness is not

09:21:56  5    telling the truth.  You must consider whether any

09:21:59  6    misstatement was an intentional falsehood or a simple lapse

09:22:04  7    of memory and what significance should be attached to that

09:22:07  8    testimony.

09:22:07  9            As I've told you previously, the attorneys in this

09:22:13  10   case are advocates for their competing clients, and they

09:22:18  11   have a duty to object when they believe evidence is offered

09:22:21  12   that should not be admitted under the rules of the Court.

09:22:25  13           When the Court sustained an objection to a

09:22:28  14   question addressed to a witness, you must disregard the

09:22:30  15   question entirely, and you may draw no inference from its

09:22:34  16   wording or speculate about what the witness would have said

09:22:38  17   if he or she had been permitted to answer that question.

09:22:41  18           However, if the objection was overruled, then you

09:22:46  19   must treat the answer to that question just as you would

09:22:49  20   treat the answer to any other question as if the objection

09:22:53  21   had not been made.

09:22:54  22           By allowing the testimony or other evidence to be

09:22:57  23   introduced over the objection of an attorney, the Court did

09:23:00  24   not indicate any opinion as to the weight or effect of such

09:23:06  25   testimony.

09:23:07  1            Now, at times during the course of the trial, it
09:23:11  2   was necessary for the Court to talk to the lawyers outside
09:23:13  3   of your hearing, either by calling a recess for that
09:23:17  4   purpose or by talking to them while you were out of the
09:23:20  5   courtroom.
09:23:21  6            This happens because often during trials, things
09:23:24  7   arise which do not involve the jury.  You should not
09:23:28  8   speculate about what was said during such discussions that
09:23:32  9   took place outside of your presence.
09:23:36  10           Now, there are two types of evidence that you may
09:23:38  11  consider in properly finding the truth as to the facts in
09:23:41  12  this case.  One type is direct evidence, such as the
09:23:46  13  testimony of an eyewitness.  The other is indirect or
09:23:50  14  circumstantial evidence, that is, the proof of a chain of
09:23:54  15  circumstances that indicates the existence or nonexistence
09:23:59  16  of certain other facts.
09:24:00  17           As a general rule, ladies and gentlemen, the law
09:24:03  18  makes no distinction between direct evidence and
09:24:08  19  circumstantial evidence but simply requires that you find
09:24:11  20  the facts based on the evidence presented, both direct and
09:24:15  21  circumstantial.
09:24:15  22           Now, the parties may have stipulated or agreed to
09:24:19  23  some facts in the case, and when the lawyers for both sides
09:24:22  24  stipulate to the existence of a fact, you must, unless
09:24:26  25  otherwise instructed, accept the stipulation as evidence

09:24:29   1   and regard the fact as proven.

09:24:31   2          Certain testimony over the course of the trial has

09:24:36   3   been presented to you through depositions.  A deposition is

09:24:40   4   the sworn, recorded answers to questions asked of a witness

09:24:44   5   in advance of the trial.

09:24:46   6          If a witness cannot be present to testify in

09:24:49   7   person from the witness stand, the witness's testimony may

09:24:53   8   be presented under oath in the form of a deposition.

09:24:56   9          Before the trial began, attorneys for both sides

09:25:01   10  in this case questioned these deposition witnesses under

09:25:04   11  oath.  A court reporter was present and recorded the

09:25:08   12  testimony, both the questions and the answers.

09:25:11   13         This deposition testimony that was presented

09:25:13   14  during this trial is entitled to the same consideration as

09:25:18   15  testimony given by a witness in person who appeared

09:25:22   16  physically at the witness stand.

09:25:24   17         Accordingly, you should determine the credibility

09:25:27   18  and importance of deposition testimony to the best of your

09:25:32   19  ability, just as if the witness had testified in court in

09:25:35   20  person.

09:25:35   21         Now, while you should consider only the evidence

09:25:41   22  in this case, you are permitted to draw such reasonable

09:25:45   23  inferences from the testimony and exhibits as you feel are

09:25:52   24  justified in the light of common experience.

09:25:53   25         Said another way, ladies and gentlemen, you may

09:25:56  1  make deductions and reach conclusions that reason and

09:25:59  2  common sense lead you to draw from the facts that have been

09:26:04  3  established by the testimony and evidence in this case.

09:26:07  4       However, you should not base your decision on any

09:26:13  5  evidence not presented by the parties during the trial,

09:26:15  6  including your own personal experiences with any of the

09:26:18  7  products that are at issue in this case.

09:26:19  8       Now, unless I instruct you otherwise, you may

09:26:24  9  properly determine that the testimony of a single witness

09:26:28  10  is sufficient to prove any fact, even if a greater number

09:26:31  11  of witnesses may have testified to the contrary if after

09:26:35  12  considering all the evidence you believe that single

09:26:38  13  witness.

09:26:38  14       Now, when knowledge of a technical subject was

09:26:44  15  helpful -- or would be helpful to the jury, a person who

09:26:46  16  has special training or experience in that technical field,

09:26:50  17  we call them an "expert witness," is permitted to state his

09:26:54  18  or her opinions on those technical matters to the jury.

09:27:00  19       However, ladies and gentlemen, you're not required

09:27:01  20  to accept those opinions.  As with any other witness, it's

09:27:05  21  solely up to you to decide whether or not to accept and

09:27:09  22  rely upon that testimony.

09:27:10  23       Also, certain exhibits have been shown to you

09:27:14  24  during the course of the trial that were illustrations.  We

09:27:18  25  call these "demonstrative exhibits," or often we simply

09:27:23  1  call them "demonstratives."

09:27:25  2       Demonstratives are a party's description, picture,

09:27:31  3  or model to describe something involved in the trial.  If

09:27:33  4  your recollection of the evidence differs from the

09:27:36  5  demonstratives, you should rely on your recollection of the

09:27:38  6  evidence.

09:27:42  7       Demonstratives are sometimes called "jury aides,"

09:27:46  8  and demonstrative exhibits themselves are not evidence but

09:27:50  9  the witness's testimony concerning a demonstrative is

09:27:52  10  evidence.  Demonstratives are not going to be available to

09:27:55  11  you to review during your deliberation in the jury room.

09:27:59  12       In any legal action, including this one, facts

09:28:04  13  must be proven by a required amount of evidence known as

09:28:07  14  the "burden of proof."

09:28:09  15       The Plaintiff in this case, Personalized Media

09:28:15  16  Communications, LLC, who I'll refer to either as the

09:28:17  17  Plaintiff or PMC, has the burden of proving patent

09:28:22  18  infringement by a preponderance of the evidence.  PMC also

09:28:27  19  has the burden of proving damages for patent infringement

09:28:30  20  by a preponderance of the evidence.

09:28:31  21       A preponderance of the evidence means evidence

09:28:35  22  that persuades you that a claim is more probably true than

09:28:39  23  not true.  Sometimes this is talked about as being the

09:28:44  24  greater weight and degree of credible testimony.

09:28:47  25       Now, in determining whether any fact has been

09:28:49   1   proven by a preponderance of the evidence, you may, unless

09:28:53   2   otherwise instructed, consider the stipulations of the

09:28:56   3   parties, the testimony of all the witnesses, regardless who

09:29:00   4   may have called them, and all the exhibits received and

09:29:02   5   used during the trial, regardless of who may have

09:29:07   6   introduced them into evidence.

09:29:08   7          As I did at the start of the case, I'll now give

09:29:11   8   you a summary of each side's contentions in this case.

09:29:15   9          As I've previously told you, PMC, the Plaintiff,

09:29:19  10   has asserted one patent in this litigation, United States

09:29:25  11   Patent No. 8,191,091, which you've heard called throughout

09:29:30  12   the trial as the "'091 patent."

09:29:33  13          This has also been referred as the "asserted

09:29:36  14   patent" and may sometimes have been called the

09:29:38  15   "patent-in-suit."  The asserted patent, the patent-in-suit

09:29:44  16   both mean the '091 patent.

09:29:45  17          PMC alleges that the Defendant, Apple Inc., who

09:29:49  18   you've heard referred to as simply Apple or as the

09:29:52  19   Defendant, has infringed Claims 13, 14, 15, and 16 of the

09:30:03  20   '091 patent.  These claims may be referred to together as

09:30:05  21   the "asserted claims."

09:30:06  22          PMC alleges that Apple has indirectly infringed

09:30:11  23   the asserted claims by actively inducing others to infringe

09:30:15  24   these claims by contributing -- and by contributing to the

09:30:20  25   infringement of these claims by others.

09:30:22   1          The particular technology that is alleged to

09:30:26   2   infringe the asserted claims of the '091 patent when used

09:30:31   3   to download and decrypt content from Apple's iTunes and App

09:30:35   4   Store is called FairPlay.

09:30:38   5          You've heard this called the "accused method," you

09:30:41   6   may have heard it called the "accused technology," or

09:30:44   7   simply called "FairPlay."  All three of those terms mean

09:30:48   8   the same thing.

09:30:49   9          Apple denies that it has infringed any asserted

09:30:53  10   claim of the patent-in-suit, the '091 patent, either

09:30:57  11   directly or by inducing or contributing to the infringement

09:31:01  12   of the asserted claims by others.

09:31:02  13          Your job is to decide whether Apple has infringed

09:31:07  14   the asserted claims of the patent-in-suit.  If you decide

09:31:11  15   that any claim of the patent-in-suit has been infringed,

09:31:15  16   you'll then need to decide any money damages to be awarded

09:31:18  17   to PMC to compensate it for the infringement.

09:31:22  18          PMC seeks damages in the form of a reasonable

09:31:26  19   royalty.

09:31:28  20          I'll now give you instructions and definitions to

09:31:31  21   help you in answering the questions that will be presented

09:31:34  22   to you.

09:31:34  23          Before you can decide many of the issues in this

09:31:37  24   case, you'll need to understand the role of the patent

09:31:40  25   "claims."  The patent claims are the numbered sentences at

09:31:44  1   the end of the patent.  The claims are important, ladies

09:31:48  2   and gentlemen, because it's the words of the claims that

09:31:51  3   define what a patent covers.

09:31:55  4           The figures and the text in the rest of the patent

09:31:58  5   provide a description and/or examples of the invention, and

09:32:01  6   they provide a context for the claims, but it is the claims

09:32:07  7   that define the breadth of the patent's coverage.  Each

09:32:11  8   claim is effectively treated as if it were a separate

09:32:14  9   patent, and each claim may cover more or cover less than

09:32:17  10  any other claim.

09:32:18  11          Therefore, what a patent covers depends in turn on

09:32:22  12  what each of its claims covers.

09:32:24  13          You will first need to understand what each claim

09:32:28  14  covers in order to decide whether or not there is

09:32:32  15  infringement of the claim.

09:32:33  16          Now, the law says it's my role to define the terms

09:32:37  17  of the claims, and it's your role to apply my definitions

09:32:40  18  to the issues that are -- you are asked to decide in this

09:32:43  19  case.

09:32:44  20          Accordingly, as I explained at the start of the

09:32:48  21  case, I have determined the meanings of the claims and

09:32:52  22  provided you with definitions for certain claim terms.

09:32:56  23  These definitions are found in your juror notebooks.

09:32:59  24          You must accept my definitions of these words in

09:33:03  25  the claims as being correct.  It's your job to take these

09:33:07  1   definitions and apply them to the issues that you're

09:33:12  2   deciding, including the issue of infringement.

09:33:13  3        For claim terms that I have not construed or

09:33:16  4   defined for you, you are to use the ordinary meaning of the

09:33:21  5   term as it would have been understood by one of ordinary

09:33:26  6   skill in the art at the time of the invention.

09:33:28  7        Now, several times in these instructions, I'll

09:33:31  8   refer to a "person of ordinary skill in the art" or a

09:33:35  9   "person of ordinary skill in the field of the invention."

09:33:38  10       Someone with "ordinary skill in the art" is a

09:33:44  11  hypothetical person who is presumed to know all of the

09:33:47  12  pertinent prior art, just not what the inventor or another

09:33:49  13  particular individual may actually have known in the field

09:33:52  14  of the invention at the time the application for the patent

09:33:56  15  was filed.

09:33:56  16       In this case, the field of invention is content

09:34:01  17  delivery and signal processing.  For purposes of these

09:34:04  18  instructions, you should use September the 11th, 1987, as

09:34:09  19  the relevant date for the '091 patent.

09:34:12  20       I'll now explain how a claim defines what it

09:34:16  21  covers.

09:34:17  22       A claim sets forth in words a set of requirements.

09:34:23  23  Each claim sets forth its requirements in a single

09:34:27  24  sentence.

09:34:27  25       In this case, the Plaintiff, PMC, has asserted

09:34:31  1  method claims which means the claim is broken out into a

09:34:35  2  series of steps.  If a method performs each of these steps,

09:34:40  3  then it is covered by the claim.

09:34:41  4         Now, there can be several claims in a patent.

09:34:45  5  Each claim may be narrower or broader than another claim by

09:34:48  6  setting forth more or fewer requirements.

09:34:52  7         The coverage of a patent is assessed on a

09:34:55  8  claim-by-claim basis.  In patent law, the requirement of --

09:34:59  9  the requirements of a claim are often called the "claim

09:35:02  10  elements."  They're sometimes called the "claim

09:35:04  11  limitations."

09:35:04  12         When a method meets all of the requirements of a

09:35:08  13  claim, the claim is said to "cover" that method, and that

09:35:11  14  method is said to "fall" within the scope of that claim.

09:35:16  15         In other words, a claim that covers a method where

09:35:19  16  each of the claim elements or limitations is present in

09:35:23  17  that method -- excuse me, a claim covers a method where

09:35:27  18  each of the claim limitations or elements is present in

09:35:30  19  that method.

09:35:32  20         However, ladies and gentlemen, if a method is

09:35:34  21  missing even one limitation or one element of a claim, the

09:35:39  22  method is not covered by the claim.

09:35:40  23         Now, by understanding the meaning of the words in

09:35:44  24  a claim and by understanding that the words in a claim set

09:35:47  25  forth the requirements that a method must meet in order to

09:35:51  1  be covered by that claim, you will be able to understand

09:35:54  2  the -- you will be able to understand the scope of coverage

09:35:58  3  for each claim.

09:36:00  4          Once you understand what each claim covers, you

09:36:03  5  then are prepared to decide the issues that you've been

09:36:06  6  asked to decide, such as infringement.

09:36:08  7          As I mentioned at the start of the case, the

09:36:13  8  claims of the '091 patent use the word "comprising."

09:36:18  9  Comprising means including or containing.  When the word

09:36:23  10  "comprising" is used in a product that includes any of the

09:36:25  11  limitations or elements of the claim, as well as additional

09:36:29  12  elements, it's covered by that claim.

09:36:31  13          For example, if you take a claim that covers the

09:36:35  14  invention of a table, if the claim recites a table

09:36:38  15  comprising a tabletop, four legs, and nails that hold the

09:36:44  16  legs and the tabletop together, the claim will cover any

09:36:47  17  table that contains these structures, even if that table

09:36:51  18  also contains other structures, such as leafs to expand the

09:36:57  19  size of the tabletop or wheels to go on the ends of the

09:37:01  20  legs.

09:37:01  21          Now, that's a simple example using the word

09:37:04  22  "comprising" and what it means.  In other words, it can

09:37:07  23  have other features in addition to those that are covered

09:37:09  24  by the claim -- by the patent.

09:37:13  25          Now, this case involves two types of patent

09:37:15  1   claims, independent claims and dependent claims.

09:37:20  2        An "independent claim" sets forth all the

09:37:22  3   requirements that must be met in order to be covered by

09:37:25  4   that claim.  Thus, it's not necessary to look at any other

09:37:30  5   claim to determine what an independent claim covers.  It is

09:37:34  6   independent.

09:37:34  7        In this case, Claim 13 of the '091 patent is an

09:37:40  8   independent claim.

09:37:42  9        The remainder of the asserted claims in the '091

09:37:46 10   patent in this case are "dependent claims."  A dependent

09:37:50 11   claim does not itself recite all the requirements of the

09:37:55 12   claim but refers to another claim for some of its elements.

09:37:59 13   In this way the claim "depends" on another claim, or as we

09:38:04 14   sometimes say, it refers to another claim.

09:38:06 15        A dependent claim incorporates all the

09:38:10 16   requirements of the claim to which it refers or from which

09:38:12 17   it depends.  The dependent claim then adds its own

09:38:18 18   additional requirements.

09:38:19 19        To determine what a dependent claim covers, it's

09:38:22 20   necessary to look at both the dependent claim itself and

09:38:28 21   any other claim or claims to which it refers or depends.

09:38:31 22        A method that meets all the requirements of both

09:38:33 23   the dependent claim and the claim or claims to which it

09:38:37 24   refers is covered by that dependent claim.

09:38:39 25        You first need to understand what each claim

09:38:42  1  covers in order to decide whether or not there is

09:38:45  2  infringement of that claim.

09:38:47  3          The first step is to understand the meaning of the

09:38:50  4  words used in the patent claim.

09:38:53  5          As I've told you, the law says it's my duty to

09:38:57  6  define the meaning of the words used in the claim, but it's

09:39:00  7  your role to apply my definitions to the issues that you've

09:39:05  8  been asked to decide, including the issue of infringement.

09:39:07  9          Accordingly, as I explained at the beginning of

09:39:10  10  the case, I've already determined the meanings of certain

09:39:14  11  words used in the claims, and those have been provided to

09:39:16  12  you, those definitions, sometimes called constructions,

09:39:22  13  have been applied -- supplied to you as a part of your

09:39:25  14  juror notebooks.

09:39:26  15          You must accept my definitions of those words in

09:39:28  16  the claims as being correct, and it's your job to take

09:39:31  17  these definitions that I have supplied and apply them to

09:39:34  18  the issue of infringement.

09:39:35  19          You should refer to the constructions or the

09:39:38  20  definitions that I've provided in your juror notebooks, and

09:39:42  21  you may refer to them as needed during your deliberations.

09:39:44  22          Now, you should disregard any evidence presented

09:39:49  23  in the trial which conflicts or is inconsistent with the

09:39:53  24  definitions or constructions that I have given you.

09:39:58  25          For any of the words in the claims that I did not

09:40:04  1   construe or define, you are to use the plain and ordinary

09:40:08  2   meaning of that term as understood by a person of ordinary

09:40:10  3   skill in the art at the time of the invention.

09:40:12  4          My interpretation of the claim terms should not be

09:40:15  5   taken by you as an indication that I have any view

09:40:18  6   regarding the issue of infringement or damages.  Those

09:40:22  7   decisions regarding those issues are yours alone to make.

09:40:26  8          I'll now instruct you on how to decide whether or

09:40:30  9   not Apple has infringed the asserted claims of the '091

09:40:34  10  patent.

09:40:34  11         Infringement, ladies and gentlemen, is assessed on

09:40:37  12  a claim-by-claim basis.  Therefore, there may be

09:40:42  13  infringement of one claim but not infringement as to

09:40:46  14  another claim.

09:40:46  15         In reaching your decision on infringement, keep in

09:40:49  16  mind that only the claims of a patent can be infringed.

09:40:53  17  Neither the written description nor the drawings of the

09:40:57  18  patent can be infringed.  The claims are intended to define

09:41:01  19  in words the boundaries of the inventor's rights.

09:41:05  20         You must compare the asserted claims as I have

09:41:08  21  construed each of them to the accused technology and

09:41:12  22  determine from that whether or not there is infringement.

09:41:15  23  The only appropriate comparison is to compare Apple's

09:41:20  24  FairPlay with the language of the claims themselves as I've

09:41:25  25  explained their meaning to you.

09:41:27   1           In order to decide the issues in the case, there

09:41:30   2   are two types of infringement that you need to understand,

09:41:32   3   direct infringement and indirect infringement.  To

09:41:37   4   understand indirect infringement, you first need to

09:41:39   5   understand direct infringement.  And I'll explain each type

09:41:43   6   of infringement in more detail.

09:41:45   7           I'll first instruct you on direct infringement.

09:41:50   8   You must determine separately for each asserted claim

09:41:54   9   whether there is direct infringement.  A patent can be

09:41:57  10   directly infringed even if the alleged infringer did not

09:41:59  11   have knowledge of the patent and without the infringer

09:42:02  12   knowing that what it is doing is infringement of any claim.

09:42:06  13           The fact that a person accused of infringement has

09:42:11  14   its own patents does not mean that it cannot infringe

09:42:14  15   someone else's patents.  A patent may also be directly

09:42:19  16   infringed even though accused -- the accused infringer

09:42:21  17   believes in good faith that what it is doing is not

09:42:24  18   infringement of the patent.

09:42:30  19           In this case, PMC alleges that customers using

09:42:33  20   Apple's devices directly infringe the asserted claims of

09:42:37  21   the '091 patent.  In order to prove direct infringement,

09:42:40  22   PMC must prove by a preponderance of the evidence, that is,

09:42:43  23   that it's more likely than not, that users of Apple's

09:42:47  24   devices that implement FairPlay used a method that meets

09:42:51  25   all the requirements of a claim and did so without the

09:42:55    1   permission of PMC during the time the '091 patent was in

09:43:01    2   force.

09:43:02    3            You must compare the accused method with each and

09:43:05    4   every one of the requirements of a claim to determine

09:43:08    5   whether each and every step recited in the claim is met.

09:43:12    6            A patent claim is directly infringed only if each

09:43:16    7   and every step in that patent claim is performed.  If the

09:43:21    8   accused method, as used, omits any requirement recited in a

09:43:25    9   claim, then you must find that that particular method does

09:43:28   10   not directly infringe that particular claim.

09:43:31   11            Accordingly, there may be direct infringement as

09:43:34   12   to one claim but no direct infringement as to another

09:43:37   13   claim.

09:43:38   14            You must determine separately, ladies and

09:43:41   15   gentlemen, for each asserted claim whether or not there is

09:43:44   16   direct infringement.  However, if you find that an

09:43:48   17   independent claim, that is, a claim on which other claims

09:43:53   18   depend, is not directly infringed, there cannot be direct

09:43:57   19   infringement of any dependent claim that refers directly or

09:44:02   20   indirectly to that independent claim.

09:44:04   21            On the other hand, if you find that an independent

09:44:07   22   claim has been directly infringed, you must still decide

09:44:11   23   separately whether the process meets the additional

09:44:14   24   requirements of any of the claims that depend from or refer

09:44:17   25   to the independent claim, and, thus, whether those

09:44:22  1  dependent claims have also been directly infringed.

09:44:24  2           A dependent claim includes all the requirements of

09:44:31  3  any of the claims to which it refers plus the additional

09:44:34  4  requirements of it own.

09:44:36  5           Mere sale of a product capable of performing the

09:44:41  6  infringing method does not constitute infringing use of the

09:44:45  7  method.

09:44:46  8           I'll now instruct you on indirect infringement.

09:44:49  9           In this case, PMC accuses Apple of indirect

09:44:54  10  infringement.  There are two types of indirect

09:44:58  11  infringement, active inducement and contributory

09:45:01  12  infringement.

09:45:01  13           PMC accuses Apple in this case of both actively

09:45:06  14  inducing infringement of the '091 patent and of

09:45:10  15  contributory infringement of the '091 patent.

09:45:12  16           I'll explain each in more detail.

09:45:16  17           In order to find indirect infringement, there must

09:45:20  18  be a direct infringer.

09:45:22  19           In this case, PMC alleges that users of Apple's

09:45:27  20  devices directly infringe the '091 patent.  PMC alleges

09:45:31  21  that Apple is liable for indirect infringement by actively

09:45:35  22  inducing users of the accused technology to directly

09:45:39  23  infringe the asserted claims of the '091 patent.

09:45:43  24           As with direct infringement, you must determine

09:45:45  25  whether there has been active inducement on a

09:45:48  1   claim-by-claim basis.

09:45:50  2        Apple is liable for induced infringement of a

09:45:56  3   claim only if PMC proves by a preponderance of the evidence

09:45:58  4   that:

09:45:59  5        1.  Acts have been carried out by users of Apple

09:46:05  6   devices that directly infringe that claim;

09:46:07  7        2.  Apple has taken action intending to cause the

09:46:11  8   infringing acts of its users; and -- excuse me -- and

09:46:18  9        3.  Apple has been aware of the asserted patent

09:46:21  10  and has known that the acts of its users constitute

09:46:25  11  infringement of the asserted patent or was willfully blind

09:46:28  12  to that infringement.

09:46:29  13        Willful blindness is established if Apple believed

09:46:35  14  there was a high probability that the acts, if taken, would

09:46:38  15  constitute infringement of the '091 patent but deliberately

09:46:44  16  avoided confirming that belief.

09:46:45  17        To establish induced infringement, it's not

09:46:49  18  sufficient that someone else directly infringes a claim,

09:46:53  19  nor is it sufficient that the company accused of inducing

09:46:56  20  another's direct infringement merely had knowledge or

09:47:00  21  notice of an asserted patent or had been aware of the acts

09:47:04  22  by another that allegedly constitute direct infringement.

09:47:07  23        And the mere fact that the company accused of

09:47:11  24  inducing another's direct infringement had known or should

09:47:14  25  have known that there was a substantial risk that someone

09:47:18  1  else's acts would infringe is not sufficient.  Rather, in

09:47:25  2  order to find inducement, you must find that Apple

09:47:28  3  specifically intended or was willfully blind to that

09:47:31  4  infringement.

09:47:31  5       PMC also alleges that Apple is liable for

09:47:36  6  contributory infringement by contributing to the direct

09:47:39  7  infringement of the asserted claims of the '091 patent by

09:47:43  8  users of the accused technologies.

09:47:46  9       As with direct infringement, you must determine

09:47:50  10  contributory infringement on a claim-by-claim basis.

09:47:53  11       Apple is liable for contributory infringement of a

09:47:59  12  claim if PMC proves by a preponderance of the evidence

09:48:04  13  that:

09:48:04  14       1.  Apple sells, offers to sell, imports within

09:48:09  15  the United States a component of a product or apparatus for

09:48:12  16  use in a method during the time the '091 patent was in

09:48:16  17  force;

09:48:16  18       2.  The component or apparatus has no substantial

09:48:21  19  non-infringing use;

09:48:22  20       3.  The component or apparatus constitutes a

09:48:27  21  material part of the invention;

09:48:29  22       4.  Apple was aware of the '091 patent and knew

09:48:33  23  that the component or apparatus is especially made or

09:48:37  24  adapted for use as an infringement of the claim; and

09:48:43  25       5.  Users of Apple devices use the component or

09:48:48   1   apparatus to directly infringe the claim.

09:48:49   2          If you find that Apple infringed any claim of the

09:48:53   3   patent-in-suit, you must then consider what amount of

09:48:56   4   damages to award to PMC.

09:49:01   5          I'll now instruct you about the measure of

09:49:05   6   damages, but by instructing you on damages, ladies and

09:49:07   7   gentlemen, I'm not suggesting which party should win this

09:49:11   8   case on any issue.

09:49:11   9          If you find that Apple has not infringed any claim

09:49:13   10  of the patent-in-suit, then PMC is not entitled to any

09:49:19   11  damages.  The damages you award, if any, must be adequate

09:49:22   12  to compensate PMC for the infringement, and they are not

09:49:27   13  meant to punish an infringer.

09:49:29   14         PMC has the burden to establish the amount of its

09:49:33   15  damages by a preponderance of the evidence.  In other

09:49:37   16  words, you should award only those damages that PMC

09:49:40   17  establishes that it more likely than not suffered.

09:49:44   18         Now, while PMC is not required to prove the amount

09:49:48   19  of its damages with mathematical precision, it must prove

09:49:53   20  them with reasonable certainty, and you may not award

09:49:56   21  damages that are speculative, damages that are only

09:50:00   22  possible, or damages that are based on guesswork.

09:50:05   23         There are different types of damages that a

09:50:07   24  patentee may seek to recover.  In this case, PMC seeks to

09:50:13   25  recover what is called a reasonable royalty for its measure

09:50:15  1  of damages.

09:50:15  2        A reasonable royalty is defined as the amount of

09:50:18  3  money PMC and Apple would have agreed upon as a fee for the

09:50:23  4  use of the invention at the time prior to when the

09:50:26  5  infringement began.

09:50:27  6        You must be careful to ensure that the award is no

09:50:32  7  more or no less than the value of the patented invention.

09:50:35  8        If you find that PMC has established infringement,

09:50:40  9  PMC is entitled to at least a reasonable royalty to

09:50:43  10  compensate it for that infringement.

09:50:47  11        A royalty, ladies and gentlemen, is a payment made

09:50:50  12  to a patentholder in exchange for the right to make, use,

09:50:53  13  or sell the claimed invention.  A reasonable royalty is the

09:50:58  14  amount of a royalty payment that a patentholder and alleged

09:51:03  15  infringer would have agreed to in a hypothetical

09:51:07  16  negotiation taking place at a time prior to when

09:51:11  17  infringement first began.

09:51:12  18        Evidence of things that happened after

09:51:15  19  infringement first began can be considered in evaluating

09:51:19  20  the reasonable royalty only to the extent that the evidence

09:51:23  21  aids in assessing what royalty would have resulted from the

09:51:27  22  hypothetical negotiation.

09:51:28  23        The law requires that any damages awarded to PMC

09:51:33  24  correspond to the value of the alleged inventions when the

09:51:37  25  accused -- within the accused technology as distinct from

09:51:42  1   other unpatented features of the accused technology.  This

09:51:47  2   is particularly true where the accused technology has

09:51:51  3   multiple features and multiple components not covered by

09:51:56  4   the patent or where the accused technology works in

09:52:00  5   conjunction with other non-patented items.

09:52:03  6          If unpatented features contribute to an accused

09:52:06  7   product, you must apportion that value to exclude any value

09:52:12  8   attributable to unpatented features.  You must determine an

09:52:17  9   appropriate royalty rate and an appropriate royalty base

09:52:20  10  that reflect the value attributable to the patented

09:52:24  11  invention alone.

09:52:25  12         In determining the reasonable royalty, you should

09:52:29  13  consider all the facts known and available to the parties

09:52:32  14  at the time infringement began.  Some of the kinds of

09:52:37  15  factors that you may consider in making your determination

09:52:40  16  are as follows:

09:52:41  17         1.  The royalties received by the patentee for

09:52:45  18  licensing of the patent-in-suit proving or tending to prove

09:52:49  19  an established royalty;

09:52:50  20         2.  Royalties paid by the licensee for the use of

09:52:55  21  other patents comparable to the patents -- or the

09:52:58  22  patent-in-suit;

09:52:59  23         3.  The nature and scope of the license as

09:53:04  24  exclusive or non-exclusive or as restricted or

09:53:07  25  non-restricted in terms of territory or with respect to the

09:53:12  1  whom the method may be used;

09:53:14  2        4.  The patentee's established policy and

09:53:18  3  marketing program to maintain its patent exclusivity by not

09:53:22  4  licensing others to use the invention or by granting

09:53:25  5  licenses under special conditions designed to preserve that

09:53:30  6  exclusivity;

09:53:30  7        5.  The commercial relationship between the

09:53:34  8  patentee and licensee, such as whether they are competitors

09:53:38  9  in the same territory in the same line of business or

09:53:42  10  whether they are inventor and promoter;

09:53:44  11        6.  The effect of selling the patented specialty

09:53:49  12  in promoting sales of other products of the licensee, the

09:53:54  13  existing value of the invention of the patentee as a

09:54:00  14  generator of sales of his non-patented items, and the

09:54:03  15  extence -- the extent of such derivative or convoyed sales;

09:54:08  16        7.  The duration of the patent and the term of the

09:54:11  17  license;

09:54:11  18        8.  The profitability of the product made under

09:54:15  19  the patent, its commercial success, and its current

09:54:19  20  popularity;

09:54:23  21        9.  The utility and advantages of the patented

09:54:25  22  property over the old modes or methods, if any, that have

09:54:29  23  been used for working out similar results;

09:54:31  24        10.  The nature of the patented invention, the

09:54:35  25  character of the commercial embodiment of it as owned and

09:54:39  1   produced by the patentee, and the benefits to those who

09:54:42  2   have used the invention;

09:54:44  3          11.  The extent to which the infringer has made

09:54:48  4   use of the invention and any evidence probative of the

09:54:50  5   value of that use;

09:54:51  6          12.  The portion of the profit or of the selling

09:54:57  7   price that may be customary in the particular business or

09:55:00  8   in comparable businesses to allow for the use of the

09:55:03  9   invention or analogous inventions;

09:55:05  10          13.  The portion of the realizable profits that

09:55:10  11   should be credited to the invention as distinguished from

09:55:14  12   non-patented elements, the manufacturing process, business

09:55:18  13   risks, or significant features or improvements added by the

09:55:23  14   infringer;

09:55:23  15          14.  The opinions and testimony of qualified

09:55:27  16   experts;

09:55:28  17          15.  The amount that the patentee and the licensee

09:55:32  18   would have agreed upon at the time the infringement began

09:55:36  19   if both had been reasonably and voluntarily trying to reach

09:55:41  20   an agreement, that is, the amount which a prudent licensee

09:55:45  21   who desired as a business proposition to obtain a license

09:55:48  22   would have been willing to pay as a royalty and yet be able

09:55:52  23   to make a reasonable profit and which amount would have

09:55:57  24   been acceptable by a prudent patentee who was willing to

09:56:01  25   grant a license.

09:56:02  1          Now, no one of these factors, ladies and

09:56:04  2   gentlemen, is dispositive, and you can and should consider

09:56:08  3   the evidence that's been presented to you in this case on

09:56:11  4   each of these factors.

09:56:12  5          You may also consider any other factors which in

09:56:15  6   your minds would have increased or decreased the royalty

09:56:20  7   the alleged infringer would have been willing to pay and

09:56:23  8   the patent owner would have been willing to accept acting

09:56:25  9   as normally prudent business people.

09:56:28  10          In considering this hypothetical negotiation, you

09:56:33  11   should focus on what the expectations of the patentholder

09:56:36  12   and the alleged infringer would have been had they entered

09:56:40  13   into an agreement at that time and had they been acting

09:56:44  14   reasonably in their negotiations.

09:56:45  15          In determining this, you must assume both parties

09:56:49  16   believed the patent was valid and infringed and that both

09:56:53  17   parties were willing to enter into an agreement.

09:56:56  18          The reasonable royalty you determine must be a

09:56:59  19   royalty that would have resulted from the hypothetical

09:57:03  20   negotiation and not simply a royalty that either party

09:57:06  21   would have preferred.

09:57:08  22          When determining a reasonable royalty, you may

09:57:12  23   consider evidence concerning the amount that other parties

09:57:16  24   have paid for the rights to the patent in question or for

09:57:20  25   rights to similar technologies.

09:57:23   1           A license agreement need not be perfectly

09:57:26   2    comparable to a hypothetical license that would be

09:57:29   3    negotiated between PMC and Apple in order for you to

09:57:32   4    consider it.

09:57:34   5           However, if you choose to rely upon evidence from

09:57:37   6    any other license agreements, you must account for any

09:57:41   7    differences between those licenses and the hypothetically

09:57:45   8    negotiated license between PMC and Apple in terms of the

09:57:49   9    technologies and economic circumstances of the contracting

09:57:54   10   parties, the number of patents involved in the license, and

09:57:58   11   the fields of use that the license permits when you make

09:58:02   12   your reasonable royalty determination.

09:58:03   13          If you have found infringement, you must determine

09:58:08   14   the date that infringement began.

09:58:11   15          As to PMC's accusation that Apple has indirectly

09:58:16   16   infringed the '091 patent, the date such infringement

09:58:20   17   begins is the date that Apple came to possess the specific

09:58:26   18   knowledge and intent required for either active inducement

09:58:29   19   or contributory infringement as I've earlier explained in

09:58:33   20   these instructions.

09:58:34   21          The filing of the complaint against Apple is

09:58:39   22   sufficient to give Apple actual knowledge so the damages

09:58:41   23   period begins no later than the date the complaint was

09:58:44   24   filed in this case.  However, the damages period can begin

09:58:48   25   earlier than the filing of the complaint if you find that

09:58:52   1   Apple had the actual knowledge and intent required for

09:58:55   2   active inducement and contributory infringement at a time

09:58:59   3   prior to the filing of the complaint.

09:59:03   4          Additionally, the evidence in this case presents a

09:59:05   5   damages calculation, an amount ending on June the 30th,

09:59:11   6   2020.  If you award damages you must determine the

09:59:16   7   beginning date for the damages period as I've just

09:59:18   8   explained, but such damages period will end on June the

09:59:22   9   30th, 2020.

09:59:23   10          Now, with those instructions, ladies and

09:59:26   11   gentlemen, we'll proceed to hear closing arguments from the

09:59:28   12   attorneys in this case.

09:59:29   13          The Plaintiff may now present its first closing

09:59:31   14   argument to the jury.

09:59:33   15          Mr. Kline, would you like a warning on your time?

09:59:49   16          MR. KLINE:  Yes, I would, Your Honor.  Thank you.

09:59:51   17   As I mentioned, I'd like to reserve 10 minutes, and I would

09:59:54   18   like a five-minute warning during this first closing.

09:59:57   19          THE COURT:  So I will warn you when you've used

10:00:00   20   30 -- 25 minutes?

10:00:01   21          MR. KLINE:  Yes, Your Honor.  Thank you.

10:00:03   22          THE COURT:  And you'll attempt to end at 30 and

10:00:08   23   reserve 10.

10:00:09   24          MR. KLINE:  Yes, I will attempt to end at 30, yes.

10:00:18   25          THE COURT:  I will warn you when you've used 25

10:00:19  1   minutes.  You may proceed with your first closing argument.

10:00:20  2            MR. KLINE:  Thank you, Your Honor.

10:00:21  3            Good morning, ladies and gentlemen, and thank you.

10:00:25  4            Monday feels like a long time ago.  I try to be

10:00:28  5   grateful every day.  On days like today, it's easy.  The

10:00:37  6   opportunity to come here to talk with you, it really is --

10:00:42  7   some of the best days of my career have been days that I've

10:00:45  8   gotten to address a jury directly.  So thank you for that.

10:00:50  9            I'm grateful for the court system.  Without a

10:00:54  10  system like ours, my client, PMC, would have had nowhere to

10:00:57  11  turn.  Certainly grateful for the hospitality that the city

10:01:04  12  of Marshall has shown us.  I'm a visitor, as I mentioned at

10:01:08  13  the outset, and people have only been kind.

10:01:11  14           I'm grateful for my colleagues who have helped us

10:01:15  15  make the case run as efficiently as we could for you and

10:01:18  16  hopefully helped you understand it a little bit.  I'm

10:01:19  17  grateful for my client who made a great contribution, and I

10:01:24  18  look forward to discussing that more with you now.

10:01:27  19           And, of course, tonight I'm sure I'll be grateful

10:01:31  20  for a proper night sleep.  The first time in a little

10:01:34  21  while.  And to you personally I'm grateful you gave up time

10:01:38  22  away from home, time away from your jobs.  I don't imagine

10:01:42  23  any of you was thrilled to get jury duty.  I've sat on a

10:01:46  24  jury.

10:01:46  25           But hopefully over the course of the week, you

10:01:49  1  came to enjoy the opportunity a little, learn a lot about

10:01:54  2  downloads and SINF files.  I know that you haven't spoken

10:02:00  3  about any of this with your friends and family over the

10:02:02  4  course of the week, but maybe you found it interesting

10:02:05  5  enough that you'll begin to talk a little bit about it with

10:02:08  6  folks at home.

10:02:09  7        So we do want to say how much PMC appreciates the

10:02:14  8  sacrifice that we know you have made.

10:02:16  9        It's now your opportunity to consider the

10:02:21  10  evidence, weigh the credibility of the witnesses, follow

10:02:25  11  His Honor's instructions that you've received, and make

10:02:28  12  your decision, and this is all very important to our

10:02:35  13  democracy.

10:02:42  14        As we started earlier today, the -- it's the

10:02:44  15  constitution of the United States that conferred on

10:02:47  16  Congress the right to grant patents, to grant to inventors

10:02:53  17  the exclusive rights to their inventions.  So it's very

10:02:59  18  important for us to have this jury system, as His Honor

10:03:02  19  described at the outset.

10:03:03  20        It's also very important for us to have a patent

10:03:07  21  system.  The United States is the greatest engine of

10:03:11  22  innovation on earth.  That is fostered by our patent

10:03:21  23  system.  His Honor described at the outset that we get our

10:03:25  24  jury system from the Old Testament, from Greek to Rome to

10:03:31  25  England and here.  We get a lot of our patent system from

10:03:35  1   England as well, but we made improvements on it.

10:03:38  2          In old England, the king gave patents to friends

10:03:43  3   and family.  I want a buggy patent.  If you were the king's

10:03:47  4   brother-in-law maybe you could get a buggy patent.  But

10:03:51  5   nobody had an incentive to make a faster buggy because they

10:03:55  6   couldn't get the exclusive rights to it.  The king might

10:03:58  7   give that patent to somebody else.

10:03:59  8          In the United States, we don't give patents to

10:04:03  9   friends of people in the government, to family of the

10:04:06 10   people in the government.  The United States Patent and

10:04:08 11   Trademark Office grants patents to inventors, people who

10:04:11 12   make contributions to the public body of knowledge.

10:04:14 13          Those people disclose their inventions publicly so

10:04:18 14   that we can all learn for -- from them.  And in exchange

10:04:22 15   for that disclosure, when the Patent Office decides that

10:04:24 16   that invention is new, it advances the state of the art,

10:04:30 17   it's different from everything that came before it, the

10:04:33 18   United States says, thank you, and we will give you the

10:04:36 19   exclusive rights to that invention for a period of time.

10:04:40 20          And that is what PMC earned in the form of the

10:04:46 21   '091 patent.

10:04:46 22          Now, I told you at the outset, as well, that the

10:04:52 23   case is about doing the right thing.  It's about holding

10:04:54 24   people accountable.  We all learned from our earliest days

10:05:01 25   that you cannot take something that does not belong to you.

| | | |
|---|---|---|
| 10:05:03 | 1 | You have to pay for permission to use other |
| 10:05:11 | 2 | people's property.  The '091 patent is PMC's property. |
| 10:05:16 | 3 | They earned it by making an invention and disclosing that |
| 10:05:19 | 4 | invention to the United States Patent and Trademark Office. |
| 10:05:26 | 5 | Apple came and took that property.  They used the |
| 10:05:29 | 6 | patented invention without paying for it.  PMC spent six |
| 10:05:35 | 7 | years trying to convince Apple to pay for it.  Apple |
| 10:05:38 | 8 | refused.  PMC had no choice.  Here we are.  So we're asking |
| 10:05:44 | 9 | you to hold Apple accountable for that. |
| 10:05:49 | 10 | The very first day of trial, we heard from |
| 10:05:53 | 11 | Mr. Gerald Holtzman.  And I wish Gerald Holtzman were |
| 10:05:56 | 12 | here -- Mr. Holtzman were here to tell you the story |
| 10:06:00 | 13 | himself.  He could have walked you through the six years of |
| 10:06:02 | 14 | discussions that he had with Apple.  But he noted in some |
| 10:06:07 | 15 | of his testimony by videotape:  I thought naively that a |
| 10:06:11 | 16 | company such as Apple might be interested in our |
| 10:06:14 | 17 | technology. |
| 10:06:14 | 18 | And after six years, we heard from Ms. Metzger, |
| 10:06:19 | 19 | and she said:  After six years of back and forth, the only |
| 10:06:22 | 20 | way we could protect our rights was to come to court. |
| 10:06:26 | 21 | So the first question you'll be asked on your |
| 10:06:30 | 22 | verdict form is about infringement.  As His Honor |
| 10:06:35 | 23 | instructed, it's PMC's burden to prove infringement by a |
| 10:06:37 | 24 | preponderance of the evidence.  We have -- I had a slide |
| 10:06:43 | 25 | for this, I didn't use it because we have a statue right in |

10:06:46  1   front of us.  We don't need my slide.  And we have the

10:06:50  2   Scales of Justice here.

10:06:51  3          And as His Honor described at the outset, if you

10:06:54  4   decide that they tip ever so slightly in PMC's favor, you

10:06:58  5   should return a verdict in favor of PMC.

10:06:59  6          As His Honor just described, a preponderance of

10:07:02  7   the evidence standard means that you find it more probably

10:07:07  8   true than not that Apple has infringed PMC's patent.

10:07:09  9          We certainly believe the evidence establishes

10:07:11  10  that, and ask for your verdict in our favor in that regard.

10:07:15  11         Now, to decide the issue of infringement, we heard

10:07:19  12  a lot of people talk about this.  I think we all used some

10:07:22  13  form of the real estate example.  The only appropriate

10:07:27  14  comparison to determine infringement is to compare Apple's

10:07:32  15  FairPlay with the language of the claims themselves.

10:07:36  16         We don't compare the specification to FairPlay.

10:07:39  17  We don't compare the figures to FairPlay.  We compare the

10:07:43  18  language of Claim 13 to FairPlay.  We don't add limitations

10:07:49  19  that aren't there.  We just look at the limitations that

10:07:54  20  are there.

10:07:54  21         We met Dr. Weaver maybe Day 2 of trial.  And

10:08:04  22  Dr. Weaver walked us through the method for decrypting

10:08:07  23  programming at a receiver station described by Claim 13 of

10:08:10  24  the '091 patent.  It includes seven steps.  And Dr. Weaver

10:08:16  25  explained how FairPlay meets each of the seven steps of

10:08:20  1    PMC's Claim 13.

10:08:22  2            Now, we also have in the case Claims 14, 15, and

10:08:26  3    16.  And Dr. Weaver walked us through those claims, as

10:08:30  4    well.  Apple never addressed the limitations of Claims 14,

10:08:34  5    15, and 16. Apple's expert, Dr. Wicker, never addressed --

10:08:43  6    addressed the limitations described in Claim 14, 15, or 16.

10:08:48  7            So if we take a look at Claim 13 of the '091

10:08:54  8    patent, as I mentioned, it's a method for decrypting

10:08:57  9    programming at a receiver station.  And this is important.

10:09:03  10   It's a method for decrypting programming at a receiver

10:09:06  11   station.

10:09:06  12           During my cross-examination of Dr. Wicker, I tried

10:09:09  13   to use the example of any one of us in this courtroom

10:09:13  14   perhaps, holding our cell phone and making a purchase or

10:09:17  15   holding our cell phone here in Marshall, Texas.

10:09:19  16           Now, Apple wants to distract you from that.  Apple

10:09:26  17   talks about its security server in Nevada, North Carolina.

10:09:33  18   Its content server's in Mississippi.  Dr. Wicker talked

10:09:38  19   about a content server in Tennessee.

10:09:44  20           None of that matters.  It doesn't matter at all.

10:09:46  21   The claim says it's a method of decrypting programming at a

10:09:49  22   receiver station.  That's the phone in your pocket.  That's

10:09:54  23   the computer on your desk at home.  That's the laptop on

10:10:00  24   your sofa.  That's the receiver station.

10:10:09  25           The first step of the claim is receiving an

10:10:13  1   encrypted digital information transmission including

10:10:19  2   encrypted information.

10:10:20  3          Dr. Weaver explained that the encrypted digital

10:10:23  4   information transmission is the response that you receive

10:10:25  5   from iTunes when you make a purchase request.  We used

10:10:30  6   throughout the trial the example of Toy Story.

10:10:34  7          Dr. Weaver explained this is the transmission that

10:10:37  8   delivers something called a SINF to the phone.  The SINF is

10:10:43  9   the encrypted information in the encrypted digital

10:10:54  10  information transmission.

10:10:54  11         Now, Dr. Wicker, Apple's expert, admitted on

10:10:56  12  cross-examination that the SINF is all digital.  And this

10:11:03  13  is the Court's claim construction:  The encrypted digital

10:11:07  14  information transmission must be all-digital information

10:11:08  15  that's been encrypted and moved between at least two

10:11:12  16  devices.

10:11:13  17         Dr. Wicker admitted the SINF is all digital.  It

10:11:17  18  moves between two devices and includes encrypted

10:11:22  19  information.

10:11:22  20         Now, Dr. Wicker adds an additional limitation to

10:11:25  21  argue that FairPlay doesn't infringe.  He says, well, the

10:11:31  22  information has to be 100 percent encrypted.  But the claim

10:11:36  23  doesn't say that.  The claim construction doesn't say that.

10:11:40  24         The claim is to encrypted digital information

10:11:44  25  including encrypted information.  If the entire thing

1037

10:11:48  1   needed to be encrypted, you wouldn't need to say,

10:11:52  2   "including encrypted information."  It wouldn't make sense

10:11:55  3   to add including information.

10:12:00  4         And Dr. Wicker certainly admitted that the SINF

10:12:03  5   includes encrypted information.

10:12:05  6         I cross-examined Dr. Weaver (sic) about when video

10:12:11  7   was encrypted, and I said, well, only part of a movie is

10:12:14  8   encrypted, for example, but we still refer to that as

10:12:17  9   encrypted information.  And Dr. Wicker admitted:  Yes,

10:12:22  10  that's right.  It's encrypted in that a large portion is

10:12:25  11  encrypted.  Just like the SINF.  It's encrypted because the

10:12:30  12  private portion of it is encrypted.

10:12:35  13        Now, the next limitation of the claim is detecting

10:12:38  14  in said digital information transmission the presence of

10:12:42  15  instruct-to-enable signal, and this got quite a bit of

10:12:45  16  focus.

10:12:50  17        What we learned is the SINF includes two parts.

10:12:52  18  One part includes a key ID and a user ID, and one part

10:12:58  19  includes an encrypted content key.  We have a claim

10:13:03  20  construction, and we have the instruction from the Court

10:13:04  21  just now that it's the claim constructions that govern.

10:13:08  22        The Court construed instruct-to-enable signal as a

10:13:11  23  signal that enables the implementation of the enumerated

10:13:19  24  operation.

10:13:20  25        Dr. Wicker agreed that the user ID and key ID are

10:13:24  1  part of the SINF.  They are in the SINF.  Now, Dr. Wicker

10:13:34  2  also agreed that without that information the system would

10:13:37  3  not be able to retrieve the appropriate key.  Before the

10:13:45  4  account key and the key ID are obtained, the system would

10:13:47  5  not be able to retrieve the appropriate key.

10:13:50  6          The claim construction is a signal that enables

10:13:54  7  the implementation of an enumerated operation.

10:13:59  8          But Dr. Wicker used a different claim

10:14:02  9  construction.  He used the wrong claim construction.

10:14:10  10          Dr. Wicker admitted on cross-examination that he

10:14:13  11  didn't apply the correct construction in his analysis.

10:14:15  12          Look at his slide, this is a slide in the lower

10:14:19  13  right from Dr. Wicker's presentation.  He said:  The key ID

10:14:23  14  and the user ID do not enumerate any operation.

10:14:26  15          Of course, that's not the claim construction.

10:14:29  16  The Court -- as -- during his examination, I asked him:

10:14:32  17  The Court has instructed us that instruct-to-enable signal

10:14:35  18  is a signal that enables the implementation of the

10:14:39  19  enumerated operation?

10:14:41  20          That's correct.

10:14:43  21          The construction is not a signal that enumerates

10:14:46  22  an operation, right?

10:14:48  23          And he admitted:  That's right.

10:14:51  24          But that's the construction that Dr. Wicker used.

10:14:54  25          The claim goes on to say  passing the

10:14:59   1   instruct-to-enable signal to a processor.

10:15:01   2          We have the SINF file, it passes the key ID to the

10:15:05   3   user ID -- the key ID and the user ID to the processor in

10:15:08   4   the phone.  Dr. Wicker agreed with this.  It's not

10:15:12   5   genuinely disputed in any way.

10:15:14   6          Next, the claim requires determining a fashion in

10:15:20   7   which the receiver station locates a first decryption key

10:15:22   8   by processing the instruct-to-enable signal.

10:15:23   9          The Court has helped us out by giving us a

10:15:31  10   construction:  Determining the way that the first receiver

10:15:37  11   station locates a first decryption key.

10:15:40  12          And Dr. Weaver explained that the way FairPlay

10:15:46  13   locates the first decryption key is by finding it in the

10:15:49  14   keybag.  That's the way Apple chose to design it.  They had

10:15:53  15   many selections, that's the way they chose.

10:15:55  16          And, in fact, Dr. Wicker admitted during his

10:15:58  17   direct examination -- as it turns out, that the Apple

10:16:01  18   device takes the data, that's the user ID and the key ID,

10:16:04  19   the program uses it in a certain way so that the content

10:16:10  20   key is decrypted.

10:16:11  21          He talked about DPinfo and says that's done in a

10:16:15  22   different way.  Each are ways, and they meet the Court's

10:16:19  23   claim construction.

10:16:19  24          Then we have to locate the first decryption key

10:16:22  25   based on the step of determining.  And as we talked about,

10:16:27    1   the way FairPlay works, the key ID and the user ID are used

10:16:30    2   to locate the account key in the keybag.

10:16:35    3           Dr. Wicker, agree -- Dr. Wicker, Apple's expert,

10:16:39    4   agreed:  The account key ID and the key ID are used to

10:16:45    5   identify the particular key in the keybag -- the account ID

10:16:51    6   and the key ID are used to identify the particular key in

10:16:55    7   the keybag needed, the account key, correct?

10:16:57    8           Yes.

10:16:58    9           Now -- we heard nothing from Apple for Dr. Wicker

10:17:02   10   on the last two limitations, decrypting said encrypted

10:17:06   11   information using the first key.

10:17:08   12           Dr. Weaver explained how this meets the Court's

10:17:14   13   limitations, the claim's limitations, and we heard nothing

10:17:16   14   from Dr. Wicker, Apple, disputing that FairPlay outputs the

10:17:22   15   programming, FairPlay based on the step of your -- of the

10:17:27   16   step of decrypting.

10:17:28   17           Now, PMC has accused Apple of indirect

10:17:33   18   infringement.  We've heard instructions about that this

10:17:35   19   morning.

10:17:35   20           Let me ask you this, did you even know that

10:17:39   21   FairPlay was running on your phone?  If you happened to

10:17:42   22   have an iPhone or you've accessed the iTunes Store from

10:17:47   23   your Samsung phone maybe or from your computer at home, did

10:17:50   24   you even know you had FairPlay on that?  Well, you do.  You

10:17:54   25   have FairPlay on that because Apple put FairPlay on your

10:17:57  1  phone or your computer.

10:17:59  2       And when you click "buy," Apple uses FairPlay in

10:18:02  3  conjunction with iTunes, which it also put on your phone or

10:18:06  4  your computer, to download content.  It runs FairPlay

10:18:12  5  practicing the method of Claim 13 of the '091 patent.

10:18:14  6       I could take out my phone right now, I could make

10:18:19  7  a purchase, I could go right on talking with you for the

10:18:22  8  next few minutes, paying no attention to my phone, and when

10:18:25  9  I came back to it, the content would be there.  It would be

10:18:27  10  there because of software that Apple put on my phone that

10:18:31  11  makes it all happen automatically.

10:18:33  12       Is Apple denying that it encourages its customers

10:18:41  13  to download apps and music that encourages app developers

10:18:45  14  to design apps?  I don't think that they are.

10:18:50  15       On the question whether FairPlay does anything

10:18:52  16  other than this decryption, Dr. Weaver explained that the

10:18:59  17  decryption feature has no purpose other than to the

10:19:02  18  infringing purpose described in the '091 patent.

10:19:03  19       And Mr. Pantos even conceded during his testimony

10:19:09  20  that FairPlay is used -- is not used for any of the other

10:19:13  21  functions other than downloading.  It has no substantial

10:19:16  22  use other than carrying out the elements of Claim 13 of the

10:19:21  23  '091 patent.

10:19:21  24       With regard to knowledge of the patent, this was

10:19:23  25  the timeline I showed you at the beginning of this trial.

10:19:31  1   Got a little more information on it now.  This interaction

10:19:33  2   between PMC and Apple, it lasted six years.  Apple had six

10:19:38  3   lawyers on this over a six-year period.

10:19:43  4          These names in the lower right-hand corner, those

10:19:46  5   are the names that show up on the correspondence among

10:19:49  6   Mr. Holtzman and Ms. Whitt, Ms. Mewes, Mr. Cooperman,

10:19:54  7   Mr. Scott, Mr. Teksler and Mr. Murphy, all Apple lawyers on

10:19:57  8   this project for six years asking PMC for more information,

10:20:02  9   analyzing PMC's patents.

10:20:04 10          Mr. Holtzman complained -- complied every time

10:20:08 11   Apple asked for more information.

10:20:10 12          Six lawyers for six years.  That's what Apple had

10:20:16 13   looking at this.  And now they say we didn't know about

10:20:21 14   PMC's '091 patent.

10:20:25 15          Well, PMC was keeping Apple informed all along the

10:20:30 16   way of its patent portfolio.

10:20:32 17          Two years before the '091 patent, PMC pointed out

10:20:34 18   a patent to Apple that specifically concerned instruct to

10:20:40 19   decrypt signals, instructing decryptors to decrypt portions

10:20:44 20   of transmissions.

10:20:44 21          There's other correspondence where PMC was telling

10:20:48 22   Apple, we're pursuing patent protection for our decryption

10:20:52 23   technology.  You should keep an eye on our patent

10:20:55 24   portfolio.

10:20:55 25          Do you think none of the six lawyers who were on

10:20:58  1  this project for six years never looked at what was going

10:21:01  2  on at the Patent Office?  And if they didn't, it was

10:21:05  3  because they stuck their head in the sand.  They decided to

10:21:09  4  be willfully blind to PMC's patent.

10:21:12  5        Ms. Mewes described:  Apple does not conduct

10:21:16  6  clearance searches.

10:21:16  7        Ms. Whitt described:  They don't make any effort

10:21:20  8  to investigate still-pending applications.

10:21:23  9        I can't come home from work every night, see

10:21:27 10  shingles falling off the roof of my house, ignore it, go

10:21:33 11  inside and hope the roof doesn't link.  There comes a point

10:21:38 12  I have to fix the roof.

10:21:40 13        Apple, I present to you, was watching PMC's patent

10:21:44 14  portfolio all along the way.  If it wasn't, it's because it

10:21:48 15  chose to stick its head in the stand.

10:21:50 16        So don't let Apple mislead you about the things

10:21:53 17  that have been going on over the past six or even more

10:21:57 18  years.

10:21:57 19        Apple talked a lot about separation.  Its system

10:22:02 20  is separated.  We did a search of the transcript.  It comes

10:22:04 21  up hundreds of times from the opening through

10:22:07 22  Ms. -- Dr. Wicker's testimony.  Apple's system is

10:22:10 23  separated.  It's got nothing to do with the claims in this

10:22:13 24  case.

10:22:14 25        Apple likes to point to one sentence in the

10:22:17   1   specification that talks about one example of the described

10:22:25   2   system that might include embedded -- signals embedded in

10:22:29   3   programming.  Well let me show you where that is relative

10:22:33   4   to the claims.  That's in column 7 of the spec that Apple

10:22:33   5   likes to point to.

10:22:35   6        The claims are all the way at the back of the

10:22:37   7   spec, and the Court has told us we only look at the claims

10:22:39   8   to assess infringement.  Apple's trying to distract you

10:22:42   9   from that.  They're saying, look over here in the spec.

10:22:47  10   Ignore what's going over here in the claim, which the Court

10:22:50  11   has told us, no.  Focus on what's going over here in the

10:22:54  12   claim.  That's what matters.

10:22:59  13        Apple talked about Apple patents.  We just had an

10:23:03  14   instruction -- two instructions matter here.  What does

10:23:05  15   comprising mean?  Comprising means if you add elements to

10:23:09  16   an infringing product, you still infringe.

10:23:14  17        The Court has given us the table example.  If I

10:23:18  18   have a patent on a table, you come up with a table with

10:23:21  19   leaves, that does not mean you don't infringe my table

10:23:24  20   patent.

10:23:24  21        I used to give a talk to my children when they

10:23:27  22   were in grade school.  I would go there and explain to the

10:23:30  23   fifth graders how patents work, and I always had a pencil

10:23:35  24   and a pencil with an eraser.  If I have a patent on a

10:23:38  25   pencil, you can't make pencils without permission from me.

10:23:43  1          If you have a pencil with an eraser on it, it's

10:23:47  2  still a pencil.  You can't make those pencils without

10:23:53  3  permission from me.  I have a patent on pencils.  You know

10:23:53  4  what, even if adding an eraser to a pencil was itself a new

10:23:53  5  invention, I think we all agree it probably would be.

10:23:59  6          It doesn't mean that it doesn't infringe the

10:24:01  7  pencil patent.  We have an instruction from the Court:  The

10:24:05  8  fact that a person accused of infringement has its own

10:24:09  9  patents does not mean it cannot infringe somebody else's

10:24:12 10  patents.

10:24:13 11          And then Apple turns to simple belittling PMC and

10:24:22 12  the '091 patent.  They say the technology is old.  Apple's

10:24:24 13  attorney during opening argument called PMC a taker.

10:24:33 14  Throughout the trial, Apple has said PMC's patent has no

10:24:37 15  value.

10:24:37 16          Well, with respect to old, Dr. Wicker admitted

10:24:39 17  that just because technology is old doesn't mean it's not

10:24:42 18  valuable.  He went on and on about 1977 encryption

10:24:47 19  technology that Amazon still uses today.  He acknowledged

10:24:50 20  that, yes, some technology has real staying power.

10:24:54 21          And PMC's technology has real staying power.

10:25:00 22          Ms. Metzger told us about how her husband back in

10:25:05 23  the '80s had a vision of how technology was going to

10:25:08 24  develop.  And that's why he filed a 500-page patent

10:25:12 25  application describing all the things he thought were going

10:25:14  1  to come to pass.  And I would say to you, those things have

10:25:18  2  come to pass.  Mr. Harvey was right.  He was acknowledged

10:25:22  3  as a 30-year overnight success.

10:25:25  4          THE COURT:  25 minutes have been used.

10:25:27  5          MR. KLINE:  Thank you, Your Honor.

10:25:27  6          Many other companies have acknowledged the value

10:25:32  7  of Mr. Harvey's invention and PMC's patent.

10:25:37  8          Samsung took a license in 2017.  LG took a license

10:25:41  9  in 2019.  You can see them all listed here.

10:25:44  10         And when you turn to damages, keep in mind,

10:25:54  11  Mr. Pantos, here with us today, he testified during the

10:25:56  12  portion that we put in on his videotape, iTunes makes Apple

10:26:02  13  devices attractive to consumers.

10:26:04  14         FairPlay is essential to iTunes.

10:26:06  15         It's essential because Apple doesn't own the

10:26:09  16  content, the content providers insisted on protection,

10:26:13  17  Apple turned to FairPlay.

10:26:14  18         Mr. Pellegrino talked about the damages.  This is

10:26:18  19  another example where there was a lot of misdirection by

10:26:22  20  Apple during Mr. Pellegrino's cross-examination.

10:26:26  21         Let me try to go through this quickly.

10:26:32  22         Apple makes 31 cents on every download.

10:26:38  23  Mr. Pellegrino estimates Apple's -- calculates that Apple's

10:26:43  24  FairPlay profit is about 1.75 cents per download.  That's

10:26:48  25  the share of the overall download profit.

10:26:52  1          A lot of talk that PMC wants all of it.  It's

10:26:56  2  absolutely not true.  As Mr. Pellegrino decide --

10:27:00  3  testified, he assigned only a quarter of the 1.75 cents to

10:27:07  4  PMC which worked out to be a little less than half a penny.

10:27:11  5          During cross-examination of Mr. Pellegrino, Apple

10:27:14  6  tried to diminish the estimate, how he came up with his

10:27:19  7  estimate of the FairPlay profit, the ballpark number he

10:27:23  8  relied on for 15 to 20 engineers working on FairPlay.  Two

10:27:26  9  things.  That was not his ballpark estimate.  That was

10:27:32  10  Mr. Farrugia, the engineering head of Apple -- of FairPlay,

10:27:34  11  he estimated his engineering team was about 15 to 20

10:27:37  12  people.

10:27:38  13          Apple has argued it was really only a couple of

10:27:41  14  people.  You know what we did, we looked at the names on

10:27:45  15  the Apple patents that they introduced, and the names on

10:27:48  16  the articles about FairPlay that Apple introduced.  We

10:27:52  17  counted them up.  It's 17 people.

10:27:56  18          So Mr. Farrugia's estimate was pretty right.  And

10:27:59  19  that's the estimate that Mr. Pellegrino relied upon.

10:28:02  20          So what's the use that Apple made of PMC's

10:28:09  21  technology?  How many times did they infringe?

10:28:12  22          They infringed over 70 billion times.  Here's the

10:28:16  23  number.

10:28:21  24          As Mr. Pellegrino testified, the royalty rate that

10:28:23  25  he calculated, a little less than half a penny per

10:28:28  1  download.

10:28:30  2        The royalty base 70 billion downloads.

10:28:33  3        The damages, ladies and gentlemen, $308,488,108.

10:28:43  4        Thank you.

10:28:43  5        So if I could briefly walk you through the verdict

10:28:46  6  form that we would ask you to fill out.

10:28:49  7        You will be asked, Question 1:  Has PMC proven by

10:28:55  8  a preponderance of the evidence that Apple infringed any of

10:28:57  9  the asserted claims of the '091 patent?

10:28:58  10        We'd ask you to check yes as a finding in favor of

10:29:03  11  PMC.

10:29:04  12        The second question you will be asked:  What sum

10:29:06  13  of money, if any, paid now in cash has PMC proven by a

10:29:11  14  preponderance of the evidence would compensate PMC for its

10:29:15  15  damages resulting infringement?

10:29:17  16        That number, $308,488,108.

10:29:24  17        And Question 2b:  Is the amount you awarded a lump

10:29:32  18  sum representing damages for past and future use or -- of

10:29:37  19  the claimed methods or is it the amount you awarded in

10:29:40  20  Question 2a, a running royalty.

10:29:41  21        As Mr. Pellegrino testified, ladies and gentlemen,

10:29:44  22  we ask you to check that's a running royalty.

10:29:46  23        So I'll have a few more moments with you after

10:29:50  24  Apple's attorney speaks.  But I will say thank you right

10:29:54  25  now.  And I'm sure I will say thank you again later.

10:29:57  1          Thank you.

10:29:58  2          THE COURT:  All right.  Defendant may now present

10:30:02  3   its closing argument.

10:30:03  4          Mr. Sernel, would you like a warning on your time?

10:30:07  5          MR. SERNEL:  Yes, five minutes, please.

10:30:08  6          THE COURT:  Five minutes remaining.

10:30:10  7          You may proceed when you're ready.

10:30:12  8          MR. SERNEL:  Good morning, ladies and gentlemen.

10:30:24  9          I want to start by thanking all of you for your

10:30:30  10  time and attention this week.  On behalf of my entire team,

10:30:35  11  my client, Apple, Mr. Pantos, we very much appreciate all

10:30:39  12  of your close attention to the evidence that has been

10:30:41  13  presented this week.  So thank you very much for that.

10:30:47  14         And now I want to walk through what I think the

10:30:49  15  evidence has shown you this week.

10:30:51  16         Let me begin where I started on Monday afternoon.

10:30:55  17         No one in this courtroom disputes that PMC's '091

10:31:03  18  patent deserves respect.  No one is trying to belittle

10:31:07  19  PMC's patent.  Mr. Harvey deserves credit for his patent,

10:31:12  20  and what he invented in 1987 solving the problem that he

10:31:16  21  solved in 1987.

10:31:17  22         Where the parties part ways, however, is when PMC

10:31:24  23  tried to take credit for something they did not invent,

10:31:32  24  trying to take credit for Apple's innovation that occurred

10:31:36  25  many years later solving different problems with the

10:31:39   1   Internet and Internet downloads coming up with a very

10:31:41   2   different solution.

10:31:42   3          Now, the evidence has shown you that Apple's

10:31:45   4   solution to their problems that they confronted in the

10:31:50   5   2000s actually took the opposite approach from PMC's

10:31:56   6   patent, and the evidence showed you that they did not use

10:31:59   7   PMC's patent and do not infringe PMC's patent.

10:32:06   8          And if we can get our slides, please.

10:32:08   9          So you just heard -- His Honor provided you the

10:32:13   10   jury instructions, and the focus in this case is on the

10:32:17   11   claims.  The claims are important because it's the words of

10:32:22   12   the claim that define PMC's patent rights.

10:32:24   13          We've tried to focus our evidence and presentation

10:32:28   14   in this case on the specific claims and what they cover and

10:32:34   15   what they do not cover.

10:32:36   16          Now, there's been a lot of evidence in this case

10:32:40   17   that don't necessarily go to the claims.  This case is not

10:32:44   18   about Mr. Harvey's honorable and good service for this

10:32:48   19   country and good work that he's done.  This case is not

10:32:52   20   about PMC licenses with other companies that have nothing

10:32:56   21   to do with the '091 patent, the patent in this case.

10:33:01   22          This case is not about meetings between the

10:33:04   23   parties or conversations between the parties where the '091

10:33:08   24   patent never came up.  This case is not about buzz words or

10:33:13   25   trying to describe the invention as a key management

10:33:17  1    invention or other things like that.

10:33:19  2              This is about the claims and focusing on the

10:33:22  3    claims and what the evidence has shown about the claims.

10:33:25  4              And I would submit to you that we have provided a

10:33:27  5    lot of evidence through Mr. Pantos's testimony, through

10:33:30  6    Dr. Wicker's testimony, through the video you saw from

10:33:34  7    other Apple engineers regarding why there is no use of

10:33:38  8    PMC's patent, no infringement of PMC's patent.

10:33:42  9              And the question you have is, has PMC met its

10:33:47 10    burden to put more evidence on their side of the scale to

10:33:49 11    prove to you that they have more evidence that Apple has

10:33:53 12    actually used PMC's patent?

10:33:56 13              And I would submit to you that they have not met

10:33:59 14    that burden.

10:33:59 15              Now, we know that specifically what we're looking

10:34:02 16    at here is Claim 13 of PMC's patent, and all of these

10:34:08 17    requirements, has PMC proven that all of these requirements

10:34:11 18    in this patent and PMC's Claim 13, have those been met?

10:34:17 19    Has Apple built on this land within the red fence, as

10:34:21 20    opposed to outside, outside PMC's property line?

10:34:27 21              I would submit to you that the evidence has shown

10:34:29 22    you that Apple independently developed FairPlay, staked out

10:34:34 23    its own land solving different problems with a different

10:34:40 24    solution many years later, not on PMC's property, not on

10:34:43 25    PMC's land.  Apple has not used PMC's patent, does not

10:34:48  1   infringe.

10:34:48  2        So there's another important jury instruction you

10:34:51  3   heard from His Honor just a few minutes ago, and that's

10:34:55  4   regarding credibility, credibility.  What has PMC told you

10:35:07  5   in terms of what they promised during their opening

10:35:10  6   statement, during their presentation?  Has the evidence

10:35:12  7   backed up what PMC promised?  Has it made sense?

10:35:16  8        You should use your common sense, as Judge

10:35:18  9   Gilstrap instructed you, to consider, has the presentation

10:35:26  10  by PMC made sense? And I want to go through certain

10:35:29  11  evidence you've been presented and -- ask that question.

10:35:33  12  Has PMC's presentation made sense?  Is it credible?

10:35:39  13       I want to start by looking at how PMC described

10:35:43  14  the '091 patent as foundational technology during the

10:35:48  15  opening statement.

10:35:49  16       There were several statements made, these are a

10:35:52  17  couple of them.  Foundational technology for decrypting

10:35:55  18  programming.  Foundational key management invention.  There

10:35:58  19  were several descriptions of the -- of the '091 patent as

10:36:00  20  being foundational.

10:36:03  21       I've got the four words here that they use saying,

10:36:06  22  if you do this, you have to use -- it's a foundational

10:36:10  23  patent for doing these things:  Encryption, decrypting, key

10:36:14  24  management, DRM.

10:36:14  25       The question is, did the evidence back up that

10:36:17  1  promise?  Did the evidence show this patent to be

10:36:24  2  foundational?

10:36:25  3          And let's look at what the evidence actually

10:36:27  4  showed.  This is PMC's expert, their hand-selected expert,

10:36:31  5  Dr. Weaver.

10:36:33  6          And I asked him:  Did PMC invent

10:36:37  7  encryption/decryption?

10:36:38  8          No, they didn't.

10:36:39  9          He admitted there were lots of ways one can do

10:36:43 10  encryption and decryption without infringing or using PMC's

10:36:46 11  patent.  This is not foundational to doing encryption and

10:36:54 12  decryption.

10:36:54 13          Also asked Dr. Weaver about decrypting

10:36:58 14  programming:  Are there other ways -- other ways you can do

10:37:01 15  decrypting programming?  Just because you're doing

10:37:04 16  decrypting programming doesn't mean you're infringing Claim

10:37:07 17  13.

10:37:08 18          He agreed with that.

10:37:08 19          He agreed PMC did not invent key management.

10:37:14 20  There are lots of ways to do key management that do not use

10:37:20 21  PMC's patent.  Same thing for DRM.  Lots of ways to do DRM

10:37:20 22  without infringing PMC's patent.

10:37:32 23          So just because you hear these buzz words, just

10:37:34 24  because Apple does something similar in the same general

10:37:37 25  field as the '091 patent, doesn't mean there's infringement

10:37:40  1  here.  We have to focus on the specific requirements of the

10:37:43  2  claim, the specific requirements of PMC's invention.  Apple

10:37:48  3  has not used that.

10:37:49  4       So on this question of foundational technology,

10:37:54  5  also I would remind you of what Mr. Harvey said.  Now, if

10:38:00  6  PMC's '091 patent was a foundational patent, something that

10:38:04  7  everyone knew about, everyone would have to use because it

10:38:06  8  provides the foundation for doing what's done today, you

10:38:09  9  would think that Mr. Harvey would be easily able to say,

10:38:13 10  yeah, of course, Apple is using it.

10:38:16 11       This is foundational, pioneering technology.  But

10:38:23 12  when he was asked in 2016 about his opinion about had Apple

10:38:26 13  done anything wrong, he agreed he had no opinion whatsoever

10:38:30 14  that Apple had done anything wrong to justify the lawsuit.

10:38:35 15       This is four years after the patent has issued.

10:38:38 16  FairPlay is in use that entire time.  This is more than a

10:38:42 17  year after the lawsuit was filed.  And Mr. Harvey could not

10:38:45 18  articulate anything that he thought Apple had done wrong.

10:38:50 19       Again, is this a foundational patent?  If that's

10:38:55 20  the answer to that question, I would suggest not.

10:38:57 21       Another piece of evidence to kind of think about,

10:39:01 22  is this a foundational pioneering patent?  If you have a

10:39:10 23  foundational patent, it would be something that would be

10:39:13 24  known by -- in the field.

10:39:13 25       People that are working in this area, experts in

10:39:15  1  this field would know about it.  If it's a significant

10:39:19  2  patent, a significant development, people would know about

10:39:21  3  it that work in this industry.

10:39:23  4       But when we asked or when I asked Dr. Weaver:

10:39:26  5  You've been in this field for 44 years, you've paid

10:39:30  6  attention to every significant development in this area of

10:39:33  7  key management.

10:39:33  8       And he agreed:  Yeah, I've stayed on top of

10:39:37  9  everything.

10:39:40  10      When was the first time you heard of PMC or its

10:39:43  11  patent?  And it was when they called him up to hire him to

10:39:47  12  be an expert in this case.  He had never heard of PMC or

10:39:51  13  Mr. Harvey or the '091 patent before he got involved in

10:39:55  14  this litigation.

10:39:56  15      Again, is that a foundational patent that an

10:40:00  16  expert -- their own expert hadn't even heard of before

10:40:03  17  being hired to work on the case?

10:40:07  18      Same thing with Dr. Wicker.  He's been in the

10:40:09  19  field for 40 years, as well, had never heard of PMC or the

10:40:15  20  '091 patent.  Again, does that make sense?  Foundational

10:40:18  21  patent, I don't think so.  I think it's a -- it's a

10:40:21  22  specific patent to a specific method that Apple does not

10:40:25  23  use.

10:40:26  24      Let's talk a little bit about this timeline, the

10:40:31  25  timeline of the conversations between Apple and PMC that

1056

10:40:36  1  PMC has pointed to in both opening and closing statement.

10:40:39  2  And you can see here right in the middle of this is when

10:40:42  3  the '091 patent is actually issued by the Patent Office.

10:40:46  4       Couple things I want to point out about this

10:40:49  5  timeline to kind of put it in context.

10:40:51  6       First of all, let's think about the fact that

10:40:55  7  PMC's timeline all occurs many, many years later.

10:41:01  8  Conversations don't even start until five years after

10:41:04  9  FairPlay is developed.  FairPlay was developed years and

10:41:08  10  years before PMC ever talked to Apple, and then even more

10:41:12  11  years before the '091 patent ever issued.

10:41:15  12       There's not a shred of evidence in this case that

10:41:18  13  FairPlay was developed by looking at PMC's patents or

10:41:22  14  technology or anything that PMC had done.  This was

10:41:26  15  independently developed by Apple in the 2003 time frame.

10:41:32  16  And all of these conversations only happened many years

10:41:34  17  later.

10:41:35  18       Another thing I want to point out about

10:41:39  19  Mr. Kline's timeline.  Now, he talked about there were six

10:41:42  20  years of back and forth and then they were forced to sue

10:41:46  21  Apple.  And there's -- it's suggesting that somehow there

10:41:50  22  was conversation about this '091 patent.

10:41:57  23       The evidence actually shows you, and Mr. Kline can

10:42:00  24  get up and respond to this, he will not be able to point to

10:42:03  25  any time or conversation when PMC actually raised or

10:42:06  1  mentioned the '091 patent to Apple.  It was never

10:42:12  2  mentioned.

10:42:13  3       The '091 patent issued May 2012, three-plus years

10:42:21  4  went by before this lawsuit was filed.  There were numerous

10:42:28  5  conversations, as reflected here on PMC's timeline.  Never

10:42:31  6  once did PMC ever mention the '091 patent to Apple.

10:42:40  7       Now, I want you to ask yourselves:  If the '091

10:42:43  8  patent was this important foundational patent -- if

10:42:49  9  something important happened in one of your lives, what's

10:42:52  10  the first thing you do when something important like that

10:42:56  11  happens, when there's an important event, you receive

10:42:59  12  something important, what is the first thing you do?  You

10:43:04  13  go tell somebody about it.

10:43:06  14       If you're in conversations with a company about a

10:43:09  15  potential business relationship, you'll go to Apple

10:43:12  16  immediately, you'll pick up the phone and tell them, hey,

10:43:16  17  I've got this patent that's foundational that just issued.

10:43:21  18  You will make Apple aware of that immediately if something

10:43:25  19  like that happens.

10:43:25  20       But what does the evidence show us?  The evidence

10:43:29  21  shows us that not only did they not raise it with Apple

10:43:33  22  immediately, they never once mentioned the '091 patent in

10:43:39  23  any of these conversations over a three-year period.  Never

10:43:45  24  once.

10:43:46  25       Now, there were patents that -- PMC -- other

10:43:55  1   patents, not the '091 patent, that PMC did mention to Apple

10:43:57  2   because Apple was asking PMC saying, we don't see the value

10:44:02  3   in your technology.  We don't think it relates to our

10:44:05  4   business.  Show us some of your best patents and explain to

10:44:08  5   us why we should be interested.  That was what was going on

10:44:16  6   in these conversations.

10:44:18  7            And so PMC did that.  They actually -- and you

10:44:21  8   heard from Mr. Holtzman and Ms. Mewes about PMC sent five

10:44:26  9   patents to Apple, not the '091, five patents to Apple and

10:44:26  10  said, okay, we think these might be relevant.  Take a look

10:44:32  11  at these.

10:44:33  12           Apple, as Mr. Holtzman acknowledged, actually sent

10:44:35  13  back and they had a meeting where they talked through

10:44:37  14  Apple's 30-page presentation explaining why the

10:44:41  15  technology -- those five patents didn't apply, why they --

10:44:45  16  we weren't using them and we weren't interested in them.

10:44:51  17  And that sort of ended that conversation.  But, again,

10:44:53  18  nothing about the '091 patent.

10:44:54  19           And you heard from Ms. Mewes about this.  I think

10:44:57  20  we communicated our position basically that we did not

10:45:01  21  think that the five patents that were identified to us were

10:45:03  22  particularly relevant to Apple.  And, effectively, we

10:45:10  23  didn't think, and explained to them in great detail why

10:45:13  24  these patents weren't really applicable to Internet

10:45:16  25  downloads and Internet companies.  Provided that

10:45:19  1   explanation.  Never heard anything back.  And, again, never

10:45:23  2   heard one word about the '091 patent.

10:45:28  3        If this was a foundational patent that they

10:45:31  4   thought we infringed, they would have raised it.  And the

10:45:34  5   evidence suggests otherwise.

10:45:36  6        Now, one other thing you heard from Ms. Mewes was

10:45:38  7   about Apple explaining to PMC, we don't think your patents

10:45:42  8   are really relevant to us, and we have lots of our own

10:45:46  9   technology and patents that we've developed in the course

10:45:51  10  of developing FairPlay.

10:45:53  11       And you heard from Mr. Tribble.  Mr. Tribble was

10:45:59  12  the senior engineer in charge of the FairPlay project, and

10:46:04  13  he explained to you that there were some examples of

10:46:05  14  patents that he talked about that came out of the

10:46:08  15  development of FairPlay.  And he walked through the

10:46:10  16  different technologies associated with those patents.

10:46:14  17       Here's those patents right here.  These are

10:46:18  18  patents that came out of the FairPlay development work,

10:46:24  19  Apple's own hard work, show the value of Apple's great

10:46:30  20  contributions to FairPlay and everything that is involved

10:46:33  21  with FairPlay.

10:46:38  22       PMC doesn't want to give Apple credit for its own

10:46:42  23  innovations, doesn't want to value those patents that you

10:46:44  24  heard about from Mr. Tribble.

10:46:47  25       Now, what does PMC try to then point to?  They

10:46:51   1   talk about, well, they've got all these other companies
10:46:53   2   that have licensed PMC's patents.  Now, we know that PMC
10:46:57   3   has got lots of other patents other than the '091 patent,
10:47:03   4   and they point to all these different companies.
10:47:05   5        What did the evidence show us in terms of tying
10:47:08   6   these licenses to the '091 patent?  The evidence showed us
10:47:13   7   there's no connection.  That you didn't hear any evidence
10:47:18   8   that any one of these companies took a license to PMC's
10:47:21   9   patents because of the '091 patent.
10:47:25   10        PMC's own expert, their damages expert, agrees
10:47:30   11   none of these licenses are comparable to the situation that
10:47:32   12   we're considering here between Apple and PMC.  These
10:47:36   13   licenses are just a distraction.  And, again, we don't want
10:47:39   14   to take away the fact that PMC has developed other
10:47:43   15   technology, has made some money off of licenses of that
10:47:48   16   technology.
10:47:48   17        Give them all the credit in the world for that.
10:47:50   18   It's just this has nothing to do with the '091 patent or
10:47:54   19   licenses to the '091 patent.
10:47:55   20        Also, with respect to damages, PMC is seeking a
10:48:03   21   lot of money in this case, trying to suggest all this value
10:48:06   22   based on billions of downloads.  I'll simply remind you
10:48:11   23   that you heard from Mr. Thomas that when Apple has actually
10:48:15   24   licensed technology in this area, when we're talking about
10:48:19   25   Internet downloads, which by the way all of those tie to

10:48:23  1  the 70 billion downloads, as well, that what Apple has paid

10:48:27  2  for technology that's actually relevant to FairPlay,

10:48:31  3  they've paid between 1 and $11 million for those kinds of

10:48:37  4  patents.  That this hundreds of millions that PMC is

10:48:40  5  talking about has no connection to any comparable licenses

10:48:44  6  to this kind of technology.

10:48:45  7         So ultimately, when we think about does PMC have a

10:48:50  8  foundational patent, a pioneering patent or not, we have to

10:48:54  9  think about the claim, Claim 13, what does it actually

10:48:58  10 cover?  And then we can think about what Mr. Harvey

10:49:01  11 actually said about it.

10:49:02  12        Claim 13 is actually a very specific set of steps,

10:49:10  13 a very specific way of doing it.  Again, perfectly okay to

10:49:13  14 solve certain problems.  Not something that's foundational

10:49:16  15 or something that's useful to Internet downloads.

10:49:21  16        And Mr. Harvey acknowledged, it took a long time

10:49:23  17 to get this patent to be issued by the Patent Office.

10:49:27  18 Thousands of prior art references.  This is a very crowded

10:49:30  19 field of lots of people trying to innovate.

10:49:33  20        Mr. Harvey had to specifically define a particular

10:49:36  21 niche, and he described it as a niche in the midst of all

10:49:41  22 of these inventions as his property.  This -- red fence

10:49:47  23 here for Claim 13 is a niche within a whole field of people

10:49:57  24 decrypting and encrypting, methods of decrypting

10:50:00  25 programming, key management.  PMC has got its piece of

| | | |
|---|---|---|
| 10:50:04 | 1 | property in the neighborhood. |
| 10:50:05 | 2 | It hasn't been able to claim the whole |
| 10:50:07 | 3 | neighborhood, however.  And Apple has developed its |
| 10:50:12 | 4 | property, FairPlay, outside the fence of PMC, has not used |
| 10:50:16 | 5 | PMC's patent, does not infringe PMC's patent. |
| 10:50:19 | 6 | And you can see again -- there was some confusion |
| 10:50:21 | 7 | from PMC's opening regarding the dates.  Again, the date |
| 10:50:29 | 8 | that PMC's patent is associated with is 1987.  It's a 1987 |
| 10:50:35 | 9 | invention, September 1987, solved problems that were |
| 10:50:40 | 10 | present at that time in September 1987. |
| 10:50:42 | 11 | And how do we know that that's true?  You may |
| 10:50:45 | 12 | remember Mr. Harvey when he was asked, okay, well, have you |
| 10:50:52 | 13 | paid attention to innovation and computers and kind of |
| 10:50:54 | 14 | what's happened since 1987?  And he acknowledged that he |
| 10:50:58 | 15 | hasn't followed it, doesn't know kind of what's happened |
| 10:51:01 | 16 | since 1987. |
| 10:51:01 | 17 | Again, no criticism.  That's fine.  The point is |
| 10:51:06 | 18 | he was focused when he came up with his invention, 1987, |
| 10:51:09 | 19 | the problems that existed then.  He hasn't followed it |
| 10:51:12 | 20 | since then.  Hasn't followed it, hasn't grappled with the |
| 10:51:17 | 21 | problems that were associated with the Internet which came |
| 10:51:19 | 22 | around in the '90s or all the problems that Apple has had |
| 10:51:23 | 23 | to deal with in terms of Internet downloads, hackers, |
| 10:51:27 | 24 | viruses, and all that stuff that's associated with just the |
| 10:51:30 | 25 | Internet. |

1063

10:51:31  1          So Apple came up with something, again, 16 years

10:51:35  2    later, that did grapple with all these problems, did come

10:51:39  3    up with a solution, a way to be able to have safe and

10:51:43  4    secure downloads of content, keep Apple users of their

10:51:48  5    devices safe from malware and viruses and that sort of

10:51:52  6    thing.

10:51:52  7          And, again, this was a time when because there was

10:51:58  8    now all this highly sensitive information that was flowing

10:52:01  9    over the Internet, you know, in content, all these movie

10:52:06  10   files and music files, et cetera, but also credit card

10:52:10  11   information, bank information, very sensitive information,

10:52:14  12   it then raised the problem of people trying to steal that

10:52:17  13   information, people trying to hack in and get their hands

10:52:20  14   on things they were not authorized to have.

10:52:23  15          And so Apple had to develop this new system, as it

10:52:27  16   was described, from scratch.  Mr. Pantos,

10:52:32  17   Mr. -- Dr. Tribble, and the team had to develop this new

10:52:34  18   system to create a safe and secure platform for doing this.

10:52:38  19          Before that time, this Internet file sharing,

10:52:41  20   there was lots of theft and problems going on.  Apple

10:52:45  21   developed FairPlay through thousands of hours of its own

10:52:49  22   hard work, leading to patents and other recognition to come

10:52:53  23   up with FairPlay to protect the iTunes Store.

10:52:56  24          Ultimately that was used to protect the App Store.

10:53:04  25   A new solution to a new set of problems that Mr. Harvey

10:53:07  1  never thought about, never grappled with.

10:53:10  2          And you heard from Dr. Wicker an explanation of

10:53:13  3  how this works.  And you remember he had the big board in

10:53:16  4  front of you and sort of walked through all the different

10:53:18  5  aspects of how the FairPlay architecture works, how the

10:53:23  6  system works.

10:53:23  7          And he explained to you the multiple levels of

10:53:31  8  separation that are involved in trying to separate all of

10:53:33  9  these different pieces, separate servers, separate server

10:53:38  10  networks, separate transmissions, separate -- sent at

10:53:41  11  separate times, trying to separate these different pieces

10:53:44  12  in multiple ways, even at the level of the SINF, separating

10:53:48  13  out the encrypted part from the non-encrypted part.

10:53:51  14          Keeping things separate to keep them safe, that

10:53:55  15  was the Apple approach in FairPlay, very intentional, very

10:53:59  16  necessary in the context of Internet downloads to do this

10:54:04  17  separation to ensure there are not problems.

10:54:06  18          When you put these things together, one thing gets

10:54:10  19  hacked, the whole thing is broken.  Apple tries to separate

10:54:14  20  it out to make sure that a hacker has to get its hands on a

10:54:20  21  lot of different things, sort of hack through the system in

10:54:23  22  multiple ways in order to break the system.  That's the

10:54:25  23  purpose of all this separation that's built in that Dr.

10:54:28  24  Wicker talked about.

10:54:29  25          And you can see here when Dr. Wicker was asked,

10:54:35  1   how do you compare this FairPlay architecture in sort of

10:54:38  2   general terms to the claims of the '091 patent?  And he

10:54:41  3   explained it's a completely different approach, with all

10:54:48  4   these different degrees of separation, pulling things

10:54:50  5   apart, not putting them together, not sending them

10:54:55  6   together.

10:54:55  7            So let's now talk a little bit about PMC's '091

10:54:58  8   patent and what the evidence has shown you about this

10:55:00  9   patent and what PMC's approach was to the problem it solved

10:55:05  10  in 1987.

10:55:06  11           You'll remember we talked about this and

10:55:12  12  Dr. Wicker talked about it.  The present invention, so PMC

10:55:15  13  describing its own invention as employing signals embedded

10:55:22  14  in programming, and then talking about the various

10:55:24  15  advantages that it saw with that solution to the problem it

10:55:27  16  confronted in 1987, putting these things together.

10:55:32  17           Signals with programming embedded in programming.

10:55:34  18  That was the solution to address the problem they -- it was

10:55:38  19  confronting, again, personalizing media for people in 1987.

10:55:42  20           Now, Mr. Kline suggests, well, embedding, I don't

10:55:48  21  see that in the claim and tries to take us to task for

10:55:52  22  saying -- pointing to something in the specification, the

10:55:54  23  description that PMC provides for the patent, and

10:55:56  24  suggesting that it's not in the claim.

10:55:57  25           But we can see here this concept is expressly in

10:56:02  1  the claims.  Maybe not the word "embedding," but you can

10:56:07  2  see the claim specifically requires that you have this

10:56:10  3  encrypted digital information transmission, and then you

10:56:12  4  have to detect in that transmission, so this signal, the

10:56:17  5  presence of an instruct-to-enable signal.

10:56:24  6       The instruct-to-enable signal must be found in, or

10:56:27  7  embedded within, in the encrypted digital information

10:56:32  8  transmission that is received by the receiver station.

10:56:36  9  This is exactly what this is being talked about, embedding

10:56:39  10  signals within.

10:56:40  11       You must detect within that transmission the

10:56:44  12  presence of one of these signals.  That is exactly what

10:56:47  13  this claim is saying.  And the evidence has shown you that

10:56:50  14  Apple does not do that, does it exactly the opposite way.

10:56:54  15       Now, there's two claim constructions from the

10:56:59  16  Court that are relevant to this -- these requirements here,

10:57:04  17  the encrypted digital information transmission is an all --

10:57:07  18  must be all-digital information that has been encrypted and

10:57:10  19  moved between at least two devices.

10:57:14  20       I'll -- stop here and -- talk about Mr. Kline just

10:57:17  21  mentioned, well, all this happens at the receiver station.

10:57:20  22  You can ignore the transmissions.  A couple of responses to

10:57:24  23  that.

10:57:24  24       First of all, the claim specifically requires that

10:57:28  25  we look at what's been received by the receiver station and

10:57:33  1   judge, okay, are we finding the right things there.  Is

10:57:36  2   there an encrypted transmission?  Are we finding the signal

10:57:39  3   in that transmission that's been received?  Okay.  So you

10:57:43  4   have to look at what's received, not just what's happening

10:57:45  5   at the receiver station.

10:57:46  6          Second -- thing I would point out is even their

10:57:49  7   own experts went through this whole process of how there's

10:57:54  8   communication, transmissions between the various servers.

10:58:00  9   This is clearly relevant to considering what these

10:58:03 10   transmissions can contain and whether there's infringement.

10:58:05 11          Their own experts went through all of that in

10:58:07 12   detail.  This is not Dr. Wicker only going through it.

10:58:09 13   Their own experts went through all these transmissions, the

10:58:13 14   seven steps that occur before the pieces get to an iPhone.

10:58:16 15          The second construction that's relevant is a

10:58:19 16   signal that enables the implementation of the enumerated

10:58:24 17   operation.  This is the instruct to enable signal.  So for

10:58:29 18   these two -- these two limitations here, there's actually

10:58:31 19   two reasons, two things that PMC has failed to prove Apple

10:58:35 20   does.  Apple does it in a different way.  Two things

10:58:39 21   that -- where this falls apart.

10:58:42 22          First place, and this is Mr. Roger Pantos, you

10:58:45 23   heard from him, the Apple engineer that was instrumental in

10:58:48 24   developing FairPlay, explained that there's nothing in any

10:58:52 25   of these transmissions that's enumerating an operation,

10:58:58  1  that implements the enumeration of an opera -- operation.

10:59:01  2  Nothing at all.

10:59:03  3          Now, if you look back, that's what we need to

10:59:06  4  have.  That's what we need to have in one of these

10:59:09  5  transmissions, a signal that enables the implementation of

10:59:17  6  an enumerated operation.  There's nothing received by Apple

10:59:20  7  devices that does that.

10:59:21  8          Now, Mr. Pantos is probably the single most

10:59:26  9  knowledgeable person about the FairPlay software.  He was

10:59:28  10  involved in writing the source code.  He was involved in

10:59:31  11  writing the documents regarding the source code.  You heard

10:59:33  12  from Mr. Pantos in an hour of video.

10:59:37  13          He was then asked questions on direct examination

10:59:39  14  for an hour and provided you this information, that there's

10:59:42  15  nothing in these transmissions that enumerate any kind of

10:59:46  16  operation.

10:59:46  17          If PMC thought that something Mr. Pantos had said

10:59:51  18  was wrong that didn't properly reflect what the source code

10:59:55  19  said, what the documents said, they should have asked him

10:59:59  20  questions, right?  PMC did not ask Mr. Pantos a single

11:00:04  21  question on cross-examination, didn't try to -- try to

11:00:10  22  follow up and ask him anything about these statements where

11:00:13  23  he's saying, we don't do this.  We don't do what the claim

11:00:17  24  requires.

11:00:18  25          Why did PMC not ask Mr. Pantos a single question

| | | |
|---|---|---|
| 11:00:25 | 1 | on cross-examination?  It's probably because they didn't |
| 11:00:31 | 2 | want to know the answer.  They knew the answer wasn't going |
| 11:00:36 | 3 | to be good for them.  They knew the answer was Apple just |
| 11:00:43 | 4 | simply does not do what the claim requires, does not |
| 11:00:48 | 5 | infringe the claim. |
| 11:00:48 | 6 | You also heard from Dr. Wicker on this point and |
| 11:00:52 | 7 | explained how nothing that's being received in these |
| 11:00:55 | 8 | transmissions is enumerating any operations.  There is no |
| 11:01:01 | 9 | infringement.  So that's the first reason of that first |
| 11:01:03 | 10 | part of the claim, nothing received that enumerates |
| 11:01:07 | 11 | operations. |
| 11:01:07 | 12 | There is no instruct-to-enable signal as the Court |
| 11:01:09 | 13 | has construed and required it must be. |
| 11:01:12 | 14 | There's a second reason why the evidence has not |
| 11:01:18 | 15 | shown that this is done by Apple's FairPlay software. |
| 11:01:22 | 16 | You may remember that Dr. Weaver talked about what |
| 11:01:24 | 17 | he thought was going to be this instruct-to-enable signal, |
| 11:01:29 | 18 | and he pointed to in his testimony -- and we've got it |
| 11:01:33 | 19 | there on the right -- the key ID and the user ID.  That's |
| 11:01:36 | 20 | what he said, Dr. Weaver, were the instruct-to-enable |
| 11:01:42 | 21 | signals in the Apple transmissions. |
| 11:01:44 | 22 | So you can see here the key ID and the user ID are |
| 11:01:48 | 23 | on the left side.  And, remember, there's a public part and |
| 11:01:53 | 24 | a private part.  So these two things that Dr. Weaver, PMC's |
| 11:01:56 | 25 | expert, pointed to are in the public part, the |

1070

11:02:01  1  non-encrypted part.

11:02:02  2         But Dr. Weaver admitted that.  The key ID and the

11:02:07  3  user ID are in the non-encrypted part of this transmission.

11:02:11  4         But then Dr. Weaver had to admit that the claim

11:02:16  5  requires the instruct-to-enable signal must be part of the

11:02:21  6  encrypted part of this.

11:02:23  7         It's got to be, according to PMC's invention,

11:02:26  8  according to the requirements of the claim, it must be in

11:02:32  9  the encrypted part, the pink or red part here.

11:02:35  10         To practice this claim, to infringe this claim,

11:02:39  11  they would have had to have found something in the red

11:02:43  12  part.  But that's not where Dr. Weaver found it.  There is

11:02:47  13  no infringement here.

11:02:49  14         This is -- we -- Apple does this very specifically

11:02:53  15  in a different way, separate out these parts.  Separate

11:02:58  16  private, separate encrypted from the public part.  And then

11:03:02  17  it puts the pieces in the public part, not the encrypted

11:03:08  18  part.  This is separate, not together, not sent -- you're

11:03:11  19  not finding this instruct-to-enable signal where the claim

11:03:15  20  requires it must be, in the encrypted part.

11:03:19  21         So this is a second reason why Apple's system does

11:03:22  22  not infringe Claim 13 and the evidence has shown it does

11:03:26  23  not infringe Claim 13.

11:03:27  24         Let's move on to other elements.  And, again, if

11:03:34  25  PMC doesn't show that all of this is done, there is no

11:03:38   1   infringement.  So all we need to show is one is missing.

11:03:44   2            There's multiple missing.  We've already talked

11:03:45   3   about two.  Let's talk about another one here.  This

11:03:45   4   requirement of determining a fashion in which the receiver

11:03:50   5   station locates.

11:03:50   6            And the Court has helped us out with a

11:03:52   7   construction on this saying that that means determining the

11:03:55   8   way the receiver locates a first decryption key.

11:04:00   9            So what did the evidence show on this?  You may

11:04:06  10   remember during Dr. Weaver's cross-examination that he

11:04:10  11   testified about this concept of locating.

11:04:15  12            And I asked him a question.  This is on the left

11:04:19  13   on Tuesday, it was late in the day, so maybe we were

11:04:23  14   getting a little bit tired, but late in the day on Tuesday,

11:04:26  15   I asked him:  In fact, your opinion is that generating a

11:04:30  16   key is something different than locating a key.

11:04:33  17            Because, again, the claim requires locating,

11:04:38  18   right?

11:04:38  19            I said:  Right?

11:04:39  20            And he said:  No, wrong.

11:04:42  21            He pushed back on that because he knew that the

11:04:45  22   claim requires locating, and he knew that the evidence

11:04:48  23   showed that what they did was generating a key, not

11:04:52  24   locating a key.

11:04:57  25            And I then had to confront him with the expert

11:04:59  1  report he had put together in 2016.  His own words in his

11:05:04  2  own report, which -- stated:  After all, it is only common

11:05:09  3  sense that locating is different from generating.  You can

11:05:15  4  only locate something that's already in existence.

11:05:21  5          If you have to generate it, you can't locate it.

11:05:25  6  And that's what Dr. Weaver said was only common sense in an

11:05:30  7  expert report he wrote in this case in 2016.

11:05:33  8          THE COURT:  Five minutes remaining.

11:05:34  9          MR. SERNEL:  And then I followed up and asked him:

11:05:37  10  In your own opinion, generating a key is not equivalent,

11:05:41  11  not the same, as locating a key?

11:05:44  12          And Dr. Weaver, when confronted with his prior

11:05:47  13  words on the same exact subject, had to admit:  Yeah,

11:05:52  14  that's what I said in 2016.

11:05:58  15          He had to admit he was caught trying to change his

11:06:00  16  opinion on this to try to make it fit the claims.

11:06:04  17          And when we walked through this with Dr. Wicker

11:06:07  18  yesterday, asked him about, okay, well, this generating

11:06:10  19  versus locating, which one is correct, Dr. Weaver in his

11:06:13  20  expert report or Dr. Weaver on Tuesday?

11:06:16  21          He explained:  Yeah, he was correct in 2016.

11:06:20  22  Generating a key is different than locating a key.  And if

11:06:23  23  you apply what Dr. Weaver said in his expert report in 2016

11:06:28  24  to the FairPlay system, there is no infringement.  There is

11:06:32  25  no locating of a key.  There's no determining a fashion to

11:06:36  1    locating a key.

11:06:38  2              And if there's any doubt about this, we can look

11:06:43  3    at the testimony from PMC's other expert.  This is

11:06:45  4    Dr. Plock, and you'll remember he's the one that actually

11:06:48  5    looked at the source code.  Dr. Weaver admitted he didn't

11:06:51  6    look at the source code, wasn't asked to look at the source

11:06:54  7    code.

11:06:54  8              Dr. Plock is the one PMC expert that actually

11:06:57  9    looked at the source code.  And you can see here he

11:07:01  10   acknowledges that in terms of this generating or locating,

11:07:06  11   the way that PMC -- or Apple system works is DPinfo is used

11:07:11  12   to generate or compute the DP key as opposed to locating

11:07:15  13   it.  Again, differentiating these two things.

11:07:18  14             Apple DPinfo generated, not located.  There is no

11:07:24  15   infringement.

11:07:24  16             And so I think the evidence has shown you that

11:07:29  17   there are multiple reasons, multiple requirements of

11:07:33  18   Claim 13 that Apple's system does not use.  There is no

11:07:37  19   infringement of this claim.

11:07:44  20             And you're going to look -- you're going to

11:07:46  21   receive a verdict form when you go back to deliberate in

11:07:48  22   the jury room.  I would submit that the evidence has shown

11:07:51  23   you that PMC has not met its burden to prove infringement

11:07:54  24   of these specific requirements of Claim 13.

11:07:57  25             The answer on the question of infringement is

11:08:00  1  that, no, it has not been proven by PMC.

11:08:04  2          And then the question with respect to damages is

11:08:06  3  that PMC has not shown themselves to be entitled to any

11:08:09  4  damages.  That should be a zero on the verdict form.  That

11:08:13  5  is what the evidence has shown to you.

11:08:15  6          And I would submit that ultimately at the end of

11:08:21  7  the day, again, we don't want to take away PMC's patent or

11:08:24  8  its land or the credit it deserves for other licenses it

11:08:28  9  has with other companies for other patents, PMC is entitled

11:08:33 10  to what it's developed.

11:08:35 11          But on the same token, Apple has also developed

11:08:40 12  its own technology, deserves its own respect, and has

11:08:43 13  staked out its own land that is not on PMC's property.

11:08:47 14  Apple has not used PMC's patent.  Apple has not infringed

11:08:53 15  PMC's patent.

11:08:53 16          Now, this is the last opportunity I'll get to

11:08:56 17  speak with you.  The rules are that Mr. Kline gets the last

11:09:01 18  word, and so I won't be able to get back up and respond to

11:09:06 19  Mr. Kline in his last statements.

11:09:08 20          I would simply ask you to think about, as you hear

11:09:11 21  Mr. Kline's last arguments, think about the credibility of

11:09:13 22  the presentation.  Think about what the evidence has

11:09:16 23  actually shown you.

11:09:18 24          Think about if he's backed up with evidence these

11:09:21 25  assertions of infringement.  And I would submit to you that

11:09:25   1   when you consider the evidence, Apple has shown you that

11:09:29   2   there is no use of PMC's patent and there has been no

11:09:35   3   infringement.

11:09:35   4           Thank you very much.

11:09:37   5           THE COURT:  Plaintiff may now present its final

11:09:39   6   closing argument.

11:09:40   7           You have 10 minutes and 15 seconds, counsel.

11:09:44   8   Would you like a warning on this final argument?

11:09:47   9           MR. KLINE:  I would, Your Honor.  Thank you.  Three

11:09:56   10  minutes?

11:09:57   11          THE COURT:  I'll warn you when you have three

11:09:59   12  minutes remaining.

11:10:01   13          MR. KLINE:  Thank you.

11:10:03   14          THE COURT:  Please proceed.

11:10:05   15          MR. KLINE:  Thank you, Your Honor.

11:10:06   16          Well, on some -- think about the credibility of

11:10:09   17  the presentation.  I invite you to do that.  Please do.

11:10:11   18          On some level, I appreciate Apple has a story, and

11:10:18   19  they're sticking with it.  So I give them credit for that.

11:10:24   20          They say they don't belittle the '091 patent and

11:10:30   21  PMC's invention.  They characterize it as niche.  They say

11:10:37   22  Mr. Harvey characterized it as niche, but that was actually

11:10:41   23  the Apple lawyer characterized it as niche.

11:10:45   24          It's interesting to me, they talk about all the

11:10:46   25  other ways of encrypting and decrypting.  There are all

11:10:51  1   sorts of other ways to protect keys, all sorts of ways to

11:10:54  2   encrypt and decrypt.

11:10:58  3          Well, ask yourself if there were all these other

11:11:02  4   ways to do it, why did Apple do it the way the '091 patent

11:11:06  5   describes?  Why didn't Apple choose one of these other

11:11:08  6   ways?

11:11:09  7          As Dr. Weaver described, Apple's FairPlay

11:11:11  8   practices the method for decrypting programming described

11:11:16  9   in PMC's '091 patent.  If Apple thinks there were all these

11:11:21  10  other ways to do it, they should have done it one of those

11:11:24  11  other ways.

11:11:25  12         They criticize Mr. Harvey for not knowing how

11:11:30  13  FairPlay works, ignoring how many times we had to seal this

11:11:35  14  courtroom because the discussions of Apple's technology

11:11:36  15  were highly confidential.

11:11:41  16         Every time we sealed this courtroom, Mr. Harvey

11:11:46  17  had to leave the courtroom because he's not allowed to see

11:11:53  18  Apple's confidential information.  And then Apple comes and

11:11:59  19  they criticize Mr. Harvey for not knowing how FairPlay

11:12:02  20  works.

11:12:02  21         They criticize PMC for not being well-known.

11:12:07  22  Who's ever heard of PMC?  PMC never bought an advertisement

11:12:15  23  for the Super Bowl.  I don't see PMC advertisements during

11:12:23  24  every intermission of every NFL game that I watch.  I see

11:12:27  25  Apple advertisements.

| | | |
|---|---|---|
| 11:12:28 | 1 | I see Apple advertisements in the Super Bowl, on |
| 11:12:34 | 2 | TV every night, on billboards as a drive down Route -- |
| 11:12:42 | 3 | Highway 20, that's when I see Apple advertisements.  And |
| 11:12:43 | 4 | you're right, we don't see PMC advertisements.  And then |
| 11:12:46 | 5 | they come and they criticize because people haven't heard |
| 11:12:49 | 6 | of PMC. |
| 11:12:56 | 7 | Now, if I could see -- Mr. Boles, maybe you could |
| 11:12:59 | 8 | help me -- the timeline slide, please. |
| 11:13:02 | 9 | They say that -- they claim that Apple told PMC |
| 11:13:10 | 10 | that we don't see the value of your portfolio.  Well, we |
| 11:13:13 | 11 | heard from Mr. Holtzman.  Mr. Holtzman testified, no one, |
| 11:13:18 | 12 | no one ever told me from Apple that your patents do not |
| 11:13:24 | 13 | intersect with our products. |
| 11:13:26 | 14 | Ms. Mewes, you heard testimony from Ms. Mewes. |
| 11:13:30 | 15 | That's testimony that PMC presented from her deposition. |
| 11:13:35 | 16 | Apple didn't bring her to talk about her inter- -- her |
| 11:13:38 | 17 | discussions with Mr. Holtzman. |
| 11:13:41 | 18 | You heard from Ms. Whitt.  That's testimony that |
| 11:13:45 | 19 | PMC played because we took her deposition.  You didn't hear |
| 11:13:51 | 20 | Ms. Whitt come and explain her interactions with |
| 11:13:54 | 21 | Mr. Holtzman. |
| 11:13:55 | 22 | Nobody came to disagree with Mr. Holtzman when he |
| 11:13:58 | 23 | said that, no one ever told me that your patents don't |
| 11:14:01 | 24 | intersect with our products. |
| 11:14:03 | 25 | Mr. Thomas.  Mr. Thomas talked about some licenses |

11:14:10  1   during his testimony, and Apple's lawyer referred to those

11:14:13  2   licenses.  They didn't give you those licenses, though.

11:14:16  3   All those licenses -- you're going to get the exhibits.

11:14:19  4         You're going to -- they're going to come back to

11:14:21  5   you in the jury room, the exhibits that the parties

11:14:23  6   introduced.  They didn't put those exhibits into evidence.

11:14:28  7   I don't know if it's because they don't want you to

11:14:30  8   actually see the exhibits.  I don't know why they did that.

11:14:33  9         PMC put an Apple license into evidence, the

11:14:38 10   Intertrust agreement.  Apple took a license to DRM

11:14:42 11   technology from a company called Intertrust.  Apple paid

11:14:48 12   ████████████████████████████████████████████████████████

11:14:55 13   took from Intertrust.

11:14:57 14         That license is in evidence.  The licenses that

11:15:01 15   Mr. Thomas says he relied upon, Apple didn't put those into

11:15:05 16   evidence.  You will not have the opportunity to review

11:15:07 17   those yourselves in the jury room.

11:15:09 18         Now, with respect to this whole issue of separate.

11:15:16 19   We're still on separate, I see.

11:15:18 20         And if we could see -- Mr. Boles, if you could

11:15:22 21   help me and show Slide 10 of our presentation.  Thank you.

11:15:26 22         The claim limitation is receiving an encrypted

11:15:33 23   digital information transmission, it includes encrypted

11:15:35 24   information.

11:15:35 25         Dr. Weaver explained -- am I going to click that,

11:15:41  1  or are you, Mr. Boles?  Thank you.

11:15:44  2        Dr. Wicker explained:  The Court has construed

11:15:48  3  it's an all-digital information that's been encrypted and

11:15:53  4  moved between two -- at least -- between at least two

11:15:54  5  devices.

11:15:55  6        And maybe we can go back, Mr. Boles.

11:15:58  7        Dr. Weaver explained:  That is the response that

11:16:00  8  you receive from iTunes.  The purchase request response

11:16:04  9  that you receive from iTunes, that is the claimed encrypted

11:16:08  10 digital information transmission.

11:16:09  11       It includes encrypted information.  There's no

11:16:18  12 dispute that the SINF that Apple sends you when you make a

11:16:22  13 purchase request includes encrypted information.  Apple

11:16:26  14 calls it the private part of the SINF.  It includes the

11:16:33  15 encrypted content key that you need to watch Toy Story on

11:16:36  16 your phone.

11:16:37  17       Dr. Weaver agrees.  Dr. Wicker agrees.

11:16:43  18       With respect to detecting in -- Apple's lawyer

11:16:48  19 referred to the "in" limitation here.  To detecting in said

11:16:53  20 encrypted information transmission of the presence of an

11:16:55  21 instruct-to-enable signal, Dr. Weaver explained that's

11:16:59  22 exactly what happens with FairPlay.

11:17:01  23       It's the key ID and the user ID.  Exactly as the

11:17:11  24 claim requires, it is in the encrypted digital information

11:17:16  25 transmission.  This is probably the prime example of Apple

11:17:19   1   trying to confuse you.

11:17:20   2          What Apple is arguing is that the claim requires

11:17:23   3   the instruct-to-enable signal to be in the programming.  It

11:17:28   4   does not.

11:17:29   5          THE COURT:  Three minutes remaining.

11:17:31   6          MR. KLINE:  Thank you, Your Honor.

11:17:36   7          So what I'll close with, ladies and gentlemen, is

11:17:40   8   we've heard quite a bit of misdirection from Apple point of

11:17:43   9   view.  We've seen their defense.  We understand why Apple

11:17:46  10   has so desperately wanted to make this case about anything

11:17:51  11   other than Claim 13, anything other than Apple's

11:17:56  12   infringement of PMC's patent, anything other than Apple's

11:18:00  13   use, improperly, of PMC's patented technology.

11:18:06  14          They brought you a defense full of distraction and

11:18:11  15   misdirection, perhaps in the hope that you might give them

11:18:17  16   a pass.

11:18:17  17          That's been Apple's approach since the beginning,

11:18:22  18   from the opening that they made, from the testimony of

11:18:24  19   their witnesses.  They strung PMC along for six years, and

11:18:29  20   they spent this week hoping they could distract us all from

11:18:36  21   what's really going on here.

11:18:37  22          So as I mentioned at the outset, we are asking you

11:18:40  23   to hold Apple accountable.

11:18:42  24          They called PMC a taker.  They called Mr. Harvey a

11:18:47  25   taker.  I would ask you, ladies and gentlemen, who is doing

11:18:51  1  the taking here?  The evidence has been abundantly clear

11:18:56  2  that it is Apple that has been doing the taking.  They have

11:19:02  3  taken PMC's patented technology without permission.

11:19:05  4        Now, at the end of this trial, you will return a

11:19:08  5  verdict.  And this is what's going to happen next.  The

11:19:13  6  lawyer sitting at this table is going to go out on to the

11:19:16  7  street, he's going to call back to Cupertino, California,

11:19:21  8  and tell his boss the news.  What did the jury decide?  And

11:19:26  9  he's going to make one of two calls.

11:19:29  10        He may call, and he's going to say:  Good news, we

11:19:35  11  got away with it.  We fooled everybody.  The jury came back

11:19:40  12  for Apple.

11:19:41  13        Or he's going to make that call and say:  I got

11:19:46  14  bad news.  They figured it out.  I think we're going to

11:19:50  15  have to change the way we deal with innovators.  I think

11:19:53  16  we're going to have to change the way we deal with people

11:19:56  17  like Mr. Harvey, companies like PMC.  I think we're going

11:20:01  18  to have to start respecting other people's intellectual

11:20:04  19  property.

11:20:04  20        Ladies and gentlemen, don't let them make that

11:20:08  21  first call.  Make them make that second call.  Hold Apple

11:20:12  22  accountable.

11:20:14  23        Thank you very much.

11:20:14  24        THE COURT:  Ladies and gentlemen, you've now heard

11:20:24  25  closing arguments from the attorneys for both of the

11:20:28   1   parties.

11:20:28   2         I'd like to provide you with a few final

11:20:30   3   instructions before you begin your deliberations.

11:20:34   4         You must perform your duties as jurors without

11:20:38   5   bias or prejudice as to any party.  The law does not permit

11:20:45   6   you to be controlled by sympathy, prejudice, or public

11:20:48   7   opinion.

11:20:49   8         All parties expect that you will carefully and

11:20:52   9   impartially consider all the evidence, follow the law as I

11:20:56  10   have given it to you, and reach a just verdict regardless

11:21:01  11   of the consequences.

11:21:02  12         Answer each question in the verdict form based on

11:21:05  13   the facts as you find them to be, following the

11:21:07  14   instructions that has -- that the Court has given you on

11:21:10  15   the law to apply.

11:21:11  16         Do not decide who you think should win and then

11:21:14  17   answer the questions accordingly.  Again, let me remind

11:21:19  18   you, your answers and your verdict in this case must be

11:21:23  19   unanimous.

11:21:24  20         You should consider and decide this case as a

11:21:26  21   dispute between persons of equal standing in the community,

11:21:32  22   of equal worth, and holding the same or similar stations in

11:21:36  23   life.  This is true in patent cases between corporations,

11:21:40  24   partnerships, and individuals.

11:21:41  25         A patent owner is entitled to protect his rights

11:21:45  1  under the laws of the United States.  And this includes

11:21:50  2  bringing a suit in a United States District Court for money

11:21:52  3  damages for infringement.

11:21:56  4          The law recognizes no distinction among the types

11:22:00  5  of parties.  All corporations, partnerships, other business

11:22:04  6  organizations and individuals stand equal before the law,

11:22:09  7  regardless of their size, who owns them, and they are to be

11:22:12  8  treated as equals.

11:22:14  9          Now, when you retire to the jury room in just a

11:22:17  10  few minutes to deliberate on your verdict, you're going to

11:22:19  11  each have a copy of these instructions that I've been

11:22:21  12  giving you orally.  You'll have your own individual written

11:22:26  13  copy.

11:22:26  14          If you desire during your deliberations to review

11:22:29  15  any of the exhibits which the Court has admitted into

11:22:31  16  evidence and which have been shown to you during the course

11:22:34  17  of the trial, you should advise me by way of a written

11:22:40  18  note, dated and signed by your foreperson, and delivered to

11:22:43  19  the Court Security Officer who will bring it to me.

11:22:45  20          I will then upon receipt of such note send you

11:22:51  21  that exhibit or those exhibits in the jury room.  I remind

11:22:55  22  you, demonstrative exhibits are not evidence, and I cannot

11:22:59  23  send you demonstratives in the jury room.

11:23:01  24          Once you retire, you should first select your

11:23:03  25  foreperson and then conduct your deliberations.  If you

1084

11:23:07  1  recess at any time during your deliberations, follow all

11:23:11  2  the instructions the Court has given you about your conduct

11:23:15  3  throughout the trial.

11:23:17  4          After you've reached a verdict, your foreperson is

11:23:20  5  to fill in the verdict form in a manner that reflects your

11:23:24  6  unanimous answers to the questions contained therein.

11:23:27  7          Do not reveal your answers until such time as you

11:23:30  8  are discharged unless otherwise instructed by me.  And you

11:23:34  9  must never disclose to anyone, not even to me, your

11:23:39  10 numerical division on any question.

11:23:41  11         Any notes you've taken over the course of the

11:23:43  12 trial are aids to your memory only.  If your memory should

11:23:50  13 differ from your notes, you should rely on your memory and

11:23:52  14 not your notes.

11:23:53  15         The notes are not evidence, and a juror who has

11:23:57  16 not taken notes should rely on his or her own independent

11:24:01  17 recollection of the evidence and not be unduly influenced

11:24:03  18 by the notes of other jurors.

11:24:05  19         Notes are not entitled to any greater weight than

11:24:07  20 the recollection or impression that each juror had of the

11:24:10  21 testimony.

11:24:10  22         Now, if you want to communicate with me at any

11:24:14  23 time, you should give a written message or a question

11:24:19  24 written by your foreperson, signed and dated by your

11:24:21  25 foreperson to the Court Security Officer who will bring it

11:24:24  1  to me.

11:24:25  2          I'll then respond to you as soon as possible,

11:24:29  3  either in writing or by having you brought back into the

11:24:32  4  courtroom where I can address you orally.  I will always

11:24:37  5  upon receipt of a note or question disclose it to the

11:24:41  6  attorneys in the case first before I respond to any such

11:24:43  7  question.

11:24:44  8          After you've reached a verdict and after I have

11:24:48  9  discharged you from your position as jurors in this case,

11:24:51  10 you are not required, ladies and gentlemen, to talk about

11:24:54  11 or discuss your service in this case with anyone.

11:24:58  12          However, by the same token, at that time, after

11:25:00  13 I've discharged you, you are absolutely free to talk with

11:25:05  14 anyone in any way about your service as jurors in this

11:25:07  15 case.  The decision is 100 percent up to you.

11:25:12  16          Whether you decide to discuss what has happened

11:25:14  17 while you served as a juror in this case or not is

11:25:17  18 completely your only personal decision.

11:25:20  19          I'm now going to hand eight printed copies of

11:25:23  20 these jury instructions and a clean copy of the verdict

11:25:26  21 form to the Court Security Officer who will bring -- who

11:25:29  22 will bring them to you in the jury room.

11:25:31  23          Ladies and gentlemen of the jury, you may now

11:25:36  24 retire to the jury room to deliberate.  We await your

11:25:39  25 verdict.

| | | |
|---|---|---|
| 11:25:40 | 1 | COURT SECURITY OFFICER:  All rise. |
| 11:25:41 | 2 | (Jury out.) |
| 11:26:09 | 3 | THE COURT:  Please be seated. |
| 11:26:10 | 4 | Counsel, you are welcome to wait for the jury's |
| 11:26:12 | 5 | verdict here in the courtroom.  I'm also aware you have |
| 11:26:15 | 6 | facilities offsite in which you have been meeting.  You're |
| 11:26:20 | 7 | welcome to wait there. |
| 11:26:21 | 8 | If you elect to wait outside the courtroom, then |
| 11:26:24 | 9 | keep your cell phones on and active so that we can reach |
| 11:26:27 | 10 | you and you can be here in a manner of a few minutes either |
| 11:26:31 | 11 | if I receive a note or upon the return of a verdict. |
| 11:26:34 | 12 | Awaiting either a note from the jury or a return |
| 11:26:38 | 13 | of the jury's verdict, the Court stands in recess. |
| 11:26:40 | 14 | COURT SECURITY OFFICER:  All rise. |
| 11:26:42 | 15 | (Recess.) |
| 02:49:11 | 16 | (Jury out.) |
| 02:49:11 | 17 | COURT SECURITY OFFICER:  All rise. |
| 02:49:31 | 18 | THE COURT:  Be seated, please. |
| 02:49:57 | 19 | Counsel, I've received the following note from the |
| 02:50:11 | 20 | jury.  It contains two questions. |
| 02:50:18 | 21 | First question with regard to Question 2b:  "The |
| 02:50:23 | 22 | amount awarded in Question 2a, a lump sum representing |
| 02:50:27 | 23 | damages for past and future use of the claimed methods, or |
| 02:50:30 | 24 | is the amount you award in Question 2 a running royalty? |
| 02:50:34 | 25 | Then below that, this says:  Check one, comma, do |

02:50:43  1   we have a choice to award a lump sum or a running royalty

02:50:48  2   as a preference, or can it be both?

02:50:51  3            That appears to be the first question.

02:50:54  4            The second question:  Can we have a calculator?

02:50:58  5            Then it's dated today's date and signed by

02:51:04  6   Mr. Quarles, who appears to be Juror No. 3, as the

02:51:08  7   foreperson.

02:51:08  8            I have prepared a tentative response, and I have a

02:51:19  9   copy for both Plaintiff and Defendant if you want to

02:51:25  10  approach, and I'll give you a copy of my proposed written

02:51:28  11  response.

02:51:29  12           Ms. Brunson will hand it to you.

02:51:31  13           Then I'll read it and see if there are any

02:51:33  14  questions or changes.

02:51:34  15           My response to Note No. 1 is as follows:  Members

02:51:40  16  of the jury, in response to the questions in your first

02:51:43  17  jury note:

02:51:45  18           (A)  You should award either a lump sum or a

02:51:48  19  running royalty.  It must be one or the other and cannot be

02:51:52  20  both.

02:51:52  21           (B)  A calculator as requested is being delivered

02:51:58  22  with this response.

02:51:59  23           Is there objection from either Plaintiff or

02:52:01  24  Defendant for the Court to send in that written response

02:52:04  25  with a calculator?

1088

02:52:05   1            MR. KLINE:  No objection, Your Honor.

02:52:06   2            MR. AROVAS:  No objection, Your Honor.

02:52:09   3            THE COURT:  All right.  And I've signed the

02:52:22   4   written response.

02:52:28   5            And I have a calculator on the bench.

02:52:31   6            Mr. Fitzpatrick, if you'll give the jury this

02:52:34   7   written response along with this calculator.

02:52:36   8            COURT SECURITY OFFICER:  Yes, sir.

02:52:37   9            THE COURT:  Also for the record, I'm taking the

02:52:42  10   original note and marking it with a "1" in the upper

02:52:45  11   right-hand corner for identification and handing it to

02:52:48  12   the courtroom deputy to be included in the papers of this

02:52:50  13   case.

02:52:50  14            All right.  Counsel, pending either another note

02:52:55  15   from the jury or the return of a verdict, we stand in

02:52:59  16   recess.

02:53:01  17            COURT SECURITY OFFICER:  All rise.

02:53:02  18            (Recess.)

03:39:44  19            (Jury out.)

03:48:49  20            COURT SECURITY OFFICER:  All rise.

03:48:50  21            THE COURT:  Be seated, please.

03:48:51  22            Counsel, I've received the following note from the

03:49:23  23   jury dated today's date, and it's signed by Mr. Quarles as

03:49:28  24   foreperson:

03:49:29  25            "We have reached a verdict."

03:49:31   1          I'll hand the note from the jury to the courtroom

03:49:34   2   deputy to be included in the documents of this case.

03:49:37   3          Let's bring in the jury.

03:49:44   4          COURT SECURITY OFFICER:  All rise.

03:50:11   5          (Jury in.)

03:50:14   6          THE COURT:  Please be seated, ladies and

03:50:17   7   gentlemen.

03:50:17   8          Mr. Quarles, I understand you are the foreperson

03:50:23   9   of the jury.  Has the jury reached a verdict?

03:50:28   10          THE FOREPERSON:  Yes, sir.

03:50:29   11          THE COURT:  Would you hand the dated and signed

03:50:31   12   verdict form to the Court Security Officer who will bring

03:50:33   13   it to me?

03:50:38   14          Ladies and gentlemen, I'm going to announce the

03:51:10   15   verdict into the record at this time, and I'd like to ask

03:51:13   16   each member of the jury to listen particularly closely and

03:51:17   17   carefully as I do that, because after I've announced the

03:51:21   18   record -- the verdict into the record, I'm going to ask

03:51:25   19   each of you if this is your verdict so that we can confirm

03:51:29   20   it is, in fact, the unanimous verdict of every member of

03:51:32   21   the jury.

03:51:32   22          Turning to the verdict form and beginning on Page

03:51:42   23   4 where Question 1 is found:

03:51:44   24          Has PNC -- PMC proven by a preponderance of the

03:51:49   25   evidence that Apple infringed any of the asserted claims of

03:51:52   1   the '091 patent?

03:51:52   2           The jury's answer is:  Yes.

03:51:56   3           Turning to Page 5 where Question 2a is located:

03:52:03   4           What sum of money, if any, paid now in cash has

03:52:07   5   PMC proven by a preponderance of the evidence would

03:52:10   6   compensate PMC for its damages resulting from infringement?

03:52:14   7           The jury's answer is:  $308,488,108.

03:52:24   8           Turning to Page 6 where Question 2b is found:

03:52:32   9           Is the amount you awarded in Question 2a a lump

03:52:36   10  sum representing damages for past and future use of the

03:52:39   11  claimed methods, or is the amount you awarded in Question

03:52:45   12  2a a running royalty?

03:52:46   13          The jury's answer is:  Running royalty.

03:52:49   14          Turning to Page 7, which is the final page of the

03:52:54   15  jury -- or the verdict form, I find it's dated with today's

03:52:58   16  date and signed by Mr. Jerry Quarles as the foreperson of

03:53:03   17  the jury.

03:53:04   18          Ladies and gentlemen of the jury, let me poll you

03:53:08   19  at this time and make sure that this verdict, as I have

03:53:11   20  read it, is the unanimous verdict of all eight members of

03:53:14   21  the jury.

03:53:14   22          If this is your verdict as I have read it, would

03:53:18   23  you please stand up?

03:53:20   24          (Jury polled.)

03:53:21   25          THE COURT: Thank you. Please be seated.

1091

03:53:26   1           Let the record reflect that all eight members of

03:53:29   2   the jury immediately rose and stood in response to the

03:53:31   3   Court's question to poll the jury.

03:53:33   4           I'm going to hand the original verdict to the

03:53:37   5   courtroom deputy.

03:53:39   6           For the record, ladies and gentlemen, the Court

03:53:41   7   accepts your verdict.  And I have confirmed to my

03:53:45   8   satisfaction that it is the unanimous verdict of all eight

03:53:48   9   members of the jury.

03:53:49   10           This now completes the trial of this case, ladies

03:53:53   11   and gentlemen.  And from the very beginning, I have

03:53:56   12   instructed you over and over again about not discussing

03:53:59   13   this case with anyone.

03:54:02   14           We are now at a point where I am releasing you

03:54:05   15   from that instruction, I'm releasing you from all the

03:54:09   16   instructions I've given you, and I'm discharging you as the

03:54:13   17   jury in this case.

03:54:14   18           You are now free to talk about this case with

03:54:16   19   anybody you'd like.  You are also free not to talk about

03:54:19   20   this case with anybody that you like.

03:54:22   21           Let me explain what the practice and custom here

03:54:27   22   in this court is and has been for more than 30 years.  It

03:54:32   23   was that way when I got here and started practicing in this

03:54:34   24   area.

03:54:36   25           And that is as follows, counsel and the parties

03:54:39   1   and the support teams for each side of this case cannot

03:54:43   2   initiate a conversation with you about your service.  None

03:54:47   3   of these lawyers or anyone else involved with either side

03:54:50   4   of this case is going to come up to you and try to get you

03:54:54   5   to talk about your service as jurors.

03:54:57   6           However, if you want to talk with any of them, I

03:55:01   7   promise you they are more than happy on either side of the

03:55:05   8   case to hear what you have to say.

03:55:07   9           And let me explain how that works, because I did

03:55:10   10  this when I was in practice.  Before you leave the

03:55:14   11  building, some if not all of these lawyers are probably

03:55:18   12  going to position themselves on the front sidewalk at the

03:55:22   13  bottom of the steps as you leave the courthouse.  And

03:55:24   14  you're going to get the opportunity to walk beside them or

03:55:27   15  to walk near them.  And if you want to talk, I promise you

03:55:30   16  that's why they're there.  They're going to make themselves

03:55:33   17  available to you.  They're not going to stop you.  They're

03:55:35   18  not going to try to engage you in conversation.  It's

03:55:38   19  strictly up to you.

03:55:39   20          If you want to talk, I promise you, they'll want

03:55:41   21  to talk.  If you don't want to talk, nobody is going to try

03:55:46   22  to get you to talk.  It's strictly up to you.  If you're

03:55:50   23  not interested in having a conversation, just smile, and as

03:55:55   24  the saying goes, walk on by.

03:55:57   25          Also, ladies and gentlemen, I've added to this

03:56:00  1   process -- I haven't changed it, but I've added something

03:56:04  2   to it, and that is in the last few years, I've asked each

03:56:08  3   side to give me a cell phone number for a representative

03:56:11  4   from each trial team.  And I've got those cell phone

03:56:15  5   numbers, and I'm going to give them to you in just a

03:56:18  6   minute.

03:56:18  7        And if you want to call one of those numbers or

03:56:21  8   both of those numbers and talk to a lawyer on either side

03:56:25  9   or both sides of the case, they'll pick up the phone, I

03:56:29 10   guarantee you, and they'll want to visit with you.  If you

03:56:31 11   don't want to call, you just don't call.  But to make it

03:56:37 12   more conducive to you doing it later, not today, and at

03:56:42 13   your own convenience, you'll have a representative cell

03:56:45 14   phone number.  And if you want to use it, use it.  If you

03:56:48 15   don't, don't.  Again, the decision is 100 percent strictly

03:56:53 16   up to you.

03:56:53 17        Also, ladies and gentlemen, since I've been on the

03:57:05 18   bench, I've followed the following practice.  Every time a

03:57:08 19   jury has returned a verdict and I've accepted a verdict and

03:57:11 20   the trial has come to a close like today, I have prepared a

03:57:16 21   personal letter of thanks to each of you, and I've prepared

03:57:19 22   a certificate from the Court thanking you and acknowledging

03:57:22 23   your service and sacrifice as jurors in this case.

03:57:26 24        There was a period of time where I came into the

03:57:29 25   jury room after each trial and asked the jury to meet me

03:57:33  1   there, and I handed out these certificates, and I shook

03:57:37  2   their hands and thanked them for their service

03:57:41  3   face-to-face, because I think what you've done warrants

03:57:43  4   that kind of special attention and special appreciation.

03:57:46  5          During the last year, I suspended that for a while

03:57:50  6   because of reasons you well understand with the pandemic.

03:57:54  7          With the fact that I've gotten both shots and I

03:57:58  8   suspect some of you have gotten shots and I'm going to wear

03:58:01  9   a mask, I'm going to restart the old process, and I'm going

03:58:06  10  to ask as a favor to me if as you leave the jury box,

03:58:10  11  instead of immediately exiting the courthouse, you will

03:58:13  12  wait in the jury room for just a minute and let me come in,

03:58:16  13  I'd like to hand each one of you your own letter and

03:58:19  14  certificate, and I'd like to thank you in person.  We may

03:58:23  15  not shake hands, but I'd like to look you in the eye and

03:58:27  16  say, thank you for your service, because what you have done

03:58:30  17  is very real and important public service.

03:58:33  18          In my opinion, it's the second highest form of

03:58:36  19  public service any American citizen can render.  And in a

03:58:41  20  very real way, what you've done this week has helped

03:58:44  21  strengthen and protect and defend our Constitution.  And I

03:58:48  22  think that warrants a special word of thanks and a personal

03:58:52  23  word of thanks.

03:58:53  24          So if you're willing to do that, I promise I won't

03:58:57  25  keep you long, but I'd like the privilege of thanking you

03:59:01   1   in person before you leave.

03:59:02   2          Counsel, the Court accepts the verdict of the

03:59:06   3   jury.  The Court discharges the jury from their service as

03:59:10   4   jurors in this case.  This completes the trial, and you are

03:59:15   5   excused.

03:59:16   6          Ladies and gentlemen, I'll meet you in the jury

03:59:18   7   room.

03:59:18   8          COURT SECURITY OFFICER:  All rise.

           9          (Court adjourned.)

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                    <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    <u>/S/ Shelly Holmes          </u>          <u>3/19/2021  </u>
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25