**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **PERSONALIZED MEDIA** | ) | |
| **COMMUNICATIONS, LLC,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:15-cv-01366-JRG-RSP** |
| | ) | |
| **APPLE INC.,** | ) | ███████████ |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**BENCH TRIAL MEMORANDUM**

Plaintiff and Counterclaim Defendant Personalized Media Communications, LLC

("PMC") and Defendant and Counterclaim Plaintiff Apple Inc. ("Apple"), by and through their

respective attorneys, pursuant to the Bench Trial Docket Control Order (Dkt. No. 616),

respectfully submit the following Bench Trial Memorandum.

I.  COUNSEL FOR THE PARTIES

Plaintiff:  S. Calvin Capshaw (State Bar No. 03788390)
Elizabeth L. DeRieux (State Bar No. 05770585)
CAPSHAW DERIEUX, LLP
114 E. Commerce Ave.
Gladewater, TX 75647
P:  (903) 845-5770
Email: ccapshaw@capshawlaw.com
Email: ederieux@capshawlaw.com

Douglas J. Kline
Kevin P. Martin
Lana S. Shiferman
J. Anthony Downs
Robert Frederickson, III
Sarah J. Fischer
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, Massachusetts 02210
P:  (617) 570-1000

Email: dkline@goodwinlaw.com
Email: kmartin@goodwinlaw.com
Email: lshiferman@goodwinlaw.com
Email: jdowns@goodwinlaw.com
Email: rfrederickson@goodwinlaw.com
Email: sfischer@goodwinlaw.com

Andrew Ong
GOODWIN PROCTER, LLP
601 Marshall St.
Redwood City, CA 94063
P: (650) 752-3100
Email: aong@goodwinlaw.com

Alexandra D. Valenti
Naomi Birbach
Autumn Soucy
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
P: (212) 813-8800
Email: avalenti@goodwinlaw.com
Email: nbirbach@goodwinlaw.com
Email: asoucy@goodwinlaw.com

Defendant:            Melissa R. Smith (State Bar No. 24001351)
                      GILLAM & SMITH LLP
                      303 S. Washington Avenue
                      Marshall, Texas 75670
                      P: (903) 934-8450
                      Email: melissa@gillamsmithlaw.com

                      Marcus E. Sernel, P.C.
                      Meredith Zinanni
                      Jacob Rambeau
                      KIRKLAND & ELLIS LLP
                      300 N. LaSalle Street
                      Chicago, Illinois 60654
                      P: (312) 862-2000
                      Email: marc.sernel@kirkland.com
                      Email: meredith.zinanni@kirkland.com
                      Email: jake.rambeau@kirkland.com

                      Gregory S. Arovas, P.C.
                      Robert A. Appleby

Alan Rabinowitz
Jonathan D. Brit
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
P: (212) 446-4800
Email: greg.arovas@kirkland.com
Email: rappleby@kirkland.com
Email: alan.rabinowitz@kirkland.com
Email: jonathan.brit@kirkland.com

Sean M. McEldowney
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue
Washington, D.C. 20004
P: (202) 389-5000
Email: sean.mceldowney@kirkland.com

Ellisen Shelton Turner, P.C.
KIRKLAND & ELLIS LLP
2049 Century Park East, 37th Floor
Los Angeles, CA 90067
P: (310) 552-4200
E-mail: ellisen.turner@kirkland.com

Luke L. Dauchot
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
P: (213) 680-8400
E-mail: luke.dauchot@kirkland.com

## II.   STATEMENT OF JURISDICTION

Plaintiff PMC brought this action under the patent laws of the United States, 35 U.S.C.

§§ 101 *et seq.*, against Apple for alleged infringement of claims 13-16 of U.S. Patent No.

8,191,091 (the "'091 patent").  This Court has jurisdiction over the subject matter of this action

under 28 U.S.C. §§ 1331, 1338(a), and the Federal Declaratory Judgment Act, 28 U.S.C.

§§ 2201-2202.  For the purpose of this action only, personal jurisdiction is not disputed.

## III.   CONTENTIONS OF THE PARTIES

### A.   Apple's Contentions

1.      Apple contends that claims 13-16 of the '091 patent are invalid and/or unenforceable for Obviousness-type Double Patenting.

2.      Apple contends that PMC's claim that Apple infringes claims 13-16 of the '091 patent are barred under the doctrine of prosecution laches.

3.      Apple contends that claims 13-16 of the '091 patent are unenforceable because they were obtained through inequitable conduct.

4.      Apple contends that PMC's claim that Apple infringes claims 13-16 of the '091 patent are barred under the doctrine of unclean hands.

### B.   PMC's Contentions

1.      PMC contends that claims 13-16 are not invalid nor unenforceable for Obviousness-type Double Patenting.

2.      PMC contends that its enforcement of claims 13-16 of the '091 patent against Apple is not barred under the doctrine of prosecution laches.

3.      PMC contends that its enforcement of claims 13-16 of the '091 patent against Apple is not barred under the doctrine of inequitable conduct, and that PMC did not commit inequitable conduct in the prosecution of its patents.

4.       PMC contends that its enforcement of claims 13-16 of the '091 patent against Apple is not barred under the doctrine of unclean hands, and that PMC does not have unclean hands.

## IV.   STIPULATIONS

1.      U.S. Patent No. 4,694,490 (the "'490 patent"), entitled "Signal Processing Apparatus and Methods," was issued by the United States Patent and Trademark Office ("USPTO") on September 15, 1987.

2.      The application that issued as the '490 patent was filed on November 3, 1981, and assigned application No. 06/317,510 (the "'510 application").

3.      The application that issued as the '490 patent was 44 pages long.

4.      PMC generally refers to the '490 patent as Harvey 1.

5.      U.S. Patent No. 4,704,725 (the "'725 patent"), entitled "Signal Processing Apparatus and Methods," was issued by the USPTO on November 3, 1987.

6.      The application that issued as the '725 patent was filed on February 14, 1986, and assigned application No. 06/829,531.

7.      The application that issued as the '725 patent was a continuation of the application filed on November 3, 1981, that later issued as the '490 patent.

8.      PMC generally refers to the '725 patent as Harvey 2.

9.      U.S. Patent No. 4,965,825 (the "'825 patent"), entitled "Signal Processing Apparatus and Methods," was issued by the United States Patent and Trademark Office on October 23, 1990.

10.     The application that issued as the '825 patent was filed on September 11, 1987, and assigned application No. 07/096,096 (the "'096 application").

11.     The application that issued as the '825 patent was 557 pages long.

12.     PMC generally refers to the '825 patent as Harvey 3.

13.     The application that issued as the '825 patent was a continuation-in-part of the application that led to the '725 patent, which was a continuation of the application that led to the '490 patent filed on November 3, 1981.

14.     U.S. Patent No. 5,109,414 (the "'414 patent"), entitled "Signal Processing Apparatus and Methods," was issued by the USPTO on April 28, 1992.

15.     The application that issued as the '414 patent was filed on September 25, 1990, and assigned application No. 07/588,126.

16.     The application that issued as the '414 patent was a continuation of the application that led to the '825 patent, which was a continuation-in-part of the application that led to the '725 patent, which was a continuation of the application that led to the '490 patent filed on November 3, 1981.

17.     PMC generally refers to the '414 patent as Harvey 4.

18.     U.S. Patent No. 5,233,654 (the "'654 patent"), entitled "Signal Processing Apparatus and Methods," was issued by the USPTO on August 3, 1993.

19.     The application that issued as the '654 patent was filed on March 10, 1992, and assigned application No. 07/849,226.

20.     The application that issued as the '654 patent was a continuation of the application that led to the '414 patent, which was a continuation of the application that led to the '825 patent, which was a continuation-in-part of the application that led to the '725 patent, which was a continuation of the application that led to the '490 patent filed on November 3, 1981.

21.     PMC generally refers to the '654 patent as Harvey 5.

22.     U.S. Patent No. 5,335,277 (the "'277 patent"), entitled "Signal Processing Apparatus and Methods," was issued by the USPTO on August 2, 1994.

23.     The application that issued as the '277 patent was filed on May 3, 1993, and assigned application No. 08/056,501.

24.     The application that issued as the '277 patent was a continuation of the application that led to the '654 patent, which was a continuation of the application that led to the '414 patent, which was a continuation of the application that led to the '825 patent, which was a continuation-in-part of the application that led to the '725 patent, which was a continuation of the application that led to the '490 patent filed on November 3, 1981.

25.     PMC generally refers to the '277 patent as Harvey 6.

26.     U.S. Patent No. 7,856,650 (the "'650 patent"), entitled "Signal Processing Apparatus and Methods," was issued by the USPTO on December 21, 2010.

27.     The application that issued as the '650 patent was filed on August 30, 1993, and assigned application No. 08/113,329.

28.     The application that issued as the '650 patent was a continuation of the application that led to the '277 patent, which was a continuation of the application that led to the '654 patent, which was a continuation of the application that led to the '414 patent, which was a continuation of the application that led to the '825 patent, which was a continuation-in-part of the application that led to the '725 patent, which was a continuation of the application that led to the '490 patent filed on November 3, 1981.

29.     Between March 2, 1995, and June 7, 1995, in advance of the GATT change in patent term rules, PMC filed 328 applications claiming priority to either the '510 application or the '096 application.  Each of these 328 applications was filed with a single claim to a "method of controlling the communication of television programming at a television transmission

station…."  PMC contemporaneously or subsequently filed preliminary amendments that added additional claims and limitations in these applications.

30.     Of the 328 patent applications PMC filed between March 2 and June 7, 1995, 326 of them were filed between May 9 and June 7, 1995.

31.     In a press release dated June 28, 1995, the PTO stated that it had "received and processed over 50,000 applications for patents during the nine days prior to the June 8th deadline when the Uruguay Round of the General Agreement on Tariffs and Trade/Trade Related Aspects of Intellectual Property (GATT/TR_PS) agreement provisions took effect," which was an "increase of approximately 45,000 applications above what normally would have been filed during the period."  The PTO stated that, in anticipation of an increase in filings before June 8, 1995, it had "prepared a series of contingency plans to effectively respond to a variety of different scenarios," and the actual increase in applications was "well within projected planning levels."  The PTO further stated that a working group was "working on ensuring that each pre-deadline application is considered as rapidly as possible without jeopardizing the post-deadline patent pendency."

32.     In the period between 1996 and 1997, PMC responded to Examiner's Actions with respect to all the related applications.  The common rejection imposed by the USPTO in this time period was double patenting on the grounds articulated in *In re: Schneller*, 397 F.2d 350 (C.C.P.A. 1968).

33.     Between 1997 and 1998, the USPTO issued Suspensions of Examinations in the majority of PMC's applications.

34.     The '091 patent, titled "Signal Processing Apparatus and Methods," was issued by the United States Patent and Trademark Office on May 29, 2012.

35.     The application that issued as the '091 patent was filed on June 7, 1995, and assigned application No. 08/485,507 ("the '507 application").

36.     The application that issued as the '091 patent was a continuation of the application that led to the '650 patent, which was a continuation of the application that led to the '277 patent, which was a continuation of the application that led to the '654 patent, which was a continuation of the application that led to the '414 patent, which was a continuation of the application that led to the '825 patent, which was a continuation-in-part of the application that led to the '725 patent, which was a continuation of the application that led to the '490 patent filed on November 3, 1981.

37.     The named inventors of the '091 patent are John Christopher Harvey and James William Cuddihy.

38.     PMC filed a preliminary amendment to the '507 application on June 7, 1995, canceling claim 1 and adding claim 2.

39.     PMC filed a supplemental preliminary amendment to the '507 application on June 5, 1996, canceling claim 2 and adding claims 3-9.

40.     The examiner of the '507 application issued his first office action on December 10, 1996.

41.     PMC responded to the first office action for the '507 application on June 10, 1997.

42.     On March 7, 2000, PMC filed a petition under 37 C.F.R. §1.181 in the prosecution of the 08/470,571 application, *inter alia*, to invoke the supervisory authority of the USPTO Director over the relevant examiners to require the withdrawal of the Administrative Requirement.  No decision was ever issued on this petition.

43.     PMC amended claims 3-9 and added claims 10-32 in its June 10, 1997 response to the first office action.

44.     On February 19, 1998, PMC sent a Status Inquiry Letter to the USPTO that request that the USPTO "[p]lease advise the undersigned of the present status of the ['507 application]."

45.     The examiner of the '507 application issued a final office action on July 7, 1998. In that office action, the examiner imposed a so-called "Administrative Requirement," which instructed PMC to either: "(1) file terminal disclaimers in each of the related 329 applications terminally disclaiming each of the other 329 applications, or; (2) provide an affidavit attesting to the fact that all claims in the 329 applications have been reviewed by applicant and that no conflicting claims exists between the applications. Applicant should provide all relevant factual information including the specific steps taken to insure that no conflicting claims exist between the applications, or; (3) resolve all conflicts between claims in the above identified 329 applications by identifying how all the claims in the instant application are distinct and separate inventions from all the claims in the above identified 329 applications."

46.     In a May 9, 2000 Supplemental Amendment, PMC cancelled all pending claims of the '507 application except for claim 3, and amended claim 3.  PMC requested that "in consonance with the agreement between Applicants and the Office," certain claims in the '507 application would be transferred to application, Serial No. 08/475,145 (the "'145 application") for further prosecution and "that further prosecution of the instant application be held in abeyance pending further action in App. Ser. No. 08/474,145."

47.     The examiner of another application (No. 08/449,413 (the "'413 application)) issued a Notice of Abandonment on January 18, 2001 asserting numerous allegations directed to applicants' and applicants' counsels' conduct in prosecuting the '413 and other applications.

48.     PMC responded to the Notice of Abandonment on March 13, 2001, with a Petition requesting that the Notice of Abandonment be withdrawn as improper and untimely. The supervisory patent examiner held an interview on March 5, 2002.  The interview summary states that "The Supervisory Patent Examiner has reviewed the attachments mailed with the Notice of Abandonment dated January 18, 2001.  The attachments appear to contain numerous allegations directed to applicants' and applicants' counsels' conduct in prosecuting the instant and related applications.  In accordance with Section 2010 of the MPEP, the USPTO has not conducted any investigation of the allegations set forth in the attachments.  Accordingly, the Supervisory Patent Examiner has determined that the allegations made in and the conclusions drawn from the attachments are unrelated to the issue of patentability of the subject matter claimed in applicants' pending applications and were not made pursuant to a duty of the Examiner imposed by law.  Any inconvenience to applicants is regretted.  No further action is required to the Notice of Abandonment in this application."

49.     The examiner of the '507 application responded to PMC's May 9, 2000 Supplemental Amendment on March 21, 2001, asserting that PMC had not complied with the Administrative Requirement.

50.     PMC responded to the examiner's March 21, 2001 filing on August 21, 2001.  In its response, PMC explained that there was "a series of interviews with PTO management. During these interviews, senior PTO management suggested that further examination of applicants' related applications could be expedited by reducing the number of pending

applications.  In response to this suggestion, applicants agreed to consolidate the claims into 56 subject matter groups. The PTO then indicated that the claims in each group are not patentably distinct and that it would be proper and desirable to examine all of the claims together. Accordingly, for each subject matter group the applications were separated based on whether priority was claimed to the 1981 Application or the 1987 Application. The claims from all applications in a group with the same priority claim were added to a single application designated an 'A' Application. There are currently 79 'A' applications pending.  The remaining applications were abandoned with the exception of one 'B' Application corresponding to each 'A' Application.  According to this arrangement, the PTO agreed to hold prosecution of the 'B' applications in abeyance pending final action in the corresponding 'A' applications.  Applicants and the PTO agreed that, in order to expedite allowance of patentable claims, if there were claims that remained finally rejected in an application, those claims were to be moved to the 'B' Application for further action, and the 'A' Application would be allowed to issue. This agreed upon process was diagramed in a flowchart produced at an interview with Examiner Faile on February 25, 1999."

51.     The '145 application was an "A" application.  The '507 application was a "B" application.

52.     The Notice of Abandonment was formally withdrawn by a Petition Decision issued April 18, 2002, that stated that "the notice of Abandonment is hereby **vacated** and the holding of abandonment **withdrawn**." (emphasis original)

53.     On June 18, 2002, the examiner stated "as per the consolidated agreement between the applicants and the PTO, the prosecution on merits of the instant B application is suspended and held in abeyance pending the outcome of the corresponding "A" application.  Ex

parte prosecution is SUSPENDED FOR A PERIOD OF SIX MONTHS from the date of this letter. Upon expiration of the period of suspension, applicant should make an inquiry as to the status of the application."

54.    Between April 2003 and January 2004, the USPTO granted eleven reexaminations on seven of PMC's then issued patents.

55.    On January 6, 2005, the examiner suspended prosecution of the '507 application for six months, stating that PMC "should make an inquiry as to the status of the application" when that six month period expired.

56.    On March 7, 2005, PMC filed a Petition to the Director Under 37 C.F.R. § 1.181, requesting "the Director of Patents and Trademarks ("Director") exercise his supervisory authority by (1) exercising authority over the Examiner responsible for this application with respect to a Notion of Suspension mailed January 6, 2005, in the [Application No. 08/459,788] and other related applications, and (2) exercising authority over the Group Director responsible for supervising the Examiner assigned to the present application and other examiners in Technology Center 2600 assigned to examine other applications related to the present application have an identical disclosure to this application.  Applicants make this request because of the PTO's failure to properly address these applications over their ten (10) year pendency."

57.    On August 4, 2005, PMC filed a Petition to the Director Under 37 C.F.R. § 1.181, requesting "the Director of Patents and Trademarks ("Director") for the U.S. Patent and Trademark Office ("PTO") exercise his supervisory authority of the Examiner and require him to produce an Examiner's Answer in response to the Appeal Brief filed February 8, 2005, in [Application No. 08/470,571].  A petition requesting similar relief is being simultaneously filed in U.S. Patent Application Serial No. 08/487,526."

13

58.     On July 19, 2007, Mr. Scott, on behalf of PMC, submitted a letter to the Honorable Jon W. Dudas, the Under Secretary of Commerce for Intellectual Property and Director of the USPTO, "to request an advisory opinion regarding the meaning of the term 'special dispatch,' used in 35 U.S.C. § 305 to govern the circumstances for the conduct of reexamination proceedings by the U.S. Patent and Trademark Office."  The letter stated that "[t]he Patent Owner would like to bring to your attention the continuing delay occurring in the above-enumerated reexaminations."

59.     On October 1, 2007, the examiner suspended prosecution of the '507 application for six months, stating that PMC "should make an inquiry as to the status of the application" when that six month period expired.

60.     On July 24, 2008, the examiner suspended prosecution of the '507 application for six months, stating that PMC "should make an inquiry as to the status of the application" when that six month period expired.

61.     PMC filed an amendment to the claims in the '507 application on April 11, 2011, adding new claims 33-63 and canceling claim 3.

62.     On September 5, 1995, PMC filed in the '507 application a 19-page Information Disclosure Statement containing approximately 348 references.

63.     On December 5, 1995, PMC filed in the '507 application a 63-page Information Disclosure Statement containing approximately 819 references.

64.     PMC's December 5, 1995, Information Disclosure Statement in the '507 application that stated "this application only claims priority to the September 11, 1987 filing date."

65.     On December 15, 1995, PMC filed in the '507 application a 20-page Information Disclosure Statement containing approximately 348 references.

66.     On February 5, 1996, PMC filed in the '507 application a 9-page Information Disclosure Statement containing approximately 126 references.

67.     On April 4, 1996, PMC filed in the '507 application a 34-page Information Disclosure Statement containing approximately 351 references.

68.     On April 7, 1997, PMC filed in the '507 application an 18-page Information Disclosure Statement containing approximately 645 references.

69.     On April 30, 1999, PMC filed in the '507 application a 1-page Information Disclosure Statement containing approximately 3 references.

70.     The '145 application issued as U.S. Patent No. 7,992,169 on August 2, 2011.

71.     On December 22, 2011, PMC filed in the '507 application an Information Disclosure Statement referencing other proceedings involving PMC's issued patents and pending patent applications.

72.     On March 6, 2012, PMC filed in the '507 application a 70-page Information Disclosure Statement containing approximately 1,762 references.

73.     Apple began developing the FairPlay system in the early 2000s.

74.     The FairPlay Next Generation document, which was representative of the technology in the FairPlay system found to infringe the '091 patent in the March 2021 jury trial, was created by May 2005.

75.     The FairPlay system found to infringe the '091 patent in the March 2021 jury trial is used with the iTunes Music Store and Apple's App Store.

76.     The iTunes Music Store launched in 2003.

77.     Apple's App Store launched in 2007.

78.     The FairPlay system found to infringe the '091 patent in the March 2021 jury trial has protected content downloaded from Apple's iTunes and App Stores since no later than 2005 and 2007, respectively.

79.     The accused functionalities of FairPlay have been the same for the entire period from May 29, 2012 until present.

80.     On May 14, 2008, Gerald Holtzman, then General Counsel of PMC, emailed Daniel Cooperman at Apple, regarding PMC's patent portfolio.  Mr. Holtzman "attached a summary of PMC's portfolio which explains some of the opportunities the PMC IP offers."  Mr. Holtzman also stated that "[b]y way of very limited example, in the context of the internet, the IP covers the delivery of content requested by a consumer that has been supplemented with targeted, personalized or profiled advertising content.  Also covered is a multimedia presentation based on media received from multiple differed sources, such as integration of content from a webpage hosted by a social networking cite with a video provided from a second source such as YouTube, Facebook or MySpace."  Mr. Holtzman also attached a document entitled "PMC – The Company," which mentioned, e.g., "controlling the cablecast of programming . . . based on control signals received with content," "selective control of the decryption of programming that may be delivered over a cable system or an IPTV environment," and with respect to one application, stating that "[t]hese claims address the transmission of access control signal through the content distribution system," and "[t]he selective distribution of decryption keys is covered by these claims"

81.     On August 4, 2009, Mr. Holtzman emailed Mr. Cooperman, stating that "[t]wo new patents with 1981 priority to issue shortly . . . with broad coverage of revenue models

operating on digital television and the internet with a term through 2026" and that "[f]ifty more comprehensive pending, most with =[sic]1981 priority (some with 1987), still in prosecution that when issued =[sic]will have 17 year terms."  Mr. Holtzman also attached a document entitled "OVERVIEW OF PMC IP," stating that one category of applications "covers technology for controlling consumers' access to content that is delivered from servers or other transmission devices.  For example, the claims cover specialized decryption techniques and other ways of restricting access."  It went on to state that "the PMC patents cover the control of the transmission of video programming and various methods of delivering encrypted video programming," and that pending applications "cover further methods for transmitting video in encrypted transmissions."

82.     On October 8, 2009, Edward W. Scott, IV, at Apple, emailed Mr. Holtzman, stating "I apologize for not getting back to you, I realized belatedly [that I] did not have the materials to review, so can you please forward them to me."  The next day, Mr. Holtzman replied to Mr. Scott's email with summary of PMC's patent portfolio, including a summary of the categories PMC and the USPTO had used for examining PMC's patent applications.  The email described the use of "decryption methods" for managing content.

83.     On October 29, 2009, Mr. Scott wrote back to Mr. Holtzman asking "Your write-up describes several pending patent applications, but I have not received any details.  How do I get this information?"  Mr. Holtzman responded the next day, stating "[y]our email yesterday requested details concerning PMC's pending patent applications" And providing several charts and summaries of PMC's then pending applications.  Mr. Holtzman included a list of "Priority Applications" that included "Application No.: 08/113,329 filed August 30, 1993 as continuation of 08/056,501 Remains pending as HEAD 81 (Group 4)."  Application No. 08/113,329 (the

"'329 application") is the immediate parent of the '507 application that issued as the '091 patent.
The '329 application is the immediate parent of all 328 applications PMC filed in 1995.

84.     On January 28, 2010, Mr. Holtzman wrote to Mr. Scott, "attaching a summary of
each of the 55 pending applications which are beginning to issue as patents (with either 1981 or
1987 priority)."  That chart contained an entry for the '329 application.

85.     On April 8, 2010, Mr. Holtzman and Boyd Lemna from PMC met with Apple in
Cupertino, CA to discuss PMC's portfolio.

86.     On April 12, 2010, Mr. Holtzman emailed Mr. Scott and Boris Teksler at Apple,
regarding "PMC and Apple: Meaning of Control Signals in the PMC Claims."  In his email, Mr.
Holtzman states "[t]he portfolio offers no generic definition of 'control signal'" and that "[a]s
you will find your deeper diligence, the PMC use and meaning of control signals has been
thoroughly reviewed and approved in PTO examination." Mr. Holtzman went on to note that
"[a]nother example is the 'instruct-to-decrypt' signal found in several claims of Patent
5,335,277, such as claim 19, which instructs the selected decryptor to decrypt the relevant
portion of the transmission."  Mr. Holtzman concluded by offering to provide additional
information:  "We'll be in touch shortly with additional claims from our new patents for your
review.  Let me know if there's any other information that would be useful to you in the
meantime."

87.     On July 19, 2011, Mr. Holtzman sent an email to Patrick Murphy at Apple, stating
"[f]urther to our licensing discussions, and as you requested, we have completed five claim
charts to provide Apple with insight regarding how Apple products and services use the PMC
portfolio."  Mr. Holtzman also explained that "[t]he provision of programming such as music,
TV shows and movies through the iTunes Store uses encrypted transmissions that are controlled

in the manner claimed" by one issued patent, and that another issued patent covers "secure transmission of data such as that occurring with the digital rights management techniques used by iTunes and iCloud."  The '091 patent, which had not issued yet, was not one of the five patents for which PMC provided claim charts.

88.    On September 11, 2013, Mr. Holtzman met with Jayna Whitt and Heather Mewes from Apple, regarding PMC's patent portfolio.

89.    On October 22, 2013, Mr. Holtzman emailed Ms. Whitt and Ms. Mewes, to offer "additional information for you and others to consider when considering the relevance and value of the PMC/Harvey patent portfolio to Apple."  Mr. Holtzman provided specification citations regarding how PMC's patent portfolio applied to various portions of the internet, including Apple's App Store/iTunes.

90.    The specification of the '091 patent is essentially the same as the specification of the '825 patent, and was first published on October 23, 1990.

91.    Apple did not present any defenses under 35 U.S.C. § 112 at trial.

92.    Apple did not present any defenses under 35 U.S.C. §§ 102, 103.

93.    The Court held prior to trial that the asserted claims of the '091 patent are not invalid under 35 U.S.C. § 101.

94.    Apple challenged the claims of the '091 patent in a co-pending IPR.  In March 2020, the Federal Circuit held that the claims at issue in this proceeding are not invalid.

95.    Six PMC patents had issued by the end of 1994.

96.    As of April 22, 2020, a total of 101 patents had issued to PMC claiming priority to its 1981 and 1987 specifications.

97.     PMC did not send or specifically identify the '091 patent to Apple prior to filing this lawsuit in July 2015.

## V.     CONTESTED ISSUES OF FACT AND LAW

### A.     Apple's Contested Issues Fact and Law

1.     Whether claims 13-16 of the '091 patent, as construed by this Court, are obvious in view of one or more claims of the '277 patent, either alone or in combination with the prior art.

2.     Whether the '091 patent issued after an unreasonable and unexplained delay in prosecution due to PMC's misuse of the patent system, and Apple was prejudiced by PMC's unreasonable and unexplained delay in prosecuting the '091 patent, demonstrated by a preponderance of the evidence, such that the '091 patent is unenforceable due to prosecution laches.

3.     Whether PMC made an affirmative misrepresentation of fact, failed to disclose material information, or submitted false material information to the Patent Office during prosecution of the '091 patent, and did so with the intent to deceive the Patent Office, such that the '091 patent is unenforceable due to inequitable conduct.

4.     Whether PMC engaged in misconduct regarding the '091 patent, affecting the equitable relationship between PMC and Apple and barring PMC from enforcing the '091 patent under the doctrine of unclean hands.

### B.     PMC's Contested Issues of Fact and Law

1.     With respect to Apple's obviousness-type double patenting defense, whether Apple has failed to show, by clear and convincing evidence, that the asserted claims of the '091 patent are not patentably distinct from one or more claims of the '277 patent.

2.     With respect to Apple's inequitable conduct defense, whether Apple has failed to show, by clear and convincing evidence, that PMC acted knowingly and deliberately with the

purpose of defrauding the PTO and the courts during prosecution of the '091 patent, that PMC in fact engaged in inequitable conduct during prosecution of the '091 patent, or that such conduct was material to issuance of the '091 patent.

3.      With respect to Apple's inequitable conduct defense, whether the alleged inequitable conduct, even if proven, warrants a holding that the '091 patent is unenforceable.

4.      With respect to Apple's prosecution laches defense, whether Apple has failed to show, by clear and convincing evidence, that PMC was solely responsible for an unreasonable and unexplained delay in prosecution of the '091 patent that constitutes an egregious misuse of the statutory patent system.

5.      With respect to Apple's prosecution laches defenses, whether Apple has failed to show, by clear and convincing evidence, that it developed intervening rights during the period of alleged delay, and was prejudiced by the delay.

6.      Whether Apple's unclean hands defense is unavailable as a matter of law to the extent it is based on alleged misconduct during prosecution of the '091 patent.

7.      With respect to Apple's unclean hands defense, whether Apple has failed to show, by clear and convincing evidence, that PMC engaged in unconscionable conduct with respect to the '091 patent that shocks the moral sensibilities of the judge and was offensive to the dictates of natural justice, having an immediate and necessary relation to the relief PMC seeks in this lawsuit, and that Apple was prejudiced as a result.

## VI.    LIST OF WITNESSES

1.     Apple's Bench Trial Witness List is attached hereto as Exhibit A.

2.     PMC's Bench Trial Witness List is attached hereto as Exhibit B.

3.     Apple's Bench Trial Designations (Trial and Deposition Testimony), including PMCs Objections and Counter-designations and Apple's Objections to PMC's Counter-Designations, are attached hereto as Exhibit C.

4.     PMC's Bench Trial Designations (Trial and Deposition Testimony), including Apple's Objections and Counter-designations and PMC Objections to Apple's Counter-Designations, are attached hereto as Exhibit D.

## VII.   LIST OF EXHIBITS

1.     Apple's Exhibit List with PMC's Objections is attached hereto as Exhibit E.

2.     PMC's Exhibit List with Apple's Objections is attached hereto as Exhibit F.

## VIII.  PROBABLE LENGTH OF BENCH TRIAL

PMC and Apple request 4 hours per side for the bench trial on Apple's equitable defenses (prosecution laches, unclean hands, inequitable conduct, and obviousness type double patenting) and unenforceability counterclaims.  The parties agree deposition excerpts not previously played or read into the record during the jury trial may be offered in the bench trial without necessarily playing or reading those excerpts during the bench trial.  The parties continue to meet and confer regarding how the designation of such designation deposition testimony will be counted against the offering parties' time allotment, with counters similarly charged against the other party.  Either side may rely on testimony from the jury trial without it counting against their time.

22

Approved as to form and substance:

Dated:  May 28, 2021

| | |
|---|---|
| */s/ Sarah J. Fischer* | /s/ *Melissa R. Smith* |
| S. Calvin Capshaw (State Bar No. 03788390) | Melissa R. Smith (State Bar No. 24001351) |
| Elizabeth L. DeRieux | GILLAM & SMITH LLP |
|   (State Bar No. 05770585) | 303 S. Washington Avenue |
| CAPSHAW DERIEUX, LLP | Marshall, Texas 75670 |
| 114 E. Commerce Ave. | P: (903) 934-8450 |
| Gladewater, TX 75647 | Email: melissa@gillamsmithlaw.com |
| P:  (903) 845-5770 | |
| Email: ccapshaw@capshawlaw.com | Marcus E. Sernel, P.C. |
| Email: ederieux@capshawlaw.com | Meredith Zinanni |
| | Jacob Rambeau |
| Douglas J. Kline | KIRKLAND & ELLIS LLP |
| Kevin Martin | 300 N. LaSalle Street |
| Lana S. Shiferman | Chicago, Illinois 60654 |
| J. Anthony Downs | P: (312) 862-2000 |
| Robert Frederickson, III | Email: marc.sernel@kirkland.com |
| Sarah J. Fischer | Email: meredith.zinanni@kirkland.com |
| GOODWIN PROCTER, LLP | Email: jake.rambeau@kirkland.com |
| 100 Northern Avenue | |
| Boston, Massachusetts 02210 | Gregory S. Arovas, P.C. |
| P:  (617) 570-1000 | Robert A. Appleby |
| Email: dkline@goodwinlaw.com | Alan Rabinowitz |
| Email: kmartin@goodwinlaw.com | Jonathan D. Brit |
| Email: lshiferman@goodwinlaw.com | KIRKLAND & ELLIS LLP |
| Email: jdowns@goodwinlaw.com | 601 Lexington Avenue |
| Email: rfrederickson@goodwinlaw.com | New York, New York 10022 |
| Email: sfischer@goodwinlaw.com | P: (212) 446-4800 |
| | Email: greg.arovas@kirkland.com |
| Andrew Ong | Email: rappleby@kirkland.com |
| GOODWIN PROCTER, LLP | Email: alan.rabinowitz@kirkland.com |
| 601 Marshall St. | Email: jonathan.brit@kirkland.com |
| Redwood City, CA 94063 | |
| P: (650) 752-3100 | Sean M. McEldowney |
| Email:  aong@goodwinlaw.com | KIRKLAND & ELLIS LLP |
| | 1301 Pennsylvania Avenue |
| Alexandra Valenti | Washington, D.C. 20004 |
| Naomi Birbach | P: (202) 389-5000 |
| Autumn Soucy | Email: sean.mceldowney@kirkland.com |
| GOODWIN PROCTER LLP | |
| The New York Times Building | Ellisen Shelton Turner, P.C. |
| 620 Eighth Avenue | KIRKLAND & ELLIS LLP |
| New York, NY 10018 | 2049 Century Park East, 37th Floor |

P: (212) 813-8800
Email: avalenti@goodwinlaw.com
Email: nbirbach@goodwinlaw.com
Email: asoucy@goodwinlaw.com

Los Angeles, CA 90067
P: (310) 552-4200
E-mail: ellisen.turner@kirkland.com

Luke L. Dauchot
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
P: (213) 680-8400
E-mail: luke.dauchot@kirkland.com

*Attorneys for Plaintiff*
*Personalized Media Communications, LLC*

*Attorneys for Defendant Apple Inc.*

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this motion was served on all counsel who have consented to electronic service on May 28, 2021. Local Rule CV-5(a)(3)(A).

*/s/ Melissa R. Smith*

