# EXHIBIT 2



DDX-2-Scott.0001



DDX-2-Scott.0002





DDX-2-Scott.0004



DDX-2-Scott.0005



RECE**™** ED OCT 2 3. 1990

JCH Draft 10/22/90
[file name: Patents.1]

PATENTS AND OTHER INTELLECTUAL PROPERTY PROTECTION

DTX-89.0001



DTX-89

DDX-2-Scott.0006

==The Company's first patent application (the "1981 Application") was filed in the U.S. Patent and Trademark Office on Nov. 3, 1981.==  The 1981 Application disclosed many inventions.  To date, two patents have resulted: U.S. Patents No. 4,694,490 and 4,704,725.  The Patent Office's examination of these initial patents was very thorough.  Nearly six years elapsed between the 1981 filing and the issuance of the first patent in 1987.  (The average patent issues in thirty months.) Before allowing the first patent, the Patent Office examiner conducted four separate searches of the Patent Office files.  (The average patent issues on the basis of one search.)

DTX-89.0001



DTX-89

DDX-2-Scott.0007

The Company's first patent application (the "1981 Application") was filed in the U.S. Patent and Trademark Office on Nov. 3, 1981. The 1981 Application disclosed many inventions. To date, two patents have resulted: U.S. Patents No. 4,694,490 and 4,704,725. The Patent Office's examination of these initial patents was very thorough. Nearly six years elapsed between the 1981 filing and the issuance of the first patent in 1987. (The average patent issues in thirty months.) Before allowing the first patent, the Patent Office examiner conducted four separate searches of the Patent Office files. (The average patent issues on the basis of one search.)

DTX-89.0001



DTX-89

==On Sept. 11, 1987, an additional application (the "1987==
Application"), which totaled 557 pages, was filed in the U.S.
Patent Office to elaborate on and extend the inventions
disclosed in the 1981 Application.  The 1987 Application was
filed as a "continuation-in-part" to the 1981 Application.
This means that inventions described in the 1987 Application
that were previously disclosed in the 1981 Application--and
many were--take the precedence of the 1981 filing date in the
United States.  ==To date, one patent has resulted: U.S. Patent==
==No. 4,965,852== which issued on Oct, 23, 1990.



DTX-89.0001



DTX-89

DDX-2-Scott.0009

The Company believes that patent protection is important to its business. ==To date the Company has received three U.S. patents.== These cover focal aspects of PTV, PPrint, PRadio, and the Company's broadcast-oriented parallel processing and communications metering technologies. Other U.S. and foreign patents are pending.

DTX-89.0001



DTX-89

DDX-2-Scott.0010

The Company believes that patent protection is important to its business. To date the Company has received three U.S. patents. These cover focal aspects of PTV, PPrint, PRadio, and the Company's broadcast-oriented parallel processing and communications metering technologies. Other U.S. and foreign patents are pending.

\* \* \*

Further patent protection is pending. The Company believes that it is likely to receive many more U.S. patents covering inventions disclosed in the 1981 and 1987 Applications.



DTX-89.0001



DTX-89

DDX-2-Scott.0011



DDX-2-Scott.0012

## Pending U.S. and International Patents

Besides the three U.S. patents described above, extensive additional patent protection is sought in the United States and internationally. In prosecuting its pending rights in the U.S. Patent Office and outside the U.S., the Company expects to pursue different strategies.

## Strategy for Prosecuting Pending Patents in the United States

In the case of patent applications, such as the 1981 and 1987 Applications, that disclose more than one invention, U.S. patent practice permits serial prosecution of the separate inventions. Doing so can result in a portfolio of patent coverage that provides protection for considerably longer than the seventeen year term of the first patent to issue.

DTX-89.0006



DTX-89

DDX-2-Scott.0013

## Pending U.S. and International Patents

Besides the three U.S. patents described above, extensive additional patent protection is sought in the United States and internationally. In prosecuting its pending rights in the U.S. Patent Office and outside the U.S., the Company expects to pursue different strategies.

## Strategy for Prosecuting Pending Patents in the United States

In the case of patent applications, such as the 1981 and 1987 Applications, that disclose more than one invention, U.S. patent practice permits serial prosecution of the separate inventions. Doing so can result in a portfolio of patent coverage that provides protection for considerably longer than the seventeen year term of the first patent to issue.

DTX-89.0006



DTX-89



DTX-89

## Pending U.S. and International Patents

Besides the three U.S. patents described above, extensive additional patent protection is sought in the United States and internationally. In prosecuting its pending rights in the U.S. Patent Office and outside the U.S., the Company expects to pursue different strategies.

## Strategy for Prosecuting Pending Patents in the United States

In the case of patent applications, such as the 1981 and 1987 Applications, that disclose more than one invention, U.S. patent practice permits serial prosecution of the separate inventions. Doing so can result in a portfolio of patent coverage that provides protection for considerably longer than the seventeen year term of the first patent to issue.

DTX-89.0006

DDX-2-Scott.0015

## Strategy for Prosecuting Pending Patents in the United States

\*          \*          \*

By prosecuting the separate inventions serially rather than simultaneously, the patent owner achieves a portfolio of patent coverage that provides protection for considerably longer than seventeen years because the the various patents issue gradually over time and the seventeen term of each patent begins on its issue date.

DTX-89.0006-7



DTX-89

DDX-2-Scott.0016

## Strategy for Prosecuting Pending Patents in the United States

\*          \*          \*

**The Company** believes that it can continue to prosecute broad claims on all its technologies, including PTV, PPrint, PRadio, and its communications metering and broadcast-oriented parallel processing systems, for years to come. **Its strategy is to prosecute coverage on its technologies deliberately over time in such a way that broad coverage is in effect at any given time while the duration of coverage is prolonged as long as possible.**



DTX-89.0006-7



DTX-89

DDX-2-Scott.0017

**Related U.S. Application Data**

(7) Continuation of application No. 08/113,329, filed on Aug. 30, 1993, now Pat. No. 7,856,650, which is a

(6) continuation of application No. 08/056,501, filed on May 3, 1993, now Pat. No. 5,335,277, which is a

(5) continuation of application No. 07/849,226, filed on Mar. 10, 1992, now Pat. No. 5,233,654, which is a

(4) continuation of application No. 07/588,126, filed on Sep. 25, 1990, now Pat. No. 5,109,414, which is a

(3) continuation of application No. 07/096,096, filed on Sep. 11, 1987, now Pat. No. 4,965,825, which is a

(2) continuation-in-part of application No. 06/829,531, filed on Feb. 14, 1986, now Pat. No. 4,704,725, which

(1) is a continuation of application No. 06/317,510, filed on Nov. 3, 1981, now Pat. No. 4,694,490.

DTX-3 ('091 Patent), Claim 13

THE

# Personalized Mass Media

## CORPORATION

### BROADCASTING, COMPUTING & INFORMATION METERING TECHNOLOGIES

## BUSINESS PLAN 1991

DTX-90.0001



DTX-90

DDX-2-Scott.0019

## MARKET DEVELOPMENT STRATEGY

The inventions, technologies and concepts at the core of PMM communications are expected to serve a very wide range of markets and applications. The potential is, in fact, so diverse that considerable care has to be exercised in developing markets so that the results are consistent with the start-up nature of PMMC and a realization of the full value on the investments made to get the venture underway. The specific elements of this strategy include the following.

DTX-90.0025



DTX-90

- **A core element of the ongoing strategy is to develop and secure a strong proprietary position.** The parent company, PMMC, is to be primarily a licensing company and its success will depend on the strengths and breadth of its intellectual and proprietary assets. The Company believes that the combination of patents and copyrights will provide an enduring intellectual property position. The intellectual property portfolio will include:

  - Current and pending patents;

  - Future patents covering new technologies as they emerge;

  - Copyrights on receiver system firmware, software, and data base designs;

DTX-90.0025



DTX-90

- A core element of the ongoing strategy is to develop and secure a strong proprietary position. ==The parent company, PMMC, is to be primarily a licensing company and its success will depend on the strengths and breadth of its intellectual and proprietary assets.== The Company believes that the combination of patents and copyrights will provide an enduring intellectual property position. The intellectual property portfolio will include:

  - Current and pending patents;

  - Future patents covering new technologies as they emerge;

  - Copyrights on receiver system firmware, software, and data base designs;

DTX-90.0025



DTX-90

- A core element of the ongoing strategy is to develop and secure a strong proprietary position. The parent company, PMMC, is to be primarily a licensing company and its success will depend on the strengths and breadth of its intellectual and proprietary assets. The Company believes that the combination of patents and copyrights will provide an enduring intellectual property position. The intellectual property portfolio will include:

  -  Current and pending patents;

  - Future patents covering new technologies as they emerge;

  - Copyrights on receiver system firmware, software, and data base designs;

DTX-90.0025



DTX-90

- A core element of the ongoing strategy is to develop and secure a strong proprietary position. The parent company, PMMC, is to be primarily a licensing company and its success will depend on the strengths and breadth of its intellectual and proprietary assets. The Company believes that the combination of patents and copyrights will provide an enduring intellectual property position. ==The intellectual property portfolio will include:==

  - Current and pending patents;

  - ==Future patents covering new technologies as they emerge;==

  - Copyrights on receiver system firmware, software, and data base designs;

DTX-90.0025



DTX-90

PMMC. **PMMC will** remain an independent company, retaining ownership of the PMM patents and working to **gain further patent coverage in this field.** PMMC's primary business functions are to develop, maintain and enforce technical standards for PMM services, software, and hardware and to license the proprietary rights associated with PMM communications. **With RESOURCE, PMMC will build a strong proprietary position, intended to endure for 30-50 years.**

DTX-90.0022



DTX-90

DDX-2-Scott.0025

# AN INTRODUCTION TO

# THE PERSONALIZED MASS MEDIA CORPORATION

## APRIL, 1992

### CONFIDENTIAL BUSINESS INFORMATION

©1992 the Personalized Mass Media Corporation
All Rights Reserved

DTX-1000.0001



DTX-1000

DDX-2-Scott.0026

Wilson was retained by PMMC in or about August of 1991 to assist in commercializing and marketing its patent rights covering "personalized television." [See id. ¶ 4]. As part of his responsibilities in that role, Wilson developed several business plans for the company. [Id. ¶ 5]. The purpose of the business plans was to familiarize other companies or individuals with PMMC and to assist in the commercialization of its patent portfolio. Wilson assisted in developing a commercialization strategy and a corporate and management development strategy. [See id. ¶ 5-6].

Wilson also acted as an intermediary or "point person" for PMMC in contacting various business entities with which he was familiar from prior business experience, and which he considered to be likely candidates for direct or indirect financial support roles to PMMC. [Id. ¶¶ 6, 9-10]. In this role, Wilson was the principal representative of the company with regard to certain of its marketing activities. [See id. ¶ 8]. In fact, for this purpose, Wilson carried a PMMC business card which identified him as the company's "Venture Manager." [Id.].

PMCAPL01009066 at 083-084



PMCAPL01009066

**PMMC Attributes and Benefits**

Among the principle attributes and benefits of PMMC are:

Proprietary Position. The hardware, methods of operation, software and firmware required to implement PMM communications, automation, metering and monitoring are protected by a portfolio of patents, pending patents, proprietary know-how, business and trade secrets, market research and application descriptions covered by copyright, and the combined expertise of the management and consultants responsible to the company. Among its issued and pending patents are several that PMMC believes to be "seminal" and market defining. This position assures the Company the ability to set industry standards and protocols, define markets, assign market share, control distribution channels and extract substantial licensing fees and royalty payments.

PMMC believes that its intellectual property position will enable it to exercise far-reaching market control for as long as 30 to 50 years.

DTX-1000.0005



DTX-1000

# ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC.

SUITE NUMBER TWO
16845 KERCHEVAL AVENUE
GROSSE POINTE, MICHIGAN 48230 U.S.A.

TELEPHONE (313) 884-3427
TELECOPIER (313) 884-8457

May 6, 1994

Mr. Robert N. Caird
Senior Vice President
Corporate Development
The Personalized Mass
Media Corporation
333 East 57th Street
New York, New York 10022

**FACSIMILE TRANSMISSION**
To: (212) 980-9774
Total pages: 4

DTX-0099.0001



DTX-0099

DDX-2-Scott.0029

Dear Bob:

This is in response to your request that we provide you with some alternative proposals on how PMMC can generate revenue from the PMMC patent portfolio. In general, there are three approaches PMMC can take, i.e. selling the patents outright, pure patent licensing, or commercial development. The relationship of our firm (St. Clair) with PMMC will vary, depending on the method PMMC chooses to exploit its patent rights.

DTX-0099.0001



DTX-0099

DDX-2-Scott.0030

The amount of revenue generated from a patent licensing program is entirely dependent on the amount of infringement. A patent licensing program will be most effective when it is launched after widespread infringement of the subject patents has been established. Once infringement becomes widespread in an industry, the patented technology becomes so deeply embedded in commercial products that design around is not an option to infringers.

DTX-0099.0002



DTX-0099

The amount of revenue generated from a patent licensing program is entirely dependent on the amount of infringement. A patent licensing program will be most effective when it is launched after widespread infringement of the subject patents has been established. Once infringement becomes widespread in an industry, the patented technology becomes so deeply embedded in commercial products that design around is not an option to infringers.

DTX-0099.0002



DTX-0099

==The better strategy may be to keep the PMMC patents hidden while industry infringement is quietly monitored. PMMC could then roll out the patents to the industry at an appropriate time in the future, after the PMMC technology has been widely adopted.==

To the extent this strategy is adopted by PMMC, it should be coordinated with advice from patent counsel on the legal doctrine of "Laches." This doctrine essentially places a time limit on the patent holder to enforce its patent rights against infringers for past damages, commencing on the date of first knowledge of infringement. The concept of Laches is similar to that of a statute of limitations.

DTX-0099.0003



DTX-0099

**SPM draft 9/12/91 11:00AM**
[file: JOINT.VEN]

CONFIDENTIAL

APPENDIX D

POTENTIAL PARTNERS/CO-VENTURERS/CONSORTIUM MEMBERS



DTX-169

DDX-2-Scott.0034

CONFIDENTIAL

**SPM draft 9/12/91 11:00AM**
[file: JOINT.VEN]

**APPENDIX D**

**POTENTIAL PARTNERS/CO-VENTURERS/CONSORTIUM MEMBERS**



DTX-169

**In some cases markets had yet not matured** to benefit from applications of the Company's technologies. During this period, **therefore, the Company had deliberately chosen not to publicize widely its technologies or plans.**

DTX-169.0001

DDX-2-Scott.0035

COMPUTER HARDWARE MANUFACTURERS. Basic personal computers (e.g., the IBM PC) have become widely cloned commodity items. New extended computing technologies (e.g., "multimedia computing" and "network computing") are developing, but no one has achieved a proprietary position strong enough to set standards. PMMC's technologies

- INTEL (manufactures the proprietary series of microprocessors that provide the CPU core of the IBM PC series of personal computers and their clones)

- IBM (world's largest computer hardware manufacturer)

- Apple (widely credited with launching the microcomputer revolution by fostering an open architecture)

- Others (Many other companies such as Sun, Compaq, Hewlett Packard, Digital Equipment and AT&T manufacture computer hardware.)

DTX-169.0005-6



DTX-169



DDX-2-Scott.0037



DDX-2-Scott.0038

# MEMORANDUM

**To:**   Robert C. Scheinfeld

**From:**   Thomas J. Scott, Jr.

**Re:**   Chronology of PMC Efforts to Expedite Prosecution Of Its Pending Applications Between 1995-2010

**Date:**   July 15, 2015

DTX-274.0001



DTX-274



DTX-274

## B.   PMC's Response to the GATT Amendments

In the period after the issuance of U.S. Patent No. 5,335,277 on August 4, 1994, PMC came to understand that the United States' adherence to the results of the Uruguay Round negotiations conducted under the framework of the General Agreement on Tariffs and Trade ("GATT") would modify the patent term to a significant degree. Accordingly, the Harvey applicants conducted a detailed study of the disclosures of both the Original 1981 Application and 1987 CIP Application. This study led to their determination that both applications disclosed many separate and distinct inventions which had not yet been patented. Accordingly, between March 2, 1995 and June 7, 1995 PMC filed 328 applications claiming priority either to the 1981 priority date of the Original 1981 Application or the 1987 priority date of the 1987 CIP Application. Each such applications contained a claim or claims identifying a separate and distinct invention to which it was addressed. PMC's reason for filing some 300 - odd applications was that the Patent and Trademark Office ("PTO") has issued guidance in 37 C.F.R. §129(b) to the effect that a Restriction Requirement could be imposed in any pre-GATT filed application with numerous claims if the failure to present those claims earlier was the result of the applicants' conduct. The imposition of such a Restriction Requirement could cause PMC to lose rights in many of its valuable distinct inventions. PMC understood the PTO to be taking the position that the submission of a large number of claims in a single application addressed to many separate aspects of the same disclosure would constitute "conduct by the applicant" within the meaning of PTO Rule 129.

DTX-274.0001-2

## B.   PMC's Response to the GATT Amendments

In the period after the issuance of U.S. Patent No. 5,335,277 on August 4, 1994, PMC came to understand that the United States' adherence to the results of the Uruguay Round negotiations conducted under the framework of the General Agreement on Tariffs and Trade ("GATT") would modify the patent term to a significant degree. Accordingly, the Harvey applicants conducted a detailed study of the disclosures of both the Original 1981 Application and 1987 CIP Application. This study led to their determination that both applications disclosed many separate and distinct inventions which had not yet been patented. Accordingly, between March 2, 1995 and June 7, 1995 PMC filed 328 applications claiming priority either to the 1981 priority date of the Original 1981 Application or the 1987 priority date of the 1987 CIP Application. Each such applications contained a claim or claims identifying a separate and distinct invention to which it was addressed. PMC's reason for filing some 300 - odd applications was that the Patent and Trademark Office ("PTO") has issued guidance in 37 C.F.R. §129(b) to the effect that a Restriction Requirement could be imposed in any pre-GATT filed application with numerous claims if the failure to present those claims earlier was the result of the applicants' conduct. The imposition of such a Restriction Requirement could cause PMC to lose rights in many of its valuable distinct inventions. PMC understood the PTO to be taking the position that the submission of a large number of claims in a single application addressed to many separate aspects of the same disclosure would constitute "conduct by the applicant" within the meaning of PTO Rule 129.

DTX-274.0001-2



DTX-274

## B.  PMC's Response to the GATT Amendments

In the period after the issuance of U.S. Patent No. 5,335,277 on August 4, 1994, PMC came to understand that the United States' adherence to the results of the Uruguay Round negotiations conducted under the framework of the General Agreement on Tariffs and Trade ("GATT") would modify the patent term to a significant degree. Accordingly, the Harvey applicants conducted a detailed study of the disclosures of both the Original 1981 Application and 1987 CIP Application. This study led to their determination that both applications disclosed many separate and distinct inventions which had not yet been patented. Accordingly, between March 2, 1995 and June 7, 1995 PMC filed 328 applications claiming priority either to the 1981 priority date of the Original 1981 Application or the 1987 priority date of the 1987 CIP Application. Each such applications contained a claim or claims identifying a separate and distinct invention to which it was addressed. PMC's reason for filing some 300 - odd applications was that the Patent and Trademark Office ("PTO") has issued guidance in 37 C.F.R. §129(b) to the effect that a Restriction Requirement could be imposed in any pre-GATT filed application with numerous claims if the failure to present those claims earlier was the result of the applicants' conduct. The imposition of such a Restriction Requirement could cause PMC to lose rights in many of its valuable distinct inventions. PMC understood the PTO to be taking the position that the submission of a large number of claims in a single application addressed to many separate aspects of the same disclosure would constitute "conduct by the applicant" within the meaning of PTO Rule 129.

DTX-274.0001-2



DTX-274

PMMC believes that its materials filed at the USPTO disclose many inventions besides those upon which it has received U.S. patents. PMMC plans to apply for coverage on these additional inventions and believes that it will receive more U.S. patent coverage on its broad technologies. (For a broader description of the PMMC technologies, see Appendix G.)

DTX-90.00028



DTX-90

DDX-2-Scott.0043

29.     Between March 2, 1995, and June 7, 1995, in advance of the GATT change in patent term rules, ==PMC filed 328 applications claiming priority to either the '510 application or the '096 application.  Each of these 328 applications was filed with a single claim to a "method of controlling the communication of television programming at a television transmission station…."== PMC contemporaneously or subsequently filed preliminary amendments that added additional claims and limitations in these applications.

Dkt. 623, Fact Stip. 29

Dkt. 623

DDX-2-Scott.0044

29.     Between March 2, 1995, and June 7, 1995, in advance of the GATT change in patent term rules, PMC filed 328 applications claiming priority to either the '510 application or the '096 application.  Each of these 328 applications was filed with a single claim to a "method of controlling the communication of television programming at a television transmission station…."  ==PMC contemporaneously or subsequently filed preliminary amendments that added additional claims and limitations in these applications.==

Dkt. 623, Fact Stip. 29

Dkt. 623

# '507 Application – December 10, 1996 Office Action

3. Applicants are reminded of their duty to maintain a line of patentable demarcation between related applications. It has been noted by the PTO that many of the pending applications have similar claimed subject matter. In the related 327 applications (the serial numbers are included in a list below), it is estimated that there may be between **10,000 and 20,000 claims.** Applicants should insure that substantially duplicate claims do not appear in different cases, and should bring to the PTO's attention instances where similar claims have been treated inconsistently, i.e. rejected in one case but not in another.

DTX-1494.0792-793 (12/10/96 Office Action)

12/10/96

1995        2000        2005        2010

# '507 Application – December 10, 1996 Office Action



> A review of the claims in the related copending applications was made. These claims do not appear independent and distinct from the claims in this application. It is believed that CCPA in *Schneller* used the "independent and distinct" standard as the main factor in its determination that the double patenting rejection should be affirmed. The relevant arguments in the preceding paragraphs in support of this position are incorporated herein.
>
> 12. It is acknowledged that a multiplicity rejection was mailed on July 27, 1989 in parent file 07/096,096. In this rejection, the examiner had limited the applicants to 25 claims.

DTX-1494.0806 (12/10/96 Office Action)

**12/10/96**

1995          2000          2005          2010

# '507 Application – December 10, 1996 Office Action

3. **Applicants are reminded of their duty to maintain a line of patentable demarcation between related applications.** It has been **noted by the PTO that many of the pending applications have similar claimed subject matter.** In the related 327 applications (the serial numbers are included in a list below), it is estimated that there may be between 10,000 and 20,000 claims. Applicants should insure that substantially duplicate claims do not appear in different cases, and should bring to the PTO's attention instances where similar claims have been treated inconsistently, i.e. rejected in one case but not in another.

DTX-1494.0792-793 (12/10/96 Office Action)

**12/10/96**

1995      2000      2005      2010

# '507 Application – July 7, 1998 Office Action

**DOUBLE PATENTING BETWEEN APPLICATIONS**

4. Conflicts exist between claims of the following related co-pending applications which includes the present application:

DTX-1494.0893



DTX-1494.0893-898

5. 37 CFR 1.78(b) provides that when two or more applications filed by the same applicant contain conflicting claims, elimination of such claims from all but one application may be required in the absence of good and sufficient reason for their retention during pendency in more than one application. The attached Appendix provides clear evidence that such conflicting claims exist between the 329 related co-pending applications identified above. However, an analysis of all claims in the 329 related co-pending applications would be an extreme burden on the Office requiring millions of claim comparisons.

DTX-1494.0898-899

**7/7/98**

1995　　　2000　　　2005　　　2010

DDX-2-Scott.0049

# '507 Application – July 7, 1998 Office Action

**DOUBLE PATENTING BETWEEN APPLICATIONS**

4. Conflicts exist between claims of the following related co-pending applications which includes the present application:

DTX-1494.0893



DTX-1494.0893-898

5. 37 CFR 1.78(b) provides that when two or more applications filed by the same applicant contain conflicting claims, elimination of such claims from all but one application may be required in the absence of good and sufficient reason for their retention during pendency in more than one application. The attached Appendix provides clear evidence that such conflicting claims exist between the 329 related co-pending applications identified above. However, an analysis of all claims in the 329 related co-pending applications would be an extreme burden on the Office requiring millions of claim comparisons.

DTX-1494.0898-899

**7/7/98**

1995     2000     2005     2010

DDX-2-Scott.0050

# '507 Application – March 21, 2001 Office Action

In fact, under 37 C.F.R. § 1.63 and § 1.56, the applicants are required to 1) review and understand the contents of each specification, including all claims and amendments, and 2) eliminate conflicting claims or notify the Office of conflicting claims. Upon review by the Office of a sampling of the specifications and the thousands of claims, it is a fact that some of the claims are conflicting. Assuming the oaths made under 37 C.F.R. § 1.63, are sound, then the applicants must not be familiar with their own applications.

DTX-1494.0933

**3/21/01**

1995　　　　　2000　　　　　2005　　　　　2010

DDX-2-Scott.0051

# '507 Application – March 21, 2001 Office Action



As the applicants assert, a substantive rule is one that "affects individual rights and obligations." Animal Legal Defense Fund, et al. v. Quigg, et al., 932 F.2d 920, 927 (Fed. Cir. 1991). The applicants identify no statutory "right" that the Administrative Requirement abrogates. The applicants cannot credibly argue they have a "right" to file conflicting claims, or to be unaware of the contents of their own specifications, amendments, or claims. The applicants have no "right" to fail to remove conflicting claims from co-pending applications, and certainly, the applicants have no "right" to fail to notify the Office of conflicting claims. The applicants also have no "right" to shop among the USPTO examiners for conflicting interpretations of the applicants' claims, as implied by the petition under 37 C.F.R. § 1.181, filed on March 7, 2000, in co-pending application no. 08/470,571, which demands an exercise of the supervisory authority of the Commissioner. See the co-pending application no. 08/470,571, Petition at page 32 lines 10-12.

DTX-1494.0935-936

**3/21/01**

1995          2000          2005          2010

# '620 Application (08/488,620)

# '383 Application (008/480,383)

## June 7, 1995

2.      A method for displaying television program information with a locally generated video overlay at a receiver station having a processor, a decoder, a storage device and a video overlay generator, said method comprising the steps of:

receiving a signal that identifies a television program presentation at a receiver station;

decoding said signal from said step of receiving to extract information about said television program presentation;

processing said information from said step of decoding to format said information to provide an organized presentation of said information;

generating a video overlay from said organized information from said step of processing; receiving said television program that is associated with said signal in said step of decoding;

combining said video overlay from said step of generating with said television program from said step of receiving said television program; and

outputting said combined signal from said receiver station to a television display to display said combined image showing said video overlay containing data associated with programming presentation and said television program.

DTX-1566.0598-0599

## June 7, 1995

2.      A method for displaying television program information with a locally generated video overlay at a receiver station having a processor, a decoder, a storage device and a video overlay generator, said method comprising the steps of:

receiving a signal that identifies a television program presentation at a receiver station;

decoding said signal from said step of receiving to extract information about said television program presentation;

processing said information from said step of decoding to format said information to provide an organized presentation of said information;

generating a video overlay from said organized information from said step of processing; receiving said television program that is associated with said signal in said step of decoding;

combining said video overlay from said step of generating with said television program from said step of receiving said television program; and

outputting said combined signal from said receiver station to a television display to display said combined image showing said video overlay containing data associated with programming presentation and said television program.

DTX-1560.0600-601

**6/7/95**

1995          2000          2005          2010

DDX-2-Scott.0053

# '507 Application – November 2, 2010 PMC Letter

328 applications are continuations of 08/056,501:
227 have been abandoned through consolidation and prosecution:
100 remain pending: 54 other "A" applications, 55 "B" applications, and 08/444,788;
1 issued: Application No. 08/480,060 issued as U.S. Patent 5,887,243 on March 23, 1999.

DTX-1568 at 1538 (11/2/10 PMC Letter)



**11/2/10**

1995          2000          2005          2010

DDX-2-Scott.0054

# '507 Application – July 7, 1998 Office Action

Serial Number: 08/485,507 -10-
Art Unit: 2733

6. Receipt is acknowledged of applicant's Information Disclosure Statements filed April 7, 1997. In view of the unusually large number of references cited in the instant application (approximately 2,200 originally and 645 in the subsequent IDS) and the failure of applicant to point out why such a large number of references is warranted, these references have been considered in accordance with 37 C.F.R. 1.97 and 1.98 to the best ability by the examiner with the time and resources available.

The foreign language references cited therein where there is no statement of relevance or no translation are not in compliance with 37 C.F.R. 1.98 and have not been considered. Numerous references listed in the IDS are subsequent to applicant's latest effective filing date of 9/11/87, therefore, the relevancy of these references is unclear. Also cited are numerous references that are apparently unrelated to the subject matter of the instant invention such as: US Patent # 33,189 directed toward a beehive, GB 1565319 directed toward a chemical compound, a cover sheet with only the word "ZING", a computer printout from a library search with the words "LST" on it and a page of business cards including that of co-inventor James Cuddihy, among others. The relevancy of these references cannot be ascertained. Furthermore, there are several database search results listed in foreign languages (such as German) which list only the title and document information; no copy has been provided, therefore, these references have not been considered.

DTX-1494.0900

6. Receipt is acknowledged of applicant's Information Disclosure Statements filed April 7, 1997. In view of the **unusually large** number of references cited in the instant application (approximately 2,200 originally and 645 in the subsequent IDS) and the failure of applicant to point out why such a large number of references is warranted, these references have been considered in accordance with 37 C.F.R. 1.97 and 1.98 to the best ability by the examiner with the time and resources available.

DTX-1494.0900 (7/7/98 Office Action)

**7/7/98**

1995    2000    2005    2010

DDX-2-Scott.0055

# '507 Application – July 7, 1998 Office Action

Serial Number: 08/485,507                                    -10-
Art Unit: 2733

6.    Receipt is acknowledged of applicant's Information Disclosure Statements filed April 7, 1997. In view of the unusually large number of references cited in the instant application (approximately 2,200 originally and 645 in the subsequent IDS) and the failure of applicant to point out why such a large number of references is warranted, these references have been considered in accordance with 37 C.F.R. 1.97 and 1.98 to the best ability by the examiner with the time and resources available.

The foreign language references cited therein where there is no statement of relevance or no translation are not in compliance with 37 C.F.R. 1.98 and have not been considered. Numerous references listed in the IDS are subsequent to applicant's latest effective filing date of 9/11/87, therefore, the relevancy of these references is unclear. Also cited are numerous references that are apparently unrelated to the subject matter of the instant invention such as: US Patent # 33,189 directed toward a beehive, GB 1565319 directed toward a chemical compound, a cover sheet with only the word "ZING", a computer printout from a library search with the words "LST" on it and a page of business cards including that of co-inventor James Cuddihy, among others. The relevancy of these references cannot be ascertained. Furthermore, there are several database search results listed in foreign languages (such as German) which list only the title and document information; no copy has been provided, therefore, these references have not been considered.

DTX-1494.0900

---

been considered. **Numerous references listed in the IDS are subsequent to applicant's latest effective filing date of 9/11/87, therefore, the relevancy of these references is unclear.** Also cited are numerous references that are apparently unrelated to the subject matter of the instant invention such as: US Patent # 33,189 directed toward a beehive, GB 1565319 directed toward a chemical compound, a cover sheet with only the word "ZING", a computer printout from a library search with the words "LST" on it and a page of business cards including that of co-inventor James Cuddihy, among others. The relevancy of these references cannot be ascertained.

DTX-1494.0900 (7/7/98 Office Action)

**7/7/98**

1995        2000        2005        2010

DDX-2-Scott.0056

# '507 Application – July 7, 1998 Office Action

Serial Number: 08/485,507
Art Unit: 2733
-10-

6. Receipt is acknowledged of applicant's Information Disclosure Statements filed April 7, 1997. In view of the unusually large number of references cited in the instant application (approximately 2,200 originally and 645 in the subsequent IDS) and the failure of applicant to point out why such a large number of references is warranted, these references have been considered in accordance with 37 C.F.R. 1.97 and 1.98 to the best ability by the examiner with the time and resources available.

The foreign language references cited therein where there is no statement of relevance or no translation are not in compliance with 37 C.F.R. 1.98 and have not been considered. Numerous references listed in the IDS are subsequent to applicant's latest effective filing date of 9/11/87, therefore, the relevancy of these references is unclear. Also cited are numerous references that are apparently unrelated to the subject matter of the instant invention such as: US Patent # 33,189 directed toward a beehive, GB 1565319 directed toward a chemical compound, a cover sheet with only the word "ZING", a computer printout from a library search with the words "LST" on it and a page of business cards including that of co-inventor James Cuddihy, among others. The relevancy of these references cannot be ascertained. Furthermore, there are several database search results listed in foreign languages (such as German) which list only the title and document information; no copy has been provided, therefore, these references have not been considered.

DTX-1494.0900

---

been considered. Numerous references listed in the IDS are subsequent to applicant's latest effective filing date of 9/11/87, therefore, the relevancy of these references is unclear. Also cited are numerous references that are apparently unrelated to the subject matter of the instant invention such as: US Patent # 33,189 directed toward a beehive, GB 1565319 directed toward a chemical compound, a cover sheet with only the word "ZING", a computer printout from a library search with the words "LST" on it and a page of business cards including that of co-inventor James Cuddihy, among others. The relevancy of these references cannot be ascertained.

DTX-1494.0900 (7/7/98 Office Action)

---

7/7/98

1995　　2000　　2005　　2010

DDX-2-Scott.0057

# '507 Application – July 7, 1998 Office Action

Serial Number: 08/485,507     -10-
Art Unit: 2733

6.    Receipt is acknowledged of applicant's Information Disclosure Statements filed April 7, 1997. In view of the unusually large number of references cited in the instant application (approximately 2,200 originally and 645 in the subsequent IDS) and the failure of applicant to point out why such a large number of references is warranted, these references have been considered in accordance with 37 C.F.R. 1.97 and 1.98 to the best ability by the examiner with the time and resources available.

The foreign language references cited therein where there is no statement of relevance or no translation are not in compliance with 37 C.F.R. 1.98 and have not been considered. Numerous references listed in the IDS are subsequent to applicant's latest effective filing date of 9/11/87, therefore, the relevancy of these references is unclear. Also cited are numerous references that are apparently unrelated to the subject matter of the instant invention such as: US Patent # 33,189 directed toward a beehive, GB 1565319 directed toward a chemical compound, a cover sheet with only the word "ZING", a computer printout from a library search with the words "LST" on it and a page of business cards including that of co-inventor James Cuddihy, among others. The relevancy of these references cannot be ascertained. Furthermore, there are several database search results listed in foreign languages (such as German) which list only the title and document information; no copy has been provided, therefore, these references have not been considered.

DTX-1494.0900

been considered. Numerous references listed in the IDS are subsequent to applicant's latest effective filing date of 9/11/87, therefore, the relevancy of these references is unclear. Also cited are numerous references that are apparently unrelated to the subject matter of the instant invention such as: US Patent # 33,189 directed toward a beehive, GB 1565319 directed toward a chemical compound, a cover sheet with only the word "ZING", a computer printout from a library search with the words "LST" on it and a page of business cards including that of co-inventor James Cuddihy, among others. The relevancy of these references cannot be ascertained.

DTX-1494.0900 (7/7/98 Office Action)

7/7/98

1995          2000          2005          2010

DDX-2-Scott.0058



DDX-2-Scott.0059

## John Harvey Testimony

Q. Were you aware that a meeting occurred between Don Wilson and Tom Scott?

A. I am aware that a meeting occurred.

Q. What was your understanding of the purpose of the meeting?

A. Mr. Wilson was in Washington and wanted to learn more about our patent position from Mr. Scott.

Harvey testimony: 5/13/97 at 1074:7-14

DDX-2-Scott.0063

John Harvey first consulted with H. Donald Wilson Inc. in 1980 at which time HDWI suggested that he test his ideas through the formation of a business financed by friends and professional associates, which he did over the ensuing years. In August, 1991 with its patents secured and much preliminary strategic thinking and industry exploration accomplished, PMMC retained HDWI in a best efforts undertaking to assist it develop a refined business strategy, together with a "first cut" at the financial potential of PMMC's inventions and to derive from the effort a structuring of the development for management and investment purposes.

DTX-90.0008



DTX-90

DDX-2-Scott.0064

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SECOND MOTION TO COMPEL DISCOVERY

Harris D. Butler, III (Va. Bar No. 26482)
Charles L. Williams (Va. Bar No. 23587)
William J. Pantele (Va. Bar No. 22860)
BUTLER, MACON, WILLIAMS,
 PANTELE & LOWNDES, P.C.
1309 East Cary Street, Second Floor
Richmond, VA  23219
(804) 648-4848

Jon F. Tuttle
Stewart D. Aaron
DORSEY & WHITNEY, P.L.L.P.
Suite 200
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 857-0700

Counsel for Plaintiff
Personalized Mass Media Corporation

Dated: November 11, 1995

PMCAPL01009066



PMCAPL01009066

**B.      The consulting roles of H. Donald Wilson and Dennis Elliott.**

\*          \*          \*

Wilson was retained by PMMC in or about August of 1991 to assist in

commercializing and marketing its patent rights covering "personalized television."

[See id.  ¶ 4]. As part of his responsibilities in that role, Wilson developed several

business plans for the company.  [Id. ¶ 5]. The purpose of the business plans was to

familiarize other companies or individuals with PMMC and to assist in the

commercialization of its patent portfolio.  Wilson assisted in developing a

commercialization strategy and a corporate and management development strategy.

PMCAPL01009082-83



PMCAPL01009066

DDX-2-Scott.0066



PMCAPL01009066

Wilson also acted as an intermediary or "point person" for PMMC in contacting various business entities with which he was familiar from prior business experience, and which he considered to be likely candidates for direct or indirect financial support roles to PMMC. [Id. ¶¶ 6, 9-10]. In this role, Wilson was the principal representative of the company with regard to certain of its marketing activities. [See id. ¶ 8]. In fact, for this purpose, Wilson carried a PMMC business card which identified him as the company's "Venture Manager." [Id.].

PMCAPL01009083-084

## Highlights of Meeting of Don Wilson with Tom Scott
## October 15, 1992

DTX-1001.0001



DTX-1001

DDX-2-Scott.0068



AO 88 (11/91) Subpoena in a Civil Case

| | | PROOF OF SERVICE | |
|---|---|---|---|
| | DATE | PLACE | |
| SERVED | 11/6/95 | H. Donald Wilson, Inc. 70 West Red Oak Lane White Plains NY 10604 | |



## DOCUMENTS AND THINGS REQUESTED

1.  All of H. Donald Wilson Inc.'s files and the contents thereof pertaining to work or services provided to, for, or on behalf of PMMC.

2.  All documents in H. Donald Wilson Inc.'s files reflecting, recording, or referring to communications between H. Donald Wilson Inc. and PMMC.

PMCAPL00795071-72

PMCAPL00795071

DDX-2-Scott.0069

November 10, 1995

**VIA FACSIMILE**

Conrad M. Shumadine, Esquire
Willcox & Savage
1800 Nations Bank Center
Norfolk, VA   23510-2197

        Re:    Personalized Mass Media Corp. v. The Weather
                   Channel, Inc. et al.
                   <u>Civil Action No. 3:95CV859</u>

Dear Conrad:

      I enclose the privilege log pertaining and supplementary to the H. Donald
Wilson, Inc. subpoena.

                                       PMCAPL00514217



PMCAPL00514217

## DOCUMENTS WITHHELD BASED ON PRIVILEGE

| DATE | # PGS. | TO | FROM | DESCRIPTION | REASON FOR PRIVILEGE |
|------|--------|-----|------|-------------|----------------------|
| 10/15/92 | 1 | | D. Wilson | Notes of meeting with counsel re: potential litigation. | AC/WP |

                                       PMCAPL00514218

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SECOND MOTION TO COMPEL DISCOVERY

Harris D. Butler, III (Va. Bar No. 26482)
Charles L. Williams (Va. Bar No. 23587)
William J. Pantele (Va. Bar No. 22860)
BUTLER, MACON, WILLIAMS,
 PANTELE & LOWNDES, P.C.
1309 East Cary Street, Second Floor
Richmond, VA   23219
(804) 648-4848

Jon F. Tuttle
Stewart D. Aaron
DORSEY & WHITNEY, P.L.L.P.
Suite 200
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 857-0700

Counsel for Plaintiff
Personalized Mass Media Corporation

Dated: November 11, 1995

PMCAPL01009066



PMCAPL01009066



PMCAPL01009066

==Wilson considered himself a representative of PMMC when he met== ==with Mr. Scott== regarding these issues and he also considered that they were central to his responsibilities in marketing PMMC patents. [See id. ¶ 15]. These discussions were confidential and have remained confidential. [See id. ¶¶ 15-16]. Other than employees of PMMC and PMMC's legal representatives, Wilson has not disseminated any legal advice or information received from Mr. Scott during the one-time meeting. [Id. ¶ 16]. ==The sole document withheld from Wilson's== ==production concerns a summary of this meeting.==

PMCAPL01009084

DDX-2-Scott.0072

In his role as a representative of PMMC with these potential investors or joint venturers, Wilson believed he needed a better understanding of PMMC's patent portfolio and legal rights, including the nature of the enforceability of those patents either through licensing, or if necessary, litigation. [Id. ¶ 11]. Accordingly, at the direction and with the approval of John Harvey, Wilson met with PMMC's patent counsel, Mr. Thomas J. Scott, Jr., in October of 1992. [See id. ¶ 11]. Mr. Harvey considered this briefing to be important to the duties Wilson was performing on behalf of PMMC. [Id.]. Among other things, Wilson was concerned that by contacting certain businesses which might be involved in the technology claimed under PMMC's patents, his role as a representative of the company might be misunderstood. Wilson did not want these businesses to think he was asserting that their activities constituted infringement of PMMC's patents. [Id. ¶ 12].

PMCAPL01009084



PMCAPL01009066

DDX-2-Scott.0073

==Wilson considered himself a representative of PMMC when he met== ==with Mr. Scott== regarding these issues and he also considered that they were central to his responsibilities in marketing PMMC patents. [See id. ¶ 15]. These discussions were confidential and have remained confidential. [See id. ¶¶ 15-16]. Other than employees of PMMC and PMMC's legal representatives, Wilson has not disseminated any legal advice or information received from Mr. Scott during the one-time meeting. [Id. ¶ 16]. The sole document withheld from Wilson's production concerns a summary of this meeting.

PMCAPL01009084



PMCAPL01009066

DDX-2-Scott.0074

Wilson also acted as an intermediary or "point person" for PMMC in contacting various business entities with which he was familiar from prior business experience, and which he considered to be likely candidates for direct or indirect financial support roles to PMMC. [Id. ¶¶ 6, 9-10]. In this role, Wilson was the principal representative of the company with regard to certain of its marketing activities. [See id. ¶ 8]. In fact, for this purpose, Wilson carried a PMMC business card which identified him as the company's "Venture Manager." [Id.].

PMCAPL01009083-084



PMCAPL01009066



PMCAPL01009066

The <u>Bieter</u> analysis is directly applicable to the instant case. Both ==Wilson== and Elliott ==worked intimately with senior PMMC officers on matters of importance to the success of the corporation. Both consultants were representatives of the company in these activities.== PMMC, a small corporation, relied extensively on them in this regard. Both men communicated with PMMC's patent counsel, Mr. Scott, at the direction of Mr. Harvey or other senior PMMC officers. These communications were for the express purpose of receiving legal advice as part of their work for the company, or to communicate essential information to Mr. Scott to enable him to provide legal advice to PMMC with regard to their patent rights. The communications were limited to the matters central to the issues for which PMMC had employed both men, and were made in the strictest confidence, which has been maintained at all times. Accordingly, the attorney client privilege applies to their documents.

PMCAPL01009095

The <u>Bieter</u> analysis is directly applicable to the instant case. Both Wilson and Elliott worked intimately with senior PMMC officers on matters of importance to the success of the corporation. Both consultants were representatives of the company in these activities. PMMC, a small corporation, relied extensively on them in this regard. Both men communicated with PMMC's patent counsel, Mr. Scott, at the direction of Mr. Harvey or other senior PMMC officers. These communications were for the express purpose of receiving legal advice as part of their work for the company, or to communicate essential information to Mr. Scott to enable him to provide legal advice to PMMC with regard to their patent rights. The communications were limited to the matters central to the issues for which PMMC had employed both men, and were made in the strictest confidence, which has been maintained at all times. Accordingly, the attorney client privilege applies to their documents.

PMCAPL01009066

PMCAPL01009095

DDX-2-Scott.0077

The Bieter analysis is directly applicable to the instant case. Both Wilson and Elliott worked intimately with senior PMMC officers on matters of importance to the success of the corporation. Both consultants were representatives of the company in these activities. PMMC, a small corporation, relied extensively on them in this regard. Both men communicated with PMMC's patent counsel, Mr. Scott, at the direction of Mr. Harvey or other senior PMMC officers. These communications were for the express purpose of receiving legal advice as part of their work for the company, or to communicate essential information to Mr. Scott to enable him to provide legal advice to PMMC with regard to their patent rights. The communications were limited to the matters central to the issues for which PMMC had employed both men, and were made in the strictest confidence, which has been maintained at all times. Accordingly, the attorney client privilege applies to their documents.

PMCAPL01009095

PMCAPL01009066

DDX-2-Scott.0078

**Patent Strategy:**

Maximize value:     Get investment and execute business concept.

Minimum value:     Stay quiet and fire torpedoes when others commercialize. Based upon John's numbers, this is worth millions of dollars.

DTX-1001.0001



DTX-1001

# '507 Application Claims



# Fact Stipulation 38

38.    PMC filed a preliminary amendment to the '507 application on June 7, 1995, canceling claim 1 and adding claim 2.

DKT-623 at 9



DKT-623

DDX-2-Scott.0081

# Fact Stipulation 39

39.    PMC filed a supplemental preliminary amendment to the '507 application on June 5, 1996, canceling claim 2 and adding claims 3-9.

DKT-623 at 9



DKT-623

# Fact Stipulation 43

43.    PMC amended claims 3-9 and added claims 10-32 in its June 10, 1997 response to the first office action.

DKT-623 at 10



DKT-623

# Fact Stipulation 46

46.    In a May 9, 2000 Supplemental Amendment, PMC cancelled all pending claims of the '507 application except for claim 3, and amended claim 3. PMC requested that "in consonance with the agreement between Applicants and the Office," certain claims in the '507 application would be transferred to application, Serial No. 08/475,145 (the "'145 application") for further prosecution and "that further prosecution of the instant application be held in abeyance pending further action in App. Ser. No. 08/474,145."

DKT-623 at 10



DKT-623

DDX-2-Scott.0084

# Fact Stipulation 46

46.    In a May 9, 2000 Supplemental Amendment, PMC cancelled all pending claims of the '507 application except for claim 3, and amended claim 3. PMC requested that "in consonance with the agreement between Applicants and the Office," certain claims in the '507 application would be transferred to application, Serial No. 08/475,145 (the "'145 application") for further prosecution and "that further prosecution of the instant application be held in abeyance pending further action in App. Ser. No. 08/474,145."

DKT-623 at 10



DKT-623

DDX-2-Scott.0085

# Fact Stipulation 53

> 53.    On June 18, 2002, the examiner stated "as per the consolidated agreement between the applicants and the PTO, the prosecution on merits of the instant B application is suspended and held in abeyance pending the outcome of the corresponding "A" application. Ex parte prosecution is SUSPENDED FOR A PERIOD OF SIX MONTHS from the date of this letter. Upon expiration of the period of suspension, applicant should make an inquiry as to the status of the application."
>
> DKT-623 at 12-13



DKT-623

# Fact Stipulation 61

61.     PMC filed an amendment to the claims in the '507 application on April 11, 2011, adding new claims 33-63 and canceling claim 3.

DKT-623 at 14



DKT-623

DDX-2-Scott.0087

# 091 Patent

## May 29, 2012

13. A method of ==decrypting programming== at a receiver station, said method comprising the steps of:

receiving an ==encrypted digital information== transmission including ==encrypted information;==

detecting in said ==encrypted digital information== transmission the presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a first ==decryption key== by processing said instruct-to-enable signal;

locating said ==first decryption key== based on said step of determining;

==decrypting said encrypted information using said first decryption key;== and

outputting said programming based on said step of decrypting.

DTX-3 ('091 Patent), Claim 13

**5/29/12**

| 1995 | 2000 | 2005 | 2010 |

DDX-2-Scott.0088

# '507 Application

# '091 Patent

## June 7, 1995

IN THE CLAIMS

Please cancel claim 1 and add the following claim:

2.    A method of enabling a presentation of programming at a subscriber station, said subscriber station having at least one receiver for receiving at least part of an information transmission, at least one information enabler for enabling at least some disabled part of an information transmission; and at least one processor, controller, or computer for controlling an information enabler, said method comprising the steps of:

receiving an information transmission from a local or remote source, said information transmission comprising some disabled information;

detecting the presence of an instruct-to-enable signal, with said instruct-to-enable signal designating some enablement information;

passing said instruct-to-enable signal to said processor, controller, or computer; and

modifying a fashion in which said station locates, identifies, or receives enablement information in response to said instruct-to-enable signals, thereby to enable said station to present some disabled information on the basis of some enablement information.

DTX-1494.0604-605

## May 29, 2012

13. A method of **decrypting programming** at a receiver station, said method comprising the steps of:

receiving an **encrypted digital information** transmission including **encrypted information**;

detecting in said **encrypted digital information** transmission the presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a first **decryption key** by processing said instruct-to-enable signal;

locating said **first decryption key** based on said step of determining;

**decrypting said encrypted information using said first decryption key;** and

outputting said programming based on said step of decrypting.

DTX-3 ('091 Patent), Claim 13

6/7/95

5/29/12

1995          2000          2005          2010

DDX-2-Scott.0089



### AMENDMENT TO THE CLAIMS

*Applicants request entering the below amendments to the claims. New claims 33-63 are added. Claim 3 is cancelled. Claims 33-63 are the only pending claims.*

\*           \*           \*

45.     (New)  A method of ==decrypting programming== at a receiver station, said method comprising the steps of:

receiving an information transmission including encrypted information;

detecting presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a first decryption key by processing said instruct-to-enable signal;

locating said first decryption key based on said step of determining;

decrypting said encrypted information using said first decryption key; and

outputting said programming based on said step of decrypting.

DTX-1494.0994, 996 (April 11, 2011 Amendment)

4/11/11

1995         2000         2005         2010



## Index of Claims

| | | |
|---|---|---|
| **Application/Control No.** | **Applicant(s)/Patent Under Reexamination** | |
| 08485507 | HARVEY ET AL. | |
| **Examiner** | **Art Unit** | |
| MICHAEL J MOORE  JR | 2467 | |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant ☐ CPA ☒ T.D. ☐ R.1.47

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 07/25/2011 | 03/06/2012 | | | | | | |
| 5 | 37 | ✓ | = | | | | | | |
| 6 | 38 | ✓ | = | | | | | | |
| 7 | 39 | ✓ | = | | | | | | |
| 8 | 40 | ✓ | = | | | | | | |
| 9 | 41 | ✓ | = | | | | | | |
| 10 | 42 | ✓ | = | | | | | | |
| 11 | 43 | ✓ | = | | | | | | |
| 12 | 44 | ✓ | = | | | | | | |
| 13 | 45 | ✓ | = | | | | | | |

DTX-1494.1412



## 08/485,507 Application – Apr. 11, 2011

Claims 33-63 correspond to various claims of the "A" application with additional amendments that Applicants believe place the claims in condition for allowance. In order to aid the Examiner in understanding the amendments to the claim, Applicants have attached a marked up copy of the claims (Appendix A) indicating the differences between the "A" Claims and the amended form submitted herein as claims 33-63.

Applicants believe that claims 33-63 overcome the prior art, and should place the above-identified patent application in condition for allowance. Applicants respectfully request favorable consideration of the above-identified patent application in view of the following remarks.

DTX-1494.0993

## 08/474,145 "A" Application – Jan. 31, 2003

22. (Twice Amended)   A method of decrypting programming at a receiver station, said method comprising the steps of:

receiving an information transmission including encrypted information;

detecting the presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a first decryption key by processing said instruct-to-enable signal;

locating said first decryption key based on said step of determining;

decrypting said encrypted information using said first decryption key; and

outputting said programming based on said step of decrypting.

DTX-1568.1132

## 08/485,507 "B" Application – Apr. 11, 2011

45. (New)  A method of decrypting programming at a receiver station, said method comprising the steps of:

receiving an information transmission including encrypted information;

detecting presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a first decryption key by processing said instruct-to-enable signal;

locating said first decryption key based on said step of determining;

decrypting said encrypted information using said first decryption key; and

outputting said programming based on said step of decrypting.

DTX-1494.0996

DDX-2-Scott.0094

## 08/474,145 "A" Application – Jan. 31, 2003

22.   (Twice Amended)     A method of decrypting  programming at a receiver station, said method comprising the steps of:

receiving an information transmission including encrypted information;

detecting the presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a first decryption key by processing said instruct-to-enable signal;

locating said first decryption key based on said step of determining;

decrypting said encrypted information using said first decryption key; and

outputting said programming based on said step of decrypting.

DTX-1568.1132

## 08/474,145 "A" Application – Oct. 22, 2010

Claim 22 (Currently amended) A method of decrypting digital television programming at a receiver station in a network including a plurality of receiver stations, said method comprising the steps of:

preprogramming said receiver station with authorization information including a first decryption key at a particular location that varies from station to station in said plurality of receiver stations in accordance with receiver station specific information;

receiving an information transmission including encrypted information programming;

detecting the presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a said first decryption key by processing said instruct-to-enable signal;

locating said first decryption key in said fashion at said particular location based on said step of determining;

decrypting said encrypted information programming using said first decryption key; and

outputting to a user at said receiver station said programming based on said step of decrypting.

DTX-1568.1296

DDX-2-Scott.0095

## 08/485,507 "B" Application – Apr. 11, 2011

45.     (New)  A method of decrypting programming at a receiver station, said method comprising the steps of:

receiving an information transmission including encrypted information;

detecting presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a first decryption key by processing said instruct-to-enable signal;

locating said first decryption key based on said step of determining;

decrypting said encrypted information using said first decryption key; and

outputting said programming based on said step of decrypting.

## 08/485,507 "B" Application – 11/21/2011

45. (**Currently Amended**) A method of decrypting programming at a receiver station, said method comprising the steps of:

receiving an <u>encrypted digital</u> information transmission including encrypted information;

detecting <u>in said encrypted digital information transmission the</u> presence of an instruct-to-enable signal;

passing said instruct-to-enable signal to a processor;

determining a fashion in which said receiver station locates a first decryption key by processing said instruct-to-enable signal;

locating said first decryption key based on said step of determining;

decrypting said encrypted information using said first decryption key; and

outputting said programming based on said step of decrypting.